No. 24-7089

# United States Court of Appeals for the District of Columbia Circuit

---

NATIONAL RAILROAD PASSENGER CORPORATION, (AMTRAK),

*Plaintiff-Appellee,*

v.

SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST MADE AS OF JANUARY 25, 2007, WITH SAID PROPERTY INTEREST PERTAINING TO DESCRIBED LEASEHOLD INTERESTS AT WASHINGTON UNION STATION; UNION STATION SOLE MEMBER, LLC; UNKNOWN OWNERS,

*Defendants-Appellees.*

---

UNION STATION INVESTCO, LLC; KOOKMIN BANK CO., LTD., INDIVIDUALLY AND IN ITS CAPACITY AS TRUSTEE OF KTB CRE DEBT FUND NO. 8, A KOREAN INVESTMENT TRUST,

*Defendants-Appellants.*

---

On Appeal from the United States District Court for the District of Columbia
Docket No. 1:22-cv-010143 (APM)

## APPELLANTS' EMERGENCY MOTION FOR A STAY PENDING APPEAL

Steven J. Willner
NEUBERGER, QUINN, GIELEN, RUBIN
  & GIBBER
One South Street
27th Floor
Baltimore, MD 21202-3282
(410) 332-8542
sjw@nqgrg.com

*Counsel for Appellant*
*Union Station Investco, LLC*

Melissa Arbus Sherry
Christine C. Smith
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com

*Counsel for Appellant*
*Kookmin Bank Co., Ltd.,*
*Individually and in its capacity as*
*Trustee of KTB CRE Debt Fund*
*No. 8, a Korean Investment Trust*

*(additional counsel on inside cover)*

Paul Kiernan
HOLLAND & KNIGHT LLP
800 17th Street, NW
Suite 1100
Washington, DC 20006
(202) 663-7276

Y. David Scharf
Amber R. Will
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022
(212) 735-8604

## TABLE OF CONTENTS

                **Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ..............................................................................1

BACKGROUND .................................................................................4

    A.    Congress Grants Amtrak Limited Eminent-Domain Power ................4

    B.    Congress Orders Private Commercial Development Of Union Station, Producing The Station's Current Lease Structure ..................5

    C.    Amtrak Seeks To Acquire The Interest.................................................6

    D.    Amtrak Moves for Possession...............................................................7

    E.    The Court Grants Immediate Possession ..............................................8

    F.    Congress Objects And Leaseholders Seek A Stay................................9

ARGUMENT ....................................................................................10

I.    APPELLANTS ARE LIKELY TO SUCCEED ON THE MERITS.............11

    A.    This Court Has Jurisdiction Over The Appeal....................................11

    B.    The Court Erred In Holding That Immediate Possession Was "Necessary For Intercity Rail Passenger Transportation" .................12

        1.    The Court Applied The Wrong Necessity Standard.................12

        2.    The Court Misinterpreted The Standard It Purported To Apply.......................................................................................13

    C.    The Court Erred In Treating Amtrak Like The Federal Government And Granting Possession On A Limited Record ..........16

II.    LEASEHOLDERS WILL SUFFER IRREPARABLE HARM ....................18

III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR GRANTING A STAY PENDING APPEAL.................................21

CONCLUSION .................................................................................24

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alcresta Therapeutics, Inc. v. Azar*,
  755 F. App'x 1 (D.C. Cir. 2018)........................................................21

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) ..........................................................19

*Changji Esquel Textile Co. v. Raimondo*,
  40 F.4th 716 (D.C. Cir. 2022)...........................................................10

*Cobell v. Kempthorne*,
  455 F.3d 317 (D.C. Cir. 2006)...........................................................12

*East Tennessee Natural Gas Co. v. Sage*,
  361 F.3d 808 (4th Cir. 2004) ............................................................17

*Garza v. Hargan*,
  No. 17-5236, 2017 WL 4707112 (D.C. Cir. Oct. 19, 2017)...............11

*Monument Realty LLC v. WMATA*,
  540 F. Supp. 2d 66 (D.D.C. 2008)......................................................20

*National Railroad Passenger Corp. (Amtrak) v. 3.44 Acres More or Less of Land & Bldg. Located at 900 2nd St. NE, Washington, DC 20002-3557*,
  266 F. Supp. 3d 63 (D.D.C. 2017)....................................................9, 13

*In re NTE Connecticut, LLC*,
  26 F.4th 980 (D.C. Cir. 2022)...........................................................10

*O'Hagan v. United States*,
  86 F.3d 776 (8th Cir. 1996) ..............................................................20

*Patriot-BSP City Center II v. U.S. Bank N.A.*,
  715 F. Supp. 2d 91 (D.D.C. 2010).....................................................20

*Reed Enterprises v. Corcoran*,
  354 F.2d 519 (D.C. Cir. 1965)...........................................................19

<div align="right">**Page(s)**</div>

*Shvartser v. Lekser*,
    308 F. Supp. 3d 260 (D.D.C. 2018) ................................................ 19

*United States v. Carmack*,
    329 U.S. 230 (1946) ......................................................................... 13

*Washington Metropolitan Area Transit Authority v. One Parcel of Land*,
    514 F.2d 1350 (D.C. Cir. 1975) ..................................................... 11

## STATUTES

28 U.S.C. §1291 ...................................................................................... 11

28 U.S.C. §1292(a)(1) ............................................................................. 11

40 U.S.C. §3114(b)(1) ............................................................................. 17

40 U.S.C. §3115(a) .................................................................................. 17

49 U.S.C. §24311(a)(1) ............................................................................. 4

49 U.S.C. §24311(a)(1)(A) ..........................................................2, 13, 17

49 U.S.C. §24311(a)(1)(B) ..................................................................... 13

49 U.S.C. §24311(a)(2) ............................................................................. 5

Pub. L. No. 97-125, 95 Stat. 1667 (1981) .......................................1, 5, 16

## OTHER AUTHORITIES

*Black's Law Dictionary* (12th ed. 2024) ................................................ 12

D.C. Circuit Handbook of Practices and Internal Procedures (2021) .................... 11

*Hearing of the Subcomm. on Railroads, Pipelines, and Hazardous Materials Before the H. Comm. on Transportation & Infrastructure, Amtrak & Intercity Passenger Rail Oversight: Promoting Performance, Safety, & Accountability* (June 12, 2024), https://transportation.house.gov/calendar/eventsingle.aspx? EventID=407522 ..................................................................................3, 10

*Oxford English Dictionary* (2003, online) ............................................................12

Press Release, Comm. on Oversight and Accountability, *Comer Probes Amtrak's Use of Eminent Domain To Assert Control of D.C.'s Union Station* (June 27, 2024), https://oversight.house.gov/release/comer-probes-amtraks-use-of-eminent-domain-to-assert-control-of-d-c-s-union-station%EF%BF%BC ...................................................................................3, 10

Defendants-Appellants Lender[1] and Union Station Investco, LLC ("USI," together with Lender, "Leaseholders") move for a stay pending appeal to halt the transfer of possession of the Leasehold Interest ("Interest") at Union Station to Amtrak at 12:01 a.m. on July 15, 2024. Dkt.111 (Ex.1); *see* Dkt.106 ("Op.") (Ex.2).[2] Leaseholders notified Amtrak's counsel of this motion on July 5, and Amtrak intends to oppose.

## INTRODUCTION

Union Station is more than a train station. It is a landmark with no parallel. It is a multimodal transportation hub. Visitors and locals shop and eat at its stores and restaurants. And it has been home to Presidential inaugural balls and festivals.

For 40 years, Union Station has been managed by a private commercial entity. That is by congressional design. In 1981, Congress enacted a law to revitalize Union Station as a mixed-use facility, with "maximum reliance on the private sector and minimum requirement for federal assistance." Pub. L. No. 97-125, §2, 95 Stat. 1667, 1667 (1981). That law produced the current lease structure where Amtrak leases space but does not own the Station or manage other spaces aside from its own.

---

[1]  The term "Lender" refers collectively to Kookmin Bank Co., Ltd., individually and in its capacity as trustee of KTB CRE Debt Fund No. 8, a Korean Investment Trust, by its agent on behalf of the Trust in Korea, Daol Fund Management Co., and by its agent on behalf of the Trust in the United States, Rexmark Holdings LLC d/b/a Rexmark. Lender controls USI.

[2]  "Ex." refers to Exhibits 1-10 at Addendum attached hereto.

Starting in 2021, at a time when USI was experiencing financial distress due to COVID-19, Amtrak began looking for opportunities to take Union Station for itself. In 2022, without having made any legitimate attempt to purchase the Interest at fair market value, Amtrak sued under a statute allowing it to take property that is "necessary for intercity rail passenger transportation." 49 U.S.C. §24311(a)(1)(A). With only limited discovery and a threadbare record of purported need, the district court ordered possession to be transferred to Amtrak on July 15, 2024.

The court's decision is riddled with legal errors. It rests on a misreading of Amtrak's eminent-domain statute and a rejection of Congress's stated goals about how Union Station should be operated. Among other errors, the court failed to demand any showing remotely approaching the statutory requirement that the taking be "necessary for intercity rail passenger transportation." *Id.* And the court accepted Amtrak's shifting explanations of why owning the Interest was necessary. Amtrak initially claimed it needed the Station to make progress on two capital-improvement projects, but that proved untrue: the decade-old projects were already proceeding and the delays were due to *Amtrak's* poor execution, unrelated to ownership of the Interest. So, nearly 18 months later, Amtrak claimed that control of the Interest was necessary to implement a new interior redesign, which had never been shown to or approved by Amtrak's Board, Leaseholders, or any federal agency. The new plan had nothing to do with rail infrastructure or safety; instead, Amtrak proposed to

eliminate much of the station's revenue-generating space and replace it with luggage areas, passenger-only lounges, and a kids' play area. Then, when Leaseholders sought a stay of possession because of the irreparable harm posed by Amtrak's plans, Amtrak flipped again, telling the court it had "no plans to make any immediate permanent or irreversible alterations to the Station," Dkt.117 at 21-22 (Ex.3), and telling Congress it intended to "maintain the retail," *Hearing of the Subcomm. on Railroads, Pipelines, and Hazardous Materials Before the H. Comm. on Transportation & Infrastructure, Amtrak & Intercity Passenger Rail Oversight: Promoting Performance, Safety, & Accountability*, at 1:08:26-1:10:20 (June 12, 2024) ("Amtrak Hr'g").[3]  It is thus no wonder that the Chairman of the House Oversight and Accountability Committee recently accused Amtrak of condemning the property "not out of necessity, but apparently out of mere convenience." Press Release, Comm. on Oversight and Accountability, *Comer Probes Amtrak's Use of Eminent Domain To Assert Control of D.C.'s Union Station* (June 27, 2024).[4]

This appeal raises complex and novel legal issues that challenge Amtrak's property grab. Amtrak's core business is railroads—the tracks and the trains—not mixed-use real estate, much less operation of a city landmark. Other major rail

---

[3]  https://transportation.house.gov/calendar/eventsingle.aspx?EventID=407522.

[4]  https://oversight.house.gov/release/comer-probes-amtraks-use-of-eminent-domain-to-assert-control-of-d-c-s-union-station%EF%BF%BC.

stations, like Boston's South Station and New York's Moynihan Station, are managed by real-estate companies, not Amtrak. Congress established a like structure here promoting private-entity control of operations.

The imminent transfer of possession to a company acting in excess of its statutory authority will cause irreparable harm to Leaseholders, the public, and the iconic Station. In marked contrast, Amtrak admits that maintaining the status quo that has existed for decades during this appeal will cause it no harm. This Court should grant a stay pending appeal, and at least an administrative stay to allow briefing on this motion before any transfer of possession on July 15.

## BACKGROUND

### A.    Congress Grants Amtrak Limited Eminent-Domain Power

Congress granted Amtrak limited eminent-domain power. The current statute provides: "[t]o the extent financial resources are available, Amtrak may acquire by eminent domain . . . interests in property" that are "(A) necessary for intercity rail passenger transportation," or "(B) requested by the Secretary of Transportation in carrying out the Secretary's duty to design and build an intermodal transportation terminal at Union Station in the District of Columbia if the Secretary assures Amtrak that the Secretary will reimburse Amtrak." 49 U.S.C. §24311(a)(1). Amtrak "may exercise the power of eminent domain only if it cannot" "acquire the interest in the

property by contract" or "agree with the owner on the purchase price for the interest." *Id.* §24311(a)(2).  Amtrak proceeded without a request from the Secretary here.

## B. Congress Orders Private Commercial Development Of Union Station, Producing The Station's Current Lease Structure

In 1981, Congress passed the Union Station Redevelopment Act ("USRA") to "achieve the goals of historic preservation and improved rail use of Union Station with maximum reliance on the private sector and minimum requirement for Federal assistance." Pub. L. No. 97-125, §2, 95 Stat. at 1667.  The Act directed the Secretary to identify a developer to assist with the management and "[c]ommercial development of the Union Station complex." *Id.* §3, 95 Stat. at 1668.  Amtrak pitched itself for that role—but neither Congress nor the Secretary selected it. Dkt.99 ¶6 (Ex.4).

To carry out USRA's objectives, the Secretary, acting through the Federal Railroad Administration ("FRA"), entered into a 99-year lease agreement with Union Station Redevelopment Corporation ("USRC"), a captive nonprofit corporation.  Op.7 (Ex.2).  The FRA-USRC lease required USRC to enter into a sublease with the developer selected by the Secretary (USI's predecessor-in-interest).  *Id.*  The USRC-USI sublease required that developer to enter into a sub-sublease with Amtrak for a portion of the station.  *Id.*  Under this structure, USI is responsible for the vast majority of the Station; Amtrak is a space tenant.

### C. Amtrak Seeks To Acquire The Interest

In late 2021, USI's then-managing member suffered financial problems, triggering a possible foreclosure sale, which Amtrak viewed as a "unique opportunity" to acquire the Interest it had long coveted. Op.23-24. Amtrak reviewed a third-party appraisal from 2021 valuing the Interest at $830.9 million. Op.24. Amtrak, having no experience valuing trophy real estate, offered to buy the senior mortgage loan for $300 million—less than the outstanding debt held by SL Green, one of the largest public real-estate companies in the United States. Op.24-25. That offer was rejected. Op.25. Amtrak then prepared to bid at the foreclosure sale, and received authority from the FRA to pay approximately $550 million. Op.24-25. But the foreclosure sale was cancelled when Lender purchased the senior mortgage loan. Op.25. Amtrak inquired about purchasing the Interest, and Lender informed Amtrak that the Interest had been under binding contract with the previous owner to a third party for a value of $700 million just months prior. *Id.* Amtrak never made an offer. *Id.*

Instead, Amtrak maneuvered to take the property by condemnation. Amtrak obtained approval from the FRA to allocate initial Amtrak funds for the acquisition, but the FRA conditioned its approval for future spending on Amtrak renegotiating the lease within six months of acquiring it. Op.25; Hearing JX 3 at 20, 23 (Ex.5). On April 6, 2022, Amtrak offered to buy the Interest for $250 million. Op.27. That

$250 million was well below what Amtrak had offered a few months earlier ($300 million), what Amtrak had authority to spend ($550 million), what the Interest was in contract for in 2021 ($700 million), and the third-party appraisal that Amtrak was in possession of ($830 million). Seven days later, without any negotiations, Amtrak filed suit and deposited $250 million as estimated just compensation. Op.9-10.

### D. Amtrak Moves for Possession

On July 8, 2022, Amtrak moved for immediate possession. The court limited discovery on Amtrak's motion to (i) five interrogatories; (ii) a single corporate deposition of Amtrak; and (iii) limited document production. 03/23/2023 Hr'g Tr. 22:18-24:2 (Ex.6). Discovery focused on Amtrak's then-claimed needs for the Interest: the Subbasement and Concourse Modernization Projects. Although both projects were planned under the "assum[ption] that [Amtrak] would remain a subtenant," Amtrak claimed it needed the Interest to complete those projects because "'dealing with USI'" was impeding its pace. Op.19, 22 (citation omitted).

After discovery confirmed that project delays had nothing to do with USI or control of the Interest, Amtrak changed its theory of necessity. Amtrak introduced a new exhibit on the eve of the evidentiary hearing showing new redevelopment plans. Those plans had never been presented to Amtrak's Board or Leaseholders and had not been subject to any discovery. Op.20-21; Rebibo Decl. ¶23 (Ex.7).

They showed radical changes to Union Station, "shrink[ing] significantly" the "amount of space devoted to commercial purposes," including "retail[] and food establishments," in exchange for Amtrak support spaces, passenger-only waiting areas, and a play area.  Op.22.

At the hearing, the court heard testimony about all of these projects. The recently retired CEO of USRC (the landlord for the Interest) testified that ownership of the Interest had no effect on the progress of the Subbasement and Concourse Modernization projects or Amtrak's ability to operate.  09/11/2023 Hr'g Tr. 228:5-11 (Ex.8).  And on the Track 22 portion of the Subbasement Project, which Amtrak claimed was being adversely affected by USI, the evidence showed that construction had been substantially completed.  *Id.* at 105:5-14.

## E.    The Court Grants Immediate Possession

On April 17, 2024, the court held that "Amtrak has met its burden of proof to exercise its 'quick take' authority over the [Interest]."  Op.3.  The court concluded Amtrak could take possession of the Interest before determining just compensation by showing (1) the taking was "necessary for intercity rail passenger transportation"; and (2) Amtrak could not "acquire the interest in the property by contract" or "agree with the owner on the purchase price."  Op.29-30, 37 (citation omitted).

As to necessity, the court held that Amtrak need not show the Interest was "indispensable" for rail transportation—only that it had a "'significant relationship'"

with such transportation. Op.37-38 (quoting *Nat'l R.R. Passenger Corp. (Amtrak) v. 3.44 Acres More or Less of Land & Bldg. Located at 900 2nd St. NE, Washington, DC 20002-3557*, 266 F. Supp. 3d 63, 69 (D.D.C. 2017)). The court held that a "'significant relationship'" was shown if the taking was "'a useful and appropriate way to accomplish [Amtrak's] goals,'" even if it was not the only or even a "superior means to achieving [those] goals." Op.37-41. Despite recognizing that "responsibility for the slow movement on major improvement projects rests in no small part on Amtrak," the court deferred under an "abuse of discretion" standard to Amtrak's "business judgment" that taking the Interest would be "a better business proposition" than continuing to work within the existing lease structure. Op.40-41.

On May 24, 2024, the court ordered Leaseholders to transfer possession to Amtrak on July 15, 2024. Dkt.111. On June 5, 2024, Leaseholders filed an appeal.

## F.    Congress Objects And Leaseholders Seek A Stay

Leaseholders moved for a stay pending appeal, identifying the irreparable harm associated with turning the Station over to Amtrak, including harms to Leaseholders' business relationships with retail subtenants and the public and the strong likelihood that Amtrak would change the Interest itself, as FRA had required for future funding. Hearing JX 3 at 20, 23. Indeed, if Amtrak takes possession now, FRA's six-month deadline to modify the lease expires no later than January 2025, before any appeal would be finished. *Id.*

Amtrak backpedaled. Having been accused of exercising its eminent-domain power "not out of necessity, but apparently out of mere convenience," *Comer Probes Amtrak's Use of Eminent Domain*, *supra*, Amtrak's CEO told Congress that Amtrak's intention was not to eliminate retail (as Amtrak had told the court) but to "enhance and maintain the retail" to "create a lively mixed-use environment." Amtrak Hr'g, at 1:08:26-1:10:20. And in its opposition to the stay, Amtrak told the court it had "no plans to make any immediate permanent or irreversible alterations to the Station," and that it would "not significantly modify the sublease or terminate it in favor of a new sublease" during the appeal. Dkt.117 at 21-22.

As of the time of filing, the district court had not acted on Leaseholders' stay motion. Given the impending transfer, Leaseholders now seek a stay and administrative stay from this Court.

## ARGUMENT

A stay pending appeal is appropriate when (1) the movant "is likely to succeed on the merits," (2) the movant "will be irreparably injured absent a stay," (3) a stay "will [not] substantially injure the other parties interested in the proceeding," and (4) the public interest favors a stay. *In re NTE Conn., LLC*, 26 F.4th 980, 987 (D.C. Cir. 2022) (citation omitted). A stay may also be warranted when there is a "serious legal question on the merits," and the other factors weigh in favor. *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (citation omitted).

This Court also has the power to enter an administrative stay "to give the court sufficient opportunity to consider the emergency motion for stay." *Garza v. Hargan*, No. 17-5236, 2017 WL 4707112, at *1 (D.C. Cir. Oct. 19, 2017) (per curiam); D.C. Circuit Handbook of Practices and Internal Procedures 33 (2021).

## I. APPELLANTS ARE LIKELY TO SUCCEED ON THE MERITS

The district court committed numerous legal errors. Among other things, the court misinterpreted the statutory "necessity" requirement, granted unprecedented deference to Amtrak's judgment, and treated Amtrak like the federal government.

### A. This Court Has Jurisdiction Over The Appeal

This Court has jurisdiction over the appeal under 28 U.S.C. §1291 as a final decision on a taking, *see Washington Metro. Area Transit Auth. v. One Parcel of Land* (*WMATA*), 514 F.2d 1350, 1351 (D.C. Cir. 1975) (per curiam), or under 28 U.S.C. §1292(a)(1) as an order effectively granting injunctive relief. On the former, this Court has held that "an order of possession is final and subject to review if it operates to defeat the right of the property owner to challenge the validity of the taking," even if "just compensation" has not yet "been adjudicated." *WMATA*, 514 F.2d at 1351. As in *WMATA*, the district court's order is final because it allows Amtrak to take immediate possession and make structural changes to the lease that would defeat the right to challenge. On the latter, the court's order qualifies as an injunction requiring Leaseholders to turn over possession on pain of contempt,

causing them irreparable harm.  *Cobell v. Kempthorne*, 455 F.3d 317, 322 (D.C. Cir. 2006).

## B. The Court Erred In Holding That Immediate Possession Was "Necessary For Intercity Rail Passenger Transportation"

The court granted Amtrak immediate possession after concluding the Interest was "'necessary for intercity rail passenger transportation.'" Op.37-41.  The court applied a watered-down test for necessity that cannot be reconciled with the governing statutes.  And Amtrak's recent statements effectively concede what Leaseholders have argued all along: Amtrak has no need for possession of the Interest, much less an immediate one.

### 1. The Court Applied The Wrong Necessity Standard

The court did not require Amtrak to make any meaningful showing of necessity.  "Necessary" means "[i]ndispensable, vital, essential; requisite." *Oxford English Dictionary* (2003, online); *Black's Law Dictionary* (12th ed. 2024) ("[t]hat is needed for some purpose or reason; essential").  Amtrak has never claimed the Interest is "essential."  Nor could it.  Amtrak has operated rail transportation out of Union Station for decades under the existing lease structure without issue.  Op.16-23.

Amtrak instead argued—and the court agreed—that it only had to show a "'significant relationship'" between the Interest and rail transportation. Op.37.  The court held that Amtrak need only show the Interest was a "useful and appropriate

way to accomplish [its] goals," not that it was "indispensable." Op.38 (citations omitted).

That conclusion misreads the text and statutory structure. When Amtrak takes property for itself, it must show the property is "necessary." 49 U.S.C. §24311(a)(1)(A). By contrast, when Amtrak takes property at the direction of the Secretary of Transportation, no such showing is required because that is a taking by the federal government—backed by the Secretary's "assur[ance]" that the United States will pay just compensation. *Id.* §24311(a)(1)(B). That structure mirrors a distinction the Supreme Court has long drawn between government officials "exercis[ing] the sovereign's power of eminent domain on behalf of the sovereign itself," and quasi-governmental entities that are granted a "limited" "right to exercise the power of eminent domain on behalf of themselves." *United States v. Carmack*, 329 U.S. 230, 243 n.13 (1946). By diminishing the necessity standard, the court treated Amtrak as equivalent to the federal government.

## 2. The Court Misinterpreted The Standard It Purported To Apply

Relying on an earlier district court decision, the court below purported to apply a "significant relationship" test. Op.37 (quoting *3.44 Acres*, 266 F. Supp. 3d

at 69). But even under that standard, the court did not require Amtrak to establish anything approaching a significant relationship.

The court further watered down the phrase "significant relationship" by allowing Amtrak to show significance so long as ownership of the Interest was "a useful and appropriate way to accomplish [Amtrak's] goals." Op.38-41 (citations omitted). The court believed it was "'not in a position to assess' what property arrangement and interest 'is the optimal way [for Amtrak] to further [its] mission'"; that Amtrak was "entitled to some deference"; and that Amtrak's "'business judgment'" that a taking was appropriate should be reviewed only for "abuse of discretion." Op.40-41 (alterations in original) (citations omitted). But the statute does not authorize the court to throw up its hands and defer to Amtrak's own determination that its taking was "necessary."

Amtrak's changing positions on necessity illustrate just how far the court strayed from the statutory standard. Amtrak initially argued it needed possession for two ongoing construction projects: the Subbasement and Concourse Modernization Projects. But as the court found, the Concourse Modernization Project "has been in the planning stages for over a decade" and "hit a major roadblock" in 2019 because the FRA rejected Amtrak's initial design. Op.18. More than four years later, Amtrak still has not obtained FRA approval. *Id.* Possession of the Interest could not possibly have any relationship to Amtrak's ability to complete that project, much less a

"significant relationship." As for the Subbasement Project, Amtrak planned that project "a decade ago" under the "assum[ption] that it would remain a subtenant of Union Station," and that project is still only 5% complete—due to no fault of Leaseholders. Op.19. Nothing in the leasehold structure prevents Amtrak from moving forward on these projects. 09/11/2023 Hr'g Tr. 228:5-11. And there was no evidence that taking the entire Interest (as opposed to some portion of it) was necessary.

Amtrak complained of the relationship between it and USI, but the district court found that Amtrak "cited few actual examples of USI hindering Amtrak's ability to achieve its transportation goals." Op.23. The court itself identified only a single concrete example: testimony from Amtrak executives that USI had "impeded" the Track 22 project. Op.22 (citation omitted). But Track 22 was substantially completed by the time of the hearing. 09/112023 Tr. 105:5-17. And today, that project remains unfinished because "*Amtrak* designed a train that is too tall to physically fit on Track 22." Rebibo Decl. ¶17 (emphasis added). Amtrak's poor planning and inability to execute projects cannot be the necessity that justifies taking property from Leaseholders.

Amtrak's new purported need to implement unapproved plans to dramatically change the Station's layout cannot justify Amtrak's extraordinary exercise of its eminent-domain powers either. Aspirational development plans not approved by

Amtrak's Board or the FRA, which have nothing to do with railroad safety or infrastructure, cannot show a "substantial relationship" necessary to take property. That is especially so given Congress's express determination in USRA that Union Station should be revitalized with "maximum reliance on the private sector." Pub. L. No. 97-125, §2, 95 Stat. at 1667. By allowing Amtrak to take the Interest without a true showing of necessity, the court handed control to a company that has little interest in the Station's various commercial uses or generating revenue to rely less on the taxpayer. And having secured its possession order, Amtrak now disclaims any interest in pursuing this plan pending appeal. Dkt.117 at 21-22. That is the third strike in Amtrak's efforts to establish genuine necessity for immediate possession, even under the court's watered-down standard.[5]

### C. The Court Erred In Treating Amtrak Like The Federal Government And Granting Possession On A Limited Record

The court erred in giving Amtrak unprecedented quick-take authority akin to that afforded to the federal government under the Declaration of Takings Act

---

[5] The court suggested that Leaseholders did not "genuinely dispute that there is a 'significant relationship' between the USI Sublease and Amtrak's provision of intercity rail passenger transportation." Op.39. That is incorrect. Counsel stated the self-evident proposition that "the station as a property is necessary for passenger rail." *Id.* (citation omitted). But the question is why Amtrak's ownership of the Interest is necessary. As counsel explained: "the inquiry is whether Amtrak's acquisition of the lease position, which the United States directed be awarded to USI's predecessor, is necessary." 09/11/2023 Hr'g Tr. 203:16-18. As Leaseholders vigorously argued below, it is not. *E.g.*, Dkt.99 ¶¶ 86-87.

("DTA"). 40 U.S.C. §3114(b)(1). When the United States exercises its quick-take powers, its commitment to pay just compensation is backed by the Constitution's Full Faith and Credit Clause. *Id.* §3115(a). Given that backing, the United States is entitled to immediate possession unless the current owner can demonstrate "undue hardship." *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 825 (4th Cir. 2004). Amtrak—a quasi-governmental corporation that has never turned a profit—does not have the same backing. As such, Amtrak may only take property if "financial resources are available" and the taking is "necessary." 49 U.S.C. §24311(a)(1)(A).

By granting Amtrak the same quick-take powers as the U.S. Government, the court doubly erred: it did not require Amtrak to make any showing of harm, much less the irreparable harm needed for an injunction; and it applied an unduly deferential necessity standard without full discovery. On harm, the court flipped the burden and required Leaseholders to prove undue hardship. Op.45-46. On the merits, the court ruled on the necessity of Amtrak's taking—but with limited document discovery, no fact witness depositions, and no third-party or co-defendant discovery. This process failure had devastating consequences: the court deemed Amtrak's taking valid on an incomplete record and allowed Amtrak to take immediate possession of an Interest valued at $830 million even though Amtrak is authorized to spend only approximately $550 million—and even that expenditure is

apparently not available unless the lease is materially changed in six months, something Amtrak now says it will not do.

## II.     LEASEHOLDERS WILL SUFFER IRREPARABLE HARM

Without a stay pending appeal, Leaseholders will suffer significant irreparable harm.  The irreparable harm to Leaseholders is three-fold: (1) severe damage to Leaseholders' business relationships, reputation, and goodwill; (2) damage to an irreplaceable property interest; and (3) destruction of USI's sole business purpose.

***Harm to Business.***  If Amtrak is permitted to control the Station during the pendency of appeal, Amtrak will cause irreparable damage to Leaseholders' longstanding commercial relationships and ultimately to the value of the Interest itself.  Amtrak has zero experience successfully operating or managing an asset like Union Station.  Amtrak's stated goals include displacing paying tenants, stopping the public from renting the Main and East Halls for major events, and renegotiating the very lease it wants to acquire.  Rebibo Decl. ¶¶8, 11, 21-22, 26.  If Leaseholders prevail on appeal, they will not be able to undo the damage caused by the implementation of these goals.

Amtrak told the district court that it planned to oust many of the retail and food-and-beverage tenants, whose commercial partnerships have helped revitalize Union Station.   This will directly disrupt Leaseholders' existing business relationships and chill future prospects of leases or contracts.  *Id.* ¶¶6-7.

Amtrak likewise recently told Leaseholders that they do not have approval for events to be booked in the Main or East Halls after July 15, 2024. *Id.* ¶8. These event spaces generate millions of dollars of revenue each year. *Id.* The harm from canceling these events cannot be easily quantified; these events are booked years in advance, relying on relationships that have taken years to build. *Id.*

Trying to pick up where things left off after the appeal will be nearly impossible, especially if the private tenant market has been shooed away or scared off in the interim and the public no longer trusts that this major event space will be available when they need it. The resulting reputational, relational, and market losses to Leaseholders cannot be remedied by money damages. After all, "[t]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific [customers] who do not [return]." *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (citation omitted); *see Reed Enters. v. Corcoran*, 354 F.2d 519, 520 (D.C. Cir. 1965) ("destruction of [movants'] good-will and property" is irreparable).

***Loss of Property.*** Damage to a unique property interest also constitutes irreparable harm. *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018). Here, even the temporary loss of the Interest creates a substantial risk of irreparable harm. Union Station is a unique asset, and 2024 is a critical time. The station has been rebuilding and succeeding economically and reputationally. It is an

unparalleled place for visitors and locals to shop, eat, and attend major events; it is a destination for retailers to rent and tenants to occupy; it is a landmark architecturally and culturally.

Handing over control of this asset to Amtrak, even temporarily, will irreparably damage its value, as Amtrak will fundamentally change the desire of companies and the public to do business at Union Station. The damage to such a property interest constitutes *per se* irreparable harm. *E.g.*, *O'Hagan v. United States*, 86 F.3d 776, 783 (8th Cir. 1996) ("diminish[ment] [of] the value of [the party's] property interest" constitutes irreparable harm); *Patriot-BSP City Ctr. II v. U.S. Bank N.A.*, 715 F. Supp. 2d 91, 95-96 (D.D.C. 2010); *Monument Realty LLC v. WMATA*, 540 F. Supp. 2d 66, 75-76 (D.D.C. 2008).

Worse still, there is a significant risk that Amtrak will fundamentally change the Interest itself during the appeal by renegotiating USI's lease with USRC. In order to blunt the request for a stay, Amtrak suggested it would not make changes to the Interest during the appeal. Dkt.117 at 21-22. But it is uncontested that Amtrak's ability to fund its acquisition was conditioned by the FRA on redoing the lease within six months of acquiring it. Hearing JX 3 at 20, 23. If Amtrak is free to renegotiate the lease, Leaseholders will be irreparably harmed.

**Destruction of USI.** Transfer of possession to Amtrak will put USI out of business. Rebibo Decl. ¶12. USI exists solely to manage and operate the Interest,

as it has done since 2007.  If possession is transferred to Amtrak, there will be no

station for USI to manage and no partnerships for it to build and maintain.  The

imminent closure of USI's business is irreparable.  *See Alcresta Therapeutics, Inc.*

*v. Azar*, 755 F. App'x 1, 5 (D.C. Cir. 2018) ("monetary loss can constitute irreparable

harm when 'the loss threatens the very existence of the movant's business'" (citation

omitted)).

## III.   THE  BALANCE  OF  THE  EQUITIES  AND  PUBLIC  INTEREST FAVOR GRANTING A STAY PENDING APPEAL

In stark contrast to Leaseholders' near-certain irreparable harms, Amtrak will

suffer no cognizable harm from a stay.  The court found that the Concourse

Modernization and Subbasement Projects were both proceeding, and much of the

delay was attributable to Amtrak.  Op.17-19.  Amtrak's new design preferences have

not been approved by any of the relevant federal entities.  Op.20.  And Amtrak now

disclaims an interest in proceeding with them during appeal regardless.  Dkt.117 at

21-22.

Amtrak's recent concessions in and out of court only further reinforce that a

stay will not harm Amtrak.  Amtrak originally told the court that it needed immediate

possession because "[e]very day we wait, we're postponing the opportunity to

improve the facility."  09/11/2023 Hr'g Tr. 94:8-9.  But even the district court

recognized that "Amtrak's need clearly wasn't immediate when they filed [the

motion]," given that Amtrak had not pressed to have the motion decided faster, so

the court would "take" any assertion of immediacy "with a grain of salt."  11/28/2023 Tr. at 60:31-25 (Ex.9).  And whether for litigation strategy reasons, congressional pressure, or lack of ability to actually do anything, Amtrak now seems content to leave things as they are during this appeal.  That further confirms that Amtrak will not be harmed by a stay.

The public interest also strongly supports a stay.  The public interest favors continuity and avoiding interruptions at Union Station while the legality of Amtrak's taking is reviewed.  Changing operators is disruptive to the public's use, especially when the federal government is actively questioning Amtrak's recent actions.  On March 6, 2024, Representative and Chairman of the Committee on Transportation and Infrastructure Sam Graves, along with Member Tom Cole, sent a letter to the Secretary of Transportation, expressing concerns that Amtrak's takeover plan "may be contrary to law."  Letter from S. Graves & T. Cole to P. Buttigieg (Mar. 6, 2024) (Ex.10).  And on July 2, 2024, a House Committee Report accompanying the appropriations bill demanded that the Department of Transportation provide a report "on its plans to maintain the existing public-private partnership for Union Station, as established by the [USRA]."  H. Rep. No. 118-XXX to Accompany the Fiscal Year 2025 Department of Transportation, Housing & Urban Development & Related Agencies Appropriations Bill, at 8 (July 2, 2024) (Ex.11).  The public interest would

be best served by maintaining the status quo to allow Congress to resolve these

serious concerns parallel to this appeal.

## CONCLUSION

For all the foregoing reasons, this Court should enter a stay pending appeal.

Because possession is set to transfer on July 15, this Court should first enter an administrative stay to permit briefing and a decision on the stay motion.

Dated:  July 5, 2024

Respectfully submitted,

_/s/ Steven J. Willner_

Steven J. Willner
NEUBERGER, QUINN, GIELEN, RUBIN
  & GIBBER
One South Street
27th Floor
Baltimore, MD 21202-3282
(410) 332-8542
sjw@nqgrg.com

_Counsel for Appellant_
_Union Station Investco, LLC_

_/s/ Melissa Arbus Sherry_

Melissa Arbus Sherry
Christine C. Smith
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com

Paul Kiernan
HOLLAND & KNIGHT LLP
800 17th Street, NW
Suite 1100
Washington, DC 20006
(202) 663-7276

Y. David Scharf
Amber R. Will
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022
(212) 735-8604

_Counsel for Appellant_
_Kookmin Bank Co., Ltd.,_
_Individually and in its capacity as_
_Trustee of KTB CRE Debt Fund_
_No. 8, a Korean Investment trust_

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,189 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

This motion complies with the typeface requirements and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: July 5, 2024

*/s/ Melissa Arbus Sherry*
Melissa Arbus Sherry

**CERTIFICATE OF SERVICE**

I hereby certify that on July 5, 2024, I electronically filed the foregoing motion with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Melissa Arbus Sherry*
Melissa Arbus Sherry

# ADDENDUM

# CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.   Parties and Amici

Pursuant to D.C. Circuit Rule 28(a)(1)(A), the parties in this case are Plaintiff-Appellee National Railroad Passenger Corporation (Amtrak) and Defendants-Appellants Kookmin Bank Co., Ltd., individually ("Kookmin") and in its capacity as trustee ("Trustee") of KTB CRE Debt Fund No. 8, a Korean Investment Trust (the "Trust"), by its agent on behalf of the Trust in Korea, Daol Fund Management Co. ("Daol"), and by its agent on behalf of the Trust in the United States, Rexmark Holdings LLC d/b/a Rexmark ("Rexmark," and together with Kookmin, Trustee, the Trust, and Daol, "Lender") and Union Station Investco, LLC ("USI").   Defendant Union Station Sole Member, LLC ("LLC) has not joined this appeal.   There were no amici with respect to the motion giving rise to the ruling under review, and no amicus briefs have been filed in this Court as of the time of this filing.

## B.   Rulings Under Review

Pursuant to D.C. Circuit Rule 28(a)(1)(B), the ruling under review is *National Railroad Passenger Corp. (Amtrak) v. Sublease Interest Pertaining to Described Leasehold Interests at Washington Union Station, et al.*, Dkt. 111, issued by the

Honorable Amit P. Mehta on May 24, 2024, and each and every part of the District Court's Memorandum Opinion regarding that Order, Dkt. 106, dated April 17, 2024.

The Court has jurisdiction over Lender and USI's appeal as a final decision pursuant to 28 U.S.C. §1291 or alternatively as an order effectively granting an injunction pursuant to 28 U.S.C. §1292(a)(1).

### C. Related Cases

Pursuant to D.C. Circuit Rule 28(a)(1)(C), this case has not previously been before this Court. Counsel for Lender is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

### D. Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Kookmin is a wholly owned subsidiary of KB Financial Group, a publicly-held financial holding company in the Republic of Korea. KB Financial Group has no parent company, and no publicly-held corporation owns 10% or more of its stock. USI is a wholly-owned subsidiary of Daol Rexmark Union Station LLC. No publicly-held corporation owns 10% or more of USI's stock.

Dated: July 5, 2024

*/s/ Melissa Arbus Sherry*
Melissa Arbus Sherry

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) | * | |
| | * | CIVIL ACTION No. 1:22-CV-01043 |
| PLAINTIFF, | * | |
| | * | |
| v. | * | |
| | * | |
| SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST, et al. | * | |
| | * | |
| DEFENDANTS. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**ORDER GRANTING MOTION FOR IMMEDIATE POSSESSION**

For the reasons set forth in the Court's Memorandum Opinion dated April 17, 2024[1], the Court GRANTS the Motion for Immediate Possession filed by Plaintiff National Railroad Passenger Corporation ("Amtrak").

The Court directs Union Station Investco, LLC to turn over to Amtrak possession of the Subject Property Interest consistent with following terms and conditions:

1.    Transfer of Possession:  Possession of the Subject Property Interest is transferred to Amtrak as of 12:01 a.m. on July 15, 2024, which shall be hereinafter referred to as the "Possession Date." This transfer of possession includes the transfer of rights of USI (or any other Defendant) in and to any subleases, leases and licenses, and all rents, other payments and security deposits relating thereto from the date of the Possession Date.

2.    Future Obligations and Future Liabilities:  Beginning on the Possession Date,

_____

[1] Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the Memorandum Opinion dated April 17, 2024.

Amtrak will be solely responsible for the performance of future obligations (i.e. obligations that accrue on or after the Possession Date, which shall hereinafter referred to as "Future Obligations") or liabilities arising after the Possession Date ("Future Liabilities") that USI would otherwise have had: (1) in connection with the Subject Property Interest; and (2) any sublease, lease, or license for a portion of the station that is a part of the Subject Property Interest and for which Amtrak is being granted possession.

3.  <u>Jones Lang LaSalle</u>:  Prior to the Possession Date, Amtrak may contact Jones Lang LaSalle (JLL) concerning a future business relationship relating to the Subject Property Interest.

4.  <u>Transfer of records, documents, and other materials relating to the operation of the Subject Property Interest in USI's possession, custody or control</u>: Information, records, documents, and other materials will be provided by Lender and USI to Amtrak as set forth below.  The information transferred will receive the same confidentiality protections as those set forth in the previously entered protective order, with the understanding that Amtrak may also use the information received for transition purposes and/or operational purposes with respect to the Subject Property Interest.

5.  <u>Timing for the production of documents</u>:  On May 9, 2024, Amtrak provided to USI and Lender a document itemizing the documents, reports, spreadsheets, contracts, and other materials that Amtrak would like to receive from USI and Lender in connection with this transition efforts. USI and Lender shall create and furnish a data room to be available to Amtrak with the requested documents.  Consistent with the previously entered protective order and the prior paragraph, Amtrak shall have the right to download and use documents from the data room. USI and Lender shall begin producing documents immediately following entry of this Order. Leases and licenses, and their modifications and amendments, as well as the last known   contact

information (person, address, email address, and, if available phone number) for all lessees and

licenses, and the service contracts for the Subject Property Interest shall be produced by May 28,

2024.  All other documents in the Lender's or USI's possession, custody or control that are

reasonably accessible to Lender and USI shall be produced by June 14, 2024.

6.      Security deposits, advance payments, and rents:  Lender and USI shall provide to

Amtrak information regarding security deposits held, advance payments received, accounts

relating to rent payments, and similar information, subject to confidentiality protections, by May

28, 2024.

7.      Special Events:  Lender and USI shall provide to Amtrak by May 28, 2024 a list of

all upcoming special events to be held at the Station, and all related agreements and documents

(including event contracts).  Lender and USI shall not schedule or contract for special events that

will take place after the Possession Date unless Amtrak specifically consents in writing to the event

schedule and terms.

8.      Transfer of rent collection and utilities and other expense payment responsibilities:

Rent, utilities and expense payments for the period after the Possession Date shall be the

responsibility of Amtrak.  Lender and USI shall provide to Amtrak a list of such obligations on or

before May 28, 2024, with all documents related thereto to be produced by June 14, 2024.

9.      Transfer of operation and maintenance responsibilities:  As of the Possession Date,

all current and future operation and maintenance responsibilities of the Subject Property Interest

shall be transferred to Amtrak.   Lender and USI shall provide to Amtrak all information in their

possession, custody and control and reasonably accessible regarding current operation and

maintenance responsibilities pertaining to the Subject Property Interest by May 28, 2024, with

documents related thereto being produced by June 14, 2024.

10.     <u>Identification and transfer of work-in-progress responsibilities</u>:  Lender and USI shall provide to Amtrak by May 28, 2024 a list of all capital work-in-progress responsibilities, with all documents related thereto being produced by June 14, 2024.   Beginning May 14, 2024, Lender and USI shall not start any new capital work in the Subject Property Interest unless Amtrak specifically consents in writing to the work.

11.     <u>Status of retail and office leasing activity</u>:  Lender and USI shall provide to Amtrak a list of and information about the current status of retail and office leasing activity (including current draft leases exchanged with prospective tenants) by May 28, 2024.  Lender and USI shall be bound by the restrictions on future leasing activities as described below. Separately, there are three current lawsuits involving previous Station tenants or arising from occupancy agreements. Lender and USI shall coordinate with Amtrak about these lawsuits.

12.     <u>Digital and other advertising agreements and revenues</u>:  Lender and USI shall provide to Amtrak all reasonably accessible information and documents in their possession, custody and control regarding digital and other advertising agreements and revenues by June 14, 2024.

13.     <u>Assessment of the physical conditions of space outside of the pre-existing Amtrak sublease</u>:  Lender and USI provided a walk-through of most of the space covered by the Subject Property Interest and outside of the pre-existing Amtrak sublease; Lender shall provide all reasonably accessible documents and information to Amtrak regarding the physical condition and operational requirements of the space covered by the Subject Property Interest Amtrak in their possession, custody and control by June 14, 2024.

14.     <u>Letter to Tenants and Licensees</u>:  On the Possession Date, Amtrak, USI and Lender shall send a joint letter to tenants and licensees using the template of Exhibit A. The parties shall

4

make immediate preparations so that the letter can be sent to the appropriate contact address for tenants and licensees on the Possession Date.

15.     <u>Restrictions on USI during the Interim Period-Operations</u>:  From the date of this Order until the Possession Date (the "Interim Period"), USI shall continue to manage the day-to-day operations at the Subject Property Interest, and: (1) abide by the terms of the sublease with USRC; (2) follow the terms of its existing retail leases and other commercial agreements with tenants and third parties; (3) pay required operating expenses and other obligations; and (4) provide all necessary services, including repair, maintenance, and other operational services and continue working on existing projects.

16.     <u>Restrictions on USI during the Interim Period—Leasing and Other Activities</u>: During the Interim Period, USI shall not do any of the following without Amtrak's prior written consent: (1) negotiate with a third party for any long-term new leases or other commercial agreements; (2) enter into any new leases, amendments or modification to existing leases or other commercial agreements or any amendments and modification of existing commercial agreements that extend beyond the Interim Period (including but not limited to license, service contracts, and agreements for events and event space); or (3) undertake any new activity that affects the station structure at the Subject Property interest, including renovations, improvements, infrastructure modifications, build-out or non-emergency repairs beyond routine repair and maintenance.

17.     <u>Restrictions on USI during the Interim Period—Negotiations</u>:  USI shall not negotiate any new retail leases, licenses or other commercial agreements or any amendments thereof, except as follows: (1) USI can undertake efforts as to collection of existing Account Receivables and enforce its existing rights and obligations under the retail leases and licenses; (2) USI is not restricted from ordinary lease administration activities, including collection of rent and

payment of expenses; (3) USI can undertake or continue leasing activity to which Amtrak has given its prior written consent; and (4) USI shall not enter into any licenses or other commercial agreements that would encumber Amtrak after the Possession Date, unless Amtrak specifically consents in writing to the contract and its contract and its terms.  Subsection 4 of this paragraph shall not apply to leases, licenses or other commercial agreements where an amendment or modification relates only to a period of time before the Possession Date (*i.e.* commercial agreements that may be cancelled on 30 days written notice).

So ORDERED this _____ day of May, 2024.

Amit Mehta

Digitally signed by Amit Mehta
Date: 2024.05.23
22:11:16 -04'00'

The Honorable Amit P. Mehta
United States District Court Judge

6

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br><br>**NATIONAL RAILROAD PASSENGER** )<br>**CORPORATION (AMTRAK),** )<br>  )<br>    **Plaintiff,** )<br>  )<br>       v. )<br>  )<br>**SUBLEASE INTEREST OBTAINED** )<br>**PURSUANT TO AN ASSIGNMENT AND** )<br>**ASSUMPTION OF LEASEHOLD INTEREST** )<br>**MADE AS OF JANUARY 25, 2007, WITH** )<br>**SAID PROPERTY INTEREST** )<br>**PERTAINING TO DESCRIBED LEASEHOLD** )<br>**INTERESTS  AT WASHINGTON UNION** )<br>**STATION LOCATED AT 50** )<br>**MASSACHUSETTS AVENUE, NE** )<br>**WASHINGTON, D.C. 20002, et al.,** )<br>  )<br>    **Defendants.** )<br>_____ ) | **Case No. 22-cv-1043 (APM)** |

### MEMORANDUM OPINION

    This case is about who gets to possess the leasehold interest to the iconic Union Station rail terminal in Washington, D.C.  Contrary to what some may think, Plaintiff National Railroad Passenger Corporation ("Amtrak") does not own, or even manage, Union Station.  It subleases only a portion of the terminal, which generally consists of the back of the building where passengers arrive and wait to board departing trains.  The remainder of the station, including its majestic Great Hall—the building's front entrance and much of its retail space—is controlled by a privately owned enterprise, Union Station Investco, LLC ("USI").  USI manages Union Station through a leasehold interest.  Amtrak subleases space from USI and thus is USI's tenant.

    Amtrak filed this action to change that leasehold structure through its statutory power of eminent domain.  _See_ 49 U.S.C. § 24311.  Congress gave Amtrak the authority to acquire "interests

in property" that are "necessary for intercity rail passenger transportation," which it cannot secure through a negotiated purchase.  *Id.* § 24311(a)(1), (a)(1)(A).  Amtrak seeks to condemn the leasehold interest presently held by USI ("USI Sublease").  If successful, Amtrak would step into the shoes of USI and control all of Union Station, subject to lease terms.

At this stage of the case, Amtrak seeks to invoke what it calls a "quick take" provision under § 24311.  That statutory mechanism permits Amtrak to take immediate possession of the condemned property before the court determines the amount of just compensation and enters final judgment.  Amtrak's "quick take" authority, however, is not absolute.  If challenged, Amtrak must convince a court that (1) the taking is "necessary for intercity rail passenger transportation" and (2) it was unable to purchase the property.  *Id.* § 24311(a)(1)(A), (a)(2).  Amtrak also must deposit the amount of money it believes is just compensation with the court.  *Id.* § 24311(b)(1).  Here, Amtrak has valued the USI Sublease at $250 million, and it has tendered that sum to the court.  By doing so, Amtrak now has legal title over the USI Sublease, but it does not yet have the right to possess the property.

USI is presently owned by a Korean bank, Defendant Kookmin Bank Co., Ltd. ("Kookmin"), and managed by a U.S.-based investment firm, Rexmark.  Kookmin and Rexmark oppose Amtrak's attempt to acquire immediate possession of the USI Sublease, contending that Amtrak has failed to satisfy the statutory prerequisites and that, even if it has, the court should permit Kookmin and Rexmark to remain in control.

The parties have extensively briefed the instant motion, taken limited discovery, presented testimonial and documentary evidence at a hearing, filed proposed findings of fact and conclusions of law, and presented oral arguments before the court.  The court has reviewed the parties'

submissions, considered the evidence presented, weighed the credibility of the witnesses, and applied the relevant law.

For the reasons that follow, the court finds that Amtrak has met its burden of proof to exercise its "quick take" authority over the USI Sublease. The court, however, will withhold entering an order conferring immediate possession of the leasehold interest until Amtrak, in consultation with the relevant interested parties, presents the court with an acceptable plan for the orderly transition of Union Station's operations and management.

## I.      BACKGROUND

This case has a complex factual and historical landscape. Acts of legislation, lease agreements, ownership disputes, and the needs of a modern passenger rail company are just some of the subjects that inform the question before the court. To frame its decision, the court starts with the statutory regime under which Amtrak operates. It next provides a brief history of Union Station. The court then discusses Amtrak's eminent domain authority. This background section concludes with a review of this matter's procedural history.

### A.      Amtrak

In 1970, Congress established the National Railroad Passenger Corporation, known as Amtrak, as part of the Rail Passenger Service Act. Pub. L. 91-518, 84 Stat. 1327, 1328, § 301 (1970). It did so "to avert the threatened extinction of passenger trains in the United States." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 383 (1995). Congress determined that "modern, efficient, intercity railroad passenger service is a necessary part of a balanced transportation system," and that "the public convenience and necessity require[d] the continuance and improvement of such service to provide fast and comfortable transportation between crowded urban areas and in other areas of the country." 84 Stat. at 1328, § 101. Amtrak's purpose was "to

provide intercity rail passenger service, employing innovative operating and marketing concepts so as to fully develop the potential of modern rail service in meeting the Nation's intercity passenger transportation requirements." *Id.* at 1330, § 301.

Amtrak has a quasi-public, quasi-private status.  Although it is publicly owned, Congress provided "that Amtrak 'shall be operated and managed as a for profit corporation.'"  *Lebron*, 513 U.S. at 385 (citing 49 U.S.C. § 24301(a)(2)).  Among its statutorily defined goals are that Amtrak "shall":

- "use its best business judgment in acting to maximize the benefits of Federal investments," including by "controlling or reducing management and operating costs";

- "carry out strategies to achieve immediately maximum productivity and efficiency consistent with safe and efficient transportation";

- "improve generally the performance of Amtrak through comprehensive and systematic operational programs and employee incentives";

- "carry out policies that ensure equitable access to the Northeast Corridor by intercity and commuter rail passenger transportation"; and

- "maximize the use of its resources, including [choosing] the most cost-effective use of employees, facilities, and real property[.]"

49 U.S.C. § 24101(c).  To advance these statutory goals, Congress has encouraged Amtrak "to make agreements with private sector entities and to undertake initiatives that are consistent with good business judgment and designed to generate additional revenues[.]" *Id.* § 24101(d).

Due to its unique origin, governance structure, and public ownership, the Supreme Court has recognized that "the political branches exercise substantial, statutorily mandated supervision over Amtrak's priorities and operations."  *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 52 (2015).  For example, Amtrak's Board is composed of 10 directors, all of whom but one—the Chief Executive Officer—are appointed by the President and confirmed by the Senate.  49 U.S.C.

§ 24302(a)(1).   The Secretary of Transportation is a permanent Board member.   *Id.* § 24302(a)(1)(A).  Today, the Secretary of Transportation holds all of Amtrak's preferred stock, as well as most of its common stock.  *Ass'n of Am. R.R.*, 575 U.S. at 51.  Thus, "Amtrak is not merely in the temporary control of the Government (as a private corporation whose stock comes into federal ownership might be); it is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees."  *Lebron*, 513 U.S. at 398.

The Northeast Corridor rail line is particularly significant to Amtrak's operations. Extending from Washington, D.C. to Boston, Massachusetts, the Northeast Corridor is Amtrak's most trafficked route.  Congress recognized the region's significance in delivering passenger rail services.  It provided that Amtrak shall "carry out policies that ensure equitable access to the Northeast Corridor by intercity and commuter rail passenger transportation" and "coordinate the uses of the Northeast Corridor, particularly intercity and commuter rail passenger transportation." 49 U.S.C. § 24101(c)(10), (11).

### B.   Washington Union Station

At the turn of the 20th century, two passenger rail terminals served Washington, D.C., one of which was located along the National Mall.  In 1901, major rail companies announced an intent to construct a single terminal, eventually leading Congress to pass an act authorizing the construction of Washington Union Station.  Pub. L. 57-122, 32 Stat. 909, § 1 (1903).  Congress decreed that the station "shall be monumental in character."  *Id.* at 911, § 2.  The original station would be privately owned by the Philadelphia, Baltimore, and Washington Rail Company, a corporation created by the merger of two major rail companies.  *Id.*

By the 1960s, rail service was in decline and so too was Union Station.  In 1968, Congress passed the National Visitor Center Facilities Act, which called for the Secretary of the Interior to

create a National Visitor Center in Union Station for use during the bicentennial celebrations. National Visitor Center Facilities Act of 1968, Pub. L. 90-264, 82 Stat. 43 § 101 (1968).  Rail services were displaced to a temporary facility behind Union Station.  *See* Union Station Redevelopment Act of 1981, Pub. L. 97-125, 95 Stat. 1667, § 2(2) (1981).  The National Visitor Center proved unpopular, and it closed in 1978.

In 1970, Congress enacted the Rail Passenger Service Act.  In addition to creating Amtrak, the legislation committed substantial funding to improving passenger rail service, particularly in the Northeast Corridor.  84 Stat. at 1338, § 601; 95 Stat. at 1667, § 2(3).  As a result, demand for passenger rail grew, and so too did the need to return Union Station, which had become "unsafe and unusable," 95 Stat. at 1667, § 2(4), to its original purpose as "a sound and fully operational transportation terminal," *id.* § 2(5).

Congress responded in 1981 by passing the Union Station Redevelopment Act.  The Act's stated purposes were "to achieve the goals of historic preservation and improved rail use of Union Station with maximum reliance on the private sector and minimum requirement for Federal assistance."  *Id.* § 2(7).  Congress directed the Secretary of the Interior to assign "right, title, and interest in the Union Station complex" to the Secretary of Transportation.  *Id.* at 1668, § 111(a). It also authorized the Secretary of Transportation to purchase Union Station itself.  *Id.* at 1669, § 113(b).  Congress tasked the Secretary of Transportation to "provide for the rehabilitation and redevelopment of the Union Station complex primarily as a multiple-use transportation terminal serving the Nation's Capital, and secondarily as a commercial complex[.]"  *Id.* at 1668, § 112. Among the Secretary's statutorily assigned objectives were (1) the "[r]estoration and operation of a portion of the historic Union Station building as a rail passenger station, together with holding facilities for charter, transit, and intercity buses in the Union Station complex," (2) the

6

"[c]ommercial development of the Union Station complex that will, to the extent possible, financially support the continued operation and maintenance of such complex," and (3) the "[w]ithdrawal of the Federal Government from any active role in the operation and management of Union Station." *Id.* § 112(b)–(d).

The Act permitted the Secretary to work with the private sector to accomplish these goals. Congress gave the Secretary authority to enter into development agreements with "one or more responsible individuals, corporations, or other private entities with demonstrated experience in the financing, undertaking, and managing of commercial real estate development," *id.* at 1670, § 115(a), as well as any other agreements deemed "necessary or desirable," *id.* § 115(d).

The Secretary carried out this charge, establishing a leasehold structure that largely resembles what is in place today.  Acting through the Federal Railroad Administration ("FRA"), a subagency of the Department of Transportation, the Secretary entered into a 99-year lease agreement with Union Station Redevelopment Corporation ("USRC"), a District of Columbia nonprofit organization established to assist the FRA Administrator to "achiev[e] the objectives of [the Act] and generally to facilitate the rehabilitation and redevelopment of the Union Station complex."  Lender's Ex. 8.  Simultaneously, USRC entered into a 99-year sublease with a private developer, Union Station Venture, Ltd., a District of Columbia limited partnership, on terms nearly identical to its own lease.  Lender's Ex. 9.[1]  Union Station Venture in turn, subleased space to Amtrak permitting it to occupy a portion of Union Station for passenger rail operations and services, whose term was coextensive with the other lease agreements.  Lender's Ex. 4.  This multi-tiered leasehold structure remains in place today.

---

[1] To be more precise, both the FRA-USRC and USRC-Union Station Venture leases are for an initial term of 29 years with five 14-year extensions at the option of the lessee, for a total of 99 years.  *See* Lender's Exs. 8 & 9.

In January 2007, Union Station Venture assigned its leasehold interest to Union Station Investco, LLC, or USI, thereby making USI Amtrak's landlord at Union Station.  Lender's Ex. 20. Union Station Sole Member LLC, as its name implies, was the sole member, or owner, of USI.

### C.     Amtrak's Eminent Domain Authority

Congress granted Amtrak the authority to condemn property in § 6 of the Amtrak Improvement Act of 1973.  Pub. L. 93-146, 87 Stat. 548, 550, § 6 (1973).  Codified today at 49 U.S.C. § 24311, the Act provides, as relevant here, that "[t]o the extent financial resources are available, Amtrak may acquire by eminent domain . . . interests in property . . . necessary for intercity rail passenger transportation."  *Id.* § 24311(a)(1)(A).  Amtrak, however, "may exercise the power of eminent domain only if it cannot" "acquire the interest in the property by contract" or "agree with the owner on the purchase price for the interest."  *Id.* § 24311(a)(2).

The Act also prescribes the procedures for a taking.  Amtrak must initiate a civil action in the U.S. District Court in which the property is located by filing a "declaration of taking" and depositing with the court "an amount of money estimated . . . to be just compensation."  *Id.* § 24311(b)(1).  The declaration must set forth: (1) "a statement of the public use for which the interest is taken"; (2) "a description of the property sufficient to identify it"; (3) "a statement of the interest in the property taken"; (4) "a plan showing the interest taken"; and (5) "a statement of the amount of money Amtrak estimates is just compensation for the interest."  *Id.* § 24311(b)(1)(A)–(E).  Upon the filing of the declaration and the deposit, "title to the property vests in Amtrak in fee simple absolute or in the lesser interest shown in the declaration, and the right to the money vests in the person entitled to the money."  *Id.* § 24311(b)(2).

Although title to the property transfers automatically upon Amtrak's satisfaction of the statutory procedures, possession does not.  The court "may decide . . . the time by which, and the

terms under which, possession of the property is given to Amtrak."  *Id.* § 24311(b)(2)(A).  As a final stage of the proceedings, after a hearing "the court shall make a finding on the amount that is just compensation for the interest in the property and enter judgment awarding that amount and interest on it."  *Id.* § 24311(b)(3).  "If the award is more than the amount [deposited with the court], the court shall enter judgment against Amtrak for the deficiency."  *Id.* § 24311(b)(4).

### D.    Procedural History

Amtrak initiated this action under § 24311 on April 14, 2022, seeking to condemn "the property interest that [USI] obtained from Union Station Venture II, LLC by an Assignment and Assumption of Leasehold Interest made as of January 25, 2007," that is, the USI Sublease.  Compl., ECF No. 1, at 2.

On the same day that Amtrak filed its complaint, it also filed the Declaration of Taking required by § 24311(b)(1).  Decl. of Taking, ECF No. 4.  Amtrak included in the Declaration a "statement of the public use for which the interest is taken," which explained the need for the condemnation as follows:

> Amtrak's acquisition of the Subject Property Interest is necessary for and will be used for intercity rail passenger transportation. Amtrak is acquiring the Subject Property Interest to ensure that [Union Station] reaches its full potential as a premier rail passenger station and multimodal transportation hub.  In particular, Amtrak needs to acquire the Subject Property Interest to, among other things, repair and reinforce the train tunnel under the Station, expand the existing passenger waiting area, and to manage effectively the Station now and in the future.  With the acquisition of the Subject Property Interest, Amtrak will gain control of the essential day-to-day management and operations at [Union Station] and will be able to make necessary improvement to and investments in the Station.

*Id.* ¶ 1.  The Declaration also estimated the value of just compensation for the USI Sublease to be $250 million.  *Id.* ¶ 5.  Amtrak deposited that sum with the court.  *See* Praecipe for Deposit of

Money into Ct., ECF No. 3.  All three named defendants—USI, Union Station Sole Member ("USSM"), and Kookmin—then filed answers to the condemnation petition.  ECF Nos. 35, 36, 38.

Soon afterwards, it became apparent that USI's ownership was in dispute.  The contest centered on whether Kookmin, the trustee of the debt issued to USSM, had acquired control over USI due to USSM's default on the debt.  The relevant loan was originated by Rexmark, a management and investing firm, and was secured by USSM's ownership of USI.  Defendants asked the court to resolve USI's ownership by determining which party-defendant had properly filed an answer on behalf of USI: Kookmin or USSM.  Def. USSM's Mot. to Strike, ECF No. 55-1; Lender's Mem. of L. in Opp'n to USSM's Mot. to Strike, ECF No. 56.  Reluctant to resolve a complex ownership dispute through a procedural motion, the court encouraged the parties to resolve their conflict, *see* Hr'g Tr., ECF No. 78, at 23:8-20, but they were unsuccessful, Jt. Status Report, ECF No. 76.

Ultimately, on August 25, 2022, Kookmin and Rexmark established themselves, at least preliminarily, as the rightful owner of USI.  They secured a preliminary injunction in the U.S. District Court for the Southern District of New York that barred USSM from "holding itself out as the owner of or in control of [USI]" or from "exercising or purporting to exercise any contractual or legal right of USI."  Prelim. Inj. Order, *Daol Rexmark Union Station v. USSM*, No. 22-cv-6649 (S.D.N.Y.), ECF No. 39.  Kookmin thus now possesses and exercises the controlling interest in USI for purposes of this litigation, as does Rexmark, which serves as Kookmin's agent in the United States.  Today, Rexmark oversees the USI Sublease and the day-to-day operations at Union Station.  For ease of reference, the court will refer to Kookmin, Rexmark, and associated entities as "Lender."

Meanwhile, on July 8, 2022, Amtrak filed a Motion for Immediate Possession of the Subject Property Interest, Pl.'s Mot. for Immediate Possession, ECF No. 72 [hereinafter Pl.'s Mot.], which all Defendants opposed, *see* Def. USSM's Opp'n to Pl.'s Mot., ECF No. 82; Defs. Lender and USI's Opp'n to Pl.'s Mot., ECF No. 83.  To demonstrate that it was unable to purchase the USI Sublease, Amtrak submitted evidence that on April 6, 2022, it offered USI $250 million to acquire the USI Sublease, and USI neither accepted the offer nor proposed a counteroffer by the deadline of April 13, 2022.  Ex. 3 to Pl.'s Mot., ECF No. 72-5, at 2.  Amtrak filed this action the following day.  Compl., ECF No. 1.

On January 18, 2023, the court held a hearing on the motion for immediate possession but did not rule.  Hr'g Tr., ECF No. 85.  Instead, it questioned whether "Amtrak ha[d] done enough [] to try and achieve some negotiated agreement with the property owner."  *Id.* at 11:18-19.  The court gave the parties 30 days to attempt to reach a deal.  *Id*. at 57:11-15; 59:24-25.

The negotiations proved unsuccessful.  After approximately nine to 10 meetings over a two-month period, the parties announced that they had been unable to reach an agreement. Jt. Status Report, ECF No. 92; Hr'g Tr., ECF No. 94, at 4:6-7.  They then sought a limited period of discovery as to Amtrak's pending motion for immediate possession, which the court ordered for a period of two months, to conclude on June 6, 2023.  *See* Hr'g Tr., ECF No. 94, at 14:14-25; Minute Order, Apr. 6, 2023.

The court held an evidentiary hearing on September 11, 2023.  Hr'g Tr., Sept. 11, 2023 [hereinafter Evid. Hr'g Tr.].  Amtrak called its Chief Executive Officer, Steven Gardner, who testified about Amtrak's strategic plans and goals should it acquire Union Station and the necessity of the USI Sublease for Amtrak's provision of intercity passenger rail service.  *Id.* at 11:5–166:19.

11

Amtrak also called its Vice President of Strategy and Planning, Dennis Newman, to testify about Amtrak's attempts to acquire the USI Sublease. *Id*. at 168:2–197:4.

Lender called three witnesses.  The court heard from the former Chief Executive Officer of USRC, Beverly Swaim-Staley, who addressed the need for Amtrak to acquire the USI Sublease and the working relationships among the Department of Transportation, USRC, USI, and Amtrak. *Id.* at 213:2–265:10.  Lender also called the Managing Principal of Rexmark, Michael Rebibo, to testify about developments under Rexmark's management of the USI Sublease; USI's relationship with Amtrak; and the negotiations to acquire the USI Sublease.  *Id.* at 266:15–313:9.  Finally, Lender presented Matthew Barry, the General Manager of Union Station, to speak about the current state of the station.  *Id.* at 315:2–337:3.  The parties submitted various documents into evidence.  *See* ECF Nos. 101–104 (exhibit lists).

The court then received the parties' proposed findings of fact and conclusions of law. Lender's Proposed Findings of Fact & Conclusions of Law, ECF No. 99 [hereinafter Lender's PFFCL]; Pl.'s Proposed Findings of Fact & Conclusions of Law, ECF No. 100 [hereinafter Pl.'s PFFCL], and it held an oral argument on November 28, 2023, Hr'g Tr., ECF No. 105 [hereinafter Oral Arg. Tr.].

## II.     FINDINGS OF FACT

Having considered the testimony presented, the exhibits submitted, and the parties' filings, the court makes the following findings of fact.

### A.     The Parties

1.     Amtrak is a federally charted, for-profit corporation whose statutory purpose is to provide passenger rail service throughout the United States.  The Department of Transportation is a majority shareholder of Amtrak.

2.      Kookmin is trustee of KTB CRE Debt Fund No. 8, a Korean Investment Trust that holds a loan to USI that is secured by the USI Sublease.  Lender's Answer to Compl. for Condemnation, ECF No. 35, at 2.  Rexmark serves as the Trust's agent in the United States and oversees the day-to-day management of the loan.  *Id.*; Evid. Hr'g Tr. at 270:18-22.

3.      USI is a limited liability corporation organized under Delaware law.  It is the USI Sublease that Amtrak seeks to condemn and immediately possess.

4.      USSM is a limited liability corporation organized under Delaware law.  Until 2022, it was the sole owner of USI.

5.      Neither the Department of Transportation nor USRC is a party to this matter, and neither has intervened in this case.

**B.    Legal Interests in Union Station**

6.      Pursuant to its authority under the USRA, the Secretary of Transportation purchased Union Station in 1988.  Jt. Ex. 3, at 0000089.

7.      USRC is a corporation organized under the District of Columbia Non-Profit Corporation Act.  The Secretary of Transportation and the Administrator of the FRA are ex officio members of USRC's Board of Directors, 40 U.S.C. § 6905, and the Chief Executive Officer of Amtrak sits on USRC's Board, as well, Evid. Hr'g Tr. at 57:9-15, 255:14-24.

8.      On October 31, 1985, the United States, acting through the FRA, entered into a lease agreement with USRC that conveyed right, title, and interest in Union Station to USRC.  Lender's Ex. 8, at 9; Evid. Hr'g Tr. at 246:2-3.  The purpose of the agreement is to "facilitate rehabilitation and development of the Union Station complex."  Lender's Ex. 8, at 1.  The lease provides that USRC would "enter[] into a firm business arrangement with a developer" preselected

by the Secretary "to redevelop Union Station."  *Id.* at 1–2.  The Secretary selected Union Station Venture, Ltd. ("USV"), a limited partnership formed under District of Columbia law.  *Id.*

9.      As contemplated, USRC simultaneously entered into a sublease with USV, whose terms largely mirror USRC's lease with the FRA.  Lender's Ex. 17.  The USRC-USV sublease authorizes the use of Union Station "only as a multiple use passenger rail station and commercial complex and for related purposes."  *Id.* at 33, § 12.1.  The sublease requires USV to "provide access twenty-four (24) hours per day, seven (7) days per week, by rail patrons to the facilities leased by Amtrak" and to "maintain and operate the retail portion of the Project primarily for retail uses."  *Id.* at 33–34, § 12.3(c)(i)–(ii).

10.     On January 25, 2007, USV II (a successor entity to USV) assigned its leasehold interest in the USRC-USV sublease to USI.  Lender's Ex. 21.  As USV's successor-in-interest, USI stepped into USV's shoes.  The Assignment and Assumption of Leasehold Interest agreement that conveyed the USV's leasehold interest to USI is the interest that Amtrak seeks to condemn in this matter, i.e., the USI Sublease.  Ex. 1 to Decl. of Taking, ECF No. 4-1.

11.     USI was previously wholly owned by USSM.  USSM is a limited liability company wholly owned by Ashkenazy Union Station Holdings, LLC, a New York-based redevelopment company.  Jt. Ex. 3, at 5; Compl., *Daol Rexmark Union Station v. USSM*, No. 22-cv-6649 (S.D.N.Y.), ECF No. 1, ¶ 8 [hereinafter *Rexmark* Compl.]; Answer, *Daol Rexmark Union Station v. USSM*, No. 22-cv-6649 (S.D.N.Y.), ECF No. 45 [hereinafter *Rexmark* Answer], at 3.

12.     On May 8, 2018, Citi Real Estate Funding, Inc. and Natixis Real Estate Capital, LLC loaned $330 million to USI secured by the USI Sublease ("Senior Note").  Lender's Ex. 13. On the same day, Rexmark originated a $100 million loan to USSM, secured by USSM's

ownership of USI ("Mezzanine Loan").  Lender's Ex. 14; Evid. Hr'g Tr. at 270:18-19.  Kookmin was designated as trustee of the Mezzanine Loan.  Evid. Hr'g Tr. at 270:13-17.

13.     In May 2020, USI and USSM defaulted on both the Senior Note and the Mezzanine Loan.  *Rexmark* Compl. ¶ 28; *Rexmark* Answer at 6.  The holders of both the Senior Note and the Mezzanine Loan accelerated the loan payments, as authorized under the agreements, and proceeded to foreclosure.  Jt. Ex. 3, at 5.

14.     The Senior Note and the Mezzanine Loan were scheduled for foreclosure auctions on January 4, 2022, and January 6, 2022, respectively.  *Id.*  These auctions were called off, however, because on January 5, 2022, Rexmark, or Lender, exercised an option to acquire the Senior Note.  *Id.*; Evid. Hr'g Tr. at 271:2; *Daol Rexmark Union Station v. USSM* Hr'g Tr., Ex. B to Proposed Status Report, ECF No. 81-2, at 30:23 [hereinafter *Rexmark* Tr.].  Lender's acquisition of the Senior Note and USSM's default on the Mezzanine Loan threw the ownership of USI and the control of the Station into question.  *See generally Rexmark* Tr. at 30–33.

15.     In June 2022, Lender foreclosed on the Mezzanine Loan and bid approximately $140 million in exchange for the equity interests in USI.  *Rexmark* Tr. at 32:25–33:2; Evid. Hr'g Tr. at 269:7-12.  Following the foreclosure sale, Lender owned and controlled USI, which retained its contractual right to possess and manage Union Station, pursuant to the USI Sublease.  *Rexmark* Tr. at 28:1-4, 33:12-14, 56:19-23.

16.     Today, USI is a subsidiary of an entity called Daol Rexmark Union Station, LLC, which Rexmark manages.  Evid. Hr'g Tr. at 271:7-10.  Rexmark is Kookmin's agent in the United States and is, "for all effective purposes," the entity "that runs the investment."  *Id.* at 270:21-22; 269:13–270:2.

17.     At present, Lender controls the USI Sublease.

18.     The USI Sublease is the property interest that Amtrak seeks to condemn in this matter.  That is, Amtrak seeks to substitute itself for USI as the lessee of the USRC-USI lease to become USRC's tenant and control the Station.

**C.     The USI-Amtrak Sublease**

19.     The FRA-USRC lease contemplated that Amtrak would enter into a ground lease covering a portion of Union Station.  Lender's Ex. 8, at 22–23.  Amtrak entered into that sublease with USV in 1988.  Lender's Ex. 4.

20.     Amtrak currently occupies less than 20% of Union Station.  Evid. Hr'g Tr. at 272:14-15.

21.     Section § 2.2 of the USV-Amtrak Sublease affords Amtrak the option to lease space adjacent to its original leased premises, but that option, which Amtrak has exercised, is limited to the West and East Concourses.  Lender's Exs. 4, 7, 22.  Amtrak thus does not presently have an option to lease the remainder of the Station.  For instance, Amtrak does not have a right to lease the Great Hall under its existing sublease.  Evid. Hr'g Tr. at 303:12-16.

22.     If Lender were open to leasing the Great Hall to Amtrak, Amtrak would have to negotiate with Lender over the fair market value of that property.  *Id*. at 302:12-17, 312:18–313:8.

**D.     Passenger Rail Services at Union Station**

23.     Amtrak's ridership has grown dramatically in the past four decades, transforming Union Station into a major transportation hub.  *Id*. at 246:5-11.  In 1988, Amtrak's annual rail passenger ridership out of Union Station was a mere three million riders.  *Id*. at 16:7-22.  By 2018, that number had increased to 14 million.  *Id.*

24.     Union Station serves more than just Amtrak passengers.  Millions of people pass through the terminal using various modes of transportation.  That includes commuter rail

passengers who use the Maryland Area Rail Commuter and Virginia Railway Express systems; riders on the Washington Metro Area Transit Authority; and inter-city bus passengers. In 2021, approximately 37 million people passed through Union Station through some mode of transportation. Jt. Ex. 5, at 0008622.

25. Growth, particularly of the Northeast Corridor line, is essential for Amtrak's continued success. Evid. Hr'g Tr. at 15:6-7, 246:18-21. To that end, Amtrak plans to double its ridership between present day and 2040, in part by increasing train volumes at Union Station from about 220 trains per day to over 500 trains per day, including commuter rail. *Id*. at 17:7-18. Amtrak has purchased 28 new Acela trains that will increase Amtrak's capacity between Washington, D.C. and New York City by about 80%. *Id*. at 15:14-19.

### E.   The Concourse Modernization Project

26. Today, Amtrak primarily operates in Union Station out of what is known as the Claytor Concourse. *Id*. at 18:13-14. This is the area where Amtrak boards, queues, and provides services to passengers, such as ticketing, baggage drop-off and retrieval, restroom facilities, and seating. *Id*. at 28:11-22. The Concourse does not contain a ticketed waiting area. *Id*. at 34:19-21.

27. On a typical day, during peak travel times, it is not unusual for there to be a thousand passengers within the Concourse area. That number surges when trains are delayed, sometimes doubling the number of passengers within the Concourse. *Id*. at 28:21-22, 30:24–31:6.

28. Amtrak conducted an internal analysis of its pedestrian flow in the Concourse, and it yielded results showing a poor passenger experience, both at on- and off-peak times. *Id*. at 31:15–32:11. The Concourse offers no waiting area and insufficient seating options to meet demand. *Id*. at 32:15-24. As a result, for many, the passenger experience at Union Station is frustrating. *Id*. at 249:9-13.

29.     The Concourse Modernization Project ("CMP") is a project executed by Amtrak, the FRA, USRC, and USI, which was designed to remedy some of these issues.  *See* Lender's Ex. 1, at 0014799.  It is part of the Second Century program, a series of projects that began in 2012. Evid. Hr'g Tr. at 222:17.  The CMP entails renovating and expanding the Concourse to increase passenger space and amenities.  Lender's Ex. 3, at 5; Evid. Hr'g Tr. at 254:7-8.  The vision of the CMP is not necessarily confined to the Concourse and could be expanded depending on the ultimate design.  Evid. Hr'g Tr. at 226:5-18.

30.     During Swaim-Staley's tenure as Chief Executive Officer for USRC, USRC agreed that the CMP was necessary for Amtrak to continue serving the Northeast Corridor.  *Id*. at 253:16-17.  Swaim-Staley met with Amtrak and USI weekly, with the FRA joining those meetings beginning around 2019 or 2020, to advance the project.  *Id*. at 228:12-23.

31.     The CMP has been in the planning stages for over a decade.  *Id*. at 222:14–223:8. It hit a major roadblock around 2019 when the FRA rejected the initial design as insufficient.  *Id*. at 227:13-25.  The FRA must approve construction permits before any actual changes can take place in the historic part of the station.  *Id.* at 106:22-24; 218:11-25.

32.     Thereafter, in 2020, USRC was asked to take over the CMP as a design-build project, but Amtrak reclaimed responsibility for it in August 2021, causing the project effectively to restart.  *Id*. at 126:12–127:10, 228:1-4.

33.     As of March 2023, the CMP remained in the pre-design phase and only 10% complete, meaning that Amtrak had not yet submitted designs to the FRA for approval.  *Id*. at 236:16-21, 227:2-8; Lender's Ex. 2, at 4.  The earliest projected construction start date is January 2025.  Lender's Ex. 2, at 5.

F.     **The Subbasement Project**

34.     Another component of the Second Century program is the Subbasement Project. The Subbasement Project was initiated a decade ago, when authorities discovered serious issues with the supporting structures for the track beds under Union Station.  Evid. Hr'g Tr. at 224:7-11. The Subbasement Project seeks to replace existing degraded bridging structure within the First Street tunnel.  Lender's Ex. 3, at 5.  To facilitate this structural repair, the utilities infrastructure must be relocated.  *Id.*

35.     When Amtrak began planning the CMP and the Subbasement Project years ago, it did so assuming that it would remain a subtenant of Union Station, not become the leaseholder of the entire property.  Dep. of Gretchen Kostura, at 121:8-10 (citing Lender's Ex. 2).

36.     The Subbasement Project remains in the early stages.  As of April 2023, the Subbasement Project was only 5% complete, and it had moved out of the "planning" phase. Lender's Ex. 2, at 1.

37.     According to Amtrak, if it possessed the leasehold interest in Union Station, it would immediately advance the CMP and the Subbasement Project by moving along the project designs.  Evid. Hr'g Tr. at 89:25–90:7.

G.     **Redesign and Repurposing of Union Station**

38.     If it were to obtain immediate possession of the entire leasehold, Amtrak proposes making multiple immediate changes to improve the customer experience.  Those include creating temporary seating and waiting areas for passengers, improving "redcap" services to assist customers, locating Amtrak customer service representatives throughout the station, creating a temporary ticketing area, adding temporary signage to guide passengers, and bolstering security through both Amtrak police and contracted private security.  *Id*. at 87:21–90:7.

39.     Amtrak also has developed a concept design that envisions how it might remake Union Station if it were to possess the USI Sublease.  *See* Pl.'s Ex. 10.  To be clear, the concept design is preliminary.  It reflects only Amtrak's vision of how it might redesign and repurpose the space in Union Station.  Evid Hr'g Tr. at 47:5-25.

40.     Among other things, Amtrak would like to expand its Metropolitan Lounge for first-class passengers, add additional signage to increase the prominence of Amtrak's branding, move Amtrak's office space for employees and Amtrak police within the station, create a crew base, and increase event space for job fairs and children's play areas.  *Id*. at 35:2-22, 36:23–37:9, 37:18–41:20, 43:9–44:18, 52:14–53:4.  The concept designs are depicted below:





**Concourse Mezzanine Floor**



**Lower Level**

Pl.'s Ex. 10.

41.     If Amtrak's concept design were to come to fruition, the amount of space devoted to commercial purposes would shrink significantly, which would mark a major shift from Union Station's present use.  Jt. Ex. 4, at 47–49; Pl.'s Ex. 10; Evid. Hr'g Tr. at 274:5-12.  Currently, large parts of the station outside of Amtrak's control are leased to retailers and food establishments. Evid. Hr'g Tr. at 275:4-6.

42.     To manage the station, Amtrak would rely on a third-party property management company, because it does not have sufficient internal resources.  Jt. Ex. 3, at 8–9.  Amtrak intends to retain the current property management company, Jones Lang Lasalle, upon possessing the USI Sublease.  Evid. Hr'g Tr. at 161:5-24; Jt. Ex. 4, at 0007757.

43.     Amtrak has not discussed these proposed changes with USI.  Evid. Hr'g Tr. at 142:5–143:1, 290:25–291:8, 324:7-19.

## H.      The Parties' Working Relationship

44.     As a subtenant within Union Station, Amtrak must seek USI's permission to take certain actions.  *Id*. at 62:13-17.  Amtrak believes that "dealing with USI" has "often [been] an impediment to the pace and outcomes that [it] wanted to see" at the station.  *Id*. at 63:14-16; *see also id.* at 105:19-22 (identifying the Track 22 project as "heavily impeded for a long time by USI" and Amtrak was "delayed as a result of it," impacting "both [Amtrak's] cost and schedule"); Jt. Ex. 6, at 2, 4.

45.     That "challenge," according to Amtrak, stems from "a different set of interests." Evid. Hr'g Tr. 63:9-10.  USI's interests are primarily "commercial," whereas Amtrak views the station as a primarily "transportation facility."  *Id.* at 63:10-13.

46.     USI's manager through Rexmark, Michael Rebibo, believes that he has a "very good working relationship" with Amtrak, with ample communication and no outstanding

22

problems.  *Id*. at 300:5-13.  Rebibo's opinion of the Amtrak-USI working relationship, however, is limited to the preceding 20 months, because he only began liaising with Amtrak in August 2022. *Id.* at 306:8-17.

47.     The current on-site property manager of Union Station, Matthew Barry, also has a limited historical understanding of the Amtrak-USI relationship.  He began working with Amtrak in November 2022.  *Id.* at 325:12-23.  Since Lender secured control of Union Station, and since the filing of this action, neither Jones Lang Lasalle nor USI have consulted Amtrak when negotiating or renegotiating subleases with retail vendors.  *Id*. at 330:3–331:13.

48.     The parties have different understandings of the productivity of their working relationship.  Although Amtrak has cited few actual examples of USI hindering Amtrak's ability to achieve its transportation goals, there is no evidence that Amtrak has manufactured its past challenges with USI as a pretext to acquire the USI Sublease.

### I.     Amtrak's Efforts to Purchase the USI Sublease

49.     On June 10, 2021, the Amtrak Board met to consider issues relating to Union Station.  A management presentation to the Board described the station's governance structure as "obsolete and complex" due in part to "misalignment between parties."  Jt. Ex. 5, at 5.  The presentation also identified a host of existing challenges at Union Station, including poor customer experience, inadequate facilities, high vacancy rates, and a backlog of critical maintenance.  *Id.* at 6–10.  Amtrak's strategy then was to focus on "collaboration with DOT/FRA to chart a new path" through "[i]ncreased capacity for rail service growth" and the Second Century Plan, among other things.  *Id*. at 18, 19.

50.     On December 7, 2021, the Amtrak Board met to consider a different approach: purchasing the USI Sublease.  *See* Jt. Ex. 6.  According to a management proposal submitted to

the Board, USI's "loan defaults and scheduled foreclosure sales" presented a "unique opportunity" for Amtrak to acquire USI's leasehold interest.  *Id.* at 3.

51.      Amtrak management submitted that acquisition of the leasehold would better position Amtrak to efficiently implement repair, maintenance, and capital improvement projects. *Id.* at 4.  It also would "improve the Amtrak customer experience," "enhance[] Amtrak's product," and "diversify[] existing revenue streams."  *Id.*  It further stated that "[n]either the current ownership and governance structure, nor the physical condition of [Union Station] affords Amtrak sufficient direct and effective control over the passenger experience at [Union Station]," "hinder[ing] the ability for growth of intercity rail at [Union Station] in a way that limits Amtrak's ability to meet future travel market demands."  *Id*. at 5.  On the other hand, "[a] status quo condition at [Union Station] will lead to continued underinvestment, deferred maintenance[,] and compounding deterioration of a historical federal asset."  *Id.* at 6.

52.      Amtrak's management projected that acquiring the USI Sublease would yield financial benefits by, among other things, injecting capital funding into Amtrak, diversifying its assets, and gaining returns on investment.  Evid. Hr'g Tr. at 78:17-19.

53.      The proposal identified three possible paths to acquisition: (1) purchasing the debt from the then-holder of the Senior Note before the scheduled foreclosure sale on January 6, 2022; (2) bidding at the foreclosure sale; or (3) "[e]xercis[ing] Amtrak's statutory right of eminent domain and condemn[ing] the Sublease Interests."  Jt. Ex. 6, at 3.

54.      In estimating possible acquisition costs, management identified a third-party appraisal that valued the USI Sublease at $830.9 million (based on a 10-year net present value of cash flow plus terminal capitalization value).  *Id*. at 8.  Amtrak management disagreed with that appraisal.  In the Board proposal, it "adjusted assumptions . . . to more accurately reflect the

operating realities in [Union Station]" and determined an appraised value of $229.1 million. *Id.* Amtrak was aware that USI's outstanding debt was $550 million. *Id.*

55.     The Board authorized management to move forward with attempting to purchase the leasehold interest from the holder of the Senior Note (Lender had not yet exercised the option to purchase the Senior Note).  Pl.'s Ex. 1, at 5; Evid. Hr'g Tr. at 85:5-16.

56.     To secure the funding, Amtrak requested pre-programming authority from the FRA to put $550 million towards acquiring the USI Sublease.  Lender's Ex. 9.  The FRA formally approved the request on January 5, 2022.  Lender's Ex. 10, at 0001983.

57.     On December 27, 2021, Amtrak offered to purchase USI's leasehold interest in the Station from the original holder of the Senior Note for $300 million.  Pl.'s Ex. 2; Evid. Hr'g Tr. at 183:13-24.  The offer letter indicated: "Amtrak has determined that ownership of the Property is necessary for intercity rail passenger transportation and an improved customer experience." Pl.'s Ex. 2, at 1.  The offer was rejected.  Evid. Hr'g Tr. at 183:25–184:12.

58.     Amtrak then decided to bid at the scheduled foreclosure sale with the purpose of acquiring the USI Sublease.  *Id.* at 80:4-15.  The auction was called off, however, when Lender, as the originator of the Mezzanine Loan, exercised an option to acquire the Senior Note. Pl.'s Ex. 1, at 3.

59.     Three weeks after the auction's cancellation, Amtrak and Lender had a meeting at which Amtrak expressed interest in acquiring the leasehold interest.  Evid. Hr'g Tr. at 283:11– 284:3.  At that meeting, Amtrak did not make a firm offer, but Rebibo informed Amtrak that Lender recently had received an offer of approximately $700 million for a partial interest.  *Id.* at 284:8-13.

60. On January 28, 2022, Amtrak advised USI that it intended to conduct its own appraisal of Union Station, but USI objected to Amtrak doing so. *See* Pl.'s Exs. 3, 4.

61. On February 18, 2022, the Amtrak Board met to again discuss the proposal to acquire the USI Sublease. Jt. Ex. 2; Evid. Hr'g Tr. at 79:25–81:3.

62. Around this time, Amtrak management had engaged FTI Consulting, a management consulting firm, to advise on the valuation of the USI Sublease. Jt. Ex. 2, at 182; Jt. Ex. 3, at 20. Based on publicly available data and market-based assumptions, FTI estimated a high-end value of no greater than approximately $400 million, with a "more likely valuation" of less than $250 million. Jt. Ex. 3, at 20. Cushman & Wakefield, a real estate services firm, also prepared an appraisal that estimated the USI Sublease to be worth $250 million. Lender's Ex. 24.

63. On March 22, 2022, the Amtrak Board met once more and this time adopted a Resolution to acquire the USI Sublease. *See* Pl.'s Ex. 1. In its Resolution, the Board stated that the "current USI sublease at [Union Station] has led to serious concerns as to the execution of necessary maintenance, capital improvements[,] and future redevelopment at [Union Station], as well as accountability for cleanliness, safety, security[,] and operational efficiencies befitting a multimodal transportation center of national significance necessary for intercity rail passenger transportation[.]" *Id.* at 3. The Board further found that "acquisition of the Sublease Interests is necessary to ensure the condition and longevity of [Union Station] as a multimodal transportation center and a key asset of Amtrak's core business and provides an opportunity to improve the lease structure of [Union Station] to serve the long-term interests of this essential multimodal station[.]" *Id.* at 4. The Board unanimously authorized and approved "the acquisition of the Sublease Interests by either entering into a binding Negotiated Deal, submitting a binding bid at Auction, or by Condemnation[.]" *Id.* at 5. The Board further authorized management to undertake the actions

necessary to acquire the USI Sublease, including "executing . . . documents for condemnation proceedings[.]" *Id.*

64. The FRA Administrator, as the representative of the Secretary of Transportation, was present at this meeting and voted in favor of acquiring the USI Sublease, including through condemnation. *Id.* at 1. The FRA again approved pre-programming authority for the acquisition. *Id.* at 4; Jt. Ex. 3, at 22 (requesting FRA approval of $66 million).

**J.      Amtrak's Efforts to Acquire the USI Sublease**

65. On April 6, 2022, Amtrak made an offer to USI to purchase the USI Sublease for $250 million. Jt. Ex. 8. The offer expired on April 13, 2022. *Id.*

66. The next day, representatives from Amtrak and USI spoke over the phone regarding the offer, and USI proposed setting up a meeting with the owner of USSM. Jt. Ex. 7, at 0015462–0015464; Evid. Hr'g Tr. at 172:8-13. After the call, the parties communicated about a next meeting, which Amtrak said would need to "occur within the timeframe indicated in our offer as time is of the essence." Jt. Ex. 7, at 0015461. Amtrak also said that it would need to have a counteroffer from USI prior to the meeting. *Id.* at 0015460. USI responded, protesting the professed urgency, but otherwise disregarding Amtrak's efforts to set a remote meeting. *Id.*

**K.      Post-Suit Negotiations**

67. Amtrak filed suit on April 14, 2022, the day after its offer to USI expired. Compl., ECF No. 1.

68. Following a hearing on January 18, 2023, and at the court's direction, Hr'g Tr., ECF No. 85, at 59, the parties began efforts to reach a deal. Their negotiations centered on a purchase price and other solutions, such as amending the parties' existing sublease, a possible joint

venture, or an alternative structure akin to Amtrak's status at the Moynihan Train Hall in New York City.  Evid. Hr'g Tr. at 288:21–289:5, 289:23–290:10.

69.     The parties met nine to 10 times, but by March 23, 2023, they had reached an impasse.  Hr'g Tr., ECF No. 94, at 4.  The parties were unable to reach an agreement as to a purchase price or alternative terms.  Evid. Hr'g Tr. at 181:11-19, 307:13–308:5.

## III.    CONCLUSIONS OF LAW

Having made its findings of fact, the court sets out below its conclusions of law.  The court begins with the standard governing the present motion, before turning to the merits.

### A.     49 U.S.C. § 24311 Is a Quick-Take Statute

The parties agree that, when Amtrak filed its declaration of taking and deposited the sum of $250 million in the court's registry, title to the USI Sublease passed to Amtrak.  49 U.S.C. § 24311(b)(2).  Their dispute centers on the process and legal standard for Amtrak to take actual possession of that interest.  Pl.'s PFFCL ¶ 2 (citing Hr'g Tr., ECF No. 85, at 35:11-19, 37:9-11).

Amtrak argues that its eminent domain statute, 49 U.S.C. § 24311, contains a "quick take" provision that authorizes it to take immediate possession of condemned property upon its filing of a declaration of taking and the required deposit.  That procedure, Amtrak says, is analogous to the quick-take provision in the Declaration of Takings Act ("DTA"), 40 U.S.C. § 3114(b)(1), which is the general federal condemnation statute.  The only additional showings required by § 24311 are nominal showings of "necessity" and an inability to otherwise acquire the property.  Pl.'s PFFCL ¶¶ 7–10 & n.4; Oral Arg. Tr. at 8:9-20 (arguing in favor of a "pleading-plus" standard).  Lender, on the other hand, demands Amtrak prove more.  It maintains that Amtrak can only secure possession of the leasehold interest before entry of final judgment by satisfying the traditional, four-factor preliminary injunction standard.  Lender's PFFCL ¶ 84.

No court appears to have addressed a motion under § 24311 for immediate possession before a final adjudication of the merits.  *Id*. ¶ 82.  Courts that have applied § 24311 have done so under circumstances different than those presented here.  *Cf. Nat'l R.R. Passenger Corp. v. 3.44 Acres More or Less of Land & Bldg. located at 900 2nd St. NE, Wash., D.C. 20002-3557*, 266 F. Supp. 3d 63, 66 (D.D.C. 2017) ("*3.44 Acres*") (parties stipulated to Amtrak's possession of the property pending disposition of the merits); *Nat'l R.R. Passenger Corp. v. 4.0446 Acres More or Less of Land & Fixtures*, No. 17-cv-1752, 2019 WL 1057932, at *1 (E.D. Pa. Mar. 6, 2019) (summary judgment based on stipulated facts); *Nat'l R.R. Passenger Corp. v. 4,945 Square Feet of Land More or Less Situated in Cnty. of Bristol*, 1 F. Supp. 2d 79, 83 (D. Mass. 1998) ("*Bristol*") (summary judgment resulting in an order of possession to Amtrak, where there was no prior request for pre-judgment possession).

Notwithstanding the novelty of the issue presented, its resolution is not difficult based on a reading of § 24311(b)(2).  The statute states that "[w]hen the declaration is filed and the deposit is made . . . title to the property vests in Amtrak in fee simple absolute or in the lesser interest shown in the declaration, and the right to the money vests in the person entitled to the money." 49 U.S.C. § 24311(b)(2).  Similar text is contained in the DTA.  *See* 40 U.S.C. § 3114(b)(1) ("On filing the declaration of taking and depositing in the court, to the use of the persons entitled to the compensation, the amount of the estimated compensation stated in the declaration . . . title to the estate or interest specified in the declaration vests in the Government[.]").  Courts have interpreted § 3114(b)(1) of the DTA as "vest[ing]" the government's "right of possession [] immediately upon filing a declaration of public use and assuring the court that the government will pay the full just compensation amount, once determined, by deposit, appropriation, or otherwise." *Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 550 F.3d 770, 774 (9th Cir. 2008);

*Transcon. Gas Pipe Line Co. v. Permanent Easements for 2.14 Acres & Temp. Easements for 3.59 Acres in Conestoga Twp., Lancaster Cnty., Tax Parcel No. 1201606900000*, 907 F.3d 725, 734 (3d Cir. 2018) (describing the DTA as providing quick-take authority because "title vests automatically with the United States" upon the filing of a declaration of taking and a deposit of estimated compensation).   Given the parallel statutory text, § 24311(b) should likewise be interpreted to vest immediate possession in Amtrak when it fulfills the quick-take provision's procedural requirements.   *See United States v. Davis*, 139 S. Ct. 2319, 2329 (2019) (courts "normally presume that the same language in related statutes carries a consistent meaning"); *see also Nat'l R.R. Passenger Corp. v. 025 Acres More or Less of Land*, No. 23-cv-2158 (JKB), 2023 WL 5940042, at *1 (D. Md. Sept. 12, 2023) (reading § 24311 to contain a quick-take provision).

There is one notable distinction between the two statutes.   Whereas the DTA expressly provides that upon filing the declaration and making the deposit "the land is condemned and taken for the use of the Government," 40 U.S.C. § 3114(b)(2), Congress did not include similar text in § 24311(b).   But the court does not view that difference to negate Amtrak's quick-take power (nor has Lender made that argument).   Nothing in the statutory text imposes any greater evidentiary standard or procedural burden on Amtrak to secure immediate possession of property.   *Cf. E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 825 (4th Cir. 2004) (holding that a preliminary injunction standard applies to a motion for immediate possession under the Natural Gas Act's statutory eminent domain provision, because under that Act "title . . . does not pass until compensation is determined and paid").

B.     **No Statute or Lease Term Bars Amtrak's Taking of the USI Sublease**

Lender makes a variety of arguments rooted either in federal statutes or the relevant leases to assert that Amtrak's eminent domain authority does not extend to the USI Sublease.  The court is not persuaded by any of these.

1.     *The USI Sublease Is Not Property of a "Governmental Authority"*

Section 24311(a)(1)(A) prohibits Amtrak from acquiring by eminent domain the "property of . . . a governmental authority[.]"  49 U.S.C. § 24311(a)(1)(A); *see Bristol*, 1 F. Supp. 2d at 83 ("Amtrak has no statutory eminent domain authority with respect to the property owned by governmental entities.").  Lender argues that "the provision of Subsection A that forbids Amtrak from taking property belonging to a governmental authority" prohibits Amtrak's condemnation of the USI Sublease, because the federal government owns the Union Station facility and its grounds in fee simple.  Jt. Opp'n of Lender & USI to Pl.'s Mot., ECF No. 83, at 30 [hereinafter Lender & USI's Opp'n]; Lender's PFFCL ¶ 85 (arguing that "Amtrak's statutory authority does not expressly allow it to condemn interests in federal property or federal contracts").  But the bar on Amtrak's acquisition of government property is not applicable here.

In the context of eminent domain, the Supreme Court has said that the term "property" refers to "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it."  *United States v. Gen. Motors Corp.*, 323 U.S. 373, 377–78 (1945).  When the government "exercises the power of eminent domain[,] it substitutes itself in relation to the physical thing in question in place of him who formerly bore the relation to that thing[.]"  *Id.* at 378.  The subject "property" is thus "what lawyers term 'interest' in the thing in question.  That interest may comprise the group of rights for which the shorthand term is 'a fee simple' or it may be the interest known as an 'estate or tenancy for years,'" as was the case in *General Motors*.  *Id.* In this case, the "thing," or property "interest," is not the fee simple interest to Union Station or

any agreement in which the federal government holds a property interest.  It is USI's leasehold interest as the tenant in the USRC-USI lease.  USI and USRC are both private entities.  Thus, Amtrak seeks to take a private property interest, not a government one, which it is permitted to do under § 24311.

Last, any concern regarding Amtrak's acquisition of a leasehold interest covering a parcel owned in fee simple by the United States is obviated by the fact that the Secretary of Transportation has expressly consented to the taking.  He did so both through his Board vote to approve condemnation and through the FRA's approval of pre-programming authority to fund it.  *See infra* Section III.B.3.

        2.      *Amtrak Can Take the USI Sublease without a "Request" from the Secretary of Transportation*

Section 24311 provides that Amtrak may acquire "interests in property" necessary for rail passenger transportation, but it also allows Amtrak to take interests "requested by the Secretary of Transportation in carrying out the Secretary's duty to design and build an intermodal transportation terminal at Union Station in the District of Columbia if the Secretary assures Amtrak that the Secretary will reimburse Amtrak." 49 U.S.C. § 24311(a)(1)(B).  Lender contends, somewhat half-heartedly, that this provision means that "any appropriation . . . relating to the 'intermodal transportation terminal at Union Station' must be initiated by the Secretary of Transportation." Lender & USI's Opp'n at 26.  Because the Secretary did not "request" the taking of USI's leasehold, Lender contends, Amtrak lacks the authority to do so.

But that reading ignores that § 24311 uses the disjunctive "or" to separate the two grounds on which Amtrak can exercise eminent domain.  "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).  Each provision typically should

be accorded its "independent and ordinary significance." *Id.* at 338–39.  Also, the "'[t]he word "or" has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both),' and is 'generally used in the inclusive sense.'"  *Rush v. Kijakazi*, 65 F.4th 114, 120 (4th Cir. 2023) (quoting *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015)).  Here, nothing about the text or structure of § 24311(a)(1) suggests that Congress meant (a)(1)(B) to restrict Amtrak's general eminent domain authority granted under (a)(1)(A) as to Union Station.  Lender's interpretation would have the court place an "unless" or "only if" at the start of (a)(1)(B) (*e.g.*, "unless" or "only if" requested by the Secretary of Transportation).  Those terms are simply not present.

Further, to the extent that the text of the statute is ambiguous, the legislative history of § 24311 supports the plain text interpretation.  As part of the Amtrak Improvement Act of 1973, Congress granted Amtrak the general eminent domain authority that is now codified in subsection (a)(1)(A).  *See* 87 Stat. at 550, § 6.  The following year, as part of the Amtrak Improvement Act of 1974, Congress added the provision that is now codified in subsection (a)(1)(B).  Pub. L. No. 93-496, 88 Stat. 1526, 1528, § 6 (1974).  When it made that amendment, the conference committee members "agreed to amend Section 305 of existing law in order to allow Amtrak to condemn any property at the request of the Secretary . . . in order to facilitate completion of the intermodal terminal" at Union Station "within the required time," but "wished to emphasize that this amendment in no way alters Amtrak's existing authority under such section 305."  H.R. Rep. No. 93-1441, at 19 (1974) (Conf. Rep.).  This history thus makes clear that Lender's reading of § 24311(a)(1)(B) as a limitation on Amtrak's general eminent domain authority is inaccurate.

> 3.    *The Union Station Redevelopment Act Does Not Limit Amtrak's Eminent Domain Authority*

Next, Lender asserts that the Union Station Redevelopment Act of 1981 ("USRA") implicitly forecloses this taking.  Lender's PPFCL ¶ 6; Oral Arg. Tr. 46–47, 74, 78–79.  The USRA

marked an important milestone in the history of Union Station.  The train station had fallen into disrepair and, after a roof collapse in 1981, Congress authorized the Secretary of Transportation to take control over Union Station from the Secretary of the Interior to oversee the rehabilitation and redevelopment of the facility as a multi-use transportation terminal.  *See* Pub. L. 97-125, 95 Stat. 1667, § 3 (1981).[2]  When Congress did so, it expressed that the purposes of the Act were to be achieved "with maximum reliance on the private sector and minimum requirement for Federal assistance."  *Id.* at 1667, § 2(7).  It also authorized the Secretary to enter into the present lease structure with private developers, under which Amtrak is a sublessee of space within the station.  Lender's PFFCL ¶ 6.  To disrupt the status quo, Lender contends, would be to subvert the intent of Congress by allowing Amtrak to become not a mere "space tenant (subtenant) at the Station, [but] the operator or developer," which is not the structure that Congress envisioned.  *Id.*; *see also* Oral Arg. Tr. at 78–79 (same).  What's more, Lender says, the contemplated new structure would require use of significant taxpayer funds to justly compensate for the leasehold interest, also contrary to Congress's intent to minimize the use of public funding to operate Union Station.  Oral Arg. Tr. at 45–46.

Absent some textual hook in the USRA, the mere impression of congressional intent upon which Lender relies is not enough to hold that the USRA bars Amtrak's exercise of eminent domain here.  Courts "approach federal statutes touching on the same topic with a 'strong presumption' they can coexist harmoniously."  *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018)).  Thus, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [courts are] not at 'liberty to pick and choose among congressional enactments.'"  *Epic Sys.*, 584 U.S. at 510

---

[2] *See* Blaine Harden, *Union Station, Leaking Badly, Closed as Unsafe*, Wash. Post, (Feb. 24, 1981), available at https://perma.cc/RH6N-U7GJ.

(quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).  If the "two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton*, 417 U.S. at 551.  "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow." *Epic Sys. Corp.*, 584 U.S. at 510 (quoting *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)).  "The intention must be 'clear and manifest.'" *Id.* (quoting *Morton*, 417 U.S. at 551).  Lender has not met that burden.

Lender points to no text in the USRA that speaks, even indirectly, to Amtrak's power of eminent domain.  The only provision addressing a takings power is one that grants the Secretary of Transportation the authority to "acquire for the United States, by lease, purchase, or otherwise, any interest in real property . . . and any other property interest . . . in or relating or adjacent to the Union Station complex that the Secretary [] deems necessary to carry out the purposes" of the Act. 95 Stat. at 1671, § 116(a)(1) (codified at 40 U.S.C. § 816(a)(1)).  Had Congress wished to bar Amtrak from operating Union Station as its primary leaseholder, it could have said so.

Importantly, the taking here does not impinge upon the broad grant of authority that Congress gave to the Secretary of Transportation to develop and manage the terminal.  The USRA leaves it to the Secretary to determine which development agreements to enter into and with whom, *id.* at 1670, §§ 115, 116(b) (codified at 40 U.S.C. §§ 815, 816(b)), and the Secretary has given his approval for Amtrak's taking of the USI Sublease.  On March 22, 2022, Amtrak received pre-programming authority from the FRA of $66 million to acquire the USI Sublease.  Pl.'s Ex. 1, at 4.  The FRA conditioned its approval of future programming requests "on Amtrak's successful renegotiations of the USI Sublease," whose terms the FRA deemed were "unsatisfactory and [did]

not serve the long-term interests of this essential multimodal station." Jt. Ex. 3, at 23 (letter from the FRA to Amtrak). The approval letter further referenced the "many discussions" among Amtrak, the Department of Transportation, and the FRA "about the acquisition of the USI Sublease." *Id.* at 24. The Secretary also later expressed his support for the condemnation by voting in favor of the acquisition of the USI Sublease as an ex-officio member of Amtrak's Board. 49 C.F.R. § 700.2; Pl.'s Ex. 1.

Amtrak's exercise of eminent domain, both as a matter of law and in its execution, is thus consistent with the broad grant of authority statutorily vested in the Secretary of Transportation under the USRA.

### 4. The USRC Sublease Does Not Preempt Amtrak's Taking

Finally, Lender contends that Amtrak's taking is barred by the lease between the FRA and USRC, which expressly contemplates that USRC would sublease its interest in Union Station to USV. USV later assigned its property interest to USI. Lender's Ex. 21; Lender's Ex. 8, at 2; Evid. Hr'g Tr. at 199–201. According to Lender, "Amtrak cannot countermand and doesn't have the unilateral authority to countermand the decision of the United States regarding the management" of Union Station. Evid. Hr'g Tr. at 199:12-15.

But there are two problems with that argument. The first is that the power of eminent domain cannot be contracted away and any effort to do so would be invalid. *See Georgia v. Chattanooga*, 264 U.S. 472, 480 (1924) (stating that the power of eminent domain "cannot be surrendered, and, if attempted to be contracted away, it may be resumed at will"); *4.0446 Acres More or Less of Land & Fixtures*, 2019 WL 1057932, at *9 (observing that if, as part of a settlement agreement, Amtrak had waived the right to exercise its power of eminent domain such waiver "would be invalid") (citing *Georgia*, 264 U.S. at 480). In view of this settled law, the court

will not read the USRC sublease to foreclose Amtrak's long-held eminent domain authority, simply because the parties originally contracted to have USV manage Union Station.

The second problem with Lender's argument is that the USRC sublease, as well as the downstream lease between USRC and USV, both contemplate the possibility of a condemnation. Each lease contains a detailed article titled "Condemnation," which sets forth the impact of a taking upon the lessee's obligations under the lease.  Lender's Ex. 8, art. 18 (USRC sublease); Lender's Ex. 17, art. 19 (USRC-USV lease).  That the parties contemplated that a "condemning authority" could take the applicable property interests cannot be squared with Lender's position that the leases foreclose Amtrak's taking here.  Lender's Ex. 8, § 18.1; Lender's Ex. 17, § 19.1.

### C.    Amtrak's Taking Satisfies the Conditions Contained in Section 24311

Section 24311 does require Amtrak to make two showings that the DTA does not. The statute permits a taking by Amtrak (1) that is "necessary for intercity rail passenger transportation," and (2) "only if it cannot acquire the interest in the property by contract" or "agree with the owner on the purchase price for the interest."  49 U.S.C. § 24311(a)(1)(A), (a)(2). Therefore, while § 24311 is a quick-take statute, the court must determine whether Amtrak has met its burden to show that the taking satisfies these two conditions.  Amtrak has done so.[3]

#### 1.    Necessary for Intercity Rail Passenger Transportation

To prove necessity, Amtrak must demonstrate that the USI Sublease has a "significant relationship" with Amtrak's provision of intercity rail passenger transportation.  *3.44 Acres*, 266 F. Supp. 3d at 69 (quoting *Nat'l R.R. Passenger Corp. v. Two Parcels of Land One 1691 Sq. Foot More or Less Parcel of Land in Town of New London*, 822 F.2d 1261, 1265 (2d Cir. 1987)).  "In other words, the taking must have some direct nexus to Amtrak's goals," which are set forth by

---

[3] The court has found no case that addresses the applicable evidentiary standard, whether it is a preponderance of the evidence or something higher.  Whatever the standard, the court concludes that Amtrak has met its burden.

statute.  *Id.*; *see also Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 503 U.S. 407, 419, 417 (1992) (interpreting the term "required for intercity rail passenger service" in a since-repealed eminent domain provision under the Rail Passenger Service Act, 45 U.S.C. § 562(d) (1992), and finding it satisfied where the acquisition "is a useful and appropriate way to accomplish [Amtrak's] goals"); *see id.* (rejecting the court of appeals' reading, which "limited Amtrak's condemnation authority to property that was necessary, in the sense of indispensable, to Amtrak's operations").

Amtrak wishes to condemn the USI Sublease to expand and improve its delivery of rail passenger services at Union Station, consistent with its statutory mandates.   49 U.S.C. § 24101(c)(3), (10), (12) (setting forth Amtrak's purposes, including implementing "strategies to achieve immediately maximum productivity and efficiency consistent with safe and efficient transportation," ensuring "equitable access to the Northeast Corridor," and "maximiz[ing] the use of its resources, including the most cost-effective use of employees, facilities, and real property"). An increased footprint would enable Amtrak to make immediate changes to enhance the customer experience, such as by placing ambassadors throughout the facility, increasing signage, expanding ticketing operations, and beefing up security.  *See* Jt. Ex. 4, at 5.

Also, according to Amtrak's Chief Executive Officer, immediate possession would allow Amtrak to accelerate work on important capital projects, such as the Concourse Modernization Project and the Subbasement Project.  More long-term control of the entire facility would facilitate Amtrak's redesign of the terminal to, among other things, increase passenger seating areas, develop first-class lounges, and create dedicated workspaces for Amtrak personnel, including its police force.  More space is essential to Amtrak's planned expansion of its rail passenger services. Amtrak's ownership also would displace a landlord whose primary commercial interests are misaligned with Amtrak's core mission as a transportation provider.  There can be little doubt that

"Amtrak's past and planned uses for [Union Station] bear an indisputable link with its transportation goals." *3.44 Acres*, 266 F. Supp. 3d at 72.

Lender does not genuinely dispute that there is "significant relationship" between the USI Sublease and Amtrak's provision of intercity rail passenger transportation. *See* Evid. Hr'g Tr. at 203:11-15 (Lender's counsel stating, "[N]obody is arguing that Union Station is not necessary for city rail passenger transportation. That's what it's for. I think we can probably all agree that the station as a property is necessary for passenger rail."). Instead, Lender's challenges are variants of one overarching theme: Amtrak has not shown that it cannot accomplish its stated objectives through actions short of a complete condemnation of the USI Sublease. That contention demands more than what the statute requires.

<p style="text-align:center">a.   <u>The present subleasing arrangement</u></p>

Lender contends that Amtrak can achieve through its existing sublease what it hopes to accomplish through condemnation. The present subleasing arrangement permits Amtrak to (1) proceed with scheduled projects (and Amtrak, not the landlord, is largely to blame for their delays), Lender's PFFCL ¶¶ 7–32; (2) rent additional space to carry out its envisioned redesign and expand customer offerings, *id.* ¶¶ 33–37, 42; and (3) implement the immediate service changes that it wishes to make, *id.* ¶¶ 38–41. Thus, Lender contends, "under the current lease structure, Amtrak has not been prohibited or limited in its proper operations or its plans for growth," and "there is no evidence to support the conclusion that the Leasehold Interest or USI's ownership of the Leasehold Interest is the cause of any alleged problem." *Id.* ¶ 87.

That argument misconstrues the "necessity" standard and Amtrak's burden in multiple ways. First, "Amtrak must show that the *property* it seeks to acquire is 'necessary for intercity passenger rail transportation,' not that condemnation is the necessary *means* of acquiring that property." *3.44 Acres*, 266 F. Supp. 3d at 68. Amtrak thus need not show that condemnation of

<p style="text-align:center">39</p>

the USI Sublease is the superior means to achieving its goals.  *See 4.0446 Acres More or Less of Land & Fixtures*, 2019 WL 1057932 at *8 (rejecting a similar argument that Amtrak had not shown necessity because it "is already receiving electricity from the Substation and can continue to receive its electricity distribution from the Substation through its current leasehold agreement").

Second, Amtrak does not need to establish that it is asserting its condemnation power as a "last resort."  *3.44 Acres*, 266 F. Supp. 3d at 73.  It therefore is not required to first explore modifying the sublease terms or attempting to lease more space before it may condemn, as Lender seems to suggest.  *See id.* (rejecting the property owner's argument that Amtrak could have taken lesser steps than condemnation, such as clarifying the current easement or negotiating for more space under the existing lease).

Third, Lender improperly dismisses the significance of a post-taking structural change, whereby Amtrak would become the tenant under the lease with USRC.  When Congress gave Amtrak eminent domain authority, it recognized that current lease arrangements may not be the optimal way, logistically or economically, for it to carry out its mission.  *See id.* (describing legislative history).  That is Amtrak's reason for the present condemnation.  In its view, the current governing structure is "[o]bsolete and complex" and "built for a different era and different task." Jt. Ex. 5, at 5.  The structure "imped[es] progress in improving the operating conditions at [Union Station] and thereby imped[es] Amtrak's ability to provide intercity passenger railroad transportation at [Union Station]."  Jt. Ex. 3, at 2.  To be sure, as Lender has shown, Amtrak is hardly free from fault.  It would appear that the responsibility for the slow movement on major improvement projects rests in no small part on Amtrak.  Still, the court "is not in a position to assess" what property arrangement and interest "is the optimal way [for Amtrak] to further [its]

mission." *3.44 Acres*, 266 F. Supp. 3d at 73.  Amtrak is entitled to some deference on matters pertaining to its governance.

### b.   Amtrak's business judgment

Lender also questions the reasonableness of Amtrak's "business judgment" in pursuing condemnation.  Oral Arg. Tr. at 62–63.  It contends that the court must reject the taking as unnecessary because Amtrak can achieve the same objectives as USI's subtenant, without expending hundreds of millions of dollars on just compensation.  *Id.*  That argument is not well taken.  As already addressed, Amtrak need not show that condemnation is superior to alternative means of achieving the same ends.  But even if the court must look for "business judgment," there is ample evidence of it in the record.  *See Bristol*, 1 F. Supp. 2d at 82 (court's review of Amtrak's necessity determination is for abuse of discretion through an "unreasonable business judgment" that condemnation is necessary).

Amtrak presented a business case to both the FRA and its Board to condemn the USI Sublease.  The FRA twice approved pre-programming and pre-award authority: first to purchase USI's outstanding debt in the planned foreclosure sale, Lender's Ex. 10, and then to acquire the USI Sublease by purchase or condemnation, Jt. Ex. 3, at 22–24.  Management's presentations to the Board contained a financial analysis of the proposed acquisition, submitting that it was "justified economically." *See, e.g.*, *id.* at 12.  The Board evidently agreed.  *See* Pl.'s Ex. 1.

Lender has offered no evidence that the FRA or Amtrak's Board failed to thoroughly consider the proposed acquisition of the USI Sublease.  At most, Lender *assumes* that renegotiating the sublease's terms, including renting more space, is a better business proposition than an acquisition of the leasehold interest.  It presents no evidence to support that position.  The court thus declines to find that Amtrak has failed to demonstrate necessity because it purportedly did not exercise reasonable business judgment.

c.      Amtrak's opportunism

Next, Lender claims that Amtrak's case for necessity is dubious because the "need" for the leasehold interest arose only after USI defaulted on its loan obligations, making the leasehold a target for acquisition.  Lender's PFFCL ¶¶ 69–71, 88.  According to Lender, because Amtrak saw the loan default as a "unique opportunity" to acquire the leasehold interest, the FRA and the Board made decisions that were "not based upon factual information on the ground" or "what was actually going on at the station in terms of the necessity."  Oral Arg. Tr. at 63–64.

But any opportunism on Amtrak's part is not a reason to reject the necessity of the taking. "[T]he mere consideration of economic factors cannot defeat an otherwise valid taking.  Amtrak's takings power is restricted by the terms [of] § 24311, but so long as it does not exceed its statutory power, Amtrak is not forbidden from considering additional factors before seeking to acquire a multi-million-dollar property."  *3.44 Acres*, 266 F. Supp. 3d at 73; *accord 4.0446 Acres More or Less of Land & Fixtures*, 2019 WL 1057932, at *8 ("Amtrak is clearly not forbidden from considering economic factors in its decision to acquire the Substation.").  The fact that Amtrak saw USI's financial distress as a "unique opportunity" to acquire the leasehold interest does not undermine its necessity.

d.      Amtrak need not be the best possible lessee

Last, Lender contends that since it took over management of the station, it has made material improvements that lessen the necessity of a taking.  Lender also doubts Amtrak's experience and capacity to manage the Station and fears the Station will lose value in Amtrak's hands.  Lender's PFFCL ¶¶ 63–68.  But the statute nowhere requires that Amtrak be the best possible lessee, or even better than the current lessee at maintaining the property value.  To the extent that Lender has concerns about Amtrak's preparedness to manage the terminal, including subleases with various retailers and food vendors, the court can address those in a transition order.

\*       \*       \*

Having considered the entirety of the record and the parties' arguments, the court finds that the USI Sublease is "necessary for intercity rail transportation."

### D.      Amtrak and Lender Negotiated in Good Faith and Were Unable to Agree

A taking by Amtrak is valid only if it "cannot acquire the interest in the property by contract or agree with the owner on the purchase price for the interest."  49 U.S.C. § 24311(a)(2).  The parties dispute whether the statute requires Amtrak to show that it acted in good faith and whether it did so here.  Pl.'s PFFCL ¶¶ 17–21; Lender's PFFCL ¶ 89.  The court need not resolve that contest, however, because it finds that Amtrak has satisfied any statutory "good faith" requirement, should one exist.

Following a hearing at which the court expressed reservations that Amtrak's pre-filing efforts—transmittal of an offer letter, a phone call, and a handful of email communications that failed to yield an in-person meeting—were sufficient to satisfy § 24311(a)(2), the parties negotiated for more than two months, meeting nine to 10 times, before reaching an impasse. *See supra*, Part II ¶¶ 65–66.  The parties discussed both a purchase price and alternative structures to achieve Amtrak's objectives short of condemnation.  *See id.*  Their efforts were not successful.

Lender complains that the "record developed during discovery and at the hearing does not support a finding of good-faith negotiation."  Lender's PFFCL ¶ 89.  That argument rests primarily on the fact that Amtrak's offer of $250 million was lower than multiple other contemporaneous benchmarks of which Amtrak had notice, including an appraisal of $700 million, Amtrak's first pre-programming funding approval of $551 million, USI's total outstanding debt of $550 million, and Amtrak's earlier offer to purchase the debt for $300 million.  *Id.*  Lender also points to the hurried, minimal discussions that took place prior to Amtrak's filing suit as evidence of lack of good faith.  *Id.*

This argument suffers from two flaws.  First, the court can consider the parties' post-suit negotiations in determining whether Amtrak and Lender have been unable to agree to terms. *See Burlington N. Santa Fe Ry. Co. v. A 50-Foot Wide Easement Consisting of 6.99 Acres more or less*, 346 F. App'x 297, 302–03 (10th Cir. 2009) (finding that the district court did not err "when it admitted evidence of confidential [post-filing] settlement negotiations and then relied upon that evidence in reaching its decision" to determine whether parties had engaged in good-faith negotiations prior to condemnation); *United States v. 6.584 Acres of Land, more or less, Hidalgo Cnty.*, 533 F. Supp. 3d 482, 500 (S.D. Tex. 2021) (directing further negotiations after the filing of suit and using impasse as evidence that negotiations were futile).  Lender does not claim that Amtrak acted in bad faith during the post-suit negotiations.

Second, there is record evidence to support the reasonableness of Amtrak's opening offer. In January 2022, management assessed that, based on "the operating realities in [Union Station]," the USI Sublease was worth $229.1 million.  Jt. Ex. 1, at 8.  That analysis explained why Amtrak management's estimate diverged from a much higher third-party appraisal, along 10 different variables.  *Id.* at 9–11.  Amtrak then hired a third-party consultant, FTI Consulting, "to assist with reviewing the internal analysis . . . previously done by Management" and provide other advice. Jt. Ex. 2, at 182; Jt. Ex. 3, at 20.  FTI Consulting estimated that the high end of the USI Sublease's value to be "no greater than approximately $400 million," but it "believe[d] the more likely valuation of the Sublease Interests to be less than $250 million."  Jt. Ex. 3, at 20.  The reasonableness of that estimate is corroborated by the Cushman & Wakefield appraisal, which values the property interest at $250 million.  *See* Lender's Ex. 24.  The record thus demonstrates a good faith basis for Amtrak's initial offer of $250 million.[4]

---

[4] To be clear, the court makes no judgment at this time about the appropriate just compensation for condemning the USI Sublease.

Accordingly, the court is satisfied that Amtrak has shown that it "cannot acquire the interest in the property by contract or agree with the owner on the purchase price for the interest." 49 U.S.C. § 24311(a)(2).  *Cf. Bos. & Me.*, 503 U.S. at 423 (interpreting the "unable to agree" condition in the since-repealed eminent domain provision of the Rail Passenger Service Act, 45 U.S.C. § 562(d) (1992), as requiring only "a factual determination that the parties will not be able to reach agreement through further negotiations"); *Wilson v. Union Elec. Light & Power Co.*, 59 F.2d 580, 581 (8th Cir. 1932) ("An absolute inability to acquire the property by contract is not necessary.  All that is required under such section is that there be a bona fide effort to so acquire the property which may be desired.") (Federal Power Act, 16 U.S.C. § 814).[5]

### E.    Lender Has Not Demonstrated Undue Hardship

The final issue before the court is whether Lender has demonstrated that it would face "undue hardship" should the court award Amtrak immediate possession.  Under the DTA's quick-take provision, "[a]lthough the district court fixes the time and any terms of the possession, the government takes possession of the condemned property as a matter of course, unless the landowner or occupant demonstrates some undue hardship that warrants a delay."  *E. Tenn. Nat. Gas Co.*, 361 F.3d at 825; *see also .025 Acres More or Less of Land*, 2023 WL 5940042, at \*1 (suggesting that the "undue hardship" exception applies under § 24311).  Lender states that if

---

[5] The Natural Gas Act contains a similarly worded provision to § 24311(a)(2).  *See* 15 U.S.C. § 717f(h) (authorizing exercise of power of eminent domain where the certificate holder cannot "acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for").  Courts consistently have found that requirement satisfied in circumstances similar to this case.  *See also, e.g., Daubenmire v. Columbia Gas Transmission*, 614 F. Supp. 3d 601, 608 (S.D. Ohio 2022) (holding that where an offer based on appraisal was rejected, and the counteroffer was much higher, the negotiation requirement was satisfied); *Columbia Gas Transmission v. 84.53 Acres of Land, More or Less, in Calhoun, Marshall, Ritchie, Tyler, & Wetzel Cntys.*, 310 F. Supp. 3d 685, 691 (N.D. W.Va. 2018) (holding that parties were unable to agree where certain offers were declined or owners failed to respond); *USG Pipeline Co. v. 1.74 Acres in Marion Cnty.*, 1 F. Supp. 2d 816, 824–25 (E.D. Tenn. 1998) (holding that making a monetary offer and demonstrating a desire to acquire easements by negotiation and settlement rather than by eminent domain was "more than sufficient" to meet requirement).

Amtrak were awarded immediate possession, it would face undue hardship in the form of "loss of property interests and consent rights." Lender's PFFCL ¶¶ 90–91.

But loss of property rights, without more, is insufficient to establish "undue hardship." After all, the end result of a condemnation is the taking of a property interest. Moreover, to the extent Lender claims financial harm, monetary loss is remediable through the statutory just compensation provision, and Lender will have every opportunity to prove the value of the leasehold interest. 49 U.S.C. § 24311(b)(3). Lender claimed at oral argument that it will be harmed from the potential discontinuation of USI's subleases with vendors, Oral Arg. Tr. at 52:22–53:2, but the monetary value of those leases will be awarded as part of the final compensation amount. Finally, although Lender asserted at argument that the discontinuation of a profit-motivated business plan would harm USI, *id*. at 52:22–53:11, that is just another complaint about financial harm, which just compensation will remedy.

When courts have found undue hardship, it has been under circumstances where expulsion from condemned property within a short timeframe would not be feasible. *See United States v. 6,576.27 Acres of Land, More or Less, in McLean Cnty.*, 77 F. Supp. 244 (D.N.D. 1948)); *see also United States v. Certain Land in Borough of Manhattan*, 332 F.2d 679, 682 (2d Cir. 1964) (remanding for consideration of undue hardship where government sought to condemn residential property with only five days' notice to residents). Here, Lender has had notice of the condemnation of the USI Sublease for over two years. It has not established a hardship that would warrant denying Amtrak immediate possession.

**IV.      CONCLUSION**

To summarize, the court finds that Amtrak has proven that its condemnation of the USI Sublease is necessary for intercity rail transportation and that Amtrak was unable to agree with Lender as to contract terms or a purchase price.  The court further finds that Lender has not demonstrated any undue hardship warranting the denial of immediate possession to Amtrak.

The court will withhold a final order of immediate possession for now.  The parties shall meet and confer to negotiate reasonable conditions under which "possession of the property is given to Amtrak." 49 U.S.C. § 24311(b)(2)(A).  The parties shall submit a Joint Status Report to the court on or before May 1, 2024, that (1) sets forth the agreed-upon and disputed conditions of the transfer of possession and (2) proposes a schedule for further proceedings, including determining just compensation.

Dated:  April 17, 2024

_____
Amit P. Mehta
United States District Court Judge

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) | * | |
| | * | CIVIL ACTION NO. 1:22-CV-01043 |
| PLAINTIFF, | * | |
| v. | * | |
| SUBLEASE INTEREST OBTAINED PURSUANT TO AN ASSIGNMENT AND ASSUMPTION OF LEASEHOLD INTEREST, et al. | * | |
| | * | |
| DEFENDANTS. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AMTRAK'S RESPONSE TO LENDER AND UNION STATION INVESTCO, LLC'S
## <u>JOINT MOTION FOR STAY PENDING APPEAL</u>

*Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 423 (1992) (no good-faith requirement in predecessor statute to § 24311); *see also, e.g.*, *Mars. & Ne. Pipeline, L.L.C. v. Decoulos*, 146 F. App'x 495, 498 (1st Cir. 2000) (no "good faith negotiation" obligation associated with "unable to agree" language in Natural Gas Act (internal quotation marks omitted)). But even if a good-faith requirement did exist, Amtrak met it here, as the Court found. *See* Op. 43-45.

### B.    Movants Have Not Demonstrated Irreparable Harm.

Movants cannot establish irreparable harm for purposes of a stay because the things they claim will irreparably harm them are things they could have, but did not, ask this Court to consider as part of determining the "time by which, and the terms under which, possession of the property is given to Amtrak." 49 U.S.C. § 24311(b)(2)(A). Such litigation choices impose only self-inflicted consequences which do not qualify as irreparable harm. Moreover, this Court already determined that Movants will not suffer "undue hardship" from the transfer of possession. *See* Op. 45-46. Movants failed to present *any* evidence at the evidentiary hearing of undue hardship and present no evidence in support of their stay motion. This Court's findings of no "undue hardship" apply equally to Movants' irreparable harm claims, which should be rejected.

Movants argue that, absent a stay, the status quo will be "drastically altered," Mem. 24, but their arguments as to that are either legally incorrect or purely speculative.

*First*, Movants argue that the "loss of their real property interests alone constitutes irreparable harm," particularly because Washington Union Station is a historic landmark. Mem. 24-25. But as the Court correctly held, "loss of property rights, without more, is insufficient to establish 'undue hardship.' After all, the end result of a condemnation is the taking of a property interest." Op. 46. Yet such transfers generally are not appealable at all, much less stayed. *See supra* 8-14. Moreover, to the extent Lender claims financial harm, monetary loss is by definition

reparable: it is remedied through just compensation, and "Lender will have every opportunity to prove the value of the leasehold interest." Op. 46; *see also E. Tenn. Nat. Gas Co.*, 361 F.3d at 829 ("[I]n view of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it . . . is properly treated as part of the burden of common citizenship" (quotation marks omitted)).

*Second*, Movants argue that irreparable harm will result from a change to the "carefully-crafted ownership structure of Union Station," and hazard that "Amtrak will make large-scale (and potentially irreversible) alterations to the [Subject Property] Interest." Mem. 25, 27. But Movants have never asked the Court to set as a "term[] under which possession of the property [would be] given to Amtrak," 49 U.S.C. § 24311(b)(2)(A), that Amtrak agree not to make any alterations to the ownership structure or to the physical space subject to the Subject Property Interest until a final ruling. Having forfeited their right to request that Amtrak adhere to the status quo, Movants cannot now complain that any departure from the status quo would cause irreparable harm. *See Senate Permanent Subcommittee on Investigations v. Ferrer*, Misc. A. No. 16-621, 2016 WL 11681577, at *5 (D.D.C. Sept. 30, 2016) ("It is well-settled that a party requesting the extraordinary equitable relief of a stay pending appeal 'does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.'" (quoting *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012)). Movants' "own litigation choices do not warrant a stay of this Court's Order." *Id.*

In any case, Amtrak hereby represents to the Court that it will not significantly modify the sublease or terminate it in favor of a new sublease before final judgment. *See* Mem. 26. Amtrak also has no plans to make any immediate permanent or irreversible alterations to the Station, as confirmed by the fact that no witness testified about irreversible alterations at the evidentiary

hearing. USI's speculative concerns unsupported by any evidence cannot ground a claim of irreparable harm. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (stating that a claim of irreparable injury must be "both certain and great; it must be actual and not theoretical").

*Third*, Movants argue that they will suffer irreparable harm because USI "exists solely to manage and operate the Leasehold Interest at Union Station," and "if the Order goes forward . . . there will be no business for USI to conduct at all." Mem. 26. But, as noted, Movants did not present any evidence of irreparable harm to USI at the hearing. They did not argue that USI would cease to exist; they have attached no declarations to that effect in their stay motion; and in any case Movants will receive the $250 million in funds that have already been deposited with the Court. Movants make no showing as to why USI will cease to exist based on the transfer of possession when USI stands to receive just compensation in this case. If Movants choose to dissolve USI as the holding company for the Subject Property Interest or because USI was created as a single purpose entity to hold the Subject Property Interest, that decision could not justify a stay because that alleged harm, too, would be self-inflicted. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (holding that litigant cannot "be heard to complain about damage inflicted by its own hand"); *Safari Club*, 852 F. Supp. 2d at 123 (no irreparable harm when plaintiffs could avoid harm).

*Fourth*, Movants argue that their "relationships with third parties [like subtenants] will be irreparably harmed" if Amtrak makes changes to the Subject Property Interest. Mem. 26. But Movants have agreed to ensure that all subtenants are given advance notice, explicitly agreeing with Amtrak as to the form and content of the joint notice to be sent all subtenants, and again did not make any requests to the Court as part of the Court's responsibility to set the "terms under which possession of the property [would be] given to Amtrak" that the Court take any other action

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------- X

NATIONAL RAILROAD PASSENGER
CORPORATION (AMTRAK),

       Plaintiff,                           No. 1:22-cv-01043(APM)

       v.

SUBLEASE INTEREST PERTAINING TO
DESCRIBED LEASEHOLD INTERESTS
AT WASHINGTON UNION STATION, et al.

       Defendants.

-------------------------------------------------------------- X

**LENDER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**IN OPPOSITION TO AMTRAK'S MOTION FOR IMMEDIATE POSSESSION**

MORRISON COHEN LLP
Y. David Scharf
Brett Dockwell
Kristin T. Roy
Latisha V. Thompson
Amber R. Will
Mahnoor Misbah
*Admitted pro hac vice*
909 Third Avenue
New York, New York 10022
(212) 735-8600

HOLLAND & KNIGHT LLP
Paul J. Kiernan
Louis J. Rouleau
800 17th Street N.W.
Suite 1100
Washington, D.C. 20006
(202) 663-7276

*Attorneys for Defendant Kookmin*
*Bank Co., Ltd.*

ownership and the DOT-USRC Lease. (*See, e.g.*, *id.* at 57 (USRC cannot sell or assign its lease interest or estate without prior written consent of the FRA).)[5]

5. The DOT-USRC Lease also required USRC to direct USV to enter into the Amtrak Train Station Lease for space to be leased by Amtrak for its rail and rail passenger operations: "On or before January 31, 1986, USRC shall obtain a binding commitment from Amtrak to enter into a lease agreement with USV pursuant to which Amtrak will lease a portion of the Project for use in Amtrak's rail and rail passenger operations." (Lender's Ex. 8, § 8.2.) The required terms for the Amtrak Train Station Lease were set forth in the USRC-USV sublease and specifically referenced in the DOT-USRC Lease. (*Id.*)[6]

6. Under the lease structure authorized by Congress and directed by the Secretary of Transportation, Amtrak was intended to be a space tenant (subtenant) at the Station, not the operator or developer. It is worth noting that during the hearings preceding the Act, Amtrak asked Congress to put Amtrak in charge as the master tenant and developer—a position that Congress rejected when it put the Secretary of Transportation in charge of Union Station and authorized the Secretary to implement the redevelopment.[7]

---

[5] The United States reserved to itself the right to enter into a lease directly with Amtrak so the lease would come between DOT and USRC in the stack of leases, but, in that event, the terms of the USRC and USV leases would nevertheless remain in place and USV would continue to have its right to quiet enjoyment. (Lender's Ex. 17 at 58, § 20.5.) The United States has never exercised this right, but the existence of the right undermines Amtrak's assertion that it has the unilateral right using eminent domain to remake the lease structure established by the Federal Government.

[6] Not only did the structure created by DOT limit Amtrak's space in the Station, but at that time DOT even limited the uses to which Amtrak could purpose the space. (*See, e.g.*, Lender's Ex. 4 at 37-38, 50-52 (Amtrak prohibited from using its space for retail stores "or any other revenue producing purpose whatsoever other than the provision of railroad transportation services").)

[7] M.L. Clark Tyler, Amtrak's Group Vice President, testified before the Senate's Subcommittee on Surface Transportation in support of the position that "one needs a lead player to deal with and as few Government players as one can assemble":

> I think that in terms of Amtrak's own view, we are equipped to be that
> lead player, and can, indeed, assemble what it takes . . . . Amtrak offered last

**B.  Amtrak's Claimed Need for Immediate Possession is Pretextual**

   **a.  Both the Subbasement and Concourse Modernization Projects are Years Away From Construction.**

7.     While the Complaint alleges that Amtrak "needs the Subject Property Interest in order to accomplish the Subbasement Project" (ECF Doc. No. 1 at ¶ 32) and implement the Concourse Modernization Project (*id.* at ¶ 45), and the motion for immediate possession includes the same points (ECF Doc. No. 72-1 at 1-2), the record shows that these projects have been planned and are being pursued with the Leasehold Interest remaining in USI's ownership and that USI's ownership has not adversely affected Amtrak's ability to proceed.

8.     Both the Subbasement and Concourse Modernization Projects anticipated having Amtrak in the subtenant position throughout the projects' executions. (Gardner Tr. 108:13-15, 22-25; Kostura Dep. Des. 11:3-12:13.) The internal status reports for both projects did not assume Amtrak had possession of the Leasehold Interest. (Kostura Dep. Des. 121:8-10 (referring to Lender's Ex. 2).)

9.     For its part, USRC "anticipated the current lease structure" would be in place to accomplish the Subbasement and Concourse Modernization Projects. (Swaim-Staley Tr. 244:13-

---

summer to assume managerial responsibility for maintaining the building and that offer still stands. Amtrak, representing the interest of the users of the building, the District of Columbia, and the Federal government, would seek a private developer to undertake commercial development of the unused portions of the building . . . . As the major tenant with established real estate experience, Amtrak believes that it is in the best position to bring about the successful transportation and commercial development at Washington Union Station.

Legislative History of the Union Station Redevelopment Act of 1981: P.L. 97-125, 95 Stat. 1667, December 29, 1981 (1981), Hearing Before the Subcommittee on Surface Transportation of the Committee on Commerce, Science, and Transportation, U.S. Senate, First Session on Repair and Future of Union Station, April 30, 1981, Serial No. 97-31, at 8 (testimony of M.L. Clark Tyler); *Id.* at 12-13 (written statement of Tyler).

67.     Bathrooms are currently located in the Concourse in Amtrak's leased area. (Rebibo Tr. 279:25-280:2.) In 2017, Amtrak signed an agreement with USI where Amtrak would plan, design, and build new bathrooms and refurbish the existing bathrooms in the interim. (Rebibo Tr. 280:2-5; Lender Ex. 22.) The existing bathrooms represent approximately 200-square-feet of space that required some cosmetic upgrades to the sinks and wall tiles. (Rebibo Tr. 280:9-14.) Instead of using commercial-grade materials, Amtrak opted for residential-grade materials. (Rebibo Tr. 280:15-18.) Even then, Amtrak took six years to finish the project, and "[t]here's all kinds of issues with it, which even they've complained about it." (Rebibo Tr. 280:6-18.)

68.     According to the action plan prepared by Amtrak after the Court inquired about Amtrak's preparedness at the hearing in January 2023, Amtrak did not expect to achieve a "better understand[ing of] the responsibilities and risks involved with the facility" until after it secured possession. (JX 4 at 5.) This action plan was the "first written documentation and presentation of an action plan" by Amtrak. (Kostura Dep. Des. 114:1-3; 114:22-115:2.)

**G.  Amtrak's Offer To Purchase Sought To Capitalize on a "Unique Opportunity"**

69.     Amtrak's Board approved a resolution to offer to purchase and acquire the Leasehold Interest by contract or eminent domain after reviewing information presented to the Board by Amtrak's management. (JX 3.) According to the various Board materials, the "loan defaults and scheduled foreclosure sales" associated with the Leasehold Interest presented a "unique opportunity for Amtrak to pursue the acquisition."  (JX 6 at 4.)

70.     When Amtrak first took up acquiring the Leasehold Interest in late 2021, the Leasehold Interest was subject to a senior mortgage loan in the original principal amount of $330 Million (Lender's Ex. 13) and a mezzanine loan in the original principal amount of $100 Million (Lender's Ex. 14). (Rebibo Tr. 268:21-269:1.) The borrowers had been in default for nonpayment since May

injunctive request where the movant should demonstrate a likelihood of ultimate success on the merits (that Amtrak will be found to have properly exercised its eminent-domain power) and relative harms should the requested transfer be approved or denied. *Pantaja v. Martinez*, 567 F. Supp. 3d 76, 80 (D.D.C. 2021), *aff'd*, 21-7118, 2022 U.S. App. LEXIS 7977 (D.C. Cir. Mar. 25, 2022) (test for mandatory preliminary injunction).

85.     Lender and USI have a meritorious challenge to Amtrak's exercise of eminent domain. First, Amtrak's statutory authority does not expressly allow it to condemn interests in federal property or federal contracts. Second, the statutory requirements that eminent-domain power can only be exercised (a) if the efforts to acquire the interest voluntarily were unsuccessful, and (b) the property to be taken is necessary for intercity passenger-rail service have not been met. 49 U.S.C. § 24311(a)(1)(A). The "property interest must have a 'significant relationship' with Amtrak's provision of intercity rail passenger transportation," a phrase that the Court has construed as something between absolute necessity and that the acquisition would be desirable by Amtrak. *Nat'l R.R. Passenger Corp. v. 3.44 Acres More or Less of Land & Bldg. located at 900 2nd St. NE, Washington, DC 20002-3557*, 266 F. Supp. 3d 63, 69 (D.D.C. 2017).

86.     The record undermines the argument that Amtrak's control of the Leasehold Interest is necessary for intercity passenger-rail service. For almost 40 years, Amtrak has been providing intercity passenger-rail service without owning this interest. Congress and DOT have never deemed Amtrak's control of this interest as being necessary or even desirable. Congress did not install Amtrak as the master tenant; the United States did not enter into a direct lease with Amtrak; and the Federal Government did not invite Amtrak to acquire this interest. Since the 1980s, Amtrak has wanted to be in the position of master tenant. Instead, the Federal Government structured the leases for its property with Amtrak as a space tenant, not the master tenant.

87.     Under the current lease structure, Amtrak has not been prohibited or limited in its proper operations or its plans for growth. The record belies the assertion that transfer of immediate possession would materially change anything regarding current projects or operations because there is no evidence to support the conclusion that the Leasehold Interest or USI's ownership of the Leasehold Interest is the cause of any alleged problem. USI has been cooperative and has acted without default in connection with its duties as Amtrak's landlord.

88.     This eminent domain was triggered by Amtrak's perception that the prospect of a foreclosure was a "unique opportunity" to acquire the leasehold position that the Federal Government had denied it but which Amtrak had long coveted. The rushed scenario of using a facially inadequate valuation number, a short-time fuse, a lack of information sharing, and an internal calendar showing that Amtrak would take possession by August 2022 was an inadequate fig leaf to cover the statutory "negotiation" prong before filing eminent domain.

89.     In its Complaint, Amtrak alleged that "[p]rior to the filing of this Complaint, Amtrak attempted in good faith to negotiate a purchase price for the Subject Property Interest with USI pursuant to 49 U.S.C. § 24311(a)(2)." (ECF Doc. No. 1 at ¶ 69.) The record developed during discovery and at the hearing does not support a finding of good-faith negotiation. Specifically, Amtrak made a single offer to USI with no backup, support, or analysis; Amtrak gave an exceedingly short timeframe of one week for USI to respond and then conditioned discussions on USI making a counteroffer; Amtrak told USI that "time was of the essence," when there were no time constraints; the offer number of $250 Million was based on a single appraisal whose own authors acknowledged that their lack of "significant information" was "likely to materially affect the findings of this report;" and the $250 Million offer was materially lower than other contemporaneous indications of true market value of the Leasehold Interest known to Amtrak,

# EXHIBIT 5

CONFIDENTIAL

EXHIBIT

**JX 03**

EXHIBIT

_15_

AMTRAK_WUS_0000085



☑ FOR APPROVAL
☐ FOR INFORMATION



# BOARD OF DIRECTORS
# AMTRAK ACQUISITION OF USI LEASEHOLD INTERESTS IN WASHINGTON UNION STATION

## EXECUTIVE SUMMARY

Management is seeking authority to acquire certain real estate interests at Washington Union Station (*WUS*) to support Amtrak's mission of providing intercity passenger rail. The current leasing and governance structures of WUS impede progress in improving the operating conditions at WUS and thereby impede Amtrak's ability to provide intercity passenger railroad transportation at WUS. Under the terms of the USRC/USI Sublease (*defined below*), USI (*defined below*) has minimal responsibility or requirement to invest capital in the upkeep of WUS, and also gets to retain all of the cash flow from retail operations. Amtrak frequently encounters difficulty in engaging USI to advance critical capital projects, as USI's priorities are not aligned with the rest of the WUS stakeholders.



Under the current leasing and governance structure, Amtrak has also been unable to advance critical projects at WUS to expand operations and capacity to meet future projected passenger demands. Management previously informed the Amtrak Board of Directors (*Board*) of USI loan defaults, scheduled foreclosures and other recent developments relating to WUS and USI's loan secured by USI's sublease interests in WUS (*Sublease Interests*). The loan defaults and subsequent transaction present a unique opportunity for Amtrak to pursue the acquisition of the Sublease Interests in order to obtain greater control over WUS; doing so will better enable Amtrak to fulfill its statutory missions while also providing for the longevity of WUS as a critical multimodal transportation center. Based on recent developments, Management has been internally formulating and revising

2



☑ FOR APPROVAL
☐ FOR INFORMATION



# BOARD OF DIRECTORS
# AMTRAK ACQUISITION OF USI LEASEHOLD INTERESTS IN WASHINGTON UNION STATION

## SECOND ADDENDUM TO BUSINESS CASE



In addition, and as explained in the Business Case, Management obtained financial and strategic advisory analysis from FTI Consulting (*FTI*). Management engaged FTI to assist with reviewing the internal analysis valuing the Sublease Interests previously completed by Management (which was based on non-confidential information), reviewing previously identified possible acquisition options that were eliminated as not realistic options by Management, as well as identifying possible commercial alternative analysis not previously considered by Management. In support of the internal analysis review, FTI developed an analysis based upon non-confidential information including publicly available data and market-based assumptions (*FTI Analysis*). The FTI Analysis estimated the Sublease Interests high end value at no greater than approximately $400 Million and believes the more likely valuation of the Sublease Interests to be less than $250 Million. FTI also, at the direction of Management, reviewed possible alternative commercial transaction strategies for acquiring the Sublease Interests including those currently and previously vetted by Management. FTI concluded that the alternative commercial transaction strategies considered have an extremely low probability for success over an extended timeframe.

Finally, on February 11, 2022, Management submitted a Pre-Programming request to the Federal Railroad Administration (*FRA*) for the acquisition of the Sublease Interests as described in the Business Case. Management received a letter from FRA dated March 11, 2022 (*attached as Exhibit A*), approving such request, conditioned upon (a) Amtrak's successful renegotiation of the USI Sublease upon the terms satisfactory to FRA no later than six months after Amtrak's successful acquisition of the Sublease Interests and (b) Amtrak's unreserved agreement to: retain USRC in its current role at WUS; maintain FRA as Authority Having Jurisdiction at WUS; and support WUS as a multimodal station (*FRA Approval*). Management has attached the FRA Approval for the Board's review and consideration and continues to discuss the terms of the FRA Approval with the FRA.

Based on the Final 2022 Appraisal and the FTI Analysis, as well as the basis of information indicated in the prior Business Case, Management reiterates its previously stated estimates that the Estimated High Just Compensation of the Project will likely cost between $250 Million to $500 Million. As a result, and based on

*Confidential & Proprietary*

CONFIDENTIAL                                                     AMTRAK_WUS_0000104



☑ FOR APPROVAL
☐ FOR INFORMATION

the Business Case, which remains unchanged except as provided for in the Addendum and herein, Management recommends that the Board authorize and approve Amtrak to pursue the acquisition of the Sublease Interests in a multi-option approach of:



*Confidential & Proprietary*

Page 2 of 2



**Exhibit A to Second Addendum to Business Case**



U.S. Department
of Transportation

**Federal Railroad
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

March 11, 2022

Nathan MacIver
Vice President, Treasurer
National Railroad Passenger Corporation (Amtrak)
1 Massachusetts Avenue, NW
Washington, DC 20001

Subject:    **Request for Pre-programming Authority – Potential Acquisition of
the Leasehold Interest in Washington Union Station**

Dear Mr. MacIver:

This letter is in response to your February 17, 2022 letter requesting pre-programming authority for
certain activities relating to Amtrak's potential acquisition of the subleasehold interest in
Washington Union Station (WUS) (Leasehold Interest). The acquired Leasehold Interest will be
subject to the terms of the sublease agreement between Union Station Redevelopment Corporation
(USRC) and Union Station Investco LLC (USI), as successor-in-interest to Union Station Venture,
LTD., dated October 31, 1985 (USI Sublease). Pursuant to Section 6 a. 3) of FY 2020 National
Network annual agreement[1] (Agreement) and subject to the conditions described below, FRA
approves the pre-programming authority request for 12 percent of the costs of acquisition of the USI
Sublease up to $66 million, as shown in Table 1. Based on a February 17, 2022 email[2], FRA
understands that Amtrak has determined there are enough unprogrammed grant funds available in
the Agreement and uncommitted program income to cover the cost of the acquisition.

---

[1] The relevant grant number is 69A36520501210AMTDC (FY 2020 NN Agreement).
[2] See 2/17/2022, 11:38AM email "RE: USI – Pre Programming Request" from Nathan MacIver (Amtrak) to Beth
Nachreiner (FRA).

CONFIDENTIAL                                                                 AMTRAK_WUS_0000106

Table 1 - Summary of Acquisition of Leasehold Interest Costs December 1, 2021
through April 30, 2022

| Activity Name | Activity Details | Total Requested ID | Total Requested Notes |
|---|---|---|---|
| Acquisition of Union Station Leasehold Interest | Potential acquisition of the USI leasehold interest in WUS | $500,000,000 | Just compensation determined by the Court will be based on an appraisal. This request includes the $500M ceiling amount. |
| Estimated taxes and other related expenses | Potential taxes, filing and other related expenses | $50,000,000 | This amount includes potential payment of taxes, filing costs, and other expenses related to the acquisition. |
| Additional Costs Incidental to the Acquisition of Union Station | Anticipated Legal and Valuation Costs | $1,000,000 | |
| Total Pre-Programming Request | | $551,000,000 | |

## Background

Amtrak has requested pre-programming authority to acquire the USI Sublease. Amtrak seeks
to acquire the USI Sublease from USI or USI's lender, if the lender forecloses on the sublease,
through either (a) a negotiated deal with USI and the lender (Negotiated Deal); (b) participating
in a foreclosure sale if the lender restarts the foreclosure process (Auction); or (c)(i)
negotiating a deal with USI, and if unable to do so, (ii) condemning the USI Sublease and
paying "just compensation" (Condemnation). In each scenario (Negotiated Deal, Auction, or
Condemnation), Amtrak intends to offer not more than $250 million (plus any applicable
taxes). FRA understands that Amtrak is requesting these funds in its attempt to acquire the USI
Sublease in WUS and that this opportunity is unique. Amtrak has therefore sought FRA pre-
programming approval so that it may spend "pre-programming authority funds" on the
elements described in Table 1.

In accordance with the terms of the Agreement, pre-programming costs are allowable only
with FRA's prior written approval. Costs incurred during the pre-programming authority
period are allowable only to the extent that they would be allowable if incurred after the date of
programming. The acquisition activities and all associated costs must comply with the terms
and conditions of the Agreement. Amtrak will incur all pre-programming costs and pre-award
costs at risk until the acquisition is formally programmed pursuant to the Agreement.

## Decision

FRA approves Amtrak's February 17, 2022 pre-programming authority request for up to $66
million in Agreement funds.

FRA's approval of a future programming request of Agreement funds, however, is conditioned
on Amtrak's successful renegotiation of the USI Sublease upon terms satisfactory to FRA[3] no
later than six months after Amtrak's successful acquisition of the USI Sublease. The United
States of America, acting through the FRA, is the fee owner of WUS and has a unique interest in
its effective long-term operation and maintenance. As Amtrak and FRA have previously
discussed, the terms of the current sublease are unsatisfactory and do not serve the long-term
interests of this essential multimodal station.

---

[3] The renegotiated lease terms must support station operations and capital improvements to the station and serve the
multimodal interests of WUS.

23

AMTRAK_WUS_0000107



FRA will not approve any future programming request for additional federal funding beyond the stated maximum federal share of $66 million. Amtrak has communicated the expected share of federal funding related to the purchase of the USI Sublease to USDOT, FRA, the Amtrak Board of Directors, and Congress and FRA has made its determination to approve the pre-programming authority request in reliance on those representations.

Amtrak, USDOT, and FRA have had many discussions about the acquisition of the USI Sublease and the opportunity it presents to improve current operations and project delivery at WUS. USDOT's and FRA's support for Amtrak's action on the USI Sublease, however, is predicated on Amtrak's unreserved agreement to the following:

- o *Retain USRC in its current role at WUS* - USRC fulfills a critically important function. USRC's singular focus is WUS and it is charged with protecting the station's historic nature as well as USDOT's multimodal interests at the station.

- o *Maintain FRA as Authority Having Jurisdiction (AHJ)* - As a Federally owned complex, FRA, as AHJ, is charged with building code enforcement responsibilities for WUS. USDOT remains committed to its AHJ responsibilities.

- o *Support WUS as a multimodal station* – USDOT is required by statute to support WUS's multimodal function. There is strong, regional interest in ensuring that the station continues to facilitate all modes of transportation, including intercity bus service.

If you have any questions, please contact Beth Nachreiner, Chief, Passenger Rail Policy and Oversight Division, at 202-493-0305 or beth.nachreiner@dot.gov.

Sincerely,

*Paul Nissin*

Paul Nissenbaum
Associate Administrator
Office of Railroad Policy and Development

cc:
       Rebecca Reyes-Alicea, Acting Director, Office of Policy and Planning
       Jamie Rennert, Director, Office of Infrastructure Investment
       Beth Nachreiner, Chief, Passenger Rail Policy and Oversight Division
       Matthew Lorah, Chief, Grants and Program Management Division
       Chris Van Nostrand, Deputy Assistant Chief Counsel

CONFIDENTIAL

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NRPC (AMTRAK),                          )
                                       )
          Plaintiff,                   )
                                       )    CV No. 22-01043
     vs.                               )    Washington, D.C.
                                       )    March 23, 2023
SUBLEASE, ET AL.,                      )    8:45 a.m.
                                       )
          Defendants.                  )
_____)


TRANSCRIPT OF STATUS HEARING PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Patricia M. Lambert
                            PESSIN KATZ LAW, P.A.
                            901 Dulaney Valley Road
                            Suite 500
                            Towson, MD 21204
                            (410) 339-6759
                            Email: plambert@pklaw.com

```
APPEARANCES CONTINUED:

For Defendant Union:          David Ross
                              Daniel James Koevary
                              KASOWITZ BENSON TORRES LLP
                              1633 Broadway
                              New York, NY 10019
                              (212) 506-1700
                              Email: dross@kasowtiz.com
                              Email: DKoevary@kasowitz.com

                              Steven Jay Willner
                              NEUBERGER, QUINN, GIELEN,
                              RUBIN & GIBBER, P.A.
                              One South Street
                              27th Floor
                              Baltimore, MD 21202
                              (410) 332-8542
                              Email: sjw@nqgrg.com

For Defendant
Kookmin Bank:                 Y. David Scharf
                              MORRISON COHEN, LLP
                              909 Third Avenue
                              New York, NY 10022
                              (212) 735-8604
                              Email:
                              dscharf@morrisoncohen.com

Court Reporter:               William P. Zaremba
                              Registered Merit Reporter
                              Certified Realtime Reporter
                              Official Court Reporter
                              E. Barrett Prettyman CH
                              333 Constitution Avenue, NW
                              Washington, D.C. 20001
                              (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription
```

1          So I think that the more appropriate would be

2    limited requests for production of documents and a corporate

3    designee on specific, designated topics that would be

4    appropriate for this, which is kind of what you do in a

5    preliminary-injunction stage.  And we would suggest that

6    that would be how to handle it here, Your Honor.

7          MR. SCHARF:  Your Honor, I think we've heard your

8    instructions.  And I think Ms. Lambert's approach that she

9    had suggested earlier that we propound, we confer, we get

10   together with Your Honor if we have issues is probably a

11   good one as opposed to taking up your time this morning

12   talking about it in an esoteric manner.

13         MS. LAMBERT:  No, Your Honor.  I think it's

14   important that we don't kind of get into requests for

15   admissions, interrogatories, all these other type of stuff.

16   I think we need some guardrails and some guidance from

17   Your Honor.

18         THE COURT:  Well, as I said, I think in terms of

19   depositions, I think a 30(b)(6) with -- is certainly

20   appropriate.  It may need -- well, 30(b)(6) is certainly

21   appropriate.

22         If there are multiple topics, as I imagine there

23   might be, there may need to be more than one 30(b)(6)

24   witness.  That seems to me to be appropriate.

25         It's not clear to me what a fact witness would

1    supplement in these circumstances.  But you all know the

2    case and understand what's happening more than I do.  But I

3    would -- let's put it this way.

4              I'm open to the idea of 30(b)(6) witnesses.  I'm

5    less open to the idea of fact witnesses unless there's a

6    compelling reason for a fact witness to substitute for

7    somebody who's otherwise a 30(b)(6) witness.  Okay?

8    That's one.

9              Two, I'd rather not get into admissions at this

10   point.  I think it's premature in some sense to get into

11   that at this point.

12             I think limited interrogatories, written

13   interrogatories could be helpful.  I'll put the number just

14   arbitrarily at five, if for no other reason than it would

15   require Amtrak to, for example, identify precisely what the

16   necessity is.  If, for no other reason, and put it down in

17   writing in a way that the defendants can be clear on.

18             So we'll limit it to five interrogatories, and

19   then I'll leave it to you all to hash out the scope of

20   document discovery.

21             Is that enough, Ms. Lambert, in terms of guidance?

22             MS. LAMBERT:  With one exception, Your Honor.

23   I think that the two issues that the Court was indicate --

24   on the issue of the prefiling negotiations and necessity,

25   the discovery would be limited to those two issues, I would

1    assume.

2          THE COURT:  Correct, correct, correct.

3          MR. SCHARF:  That's what we understood.

4          THE COURT:  Mr. Ross?

5          MR. ROSS:  Yes, Your Honor.  Do you want to defer

6    at this time the question regarding supplemental filings?

7          THE COURT:  I'll defer at this point because what

8    I'm contemplating is one of two things, depending upon where

9    we are:  Supplemental filings or just having a hearing in

10   which you all could present evidence.

11         And that will, frankly, depend upon, one, how --

12   where we are in terms of the need to move quickly, although

13   much time has already passed; and, two, what my schedule

14   looks like, which --

15         MR. SCHARF:  Thank you, Your Honor.

16         MR. ROSS:  Thank you, Your Honor.

17         THE COURT:  And the truth of the matter is --

18   well, I'll just leave it at that at this point.

19         So we'll get something from you all in two weeks

20   that just gives me an update on where things stand in terms

21   of your -- the spirit of negotiations and the production of

22   discovery.

23         If there are disputes that arise before then, just

24   contact chambers; and we'll figure out a way to get online

25   to resolve them.  And then we'll put a hard deadline of

# EXHIBIT 7

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

-------------------------------------------------------- X

NATIONAL RAILROAD PASSENGER
CORPORATION (AMTRAK),

        Plaintiff-Appellee,                Case No. 24-7089

        v.

SUBLEASE INTEREST PERTAINING TO
DESCRIBED LEASEHOLD INTERESTS
AT WASHINGTON UNION STATION, et al.

        Defendants-Appellants.

-------------------------------------------------------- X

**DECLARATION OF MICHAEL REBIBO IN SUPPORT OF**
**LEASEHOLDERS' MOTION FOR A STAY**

1.      I am the Founder and Managing Principal of Rexmark Holdings LLC d/b/a Rexmark ("Rexmark"), a real-estate-investment management firm focused on debt and equity investments throughout the United States and Europe. I make this declaration on behalf of Defendant Kookmin Bank Co., Ltd., individually ("Kookmin") and in its capacity as trustee ("Trustee"), of KTB CRE debt Fund No. 8, a Korean Investment Trust (the "Trust"). The Trust's agent in Korea is Daol Fund Management Co. ("Daol"), and the Trust's agent in United States is Rexmark (together with Trustee, the Trust, and Daol, "Lender").

2.     I am over 18 years of age and have personal knowledge of the facts set forth herein.

3.     This declaration is submitted in support of the Joint Motion of Lender and Union Station Investco LLC ("USI," together with Lender, "Leaseholders") for a Stay Pending Appeal of the District Court's Order, which requires USI to transfer possession of the Leasehold Interest (the "Interest") at Washington Union Station ("Union Station" or the "Station") to Amtrak on July 15, 2024 (the "Motion"). I have read the briefing in the district court. I understand that Amtrak objects to Leaseholders' motion for a stay pending appeal of complex and novel legal issues. However, the denial of a stay will bring imminent and irreparable damage to Leaseholders. This declaration is submitted to address two points: (1) the irreparable harm to Leaseholders if possession is transferred; and (2) the lack of harm to Amtrak from a stay, especially given its recent acknowledgement that it will not make the changes to the Station that were the basis of the district court's decision to grant it possession, during the pendency of the appeal.

4.     Amtrak's takeover of the Interest will immediately and irreparably harm the operation, reputation, and continued development of the Interest. Even if Leaseholders prevail on appeal, these effects cannot be undone by monetary damages.

## A.    Transferring Possession Will Irreparably Harm Leaseholders

5.    Amtrak's ownership and control of the Interest will cause irreparable harm to Leaseholders at Union Station.  Amtrak does not own or manage an asset comparable to Union Station.  Amtrak's core business is operating trains—not trophy real estate.  Amtrak does not have any experience managing or operating a mixed-use property, which is comprised of various complicated components, including retail, event space, digital signage, space for tour operators, and office space.  Boston's South Station, New York's Moynihan Station, and other major mixed-use train stations throughout the United States are operated by major real estate companies, not Amtrak.  Amtrak merely holds a subleased interest or condominium for the track and its train operations at these stations.  Amtrak lacks the resources, qualifications, and experience to manage such an asset as Union Station, and the damage from its inexperience cannot be undone overnight or solved with money.

6.    By taking over the possession of the Station, Amtrak will effectively step into Leaseholders' place to manage and operate the day-to-day operations of the entire Interest, including managing the subtenants and third parties intimately involved in the Station.  Amtrak is not only inexperienced in this role, but is also is likely to harm Leaseholders' standing with these subtenants and the broader market.

7.     Amtrak's immediate intention to repurpose some of the Station's major components—despite recently telling the district court that it will not make changes during this litigation—is further evidence that turning over possession will have significant consequences to the property and Leaseholders.

8.     And while Amtrak now shifts its position from making immediate permanent changes to the Station, Amtrak has recently directed Leaseholders against marketing or executing any new agreements for events in the East or Main Halls after July 15, effectively eliminating major components of the Station that provide numerous events for the community, all without the approval or consent of USRC, the landlord, or the other authorities having jurisdiction over the Station.  The Main and East Halls are among the largest revenue generators for the entire Station and generate millions of dollars in revenue for the property, the harm to which over time cannot be easily quantified.  The nature of events and functions that take place in these spaces involve reservations that are booked years in advance, and the relationships with various companies involved have taken years to build up.  By closing these areas for business, Amtrak is removing one of Union Station's most lucrative spaces and income streams.  A space which has serviced everything from Presidential inauguration dinners, government press conferences, city festivals, conferences, and holiday celebrations while generating millions of dollars in revenue each year will become an empty waiting room under Amtrak's control.  The loss of

those opportunities cannot be remedied by money damages. Many companies and organizations hold annual events at Union Station, and their inability to hold an event in 2024 or 2025 will cause them to turn to other venues, severing that longstanding relationship. In addition, holding frequent events is what keeps the space salient in the public's mind. If Leaseholders are unable to hold events for a year or more during the appeal, that will again cause the public to turn to other venues, making it very difficult to regain their business and their trust.

9.     Moreover, Amtrak still has not clearly stated whether it will renew existing leases with commercial tenants or otherwise make it difficult for those tenants to remain at the Station. A number of leases and agreements are up for renegotiation over the next 12 months. That uncertainty will undermine commercial tenants' trust in the Station and will irreparably harm Leaseholders' relationships with them. This harm will be all the more grievous in light of the substantial efforts that Leaseholders have made to develop and build these relationships in the first place. Regaining control of the Interest after prevailing on appeal will not put Leaseholders back in the same place as they sit today; the damage suffered cannot be undone by a simple reset. It will take years to gain back the trust of the tenants and the public. The losses will be exponential in nature and difficult to quantify. These relationships, and Leaseholders' goodwill, will be irreparably tainted by Amtrak's possession of the Interest.

**B.**     **Irreparable Harm From Loss of Property Interest**

10.     Trophy assets like Washington Union Station are not simply properties that can just be acquired with money or valued by appraisers.  They are irreplaceable assets.  You cannot build another Washington Union Station across the street or anywhere else in Washington, D.C.  The building's proximity to the U.S. Capitol, as well as the historic nature of the building, make it one of its kind.  There is nothing comparable to it in any other major American city.  One doesn't need to look any further than the fact that more people travel to Washington, D.C. through Union Station than the two D.C. airports combined.  The $250 million value that Amtrak assigns to the Interest, while having a third-party valuation from a leading global firm for $830 million, is further evidence that Amtrak does not understand this asset. Amtrak's proposed changes will fundamentally alter this asset and Leaseholders' business relationships in ways that money damages simply cannot remedy.

11.     Amtrak now represents that it will not materially alter the Interest after obtaining possession, but that representation runs counter to what is in the record. When approving authority for Amtrak's spending regarding the acquisition of the Interest, the FRA explicitly conditioned approval of any funding on Amtrak renegotiating the sublease within 6 months from when it got possession.  Now Amtrak claims that they will not significantly modify or terminate the lease in favor of a new sublease.  If Amtrak reverses course again and renegotiates the lease after

taking possession (as it promised to the FRA), the damage to Leaseholders cannot be rectified with money damages.

### C.    USI Will Cease To Exist

12.    Amtrak's possession will also eliminate the need for USI's continued existence.  As a single-purpose entity, the sole purpose of USI is to manage the Interest.  That is what USI was created to do, that is what it has done since 2007, and that is the entirety of its business.  If Amtrak is permitted to take over the Interest, USI will cease to have a purpose.

### D.    Irreparable Harm in the Industry

13.    Stepping back from Union Station specifically, Amtrak's possession of the Interest threatens to stymie the future of partnerships between the government and private real estate developers.  Local municipalities intentionally created the public-private structures in place in major train stations like Boston's South Station and New York's Moynihan Station.  The threat that Amtrak can condemn the interests at any of these major train stations *after* private real estate developers invested millions of dollars into the redevelopment of the property, as it is trying to do here, will cause the private sector to cease entering into any contracts with the government.

### E. Amtrak Will Not Be Harmed By A Stay Pending Appeal

14.     As against the irreparable harm to Leaseholders, Amtrak will not suffer any harm from a stay because Amtrak has no need for immediate possession. Amtrak's narrative as to why immediate possession is needed has drastically changed over the last 2+ years.  These misrepresentations demonstrate that Amtrak cannot be taken at its word.

15.     Amtrak initially indicated in its April 2022 filing that the main justification for its eminent-domain authority was for major capital improvement projects, including the Subbasement Project (which includes Track 22) and the Concourse Modernization Project.  Importantly, Amtrak never claimed that USI was in breach of its lease with Amtrak for causing delay or impediment to these projects. The evidence at the evidentiary hearing in September 2023 indicated that these projects were not delayed as a result of the governance structure and are still years away from starting construction.

16.     Neither of those projects require Amtrak to own the Interest.  Indeed, the projects were planned assuming that Amtrak did not possess the Interest. Moreover, since Lender took over control and management of the Interest in August 2022, Leaseholders have worked collaboratively with Amtrak to keep the projects moving forward.

17.     For example, Track 22, a precursor to moving forward with the Subbasement Project, was substantially completed with Leaseholders' involvement and accommodations given to Amtrak before the Court held the evidentiary hearing in September 2023.  Today, the project remains unfinished primarily because after years of planning, design, and spending, Amtrak designed a train that is too tall to physically fit on Track 22.  That is not the fault of Leaseholders or in any way related to who has possession of the Interest.

18.     In addition, neither the Subbasement nor the Concourse Modernization Projects are ready for further construction as Amtrak still needs to get approval for design plans to the FRA, the authority having jurisdiction, in order to get a building permit.  As of this writing, Leaseholders have not seen any design plans from Amtrak, nor has Amtrak submitted anything to Leaseholders for approval.  These projects are not imminent nor is possession of the Interest required to move forward.  Both of these projects were designed more than 10 years ago under the existing governance system, meaning that no one—not Amtrak, not the FRA, not USRC—expected Amtrak to own the Interest when moving forward with these designs.

19.     Under the current structure—where Amtrak is a subtenant to the Interest controlled by USI (which is, in turn, controlled by Lender)—the parties are working in harmony.  Amtrak has not identified any delays, impediments, or issues

caused by Leaseholders in proceeding with their plans for the Subbasement or Concourse Modernization Projects.

20.     Amtrak does not suffer any harm by having a stay on the order transferring possession pending appeal. To the extent that Amtrak is ready to pick up a hammer for construction purposes on the Subbasement and Concourse Modernization Projects, Leaseholders will continue to lend support as needed to facilitate progress, just as they did for the Track 22 project.

21.     Because Leaseholders pose no impediment to proceeding with these construction projects, Amtrak changed its focus almost 18 months after filing this eminent-domain action and just prior to the September 2023 evidentiary hearing to improving customer experience at Union Station. Amtrak shifted its position to the idea that immediate possession was needed to replace critical retail and event spaces with Amtrak-support spaces, namely waiting rooms, baggage claims, and a play area for children, signage in the Main Hall, and staff members stationed at the property to direct commuters.

22.     At the September 2023 evidentiary hearing, Amtrak presented a schematic that outlined how Amtrak would eliminate most of the revenue-generating retail and food and beverage spaces in order to address these needs. That schematic is attached here as **Exhibit A**. As recognized by the district court, Amtrak's plans would fundamentally shift the current mixed-use function of Union Station.

23.     I first saw the schematic as part of Amtrak's proposed exhibits days before the originally scheduled evidentiary hearing.  Neither the FRA, the DOT, nor USRC approved the schematics at any time.  To date, Amtrak has never made a request from Leaseholders for any additional space or accommodations to address these issues.

24.     It is important to note that under the current sublease, Amtrak has the ability to expand its leased premises and take over additional space within the Station for its needs.  To do so, Amtrak needs only to pay the market rent for the space.  In fact, Amtrak exercised this same right in 2017 to relocate its restrooms to the space currently occupied by McDonalds (who would then move elsewhere in the Station)—a project which Amtrak has not yet started almost 6 years later.  Had Amtrak reached out to Leaseholders about its purported immediate needs (the waiting areas, baggage claims, and children's play area), Leaseholders would have worked with Amtrak to implement these plans under the current lease structure— just as they had with the restrooms and Track 22 project—all while retaining Union Station's essential commercial character that Congress envisioned.

25.     The district court relied on the schematic in granting immediate possession.  But now, confronted with the evidence of irreparable harm set forth in Leaseholders' district court briefing showing that the Station will be altered, the Interest modified or terminated, and Leaseholders' business relationships

irreversibly damaged, Amtrak has changed its narrative again.  In its opposition brief to Leaseholders' stay motion in the district court, Amtrak claimed that, contrary to its proposed schematic, it would make no immediate irreversible changes to the Station.

26.     Amtrak's representations are simply not in line with the facts on the ground.  Irreparable damage is already taking place.  In particular, as explained, Amtrak is no longer allowing Leaseholders to book events in the Main or East Halls, which are significant revenue generators for the Station and which generally must be booked years in advance.

27.     Ultimately, Amtrak has shown no need for possession of the Interest that it could not accomplish  under the existing structure—and certainly no need for immediate possession during the pendency of this appeal.

28.     Since taking over management in 2022, Lender (through USI) has done everything it can to stabilize and further develop Union Station, including working with subtenants, management, third parties, and Amtrak to improve and curate the retail and mixed-use environment at Union Station for the benefit of travelers and the Station's surrounding community.  In the last two years, Leaseholders have secured additional tenants and moved the property in a direction where retailers, advertisers, and various parties want to participate in the revitalization of the property, creating revenue for the station.

29.     As part of these efforts, Leaseholders have also, at every turn, offered to work cooperatively with Amtrak to help them advance their Subbasement and Concourse Modernization Projects at the Interest, which were the original basis for their claimed interest in taking the Interest.  (*See* ECF Doc. No. 1 ¶¶ 32-47.)  Both the Subbasement and Concourse Modernization Projects were developed in 2012 under the existing governance structure and have faced numerous delays based on Amtrak not having the requisite plans, approvals, permits, or funding.  At the evidentiary hearing, it was confirmed that neither Lender nor USI are the impediment to Amtrak moving forward with either of these projects.

30.     Despite Leaseholders' best efforts to gain control of and improve Union Station, the Order now requires Leaseholders to transfer possession of the entirety of the Interest to Amtrak.  Not only would this be a grievous loss of landmark property for Leaseholders, but the transfer to Amtrak threatens the very operation of the Station.  Simply put, all of Lender's communications with Amtrak about the transfer of possession have validated that Amtrak does not have the necessary resources, experience, or personnel to undertake operating a complex property on the scale of the Interest.

31.     Giving a trophy asset to a party who has made misleading statements to advance its agenda and demonstrated inexperience on numerous levels will cause irreparable harm that cannot simply be reversed if possession is transferred back at

a later time.  This lack of experience and resources was evident on a variety of occasions from designing a train that physically cannot fit on Track 22 after years of planning and millions spent to Amtrak's incompetent renovation of the men's restroom in the train concourse area, which took six years to recently complete yet consisted of residential-grade materials rather than commercial-grade materials necessary for such a highly trafficked zone of the Station.  In addition, even basic life safety measures such as a fire alarm system in Amtrak's leasehold area were inoperable for years on the property, posing a threat to the public.  These three examples speak volumes and are indicative of how much damage an inexperienced company can cause.  To trust Amtrak with the rest of the Interest before the final matter is ruled upon is certainly going to result in irreversible damage.  Such an iconic asset should not be left in incompetent hands, even temporarily.

32.    For all of these reasons, the Order's transfer of possession threatens Leaseholders with irreparable harm that is substantial, actual, and imminent.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed this 5th day of July, 2024.

*s/ Michael Rebibo*
Michael Rebibo, Managing Principal
Rexmark Holdings LLC d/b/a Rexmark

# Exhibit A



PLAINTIFF'S EXHIBIT
10
ALL-STATE LEGAL®

Amtrak and Heavy Rail

Retail + Amenities

Public Space / Circulation

Support

Metro

Rest.
Rm

Metro + VIP Lounge

Event Space

Quiet Waiting

Restrooms

Ticketed Waiting Restrooms

Amtrak North Hangar Boarding

VRE Boarding

Amtrak Ticketed Waiting

Retail/ Food

Baggage Handling

Amtrak Ticketing

MARC/VRE Ticketing

Restrooms

CLAYTOR CONCOURSE

VRE Waiting

ELEV & ESC. UP/DN

CSR

OPEN

OPEN

Seating Long Waiting

Red Cap

Amtrak Passenger Boarding

Acela Boarding

MARC Waiting

HISTORIC CONCOURSE

CSR

Seating Long Waiting

MAIN HALL

ENTRANCE PORTICO

Shoe shine

Restrooms

Kids Area

Retail/ Food

Retail/ Food

West Hall

Retail.

PASSENGER DISEMBARKING

MARC Boarding

Baggage Claim

Red Cap

Red Cap

Carriage Porch

Retail

METRO

Rest. Rm

METRO

METRO

# Main Floor



# Concourse Mezzanine Floor

Amtrak

Retail + Amenities

Public Space / Circulation

Support

Metropolitan Lounge

VIP Lounge

Meeting Rooms

Amtrak Police

Restrms

Meeting Rooms

Event Space

Open Dining Seating

CSR/Security

Food + Drink

Restrms

Food + Drink

Open Dining Seating

Retail



Amtrak

Retail + Amenities

Public Space / Circulation

Support

Metro

Amtrak
Back of House

Amtrak
Train Services

Amtrak Services
Lost and Found

Restrooms

Baggage

HVAC and Utility

FOOD + DRINK

Open Dining
Seating

FOOD + DRINK

Amtrak
Back of House

WMATA
Substation

**Lower Level**

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
NRPC (AMTRAK),                    )
                                  )
          Plaintiff,              )
                                  )    CV No. 22-01043
       vs.                        )    Washington, D.C.
                                  )    September 11, 2023
SUBLEASE, ET AL.,                 )    9:30 a.m.
                                  )
          Defendants.             )
_____)
```

TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Patricia M. Lambert
                            PESSIN KATZ LAW, P.A.
                            901 Dulaney Valley Road
                            Suite 500
                            Towson, MD 21204
                            (410) 339-6759
                            Email: plambert@pklaw.com

APPEARANCES CONTINUED:

For Defendant Union:                David Ross
                                    Daniel James Koevary
                                    KASOWITZ BENSON TORRES LLP
                                    1633 Broadway
                                    New York, NY 10019
                                    (212) 506-1700
                                    Email: dross@kasowtiz.com
                                    Email: DKoevary@kasowitz.com

                                    Steven Jay Willner
                                    NEUBERGER, QUINN, GIELEN,
                                    RUBIN & GIBBER, P.A.
                                    One South Street
                                    27th Floor
                                    Baltimore, MD 21202
                                    (410) 332-8542
                                    Email: sjw@nqgrg.com

For Defendant
Kookmin Bank:                       Y. David Scharf
                                    Amber R. Will
                                    MORRISON COHEN, LLP
                                    909 Third Avenue
                                    New York, NY 10022
                                    (212) 735-8604
                                    Email:
                                    dscharf@morrisoncohen.com

                                    Paul J. Kiernan
                                    HOLLAND & KNIGHT LLP
                                    800 17th Street, NW
                                    Suite 1100
                                    Washington, D.C. 20006
                                    (202) 955-5564
                                    Email: paul.kiernan@hklaw.com

Court Reporter:                     William P. Zaremba
                                    Registered Merit Reporter
                                    Certified Realtime Reporter
                                    Official Court Reporter
                                    E. Barrett Prettyman CH
                                    333 Constitution Avenue, NW
                                    Washington, D.C. 20001
                                    (202) 354-3249

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

- - -

INDEX OF EXHIBITS

- - -

| PLAINTIFF'S | ADMITTED |
|---|---|
| JX1 THROUGH 8 | 6 |
| 1 | 83 |
| 10 | 163 |
| 3 | 175 |
| 4 | 177 |
| 5 AND 6 | 180 |
| 2 | 183 |
| 8 | 311 |

- - -

INDEX OF EXHIBITS

- - -

| DEFENDANT'S | ADMITTED |
|---|---|
| 1 THROUGH 21 | 8 |
| 24 | 156 |
| 22 AND 24 | 338 |

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

PLAINTIFF's:

| STEVEN GARDNER | 11 | 96 | | |
| STEVEN GARDNER | | 166 | | |
| DENNIS NEWMAN | 168 | 180 | 196 | |

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

DEFENDANT'S:

| BEVERLY KAY SWAIM-STALEY | 213 | 245 | | |
| BEVERLY KAY SWAIM-STALEY | | 261 | | |
| MICHAEL REBIBO | 266 | 306 | | |
| MATTHEW BARRY | 315 | 325 | | |
| MATTHEW BARRY | | 335 | | |

1               P R O C E E D I N G S

2          COURTROOM DEPUTY:  All rise.  The Court is now in

3     session; the Honorable Amit P. Mehta now presiding.

4          THE COURT:  Good morning.  Please be seated,

5     everyone.

6          COURTROOM DEPUTY:  Good morning, Your Honor.

7     This is Civil Action 22-1043, National Railroad Passenger

8     Corporation, doing business as Amtrak, versus Sublease

9     Interest Obtained Pursuant to an Assignment and Assumption

10    of Leasehold Interest Made as of January 25th, 2007, with

11    Said Property Interest Pertaining to Described Leasehold

12    Interest at Washington Union Station.

13          Patricia Lambert for the plaintiff.

14          Steven Willner, David Ross, Amber Will,

15    Mahnoor Misbah, Paul Kiernan and David Scharf for the

16    defendants.

17          THE COURT:  Okay.  Good morning, everyone.  It's

18    nice to be with everyone.  It's nice to see you all.  Can

19    I just ask somebody in the back to just shut the door there,

20    please.  Thank you very much.

21          All right.  So I appreciate the patience in the

22    start this morning.  We had a 9:00 matter that ran a little

23    long.

24          All right.  So we're here this morning to have an

25    evidentiary hearing on the motion for immediate possession.

1        So why don't you just provide me with a preview of

2   what we expect today.

3        MS. LAMBERT:  Your Honor, before we begin --

4        THE COURT:  Okay.

5        MS. LAMBERT:  -- the parties have worked together

6   to narrow any exhibit issues, and so I wanted to explain

7   what you have in front of them subject to supplementation by

8   opposing counsel.

9        There are a book full of what's called joint

10  exhibits.  Those are exhibits to which no one has

11  objections, and we would ask the Court to accept them as to

12  part of the record.

13       THE COURT:  Okay.  So that's JX1 through 8, is

14  that what --

15       MS. LAMBERT:  That's correct, Your Honor.

16       THE COURT:  All right.  So we'll admit those.

17                      (Plaintiff's Exhibits JX1 through 8
                            received into evidence.)
18

19       MS. LAMBERT:  Then there is a book that's entitled

20  "Lender's Exhibit Stipulated," to which there's no

21  objection.

22       THE COURT:  Okay.

23       MS. LAMBERT:  And those we -- I think that the --

24  technically it's the lender moves them in, but we have not

25  objected to them and will not object to them, Your Honor.

1          THE COURT:  So, hang on.  I have two binders

2  containing Lender's Exhibits that's Exhibits 1 through 32?

3  Any objections as to those?  I don't have the word

4  "stipulated" on the cover here.

5          MS. LAMBERT:  Yeah, I believe those, Your Honor,

6  are the ones that have been stipulated to that there have

7  been no objection.

8          THE COURT:  Okay.

9          MS. LAMBERT:  And then there is a third binder,

10  which is the lender's exhibits to which there has been an

11  objection -- or may be -- an objection may be raised.  So

12  those are not stipulated to.

13          THE COURT:  So I don't know that I have that

14  binder.

15          MS. LAMBERT:  It should be the thick one.

16  Mr. Kiernan.

17          THE COURT:  I'll just tell you what I have.

18          I've got something called Lender's Exhibits 1

19  through 21, Lender's Exhibits 22 through 32.

20          MS. LAMBERT:  22 through 32 is the ones that have

21  not been --

22          THE COURT:  All right.  So then 1 through 21 are

23  agreed upon, and so we'll go ahead and just admit those at

24  the start.

25

1                   (Defendant's Exhibit 1 through 21
                            received into evidence.)

2

3          MS. LAMBERT:  And then there is a smaller binder

4   of plaintiff's exhibits.

5          THE COURT:  Yep.

6          MS. LAMBERT:  These have not been stipulated to,

7   but they've been separately marked and -- for the witnesses.

8          THE COURT:  Okay.

9          MS. LAMBERT:  We've also put them in front of the

10  witnesses and given a copy to your law clerk.

11         THE COURT:  And I'm just curious.  When you all

12  say -- all right.  I've got something in here that it looks

13  like somebody's work product, so why don't I hand that up.

14         MS. LAMBERT:  Sorry.

15         THE COURT:  That's okay.

16         MS. LAMBERT:  All right.

17         THE COURT:  So the plaintiff's exhibits, when we

18  say they aren't stipulated to, I mean, is there going to be

19  any objection to their admissibility?

20         MS. LAMBERT:  Yes, Your Honor, the plaintiff's

21  exhibits are ones that the parties anticipate there may be

22  an objection.

23         THE COURT:  Okay.  All right.  I guess we can just

24  take that up as it comes.

25         MS. LAMBERT:  Thank you, Your Honor.

1          And then we'd like to invoke the sequestration

2     rule.

3          THE COURT:  Okay.

4          Any objection to that?

5          MR. SCHARF:  No, Your Honor.

6          THE COURT:  All right.  So I assume there are no

7     witnesses or anticipated witnesses in the courtroom?

8          MS. LAMBERT:  Well, our first witness is just

9     because he's our first witness.

10         THE COURT:  That's fine.  Other than your first --

11         MS. LAMBERT:  And our corporate designee is here.

12         MR. SCHARF:  And our corporate designee is also

13    present.

14         Mr. Rebibo is sitting with us as well, Your Honor.

15         THE COURT:  All right.

16         And are you all anticipating calling either of the

17    corporate designees?

18         MS. LAMBERT:  Yes.

19         MR. SCHARF:  Yes.

20         THE COURT:  There's no objection to having --

21         MS. LAMBERT:  No.

22         THE COURT:  -- the corporate designee remain in

23    the courtroom?

24         All right.

25         MS. LAMBERT:  And then we're ready to proceed with

1    witnesses since we've had at least three hearings on this,

2    and we might just as well get to it.  But that's subject to

3    your preference.

4            THE COURT:  So just in terms of how many witnesses

5    each side will have, I understood it was two apiece.  Is

6    that still where we are?

7            MR. SCHARF:  We have three, Your Honor.

8            THE COURT:  Okay.  All right.

9            All right.  And so we'll just -- we'll move

10   through this.  And at least from the plaintiffs, how long

11   do you anticipate your presentation will be?

12           MS. LAMBERT:  We have anticipated two and a half

13   hours without cross.

14           THE COURT:  Okay.

15           MS. LAMBERT:  And with the Court's permission, I'd

16   like to call Steven Gardner to the stand.

17           THE COURT:  Well, before we do that, is there

18   anything else we need to discuss preliminarily?

19           MR. SCHARF:  Nothing on our side, Your Honor.

20   Thank you.

21           All right.  Well, then why don't we have

22   Mr. Gardner come on up.

23           COURTROOM DEPUTY:  Please raise your right hand.

24           (Witness is placed under oath.)

25           COURTROOM DEPUTY:  Thank you.  Please have a seat.

1          THE COURT:  Mr. Gardner, welcome and good morning.

2          THE WITNESS:  Thank you.

3                      - - -

4    STEVEN GARDNER, WITNESS FOR THE PLAINTIFF, SWORN

5                   DIRECT EXAMINATION

6                      - - -

7    BY MS. LAMBERT:

8      Q    Could you state your name, title, and business

9    address for the record.

10     A    Yep.

11          Steven Gardner.

12          And I am the CEO at Amtrak.  And my business

13   address is 1 Massachusetts Avenue Northwest, Washington,

14   D.C. --

15     Q    And --

16     A    -- 20001.

17     Q    I'm sorry, I forgot the ZIP Code.

18          So in any event, what's your general

19   responsibility as CEO for Amtrak?

20     A    As Amtrak's CEO, I'm responsible for leading the

21   management team of the company, delivering our day-to-day

22   business and long-term plans, and then serving as an ex

23   officio member of the board of directors.

24     Q    How long have you been with Amtrak?

25     A    Coming up on about 15 years.

1    Q    What is Amtrak?

2    A    Amtrak is a provider of inter-city passenger rail.

3    We're really the nation's inter-city passenger rail provider

4    created by Congress.  We're a for-profit company with a

5    public mission.  And we operate across a 21,000-mile

6    network, 46 states, three provinces, serving about

7    32 million passengers pre-pandemic a year.

8    Q    Could you describe for the Court the routes that

9    are -- Amtrak train routes that go from D.C. to the north?

10    A    Sure.

11    Washington is really a hub of the whole network.

12    To the north, we have the northeast corridor, which is the

13    North America's busiest passenger railroad, and so the route

14    proceeds from Washington north through Philadelphia to

15    New York and up to Boston primarily.

16    Q    How about to the south?

17    A    To the south, we have a series of both

18    state-supported trains -- these are trains we run in

19    cooperation with states, and our long-distance trains

20    through Virginia, North Carolina, and then long-distance

21    service all the way to Florida, Atlanta, New Orleans and

22    locations.

23    Q    How about to the west from D.C.?

24    A    To the west, we have primarily two services, both

25    long-distance services to Chicago, one to the northwest and

1  the other through the southwest.

2      Q    How many trains does Amtrak run?

3      A    About 300 a day.

4      Q    And does Amtrak expect growth in its passenger

5  ridership for its entire system in the future?

6      A    Absolutely.

7           Amtrak's service is already back.  We're at

8  pre-pandemic levels.  In fact, the past couple of months,

9  we've exceeded our pre-pandemic ridership.

10          And we have a tremendous growth trajectory, an

11  opportunity.  The nation's invested just now about

12  $60 billion in Amtrak and passenger rail between us and the

13  DOT, and strong mission and mandate to grow.

14          So our goal is to double our ridership to about

15  60 plus million riders by 2040.  So we're on good track to

16  do that already.

17     Q    From Amtrak's perspective, why does it need

18  growth?

19     A    Well, growth, fundamentally, I think, is the

20  mission from our owners.  We're owned by the

21  U.S. Government, and they have been very clear about the

22  need for passenger rail to take on a bigger role of

23  inter-city passenger transportation and to help us meet both

24  sustainability goals and mobility in the future.

25          It's essential for us to grow as well because we

1   rely on ticket revenues to cover most of our operating

2   expenses, and we've got to go out and sort of deliver

3   service to folks and continue to make use of the assets

4   we've got and deliver value.  That's the instructions from

5   the statute.

6           Additionally, we have a number of ongoing

7   obligations associated with new equipment and other capital

8   improvements, and we've got to make good use of those to

9   justify public investment by delivering more service.

10      Q    Now, what's the name of the train station in D.C.?

11      A    Washington Union Station.

12      Q    What responsibilities have you had over the years

13  over that train station?

14      A    Well, I've had a lot of -- I actually started my

15  railroad career as an intern in Washington Union Station

16  some long time ago.

17          But began with Amtrak heading the policy and

18  planning organizations, have been involved in overseeing the

19  real estate activities, the long-term planning, and then

20  ultimately the commercial and operations elements of the

21  whole network, including Washington Union Station.

22          It's our second busiest station, so it's a huge

23  focal point for Amtrak.

24      Q    Could you explain to the Court how this station

25  fits into Amtrak's system and its plans for growth?

1     A     Yes.

2          As I said, it's the second busiest station in the

3     network, so it is fundamental, really, to our whole service,

4     and it serves as this key point connecting the northeast

5     corridor to the whole south and west.

6          And growth there is really absolutely required for

7     Amtrak to meet its mission.  In our view, we have this

8     interface between the northeast corridor and the points

9     south.  And all that comes through this terminal area.  And

10    we've been seeing a huge growth in passengers over the

11    period since the station was redeveloped, and we expect that

12    growth to continue.

13         It has also a lot to do with the increase in

14    equipment we've just purchased.  We have 28 new Acela trains

15    that are coming soon.  That's going to increase about

16    80 percent our capacity between Washington and New York, and

17    we must expand and improve our station operations to handle

18    the increased growth in passengers that we anticipate as

19    part of that acquisition.

20    Q     Well, I want to discuss ridership at the D.C.

21    train station, but I want to go backwards for historical

22    perspective first.

23         What happened in 1988 in terms of ownership of the

24    station?

25    A     The U.S. Department of Transportation became the

1  owner.

2      Q    And what happened with respect to Amtrak in 1988

3  in the D.C. station?

4      A    We moved into the redeveloped station.  We had

5  been in a very subpar location beyond the station and were

6  able to move in to the concourse and began operations there.

7      Q    What was the total rail passenger ridership

8  in 1988?

9      A    About five and a half million riders.

10     Q    And how much of that was Amtrak back then?

11     A    About 3 million riders.

12          THE COURT:  Sorry, this is just out of

13  Union Station?

14          THE WITNESS:  This is just out of Union Station,

15  yep.

16  BY MS. LAMBERT:

17     Q    Now, let's go to 2018, 30 years later.

18     A    Yeah.

19     Q    What was Amtrak's ridership in that year?

20     A    So Amtrak's ridership total was more than

21  30 million riders.  And in Washington Union Station,

22  ridership had grown to about 14 million.

23     Q    So there was substantial growth in ridership.

24          Was there substantial growth in the leased area

25  that Amtrak had during that period of time?

1      A     No.  Amtrak is really confined to a very narrow

2   portion of the rear of the station, essentially kind of

3   outside of the historic train station area, and we were

4   not -- we didn't have any growth in the space available to

5   passengers or for our core functions within the station,

6   even though ridership grew by about 250 percent.

7      Q     What does Amtrak expect to be its growth in

8   ridership at that station in the coming year?

9      A     Well, we're planning to double, again, the

10  ridership here between now and 2040.  We expect Washington

11  will see that kind of result.

12           Train volumes, about 220 trains today.  We expect

13  in the 2040 period to have over 500 trains a day between us

14  and our two tenants.  We have two commuter railroad tenants

15  who use our facilities here.

16     Q     Who are those two commuter tenants?

17     A     MARC, which is the Maryland MTA services, and VRE,

18  Virginia Railway Express.

19     Q     And what's the total ridership at the station per

20  day, if you know?

21     A     Today, it's about 30,000 riders, of which about

22  16,000 are Amtrak.

23           In 2018, pre-pandemic, it was about 50,000 riders

24  but still 16,000 riders for Amtrak.  So Amtrak's back to its

25  pre-pandemic levels.

1    Q    And while we're discussing numbers, could you

2  describe for the Court how many D.C.-based employees

3  Amtrak has?

4    A    About 2500.

5         THE COURT:  I'm sorry, just a clarifying question.

6         When you say Amtrak is confined to a narrow

7  portion at the rear of the station, do you mean to say that

8  Amtrak has leased that sort of back part of the station

9  where its operations are and where people enter into the

10 train gates and then walk through to the actual rails and

11 the trains?

12        THE WITNESS:  Yes, yeah.

13        That's called the Claytor Concourse, and it was an

14 addition, it was part of the ADA redevelopment.

15        So historically, the train station was occupied by

16 the train station functions primarily.

17        In the redevelopment -- Amtrak was obviously much,

18 much smaller then -- we've pushed into sort of this rear new

19 concourse, and that's the Claytor Concourse.  That's where

20 primarily our functions are today.

21        THE COURT:  I see.  Okay.  Thank you.

22 BY MS. LAMBERT:

23    Q    Could you describe for the Court the parts of a

24 train station.

25    A    Sure.

1          In Washington, there's really three kind of main

2   areas as part of what we call the terminal complex.

3          The first is the head house.  That's the main

4   station building.  So when people go to Washington

5   Union Station, they're usually talking about the head house

6   area.

7          The head house is where we provide all the

8   services to passengers, where they board, where they wait,

9   where we sell tickets and so forth.  And that's really the

10  front door for Amtrak and, in a way, the front door to the

11  city from our services, the head house building; passenger

12  oriented in its functions, and also the supporting functions

13  that need to support the passengers.

14         And then we have the terminal area.  Those are the

15  tracks and platforms so this is behind the building, and

16  that's where all the railroad operations happens, where we

17  load our trains, where we service trains.  Amtrak maintains

18  tracks and platforms there, of course, and our electric

19  systems and signals and so forth.

20         Then a little bit distant to the north, we have

21  our facilities, and they're also intermixed in the terminal

22  area.  These are the places we maintain trains, do heavy

23  overhaul work, also keep our equipment to maintain tracks

24  and platforms.

25         So yards, tracks and platforms, and head house.

1     Q    From Amtrak's perspective, how is a retail mall

2    different from a head house?

3     A    Well, it's really quite different.  A head house's

4    main function is to absorb sort of large groups of people

5    coming and going in transit.  So it's fundamentally a

6    transportation asset of serving -- of several different

7    providers, Amtrak and our commuter tenants being the

8    biggest, but also inter-city bus, and there's the Metro

9    station, WMATA, there.

10         And train stations need to be able to process

11   people quickly, allow people to get in and out to their

12   destination.  We're, of course, competing with other modes

13   of transportation, notably the airport here at National.

14   And one of the things that's really important at a train

15   station is that there's not a lot of delay, that it's

16   intuitive to be able to get to the tracks and platforms.

17   Our speed of service is one of our benefits.

18         So it's very different than a mall, which is

19   oriented primarily around folks having a leisurely time,

20   spending time shopping, spending time circulating but not

21   necessarily having a destination.

22         And, of course, we have a variety of different

23   passenger needs.  Commuters who want to show up, you know,

24   two minutes beforehand; long-distance travelers with

25   families might have to check their baggage coming 45 minutes

1    before.  So all of this back-and-forth is going on.  And the

2    whole building needs to be oriented around it, not

3    dissimilar in a way to an airport, which is just really

4    focused on moving people efficiently in and out and getting

5    them effectively to their gates and to the various services

6    they need as part of their trip.

7        Q    How many floors are there in the head house at

8    Washington Union Station, not counting office towers?

9        A    There are three.

10       Q    I'm going to show you, from the Joint Exhibit 5,

11   and I ask that it be put on the screen, page 13.  This is an

12   exhibit that is already admitted.

13            And is this a fair and accurate representation of

14   the Union Station complex?

15       A    Yes.

16            THE COURT:  Sorry, this is JX what?

17            MS. LAMBERT:  It is Joint Exhibit 5 at page 13.

18            THE COURT:  Oh, at page 13.  Okay, got it.  Sorry

19   about that.

20            MS. LAMBERT:  And you can see the numbers -- I

21   could also give you the bottom number.

22            THE COURT:  That's fine.  As long as this is in,

23   I can just look at the screen.

24            MS. LAMBERT:  Okay.

25

1    BY MS. LAMBERT:

2        Q    So I'm going to ask that my paralegal, who's been

3    patient with me, to put up -- I'm going to have him walk

4    through you through different areas.

5            Could you put up the first area.

6            What is that?

7        A    So this is the historic station area.  This is the

8    head house that I described earlier.

9        Q    And if you look down, what's that roadway?

10   Do you see it on the screen in yellow?

11       A    I do, yes.

12           So this is the bottom left here.

13           That's the taxiway and drop-off, pick-up area.

14           That's -- Columbus Circle is the actual roadway.

15           And that's the Columbus Park there that's the

16   National Park Service in the front.

17           THE COURT:  Excuse me.  Does the head house

18   include what currently is sort of the mall portion of it,

19   the hall of the retail, as well as the entranceway that used

20   to, at least at one point in time, host social events?

21           THE WITNESS:  Yeah, it does.

22           So that's all the historic -- that very front

23   portion is known as the great hall.

24           THE COURT:  Right.

25           THE WITNESS:  And then there's the concourse, the

1   historic concourse.  And then there's the Claytor Concourse.

2   So that whole building is the head house --

3            THE COURT:  I see, okay.

4            THE WITNESS:  -- historically.

5            And you know, originally that great hall you come

6   in was the waiting area, the ticketing.  So that's all where

7   passengers waited and did those things.  And the concourse

8   is where trains were boarded from.  So, historically.

9            THE COURT:  Gotcha.

10           MS. LAMBERT:  Could you show the next area,

11  please.

12  BY MS. LAMBERT:

13      Q    What's that?

14      A    Those are the tracks and platforms, and that's the

15  area that I referred to really as the terminal zone.

16           Some of those tracks and platforms end at Union

17  Station.  Some go through a tunnel that proceeds under

18  Union Station actually and down First Street to bring trains

19  to the south.

20      Q    Could you show the next area, please.

21           Could you identify what that is.

22      A    It's the Union Station parking garage.

23      Q    And that's not part of this litigation?

24      A    Right, yeah.

25      Q    And can you show the next depiction, please.

1          And what is that?

2     A     So this is the head house.  And it -- again, it

3     proceeds from Columbus Circle.  That area at the bottom is

4     the great hall area, and then to the concourse next, leading

5     out to -- towards the tracks and platforms.

6     Q     And could you describe for the Court the office

7     towers.  We've mentioned office towers.  Where are they on

8     this picture?

9     A     Yeah, those towers are known as 40 and

10    60 Massachusetts Avenue.  They're in basically each of the

11    corners.  And they go along the front of the facade.

12         So they're above the mezzanine level, and they

13    kind of ring around the great hall, the building.

14    Q     Are they more than three floors?

15    A     They're three floors, I think.

16    Q     Now, I want to turn to the main portion of the

17    historic building.  And to orient the Court, I want to show

18    a picture from Joint Exhibit 5.  It's described as part of

19    Slide 9.  It's already in evidence, Your Honor.

20         Could you describe what this is.

21    A     Yeah, this is the great hall.

22         Again, this is the former boarding -- or excuse

23    me, former waiting area to get baggage, et cetera, of the

24    train station.

25    Q     Prior to this action, the moment just before this

1  was filed, what floor did Amtrak lease space from from USI?

2      A    On the first floor.

3      Q    What about the mezzanine level?

4      A    No.

5      Q    How about the lower level, was Amtrak leasing

6  anything from USI?

7      A    We were not leasing anything from USI there,

8  I don't believe.

9      Q    I'd like to show Plaintiff's Exhibit 9.

10         And can you identify what that is.

11     A    Well, this is the Amtrak leasehold area which

12 Amtrak leased from USI.

13         And this is basically the confines of Amtrak's

14 controlled space in the station.

15     Q    Is it a fair and accurate representation?

16     A    Yep, I believe so.

17     Q    Which floor of the head house does it show?

18     A    The first floor.

19     Q    And could you describe briefly for the Court the

20 areas that are labeled "Block," "North Hangar" and "Metro."

21     A    Sure.

22         So north hangar is a series of basically elevated

23 hallways that lead out to the tracks and platforms that go

24 underneath the building to the south, also extends to the

25 north.  So they're kind of like -- well, they're walkways,

1   in essence, that lead to vertical circulation, so stairs,

2   elevators, escalators that bring you down to track level.

3          The block is essentially the apron that precedes

4   the tracks and platforms.  So it's an open area where

5   passengers proceed out to the platforms.  It's also a place

6   where we have a variety of service vehicles and other things

7   that bring materials to the train.

8          And we have our small Amtrak Acela Lounge there,

9   Metropolitan Club, and a number of other supporting

10  functions.

11         And then the metro space, that's the Washington

12  metropolitan area station authority.  That's the Metro

13  station.  So that's where passengers leaving Amtrak space or

14  otherwise the station enter into Metro's station, proceed

15  down underground to their tunnel.

16         THE COURT:  Can I just ask, you measured MARC and

17  VRE earlier.  Do they sublease from Amtrak?

18         THE WITNESS:  That's right.  They're tenants by --

19  one by statute, one by contract, and have used our

20  facilities here in this area.  So the passenger concourse in

21  this area is the area that's for both us and the

22  two commuter railways, and has been for a long time.

23  BY MS. LAMBERT:

24     Q    And just to complete the thought, north hangar,

25  the block and metro, are they part of the head house?

1        A    They are not part of the head house.

2        Q    Are they part of this condemnation?

3        A    No.

4        Q    Now, using this demonstrative,

5   Plaintiff's Exhibit 9, could you describe for the Court how

6   a person would go from the front of Washington Union Station

7   to get to an Amtrak train.

8        A    Yes.

9             So typically, passengers are going to -- looking

10  at this diagram there -- enter from the front of the

11  building, which is at the bottom of the schematic depiction

12  here, either through the --

13            THE COURT:  By the way, just to -- that also is a

14  touchscreen, so if you'd like to draw on it, feel free.

15            THE WITNESS:  Oh, okay.  Sure.  Thanks,

16  Your Honor.

17            So this would be the -- wow -- this would be the

18  primary entrance point for many folks typically who are

19  coming by either taxi or drop-off.

20            Over here is the primary WMATA entrance, in

21  addition to here.

22            So for the most part, passengers have -- come in

23  the building and then have to sort of make their way either

24  through the carriageway, which is this area here, or through

25  the main hall, and then have to find their way through to

1    the ticketing, if they need that, or into the rear, again,

2    in the passenger concourse, what's labeled "Passenger

3    Concourse," which is where the boarding and primary

4    information is available for passengers.

5         Q    So what is that area in red?

6         A    What is the area?

7         Q    Yeah?

8         A    The passenger concourse?

9         Q    Yes.

10        A    Yep, the passenger concourse.

11             So that's where Amtrak boards, queues, and

12   services passengers.  So we've got the ticketing functions,

13   we've got baggage.  So there's a carousel for baggage to

14   come up.  And also you can drop off baggage at the ticketing

15   area.

16             And then we have gates, which are where the

17   passengers queue and give it entrance into the tracks and

18   platforms.

19             There are restrooms, of course, and there is a

20   limited number of -- amount of seating in that space.

21   Primarily when it's busy, it's really -- there's no room for

22   people to sit primarily, it's queuing and boarding.

23        Q    So how is a passenger concourse such as depicted

24   in the red area connected to rail passenger service?

25        A    Well, it's the entryway onto our trains.  I mean,

1    it's the front door to the railroad.  So this is the way

2    that everyone passes -- you know, everyone gains passage to

3    the tracks and platform.  So it's fundamental to our

4    business.  It's fundamental to the operation of Amtrak

5    trains and our network at any station.

6           But here, again, our second-busiest station, it's

7    related in every way because it's where folks get tickets,

8    get information, figure out where their train is and then

9    proceed to board at the right time.

10   Q    So what's a peak afternoon train departure?

11          THE COURT:  I'm sorry, we haven't admitted 9,

12   I just want make sure.

13          MS. LAMBERT:  It's only for demonstrative.

14          THE COURT:  Okay.  All right.

15          MS. LAMBERT:  Demonstrative purposes, Your Honor.

16          THE COURT:  Okay.

17   BY MS. LAMBERT:

18   Q    So tell me about peak afternoon train departures.

19   A    Yeah, peak afternoon departures, we have about 35

20   now.  Back in 2011, we only had about 15.  So we've

21   increased a lot, the departures, in the peak period.

22          And there are really two peaks.  There's a morning

23   peak and an afternoon peak.  The peak for the commuter

24   trains is a little bit earlier, driven by a workday

25   schedule, and then our peak extends a little bit longer in

1    the morning.

2           And then on the afternoon side, it starts

3    mid-afternoon, give -- the commuters peak a little bit

4    earlier, and our folks tend to depart sometime around that

5    late afternoon, early evening.

6       Q    You said that's -- number has risen.  What does

7    Amtrak expect the trend to be in the future?

8       A    Well, again, we're anticipating, between us and

9    the commuter railroads, essentially a doubling of train

10   volume, more than doubling of train volume between now and

11   roughly 2040, the next 15, 20 years.

12          And so the peak period will get much worse in

13   terms of the busyness at the station.

14          We've purchased, as I said, 28 new Acelas, and

15   part of the whole concept there was to be able to have

16   double frequencies in the peak for Acela, because we have a

17   lot of demand in those key travel times.

18      Q    What happens to that area in red when there are

19   train delays?

20      A    Well, it's already very crowded even in the peak

21   without delays.  About 900 or so folks back when we were

22   looking at this early work in the '10, 2010, 2011, 2012

23   period.

24          So you can have a thousand people there easily as

25   trains both board and alight at the same time.  We have

1    folks who come in -- it all comes through the same gate

2    areas, basically, people coming in and boarding at the same

3    time.

4           When there are delays, which, you know, sometimes

5    can happen, the concourse can easily fill up with 2,000 or

6    so folks.  So far exceeding what we desire and, frankly,

7    what's workable.

8           Even in -- 10, 15 years ago, much of the gates

9    here, when we did analysis of pedestrian flows, were

10   operating at the lowest possible level.  They're ranked A

11   through F of passenger flow and passenger space.  And during

12   the peak period, most of the main gates here were at the

13   worst level of performance because there's more people than

14   there is space.

15       Q    How has Amtrak rated itself on the concourse space

16   need?

17       A    Well, we've -- just to make sure, can you say the

18   question once more.

19       Q    Yes, it was a bad question.

20           Has Amtrak ever graded itself on its concourse?

21       A    Oh, grade, yes, sorry.

22           We did.

23           As I said, we did this work to analyze the

24   pedestrian flows and the quality of pedestrian -- and space.

25           And the main gates that lead to the lower number

1    tracks, A through F, they had levels of basically F, the

2    lowest levels in peak.

3           And even in off peak, they never were really

4    better than a C.  So these are really substandard conditions

5    in terms of personal space, the ability to move freely in

6    and out.  These are the kind of situations you never expect,

7    say, at our competitor airport here.

8           And the other gates to the east were regularly at

9    C and D.  So, again, nearly the lowest levels in terms of

10   performance.  And that was 2011, 2012.  So now we're well

11   beyond that.

12   Q    Is the red space sufficient for Amtrak's concourse

13   operations?

14   A    No, it's not efficient.

15          The main problem, I would say, with the passenger

16   concourse, from Amtrak's perspective, is that it doesn't

17   permit the boarding and alighting and also waiting at the

18   same location.  There really is no waiting space when you

19   have the terminal filled and during this peak period because

20   we don't have enough room to be able to have sufficient

21   seating options.

22          There's no ticketed waiting area.  There's no

23   space for children and families.  It's just really far, far

24   below an ideal experience for our passengers, and it's a

25   source of both complaints from passengers and

1    dissatisfaction at Amtrak.

2         Q    Do you see where it's labeled "Ticketing"?

3         A    Yes.

4         Q    And what is that label supposed to be?

5         A    Well, that's where the ticket counters are.  So

6    that's where -- folks who are purchasing tickets.

7              So today, most of -- many folks are purchasing

8    tickets online and other things, so a lot of people proceed

9    there either to pick up tickets, buy tuckets, work on their

10   reservation, or get assistance and have customer service

11   answers.

12             There's also, behind there, a series of small

13   offices, which is where our announcer and usher is, the

14   break area for the ticket clerks, et cetera.

15        Q    Is the red space sufficient for Amtrak's ticketing

16   operations, in Amtrak's view?

17        A    It's not.  It's really configured to a -- sort of

18   in a past era, a time, and we need a very different approach

19   to ticketing nowadays where we want to distribute our clerks

20   and customer service agents across the terminal complex,

21   because, again, people often need help and assistance, and

22   forcing everyone to queue into this relatively small spot

23   has not been really successful or meet the needs of our

24   passengers, what have you.

25        Q    What is a ticketed waiting area?

1     A    Ticketed waiting area is a select waiting area for

2  passengers with tickets.  The idea there is to provide

3  passengers with an area that is exclusively for their use,

4  not for the general public, and features the kind of

5  amenities that you'd -- that passengers need.  So access to

6  charging and other things, yep.

7     Q    Why is a ticketed waiting area useful for rail

8  passenger operations?

9     A    Well, again, it really allows our passengers to

10  have a secure, comfortable place while they wait for their

11  trains.

12         And it gives passengers access to amenities that

13  we can control and offer.

14         It helps to upgrade the experience for passengers

15  and helps us compete with other modes of transportation,

16  particularly, you know, in airlines, which have -- you know,

17  at the airport have a variety of seating options and

18  comfortable places for passengers.

19     Q    Where's the ticketed waiting area in Washington

20  Union Station?

21     A    There is none.

22     Q    Is the red space sufficient for Amtrak to create a

23  ticketed waiting area, in its view?

24     A    No.

25     Q    I don't see any label on the red space showing a

1    lounge.  What's a lounge or a Metropolitan Lounge?

2         A    A Metropolitan Lounge is a first-class lounge.  So

3    again, similar to what you'd see in the first-class lounges

4    at the airport.  It's a space for our first-class and

5    premium customers, our customers with high loyalty in our

6    loyalty program.

7              And so we have a small space.  It is not within

8    the leased space, it's in the block area.  It's not part of

9    this lease.

10        Q    Is that space, it's a small space that you're

11   talking about where there's an existing lounge, sufficient

12   for what Amtrak wants to do with regard to a lounge?

13        A    No, it's grossly inadequate.  It's very, very

14   undersized.

15             Because we have a number, as you'd expect, of

16   first-class passengers on our Acela service.  We also have a

17   big population of passengers who ride our sleeper trains,

18   and they have access to our Metropolitan Lounges.

19             And we have a number of regular riders who have

20   high status in the loyalty program.  So basically we have

21   very insufficient space to handle this whole class of

22   passenger.

23             And they have expectations from our other major

24   facilities that have these Metropolitan Lounges, that

25   Washington would have a similar-quality lounge, and yet we

1    don't, and we don't have the location for it, and it's

2    something that we sorely, sorely miss.

3         Q    Have you heard the term "signage"?

4         A    Yes.

5         Q    What is it?

6         A    Signage is a term used for way-finding signs

7    basically.  These are the kind of instructional signs that

8    you have in a -- in a head house, in a terminal area, in a

9    transportation space, to direct passengers through a

10   building to a gate, to understand where all the amenities

11   are, and to know that they're at the train station and how

12   to connect to the connecting forms of transportation.

13        Of course, Washington's a big multimodal

14   transportation hub, so we have the need to help people

15   navigate efficiently through the building.

16        Q    Where is signage currently?

17        A    The signage for Amtrak is primarily in the

18   passenger concourse, and there is some limited signage in

19   the main hall, in the head house building, to get to that

20   area.

21        Q    Is that sufficient space for signage?

22        A    No.

23        I think the train station is very undersigned.

24   There's not good wayfinding.

25        In fact, there's no real Amtrak branding even, any

1   noticeable branding on the outside of the building.  It's a

2   building that is difficult to navigate for many new

3   passengers, we think, and that it's -- we've got limited

4   train information in some locations in the head house, and

5   we don't have nearly the directional information that we

6   would like to have in the building.

7       Q    If Amtrak had more space, what would it do about

8   signage?

9       A    We would increase signage.

10          And we would move a lot of the signage information

11  to the front of the building.  That's where our sort of

12  primary point of contact is as passengers come into the

13  station.  They come in and they find themselves in this

14  beautiful space, but it's not -- grand space, I should say,

15  and yet exactly where the trains are and how to get to

16  trains and how to get the services they need is not

17  intuitive.

18      Q    Turning back to the red space.  What office space

19  for operations did Amtrak have in this area?

20      A    Oh, very little.

21          As I said, there's some space associated with

22  behind the ticketing that's for some of the basic

23  operations.  But other than that, really none.

24      Q    Why is office space for operations important at a

25  rail station?

1     A    Well, all the key operating functions that support

2    the railroad are obviously necessary to run trains.

3         So it's -- we have a whole series of different

4    classes of craftspeople who work on our trains, who work to

5    maintain the tracks, who work to maintain the platforms, and

6    who provide things like foodservice, commissary, et cetera.

7     Q    So let me ask you, why is office space important

8    to rail passenger service?

9     A    Well, without sufficient space and to be able to

10    house all those people, you obviously can't operate the

11    service and trains.

12         Additionally, when those employees are farther

13    away from where they need to be relative to the trains and

14    platforms, it adds time.  It creates sort of a lack of

15    continuity across the complex, and it's really important,

16    from our perspective, to try and have everything co-located.

17         We have all these different functions that come

18    together, and when folks can be together and be connected to

19    the passengers, we see better service, better performance.

20     Q    Have you heard of the term "crew base"?

21     A    Yes.

22     Q    What is that?

23     A    Crew base is where our various crews who operate

24    our trains report to work, and it's also where they store

25    their items, and there's rest and welfare facilities there.

1    So it's where our train and engine crews, as they're known.

2    Those are the locomotive engineers and our conductors,

3    start.  That's also where they rest when they're on trips

4    that go back and forth, and they have a period of rest.

5           It's also where our -- what are called our

6    on-board services personnel.  Those are our cafe attendants

7    and sleeping car attendants, you know, those are folks who

8    work on the body of the train.

9    Q    Is there crew base office space in this red area?

10   A    No.

11   Q    From Amtrak's perspective, is there sufficient

12   space in the red area to create the offices it needs?

13   A    No.

14   Q    Let me turn to office space for the Amtrak police.

15          First, could you describe what the Amtrak police

16   force is.

17   A    You know, the Amtrak police force is a railroad

18   police force, federally, statutorily chartered police force

19   that Amtrak has to protect Amtrak's people, our customers,

20   and our assets around our network.

21   Q    How is that necessary for inter-city rail

22   passenger transportation?

23   A    They're the first line of defense for security for

24   our whole network.  So we have more than roughly 30 million

25   riders a year, and we've got to keep those passengers safe.

1    Obviously, it's core to the business, core to our promise,

2    core to our public mission.

3              And the APD, as the Amtrak Police Department is

4    known, is the frontline of defense there securing the

5    railroad and also helping to serve our customers and really

6    be an ambassador for the brand.

7         Q    Is there any police office space in this red area?

8         A    There's no police office space in the red area.

9         Q    Does Amtrak need additional office space for its

10   police force?

11        A    We do.  We need to improve and expand the service

12   available to our police.

13             We have a desire to expand significantly the

14   policing presence and create facilities that allow us to

15   handle issues that come up right there at the facility, at

16   the station, in terms of interview rooms and holding areas,

17   et cetera.

18        Q    Now, we've talked about crew base, we've talked

19   about police officers.  Does Amtrak ever need office space

20   at the station for engineer or dispatchers, people to

21   complete projects?

22        A    Yes.  We have, you know, a long set of plans that

23   we would like to undertake and achieve improvements.  And we

24   need space to locate the professional engineers and

25   designers, planners, et cetera, who work at the building.

1    The most efficient way is to have folks co-located

2 with the project work and to be able to work with our

3 partners at the station.  So we have both a need and,

4 I think, a big improvement that would come from having space

5 here to locate the various professional and construction

6 services necessary as we look to improve the building and

7 our facilities.

8    Q    Is there space in that red area for that?

9    A    No.

10   Q    Now, you mentioned earlier that there were about,

11 what, 2500 D.C.-based employees; is that correct?

12   A    That's right.

13   Q    Do all of those employees have office space at

14 Washington Union Station?

15   A    No.

16   Q    How many additional operations staff could -- does

17 Amtrak estimate that it could move into Washington

18 Union Station with the acquisition of the property interest?

19   A    About 5- to 600 operation staff we can move into

20 the building.

21   Q    How did you get that number?

22   A    Well, it's based off both our estimate of the

23 space of the building and then our crew base sizes.  Our

24 crew bases are to the north of the station up towards the

25 block area there, and we could relocate those employees into

1   the head house area.

2        Q     And why would that be important to rail passenger

3   service?

4        A     Well, first of all, the current facilities are

5   really woefully inadequate and out of date.  We need to

6   replace them and being able to do that efficiently at the

7   right size, particularly as we look to grow.

8              As I just mentioned, we're adding more service

9   here in the near term and over the long term.  We want to

10  have sufficient capacity to be able to expand the crew base.

11  That's not going to work in its current location over the

12  long term.

13             And it will bring, again, as I described, all the

14  different types of craftspeople who work on our trains, our

15  management structure, if we can consolidate all of that into

16  the head house, or much it of it into the head house area,

17  it will provide improvements efficiency, better supervision,

18  better collaboration amongst our different employees who

19  work to serve our customers.

20       Q     Does Amtrak ever need to move equipment such as

21  generators, fire pumps, or electrical substations to the

22  head house?

23       A     Yes.

24             And we need to be able to, over time potentially,

25  accommodate all sorts of different technical elements in the

1    head house area as we look to improve the tracks and

2    platforms.

3        Q    Is that red space sufficient to do that?

4        A    No.

5        Q    Now, has -- does Amtrak have enough space in the

6    red area to hold events like job fairs or community

7    meetings?

8        A    No, not at all.

9             Again, as I've described, the concourse area, the

10   passenger concourse, is really totally consumed with

11   boarding and alighting and very limited seating and what we

12   can accommodate.  And particularly those functions with the

13   ticketing and other things, leave us no space for really any

14   public events or any other kind of opportunities to engage

15   with the community.

16       Q    Why are those functions -- how are those functions

17   connected to rail passenger service?

18       A    Well, we're in an incredible -- just use hiring as

19   a good example.  We're having -- trying to hold job fairs

20   all over.  We've been hiring a huge number of employees

21   across the network.  By the end of this year, I anticipate

22   we'll have hired about 7,000 people in the last two years,

23   just to put that in magnitude.

24            So having space where we can, again, have a front

25   door we're proud of and bring potential employees in to

1   engage with Amtrak, understand the services, that would be

2   really essential to us getting the right talent for the

3   future for the company.

4        Q    You mentioned families traveling with children

5   earlier.  Is there any space for children, devoted to

6   children, in that red area?

7        A    No, there's no space for children or families.

8        Q    And why is that a concern?

9        A    Well, we know that our passengers, particularly

10  with families, with young children in particular, families

11  traveling together, of which there are a sizable number of

12  passengers who fit that, really desire a space that they can

13  have their children and their family together, be safe, and

14  have opportunities to entertain children, et cetera.

15       As a parent of young children myself, I know that

16  that's an important part of when you're traveling and is a

17  feature at some other Amtrak facilities and, again, is a

18  feature you might find at airports.

19       And it's really -- it undermines one of our key

20  marketing objectives, which is to create a great experience

21  for families and really get a new generation of rail

22  travelers familiar with our system.

23       Q    So you've been talking a lot about Amtrak's

24  current space needs.  What does Amtrak anticipate in terms

25  of its space needs into the future?

1    A    Well, we anticipate needing much more than we have

2    today.

3         Already today, space is woefully inadequate from

4    our view of what the business requires, of what it needs to

5    be able to operate a first-class facility, one that competes

6    with major airline terminals and creates a welcome front

7    door to the brand and to our experience so that that can be

8    accommodated in today's space that we have in the sublease.

9         And in the future what we would like to do is to

10   be able to utilize the whole building, essentially put the

11   train station back into the train station, where we can

12   serve our passengers and make use of the grand features and

13   really create, I think, a front entrance that's befitting

14   the second-busiest station for us.

15   Q    So you've been talking about all these space

16   needs.  How did those space needs impact Amtrak's decision

17   to acquire the Union Station Investco, or as I'm going to

18   refer to it, USI, leasehold interest?

19   A    Well, they were fundamental to it.  These were the

20   reasons we need this space to expand.  We need more of the

21   head house area to be able to meet the needs of passengers

22   and operate the business efficiently, effectively, as we're

23   charged to do so by Congress and statute.

24        And to take on a bigger role of mobility in the

25   region, which Congress clearly -- and the Administration

1    clearly intends for us, given the, you know, again,

2    $60 billion in recent investment to expand and improve

3    passenger.

4        Q    Has Amtrak ever tried to lease additional space

5    for its space needs?

6        A    We have.

7        Q    Could you describe some of those to the Court.

8        A    Well, we did lease a very small area, not nearly

9    as much as we would need.  But we were unable to then pursue

10   to the projects that we were leasing the space for to get

11   those done, and the lease eventually expired.

12       Q    What project was that for?

13       A    That was for the concourse expansion project.

14       Q    Would leasing additional space from USI accomplish

15   all the space needs that you've been discussing?

16       A    No.

17            We really think control of the head house is

18   what's essential so that we can use the space to meet the

19   needs of passengers and the operation and to be able to do

20   so as it evolves over time, as we grow, and as passengers'

21   needs change.  We're looking to remove any layers that are

22   unnecessary there and create the level of control we need to

23   get good outcomes for passengers in the business.

24       Q    You've been connected to Washington Union Station

25   for a long time.  Have you been thinking about this building

1  for a while?

2      A    I have, a long time.

3      Q    Well, can you -- can you -- I want to show you

4  what's Plaintiff's Exhibit 10.  It is a demonstrative.

5           What are these Exhibit 10 demonstratives?

6      A    These are schematic views of what could be the use

7  of the station head house in the future.  So --

8      Q    And are these things that you're actually thinking

9  about?

10     A    Absolutely.

11     Q    And were you actually thinking about some of these

12  purposes at the time that the eminent domain action was

13  filed?

14     A    Yes.

15          Because, as I described earlier, this is really

16  about putting some of the passenger functions and support

17  back into the train station, back into the main building,

18  and being able to serve passengers there, while also, of

19  course, maintaining connection.  So all the different

20  transportation facilities and the commercial elements, but

21  really bringing back, as the primary core function of the

22  building, serving transportation.

23     Q    And to be clear, are these absolutely what Amtrak

24  is going to do?

25     A    No.

1          We're in the planning process here and evaluation.

2          This is a good example of the type of thing that

3     we could accomplish and the -- from my perspective, the

4     right type of use for a major head house, again, at the

5     nation's second-busiest train station.

6          Q    I'd look to work from the bottom up.

7          A    Okay.

8          Q    So if we could go to the demonstrative for the

9     lower level.

10          And the color is not very good on here, but could

11     you describe for the Court what the various uses that Amtrak

12     could make of the -- is considering making on this lower

13     level.

14          A    Sure.

15          So the -- you know, there's the food court area in

16     the middle.  That remains.

17          But there's a large, you know, former movie

18     theater that had been abandoned that's vacant there.  We

19     could use that for the back-of-house --

20          THE COURT:  It's been a long time.

21          THE WITNESS:  It's been a long time, Your Honor.

22     BY MS. LAMBERT:

23          Q    Silent pictures.

24          A    So we have all this fallow space down there that

25     we would love to use for those back-of-house functions.

1  Back-of-house functions I mean the support functions like

2  being able to use those offices for engineers, et cetera.

3           And then we've got a number of utilities and other

4  elements that need to be consolidated, would be much more

5  efficient to have in a single location --

6  BY MS. LAMBERT:

7      Q    Could you show where that is?

8      A    That's at the bottom right there, so if you see --

9      Q    You can touch it.

10     A    Oh, yeah, that's right.  Thank you.  So there

11  you go.

12          There's, of course, a WMATA substation here that's

13  related to the Metro.

14          Continued food and drink, of course, and open

15  seating.

16          But up here is where we could have the crew base,

17  and that would give us a huge opportunity, again, to bring

18  all of our train and engine folks out of the sort of

19  decrepit facilities they're in, out of the weather and into

20  the building and together with the rest of the Amtrak

21  stations team.

22          And more back-of-the-house space over here to,

23  again, serve those various functions of support for the

24  concourse.

25     Q    How about the baggage area, what's that?

1    A    Baggage area, yeah, so we have insufficient

2    baggage, an old baggage system there today to be able to

3    handle checked baggage.  So passenger bring their bags to

4    the ticketing area typically, and then those bags go down a

5    chute to the bottom to an old carousel.

6         This would be able to expand and modernize that

7    system to move and handle and store bags.

8    Q    Okay.

9         So let's go to the next highest floor, the main

10   floor.  Could you show that on the screen, please.

11        And just for orientation purposes, what is this?

12   A    This is the great hall.

13   Q    Okay.

14        So could you put the schematic, please.

15        Could you describe to the Court uses that Amtrak

16   is considering in terms of the main hall, main floor?

17   A    Main floor.

18        So, I mean, first is to -- just going from the

19   bottom up, is to introduce seating back into the great hall,

20   which when I started at the station, was there and was an

21   important part of serving passengers.

22        And then re-establishing, it used to be in the

23   west hall but over to the east hall in this schematic, some

24   of the ticketing functions --

25   Q    Could you touch that --

1    A    -- and the ticketed waiting area.  Here --

2    Q    -- as you talk about this.

3    A    This would be ticketing, this is the ticketed

4    waiting area today on the east hall, which has long been

5    essentially unused by very much.

6        And then would -- as I said, we'd have some

7    seating here in the middle.

8        You still have a good amount of retail and food to

9    service all the passengers and other visitors, which is, of

10   course, an important part.

11       But it's got to be a sympathetic part to the core

12   of the building, which is transportation.  So we have --

13   maintain the retail and food and other things here on the

14   west side.

15       We've got a proposed kids area here which would be

16   an area for families and children to be able to wait and

17   have a safe, comfortable place.

18       A big expansion, restrooms here and here.

19   Restroom capacity is one of the number-one complaints that

20   we get in the building.  I mean, a constant complaint,

21   whether it's from passengers I interact with.

22       And I'm in the station two or three times every

23   week, just to be clear.  I spend a lot of time interfacing

24   with folks directly.  And bathroom capacity is a constant

25   challenge because we have very small bathrooms in the lease

1   space, and we'd love to create a much better bathroom

2   experience.  It's an important part of customer

3   satisfaction.

4          And then you'd take all this area here that today

5   is -- sort of everything gets crammed into, and it becomes

6   a -- really a well-sized passenger queuing and boarding area

7   that's appropriate given the demands of the service and the

8   number of passengers we have.

9          I want to point out, there's also a dedicated

10  space now for MARC and VRE today, that there's really no

11  dedicated space for VRE.  And MARC operates out of a few of

12  the gates on the west side.  This would expand that and

13  create seating, more seating capacity for them.

14         And then over to the east, we have the

15  Metro Lounge and waiting areas.  This would, again, give us

16  a chance to have a first-class lounge space, ticketed

17  waiting area, as I mentioned earlier, and still retain here,

18  to the bottom, some of the great event space, which today is

19  underutilized, I think, for public events and various other

20  uses within the building.

21     Q   And could Amtrak use that event space for

22  community affairs and job fairs?

23     A   Absolutely.  We're very excited to do that, to be

24  able to expand the programming, work with USRC and really

25  have this be a community asset, in addition to a

1    transportation facility.

2          But the community asset elements, again, are

3    designed to be sympathetic to the transportation needs of

4    the building.

5      Q    Let's move up one more level, the mezzanine level.

6          Could you describe for the Court things that

7    Amtrak's considering about that level.

8      A    Yes.

9          So we are up on the mezzanine here.  And, again,

10   you can see the event space.  We anticipate you have

11   two levels of event space there.

12         Continuing retail on the west side here.

13         The great hall area is really just a sort of

14   pass-through here and here.  That's essentially walkways and

15   some space there.

16         And then in the historic concourse, which is this

17   middle section, we would like to add here or elsewhere that

18   Amtrak police function.  So this would give us an

19   opportunity to centralize and upgrade all the security,

20   bring all the security cameras, add a lot more security

21   cameras because today the head house is under-monitored,

22   from our view, and bring the ability for our APD, when they

23   encounter someone they need to interview or need to hold

24   someone, be able to get them right away into that space as

25   opposed to sort of having to bring them all the way back to

1    the rear and out into the block area and beyond.

2          Today, a lot of the problems we have with security

3    are in the front of the build or around the -- Columbus

4    Plaza in this area, and you have to bring folks back.  This

5    would give us a chance to be able to have a central place

6    for that.

7          And then, of course, Metropolitan Lounge, as I

8    mentioned, the first class area --

9    Q    Let me stop you there.  I thought you said it was

10   going to be on the main floor?

11   A    The idea is that it's going to be two levels, that

12   we have a sufficient volume of demand that we actually could

13   use that space both levels, because it's -- again, it's a

14   generous experience for our first-class passengers, one in

15   which we provide food and other amenities and give people a

16   place to work, to have some -- work together, collaborate,

17   and also commune.

18         So given our success with our new expanded lounge

19   in New York, we really see that we have the opportunity to

20   do something of similar value and import here to the

21   business and help drive ridership and loyalty and really

22   meet this class of passengers' needs.

23   Q    We talked a lot about offices, crew base offices,

24   other types of offices, bringing 500 people in.  But I

25   haven't seen a lot of offices on these schematics.  Where

1   would the offices be?

2       A    So the office space for Amtrak's headquarters

3   staff, so that's our management and leadership, we used to

4   occupy, actually, 40 and 60 Mass.  So we were tenants of

5   this building for a long time, and we would like to reuse

6   that space again to move our -- and consolidate Amtrak

7   leadership and headquarters into this building.

8       Q    And why didn't Amtrak just stay there?

9       A    Well, Amtrak had real difficulties with our

10  landlord.  They wanted an exorbitant rent, essentially

11  double what we thought were valuable, and we were not able

12  to come to agreement and we had to leave, which was a big

13  disservice, frankly, a big distraction for us.

14          We had to move.  We moved across the -- a couple

15  blacks away, and we were able to find reasonable rent in a

16  very good building, but we would like to return here.

17      Q    Now, just to be clear, the office towers are not

18  shown on these schematics?

19      A    They're not.  They're above this level,

20  essentially.

21      Q    Or to the right and left?

22      A    And to the right and left around the front.

23      Q    Did Amtrak ever study the governance structure at

24  Washington Union Station as it related to levels of

25  approvals for projects?

1    A    We did.

2    Q    I would like you to turn to Slide 7 of Joint

3  Exhibit 5 and have that put up on the screen.

4         And I pulled out the -- made it a little bit

5  popped out, the picture to the left-hand side because

6  I'm going to ask you some questions about it.

7         What is that -- on the screen, what is that

8  picture?

9    A    Those -- that's a view of the concourse in a peak

10  period.

11   Q    And if you look at the front of the page of that

12  exhibit, what is the date of that exhibit, Joint Exhibit 5?

13   A    June 10th, 2021.

14   Q    And at that time, was Amtrak studying these

15  governance challenges?

16   A    Yes.

17   Q    Could you turn to Slide 5, please.

18        Were these some of the challenges that Amtrak was

19  studying?

20   A    Yes.

21   Q    And did it continue to study these challenges?

22   A    Yes.

23   Q    What conclusions did Amtrak ultimately come to in

24  terms of eliminating layers with respect to governance?

25   A    We came to the conclusion that we needed to gain

1    control of the head house, that it would enhance our

2    business, that it would be necessary for us to really

3    achieve the service outcomes and the vision of passenger

4    growth and high-quality service.

5          Q     Let me back up.

6          What were the layers of ownership leasing and

7    governance at Washington Union Station prior to this eminent

8    domain action?

9          A     Well, there's -- maybe to start at the sort of

10   very top, we have the U.S. Department of Transportation, who

11   owns the building.  They own the building itself.  Then they

12   lease the building to Union Station Redevelopment

13   Corporation, which is a nonprofit made up of U.S. DOT, FRA,

14   Amtrak, is the vice chair.  I served as the vice chair for a

15   while there, and the District and Federal City Council.

16         Then they have a lease to USI for the head house,

17   and then Amtrak has a sublease from the USI lease for that

18   area that we've looked at here and read, the passenger

19   concourse area.

20         Q     So when you were talking about eliminating a layer

21   of governance, what did you mean?

22         A     Well, that Amtrak wanted to, needed to really,

23   take that layer of sort of interlude between USRC and Amtrak

24   by getting control of the lease of the head house so that we

25   would have a direct relationship with USRC, be able to

advance our projects, and be able to utilize the facility to
meet the needs of passenger rail service.

Q    Let me ask you some questions about two specific
projects in eliminating layers of approval.  The first is
the subbasement project.  Could you remind the Court what
that is.

A    Sure.

The subbasement project is a project to
essentially repair and upgrade a bridge that serves as the
ceiling of the subbasement of the station on which Amtrak's
tracks rest.

So --

THE COURT:  I'm sorry, could you say that one more
time.

THE WITNESS:  Yes.

So, Your Honor, there's a subbasement below the
building.  For a portion of that subbasement, the ceiling
serves as the floor of the tracks.  And this is the tracks
that lead to the tunnel that proceeds under First and leads
the trains to the south.

The structural supports, the columns, the other
structural elements in that subbasement that hold up that
ceiling, which is the floor of the tracks, they are
deficient and are compromised, being shored up temporarily,
and they need to be replaced.  And that whole area needs to

1    be improved to ensure the safety and the operation of the

2    tracks that rest on this subbasement ceiling.

3    BY MS. LAMBERT:

4        Q    And is that called the subbasement project?

5        A    That is called the subbasement project, and there

6    are some other projects that are predicate parts of it.

7        Q    Why is it important to get that done?

8        A    It's essential.  It's for the safety and operation

9    of the tracks and platforms.

10            And also ultimately the building.  I mean, the

11   subbasement, of course, holds up the building, and the

12   tracks run through it essentially.  And so it's important

13   for the structural integrity of the tracks and platforms and

14   for the whole building.

15       Q    Now, before this eminent domain action was filed

16   when Amtrak was -- who did Amtrak have to get approvals from

17   to do those projects?

18       A    Amtrak needed to get approvals from USI, from USRC

19   and from FRA.

20       Q    Was Amtrak able to get all the approvals it needed

21   to do that project?

22       A    No.

23            THE COURT:  I'm sorry, you said FRA.  Who's that?

24            THE WITNESS:  Oh, sorry, Your Honor.  It's the

25   Federal Railroad Administration.  It's the Department of

1  Transportation, modal agency.

2  THE COURT:  And the subbasement, is that part of

3  the Amtrak lease or is it --

4  THE WITNESS:  It's not.

5  THE COURT:  It's not part of the lease.

6  THE WITNESS:  It's not.

7  BY MS. LAMBERT:

8  Q    So how is it connected to the head house?

9  A    Well, the subbasement is below the head house.

10  And so it's -- I mean, it's part of the head house itself,

11  and it sits underneath that basement level.

12  Q    I'm going to ask you how the project is connected

13  to the head house, not how physically the subbasement is

14  connected to the head house.

15  A    Sorry.

16  So the project is connected to the head house in

17  that it is essential to both preserving Amtrak's continued

18  safe operation and advancing a state of repair function for

19  the head house itself.

20  Q    So with the acquisition of the leasehold interest,

21  how many layers of approval would Amtrak then need?

22  A    Well, Amtrak would then not have to seek approval

23  from USI.  Amtrak would be able to proceed directly in any

24  approvals with USRC and with FRA.

25  Q    Have you heard of the concourse modernization

1    project?

2        A    Yes, sir.

3            THE COURT:  I'm sorry to interrupt.

4            Why is Amtrak at all responsible for this project

5    if it doesn't lease the area?  In other words, if it's USI's

6    leasehold, why aren't they directly responsible for ensuring

7    the structural integrity of that area of the facility?

8            THE WITNESS:  So I think it's -- Your Honor, it

9    comes down to the USRC and Amtrak responsibilities.  There

10   are -- because of the tracks and platforms above, we have a

11   direct interest in ensuring that the facility is improved.

12           And USRC also has the responsibilities related to

13   capital improvements and standard and repair functions in

14   the building.

15           So together, our primary interest is that the work

16   be done and that the work be funded, and we have been

17   working to try and get permission to advance the work.

18           To be able to undertake this work, we need --

19   there are a couple of elements that are within the leasehold

20   control that -- USI leasehold, and we need permission to use

21   the space to be able to reconfigure some of the activities

22   and utilities, generators, et cetera, there, to then go and

23   do the actual work on the columns to create, essentially, a

24   new bridge for the tracks.  So we've been unable to do that.

25

1    BY MS. LAMBERT:

2        Q    Let's turn back to the concourse modernization

3    project.  Could you explain to the Court what that is?

4        A    The concourse modernization project is essentially

5    trying to open up and expand the concourse area to serve the

6    passengers that we need.

7             This was really a short-term project trying to get

8    some improvement in the station area for passengers.  It's

9    nowhere near enough, from our perspective, but a way to sort

10   of de-conflict and open up some of the existing space of the

11   concourse and into Amtrak's area, which is that area of the

12   block, and improve our waiting and boarding and queuing.

13       Q    Now, before this action was filed, was Amtrak able

14   to get the approvals it needed?

15       A    No.

16       Q    And who did it have to get approvals from?

17       A    USI, USRC, and the Federal Railroad

18   Administration.

19       Q    And how would that change with the acquisition?

20       A    Amtrak, again, would sort of be direct -- in

21   direct work with USRC, which has the broader

22   responsibilities for the -- for ensuring the condition of

23   the building, and we would be direct -- today, we have to go

24   through USI to even get to USRC assets because we're

25   subtenants.

1          So we'd have a direct relationship, we'd be able

2    to plan cooperatively and advance these projects together,

3    which we think we have a very good alignment with USRC

4    really, again, Amtrak's a very good alignment with USRC.

5          Q    Now, is Amtrak blaming USI for not giving it

6    approvals?

7          A    No.  I -- look, I think we have had difficulty

8    getting approvals from various entities.

9          And the main challenge with USI, I think, is a

10   different set of interests.  They have commercial interests.

11   Primarily our interest is in a transportation facility.  And

12   so we do not have alignment in big picture on a number of

13   things.

14         And we had found dealing with USI to be often an

15   impediment to the pace and outcomes that we wanted to see,

16   but they're pursuing their interests.

17         Fundamentally, our goal here is to take away that

18   interference and distraction between us and instead have the

19   control of the leased area so we can undertake our projects

20   efficiently and use the building more effectively for

21   passengers.

22         Q    Well, let me ask you this:  Were all of the delays

23   that are caused on these projects caused by USI not giving

24   its approval?

25         A    No, nope.  There were delays from a variety of

1    different sources.

2            But certainly the USI -- the inability to get

3    permission from USI, the length it would take to get

4    agreements with USI, all those things added time and

5    element, but they were not the only issues.

6    Q    Now, was Amtrak ever the cause of delays?

7    A    Yes.

8    Q    And you mentioned USRC.  Prior to this eminent

9    domain action, who was the head of USRC?

10   A    Ms. Beverly Swaim-Staley.

11   Q    Were there any issues that Amtrak had with USRC

12   regarding approvals that resulted from the fact that Amtrak

13   was a subtenant of USI and not a direct tenant of USRC?

14   A    Yes, we did have difficulties, in part because,

15   again, USRC is managing USI.  We're a subtenant, and so we

16   have this kind of interstitiary [sic] layer between us.  And

17   so it was often difficult for us to get agreements between

18   us because we couldn't reach agreements with USI.

19           And USI and USRC had to reach agreements in

20   various ways.  So it ended up being really a chain of

21   relationships which often interfered with progress for

22   projects and improvements.

23   Q    Sounds like a lot of this is going to cost money.

24   A    It costs a lot of money.

25           I mean, I would say that the delays we've

1    encountered as a result of this governance structure and the

2    many layers have been many, many, many millions of dollars

3    because we have incurred a lot.

4            And we are now anxious to be able to effectively

5    invest in the station.  And we have more resources than

6    ever, again, because of the infrastructure bill and the huge

7    resources it provides to Amtrak and for passenger rail, to

8    be able to invest in the building and improve the whole area

9    and make it a better experience for the traveling public.

10       Q    How does having the leasehold interest, the USI or

11   former USI leasehold interest, impact Amtrak's ability to

12   invest in the station?

13       A    Well, first, it makes it so that we can easily

14   invest in the station.  Today if we were to invest our

15   federal dollars in other parts, we couldn't do that easily

16   because USI would have to accept the federal dollars, accept

17   the flow-down requirements -- these are the requirements

18   that come from federal laws and grants through Amtrak, and

19   follow the dollars.

20           We would be able to program the money efficiently

21   on the priorities that we have.

22           And we would also would be eligible for federal

23   dollars.  It would be in our interest to invest in the

24   property we now control as opposed to a property that's

25   controlled by a third-party, for-profit entity.

1      Q    If this lease lasts a long time, some 60 years,

2   how does Amtrak's acquisition of this property interest

3   impact or help with Amtrak's delivery of inter-city rail

4   transportation in the not-so-near future?

5      A    Well, I think it's important to realize, you know,

6   there's only one train station in Washington.  We can't go

7   anywhere else.  We can't pick up our tracks and go to some

8   other place.  And we're very hemmed in today by the

9   development of the NOLA [sic] neighborhood.  I mean, all of

10  the facilities around us have been really developed.

11         And what we need to do to grow, to be able to

12  handle more trains, more people, is to make better use of

13  the station facility.  So if we're to add those more than --

14  you know, go from about 200 trains a day to over 500 trains

15  a day between us, MARC and VRE, there's no way on earth we

16  can accomplish that on the current footprint.  We just do

17  not have the space to handle the people associated with

18  that.  So it's essential for us on a just very simple

19  capacity level.

20         Let me also turn to the brand side of this, which

21  is we need a first-class experience that's befitting the

22  nation's capitol, that's befitting our second-largest

23  station, and that reflects the interests of our passengers

24  and riders, allows us to compete, and reflects well on the

25  company with our owner, many of whom are -- offices are

1    right across the street there in the Capitol complex.

2         So it's essential for us to have the product that

3    we want in the future to create the capacity we need in the

4    future, and to have the efficient operation and the

5    investment possibility to get those things accomplished over

6    time.

7         Q    Let me ask you this:  Isn't the -- Amtrak's entire

8    need for the sublease based on the fact that Amtrak couldn't

9    get along with Joe Press and the Ashkenazy people?

10        A    No, no.  Again, as I said, I think -- you know, in

11   a way that the commercial interest is sort of dominated when

12   the purpose of the building, the whole point of redeveloping

13   Union Station was to have a fantastic transportation

14   facility.  And so I think there's a conflict between the

15   commercial interest and the passenger and transportation

16   interests at times, and it's independent of the people,

17   necessarily, themselves.

18        We think that what would really be the best

19   outcome here is putting Amtrak in the position of being able

20   to control this facility, as we do elsewhere at facilities,

21   and have it adapt and grow and improve for the benefit of

22   the traveling public, while also supporting other needs.

23        THE COURT:  So actually, you touched on a point I

24   was going to ask earlier.

25        Some of the other main stations along the

1   northeast corridor, Philadelphia, Wilmington, obviously

2   New York, Boston, what's Amtrak's relationship with the

3   stations in those steads?

4           THE WITNESS:  Really at all of the stations, we

5   own the station and control the station generally.  So the

6   ones you've just mentioned --

7           THE COURT:  Actually own the property?

8           THE WITNESS:  Yes, own the fee, own the station

9   and control.

10          Or in some instances, we're a tenant of another

11  transportation entity.  For instance, at south station in

12  Boston.  So we're -- in that case, we find ourselves in good

13  alignment because the fundamental missions of the owner and

14  us as the lessee are aligned.  We're transportation

15  providers, we're interested in the traveling public.

16          You know, our goal is to move people by train,

17  it's -- it's not to operate a station per se.  The station

18  is a means to the end.  The end is the transportation.

19          THE COURT:  So the new Moynihan Station in

20  New York, that is owned by whom?

21          THE WITNESS:  So the building itself is owned by

22  Empire State Development Corporation.  We own the condo,

23  which is the train station hall.  So the station area

24  itself, vertical circulation, the main floor, our

25  Metropolitan Lounge, the seated waiting area, that's ours.

1          We have a tenant there in the form of Long Island

2     Railroad.  We sit on the condo board, and, of course, it's a

3     much bigger facility than just the train station.

4          THE COURT:  Right.  Thank you.  Sorry for the

5     interruption.

6     BY MS. LAMBERT:

7          Q     Is Amtrak's determination of need based on who

8     runs USI?

9          A     No.

10         Q     Would you have the same concerns if Kookmin Bank

11    took over control of USI?

12         A     Yes.

13         Q     Well, but doesn't it go away, the need go away if

14    you get somebody that's more agreeable?

15         A     No.

16              Like I think again, there's just a mismatch

17    between expectations and motivations, I think, between a

18    private developer, who's looking to maximize retail and

19    revenue, and Amtrak, who is trying to serve largely the

20    transportation needs first and foremost and have commercial

21    be sympathetic and supportive of that.

22              And so I think there -- independent of who it is,

23    I think that challenge could exist.

24              And I also would say there's, you know -- from our

25    perspective, when we see a problem at the front door, one of

1   the doors isn't working, you know, we want to be able to

2   call someone immediately and have that fixed immediately for

3   the benefit of our passengers.

4         So today, you know, we really don't have much

5   voice there.  It's not a leased area we have, we could call

6   USRC, who could call down to them and maybe get it fixed.

7   But we want the immediacy of being able to get a great

8   experience for our passengers and solve the problems.

9         Because when they show up at Union Station, many

10   folks think we own the station, think we're in charge of the

11   station, think that it is ours, and they view our brand,

12   when they see some of the problems that exist, or, you know,

13   good or bad, the situation, and we want to actually be able

14   to control that and effectuate a good experience.

15   BY MS. LAMBERT:

16     Q   I want to turn to the decision-making process that

17   Amtrak used in making a determination to file this imminent

18   domain action.

19         THE COURT:  Counsel, I'm sorry to interrupt.

20         Let's go ahead and take a break.  It's 11:00.

21   I want to give our court reporter a rest.

22         So it's 11:00 by my watch, that clock is slow.

23   We'll resume at 11:15.  See everybody shortly.

24         COURTROOM DEPUTY:  All rise.

25         (Recess from 11:00 a.m. to 11:16 a.m.)

1          COURTROOM DEPUTY:  All rise.

2          THE COURT:  All right.  Ms. Lambert, ready when

3    you are.

4          MS. LAMBERT:  May I proceed?

5          THE COURT:  Sure.

6          MS. LAMBERT:  Thank you, Your Honor.

7    BY MS. LAMBERT:

8      Q    I think as we ended, I was saying that we were

9    going to turn to the decision-making process that Amtrak

10   used in coming to this decision to file this eminent domain

11   action.

12         So let me start with the first question.  Could

13   you describe the internal management process that was used

14   to review this issue?

15     A    Sure.

16         We had the team working on Washington

17   Union Station for a long time.  We've been engaged in

18   planning there and activities for decades, of course.

19         And as we came to understand the need to gain

20   access and control of this leasehold, we set up a team

21   across various departments to work and build an

22   understanding of the opportunities and then progressed

23   through the management chain at Amtrak and ultimately to me

24   and the other members of the executive committee at Amtrak.

25     Q    So did management come to a conclusion as to

1   whether the acquisition of this interest was necessary?

2       A    We did.

3       Q    And what was that conclusion?

4       A    Our conclusion was that it was necessary for our

5   business, for inter-city passenger rail, and for the future

6   of both our capacity and performance and grand standards.

7       Q    You're the highest executive at Amtrak.  Were you

8   personally involved in studying whether or not Amtrak should

9   acquire this property interest?

10      A    Yes.

11      Q    And did you personally support the decision?

12      A    I did.

13      Q    Now, in making the decision, did Amtrak and you

14  personally consider Amtrak's statutory mission in making its

15  decision to acquire the property interest?

16      A    We did, and I did.

17      Q    Okay.

18           I'm going to -- as a predicate to my question,

19  Your Honor, I'm going to show two demonstratives, that they

20  are 11 and 12.  He's not going to discuss them, I'm just

21  going to ask him to read to himself Plaintiff's Exhibit 11,

22  the highlighted language on the first page, and it's been

23  called out here, and then I'll put the second one on.

24           And let me know when you're done.

25      A    I'm done.

1      Q    Would you put up the second page.

2      A    I'm done.

3      Q    So could you put up Plaintiff's 12.

4           I'm going to ask that you read to yourself the

5      highlighted language.

6           MS. LAMBERT:  And, for the record, Your Honor, the

7      highlighted language in Plaintiff's 11 is 49 U.S.C.

8      24101(b), (c)(1)(E) and (F), and (c)(12).

9           And on the other -- the demonstrative on

10     Plaintiff's 12 is Section 24305 (a)(1) and (2).

11     BY MS. LAMBERT:

12     Q    Have you finished your reading?

13     A    I have.

14     Q    Did Amtrak and you personally consider these

15     provisions in making the decision to acquire this property

16     interest?

17     A    Yes, absolutely.

18     Q    And how did the decision to acquire connect with

19     these goals?

20     A    The decision to acquire the leasehold interest

21     supported these goals and fulfills some of the direction

22     here in the statute.

23          THE COURT:  I'm sorry, could you just restate

24     the -- could you just put 11 back up so I can write down the

25     statute numbers and provisions.

1          I'm sorry.

2          MS. LAMBERT:  Do you want him to cull it out so

3    you can --

4          THE COURT:  If you could, please, yeah, I'll just

5    move very quickly through it.

6          MS. LAMBERT:  There's one on the second page that

7    you can put up when you're finished, Your Honor.

8          THE COURT:  Okay.

9          All right.  Thank you.

10   BY MS. LAMBERT:

11        Q    In coming to this decision to acquire the

12   property, did Amtrak also consider the risk of not

13   acquiring it?

14        A    Yes, we did.

15        Q    And could you describe what risks were considered?

16        A    Yes.

17        So for a long time, we've been endeavoring to

18   improve the facility and our space within it.  We just have

19   not been able to get real traction in advancing projects and

20   getting improvements made.

21        And then, of course, during the pandemic, the

22   building and ridership obviously really left, and we had

23   this situation where clearly the asset became distressed,

24   and there was a real lack of economic activity and passenger

25   travel for a while.  That's come back.  But it really

1   brought into focus for us that we needed to be able to adapt

2   the building to the passenger service needs over time.

3          And we were worried about what would happen, given

4   the sort of harsh economics.  Obviously we had a -- USI in

5   default.  We had a distressed asset clearly.  And we were

6   worried that -- what could happen.  The leasehold could get

7   bought by an entity even less cooperative than Amtrak.  It

8   could enter into a situation of bankruptcy or some other

9   litigation.  All these things could further remove or create

10  new impediments to Amtrak seeing improvements that they were

11  seeking and necessary for us and the building.

12         So we were very concerned that if we didn't

13  acquire, that things could get worse for us, in addition to

14  already compounding the delays that we had faced at the

15  building.

16     Q    Sir, you're aware that USI had liens on its

17  interests?

18     A    Yes.

19     Q    What did you understand the status of those liens

20  to be in late 2021?

21     A    That they were in foreclosure.

22     Q    And do those liens still exist, to your knowledge?

23     A    Yes.

24     Q    What were the risks that Amtrak considered about

25  changing the possible change of ownership?

1    A    Well, we were concerned, again, that we could end

2  up with a worse situation and a party who was motivated

3  really by finance and economics fundamentally, and not

4  interested in working with us or supporting the needs of the

5  larger building.

6         We were concerned that in addition to the already

7  cumbersome layers, it could get worse.

8         And additionally, we were also -- we've been in

9  this situation where we have often been stymied, and really,

10  we have a whole series of new trains coming, this big growth

11  happening, our business is recovering, and we were worried

12  that we would not be able to progress the facility

13  improvements necessary to support the launch of the new

14  Acela trains.

15    Q    Did the management of Amtrak decide to make a

16  recommendation to the board?

17    A    We did.

18    Q    And what was that recommendation in general?

19    A    That we seek to acquire the interest in the

20  leasehold, the USI leasehold.

21    Q    In a moment I'm going to ask you some questions

22  about the process that was used by Amtrak's Board of

23  Directors, but could you describe Amtrak's Board for the

24  Court.

25    A    Amtrak's Board is statutorily established.

1    Members are nominated by the President of the United States,

2    confirmed by the U.S. Senate.  It features a number of

3    nominated members, and the Amtrak CEO serves ex officio, and

4    the Department of Transportation Secretary, Secretary of

5    Transportation, is a member of the Board.

6         Q    Are you familiar with the audit and finance

7    committee of the Amtrak Board?

8         A    I am.

9         Q    I'm going to show -- ask that we look at a portion

10   of Joint Exhibit 6, which is already in evidence.

11             And we're not going to go over this lengthy

12   document.  It's one of 21 pages.  But could you tell the

13   Court what it is.

14        A    Well, this is the material provided, the memo, in

15   essence, provided to the Board in preparation for a

16   discussion of the acquisition of the leasehold.

17             At this time, it's really in preparation for the

18   auctions that we anticipated were coming at that time.

19        Q    So this would have been in December of 2021?

20        A    That's right.  I believe that's correct.

21             THE COURT:  I'm sorry, what do you mean by "the

22   auction"?

23             THE WITNESS:  So there were -- the senior debt and

24   the mezzanine debt were both in default, and the debt -- the

25   lenders were -- had scheduled auctions to auction off --

1              THE COURT:  I see, okay.

2              THE WITNESS:  -- the debt in January.

3      BY MS. LAMBERT:

4          Q     And did you attend this meeting?

5          A     I did.

6          Q     And what was the purpose of the meeting?

7          A     The purpose of the meeting was to discuss with the

8      Board of Directors the strategy for acquisition and to gain

9      approval to participate in the auction and otherwise pursue

10     acquisition.

11         Q     I'd ask that Joint Exhibit 6, the same exhibit,

12     but page -- a portion of page 13 through 21, be put on the

13     screen.

14             What was the -- is this the conclusion of Amtrak's

15     recommendation to the audit committee?

16         A     Yes.

17         Q     And did the audit committee agree to the

18     acquisition of the property interest?

19         A     Yes.

20         Q     And at that point in time, what was the -- going

21     on in early January that Amtrak was concerned about?

22         A     Again, the auction of the leasehold by the

23     lenders.

24         Q     I would like to turn to a portion of Joint

25     Exhibit 1, which is already in evidence.  And starting at

1    page 2 of that.  And, again, I'm not going to go -- could

2    you get to the whole thing -- could you go back one -- to

3    the initial page, please.

4          And was this another recommendation that was made

5    to the Board?

6      A    Yes.

7      Q    And was this for the board meeting that occurred

8    in January?

9      A    This is, yes.

10     Q    And what was the purpose of that board meeting?

11     A    Well, the purpose of this board meeting was to

12   update the Board on the fact that the auctions had been

13   canceled.

14     Q    And was a recommendation -- was the board meeting

15   set prior to the cancelation of that auction or that

16   foreclosure?

17     A    Yes.

18     Q    Could you turn to page 14 and the conclusion of

19   that report, and ask, was that the conclusion of the

20   recommendation that was made by management to the Board at

21   that time?

22     A    Yes.

23     Q    Was any vote taken at that time?

24     A    No.

25     Q    Why not?

1      A    Because of the cancelation of the auction.

2      Q    I'd ask that you show Joint Exhibit 2, which is

3 from the February board meeting; and specifically --

4           THE COURT:  I'm sorry to interrupt.

5           So to be clear, the recommendation at this point

6 was to attempt to acquire the debt or to move forward with

7 the condemnation?

8           THE WITNESS:  It was to -- come to acquire the

9 debt.

10          THE COURT:  Okay.

11          THE WITNESS:  Yep.  And to bid at auction.

12 BY MS. LAMBERT:

13     Q    And if you acquired the debt, was the ultimate

14 purpose to acquire the property?

15     A    Yes.

16     Q    Now, with respect to the -- what's up on the

17 screen, which is part of Joint Exhibit 2, is this another

18 recommendation by management to the Board?

19     A    Yes.

20     Q    I'd ask that page 3 be shown on the screen.

21          And what was the recommendation -- is this the

22 recommendation that management was making at that point in

23 time?

24     A    Yes.

25     Q    Now, was any vote taken by the Board at that point

1  in time?

2      A    This is the February meeting?

3      Q    That's correct.

4      A    No.

5      Q    So when was a vote taken?

6      A    In March.

7      Q    Going back -- but this was a conclusion, correct?

8      A    Correct.

9      Q    I'd ask that you turn to Joint Exhibit 3, which is

10 already in evidence.

11     And this is the recommendation that management

12 gave to the Board for the March meeting?

13     A    Yes.

14     Q    I'd ask that you turn to page 3 and have it put on

15 the screen.

16     Was this a conclusion that -- after the December

17 meeting, the January meeting, the February meeting, the

18 fourth meeting, the March meeting, that was the conclusion

19 and recommendation that Amtrak's management was making to

20 the Board?

21     A    Yes.

22     Q    Was any vote taken at that point in time?

23     A    Yes.

24     Q    And what was the vote?

25     A    It was unanimous.

1    Q    I'd like to move Plaintiff's -- call your

2  attention to Plaintiff's 1.

3         MS. LAMBERT:  And I believe there's no objection

4  to this exhibit.

5  BY MS. LAMBERT:

6    Q    But could you identify what that document is.

7    A    These are the Board of Director minutes of meeting

8  for March 22nd, 2022.

9    Q    And what was the vote at the meeting?

10   A    It was unanimous.

11        MS. LAMBERT:  I'd move Plaintiff's Exhibit No. 1

12 into evidence.

13        MR. SCHARF:  No objection.

14        THE COURT:  All right.  Plaintiff's 1 will be

15 admitted.

16        And when you say it's "unanimous," unanimous as to

17 what?

18        THE WITNESS:  Unanimous on the motion to pursue

19 acquisition.

20        THE COURT:  Through condemnation.

21        THE WITNESS:  Through -- through negotiation,

22 potential acquisition, and then condemnation if necessary.

23 It was considered by all the Board members, including the

24 Secretary's representative.

25

                                        (Plaintiff's Exhibit 1
                                        received into evidence.)

BY MS. LAMBERT:

    Q    And how did the representative from the Department

of Transportation vote?

    A    In the affirmative.

    Q    Now, as part of Joint Exhibit 3, there's a letter

from the FRA dated March 11th, 2022.  This letter is already

in evidence as part of Joint Exhibit 3.

        What is this letter?

    A    This is a letter from the Federal Administration

of the Department of Transportation to our vice

president/treasurer, Nathan MacIver.  And it's a response to

Amtrak's request for preprogramming authority for the

potential acquisition of the leasehold interest.

    Q    Now, I know preprogramming authority can mean a

lot of things in a lot of different contexts.  What did it

mean in this context?

    A    So the simple way to describe it, I think, is that

the Department of Transportation, FRA, gives us authority to

go and expend dollars with the eventual goal of using

federal dollars that'll be programmed per our grant

agreement for that work, but we have yet to attain that

programming authority.

        And maybe to step back one bit, there's a grant

1　agreement between the Department of Transportation and the

2　Federal Administration and Amtrak.  That's how all of our

3　federal dollars flow to Amtrak is from the Department of

4　Transportation.

5　　　　And then when we spend those dollars, we do it

6　pursuant to a programming activity between us and the FRA

7　where we say what the project is going to be and how the

8　money will be spent and the outcomes, et cetera.

9　　　　And this was permission for us to advance on this

10　work before achieving programming authority but in

11　recognition that if we did achieve programming authority,

12　that these expenses could be funded with grant funds.

13　Q　　I'd like to turn back to Plaintiff's Exhibit 1,

14　which is now in evidence.  Specifically to page 4.

15　　　　And it says, "Whereas, management has advised, and

16　the Board has concluded, that the acquisition of the

17　sublease interests is necessary to ensure the condition and

18　longevity of Washington Union Station," or as it says here,

19　"WUS as a multimodal transportation and a key asset of

20　Amtrak's core business, and provides an opportunity to

21　improve the lease structure of WUS to serve the long-term

22　interests essential to this multimodal station."

23　　　　Was it -- that discussed that these various board

24　meetings?

25　A　　Yes.

1     Q    Could you -- and is this the conclusion that the

2  Board reached?

3     A    Yes.

4     Q    Could you turn to page 5 of the minutes.

5          And if you could pull up the "Resolve" language.

6          It says that, "The Board has determined that the

7  acquisition of the sublease interests is necessary for

8  Amtrak's inter-city rail passenger transportation services

9  and is otherwise in the best interests of Amtrak and WUS,

10 and authorizes and approves the acquisition of the sublease

11 interests either by entering into a binding negotiated deal,

12 or submitting a binding bid at auction, or by condemnation."

13         Did the Board conclude this?

14    A    Yes.

15    Q    And were those options discussed?

16    A    Yes.

17    Q    Now, the lease is old, so is it a perfect lease?

18    A    No, no.

19    Q    So how would Amtrak go about making it less old,

20 more perfect?

21         THE COURT:  When you say the lease is "old,"

22 I'm not sure what you mean, just the original entry of the

23 lease, or can you just be more specific?

24         MS. LAMBERT:  Yes.

25

1    BY MS. LAMBERT:

2        Q    So let me just ask that.

3             So the originally was entered between USRC and the

4    person who it was being subleased to, which is USV,

5    I believe.  That was in 1988, correct?

6        A    Correct.

7        Q    And leases -- so that's -- it's an old lease in

8    your view?

9        A    Correct.

10       Q    So how is Amtrak going to update that lease?

11            MR. SCHARF:  Objection.

12            THE COURT:  He can respond to the extent that, if

13   given the opportunity, he can say how he would like to see

14   it updated.  That's fine.

15            THE WITNESS:  You're right.  The lease that we

16   inherit -- purchased with this action is old and has a

17   number of things that we believe should be improved, and

18   I think will make our work with our colleagues at USRC much

19   more efficient and ensure that the quality of the asset is

20   always first rate and that both Amtrak fulfills its

21   obligations and we have a good partner with USRC.

22            So there are things that are definitely outdated

23   or underdeveloped in that lease, and we know that that needs

24   to be -- we'd like to see it improved.

25       Q    What happens if USRC does not agree to update the

1  lease?

2      A    Well, we have a very strong sense that USRC is

3  interested in updating the lease but --

4      Q    But let's assume they don't.

5      A    But if they don't, we certainly -- we can operate

6  under the current lease, and we'll have, you know, all the

7  things that we are trying to obtain in terms of control,

8  which will give us efficiency of project delivery, it will

9  give us the ability to move forward on expanding capacity,

10  all those betterments to the passengers, those are all

11  possible under the current lease and immediately will be,

12  again, sort of in direct position with USRC, and that will

13  facilitate better outcomes for us and the public.

14          So right away as it exists, it will be a huge

15  improvement for Amtrak and our business and for our

16  passengers.

17          It could get better, and we will endeavor to do

18  that.

19      Q    But what specifically could Amtrak do if the lease

20  isn't -- strike that.

21          What could Amtrak do immediately even if the lease

22  isn't updated?

23      A    Well, immediately, and, in fact, our goal would

24  be, an enhance -- if we can get control of the property,

25  would be to do this in advance of the holiday period.  We

1    would immediately start to create some temporary seating and

2    waiting areas for passengers.

3           We would immediately move things like our redcap

4    service, these are the employees who help passengers bring

5    bags and help people who need assistance, move them to the

6    front of the station.

7           Immediately put our customer service

8    representation -- representatives all around the station.

9           Immediately create temporary signage to help guide

10   passengers.

11          So all of that's permissible under the lease.  The

12   lease gives -- creates a lot of control for us to be able to

13   make these immediate improvements.

14          And I would say that since the complex is very

15   underleased, there's a lot of empty space today that's

16   available and we can use effectively immediately.

17   Q    Let me ask specifically about security.  What

18   could Amtrak do immediately about security?

19   A    Our goal is to add ten additional officers and

20   really upgrade the entire security approach.  There's

21   really -- under-protected, from our view, in terms of the

22   amount of video cameras and monitoring presence.  We now

23   would have responsibility for the entire complex in terms of

24   security and be able to bring on both our own uniformed

25   officers and increase and improve security contractors.

1     Q    What could and would Amtrak do in terms of a

2  ticketed waiting area immediately?

3     A    We could immediately create a temporary ticketed

4  waiting area with really the addition of furniture, frankly,

5  only, and be able to create that kind of calm, peaceful

6  break before traveling in a place for folks to wait.

7     When we have delays in particular, we can have

8  folks who need to stay in the station for a couple hours,

9  and we have no place to put those people.  So we could

10  immediately occupy some of the unused open space and handle

11  passenger needs right away.

12     Q    What are CSRs?

13     A    Customer service representatives.

14     Q    What could and would Amtrak do immediately in

15  terms of using CSRs?

16     A    We would deploy them throughout the building so

17  they wouldn't be sequestered in this little sort of back

18  area.  They'd be able to be across the building and

19  interfacing directly with passengers, providing help,

20  providing assistance, helping folks find their way to the

21  departure gates, and we would staff up appropriately to meet

22  that need.

23     Q    What could and would Amtrak do immediately about

24  designs of projects?

25     A    Well, we would immediately advance some of the

1  critical projects we discussed today, the subbasement

2  project, and the two predicate projects there associated

3  with backup house space and relocation of utilities and

4  generator.

5          We'd be able to get -- immediately advance the

6  design there and partner with USRC, our partner for that

7  project, to be able to advance the work of the subbasement.

8      Q    I'd ask you to turn to Joint Exhibit 8.  It's not

9  going to be put on the stand.  It's already in evidence.  We

10  don't need anything on the stand right now.

11          Is this the offer letter that was made to USI?

12     A    Yes.

13          THE COURT:  I'm sorry, you said -- oh, I'm on the

14  wrong binder.  Go ahead.

15          MS. LAMBERT:  A lot of books up there.

16          THE COURT:  I was in the wrong one.

17          MS. LAMBERT:  Joint Exhibit 8, Your Honor.

18          THE COURT:  Uh-huh.

19  BY MS. LAMBERT:

20     Q    Is this the offer letter that Amtrak made to USI?

21     A    Yes, it is.

22     Q    And how much was that for?

23     A    The offer was for $250 million.

24     Q    Why not the amount of the debt?

25     A    The amount of the debt is not the -- necessarily

1    the fair market value or the value of the property.  That

2    was what our charge was.  That's what we offered is what we

3    understood to be the value, and made that offer.

4        Q    Who did you task with sending the letter and

5    negotiating with USI?

6        A    Dennis Newman, our executive vice president of

7    planning and strategy.

8        Q    Is he the second person at this table on the

9    left-hand side?

10       A    He is.

11       Q    Your left.  My right.

12            Was he successful in negotiating a deal with USI?

13       A    No.

14       Q    Could I ask you to look at Joint Exhibit 7, and

15   Your Honor, 7 and 8 are already in evidence.

16            And these are emails between Mr. Newman and

17   Joe Press.

18            In April of 2022, were you familiar with those

19   emails?

20       A    Yes, or the -- the outcome of the emails, the

21   information.

22       Q    What do you mean by "the outcome"?

23       A    Well, we had made an offer, and we were unable to

24   really even schedule time to discuss the offer.  We received

25   no feedback on the offer.  From my perspective, USI just

1    refused to respond.

2        Q     Did you as CEO of Amtrak make the decision to file

3    this eminent domain lawsuit?

4        A     Yes, I did.

5        Q     Why did you make that decision?

6        A     Because we had not received any offer.  USI, from

7    our view, was clearly not interested in negotiating.  They

8    didn't respond to our offer, they didn't agree to meet

9    and -- schedule a meeting with us.  There was no contact.

10           They knew, I think, we were well interested in the

11   leasehold, and we just never heard from them.

12           And I was concerned, deeply concerned that they

13   might file bankruptcy, they might engage in some other

14   transaction, something else could happen that would further

15   make more difficult our ability to acquire the leasehold.

16   So we took the action.

17       Q     But why not just keep negotiating?

18       A     Well, again, all of those things I just mentioned

19   could happen in the interim.  We could get in a position

20   where we really lose further opportunity or control.

21           In a bankruptcy, what would happen, it's really

22   unclear to me.  And I think our needs had been

23   well-established within the company that we needed control

24   of this asset, and their failure to respond was loud and

25   clear to me that they were not interested in negotiating on

1  this point and not responding, and so we then took the

2  action.

3      Q    Well, you mentioned control.  Was there any

4  concerns that Amtrak had at that point in time as to who was

5  in control of the leasehold interest?

6      A    Yes.

7          We knew USI was -- and Ashkenazy was the owner at

8  that point.  But just how control -- who was going to be in

9  control, how control could change, all those things were not

10  really clear to us.

11         And, again, we have a whole series of projects

12  we're trying to advance that are critical.  We can't do that

13  with the -- USI currently.  We wanted to assert our control

14  over the leasehold because it was important to our business,

15  and so we filed the action.

16     Q    Since this case was filed, has Amtrak made an

17  attempt to negotiate?

18     A    We have.

19     Q    And have you personally been involved in those

20  efforts?

21     A    I have.

22     Q    Has an agreement been reached?

23     A    No.

24     Q    When was the first time that Amtrak received a

25  counteroffer from anyone?

1    A    We received a counteroffer a week before the prior

2    hearing, you know, the one was canceled or postponed, I

3    should say, till today, so early August.

4    Q    August of 2023?

5    A    Correct.

6    Q    Now, we are 515 days after the filing of this

7    eminent domain action, 16 months.  Why not just wait longer?

8    A    Every day we wait, we're postponing the

9    opportunity to improve the facility.  We are increasing

10   project costs, which are ultimately going to be borne by the

11   federal taxpayer, which is our investor.

12          We are delaying the services and improvements

13   necessary to really give our passengers the experience that

14   our owners expect from us and that our passengers expect.

15          We are getting further behind the ability to meet

16   the coming increase of passengers associated with our new

17   Acela train launch.  All of these things just get farther

18   behind.

19          Today we've invested $250 million, a credible

20   amount of money, to acquire, but we do not have control.  So

21   there are things that could happen in this period.  If there

22   are issues that happen in the head house while we don't have

23   control, how does that impact what we have purchased.

24          I mean, all of those things are big risks for us.

25   So we -- in a nutshell, we're being delayed from making the

1  improvements we need, we face risks in this period of

2  interim, and we are reducing the capacity of -- for growth

3  as we wait upon this imminent addition of new trains.

4      Q    Could you turn to Joint Exhibit 4, which is

5  already in evidence, and tell the Court what it is.

6      A    This is the Washington Union Station action plan.

7      Q    What is that?

8      A    This was a presentation made to me and others

9  around the work to prepare to take over the leasehold when

10 we got control.

11     Q    So this is after the eminent domain action and in

12 preparation of taking over possession?

13     A    That's right.

14     Q    Is Amtrak ready to take over possession?

15     A    We are.

16          MS. LAMBERT:  Your Honor, no further questions.

17          THE COURT:  All right.  Thank you very much,

18 Counsel.

19          Cross-examination.

20          MR. SCHARF:  May I proceed, Your Honor?

21          THE COURT:  You may.

22

23

24

25

1                              - - -

2                      CROSS-EXAMINATION

3    BY MR. SCHARF:

4         Q    Good morning, Mr. Gardner.  Or is it almost --

5    almost good afternoon.

6         A    Hello.

7         Q    You were deposed in this matter, correct?

8         A    Correct.

9         Q    And you prepared for that testimony that you gave

10   at deposition by reviewing certain documents, correct?

11        A    That's correct.

12        Q    And you also talked to your colleagues before your

13   deposition, correct?

14        A    A few, yes.

15        Q    And you spoke to them not only about logistics but

16   about substance to refresh your recollection, correct?

17        A    Some, yes.

18        Q    And after your deposition, you had a chance to

19   review your transcript, correct?

20        A    Yes.

21        Q    And you did, in fact, review it, right?

22        A    Yes.

23        Q    You made corrections, right?

24        A    Yes.

25        Q    Remember how many?  72 sound about right?

1     A    I don't remember.

2     Q    Okay.

3           And you made corrections that were transcription

4  errors, correct?

5     A    We did, I believe.

6     Q    And -- but you all made substantive changes,

7  right?

8     A    I don't -- I don't know.  I do have -- do we have

9  the documents to review?

10     Q    Sure, I'm happy to share with you.

11           MR. SCHARF:  If I may, Your Honor, approach?

12           THE COURT:  Sure.

13           MR. SCHARF:  Thank you.

14  BY MR. SCHARF:

15     Q    Your errata is at the back.

16     A    Thank you.

17     Q    For instance, you made corrections to line 98 --

18  I'm sorry, page 98, line 58, you added something, "We also

19  consulted with FTI."

20           Do you see that?

21     A    I'm just trying to locate this here and there.

22           What page is that on?

23     Q    At the very end.  Your erratas are at the very end

24  of the transcript.

25     A    Okay.

1      Yes, it looks like most of these are really just

2 corrections that ensure that Board is capitalized or

3 reflecting dollar value, so they look like technical edits

4 to me.

5    Q    You were careful, you wanted to make sure you got

6 it right, correct?

7    A    Yes, though I think most of these are just, again,

8 to capitalize president to president with a capital P so

9 they are to reflect what I would say is good practice with

10 grammar.

11    Q    Would you agree with me that you made some

12 substantive changes?  Particularly, I draw your attention to

13 page 98, line 58, of the errata.

14      Do you see that?

15    A    Well, yeah, that looks like an addition I made to

16 reflect -- reflect that point.

17    Q    But you wanted to provide full and complete

18 answers of your testimony, correct?

19    A    I did, yeah.

20    Q    Okay.

21      And you were a profiter [sic] as a witness on

22 certain topics, correct?

23    A    We did offer my -- in the deposition on certain

24 topics, that's right.

25    Q    And there were other witnesses who were proffered

1  on other topics, right?

2      A    That's right.

3      Q    For instance, Mr. Newman was proffered as having

4  knowledge on certain topics, correct?

5      A    I believe that's right.

6      Q    And Ms. Gretchen Kostura was another person that

7  was proffered on other topics as well, right?

8      A    Yes.

9      Q    And Mr. MacIver, we referred to a letter before to

10  Mr. MacIver.  He was proffered on other topics, correct?

11      A    Yes.

12      Q    Now, you'll agree with me that today you testified

13  about topics that you didn't talk about at your deposition,

14  right?

15      A    Well, I think I went into specificity maybe, but I

16  feel like all of the basic topics that we discussed today

17  were talked about in the deposition.

18      Q    Like Ms. Kostura, she talked about the subbasement

19  and the concourse modernization projects, right, and the

20  schedule for those, right?

21      A    I believe that's part of her testimony.

22      Q    Right.  That was part of what she was designated

23  for, not you, correct?

24      A    Well, I don't -- I think she was designated for

25  that.  I would say I was designated for the decision-making

and the reasons and rationales that we used to enter into

this action, and, therefore, from my view, that encompasses

sort of everything, the whole story.  I'm the decision-maker

ultimately.

    Q    And only Mr. Newman and you are testifying today,

Ms. Kostura is not, correct?

    A    That's correct.

    Q    And she's in the courtroom, though, isn't she?

    A    She is.

    Q    And Mr. MacIver isn't testifying today either,

correct?

    A    That's right.

    Q    Now, you're aware that Amtrak has made two motions

for immediate possession, correct?

    A    Yes, I think that's right.

    Q    And you have not signed any declarations or sworn

statements for this case other than giving your deposition

and the errata, correct?

    A    I'm not sure.

    Q    Do you recall giving any sworn declarations?

    A    No, no.

    Q    Okay.

    And since this action was filed in April of 2022,

you are and have been the most senior person in management

at Amtrak, correct?

1      A      Since April of '22?

2      Q      Yes.

3      A      Yes.

4      Q      And when this case was filed, the declaration of

5   taking was not signed by you, correct?

6              MS. LAMBERT:  Objection, Your Honor.  This hearing

7   is only about necessity and unable to agree.  This is a

8   different topic and should not be heard at this proceeding.

9              Plus, anything that is related to a pleading that

10  has been filed speaks for itself.

11             THE COURT:  I'll overrule the objection, but I'd

12  like to sort of get to the substance of his testimony if we

13  can do that.

14             MR. SCHARF:  Sure.

15  BY MR. SCHARF:

16     Q      Amtrak submitted, in May of '22, a declaration

17  from Mr. David Handera to support its motion for possession,

18  correct?

19     A      I don't know.

20     Q      You don't know that?

21     A      Uh-huh.

22     Q      I'll show that to you.

23             THE COURT:  I'm sorry, it's in the record.  If he

24  doesn't know, I can look at the docket.

25             MR. SCHARF:  Okay.

BY MR. SCHARF:

Q    Mr. Handera reports to you, correct?

A    No, he reports to other executives who report to me.

Q    Right.  So he's an indirect report to you, correct?

A    That's right.

Q    Okay.

Now, you'll agree with me that Amtrak has something called a 2nd Century plan, correct?

A    We do.  We have, yes.

Q    And that includes the subbasement project that you talked about earlier, correct?

A    Subbasement is one of the near-term actions.  The 2nd Century program really encompasses both a set of near-term actions and predicates, and then a long-term vision of improvement and expansion of the station.

Q    And you shared a long-term vision for the expansion of the project right up through 2040 earlier today, right?

A    Yes.

Q    And the 2nd Century plan also includes the concourse modernization project, correct?

A    Well, it's one of the near-term actions that we've been looking to advance as part of the 2nd Century plan.

1    Q    Now, do you know if Mr. Handera mentioned either

2    the subbasement project or the concourse modernization

3    project in his submission to this Court in May of '22?

4    A    I don't.

5    Q    Now, you'll agree with me that the 2nd Century

6    project plan existed in May of '22, correct?

7    A    It did.  It's really a program of improvements,

8    near-term and long-term, that's existed.  And it's had

9    various names.

10          Of course, there's a corollary going on at the

11   federal level with the environmental process called the

12   station expansion plan.  So all these things are happening

13   together.

14   Q    And the need for office space that you mentioned

15   earlier today, that existed in May of '22, correct?

16   A    Well, we've had office needs for -- I mean,

17   obviously it's a growing, concerned business, we always have

18   needs for office, so that has existed in various forms.

19   Q    No, I'm just trying to understand, sir, you told

20   us about a need for office space.  You gave up the office

21   space in 2018, right?

22   A    We did.

23   Q    Okay.

24          And now I'm focused on May of '22 when Amtrak

25   first came to this Court and said it needed immediate

1 possession.  And I'm --

2           MS. LAMBERT:  Objection, Your Honor.  I think the

3 pleadings speak for themselves, and those are

4 mischaracterization.  That was an issue involving JLL.

5           THE COURT:  I think the issue is just simply

6 whether there's a mention of office space in the

7 declaration, and I take it there isn't.  I don't know what

8 the declaration says or doesn't say so --

9           MR. SCHARF:  Well, Your Honor, since it's an

10 evidentiary hearing, I'll make the representation that

11 Mr. Handera's affidavit doesn't say anything about a need

12 for space, a need for community space, job fairs, space for

13 children, disbursements relating to tickets offices or any

14 of the things that were mentioned here this morning when

15 Amtrak came to this Court.

16 BY MR. SCHARF:

17     Q    And in May of '22, the subbasement project was in

18 its planning stages, correct?

19     A    Planning/design.

20     Q    Okay.

21          And the Track 22 rehabilitation project was

22 something that needs to be completed before the subbasement

23 project can proceed, correct?

24     A    No, I wouldn't say that's correct, because the

25 subbasement project needs to proceed through design, needs

1   to then go through procurement.  There's a lot of work to be

2   done.  So those things can advance concurrently and

3   together.  They're different projects but they can happen at

4   the same time.

5        Q    But the physical work as it relates to the

6   subbasement project can only happen once the Track 22 rehab

7   has been completed, correct?

8        A    Yes, the ultimate construction of the subbasement,

9   which is some ways away, given that we haven't been able to

10  advance design, needs 22, Track 22 to be completed.  Of

11  course, Track 22 is essentially complete.

12       Q    It's essentially complete by this point in time,

13  correct?

14       A    Near -- near term.

15       Q    And that's scheduled to be completed by the end of

16  this year, correct?

17       A    Yes.

18       Q    Not being impeded by USI, correct?

19       A    Well, no, it was heavily impeded for a long time

20  by USI.  We only recently reached agreement.  And that

21  delay -- we're delayed as a result of it, and it was --

22  impacted both our cost and schedule.

23       Q    And those agreements that were reached were

24  reached by the new ownership of USI with Amtrak, correct?

25       A    They were after many -- a long period of delay.

1    Q    And am I correct that the 2nd Century plan for

2  Washington Union Station has actually been around since at

3  least 2016, right?

4    A    The 2nd Century plan, yeah, that's about right.

5  There's plenty of work before that, but that seems to be,

6  I'd say generally, the time period.

7    Q    Okay.

8         So that means the subbasement project and the

9  concourse modernization project that you talked about this

10 morning have been around since at least 2016, right?

11   A    Well, I think the subbasement program has evolved

12 over that period of time, but I think we were becoming aware

13 of the deficiencies there and the need to intervene in a

14 dramatic way.

15   Q    So six years before this action was filed, Amtrak

16 had been planning a subbasement and concourse modernization

17 project, right?

18   A    We had been planning and seeking to advance those

19 projects through that -- through, you know, portions of that

20 period by gaining approvals we needed from USI and others.

21   Q    Right.

22        And part of getting those approvals from others

23 was the FRA, correct?

24   A    Yes.

25   Q    And you submitted -- the 2nd Century plan was

1  provided to the FRA by December of 2021, right?

2      A    Well, submitted, I'm not sure what you mean.

3           Provided, we've briefed them, the Department and

4  the FRA, through that period on our various plans for the

5  station.

6      Q    And this project had been greenlighted before

7  2021, right, the concourse modernization and subbasement

8  program?

9      A    Greenlighted, I don't know what you mean by that

10 term.

11          We had not been able to reach all the agreements

12 necessary to undertake the project.  So we had been

13 attempting to.  We had been getting -- we had funding of

14 reserve, we had a program team, we were trying to advance

15 the work.  We had not been able to commence the work.

16     Q    Right.

17          And you had to deal with USRC for that, right?

18     A    And USI.

19     Q    And FRA, correct?

20     A    FRA, correct, all three parties.

21     Q    Okay.

22          Now, Amtrak was planning the subbasement project

23 when it was only a subtenant at Washington Union Station,

24 right?

25     A    Well, we were trying to advance the work that was

1   necessary, again, for the tracks and platforms, because the

2   fundamental concern here is that we would have a disruption

3   of the track floor.  So we were advancing this work and

4   partnering with USRC to make sure that this critical need

5   was addressed.

6       Q    I'm sorry, maybe it was my question.  I'm going to

7   try the question a little differently.

8            Amtrak developed the 2nd Century plan for

9   Washington Union Station when Amtrak was only a subtenant at

10  the station, right, yes or no?

11      A    Yes.

12      Q    Okay.

13           And, therefore, the plan for the subbasement

14  project was also done at the time it was a subtenant, right?

15      A    Yes, though, again, the plan -- we're not a

16  unitary actor here, so we did planning, and we undertook,

17  with our other partners, assessments of the issue, but we

18  never really were able to advance, frankly, into what we

19  consider design, which is coming up with the actual plan and

20  approach to understand -- or undertaking the construction

21  work.

22      Q    So Amtrak also planned the concourse modernization

23  project when it was a subtenant at Washington Union Station,

24  right?

25      A    Yes.

1      Q    Okay.

2           And it wasn't until December of 2021 that Amtrak's

3      Board of Directors first considered acquiring the subleased

4      interest at Washington Union Station, right?

5      A    That's right.

6      Q    Now, Amtrak had not asked USI to purchase the

7      leasehold position at Union Station prior to the board

8      meeting in December of 2021, right?

9      A    That's correct.

10     Q    And it was not until December of '21 that Amtrak's

11     Board considered changing the governance structure of the --

12     from the status quo, correct?

13     A    I mean, in a formal action, I think that was the

14     first formal action.

15          Certainly it had been a topic in board meetings

16     and other conversations with Board members about the slow

17     pace of improvements at Washington and the fact that we

18     endeavored to make improvements and expand capacity, all the

19     things I've mentioned today, and that we've been able unable

20     to do so.

21          And talked about the various impediments and

22     challenges that existed.

23          MR. SCHARF:  Your Honor, I'd move to strike the

24     portion of his answer that follows after he said yes.  Okay.

25          THE COURT:  He's responding, so go ahead.

1          MR. SCHARF:  Sure.

2     BY MR. SCHARF:

3          Q    Now, what precipitated the change of the potential

4     status quo was a default by the former owners of USI to

5     their lenders, right?

6          A    That plus the continued delays that we have been

7     facing, the change in -- significant change in condition of

8     the whole complex because of the reduction in attendance and

9     ridership, et cetera, with the pandemic, all these things

10    together.

11         Q    Sir, isn't it true that the impetus to move

12    forward with looking at the opportunity to acquire the

13    leasehold interest was the event of defaults that had taken

14    place and the notice that had come to Amtrak in November of

15    '21?

16         A    I think that was the primary impetus.

17         Q    Right.

18              And because that's what you told Mr. Kiernan when

19    he asked you that question, right?

20         A    Yes.

21         Q    And the prior owners were Ashkenazy, correct?

22         A    Correct.

23         Q    You were informed that the lenders noticed the

24    foreclosure sale on the mortgage for January of 2022,

25    correct?

1    A    We were aware that there was a foreclosure sale in

2  January.

3    Q    Right.  And you told the Board about that, right?

4    A    We did.

5    Q    And those foreclosure sales were canceled,

6  correct?

7    A    That's correct.

8    Q    And even after those foreclosure sales were

9  canceled, Amtrak remained interested in acquiring the USI

10 leasehold interest, correct?

11   A    We did.

12   Q    And you had a plenary -- special plenary board

13 meeting about that in January of '22, correct?

14   A    Yes.  Again, the plenary meeting was set up to

15 consider the recommendation of audit and finance, and the

16 auctions were canceled, so we used that meeting to update

17 the Board.

18   Q    Right.

19        And the plenary board meeting was an outgrowth of

20 the audit and finance committee meeting regarding the

21 anticipated mortgage foreclosure action, right?

22   A    Regarding the auction, yes.

23   Q    Okay.

24        Can you please look at Joint Exhibit No. 1 that

25 you were shown by Ms. Lambert.

1       And in particular -- do you have it?

2   A   I do.

3   Q   In particular, I'd like you to look at page 2 of

4   22 at the start of the second paragraph.

5   A   Yes.

6   Q   Where it begins, "The current leasing and

7   governance structures of Washington Union Station impedes

8   progress in improving the operation -- operating conditions

9   of Washington Union Station."

10      Do you see that?

11  A   I do.

12  Q   Now, nowhere in that report is there a mention for

13  a need for space for offices; am I right?

14  A   Well, I think there is a reference throughout here

15  about the need for capacity, and that is -- in a document

16  like this, we're not covering necessarily every

17  possible use.

18  Q   So you have 22 pages justifying it as pretty

19  significant acquisition; I think you said 250 million is a

20  lot of money, right?

21  A   Yes.

22  Q   And in this document justifying it, I just want to

23  confirm, we don't see the actual use of the words, "The

24  needs for office space, the need for community events, the

25  need for space for job fairs and space for children," we

1    don't see any of that, right?

2           MS. LAMBERT:  Objection, Your Honor.  The document

3    speaks for itself, and unless you're going to have the

4    witness look over 22 pages, I don't think any of this

5    belongs --

6           THE COURT:  Fair enough.  On the other hand,

7    I assume it's not in there, so why don't we move forward.

8    BY MR. SCHARF:

9      Q    Now, sir, Amtrak sought to fulfill its mission as

10   stated in the federal enabling statute, right?

11          MS. LAMBERT:  I didn't hear you.

12   BY MR. SCHARF:

13     Q    Amtrak sought to fulfill its mission as stated in

14   the federal enabling statute.  It's in JX1.

15     A    We do, on all of our actions, seek to fulfill our

16   mission.

17     Q    Right.

18          You told Ms. Lambert about that, and the Court

19   this morning about that, right?

20     A    Yes.

21     Q    And -- because Amtrak needs to comply with federal

22   statutes, right?

23     A    Correct.

24     Q    Including the Union Station Redevelopment Act of

25   1981, correct?

1      A      To the extent --

2            MS. LAMBERT:  Objection, Your Honor; beyond the

3      scope.  It's also not related to necessity or --

4            THE COURT:  Why don't I just hear the question.

5      I don't know what the question is, so I'll overrule it for

6      now.

7            Go ahead.

8      BY MR. SCHARF:

9      Q      Amtrak has to comply with the federal statute,

10     including the Union Station Redevelopment Act of 1981,

11     correct?

12     A      I would need to see the '81 statute and what

13     obligations it places on Amtrak.

14           MR. SCHARF:  Permission to approach, Your Honor?

15           THE COURT:  You may.

16           MS. LAMBERT:  I haven't seen it, Your Honor.

17           THE COURT:  Oh.  Make sure opposing counsel has a

18     copy.

19           MR. SCHARF:  Yes, we will.

20     BY MR. SCHARF:

21     Q      In particular, I'd like to draw your attention to

22     the second page.  Down at the bottom, Item C.

23           See where it says "Commercial development of

24     Union Station complex that will, to the extent possible,

25     financially support the continued operation and maintenance

1  of such complex"?

2          Do you see that?

3      A    Yes.

4          MS. LAMBERT:  Your Honor, I renew my objection.

5  And also, there has been no foundation that this witness has

6  seen this Act.

7          I will say that it has been modified and updated,

8  and so this is from the 1981 version.

9          THE COURT:  All right.  What's the question?

10          MR. SCHARF:  My question is, is part of -- he --

11  the witness, on direct examination, talked about and was

12  shown certain provisions of statutes and whether or not

13  certain statutes --

14          THE COURT:  No, no, what's the question?  That's

15  what I'm trying to get at.  You've directed him somewhere.

16  What's the question about what you directed him to?

17  BY MR. SCHARF:

18      Q    My question is whether or not the actions taken by

19  you -- I believe you said you personally recommended to the

20  Board and you personally thought about certain sections, and

21  I want to know if you took into account this Subsection (c)

22  of 40 U.S.C. 812.

23      A    Well, this is, I think, the first that I'm

24  reviewing this original Public Law 97-125.

25          Certainly I'm familiar with the general approach

1  to redevelopment of the station and our cooperation with the

2  Department of Transportation then to establish the

3  redevelopment.

4          THE COURT:  I'm sorry, what's the statutory

5  provision again?  I didn't quite get it.

6          MR. SCHARF:  Sure.

7          It's P.L. 97-125, Section 112(c).

8          THE COURT:  Sorry, P.L. 197- what?

9          MR. SCHARF:  P.L. 97, not 197.

10         So P.L. 97-125.

11         THE COURT:  Okay.

12         MR. SCHARF:  Section 112 Sub (c).

13         It was then codified at 40 U.S.C. 812.

14         THE COURT:  Okay.

15  BY MR. SCHARF:

16     Q    And if we look further down to Subsection (d)

17  right below the section I read to you, it says, "Withdrawal

18  by the Federal Government from any active role in the

19  operation and management of the Union Station complex as

20  soon as practical and" at least possible and -- I'm sorry --

21  "and at the least possible federal expense, consistent with

22  the goals set forth in Subsections (a) through (c) of the

23  section."

24         Do you see that?

25     A    I don't.  I'm just having trouble finding where

1  this --

2           MR. SCHARF:  Sure.

3           May I approach and help the witness, Your Honor?

4           THE COURT:  Why don't you just put it on ELMO and

5  then --

6           MR. SCHARF:  I don't have it set up that way,

7  Your Honor.

8           THE COURT:  Oh, we can turn it on and you can just

9  put it on.

10          MR. SCHARF:  Oh, I can just do that?

11          Yes, I guess I can do that.

12          Do we put it up face up or face down?

13          Right down here?

14          THE WITNESS:  This is which page?

15  BY MR. SCHARF:

16      Q   It's the second page, or you can just follow along

17  with where I'm at.

18          If you look at the computer screen, my finger is

19  right there.

20      A   I just don't have Section 112, I'm afraid, in what

21  you've given me.

22      Q   812?

23          THE COURT:  That's all right.

24          That's -- Mr. Gardner, why don't you just take a

25  look at your screen, and that's what he's trying to direct

1   you to.

2          THE WITNESS:  So, the question is, am I --

3   BY MR. SCHARF:

4      Q    So my question is, do you see what I'm pointing

5   to?

6      A    I see, yes.

7      Q    And my question to you is, when you were making

8   recommendations as to what was to be done to the Board of

9   Directors, did you take into account this subsection that

10  I'm pointing you to.

11     A    Well, I think, you know, commercial development,

12  as I've said many times, is a key part of the station

13  complex, as all the stations are.  So that is something we

14  always have understood is important, again, both for the

15  meeting of our passengers' needs but also to help provide

16  revenue for improvement and maintenance of the building.

17         So, yes, that concept generally -- again,

18  I'm not -- I've not looked at this statute, but that concept

19  generally is an important part that we know is critical to

20  the elements of a good train station, specific to the course

21  of the outcome.

22     Q    So that's Subsection (c).

23         I'm focused now on Subsection (d), "The withdrawal

24  by the Federal Government from any active role in the

25  operation and management of the Union Station complex as

1   soon as practical, and at the least possible federal expense

2   consistent with the goals set forth in Subsections (a)

3   through (c) of this section."

4           My question is:  When you were making

5   recommendations to the Board to take action to buy the

6   leasehold interest, negotiate forward or declare eminent

7   domain, did you take that section into account, yes or no?

8       A    That section, again, I've not read this statute

9   here.

10      Q    So the answer is no, you did not?

11      A    That idea that the Federal Government is involved

12  and needs to be involved is -- I mean, we live it every day

13  in the form of USRC and the Department of Transportation's

14  involvement, the Department's approval of our action here,

15  and the approval of funding.  So we know that the Department

16  remains involved.

17      Q    And it was a unique opportunity at the time when

18  there was a leasehold interest default on the loans that

19  caused Amtrak to pursue acquiring a leasehold interest,

20  correct?

21      A    Well, that the mortgage was in default was -- from

22  my experience at the company of 15 years, was the first time

23  that that had happened.

24      Q    Right.

25           And the presentation to the Board was that it was

1  a unique opportunity, right?

2      A    I think -- you're referring to a specific document

3  here?

4      Q    Sure.  I'm happy for you to take a look at Joint

5  Exhibit 2 that Ms. Lambert put in front of you.

6           On page 1, the start of the last paragraph.

7           See where it says, "Management previously informed

8  the Amtrak Board of the USI loan defaults, scheduled

9  foreclosures, and other recent developments to Washington

10 Union Station and USI's loan secured.  The loan defaults and

11 subsequent transactions present a unique opportunity for

12 Amtrak to pursue the acquisition."

13          Do you see that?

14     A    I do.

15     Q    Okay.

16          And that's a correct statement, right?

17     A    Yes.  It continues on, the full sentence, to talk

18 about our statutory mission and improving the facility --

19     Q    Right.

20          And you'll agree with me that the unique

21 opportunity relating to the default no longer exists, right,

22 because it's -- foreclosure has happened, right?

23     A    No, I -- well, again, the -- I mean, this created,

24 when we're talking here at this moment in advance of -- this

25 was in anticipation of an auction.

1          But the whole change in ownership and the

2     activities of the year created this opportunity and this

3     conversation.

4          Q    And you mentioned to Ms. Lambert that -- in

5     response to a question about the amount of the debt, that

6     you decided to offer less than the amount of the debt,

7     correct?

8          A    We offered the appraised -- our appraised value.

9          Q    Right.

10          And -- but you knew that was less than the debt,

11     right?

12          A    We did know it was less than the debt.

13          Q    And you knew that the lender would seek to recoup

14     the debt that it was owed, right?

15          A    That's certainly what we would expect the lender

16     to try to do.

17          Q    That's, in fact, what you presented to the Board

18     in Joint Exhibit 1, correct?

19          A    We did talk about the lender's interest in

20     obtaining, certainly, the -- the debt.

21          Q    Right.  Recoupment of the debt that it was owed,

22     right, those were the words that you presented to your Board

23     in Joint Exhibit 1?  It's to the Bates page number of 40.

24          I'll read to you, "In addition to the cash flow

25     analysis, the existing amount owed under the debt was

1    examined to determine what value the senior debt lender may

2    desire to recoup the debt owed."

3              Right, you reported that to your Board?

4    A    Yes.

5    Q    And several values particular to the analysis were

6    shown in the table below, correct?  Yes?

7    A    This is on which page of 2?

8    Q    It's got a Bates number of 40 to 41.

9              THE COURT:  So can I just make a brief suggestion

10   here, that if you want to show him something, to just plop

11   it onto the screen there, and you can easily direct him and

12   save us a lot of time in flipping pages.

13             So if you want to direct him to a particular

14   portion, just put it on the ELMO, and he'll be able to see

15   it on the screen in front of him.

16             MR. SCHARF:  Yes, I'll move -- I'll continue

17   moving on, Your Honor, and I'll try to implement that as we

18   go through.

19   BY MR. SCHARF:

20   Q    Now, the Amtrak strategy to acquire the leasehold

21   interest morphed after the foreclosure sale were canceled,

22   correct?

23   A    Well, it did change because the auction was no

24   longer scheduled.

25   Q    And if Ashkenazy, as the owner of USI, wasn't

1    going to accept Amtrak's offer to purchase the leasehold

2    and -- interest, Amtrak was prepared to exercise what Amtrak

3    believed to be its powers under eminent domain, right?  You

4    saw that with Ms. Lambert, right?

5         A    Yep, we were.

6              THE COURT:  I'm sorry, would you repeat the

7    question again?  I didn't --

8              MR. SCHARF:  Sure.

9    BY MR. SCHARF:

10        Q    And if Ashkenazy, who was then the owner of USI,

11   did not accept Amtrak's offer to purchase the leasehold

12   interest, Amtrak was prepared to exercise what Amtrak

13   believed to be its powers of eminent domain?  And he said

14   yes.

15             THE COURT:  Okay.  Maybe I'm misunderstanding.

16             I never understood Amtrak to be offering -- you

17   mean -- by that, you mean purchase the debt?  I thought the

18   bank was the one that put the auction up for the debt.

19             MR. SCHARF:  Well, in the documents, Your Honor,

20   that he was showed by Ms. Lambert, there were three options.

21   One of them was to purchase the debt, the other one was to

22   negotiate for the acquisition of the leasehold interest.

23             THE COURT:  Okay.

24             MR. SCHARF:  And then if unsuccessful --

25             THE COURT:  But that never happened?

1          MR. SCHARF:  That's correct.

2          THE COURT:  But because it went up for auction.

3          MR. SCHARF:  Which part?

4          THE COURT:  The debt went up for auction.

5          MR. SCHARF:  The debt -- there was a foreclosure

6     sale that happened in June of '22, that's correct.

7          THE COURT:  Right.  Okay.

8          MR. SCHARF:  But that was after, obviously, the --

9     what happened in April of '20, which was the filing of the

10    declaration.

11    BY MR. SCHARF:

12         Q    Now, when Amtrak filed its initial motion for

13    possession back in May of '22, it said it needed possession

14    by August of 2022, correct?

15         A    I'm not intimately familiar with the motion.

16         Q    Let's take a look at -- well, the Court's going to

17    want me to find it, so let me --

18         THE COURT:  I remember what it says.  Let's --

19    Mr. Scharf, I remember what it says.

20         MR. SCHARF:  Okay.

21    BY MR. SCHARF:

22         Q    When the Board was discussing, in March of 2022,

23    getting possession, it wanted possession by April --

24    I'm sorry, by August of 2022, correct?

25         A    We were seeking possession as soon as we could get

1   it, that's for certain, for all the reasons I've described.

2       Q    And Mr. Kiernan showed you a chart at the

3   deposition that showed, as part of Joint Exhibit No. 3, that

4   there was a date of August of 2022 that was going to be

5   utilized, right?

6       A    Well, I think that was our working plan, is we

7   wanted -- we were hopeful that we would be able to proceed

8   quickly, get control, and begin to then make the

9   improvements that we had discussed.

10      Q    And the 2nd Century plans for Washington

11  Union Station are still moving forward even though we're

12  13 months later than that, right?

13      A    No.  In essence, I mean, much of what is in the

14  2nd Century plan remains on hold or, you know, is advancing

15  but not able to advance fully because we don't have

16  possession and we can't achieve the full agreements we need

17  to move the projects.

18      Q    The plans haven't been abandoned, correct?

19      A    The plans -- well, they've certainly -- again, if

20  we can gain possession, the plans may be able to be changed.

21  So we have not given up hope on any of the things that we

22  want to advance, but we are waiting for this possession so

23  that we can fully utilize the facility and advance, in any

24  way that we can, the improvement of the station.

25      Q    The concourse modernization project was re-started

1    in August of 2021, correct?

2        A    Yes, I believe that's right.

3        Q    And one of the reasons why it had to be re-started

4    was because USRC lacked adequate project management

5    resources to deliver the project, posing risk of the

6    successful delivery and realization of improvements,

7    correct?

8        A    I think there were various elements that required

9    us to re-start the project.  There were issues with USI,

10   there were issues with USRC, there were other elements with

11   FRA.  All of these had us re-start.

12       Q    And the project was re-started because Amtrak and

13   USRC determined to take a different approach on how to

14   deliver the project, correct?

15       A    That's right.  We were trying a different approach

16   to -- hopefully a successful approach, a more successful

17   approach, because we had not been able to achieve it to that

18   point.

19       Q    And at one point, FRA asked USRC to deliver the

20   concourse modernization project, correct?

21       A    Yes.

22       Q    And in August of '21, Amtrak took over delivering

23   the project, correct?

24       A    So the project was re-started with Amtrak, yes.

25       Q    And the change in USRC's role is what required the

1  project to re-start, correct?

2      A    Well, again, we had not been able to successfully

3  advance the project before, and so this was an attempt,

4  again, to deliver the project, this time with a different

5  structure on the project delivery level, but the same issues

6  existed, which was, again, getting approvals from USI, USRC,

7  FRA, having all that come together so we could deliver an

8  approved concourse.

9          So that the issues -- I'd say it's a change in

10  tactic, maybe, but the same issues generally.

11      Q    And in the April 28th, 2023 plan, Amtrak Project

12  Status Report, the current -- the then-current status of the

13  concourse modernization project was still in planning,

14  correct?

15      A    Is there something you'd like me to review?

16      Q    Yes.

17          Yes.  Sorry.  I just I'll just find the right

18  place.

19      A    Is this in the exhibits as well?

20      Q    Yes.

21          I'd like to just focus on a couple things that are

22  on the page.

23          THE COURT:  Could we get an exhibit number and

24  what we're looking at?

25          MR. SCHARF:  Yes.

1          It's Lender's Exhibit 2.

2          THE COURT:  It's probably just easier if you look

3    on the screen, if he'll bring it up, instead of rifling

4    through the books.

5    BY MR. SCHARF:

6    Q    If I can turn just your attention to the top,

7    where it says the date of the report is 4/28 of '23.

8    A    Yes.

9    Q    And we go further down, you see agreement with USI

10   on the resolution of storage and back of the house was

11   complete?

12         Do you see that?

13   A    This is for --

14         THE COURT:  Can you point him to where --

15         THE WITNESS:  -- received.

16         THE COURT:  -- you want him to look.

17         MR. SCHARF:  Sure.

18   BY MR. SCHARF:

19   Q    Agreement with USI on resolution of storage and

20   back of house impact.  Status complete.

21         In fact, the target had been 10/15 of '21, and it

22   actually happened earlier, right?

23         Sorry, a little bit later.

24   A    No, it happened later.

25         And then I think we lost that agreement, if I'm

1    remembering correctly, right?

2            So then with the change in ownership, I think we

3    no longer have agreement on storage and back of house.

4        Q    Because that was re-worked, right?

5        A    I think that we have yet to been able -- we have

6    yet to agree and get approvals from USI relative to the

7    storage and back of house.  And this relates to, again,

8    clearing out some space that's in the USI leasehold so that

9    we can then move utilities and the emergency generator.

10   I think there's a whole series of preparatory actions.

11           So this is -- that's a snapshot of a -- something

12   that had been achieved but no longer was current.

13       Q    As of April '23, that was the status, right?

14       A    Well, again, I think you -- this is based off a

15   prior achievement with USI, which then became undone.

16   I think it was undone at the time.  This is in '23.

17       Q    But -- you're saying it was undone but not

18   reflected in this report of '23?

19       A    Well, again, I haven't looked at all the report to

20   know if there's somewhere else in this document that

21   explains sort of where things are, but -- because I do not

22   believe that we have resolution with USI on the storage and

23   back of house matter.

24       Q    Now, would you agree that the --

25           THE COURT:  Mr. Scharf, if I could interrupt you,

1  please.

2          So how much longer do you think you have in your

3  cross?

4          MR. SCHARF:  Probably about another 45 minutes,

5  Your Honor.

6          THE COURT:  Why don't we take lunch.  It's 12:35

7  now.  We'll resume at 1:35.

8          Mr. Gardner, I'll just ask you not to discuss your

9  testimony with anyone over the break.

10          Why don't you step down, sir.

11          So just real quick before we adjourn, how are we

12  looking in terms of timing?

13          MS. LAMBERT:  Your Honor, our next witness we

14  anticipate taking 20 to 25 minutes only.

15          THE COURT:  All right.  So if we're back at,

16  let's see, 1:35.

17          Okay.  And how long does the defense expect its

18  witnesses will be?

19          MR. SCHARF:  Two hours and 15 minutes is what we

20  projected, Your Honor.

21          THE COURT:  Total?

22          MR. SCHARF:  Total.  Without -- without cross.

23          THE COURT:  Okay.  We'll just see where we are.

24          Just for scheduling purposes, it would be optimal

25  to get this done today.  I have another trial beginning

1    tomorrow that is going to make scheduling complicated, so

2    let's be mindful of that and move through this as

3    efficiently as we can.

4            MR. SCHARF:  Can we use the courtroom during the

5    lunch break to work in here?

6            I'm going to figure out how to get my exhibits on

7    that, Your Honor.

8            MR. ROSS:  Your Honor, for U.S. sole member, we're

9    attempting to limit our cross, and at this moment have

10   nothing for this witness.

11           THE COURT:  Okay.

12           Let's do this.

13           I think we may have lost Mr. Gardner, but please,

14   let's start at -- let's start at 1:15.  We'll get back

15   sooner, and try and squeeze in as much time as we can.

16           JC, I'll do the Zoom in the office.

17           Thanks, everyone.  See you after lunch, everyone.

18           COURTROOM DEPUTY:  This Court stands in recess.

19           (Recess from 12:35 p.m. to 1:15 p.m.)

20           COURTROOM DEPUTY:  All rise.  The Honorable

21   Amit P. Mehta presiding.

22           THE COURT:  All right.  Welcome back, everybody.

23           Thank you for cutting your lunch hours a little

24   short so we can try and move forward.

25           So, Mr. Scharf.

1          MR. SCHARF:  Thank you, Your Honor.

2          I've asked Ms. Will to assist me in getting the

3    exhibits up and posted so that we can hopefully have a

4    quicker and better pace.

5    BY MR. SCHARF:

6      Q    I want to talk to you briefly about the project

7    status report that we've been talking about, especially

8    regarding the utility relocation for the subbasement

9    project.

10         Do you see that?

11     A    Yes, I see --

12     Q    All right.

13         And it shows it as 36 percent elapsed and the

14   scope, 5 percent complete, right?

15     A    Yes, that's what it says here.

16     Q    Okay.

17         And that's -- that's accurate as of April of '23,

18   right?

19     A    Well, I haven't verified these documents, but

20   that's what's in this report.

21     Q    And just to pull you back, it's -- the date of the

22   report is 4/28/23, right?

23     A    Yep, that's what it says.

24     Q    And this is an Amtrak Project Status Report

25   inter-city train set, right?

1    A    Yes.

2    Q    You didn't have any reason to doubt its veracity

3  and accuracy, do you?

4    A    No.  And, again, this is the first time I've seen

5  this document, but all the things you're saying are -- I see

6  on the page.

7    Q    Okay.

8         So no reason to doubt that it's 5 percent

9  complete, right?

10   A    Well, again, the question of the scope in full and

11  the relative assessment here, 5 percent, that's what the

12  project team appears to have written.  So what 5 percent

13  that is and what phase, it's clearly in the planning and

14  early design phase.

15   Q    Now, I'd like to talk to you a little bit about

16  the subbasement structural replacement project, okay?

17        And that's also in this report, right.

18        We see that at the top right?

19   A    Yes.  Sorry.

20   Q    You see it says, "The subbasement structural

21  replacement project is a critical state of good repair"?

22        Do you see that?

23   A    I do.

24   Q    And scope includes design and construction?

25   A    Yes.

1    Q    And it says, "Ownership of the asset is unclear,

2  given current lease arrangements at Washington

3  Union Station.  The Track 22 reconstruction and the USRC

4  utility relocation are precedent construction projects,

5  right?

6    A    Yes.

7    Q    And it talks about it's a USRC utility relocation

8  project, right?

9    A    Yes.  I mean, I think, again, Amtrak is working

10 together with USRC on all of these in collaboration.

11   Q    And the project scope is -- complete is only

12 15 percent, right?

13   A    Down here I see that, yep, 15 percent.

14   Q    And the -- and it started in 2015, right?  That's

15 the start date that's shown here?

16   A    Yes, because, again, we've been -- as we discussed

17 earlier, we've been trying to advance this project into

18 design for a long time.

19   Q    At the time it started, right, I think we're

20 pretty clear that the plan for it was to be done under the

21 lease structure where Amtrak was a subtenant, right?

22   A    Well, there are a variety of different elements of

23 the subbasement structural replacement, so some of it would

24 have been done by Amtrak, some done necessary for USI and

25 some work with USRC.

1      Q    And now, let's talk about --

2           THE COURT:  Mr. Scharf, I'm sorry to interrupt.

3           Can you just tell me what "project time elapse"

4      means, that 51 percent figure?

5           THE WITNESS:  Yes, the project time elapse.

6           So typically for each project, we have an

7      anticipated schedule, and that schedule relates to

8      milestones of certain phases and completion, and we have a

9      scope of work.

10          So when we have a project time elapse, that means

11     we've eaten into or consumed a large piece of our schedule.

12     And you can see here we've had 51 percent of our planned

13     schedule, but we have only achieved 15 percent scope.

14          So in this case, I think that's because we had

15     difficulty achieving the various agreements.  So we're sort

16     of stuck in this position of design and plan.

17     BY MR. SCHARF:

18     Q    And if we're -- and the subbasement structural

19     replacement project is not slated to start until August of

20     '24, right?

21     A    Do you mean the construction?  Where do you see

22     that?  Let's see.

23     Q    The construction start, do you see that?

24          Construction start, not yet started, 8/7 of '24.

25          Do you see that?

1      A      I do.  I do.

2             I mean, that -- that's -- because we haven't done

3      bids, I mean, we're way down on this list so this schedule

4      certainly is not accurate today.  It will happen probably

5      well after that potentially.

6      Q      So since April of '23 until September of '23, the

7      schedule is even elongated; you're not even scheduled to be

8      shovel ready until after August of 24', right?

9      A      Right, because we have yet to reach agreement with

10     USI on the matter of the relocation space and advance the

11     design.

12     Q      And that's reflected up here where it talks about,

13     "The project team is working on new milestone goals in lieu

14     of the current USRC utility relocation scope delay," right?

15     A      I see that as -- yes.

16     Q      Okay.

17            Now, I think the -- we talked about the fact that

18     the Second Century plan was developed at a time that Amtrak

19     did not have any interest in the USI, USR leasehold

20     interest, right?

21     A      That's correct.

22            I mean, again, the program is continuing to

23     evolve, so -- but there was a period before that in which

24     the program was begun.

25     Q      And the -- and Amtrak would have remained a tenant

1    of USI lease position and still be able to do all of its

2    programs under the Second Century program, correct?

3        A    No.

4        Q    That was not the original intention back in 2016;

5    you planned to do eminent domain back then?

6        A    No.  In 2016, we did -- we endeavored and hoped

7    that we'd be able to advance the projects working with USI,

8    USRC, FRA, all the parties, but we were unable to progress

9    and we've spent many years essentially sort of stuck in

10   neutral here.

11       Q    So from 2016 to 20 -- the end of 2021, you were

12   stuck in neutral, right?

13       A    Yeah.  I mean, advancing in some cases, backing up

14   in others.  Again, not making much progress.

15       Q    And you were not having Amtrak -- all that work

16   and the work that was being done didn't contemplate having

17   Amtrak in the master tenant position, right?

18       A    Well, no.  At that time, again, pre-action, we

19   were endeavoring to make it work within the structure that

20   existed.  It was not --

21       Q    Right.  And that structure had been in place for

22   40 years already, right?

23       A    That's right.

24       Q    Now, Amtrak, in its lease with USI, gives it

25   certain rights to have and take additional space, does it

1    not?

2        A    Well, I'm not familiar intimately with the -- this

3    is the Amtrak lease, the sublease with USI you're

4    referring to?

5        Q    The Amtrak sublease with USI.

6        A    Yes.

7        Q    You're familiar that it provides Amtrak with

8    certain rights to take additional space and use additional

9    space, right?

10       A    No, I'm not familiar in detail with all the

11   elements of the lease, but I know that we -- again, as we've

12   discussed earlier, we have been able -- we did reach

13   agreement to gain some additional space through a lease that

14   then expired.

15       Q    And you'll acknowledge that there have been

16   multiple amendments to the Amtrak/USI lease over the years?

17       A    I'm not familiar with the history of the agreement

18   in detail.

19       Q    Okay.

20            Are you generally aware that there have been

21   multiple amendments to accommodate requests by Amtrak?

22       A    I know that there have been some amendments to

23   create the lease that I mentioned, and certainly we've

24   worked for many years with USI.  But I'm not familiar with

25   the actual lease amendments.

1      Q    Okay.

2           And we had a chuckle about the bathroom space,

3      right?

4      A    Yes.

5      Q    At Union Station, right?

6           But there was a lease amendment that was done with

7      respect to that space as well, right?

8      A    I'm not aware of that lease amendment.

9      Q    You're not aware that Amtrak has been responsible

10     for redeveloping the bathroom space for -- it took them

11     five years to get it done?

12     A    I know that we just recently completed a bathroom

13     upgrade, but I'm not sure in detail what the contractual

14     relationship or lease arrangements were to do that work --

15     Q    Okay.

16     A    -- in our space.

17     Q    So you're not familiar that that was a result of a

18     lease amendment with USI that permitted that to go forward,

19     the relocation of the bathroom space?

20     A    Well, the bathroom space was simply upgraded.  We

21     haven't changed the bathroom space.  We're still in the same

22     space within the lease structure, and we simply unimproved

23     what were very bad condition bathrooms there.

24     Q    And you're familiar -- are you familiar with the

25     concourse agreement that provides for the men's restroom to

1   be surrendered to USI upon a substitute men's bathroom being

2   built in the concourse for use by the general public?

3       A    No.

4       Q    Okay.

5            I would like to show you Lender's Exhibit 22.

6   We can put that up.

7            We've put it up for you.  Have you seen this

8   document before?

9       A    No.

10      Q    Okay.

11           Are you familiar, as the most senior officer, that

12  this is an agreement between Amtrak and USI that was entered

13  into in September 27 of 2017?

14      A    No.  Again, this is the first time I've seen this

15  concourse agreement.

16      Q    So you didn't take this into account in your

17  testimony in talking about the bathrooms?

18      A    Well, certainly -- you mean my testimony today?

19      Q    Yes.

20      A    No, I did not take this into account in my

21  testimony today.

22      Q    So you're not familiar with the contractual

23  relationships as it relates to the bathrooms; is that what

24  you're explaining to the Court?

25      A    No.  My conversation about the bathroom was the

1  desire and need to expand bathroom facilities into the head

2  house.  So this relates to the current bathrooms, the

3  bathrooms that are in the lease space.

4        I was talking about the need to expand the number

5  of bathrooms and the availability of bathrooms beyond our

6  Amtrak lease space.  So I don't see that this is related to

7  that because I don't believe the agreement exists that

8  allows us to add bathrooms in the head house otherwise.

9    Q    Are you familiar with the lease relationship

10  between Amtrak and USI that allows it to increase or

11  decrease space that Amtrak was using and leasing and

12  controlling?

13   A    I'm not familiar with the details of that lease.

14  Again, I --

15   Q    But you're aware that that's the case, right?

16   A    Well, again, I know that we have, for many times,

17  tried to negotiate with USI to gain more space.  We're

18  unable to come to terms.  We certainly don't have, I don't

19  think, any sort of unilateral right there.  We've always had

20  to negotiate, and that's what my understanding is.

21        And, again, sometimes been able to --

22   Q    Sorry.

23        You mentioned in questions to Ms. Lambert at the

24  end about a bunch of things that you wanted to do

25  immediately, right, like putting in waiting room areas,

1    right, butting benches for people to wait, right?

2        A    Yes.

3        Q    You want to get that done before Christmas, right?

4        A    Yes.

5        Q    Did anybody at Amtrak ask USI for permission to do

6    that in the last six months?

7        A    Well, no.  Our goal here is to be able to get

8    control of the lease, be able to make the changes we want so

9    that we can improve the facility.

10           Our experience with USI generally in the past has

11   been that any conversation about using additional space has

12   come with financial demands and difficult negotiations.

13           Our goal here is to be able to purchase the space,

14   have it as Amtrak controlled, and then be able to make use

15   of it to adapt to the needs of our passengers.

16       Q    Did you -- did anybody at Amtrak in the last

17   six months ask anybody at USI to use some of the unleased

18   spaces that Amtrak wants to use for improving the customer

19   experience?

20       A    I'm not aware.  I can't answer that question.

21   I don't know.

22       Q    Are you aware of any of the items that you talked

23   about as wanting to do immediately that anybody at Amtrak

24   asked anybody at USI for permission to do that at a cost or

25   no cost?

1      A     Again, I'm unaware.  The only thing I can say,

2    I don't think we've had a lot of communication from USI in

3    general about the conditions of the building.

4           But as I said, our goal here is to be able to have

5    control so that we can make the changes necessary.

6      Q     Now, necessary -- withdrawn.

7           Now, you'll agree with me -- I'd like to talk to

8    you a little bit about the Second Century PowerPoint

9    presentation that Amtrak talked about the challenges it was

10   experiencing at Washington Union Station.

11          You're familiar with this, a meeting with

12   Steven Gardner, right?

13     A     Yes.  I think this is Exhibit --

14     Q     It's Lender's Exhibit 1.

15     A     1.  Okay.

16     Q     Okay.

17          You're familiar with this, right?

18     A     I am.

19     Q     This was a presentation that was made to you,

20   right?

21     A     Yes.

22     Q     We're going to put up Slide 6 for you.

23          In October of 2019, there were lists of concourse

24   challenges for the concourse plan.

25          Do you see that?

1      A    I do.

2      Q    And your team reported to you that USRC is the

3  roadblock to project implementation, right?

4      A    No.

5           USRC -- there were roadblocks to project USRC --

6  for USRC, it's true, but the first point is "Current lease

7  structure limits in Amtrak's delivery of capital

8  improvement," so there's a whole lot of challenges,

9  certainly not the USRC was the --

10     Q    Right.  And that's the lease structure -- the

11 lease structure that's being referred to here is the lease

12 structure that was put in place by Congress, right?

13          MS. LAMBERT:  Objection, Your Honor.

14          THE WITNESS:  No.

15          THE COURT:  That's overruled.  Go ahead.

16          If he knows.

17          THE WITNESS:  I think the lease structure here

18 relates to the variety of lease arrangements, including

19 Amtrak USI.

20 BY MR. SCHARF:

21     Q    Now, USRC is -- it has a leasehold interest from

22 DOT, right?  You said DOT is the owner.

23     A    That's right.

24     Q    And DOT is a government agency, correct?

25     A    Yes.

1     Q    USRC is created by the government?

2     A    It's a District nonprofit with --

3     Q    You'll agree with me that Amtrak can't eminent

4 domain USRC's leasehold interest, right?

5          MS. LAMBERT:  Objection, Your Honor.  That's far

6 beyond the scope of this case.  It includes legal

7 discussions and everything.  And that's not appropriate.

8          THE COURT:  I'll sustain the objection.  It's

9 asking for a legal conclusion.

10         Go ahead.  Next question.

11 BY MR. SCHARF:

12    Q    Sure.

13         And here -- and are you aware that in the grant of

14 power, that USRC was directed to enter into a leasehold with

15 USI's predecessor interest?

16    A    I know that as part of the development of the USRC

17 and the station of redevelopment -- or station redevelopment

18 plan, that there was a lease entered into with USRC and the

19 then-leaseholder.

20    Q    Right.

21         Okay.  And here as you go down the list of

22 concourse challenges, you see "No process from building

23 ownership and approvals," right?

24    A    I do.

25    Q    And building ownership was DOT, right?

1    A    Building ownership includes DOT, yes.

2    Q    Okay.

3         And "No path to construction under previous model

4    (Amtrak designs and USRC constructs)."

5         Do you see that?

6         We talked about that a little bit before, right?

7    A    Yes.

8         Though I would also say, again, this includes

9    beyond simply the parenthetical of Amtrak design and USRC

10   constructs because that tag team has to then interface with

11   both USI and FRA.  So there's really the four elements in

12   the construction models, so four parties had to find a way

13   through that.

14   Q    But that was not --

15   A    That was not working.

16   Q    But that was not in the report that was made to

17   you, what you just testified to, right?

18   A    Well, that's what I understood at the time of this

19   report.  I assume very, very involved and knowledgeable

20   about this whole process over the many years.

21        MR. SCHARF:  Move to strike as hearsay,

22   Your Honor.  What he heard from others.

23        THE COURT:  I don't think he said he heard

24   anything.  He said he understood certain things.

25

BY MR. SCHARF:

Q    Okay.

The USRC roadblock, the project implementation, has five subpoints under it, right?

A    Yes.

Q    And those all reference to USRC, right?

A    Well, they reference the challenges that USRC faces, right, the communication with FRA through USRC.  So some of these are about USRC as an entity at the point, some are about the structure.

So I would say that they relate to USRC.  They're not all USRC issues.  The FRA issue with USRC is also a product of the DOT and FRA.

Q    Now, you mentioned that the offer that was made was based upon an appraisal, right?

A    Yes.

Q    And even though you knew that the amount of money that was on the debt was more than the appraised amount, right?

A    Yes.

Q    Now, you were aware, were you not, that there had been a third-party appraisal that had been done that valued the property at approximately $830 million, correct?

MS. LAMBERT:  Objection, Your Honor.  This case is not about valuation, that's for another phase.

1          MR. SCHARF:  Your Honor, I would agree that this

2     case is not about valuation, but the witness opened the door

3     by saying he had a predicate for making an offer of 250.

4     The documents that we see that's been put in talk about the

5     fact that they knew about the loan amount and that that was

6     not relevant.  They provided a one-week period of time for

7     negotiation.

8          THE COURT:  Okay.  Okay.

9          All right.  Why don't you just ask him.  I don't

10    know what the date of this offer or this -- date of this

11    appraisal is relative to the offer that was made.

12    BY MR. SCHARF:

13    Q    You're aware -- Amtrak was aware and presented to

14    its board that there was a valuation done by a third party

15    for $830 million; am I correct?

16          MS. LAMBERT:  Your Honor, I renew my objection

17    because -- in addition, it's hearsay because it's a report

18    that's not in evidence, but most importantly, valuation is

19    not at issue.  And so -- and this should not come in.

20          THE COURT:  Can I just understand what the date of

21    this is, when this valuation report was done?

22          MR. SCHARF:  So, Your Honor, it's part of Joint

23    Exhibit No. 6.  I'd like to put that in front of the

24    witness.

25          THE COURT:  Well, you haven't answered my

1    question.  What's the date?

2              MR. SCHARF:  What's the date?

3              THE COURT:  Yes.

4              MR. SCHARF:  Well, the date of the appraisal is

5    from June of '21, Your Honor, but it is in the materials

6    that was being evaluated by the Amtrak Board of Directors.

7    It's in Joint Exhibit 6.  They have a schedule that talks

8    specifically about evaluation comparison, and it's found on

9    the page that has a Bates number --

10             THE COURT:  So what's the relevancy of it?

11   I mean, I see where it is, but what's the relevancy of it?

12             MR. SCHARF:  The relevancy is it goes to show that

13   they didn't fulfill their obligations prefiling to negotiate

14   in what arguably is an implied obligation of coming up with

15   an offer that is -- that bears a reasonable resemblance to

16   reality.

17             MS. LAMBERT:  Objection, Your Honor.

18             And in addition to the other argument --

19             THE COURT:  Hang on, hang on.

20             MS. LAMBERT:  -- they --

21             THE COURT:  Okay.

22             I'll allow it.  It's fine.  Let's go ahead.  Move

23   forward.  I've read it, I know what it says.

24             MR. SCHARF:  Okay.

25

1    BY MR. SCHARF:

2         Q    And you received authority -- and this is also in

3    Lender's -- I'm sorry, in Joint Exhibit No. 6.

4              You received authority to bid $550 million?

5              MS. LAMBERT:  Objection, Your Honor.

6              THE COURT:  We are really getting outside the

7    scope of what's this hearing is about now.  We really are

8    getting into what the actual valuation should be.  And, you

9    know, whatever the initial figure was, on a good faith or

10   not, the ultimate question for me is whether the overall

11   efforts to negotiate meet the statutory requirement.

12             MR. SCHARF:  Understood, Your Honor, but the

13   $550 million was something that was authorized by the Board

14   yet was never offered.

15             THE COURT:  Well -- okay.

16             You know, all right.

17   BY MR. SCHARF:

18        Q    Now, Amtrak -- as of December 2021, Amtrak had

19   already had four valuations done on the Union Station

20   leasehold interest, correct?

21        A    Of December of 2021?

22        Q    Yes.  Four valuations had been done already before

23   your appraisal that you relied on came in.

24        A    I'm not sure of that exact number.  We certainly

25   did valuations.  We had consultants which did additional

1   valuations for us, and we ultimately ended up with an

2   appraisal and an appraisal that we thought was well crafted.

3       Q   I'd like to just put what's been marked for

4   identification Lender's Exhibit 25 in front of you and ask

5   you if this refreshes your recollection that by November of

6   '24 -- I'm sorry, by November 24th of 2021, Amtrak had

7   appraised the station --

8       MS. LAMBERT:  Objection --

9   BY MR. SCHARF:

10     Q   -- and various components in four separate reports

11  over the past three months?

12       MS. LAMBERT:  Objection, Your Honor.

13       First of all, there's no foundation laid with this

14  witness.

15       Second, anything that Mr. Marchitelli was doing,

16  he was a litigation consultant for me.  And anything about

17  valuation would be beyond the scope of this thing so that

18  there's no relevant -- valuation is not an issue, and so we

19  would object to any questions about this exhibit.  Not only

20  on that issue but -- and they have been advised that he was

21  a litigation consultant to me.

22       MR. SCHARF:  Just asking if this refreshes the

23  witness's recollection that by December, they had had over

24  four separate valuations done for Washington Union Station.

25       MS. LAMBERT:  Objection.  There's no foundation

1   that this witness has ever seen this exhibit.

2            THE COURT:  I understand.  If it's simply being

3   offered to refresh his memory, he doesn't need a foundation.

4   He can either say it refreshes his memory or it doesn't.

5            THE WITNESS:  I've never seen this document.

6            THE COURT:  Okay.  All right.  So let's move on.

7   BY MR. SCHARF:

8       Q    But does it refresh your recollection that you had

9   had four valuations done in the three months leading up to

10  November?

11      A    No.  As I said, I don't -- I'm not sure what to

12  make of that document, and I'm not sure exactly what it

13  refers to.

14      Q    Okay.

15           I'd like to show you what's been marked as

16  Lender's Exhibit 24.  You mentioned an appraisal that had

17  been done that you based the offer on that you authorized,

18  the $250 million offer.

19           Is this the appraisal?

20           MS. LAMBERT:  Objection, Your Honor.

21           THE COURT:  Why are we getting into the appraisal?

22  I don't understand why we're going down this road.

23           MR. SCHARF:  Your Honor, I continue to say that

24  the conduct of Amtrak to satisfy the statutory obligation

25  that they had to prenegotiate establishes that they had

1    valuations, basically ended up finding the lowest possible

2    valuation, and when you open up the valuation, you'll see

3    that it said it's not based upon any of the information --

4              THE COURT:  Can I ask the following which is, are

5    you going to tell me where it ended up?

6              MR. SCHARF:  Where what ended up?

7              THE COURT:  The negotiation ended up before it was

8    broken off?  Like what was the final number that you all

9    were talking about?

10             MR. SCHARF:  250.

11             THE COURT:  Did Amtrak move from the 250 --

12             MR. SCHARF:  No, 250, one and done, in one week,

13   Your Honor.  That's --

14             THE COURT:  No, no, no.  There was an extended

15   period of time after this litigation was filed where you all

16   negotiated for several months, I don't know whether it was

17   60 days, 90 days, but it was some period of time.  So, you

18   know, are we going to get into that here, how close you came

19   or didn't come, whether Amtrak went up, didn't go up?

20             MR. SCHARF:  I'm happy to get into that as well,

21   Your Honor.  Mr. Rebibo can testify about it since he was

22   the counterparty to that.

23             THE COURT:  I mean, at the end of the day, the

24   question is, you know, only if Amtrak -- the statute says

25   "may exercise the power of eminent domain only if it cannot

1  acquire the interest in the property by a contract or agree

2  with the owner on the purchase price for the interest."

3          Now, I think your argument is that you can't sort

4  of assume the power of eminent domain by negotiating in bad

5  faith; in other words, you can't sort of throw in a lowball

6  offer that you know is nowhere close and say, ha-ha, the

7  purchase price, we can't reach an agreement as to the

8  purchase price and, therefore, we have the power of eminent

9  domain.  I suppose that's what you're arguing or trying to

10 get at; is that right?

11         MR. SCHARF:  It is, Your Honor.

12         And it goes right to the heart of this exhibit,

13 where it talks about the special assignment conditions and

14 talks about all the documentation that they don't have and

15 why can it can't be relied upon, yet that's the only

16 document they rely upon when Amtrak authorizes 550 million

17 when they have an appraisal that they look at that's 830.

18         THE COURT:  I'm not interested in argument,

19 Counsel.

20         MR. SCHARF:  Yes, I understand.

21         THE COURT:  So let's dial it back a little bit.

22         Let's focus on what you want to show him and why

23 it's relevant.  All right?

24         MR. SCHARF:  Yes, Your Honor.  Absolutely.

25         MS. LAMBERT:  Your Honor, may I speak as to the

1    issue of good faith on that?

2              THE COURT:  Sure.

3              MS. LAMBERT:  In -- the Supreme Court, in *Boston*

4    *and Maine*, in 503 U.S. 407, and the predecessor statute to

5    the current Amtrak statute, specifically dealt with this

6    argument, where the other side had said that they had --

7    negotiations must occur in good faith.

8              And what the Supreme Court held was that that

9    is -- it's unable to read it that way, and it's really, the

10   requirement is unable to -- that the unable to agree is

11   unable to agree means nothing more than a factual

12   determination that the parties will not be able to reach

13   agreement through further negotiation.

14             There are other cases as well, but I will argue

15   those, but that this is not about valuation, this is -- or

16   valuations and whether it's good or not.

17             Because otherwise you just turn this -- a motion

18   for possession into a mini valuation case.

19             THE COURT:  No, I understand.  I understand.

20             All right.  If you want to put documents in the

21   record about dollar values, go ahead and do that.  Let's not

22   waste a lot of time doing that right now.  You can always

23   argue from the record and the documents when we have the

24   opportunity to do so.

25             MR. SCHARF:  Your Honor, I agree, but Ms. Lambert

1    has objected to the introduction of this exhibit, which this

2    witness testified to was his predicate for making the offer,

3    so I'd move Exhibit 24 into evidence so that we can make

4    that argument.

5         MS. LAMBERT:  We object, Your Honor, specifically

6    because he said it's for this particular purpose.  And you

7    had said that valuations are not to be part of this trial,

8    and also for the reasons previously stated.

9         THE COURT:  All right.  I will admit it.  At the

10   end of the day, it's a fact, it's something he considered,

11   they made an offer based upon what they made an offer on.

12   Let's go ahead and move forward.

13                                    (Defendant's Exhibit 24
                                       received into evidence.)
14

15   BY MR. SCHARF:

16        Q    Am I correct that after one of the initial

17   hearings on immediate possession, you directed Ms. Kostura

18   to draft a Washington Union Station action plan to show what

19   Amtrak would do if it was awarded possession of

20   Union Station?

21        A    Well, there are a variety of folks working on

22   ideas, and so what I asked Ms. Kostura to do is to pull

23   those together into a plan that myself and our executives

24   could review, make sure that we're aware of the status and

25   the efforts of our cross-functional team working on this.

1    Q    And that was Joint Exhibit No. 4 that we looked at

2    before, correct?

3    A    Correct.

4    Q    And prior to that, there was no written document

5    for an action plan that was comprehensive like this,

6    correct?

7    A    Well, I don't know.  I'm not sure what all the

8    staff put together on various elements here, but this was

9    the presentation that was made to me and I requested.

10    Q    And if we look at Slide 5, Amtrak says that, "Once

11    it gets possession of the USI sublease interest, Amtrak will

12    be able to better understand the responsibilities and risks

13    involved with the facility."

14         Do you see that?

15    A    I do.

16    Q    Is that not something you know now?

17    A    I think there are many elements as it relates to

18    USI and its relationship with its tenants and the finances

19    and all the other elements that we're not fully aware of.

20    Q    So it's fair to say that as of today, Amtrak

21    doesn't fully understand the responsibilities associated

22    with managing and operating the leasehold interest, right?

23    A    No.  No, I would say that we want to better

24    understand the responsibilities with the facility, and

25    I think that refers to, again, whatever USI has entered into

1    with tenants, with contractors, with vendors, and we don't

2    have a full view into all of that, I don't believe.

3            And so this will help us understand the lay of the

4    land as it exists to the sublease, where today, we don't

5    have visibility into all that.

6        Q    And if we look at Slide 10 -- you see that?

7        A    Okay.  I'm on 10.

8        Q    There's a reference to "30, 60, 90 after transfer

9    of possession."

10           Do you see that?

11       A    Yes.

12       Q    You mentioned the second point there a little bit

13   with Ms. Lambert, mentioning a renegotiation of a sublease

14   with FRA, USRC, right?

15       A    Yes.

16       Q    And that's something that's planned for 30, 60 or

17   90 days after the transfer of possession, right?

18       A    Yep.

19       Q    And I think you acknowledged to Ms. Lambert that

20   those negotiations could fail; it's not assured, correct?

21       A    Yes, absolutely.  Again, we will gain control of

22   the lease, is our hope, and then we'll enter into

23   renegotiations with USRC to see if we can improve it

24   together.

25       Q    And wasn't one of the conditions for

1   preprogramming authority was a successful renegotiation of

2   the lease with USRC?

3       A    That was one of the FRA's conditions, yep.

4       Q    And you got that preprogramming authority in March

5   of 2022, right?

6       A    Preprogramming authority, I think, relates to --

7   March sounds about right, in that area between the winter

8   and spring.

9       Q    And those lease negotiations could have been

10  ongoing since March of 2022, but haven't even started yet,

11  correct?

12      A    That's right.  We don't have possession yet, and

13  so functionally we're not in control of anything related to

14  the leasehold beyond the space that Amtrak has historically

15  leased so --

16      Q    Right.

17           You haven't even begin to outline with USRC what

18  is a condition of preprogramming authority, which you could

19  have been doing all along, just to talk to them about what

20  you might want and what they might be willing to concede on,

21  correct?

22      A    Doesn't seem -- well, I think, again, that doesn't

23  seem prudent until we have the matter resolved here of

24  control to begin the further conversations with USRC.

25           So -- and again, I think this is -- USRC has

1   interests, we have interest, we're going to look forward to
2   cooperating together and trying to modernize this for a
3   great relationship for the benefit of the station.
4       Q    But despite the fact that you got preprogramming
5   authority from FRA that that was a condition for the
6   authority that you got, you still haven't undertaken
7   anything in, what is it, a year and six months?
8       A    Well, a couple of things.
9            So, one, as you know, we're still here today
10  trying to gain control of the facility.
11           Two, preprogramming authority reflects, again, an
12  advance approval of ultimate programming.  When we get to
13  the phase of needing to program rent dollars for this
14  activity, then that's when we need to have this satisfied.
15           We aren't yet at that phase.  We've deposited the
16  dollars with the Court, and they sit there.  And until we're
17  actually successful in this process, we won't need to
18  program the dollars.
19           So the condition yet hasn't occurred in which this
20  is ripe, from our perspective.
21      Q    I'd like to show you another page from the slide,
22  I believe it's Slide 11.
23           Amtrak currently has no real estate leasing
24  responsibilities at the site, correct?
25      A    Yes, I believe that's right.

1     Q    And that after transfer of possession of the USI

2   sublease and its interests, Amtrak will suddenly become

3   responsible for all of that, correct?

4     A    Yes.

5     Q    And it's your plan, according to this document, to

6   ask JLL, who's currently engaged to do that work, right?

7     A    Our plan is to see if we can retain JLL for the

8   immediate period so we have a -- continuity and successful

9   transition.

10     Q    Right.  The same JLL that Amtrak wanted Rexmark

11   and the lender to keep in place, right?

12     A    That's right.

13     Q    And they have, in fact, kept JLL in place?

14     A    JLL has remained in place, is what I understand,

15   yep.

16     Q    Right.

17          So you're just going to continue that even after

18   you get immediate possession, right?

19     A    The immediate activity will be to keep JLL to --

20   ideally to have JLL continue so that we can gain all the

21   information that you see here on this slide, and then

22   transition appropriately.  We, of course, manage other

23   properties and have other stations, we have other third

24   parties here, we know how to do that.

25          This gives us immediate continuity so we can have

1    a -- day one, a facility that's -- that certainly functions,

2    and then we can improve from there as I've described.

3         Q    Now, Ms. Lambert showed you Exhibit 10, a plan

4    that you had been thinking about that showed how Amtrak

5    could conceivably use all the space at Washington

6    Union Station, right?

7         A    Yes.

8         Q    And you'll agree with me that under that plan,

9    there would be less retail space allocated for tenants than

10   are currently allocated, correct?

11        A    I don't know.  I'm not really clear on the status

12   of all the current agreements with tenants or, for that

13   matter, the exact vacancy, so I don't know how much of the

14   USI lease is occupied by retail tenants and -- or the status

15   of that tenancy.

16             So -- and, again, what you saw is a description

17   here.  Our goal would be to have the appropriate retail and

18   the appropriate commercial activity.  If -- and again,

19   I'm not sure -- I know there's a lot less retail than there

20   used to be and there's a lot more vacancy than there ever

21   was.  So the question is, how do we position the space

22   that's not used, and then for the space that is used for

23   retail, how does it fit, where does it work.

24        Q    And for what you've shown the Court for

25   Plaintiff's Exhibit No. 10, there is no actual plan that's

1    in place to implement all of those items that have been

2    shown on Plaintiff's Exhibit 10, correct?

3        A    Well, there's -- we have an executive committee

4    that's working on this whole plan to transition, and part of

5    this goal is the active planning right now to be able to

6    reposition space that it meets the needs of the

7    transportation entity.

8            So we obviously don't have control.  We are not

9    able to advance on a plan, but we are doing the work so that

10   when we gain control, we can start to move out and make

11   it -- both evaluate and properly plan for the space and then

12   take the steps to implement.

13       Q    So you haven't done the evaluation --

14           THE COURT:  Mr. Scharf, we're probably about

15   35 minutes into the 30 minutes you said you needed, so

16   I'm going to ask you to start moving --

17           MR. SCHARF:  I am wrapping up, Your Honor.

18           In fact, I would move into evidence

19   Plaintiff's Exhibit 10, which was shown only as

20   demonstrative.

21           THE COURT:  Okay.  Is there any objection?

22           MS. LAMBERT:  No objection, Your Honor.

23           THE COURT:  Okay.  Plaintiff's 10 will be

24   admitted.

25                           (Plaintiff's Exhibit 10
                             received into evidence.)

1

2   BY MR. SCHARF:

3      Q   Now, am I correct that Amtrak had substantial

4  amount of office space at Washington Union Station pursuant

5  to an office lease, correct?

6      A   We did.

7      Q   And you elected not to continue that lease in

8  2018, right?

9      A   We were unable to come to terms.

10     Q   Right.

11        And you didn't condemn the building, the

12  Washington Union Station leasehold interest in 2018, right,

13  when you couldn't come to terms?

14     A   We did not.

15     Q   Okay.

16        And Amtrak, in fact, recently condemned a nearby

17  office building for office space, correct?

18     A   Condemned an office building?

19     Q   A building to use for office space, correct, near

20  Washington Union Station.

21     A   We did take a building that was actually, for

22  construction purposes, laid down and a whole variety of

23  features.  There are some office spaces there, but it was

24  larger than just the building, and it's really about sort of

25  supporting the railroad infrastructure work.

1     Q     And the office space that Amtrak was using at

2  Washington Union Station up to 2018 had been used for over

3  30 years by Amtrak, right?

4     A     It had been.  It had been used for that period of

5  time.  And since we've been -- since we left, it's been at

6  fallow and unleased.

7     Q     Now, you told Ms. Lambert, with respect to

8  Exhibit 10, that that was in the planning and evaluation

9  process, right?  Did I understand and hear you correctly?

10    A     Say that again for me.

11    Q     Sure.

12          About the Exhibit No. 10, that that was in the

13 planning and evaluation process, right?

14    A     This is the prospective use of the leasehold, is

15 that Exhibit 10?

16    Q     Yes.

17    A     Yes, that's in planning and evaluation phase, yep.

18          MR. SCHARF:  Just looking through my notes,

19 Your Honor, which may be obvious, just to make sure I've

20 covered everything.

21          THE COURT:  Okay.

22          MR. SCHARF:  Nothing further, Your Honor.

23          THE COURT:  All right.  Thank you, Mr. Scharf.

24          Mr. Ross.

25          MR. ROSS:  Your Honor, USSM has no questions for

1   this witness.

2          THE COURT:  Thank you, Mr. Ross.

3          Any redirect?

4          MS. LAMBERT:  One question, Your Honor.

5          THE COURT:  Okay.

6                 - - -

7             REDIRECT EXAMINATION

8   BY MS. LAMBERT:

9      Q    The offer that went to USI was for $250 million.

10  Why wasn't it for 550 million?

11     A    The authority we received was to deal with,

12  originally, the auction and the possibility of a variety of,

13  you know, competitive bidding going on.

14         And the $250 million offer was the appraised

15  value, it was the value, and that is our obligation is to

16  offer what we believe the appraised value is.  That was the

17  amount of money we needed to deposit with the Court once we

18  were unable to acquire.

19         MS. LAMBERT:  No further questions, Your Honor.

20         MR. SCHARF:  If I may, I think I have a couple.

21         THE COURT:  Well, no, I don't think you get to get

22  up and ask those questions, no.

23         MR. SCHARF:  They're related to his answer.

24  I'm not going to be --

25         THE COURT:  No.  I understand.

1    MR. SCHARF:  Okay.  Understood.

2    THE COURT:  All right.

3    Mr. Gardner, thank you very much for your time and

4    testimony.

5    All right.  Take care.

6    All right.  Next witness.

7    MS. LAMBERT:  Yes, Your Honor.  I call Dennis

8    Newman to the stand.

9    THE COURT:  Yeah, if counsel would just grab --

10   Mr. Scharf, could I ask you, whatever exhibits you handed to

11   him.

12   MR. SCHARF:  Thank you.

13   THE COURT:  Thank you.

14   COURTROOM DEPUTY:  Please raise your right hand.

15   (Witness is placed under oath.)

16   COURTROOM DEPUTY:  Thank you.

17   THE COURT:  Mr. Newman, welcome.

18   THE WITNESS:  Thank you, Your Honor.

19   Good afternoon.

20   MS. LAMBERT:  Good afternoon, Your Honor.

21   May Steven Gardner be excused so he can stay in

22   the courtroom if he so desires?

23   THE COURT:  Sure, he's welcome to stay.

24   MS. LAMBERT:  Thank you, Your Honor.

25                          - - -

1  DENNIS NEWMAN, WITNESS FOR THE PLAINTIFF, SWORN

2                    DIRECT EXAMINATION

3                         - - -

4  BY MS. LAMBERT:

5      Q    Mr. Newman, can you state your name, title, and

6  business address.

7      A    Yes.

8           My name is Dennis Newman.  My title is executive

9  vice president of strategy and planning for Amtrak.

10          And my business address is 1 Massachusetts Avenue,

11 Northwest, Washington, D.C.

12     Q    How long have you been employed by Amtrak?

13     A    I've been employed by Amtrak for nearly six years.

14     Q    Now, you mentioned that you're the executive vice

15 president of strategy and planning.  What does that mean,

16 strategy and planning?

17     A    Well, largely it means what it says.  I'm

18 responsible for our long-range strategic planning and also

19 long-range planning of, you know, particularly our major

20 fixed assets, so that would be like our -- so our network,

21 our fleet, our infrastructure, and that includes real

22 estate.

23     Q    What responsibilities have you had with respect to

24 negotiations for the property interest in this case?

25     A    I oversaw the negotiations.

1      Q    I'm going to put up on the screen Joint Exhibit 8,

2  and you could also look at it in the binder.

3           Are you familiar with this?

4      A    Pardon me.

5           Your Honor, I forgot my reading glasses.  Sorry

6  about that.

7      Q    We're all getting older.

8           So are you familiar with Joint Exhibit 8?

9      A    Make sure I get to it.

10          Yes, I am.

11     Q    Is this the offer that was made from Amtrak to

12 USI, dated April 6th, 2022?

13     A    Yes, it is.

14     Q    When did you send it?

15     A    I sent it on April 6th, 2022.

16     Q    Who'd you send it to?

17     A    I sent it to Mr. Joe Press.

18     Q    And calling your attention to the first sentence

19 of this letter, why did you send this letter to Joe Press?

20     A    I sent this letter to -- as noted here, to provide

21 notice that we wish to acquire the -- USI's leasehold

22 property interest at Union Station and, two, to make that

23 offer, convey the offer.

24     Q    At the time the letter was sent, April 6th, 2022,

25 who did Amtrak understand the owner of the property interest

1    to be?

2        A    We understood that to be USI.

3        Q    Not Kookmin Bank?

4        A    That's correct, not Kookmin Bank.

5        Q    So why didn't you send this letter to Kookmin?

6        A    We extended it to the owner, and that's who we

7    needed to negotiate with for the -- for -- for acquiring the

8    property.

9        Q    Could you describe the offer that Amtrak made to

10   USI to acquire the leasehold interest?

11       A    Yes.

12            As it says a little further down in the offer

13   letter, it was an offer to acquire the subject property

14   interest and free and clear of all taxes, assessments,

15   liens, encumbrances, or claims, and it was for $250 million.

16       Q    Why that amount?

17       A    $250 million was the valuation that we had

18   obtained through the appraisal that we had obtained.

19       Q    And that's the Cushman appraisal that was

20   introduced into evidence?

21       A    That is correct.

22       Q    Now, there's liens on the property.  What was

23   Amtrak's understanding as to whether the liens were more or

24   less than 250 million?

25       A    Our understanding was that the liens were more

1  than 250 million.

2  Q    So why not offer the amounts of the lien?

3  A    We needed to -- we were looking to acquire the

4  actual property interest, the leasehold, and so we offered

5  the value of the leasehold.

6  Q    If the offer letter was sent on April 6th, '22 --

7  April 6th, 2022, we're 16 months later.  Has -- at any point

8  in those 16 months, did USI accept Amtrak's offer?

9  A    No.

10  Q    I'm going to ask that you turn to Joint Exhibit 7;

11  which is in evidence.  And could you identify for the

12  record, Mr. Newman, what that document is.

13  A    Yes.  This document is an email string that starts

14  with my email to convey the offer to Mr. Press at USI, and

15  then our back-and-forth on -- that followed that.

16  Q    Let's go to the first email dated April 6th, 2022,

17  in that string.

18       It says.  In the second sentence, "I look forward

19  to your reply."

20       You're writing to Mr. Press?

21  A    That is correct.

22  Q    Why did you include that, "I look forward to your

23  reply" language?

24  A    Because I was looking forward to his reply so that

25  we could move forward with -- on advancing negotiations.

1      Q    And you attached the offer letter to that email?

2      A    I did.

3      Q    And what happened after that?

4      A    The next day, I received an email, and it's -- so

5 April 7th, that's in the email string.

6          So I received an email from Mr. Press saying, "Let

7 me know when you're available for a call."

8      Q    And what did -- did a call occur?

9      A    It did.

10     Q    Could you describe that call.

11     A    That was a relatively brief call.  And in the

12 call, Mr. Press indicated that we should try to set up a

13 meeting with Mr. Ashkenazy.

14     Q    Now, there was emails going back and forth on

15 April 7th and 8th, correct?

16     A    That's right.

17     Q    And how quickly during the 7th and 8th was

18 Mr. Press responding to you?

19     A    Very quickly.

20     Q    Let's turn to the last email, the one on

21 April 9th, 2022.

22          First of all, what day of the week is that?

23     A    April 9th is a Saturday.

24     Q    And what time did you send this email?

25     A    I sent it at 12:20 a.m.

1    Q    Why were you sending it then?

2    A    Well, the previous email I'd received from

3 Mr. Press was earlier, late on Friday, so I wanted to get

4 back to him quickly because, as noted, we're interested in

5 trying to get a meeting set up at the beginning of the

6 following week on Monday or Tuesday.

7    Q    And what were you requesting in that email?

8    A    Looking to set up a call, either Teams or Zoom.

9    Q    Can and when did you suggest that such a call

10 occur?

11    A    As the letter states, on Monday or Tuesday.

12    Q    What was the response to your April 9th, 2022

13 email?

14    A    I did not receive a response to the email.

15    Q    Not on Monday, Tuesday, Wednesday, Thursday,

16 anytime did you receive a response?

17    A    No, I did not receive a response.

18    Q    Was there any follow-up at all from USI to your

19 April 9th email?

20    A    There was not.

21    Q    Now, let's go back to the April 6th letter, and

22 I'd ask to go to the second sentence of the second page.

23         And it says, "If, however, USI wishes to provide

24 additional information to Amtrak related to the offer and/or

25 acquisition, please send such information to Amtrak

1    immediately."

2           When, if at all, did USI provide any additional

3    information in April 2022?

4       A    We did not receive any additional information.

5       Q    When, if at all, did USI advise you that it needed

6    additional time to provide information?

7       A    USI did not advise us that they needed more time.

8       Q    When, if at all, did USI advise you that it needed

9    additional time to make a counteroffer?

10      A    USI did not advise us they needed more time to

11   make the counteroffer.

12      Q    When, if at all, did USI advise you that Amtrak

13   needed to speak to the lender?

14      A    USI did not advise us that we needed to speak to

15   the lender.

16      Q    When did Joe Press or anyone at USI said you had

17   to negotiate with Kookmin?

18      A    Neither Joe nor anyone else at USI told us that we

19   should negotiate with Kookmin.

20      Q    I want to go back and turn the clock back to

21   January of 2022.  And I'd ask that you look at Plaintiff's

22   Exhibit No. 3, and identify what it is.  And it's up on the

23   screen if you prefer to look at that.

24      A    Yes.  This is a letter from Dan Sporik, who's on

25   my team, to Mr. Press.

1    Q    And what was the purpose of it?

2    A    The purpose was -- as the document says, was to

3    advise USI that Amtrak was in the process of obtaining a

4    valuation appraisal, and that as part of the appraisal, we

5    were having to have the appraiser conduct an on-site

6    inspection upcoming in a few days later.

7         And so besides advising Mr. Press of that, also

8    inviting Mr. Press or -- to -- or a representative to join

9    us -- join on the appraisal.

10        MS. LAMBERT:  Move the admission of --

11        THE WITNESS:  Inspection, sorry.

12        MS. LAMBERT:  -- Plaintiff's 3.

13        MR. KIERNAN:  No objection.

14        THE COURT:  Plaintiff's 3 will be admitted.

15                              (Plaintiff's Exhibit 3
                               received into evidence.)

16

17        THE COURT:  Can I ask you to just blow it up

18    because I'm having trouble reading it.  Thanks.

19        MS. LAMBERT:  So, I'm going to go to the first

20    paragraph.

21    BY MS. LAMBERT:

22        Q    And what did Amtrak advise you aside the first

23    paragraph.  Is it the language that is on the screen?

24        A    Oh, I think that's the first paragraph.

25    I can't -- now that it's blown up, I can't see what the

1    actual first paragraph is, but, yes.

2        Q    But it advised the -- USI that you were going to

3    have John Ferrell conduct an on-site inspection

4    on January31, 2022?

5        A    That is correct.

6        Q    Okay.

7             Could you go to the second paragraph, please.

8             And is this where you said that Amtrak wanted to

9    let you know what was happening and provide you or your

10   designee the opportunity to accompany the appraiser during

11   the inspection and to let you know, or let Amtrak know?

12       A    Well, this is where -- it's not where I, and this

13   letter was from Mr. Sporik, but this is where Amtrak was

14   advising them that we were inviting USI to join us.

15       Q    Did Amtrak receive a response to this letter?

16       A    We did receive a response.

17       Q    Put on Exhibit 4, Plaintiff's Exhibit 4, to the

18   stand.

19            Is this the response to that letter?

20       A    Yes, it is.

21       Q    I would move the admission of Exhibit --

22   Plaintiff's Exhibit 4.

23            MR. KIERNAN:  No objection, Your Honor.

24            THE COURT:  Plaintiff's 4 will be admitted.

25            MS. LAMBERT:  I ask that the second paragraph be

1    highlighted and shown.

2                                        (Plaintiff's Exhibit 4
                                        received into evidence.)
3

4    BY MS. LAMBERT:

5        Q    In this letter, was Amtrak being advised by USI's

6    lawyer, David Ross, the following:  Amtrak has no right to

7    conduct an on-site inspection or valuation appraisal of

8    property interests of USI as a tenant or otherwise.

9            Is that one of the things they told you?

10       A    Yes, it is.

11       Q    And they said that they demanded that Amtrak

12   refrain from conducting an inspection and ceasing and

13   desisting from obtaining a valuation.  Did they tell Amtrak

14   that?

15       A    That is correct.

16       Q    And did they say -- did Amtrak go ahead and get an

17   appraisal?

18       A    Yes, we did.

19       Q    How did this impact your thinking about whether or

20   not Amtrak would be able to acquire the property by

21   negotiations?

22       A    Well, this was a pretty clear indication that USI

23   was not interested in having Amtrak acquire the property.

24       Q    That's what you thought?

25       A    Yes.

1     Q    And what was Amtrak's understanding in April as to

2 what Kookmin wanted to do with the property?

3     A    Well, as of April, you know, we -- our

4 understanding was that Kookmin was looking to potentially

5 find partners, develop the property, and, you know,

6 eventually get a return on their investment in the property.

7     Q    And in April 6th of 2022, what was Amtrak

8 understanding as to whether USI or Kookmin was in control of

9 the property?

10     A    Our understanding was that USI -- well, there was

11 some, you know, lack of clarity. Our understanding was that

12 USI was the owner.

13          But certainly, you know, there were -- you know,

14 as I said, lack of clarity as to who was really in control.

15     Q    When this suit was filed in early April, mid April

16 of 2022, what was your view, you personally, as to whether

17 further negotiations would be successful or futile with USI?

18     A    My view was that they would be futile.

19     Q    Why?

20     A    Well, we had, you know, obviously already had

21 indicated our interests. USI was aware that we had been

22 obtaining an appraisal several months before. USI had tried

23 to tell us we couldn't even do that.

24          And then when we had made the offer after -- you

25 know, after my last note to Mr. Press, we had received no

1   response to the note.

2       Q    Are you familiar with Mr. Rebibo?

3       A    I am.

4       Q    Who is he?

5       A    Mr. Rebibo is a principal of Rexmark.

6       Q    And that's Kookmin?

7       A    Representing Kookmin.

8       Q    Can you point him out?

9       A    Yes, he's on a straight line behind you.

10      Q    Now, how many meetings have you --

11           THE COURT:  Let the record reflect an in-court

12  identification.

13  BY MS. LAMBERT:

14      Q    All right.

15           THE COURT:  You know how many civil litigators

16  would get that joke, but anyway.

17           MS. LAMBERT:  We have to be civil.

18  BY LEFT SPEAKER:

19      Q    How many meetings, whether virtual or in-person,

20  have you had with Mr. Rebibo since the start of this

21  litigation on April 14, 2022?

22      A    Since the start of litigation, I think personally

23  I've had about nine, plus a few phone calls.

24      Q    And what was the purpose of those meetings?

25      A    To see if we could reach an agreement for

1    acquisition of the property.

2              MS. LAMBERT:  Your Honor, I would move

3    Plaintiff's 6 -- 5 and 6, which are just status reports that

4    reflect the number of times that the defendants, Kookmin and

5    USI, indicate that they have met post-litigation to discuss

6    this matter.

7              MR. KIERNAN:  No objection, Your Honor.

8              THE COURT:  5 and 6 will be admitted.

9                              (Plaintiff's Exhibit 5 and 6
                                  received into evidence.)
10

11   BY MS. LAMBERT:

12        Q    What was the result of those meetings?

13        A    We were not able to reach agreement.

14        Q    Have you come to an agreement as to terms?

15        A    We have not come to agreement on terms.

16        Q    How about price?

17        A    And we have not come to agreement on price.

18             MS. LAMBERT:  No further questions, Your Honor.

19             THE COURT:  All right.  Mr. Kiernan.

20             MR. KIERNAN:  This here should come with

21   bookshelves.

22             THE COURT:  That's why we have electronic

23   courtrooms now, Mr. Kiernan.

24                          -  -  -

25                     CROSS-EXAMINATION

1   BY MR. KIERNAN:

2       Q    Mr. Newman, good afternoon.  Nice to see you

3   again, sir.

4       A    Good afternoon.

5       Q    A couple of questions.

6            Could you pull back up Joint Exhibit 8 that

7   Ms. Lambert just asking you about, the offer letter.

8            And you'll confirm for us that this was the only

9   offer that Amtrak made prior to filing this lawsuit to

10  acquire the leasehold interests, correct?

11      A    This was the only offer we had made to USI.  We

12  had attempted to acquire the leasehold interests earlier

13  before the first auctions were scheduled.

14      Q    You attempted to acquire the debt position,

15  correct?

16      A    Well, we were looking to acquire the leasehold.

17      Q    From whom?

18      A    It would have been through -- we had made an offer

19  to SL Green, who was the special server for the senior debt.

20      Q    Can you turn to Plaintiff's Exhibit 2, please.

21           Put the first page up.

22           THE COURT:  Mr. Kiernan, would you just remind me,

23  SL Green, was that the -- from whom Kookmin bought the

24  senior note?

25           MR. KIERNAN:  Not at this time.  That was later.

1    They had the senior mortgages.

2               THE COURT:  Right.

3               And then Kookmin bought them out?

4               MR. KIERNAN:  Later on, yep.

5               THE COURT:  Okay.

6               THE WITNESS:  I'm sorry, this was exhibit which

7    one?

8    BY MR. KIERNAN:

9        Q    Plaintiff's Exhibit 2, so it's in one of the

10   skinnier volumes there.

11              And would you identify for us, this is a letter

12   that you sent to SL -- a representative of SL Green in

13   connection with an offer to acquire the debt position that

14   SL Green had?

15       A    Well, as it says on the document, it's an offer to

16   purchase the Union Station Investco leasehold interest in

17   Washington Union Station.

18       Q    Once SL Green had acquired it?

19       A    That's correct.

20       Q    Is that a better way to put it?

21       A    That's correct.

22       Q    Okay.

23              MR. KIERNAN:  Your Honor, move the admission of

24   Plaintiff's 2?

25              THE COURT:  Any objection, Ms. Lambert?

1          MS. LAMBERT:  No objection.

2          THE COURT:  All right.  Plaintiff's 2 will be

3    admitted.

4                                    (Plaintiff's Exhibit 2
                                     received into evidence.)
5

6    BY MR. KIERNAN:

7          Q    And in this letter, Mr. Newman, Amtrak offered to

8    pay SL Green $300 million to acquire the leasehold interest,

9    correct?

10         A    That is correct.

11         Q    And that's in December of 2021?

12         A    That is correct.

13         Q    Now, there were certain conditions in the offer,

14   correct, including that SL Green had to successfully

15   foreclose, right, and then you would buy it from them once

16   they foreclose, right?

17         A    Either to foreclose or to credit bid at auction

18   and obtain it.

19              Put for them to obtain the leasehold interests.

20         Q    And so essentially the offer from Amtrak is,

21   SL Green, if you can get control of this position,

22   representing the leasehold interests ultimately, we'll pay

23   you $300 million?

24         A    That is correct.

25         Q    And SL Green did not accept that offer, right?

1      A     That is correct.

2      Q     And it's your understanding that they didn't

3   accept the offer because it was an amount that was less than

4   the obligation they had outstanding?

5            MS. LAMBERT:  Objection, Your Honor.

6            THE COURT:  This is a -- it's an evidentiary

7   hearing.  I mean, it's a loose hearing.  I know it's

8   hearsay, but he can provide his impressions.

9            Go ahead, sir.

10           THE WITNESS:  If they -- what I know is that they

11   didn't accept the offer, I think because they had hoped to

12   get more.

13   BY MR. KIERNAN:

14     Q     So when you sent Exhibit 8 to USI a couple of

15   months after Plaintiff's Exhibit 2 -- Joint Exhibit A,

16   excuse me, that was in an amount that was $50 million less

17   than had just been turned down by SL Green a few months

18   earlier, right?

19     A     That's correct.

20           We had obtained our valuation appraisal

21   subsequently.

22     Q     The Cushman & Wakefield appraisal?

23     A     That's correct.

24     Q     Have you ever read that appraisal?

25     A     I have.

1     Q   And that's the appraisal referenced in your

2  letter, right?

3     A   That is correct.

4     Q   In Footnote 2, right?

5     A   I'm sorry?

6     Q   In Footnote 2 of your letter references that same

7  appraisal, right?

8          I'm sorry, Joint Exhibit 8.

9     A   It does.

10    Q   Now, after you sent the offer letter to Mr. Press,

11  who was then the representative of USI, you had some emails

12  back and forth with him.  That's Joint Exhibit 7?

13    A   That is correct.

14    Q   Right.

15         And let me -- Ms. Lambert talked to you about a

16  couple of them, but let me direct your attention to

17  something else.

18         First of all, Mr. Press responded to your

19  letter -- you sent it, it says here, at 1:42 on the 6th, and

20  he responded by a little after 10:00 on the next morning,

21  right?

22    A   That is correct.

23    Q   Prompt response?

24    A   Yes.

25    Q   Okay.

1          And then there's some emails where you go back and

2     forth about when you can meet or talk.

3          And let me direct your attention, it's the first

4     page of Joint Exhibit 7.  On the bottom, there's a Bates

5     number, 15460.

6          And I'll do this.  I'm pointing to the email that

7     starts here because there's no real text, but it's April 7th

8     at 4:00 p.m.

9          The text is actually on this page here, right?

10          And you say to Mr. Press, "Amtrak would prefer

11     that the meeting be a Teams or Zoom meeting so that it can

12     occur within the time frame indicated in our offer, as time

13     is of the essence, and we will need a counteroffer from

14     U.S.A. [sic] prior to the meeting so that we're able to have

15     a meaningful discussion and understand USI's position,"

16     right?

17          So let me talk about those two elements.

18          Number one, you say in this, "Time is of the

19     essence," a phrase that's not in your offer letter, right?

20     A     I'd have to look back at the offer letter, but

21     I don't --

22     Q     Sure, it's Exhibit 8.

23     A     -- I don't think it was in there.

24     Q     Right.

25          And -- and specifically, if I can just jump ahead

1    for a second, the next email above that, Mr. Press says to

2    you directly, "What is the urgency here on timing," right?

3    He asked you that question?

4        A    He did.

5        Q    And you never sent him an answer to that question,

6    did you?

7        A    I think the -- I mean, the answer to the question

8    was, we had put an offer out that had -- and we did not want

9    to leave an offer out on -- you know, for a long time.  We

10   had the offer out to USI, and it said that it would be -- it

11   was valid for the -- until the 13th.

12           And so we were very anxious to get together and be

13   able to move forward, and -- because we were very concerned

14   about the status of Washington Union Station, as you've

15   heard us talk about, our second-busiest station, a very

16   critical part of our network, and so we were very concerned

17   about what was -- what the status was, the lack of clarity,

18   and so we wanted to get moving.

19       Q    And the answer to my question was, you never

20   responded to Mr. Press' direct question, "What is the

21   urgency of the timing," right?

22       A    I did not provide a specific answer to that.

23       Q    You didn't provide a general answer to that

24   either, did you?

25       A    Other than that we obviously were anxious to meet.

1      Q      Then let me go back to your email where you said,

2   "We will need a counteroffer prior to the meeting."

3              That's also not something that was in your letter

4   of 24 hours earlier, right?

5      A      We had not specifically asked -- we had not asked

6   for a counter in the letter.

7      Q      In fact, your email says, "A counteroffer is a

8   condition for us even having a meeting," right?

9      A      It says, "We'll need a counteroffer."  We were

10  looking to be able to move things forward, and so having a

11  counteroffer would definitely be able to let us move

12  forward.

13     Q      Having a meeting would allow you to move forward,

14  too, wouldn't it, short of a counteroffer?

15     A      We were very anxious to have the meeting and were

16  ready to do it on Monday or Tuesday.

17     Q      If, if you got a counteroffer?

18     A      Mr. Press could have sent me back a note saying,

19  like, Hey, we're not ready with a counteroffer but let's

20  meet.  We were ready to meet.

21     Q      When you sent the offer letter to USI, you did not

22  send to USI any of the backup, the appraisal, any of the

23  studies that had been done, any of the board minutes, any of

24  the workup that Amtrak had done in support of its valuation

25  conclusion, right?

1      A     We did not include all that with the offer letter.

2      Q     You didn't include any of it?

3      A     No.  And that was -- were things that we could

4  have gotten into if we had had the meeting that we were

5  trying to arrange.

6      Q     In fact, the squeezed timing on this was something

7  that Amtrak had planned on the whole time, right, to squeeze

8  the timing on this?

9      A     I would -- in terms of the squeeze, I would not

10  agree with the squeeze.

11         We had -- did not want to leave an offer out

12  for -- on a distressed asset and not knowing what could be

13  going on, for a long period of time, and we were starting

14  negotiations so that we could move forward.

15      Q     Well, the loan had been, USI's loan had been in

16  default for two years by the time you sent your letter,

17  right?

18      A     I don't know when it first went into default.

19      Q     A long time, right?

20      A     It had been in default for a while.

21      Q     Okay.

22         And so now there was a sense of urgency, time is

23  of the essence, something that might happen, that's your

24  version?

25      A     Oh, well, I mean, something might happen had --

1   that that had been the case for several months.  So

2   certainly with all of the -- you know, with both loans being

3   in default, with foreclosure auctions having been scheduled,

4   there was -- you know, a bunch of time had already

5   transpired, and we were anxious to make sure that more time

6   didn't transpire.

7        Q    And in Joint Exhibit 3, which is in, I think, the

8   same book you have open, if you would look at the page

9   that's about three pages from the end.  It's Bates stamped

10  109.  I'll put it in up here in front of you here if this is

11  easier to look at, and I will represent that this is -- this

12  was attached to the materials that management gave to the

13  Board in connection with the March meeting seeking approval

14  of the taking, right.

15       And this particular document, it is stamped

16  "Draft," refers to the Washington Union Station real estate

17  transaction project, and it's got a schedule attached to it,

18  right?  It's got duration, how long should it take, when are

19  we starting, when are we finishing, right?  Project

20  milestones.

21       Do you see all that?

22   A    Yes, I do.

23   Q    And so this was some of the material that

24  Mr. Gardner considered and that the Board considered in

25  connection with this meeting, right?

1    A    That's correct.

2    Q    Okay.

3         And if you look down here, we have "Project

4    Milestones."  Amtrak notified of foreclosure in November,

5    Board approved -- Board of Directors approval in March,

6    acquisition offer to USI, could have started as early as

7    March 30th, let's say it's finished on March 30th, Amtrak

8    files condemnation a week later.

9         So built into the schedule was that there would be

10   no more than a week between the offer to USI and filing the

11   condemnation, right?

12   A    That is a -- that's a potential schedule.

13   Q    All right.  Well, this was the schedule the Board

14   was looking at, right, that management put forward, said,

15   This is what we want to do?

16   A    It was the draft that was --

17   Q    Okay.

18   A    -- included.

19   Q    And then underneath there -- that's the project

20   milestones -- there's a little more breakdown of real estate

21   acquisition.  And you'll notice, it's a little hard to read

22   through the draft part -- acquisition offer of March 30th.

23   Negotiations with USI lasting somewhere between 24 hours and

24   five days, six days.

25         And then filing of the condemnation and depositing

1    the money.

2           Do you see that?

3      A    I see that that was a -- the potential schedule.

4    That does that mean that that was exactly what we

5    anticipated would happen.  That was a possible schedule.

6      Q    Okay.

7           And it's in italics because obviously it's

8    possible.  But this is what Amtrak was hoping to do, was

9    basically squeeze this process into as little as somewhere

10   between a day and a week?

11          MS. LAMBERT:  Objection, Your Honor.

12   BY MR. KIERNAN:

13     Q    Is that true or not true?

14          THE COURT:  It's overruled.  You can answer.

15          THE WITNESS:  What Amtrak was hoping to do was to

16   be able to acquire the leasehold interest.  And so we made

17   an offer.  We were negotiating and ready to negotiate.  As

18   long as the negotiations took, that's how long it would --

19   they would go on.  And then if we concluded that they

20   weren't going to go anywhere, then condemnation was a

21   possibility.

22   BY MR. KIERNAN:

23     Q    Let me turn your attention to something else and

24   then I'll be finished.

25          As I understand it, you have both a position with

1    Amtrak and you're also Amtrak's representative on the

2    Union Station Redevelopment Corporation, correct?

3          MS. LAMBERT:  Objection, Your Honor; beyond the

4    scope.

5          MR. KIERNAN:  It goes to the -- sorry.

6          THE COURT:  I'll allow it.  It's

7    cross-examination.  I'll see where it goes.

8          Go ahead.

9    BY MR. KIERNAN:

10         Q    Is that correct?

11         A    I am the representative, Amtrak's president on the

12   USRC board.

13         Q    So you have a dual role, one with Amtrak, which is

14   USI's tenant, and also USRC, which is USI's landlord?

15         A    That's correct.

16         Q    Okay.

17              So wearing your USRC hat for just a second,

18   when -- or let me back up.

19              Wearing your USRC hat, you were aware, weren't

20   you, that if USI was going to voluntarily sell its interest

21   to anyone, it needed the prior written consent of USRC under

22   its lease, right?  Were you aware of that?

23         MS. LAMBERT:  Objection, Your Honor.  This is

24   really getting into what USRC would require.

25         MR. KIERNAN:  Your Honor, my proffer this is in

1   the nature of the offer that was extended.

2          THE COURT:  I'll allow a little bit.

3          Go ahead.

4          MS. LAMBERT:  Objection again.

5          THE WITNESS:  I was not familiar with the -- with

6   that provision.

7   BY MR. KIERNAN:

8      Q    So this is Lender's Exhibit 17, it's copy of the

9   original lease, not with the amendments, between USRC and

10  Union Station Venture, which was the predecessor of USI.

11  And I'm putting in front of you, you can see it right up

12  here, Article 21 of the --

13         MS. LAMBERT:  Objection, Your Honor.  But he says

14  he's not aware of this document.  So now we've got a further

15  document that we're down the road.

16         THE COURT:  I thought --

17         MS. LAMBERT:  The documents are in evidence.

18         THE COURT:  Oh, I know, and he can -- if it's

19  already in evidence, he can be shown.  If he hasn't seen it,

20  he hasn't seen it.  So if the document is in evidence, it

21  can be used -- you can at least show it to him, and if he

22  hasn't seen it, he hasn't seen it.

23         So why don't you go ahead and just take a look at

24  the document on the screen there.  You can actually blow

25  that up too.  You can just turn the little knob.

1          There you go.

2     BY MR. KIERNAN:

3          Q     Is that better?  That's my highlighting, by the

4     way.

5               And the section I'm pointing to is that -- and

6     lessee in this case is USI.

7               "Lessee shall not sell, assign, or in any manner

8     transfer this sublease, or any interest therein, or the

9     estate of lessee hereunder, without the prior written

10    consent of lesser," which is USRC.

11               So --

12         A     So it has a --

13         Q     The words from this --

14         A     -- so I had -- I was not familiar -- I -- it was

15    not familiar with this at the time, and I have subsequently,

16    you know, been aware.  I have not actually spent time

17    studying the document.

18         Q     But it's fair to say, too, that wearing your USRC

19    hat, when you made the offer wearing your Amtrak hat, you

20    knew USRC had not given prior written consent to USI selling

21    its interests, right?

22         A     So as I said, I was not aware of the -- of that

23    clause, but I was aware that there had not been any action

24    to sell the interest.  There hadn't been -- you know,

25    obviously Amtrak at the time hadn't made the offer, you

1   know.  Before Amtrak made the offer, there wouldn't have

2   been any way for USRC to give approval of selling.  There

3   wasn't -- because there wasn't a sale imminent.

4        Q    One last question, and, again, I'm asking you with

5   your USRC hat on.

6             Amtrak has said, in response to Interrogatory

7   No. 1, that Amtrak was not asked by the United States, the

8   Department of Transportation, or USRC, to become the master

9   tenant at Union Station, nor did any of them invite Amtrak

10  to take over that leasehold position.

11            That's USRC's position as well, isn't it?

12       A    I think the -- I mean, the position in the

13  interrogatory is just stating what -- the facts of -- that

14  Amtrak was not asked.

15            MR. KIERNAN:  Bear with me just one second.

16            (Pause)

17            MR. KIERNAN:  I have nothing further.

18            Thank you, sir.

19            MS. LAMBERT:  Just one question.

20            MR. ROSS:  Your Honor, no questions for this

21  witness.  Thank you.

22            THE COURT:  Thank you, Counsel.

23                          - - -

24                    REDIRECT EXAMINATION

25

1   BY MS. LAMBERT:

2       Q    Did USI ever say, Slow down, wait a minute, we got

3   to go get USRC's permission before we do a deal?

4       A    No.

5            MS. LAMBERT:  Thank you.

6            THE COURT:  All right.  Mr. Newman,

7   thank you very much for your time and testimony.  You may

8   step down, sir.

9            THE WITNESS:  Thank you, Your Honor.

10           MS. LAMBERT:  Your Honor, just for housekeeping

11  purposes, I have that all plaintiff's exhibits, with

12  exception of two, are in.  Not Exhibit 7, which we are not

13  going to introduce -- well, not at this point in time.  And

14  Exhibit 9, but only as a demonstrative.  Otherwise,

15  I believe all exhibits have been admitted, and I guess we

16  want to make sure that that's the case for housekeeping.

17           THE COURT:  Okay.  I think that's -- I mean,

18  I have it -- is that consistent with what we have here?

19           Yeah, I think the defense introduced 2, so I think

20  Plaintiff's 2 is now in.

21           MS. LAMBERT:  I'm sorry, Your Honor, I didn't

22  hear you.

23           THE COURT:  Plaintiff's 2 is now in.

24           MS. LAMBERT:  I've got that --

25           THE COURT:  The defense requested that.

1          MS. LAMBERT:  -- 2 is in.

2          THE COURT:  It's an admission.

3          MS. LAMBERT:  Yes.

4          And I don't believe that the -- I've been

5     corrected by Mr. Kiernan that 8 is not in at this point in

6     time.  So that would be not 7 at this time, not 8, and 9 is

7     for demonstrative purposes only.

8          THE COURT:  Okay.

9          MS. LAMBERT:  Thank you, Your Honor.

10         THE COURT:  Thank you.

11         All right.  Mr. Scharf, Mr. Kiernan, witness.

12         MR. SCHARF:  Your Honor, before we start, can I

13    have 60 seconds to make a motion pursuant to FRCB 52(c),

14    60 seconds.

15         THE COURT:  Sure.  I'm not sure we're really in

16    the posture where that applies, but if you want to make the

17    record, sure, go ahead.

18         MR. SCHARF:  Thank you.

19         Your Honor, Amtrak hasn't met its burden to

20    establish that immediate transfer of possession is

21    necessary.  Mr. Gardner, Mr. Newman, even when supplemented

22    by all the evidence, fails to demonstrate any of Amtrak's

23    feigned immediacy.

24         None of the projects are slated for immediate

25    construction to require the transfer of possession now.

1          The Amtrak sublease provides Amtrak with the

2    ability to move forward with the projects without hindrance,

3    and importantly, Amtrak has not established this prefiling

4    requirements under the statute.

5          In particular, as Mr. Kiernan just read, Amtrak

6    can invoke 49 U.S.C. 24311(a)(1)(A) to condemn the leasehold

7    interest, but Amtrak doesn't have the statutory power to

8    condemn a leasehold interest on federally owned property

9    where the United States created the leasehold interest.

10         And the United States expressly selected USI's

11   predecessor in interest to hold the leasehold position that

12   Amtrak now wants to take.  Amtrak cannot countermand and

13   doesn't have the unilateral authority to countermand the

14   decision of the United States regarding the management of

15   federal property.

16         THE COURT:  Where does that come from?

17         MR. SCHARF:  That comes straight out of the

18   Department of Transportation lease with USRC, which

19   specifically designates that the predecessor in interest to

20   USI shall be the one that does all of the actions, and that

21   Amtrak and USRC have specific responsibilities as it relates

22   to Amtrak.  But there -- the -- expressly in the DOT

23   United States lease with USRC is a specific party and an

24   attachment that says this is the lease that has to be

25   entered into.

1          So this is, in essence, a countermanding of

2   congressional intent and the grant by the United States of a

3   required leasehold interest which designates USI to hold

4   this leasehold interest, which Amtrak, frankly, just doesn't

5   have the authority to take unilaterally.

6          THE COURT:  I guess I don't quite -- maybe I'm

7   confused about what you're subjecting.

8          MR. SCHARF:  Sure.

9          THE COURT:  There is a lease -- or there is an

10  interest, and I can't remember whether it's a leasehold

11  interest -- that USRC holds, correct?

12         MR. SCHARF:  Yes.  And in that leasehold interest

13  it specifically designates USI to hold and operate and

14  manage the leasehold interest, so it -- United States lease

15  actually requires that USRC sublease the station, the

16  leasehold interest, to USI, and specifically designates who

17  is responsible for conduct and activity at the station even

18  as it relates to Amtrak.

19         THE COURT:  Okay.  That's the first I'm hearing of

20  that, but okay.

21         MR. SCHARF:  It was in our -- it was in our

22  original answer, and Your Honor asked me a question about it

23  at one of the hearings, and you said, Mr. Scharf, is that

24  your position?  And you should know what your position is

25  by now.

1      THE COURT:  No.  I -- well, I actually remember.

2  That wasn't about the lease, that was about the statute.

3      MR. SCHARF:  But we said the statute couldn't

4  apply to this particular leasehold interest.

5      THE COURT:  Right.  But you're now arguing about a

6  lease term that I don't recall being raised, but you've

7  raised it now, but that's helpful.

8      No, because I remember asking whether it's your

9  position that the eminent domain can only be done under

10  24311(a)(1)(A), and you sort of hedged, and I think that's

11  what --

12      MR. SCHARF:  Yes, and that is exactly what I'm

13  saying, Your Honor, because it wasn't done in the manner --

14  and this is why Mr. Kiernan read in that interrogatory

15  response, that Amtrak has acknowledged that it acted in

16  accordance with its regular authority, not with special

17  authority that was granted with respect to Washington

18  Union Station, which --

19      THE COURT:  So what do I make of the fact that the

20  Secretary of Transportation voted in favor of the

21  condemnation?

22      MR. SCHARF:  That Amtrak didn't follow the

23  statutory authority that required something to be done

24  differently, because the Secretary of Transportation has

25  always been on the Amtrak Board.

1          THE COURT:  No, no, but what would they have --

2    according to -- what do you understand that they should have

3    done differently?  They would have, what, had to have the --

4    how could that -- help me understand how the USRC lease

5    could have been re-negotiated to make Amtrak the lessee.

6          MR. SCHARF:  Frankly, I think it would have

7    required congressional intent on the Secretary of

8    Transportation, because the Secretary --

9          THE COURT:  I'm sorry, congressional intent?

10         MR. SCHARF:  I'm sorry, I misspoke.

11         It would have required either congressional action

12   or the Secretary of Transportation to take the lease that it

13   entered into with USRC and break that lease and say, The

14   lease obligations that USRC has to enter into a lease and

15   maintain a lease with USI is no longer valid.  And that

16   didn't happen -- that's not what happened here.

17         THE COURT:  I know it didn't happen.

18         I guess the question is -- I'm not sure how that

19   squares with a statute that permits Amtrak to exercise

20   condemnation of a property --

21         MR. SCHARF:  Well, Your Honor, I --

22         THE COURT:  -- including the leasehold, and now,

23   you know, you're right, it doesn't say anything about what

24   might be considered a derivatively federal leasehold because

25   I think, as I understand, USRC is not a federal entity.  Or

1    is it?

2              MR. SCHARF:  It is.

3              THE COURT:  It is.  Okay.  I thought it was

4    something that established under the --

5              MR. SCHARF:  It was established under the Federal

6    Railway Act of Congress.

7              THE COURT:  Right.  But as an entity, is it a

8    federal entity or is it -- what is it?

9              MR. SCHARF:  It's a congressionally chartered

10   not-for-profit, Your Honor.  That's from -- if I can help

11   Your Honor here, I think -- nobody is arguing that

12   Union Station is not necessary for city rail passenger

13   transportation.  That's what it's for.  I think we can

14   probably all agree that the station as a property is

15   necessary for passenger rail.

16             But the inquiry here is whether Amtrak's

17   acquisition of the lease position, which the United States

18   directed be awarded to USI's predecessor, is necessary.  And

19   for decades, the station's operation for inter-city rail

20   have been premised on the lease structure.

21             THE COURT:  So I guess I'm just confused, because

22   as I said, this is the first time I think this argument has

23   been raised, which is that this federal statute that permits

24   condemnation is somehow subsidiary to a lease?  In other

25   words, the lease interest that was granted to USI somehow

1  trumps a federal statute that allows Amtrak to condemn the

2  lease?

3  MR. SCHARF:  It just requires if it's going to

4  happen, to go about it in a different way, which didn't

5  happen here.

6  THE COURT:  But tell me what that way should have

7  been, in your estimation.

8  MR. SCHARF:  It would have been required to go to

9  the Secretary of Transportation to provide that the lease of

10  October 31st, 1985, between the United States of America and

11  Union Station Redevelopment Corporation be canceled; in

12  particular, because in Article 7 of that lease,

13  Article 7.1(c), it says, "USRC shall enter into the USV

14  sublease" -- USV is the predecessor to USI -- "with USV

15  substantially in the form attached hereto as Exhibit J."

16  THE COURT:  So what do I make of the fact that UCI

17  [sic] isn't named anywhere in the lease?

18  I mean, it seems like the lease was modified in

19  some way to have a different property holder, and the lease

20  itself was never changed.

21  MR. SCHARF:  USI is indisputably --

22  THE COURT:  Is the successor in interest.

23  But, again, I mean, you're suggesting that

24  something needed to happen to the original lease in order

25  for USI -- or UCI to become the leaseholder or at least --

1    or Amtrak would become the leaseholder.  So why wasn't UCI

2    then substituted in the lease with USRC?

3              MR. SCHARF:  Your Honor, I believe subsequent

4    lease amendments substituted USI in place of USV, and all

5    the interests continued, including --

6              THE COURT:  You believe or know?

7              MR. SCHARF:  I -- that is -- that is what

8    happened, Your Honor.

9              THE COURT:  Okay.

10             MR. SCHARF:  And importantly, in Section F, it

11   says, "Consistent with Subsection B of the section, USRC

12   shall" --

13             THE COURT:  So is it your view then that USRC

14   would have to authorize the eminent domain by its agreement

15   to break the lease and substitute Amtrak in as the lessee?

16             MR. SCHARF:  At a minimum, the Secretary of

17   Transportation and USRC would be required to break the

18   sublease agreement between the United States and USRC,

19   because that lease is the enabling of USI's --

20             THE COURT:  They have to break the lease between

21   the United States and USRC?

22             MR. SCHARF:  Well, the lease -- it was set up

23   originally between the United States of America and Union

24   Station Redevelopment Corporation.

25             THE COURT:  And that's the lease that requires --

1   or that names USI or USI's predecessor as the sublessee?

2         MR. SCHARF:  That's correct, Your Honor, and says

3   that a lease in substantially the same form needs to be

4   entered into and granted to USI's predecessor.

5         And that lease also provides that USRC shall

6   construct the improvements needed for the new Amtrak

7   passenger station contemplated in the Amtrak train station

8   lease.  The Amtrak train station lease was provided for.

9   And for Amtrak offices contemplated in the Amtrak office

10   lease.

11         So what we have here is a usurpation of what

12   Congress authorized, which was the United States of America,

13   now DOT, to be in a leasehold position, which allocated the

14   responsibility among the parties, and the reason they're

15   looking -- you heard them say why they want to break the

16   lease with USI is because they want to do different things

17   in the passenger train station lease and for office space.

18         Well, that's USRC's issue.  You know, we haven't

19   heard from USRC, but -- and they're not in this case.

20         But I don't know how they can usurp this lease, as

21   Mr. Gardner described they intend to usurp the lease, and

22   that's the basis of our motion for directed verdict.

23         THE COURT:  Well, I guess we spent a lot of time

24   in discovery and here at this hearing for not a lot of

25   purpose if that's been your argument all long.

1          MR. SCHARF:  Well, it --

2          THE COURT:  I mean, we've spent months and months

3     and months in discovery, and I'm not saying the argument is

4     forfeited, but we've sure spent a lot of time and effort in

5     discovery for an argument that didn't require any discovery.

6          MR. SCHARF:  Well, I think Your Honor --

7          THE COURT:  If that's right.  I mean, I know I'm

8     right about this.

9          I mean, this is a straight legal argument about

10    the proper execution of a -- based upon a lease.  It didn't

11    require months of discovery, but we took it anyway.  That's

12    okay.  That's fine, I get it.

13         Ms. Lambert.

14         MS. LAMBERT:  Thank you, Your Honor.

15         Just I'll start with, as indicated in the

16    complaint, the Department of Transportation and USRC were

17    both notified of the filing and complaint, and neither chose

18    to intervene in this matter.

19         One, as a legal --

20         THE COURT:  No, but I mean, if he's right, the

21    fact that they haven't intervened, they can't consent by

22    silence.

23         MS. LAMBERT:  Well, let me just say that I don't

24    think this argument is raised in their answer; certainly not

25    explicitly, they're kind of slipping and sliding.

1          But I would ask the Court to take time, I do not

2     see it in there.

3          Secondly --

4          THE COURT:  I don't remember it, that it's in

5     there.  This is the first time that I've -- again, I've had

6     a lot happen between January of last year and today, and

7     that's just not an argument I remember -- I guess it was

8     March -- ever hearing from them.

9          MS. LAMBERT:  I don't remember it either,

10    Your Honor, so I think -- again, I'm sitting there reading

11    all the transcripts in preparation for this hearing and --

12         THE COURT:  So was I, and I don't remember this

13    argument.

14         MS. LAMBERT:  Yes.

15         The second thing, I think it's very ironic that

16    USI is here saying that USV's interests can't be transferred

17    to somebody else, because clearly it can be; otherwise, they

18    wouldn't be here.  So --

19         THE COURT:  Well, that was my point, but he said

20    the lease was amended.

21         MS. LAMBERT:  Actually, if you look at it, the

22    amendment doesn't have the Federal Government's consent that

23    I see.  It's in an -- in the exhibit.

24         The third issue is the -- what you -- Your Honor

25    said, the statute preempts leases.  But the last point is

each and every one of these leases have a provision in it
about condemnation.  The U.S. to USRC, the USRC to USV,
frankly, the USV to Amtrak, they all have condemnation
provisions.

What he's basically saying is that nobody can
exercise condemnation rights.  The parties in each and every
one of those leases specifically understood that there was a
condemnation.

And so for all those reasons, Your Honor, we find
that this argument --

THE COURT:  Do I have those condemnation, and are
those leases in evidence now?

MS. LAMBERT:  They are.  The ones that are not
objected to.

But if you look at like -- I'd ask you to look at
Lender's Exhibit 17, which is the -- I believe the DOT --
the United States Government to Am-- to USRC lease.  And if
you look at Section 19, it specifically talks about
condemnation.

So if they're saying that it would take an act of
Congress for somebody to do a condemnation in this matter,
it's inconsistent with the leases.  And there's certainly
nothing in the congressional Union Station Redevelopment
Corp. Act, any other act, which they've pointed to that says
you can't do that.

1          THE COURT:  Can I ask you, the sublease between --

2  so this is the lease terms that govern USI?

3          MS. LAMBERT:  There's --

4          THE COURT:  As a successor in interest.

5          MS. LAMBERT:  May I ask my co-counsel?

6          (Pause)

7          MS. LAMBERT:  So if you look at -- that's the

8  US- --

9          MR. SCHARF:  It's Lender's 17 -- 19, Your Honor.

10          MS. LAMBERT:  It's the original USI lease that

11  goes -- and I'm sorry, Your Honor, I said it was the DOT.

12  The DOT is in the binder.  I just grabbed one to show that

13  they're -- each and every one has condemnation.  I know

14  because I looked at all of them.

15          THE COURT:  But 17 is the lease that you are

16  seeking to condemn?

17          MS. LAMBERT:  That's correct.

18          THE COURT:  Right?  And I'll take a closer look

19  at it.

20          MS. LAMBERT:  And, Your Honor --

21          THE COURT:  What do I make of the fact that it

22  says that, "Upon condemnation, then this sublease shall

23  expire and terminate upon date when title vests in the

24  condemning authority"?

25          MS. LAMBERT:  Your Honor --

1          THE COURT:  I thought we were all in agreement

2    that title had transferred to Amtrak.

3          MS. LAMBERT:  It does transfer to Amtrak upon

4    condemnation.  And that -- that is not involved in this

5    proceeding.

6          Sometimes there's -- what I know, and I'm not a

7    corporate lawyer, that there are provisions into leases that

8    say, how do you divide moneys up, who gets what, those types

9    of situations, whether obligations continues among each

10   other's or not, and I think that's what that is addressing.

11         THE COURT:  I might read this to say that the bank

12   doesn't have to pay rent anymore, but maybe they read it

13   differently, I don't know.

14         MS. LAMBERT:  You know, but each -- I think that

15   the point of this is they say condemnation is not allowable.

16   It wasn't even contemplated, there's no way in each of the

17   leases, and the exhibits that they produce talk about

18   condemnation.

19         And I finally -- I think I said it implicitly, but

20   let me be explicit.  Since they didn't raise it in their

21   answer under Rule 71.1E3, arguments not raised in the answer

22   are waived.

23         THE COURT:  Okay.  Let me go ahead and take a

24   break.  It's now 3:00.  We'll take 15 minutes, and then

25   we'll return at 3:15.  Thank you, everyone.

1                  COURTROOM DEPUTY:  All rise.

2                  (Recess from 3:00 p.m. to 3:16 p.m.)

3                  COURTROOM DEPUTY:  All rise.  This Honorable Court

4      is again in session.  Be seated and come to order.

5                  THE COURT:  Please be seated.  Thank you,

6      everybody.

7                  All right.  Are we ready to call your first

8      witness on behalf of the bank?

9                  MR. SCHARF:  Yes, Your Honor.  We call Beverly

10     Swaim-Staley as our first witness, Your Honor.

11                 THE COURT:  Ms. Swaim-Staley, why don't you come

12     on up.

13                 COURTROOM DEPUTY:  Before you have a seat, can you

14     please raise your right hand.

15                 (Witness is placed under oath.)

16                 COURTROOM DEPUTY:  Thank you.

17                 THE COURT:  Hi, welcome.

18                 THE WITNESS:  Good afternoon.

19                 THE COURT:  Good afternoon.

20

21

22

23

24

25

```
 1                              - - -

 2     BEVERLY KAY SWAIM-STALEY, WITNESS FOR THE PLAINTIFF, SWORN

 3                        DIRECT EXAMINATION

 4                              - - -

 5     BY MR. SCHARF:

 6          Q     Good afternoon.  Can you please state your name

 7     for the record.

 8          A     Beverly Kay Swaim-Staley.

 9                B-e-v-e-r-l-y, Kay is K-a-y, Swaim, S-w-a-i-m

10     hyphen S-t-a-l-e-y.

11          Q     Were you subpoenaed to come and provide testimony

12     here today?

13          A     Yes, I was.

14          Q     Okay.

15                So thank you for coming and complying with the

16     subpoena.

17                Are you currently employed?

18          A     I'm not.  I'm mostly retired.  I do do some

19     consulting work as an independent contractor, but I do not

20     have an employer.

21          Q     What type of consulting work are you currently

22     doing?

23          A     A little bit, but mostly with regard to coaching,

24     mentoring, staff development.

25          Q     In what area?
```

1    A    Coaching, mentoring, staff development, for

2  transportation -- I mean, yeah, for transportation.

3    Q    Okay.

4         Prior to this consulting work, what did you do

5  professionally?  Where were you employed?  What positions

6  did you hold?

7    A    For the past ten years, I was the CEO and

8  president at Union Station Redevelopment Corporation here in

9  Washington, D.C.

10         Prior to that, just prior to that, I was

11  three years as the Secretary of the Maryland Department of

12  Transportation.

13         Prior to that, two years as the Deputy Secretary

14  of Transportation.

15         Previously, the Director of the Office of

16  Management and Budget in Montgomery County.

17         Prior to that, I had been at the Maryland

18  Department of Transportation serving four years as the

19  Deputy Secretary, with one year as the Executive Director at

20  BWI Thurgood Marshall Airport.

21         And I was also the chief financial officer for

22  five years.  I don't know if you want me to keep going back,

23  but prior to that, I was ten years as a budget and financial

24  analyst for the Maryland General Assembly.

25    Q    So is it fair to say that you've had most of your

1    professional career experience in transportation?

2      A    In public service, but certainly a bulk of it in

3    transportation for the last 20 years, yes.

4      Q    I'd like to focus on the time that you were CEO

5    and president of USRC.

6          Who was the most senior person there in those last

7    years that you spent there?

8      A    Well, the CEO and president is the senior person

9    reporting to a Board of Directors, of course.

10      Q    Okay.

11          And when did you leave USRC?

12      A    I left as the CEO and president last -- July 31st

13    was my last day, 2022.

14          I was asked to stay on on a contractual

15    relationship serving as treasurer for a time.

16      Q    And you mentioned reporting to a Board of

17    Directors. Who was on the USRC Board?

18      A    Officially, the USRC Board is the Secretary of

19    Transportation, usually represented by the Deputy Secretary,

20    the Mayor of the District of Columbia, represented by

21    someone that, in this case, she appoints; the President of

22    Amtrak or an appointee; the director -- the Administrator

23    for the Federal Railroad Administration or a designee, and

24    the Federal City Council Chair or a designee.

25      Q    Are you familiar with the leasing structure and

1    governance structure for Washington Union Station?

2        A    Yes, very much so.

3        Q    Can you just briefly describe that to the Court.

4        A    Yes.  It's -- the building is owned by the U.S.

5    Department of Transportation.  They have a lease.  It's a

6    Federal Railroad Administration lease with Union Station

7    Redevelopment Corporation.

8            And then it's a flow -- what's termed a

9    flow-through lease Union Station Redevelopment Corporation

10   has with USI, Union Station Investors.

11           And then that entity obviously operates the

12   station, and then they have leases with Amtrak, for example,

13   and with many vendors and others who use the station.

14       Q    Now, does the -- you called it a flow-through.  So

15   does USI have the same leasehold interest that the

16   Department of Transportation has, that is then provided to

17   USRC?

18       A    It's similar.  I'm not going to say it's exact,

19   but the lease that USRC has with FRA is very similar with

20   the lease that USRC then has with the developer.

21           THE COURT:  I'm sorry, USRC's leases is with FRA

22   and not the Department of Transportation, or is that a

23   subsidiary of the --

24           THE WITNESS:  I guess -- I assume that was set up

25   as a subsidiary of USDOT, yes.

BY MR. SCHARF:

    Q    Now, the Amtrak space that's subleased from USI, is that all of the space that USI subleases from USRC?

    A    No.  It is a portion of the space primarily in what you would know as the Amtrak concourse area.  But the retail areas, the historic, most of the facility is not leased to Amtrak.

    Q    And is that set up in the lease between the Department of Transportation, FRA, and USRC in its lease?

    A    I believe the plan back in the '80s was that a portion of the facility would be leased to Amtrak, and so those arrangements were made as part of the redevelopment in the 1980s.

    Q    Now, if Amtrak wants to complete work at the station, are there any government relations that Amtrak has to comply with that implicates USRC or FRA?

    A    There are --

    MS. HARRISON:  Objection.  I just want to make sure.  Do you mean regulations?  I think you said relations, and I just --

    MR. SCHARF:  I was trying to say regulations.  If I misspoke, thank you.

    MS. HARRISON:  Thank you.

    THE WITNESS:  I would assume you're referring to a couple of things.  Obviously the station is subject to the

1   State Historic Preservation Act, and so there are those

2   relationships and regulations.

3           And also the FRA acts as the authority having

4   jurisdiction.  In this case, they're the code reviewers,

5   rather than the District of Columbia, and so there's also a

6   very strong relationship there.

7           And so in the station, anything that would -- that

8   Amtrak would do, in addition to working with USI and USRC,

9   they would also be working with FRA and the AHJ for the FRA.

10  BY MR. SCHARF:

11      Q    Can Amtrak begin construction of capital

12  improvement projects without FRA permitting?

13      A    Not if they're in the historic station.

14      Q    And why is it that Amtrak can't begin construction

15  on projects in the historic station without FRA approval?

16      A    Well, again, FRA is the -- serves as the authority

17  having jurisdiction.  So obviously you can't begin a

18  construction project unless you have a building permit, and

19  that's the entity that's been designated by USDOT as the

20  entity that provides that.

21          THE COURT:  Just to be clear, when you say

22  "construction" with respect to the historic station, do you

23  mean interior or exterior?

24          THE WITNESS:  Interior or exterior if it's related

25  to code issues.

1          And I'm not referring to the track area, I'm

2    referring to the building.

3          THE COURT:  Right.  Okay.

4    BY MR. SCHARF:

5    Q    Now, I'd like to focus on capital projects that

6    required FRA approval, okay, for a moment.

7          During your leadership of USRC, were there

8    instances where a capital improvement project at the station

9    that was initiated by Amtrak was approved by FRA and it had

10   received a building permit but was not approved by USRC?

11   A    To my knowledge of the major projects that I'm

12   thinking of, no.  That does not mean that there were not

13   projects, there probably were.  I think, perhaps Track 22

14   and some other projects did receive those.

15         The two projects -- the two big projects that we

16   worked on for several years was the concourse renovation and

17   then the track better subbasement project.  And at least as

18   of the time I left, they had not received approvals from the

19   authority having jurisdiction.

20   Q    Now, do you recall any instances where there was a

21   capital improvement project at the station that was approved

22   by FRA where a building permit was issued but USI did not

23   approve that project?

24   A    Not that I recall, but it's possible.  You know,

25   in some cases, USI and Amtrak, as lessor and lessee, were

1 able to work together, and so long as it was in compliance

2 with USI's lease with USRC, we didn't necessarily have to

3 get involved in every single project.

4     Q    Who has the power to greenlight or redlight

5 proposed capital improvements at Washington Union Station?

6     A    Well, in accordance with the lease, obviously

7 the -- USI is the lessor, and then USRC.  And then

8 ultimately, obviously, FRA, which, again, through the AHJ,

9 authority having jurisdiction, because obviously you can't

10 start any project anywhere without the appropriate code

11 requirements and without a building permit that says your

12 design is going to meet those appropriate building code

13 requirements.

14     Q    As the senior-most leadership person at USRC

15 during your tenure there, did you have an understanding why

16 all of these stakeholders that you just described, both

17 public and private, were involved in the ownership

18 structure, as you described it?

19     A    Well, it's a very important building.  It is owned

20 by the Federal Government.  And it was -- this was the

21 way -- the structure that had been established with the

22 approval of Congress and USDOT, with these entities working

23 together, which allows for a variety of stakeholders since

24 the station obviously also serves WMATA, buses, MARC,

25 commuter rail, and it was simply the structure that had been

1   set up and has been operating since the late 1980s, where

2   you have USDOT, then FRA, USRC, the developer, Amtrak.

3       Q    Can you describe the relationship between Amtrak

4   and USRC during your time as CEO and president of USRC?

5       A    Yes.  We worked together on many, many projects

6   from signage, wayfinding, to the major projects like the

7   concourse and other major projects such as the redevelopment

8   that is planned for, you know, in the next 20 years or so.

9       Q    And what role, if any, does USI play in the

10  governance of Washington Union Station, in particular the

11  historic building?

12      A    Well, I'm not sure what you mean by not so much

13  the governance because obviously the Board is the ultimate

14  governing entity for USRC and for the historic building.

15          But USI must comply with the lease and their lease

16  obligations within that.

17      Q    Now, during -- during your tenure, do you ever

18  recall USRC sending a notice of default or a notice to cure

19  to USI for its failure to comply with its leasehold

20  obligations to USRC?

21      A    I don't recall.  That's not to say that we didn't

22  in the past 12 years, but I do not recall that we did.

23          We obviously, as we had issues, had many

24  conversations.

25          It's possible, but I don't recall ever having sent

1  a formal letter.

2      Q    And were you familiar with the USRC/USI sublease?

3      A    Yes.  It's a very large sublease, but, yes I was

4  familiar with it.

5      Q    Okay.

6           Had you heard of the Second Century program?

7      A    Yes.  And I'm sorry, that was the project I was

8  referring to a moment ago when I said a 20-year program.  I

9  could not recall what we were calling it.  But, yes, that

10 was part of the Second Century project.

11     Q    And do you recall what your understanding -- can

12 you please describe what your understanding was of the

13 Second Century program and plan.

14     A    Well, I think the Second Century was really a name

15 that we gave to a series of projects that came from a master

16 plan -- a planning effort, let's say, that was released in

17 around the 2012 time period, and it was to upgrade many of

18 the facilities within the station as part of Amtrak

19 upgrading the entire corridor and bringing the rail service

20 into the 21st century, I guess we're in, as well as also

21 planning for redevelopment in conjunction with the air

22 rights that had been sold to a local developer back in the

23 early 2000s.

24          So it consisted of several projects at the time

25 from small projects such as a new baggage claim, the

1  concourse renovation, up to a major, complete renovation

2  that includes the H Street Bridge and a complete track

3  rebuild, which -- as the ultimate project.

4        And then there were also probably some smaller

5  projects, I think, such as the police relocation, the crew

6  base relocation, that had to take place, obviously, as a

7  part of achieving this complete rehabilitation, almost a

8  rebuilding, I guess is really a better term for it.

9        Q    And did these individual projects that you've

10  described need some type of approval from FRA or DOT?

11       A    Well, they would ultimately all need a building

12  permit.

13       Q    So who would they have to go to for that?

14       A    As we were working through the projects, it was

15  decided that, again, as I said, FRA would serve as the

16  authority having jurisdiction.

17       Q    And did it require USRC to process or be involved

18  in that process at all?

19       A    Yes.  We were all involved in that process

20  together, I think it's fair to say.

21       Q    Now, have you heard of the subbasement

22  reconstruction project?

23       A    Yes.

24       Q    Was that originally part of the Second Century

25  plan?

1    A    It was not part of the plan we started in 2012

2  when I began.

3         But as part of an inspection after the earthquake

4  in 2011, the Board wisely asked USRC to do a complete

5  evaluation of the structural components of the building,

6  which they did.

7         And as part of that, it was discovered that there

8  were serious issues with the supporting structures for the

9  track bed that were located within the subbasement of

10 Washington Union Station.  I think this was in the 2013,

11 2014 time period.

12        So that became a critical project that was then

13 added as part of the work that was going to need to be done

14 to really make a whole new rail station and upgrade

15 everything.

16   Q    And was there something in particular that USRC

17 called the subbasement reconstruction project?  Did you

18 refer to it in some other way?

19   A    We referred to it as the track bed project since

20 it was replacement of the track bed.

21   Q    Okay.

22        And are you familiar also with the concourse

23 modernization project?

24   A    Yes.  That project was a project we worked on

25 extensively during my tenure.

1      Q    And can you describe to the Court what that

2  project is?

3      A    I think everyone's familiar with the existing

4  Amtrak concourse, which was built in the '80s.  I think

5  Amtrak, very wisely, wanted to upgrade and obviously update

6  that concourse.  Also, they have new trains coming in.

7  Obviously the ridership has grown tremendously.

8           So it was an effort to completely renovate almost

9  too small a description, the existing concourse so that

10  there would be large -- there would be more light, larger

11  waiting areas, just more attractive amenities, a new version

12  of an Acela lounge, larger, better, more modern bathrooms,

13  more bathrooms, and better access to the track yard.

14      Q    And when was that plan conceived to be part of the

15  Second Century plan, specifically the concourse

16  modernization project?

17      A    It was on the list of projects when I arrived in

18  2012, so I'm really not sure the sequence of when things

19  were added, but it was a major emphasis.

20      Q    And how long was the concourse modernization

21  project expected to take in number of years?

22      A    Until you have a design, you can't really be sure.

23  I think the estimated construction time was about

24  three years with the design effort of, say, two years.

25      Q    And at the time you retired, was that project

1  completed?

2      A     No, it was not.

3              THE COURT:  I'm sorry, can I ask a quick question?

4              THE WITNESS:  Sure.

5              THE COURT:  The project, the concourse

6  modernization project, to your knowledge, was that to be

7  confined to the existing footprint of the concourse, or

8  would it involve expanding beyond that footprint?

9              THE WITNESS:  It could be expanded depending upon

10 what -- the ultimate design.  There are areas, for example,

11 in that concourse, if you go there today, that are not

12 leased to Amtrak, but at certain periods of time, Amtrak

13 does have the option to lease them.

14             I'm not -- I don't recall completely.  I don't

15 think they were going to lease additional room for the new

16 concourse, but I'm not -- I don't recall.

17             There may, in fact, have been more areas that were

18 going to be part of the larger concourse.  And it was

19 difficult going to extend closer towards the tracks so

20 it would be much easier for people to get from the waiting

21 areas to the train, so it may have accomplished more, I just

22 don't remember.

23 BY MR. SCHARF:

24     Q     How much longer was it scheduled to take, meaning

25 the concourse modernization project, at the time you

1    retired?

2         A    I'm not sure where the project was at the time I

3    retired.   It was still -- to my knowledge, there -- no

4    design had been submitted for approval to the AHJ.

5         Q    And who was responsible for the submission of

6    those plans for approval?

7         A    At the time I left, the project was back in

8    Amtrak's court.

9         Q    Is there anything in the U.S. Government/USRC

10   lease, the master lease, that prevents Amtrak was moving

11   forward with the concourse modernization project?

12        A    I don't believe so.

13             The design started in 2015, and it was a

14   collaborative effort with Amtrak, USI, FRA.   The design was

15   submitted in 2018 by the designers.

16             But in the review of that design, which was

17   labeled 100 percent, the AHJ deemed it insufficient to

18   determine whether or not it was buildable, and so it was

19   rejected.

20             I mean, comments were provided, which is normal in

21   a case like this when you're reviewing design.   And the

22   Acela lounge, for example, that location was deemed to be

23   insufficient.   It didn't have a structurally sound roof.   So

24   at that point, the plan was for Amtrak to go back and finish

25   the design.

1          Subsequently then, USRC was asked to do the

2     project as a design build for a portion in time in 2020, but

3     then later, Amtrak decided to take the project back and

4     continue it on their own.

5          Q    Now, was there anything structurally in the

6     USRC/USI lease that prevented Amtrak from doing the work

7     that was contemplated back as far as 2012?

8          A    I don't believe so.  I think that we had all of --

9     everything in place, and if -- we had the capacity, I should

10    say, if we'd had the design and the agreement, the funding

11    agreements in place to do it, do the work.

12         Q    Now, did USRC monitor the progress of the

13    concourse modernization project?

14         A    Well, we were meeting with Amtrak and USI weekly.

15    We had hired a construction manager so I'm not sure about

16    monitoring.  We were really all in it together, so to speak.

17         So but at some point, FRA began monitoring the

18    project, I think, around the 20- -- late 2019, early 2020

19    time period, they began monitoring the project to, again,

20    make sure that all of us, a lot of stakeholders, a lot of

21    set things that we needed to do.  So they kept a weekly

22    tracking of who was doing what and whether or not we were

23    meeting our commitments on time.

24         Q    And when you retired, had building permits been

25    issued for the concourse modernization project?

1     A     No.

2     Q     And when you retired, what was the status of the

3 design plans that had been sent back for redesign and

4 comment back as far as back as 2018, 2019?

5     A     I honestly don't know.  I believe that the last

6 I was -- I knew of where it was, Amtrak was still

7 determining what their project delivery method would be and

8 how they were going to proceed on the project.

9     Q     And am I correct that at the time you retired in

10 July of '22, that Amtrak had not provided final designs for

11 consideration by FRA?

12     A     Not to my knowledge.

13     Q     Okay.

14     Now, you mentioned that there was tracking being

15 done of the status of the project, correct?

16     A     Federal Railroad Administration assigned a staff

17 person to do that, yes.

18     Q     And did you personally receive copies of those

19 status reports?

20     A     Yes.  Each week I had a member of the USRC staff

21 on -- they were -- they tended to be phone calls.  And so

22 obviously I went over those with the staff, and then they

23 briefed me after each of those phone calls with regard to

24 what was happening or not happening.

25     Q     And did you review those status reports with your

1  staff?

2      A    Yes, I did.

3      Q    And what was the purpose of your reviewing those

4  reports?

5      A    Well, first, to make sure that we, USRC, was on

6  schedule because we had deliverables as part of those

7  efforts as well.  And then obviously in some cases we were

8  waiting on deliverables from others, so, you know, it was

9  just part of trying to get the projects ready to go.

10          THE COURT:  I'm sorry, who prepared the status

11  reports, FRA?

12          THE WITNESS:  Federal Railroad Administration

13  prepared and maintained those, yes.

14  BY MR. SCHARF:

15      Q    I'd like to -- just for ease of reference, we have

16  Lender's 28.  I'm going to put it up, but because it's a

17  little large, Your Honor, permission to give the witness a

18  copy of it.  It's in your binder, but it's a little smaller

19  so it's 8 and-a-half by 11.

20          Can you identify Lender's Exhibit A -- 28 for

21  identification, please?

22      A    It looks like the tracking, a printed version of

23  the tracking.

24      Q    And is there a particular date on it that we can

25  use to reference and understand what the as-of date is?

1    A    It looks like this as-of date was May -- is

2  May 25th, 2022.

3    Q    And were you still leading USRC at the time of

4  this report?

5    A    I was.

6    Q    And when you -- do you recall receiving this

7  report?

8    A    I don't recall this particular report as opposed

9  to the week before or the week after, but, yes I do recall

10  seeing this report.

11    Q    Okay.

12        And at the time you received this report at this

13  particular point in time, were there any projects that were

14  awaiting USI approval?

15    A    I don't recall what had been resolved as of

16  May 2022.

17        I believe that there was at least -- there had

18  been -- there was agreement by the parties.

19        But there were some particulars with regard to the

20  back of house that USI and Amtrak were working on, so I'm --

21  I'm looking to see that here.

22        And they were completed, I understand, but I don't

23  know if they had been as of the time of this May 2022

24  report, without looking through it in detail here.

25    Q    Sure.

1          If you can please take a look at it and see if it

2    refreshes your recollection as to whether or not there were

3    any approvals that were outstanding as of the date that this

4    report was generated by FRA.

5          A    With regard to the subbasement structural

6    replacement project program, the first one here?

7          Q    Sure.

8          I mean, I would say with anything that's on this

9    tracker.

10         A    Okay.  There may be other projects in --

11         Q    Right.

12         A    There should be other projects, I should say, on

13   subsequent pages.  That's what I'm asking.

14         THE COURT:  I'm sorry, what was the question

15   again?

16         MR. SCHARF:  The question was whether looking at

17   this tracker, it indicates -- it refreshes her recollection

18   as to whether or not there were any projects that were

19   awaiting USI approval.

20         THE WITNESS:  I'm just looking at the responsible

21   parties column.

22            (Pause)

23         THE WITNESS:  Sorry.  Almost finished.

24         It looks like the USI space program complete -- it

25   appeared to have been completed three months prior to this.

1    That's the first USI one I see.

2           (Pause)

3           THE WITNESS:  No.  There appear to be only one on

4    here, and it looks like it was completed prior to May.

5    BY MR. SCHARF:

6        Q    Right.

7           And in order to be able to understand how to

8    utilize this tracker to see who was up in terms of what was

9    happening next, one would look at which column?

10       A    The responsibility party.

11       Q    Okay.

12       A    No, I did not read, obviously, in that time the

13   current actions, but I just was looking through the

14   responsible party column.

15       Q    Okay.

16          Now, I notice there are a number of items,

17   especially on the first page, that say "Hold off."

18          Do you see that?

19       A    Yes, I do.

20       Q    What does that mean?

21       A    Usually that typically meant that some other

22   action needed to be done in order to do the next action.

23   So, again, it's been a long time since I looked at this

24   document, but I'm just guessing that it's because you see

25   the four red actions needed, that those actions are needed

1   prior to continuing with the other.

2       Q    And I notice there are certain items in status

3   that are listed as not started.  What does that mean?

4       A    Those are probably also because that's

5   something -- there's a precursor project or something that

6   needs to be done in order to be ready to start the next

7   step.

8       Q    Now, can you tell from here what the actual --

9   when the actual construction of the subbasement project was

10  scheduled to begin as of the date of this report, May 25th

11  of 2022?

12      A    That would probably take me a moment to get to

13  that point.

14      Q    Sure.

15      A    There were several projects that had to happen,

16  several things that had to happen prior to that.

17           I'll start in '22.

18           I can go to the construction category.

19           THE COURT:  Is there a place you can direct her

20  to, Mr. Scharf?

21           THE WITNESS:  Yes, please, there's a lot of paper

22  here.

23           THE COURT:  There's a lot of lines on this

24  document.

25           THE WITNESS:  There should be something called

1    "Construction" --

2    BY MR. SCHARF:

3        Q    If we look at, for instance, line 53, as well as

4    55 to 58.

5        A    Well, 53 is Track 22.  That's a different project.

6        Q    Uh-huh.

7        A    And the other line?

8        Q    55 to 58 where it says "Track Bed."

9        A    Yes.  According to this, the construction is to be

10   complete on March 2025 based on an award of 2021.  It says,

11   "Not started."

12       Q    Okay.

13            And I'd like to focus for a moment also on the

14   concourse modernization project.  I think we talked about

15   this a little earlier, that it was not running on schedule.

16            But as of this date, did it reflect a bill date of

17   some sort on here?

18       A    Again, I'll have to get to that project, and --

19            THE COURT:  Okay.  Mr. Scharf, it would be

20   helpful --

21            THE WITNESS:  -- that line, if you would like to

22   help me --

23            THE COURT:  -- if you could point her to the

24   lines.

25            MR. SCHARF:  Yes.

1          THE WITNESS:  -- find which line that is.  I

2   haven't seen this document -- oh, here, the last pages.

3          Okay.  It's on the last couple of pages.

4          Redesign.  Redesign.

5          I'm not seeing a construction date, at least not

6   designated by task --

7   BY MR. SCHARF:

8      Q    Okay.

9      A    -- into the concourse, unless you can refer me to

10  a line --

11     Q    No.

12     A    -- I'm missing here.

13     Q    I think that's fine.  Thank you.

14     A    Yeah, I see a lot of predesign and analysis.

15     Q    Thank you.

16          Would it be fair to say based upon what you've

17  looked at here, that by the summer of 2022, was the

18  concourse modernization project ready to begin construction?

19     A    No, it appears, and my recollection, it was still

20  waiting upon decisions about the project delivery method.

21  So I guess that -- in a predesign phase.

22     Q    And by July of 2022, how long had the concourse

23  modernization been in predevelopment?

24          THE COURT:  Sorry to interrupt.

25          When you say "project delivery method," what do

1   you mean by that?

2          THE WITNESS:  You could do a project in sort of a

3   traditional way as you do with the design and then you

4   finish and then you go out for a contract to do the

5   construction.

6          But many times in -- well, in buildings as well as

7   in transportation now, for example, you could do a bid, a

8   bid build or something that's where you're designing and --

9   and doing the -- you know, planning for the construction and

10  doing elements within, so that's what I mean by project

11  delivery.

12         THE COURT:  Okay.

13         THE WITNESS:  So the issue is do you just go hire

14  a designer and then wait -- when the design is finished,

15  then you go out for a general contractor, which was the

16  original plan when the designs began in 2015, or do you do

17  it like -- one option would be a design build, which is what

18  USRC was asked to do in 2020, and we would have proceeded to

19  do that had we received the program of requirements and

20  other documents that would have allowed us to solicit for

21  the type of firms that would have managed a design build

22  project.  That's what I mean.  It's a critical decision in

23  terms of how it's delivered.

24         THE COURT:  Right.  And so that key decision had

25  not been made by the time you left?

1         THE WITNESS:  To my knowledge.  If it had been, it

2    was not -- I was not informed of it.

3         THE COURT:  Okay.

4    BY MR. SCHARF:

5         Q    Did you rely on these status reports such as the

6    like that we're looking at, Lender's 28, in the course of

7    your administration of what was happening at the station on

8    behalf of USRC?

9         A    Yes.  Obviously we needed to, you know -- if

10   design was moving forward at the point where it is, it would

11   require, as we had previously, re-engaging USI, re-engaging

12   the AHJ.  And again, these individuals and their engineering

13   firms work together for many, many years on these projects.

14        Q    And did they work together well on these projects?

15        A    I think they did work together well.

16   Unfortunately, we didn't get to design points that were

17   sufficient -- that were to the point where we could proceed

18   to completing a design and then taking that design out for

19   bid to actually have a construction take place.

20        Q    Did you find that these status reports, the like

21   of Lender's 28, were accurate when you received them after

22   the meetings?

23        A    Yes, we were usually asked, that was one of the

24   things was to double-check after each meeting and make sure

25   that was what was being recorded by the FRA analyst was, in

1  fact, correct.

2  And sometimes we found errors and tried -- you

3  know, and asked that things be updated or the action item be

4  changed or the comment be changed if it didn't reflect

5  accuracy.

6  Q    And if it didn't reflect accuracy from USRC's

7  perspective and request for changes were made, were those

8  changes made?

9  A    Yes, assuming, again, everybody -- USRC couldn't

10  unilaterally just ask for something to be changed.  But,

11  yes, it was part of the weekly conversations.

12  MR. SCHARF:  Your Honor, I'd move Lender's

13  Exhibit 28 into evidence.

14  MS. HARRISON:  Your Honor, objection as to

15  authenticity.  There's been no foundation as to where this

16  particular file came from, whether it came from the witness

17  or if the witness even knows who delivered it to counsel.

18  And so I would object that there's been no authentication

19  yet.

20  MR. SCHARF:  Your Honor, I believe under the

21  Federal Rules of Evidence, a document that is prepared by a

22  federal agency that is charged with responsibility for the

23  accurate recordkeeping, and when it disseminates it,

24  especially those who rely upon it, it's an exception to the

25  hearsay rule.  I believe this witness has authenticated and

1  provided the exception as well.

2           THE COURT:  I think it's less about hearsay than

3  it is just simply -- can you just confirm for us that this

4  is the kind of status report that you received on a weekly

5  basis.

6           THE WITNESS:  It looks like the kind of status

7  report I received on a weekly basis.

8           THE COURT:  And it would be in this format,

9  including the various color coding and the dates and the

10 description of a project's status?

11          THE WITNESS:  Yes.  FRA was trying very hard at

12 that point to make sure they were managing and monitoring

13 the project, and all of its elements.

14          MS. HARRISON:  May I just one or two questions of

15 the witness?

16          THE COURT:  Sure.

17          MS. HARRISON:  Thank you.

18          Do you know how counsel received this particular

19 report?

20          THE WITNESS:  I do not.

21          MS. HARRISON:  Do you know whether any edits or

22 alterations were made to this report as opposed to the one

23 that may have been created by the original creator of the

24 report?

25          THE WITNESS:  I do not.

1        MS. HARRISON:  Okay.  Thank you.

2        THE COURT:  Okay.

3        MR. SCHARF:  Your Honor, this -- we can represent

4   that this came out of Amtrak's production.  It was a native

5   file of Amtrak's that bears a WS9595 designation.

6        MS. HARRISON:  It has no Bates number.  I have no

7   way to verify that, Your Honor.  It wasn't --

8        THE COURT:  Well, let's move forward.  I'll

9   provisionally admit it.  If we can get some confirmation

10  about its source, terrific.  But she certainly confirmed

11  that it appears to be authentic and consistent with what she

12  used to receive.

13       Can I ask you the following question, and maybe

14  it's more complicated than the question may seem.

15       Just taking the concourse project, how would you,

16  in your words, explain the delays in meeting the targeted

17  dates for design construction, moving forward?

18       THE WITNESS:  I'm not sure.

19       The project began, the design by KGB -- KGB

20  I believe was the name of the firm in 2015.  The project

21  was -- design was proceeding.

22       In 2017, USRC was asked to hire a construction

23  manager because at that time, the plan was for Amtrak to

24  complete the design, obviously to meet their needs.  And

25  then USRC would actually manage the construction.

1       And so with Amtrak, we hired -- with their

2   approval, we hired a construction manager,

3   Hill Construction, a very well-known firm, and they came on

4   board in late -- well, they were selected, I should say, in

5   late 2017.  And at that time, the schedule called for the

6   design to be completed in late 2017, with the idea that it

7   would immediately be handed off to the construction

8   managers.

9       They had said they would do it as -- again,

10  delivery method would be something called CMGC.  So they

11  could do the technical designs and address it -- any issues

12  that arose, and hopefully expedite the project.

13      So they came on board.  And -- but then we started

14  meeting fairly regularly, USI, USRC.  FRA came in as the

15  AHJ.  And then the project design was -- labeled

16  100 percent, was delivered, I think, in the August,

17  September time frame of 2018.

18      And as I said, all of the -- all of us began

19  reviewing it.

20      There were many comments, several hundred comments

21  on the design.  But ultimately as I said, it was deemed

22  insufficient to really be considered a full design.

23      So USRC was asked to go forward and solicit for a

24  general contractor in any case, which we did, but by spring

25  of 2019, everyone acknowledged that one couldn't begin

1    construction if one did not have a design for a project.

2            THE COURT:  Okay.  Thank you.

3    BY MR. SCHARF:

4        Q    You're aware that Amtrak condemned the USRC/USI

5    leasehold interest, correct?

6        A    I am.

7        Q    And that happened while you were still working

8    with USRC, correct?

9        A    It did.

10       Q    From your perspective at the time the condemnation

11   action was started, did the condemnation action in any way

12   change how Amtrak would need to obtain approval from USRC

13   related to the completion of the concourse modernization

14   project?

15       A    I'm not sure I'm the authority on answering that

16   question because I'm obviously not an expert on condemnation

17   and those kinds of things.

18           I -- the way -- as I understand it, strictly as

19   the way I understand it, USRC, as I said, maintains the

20   lease.  So if what is being condemned is the lease, then I

21   assume that Amtrak would replace USI and that the other

22   structures would stay in place.  But, again, I'm not a

23   lawyer, I'm -- just my guess.

24       Q    Well, is USRC the cause of why the concourse

25   modernization project had not started?

1     A     Well, we couldn't be the cause because the design

2     that was received was judged insufficient even for -- and a

3     building permit is sort of the low -- the first hurdle to

4     get through, so it didn't get that far.

5     Q     And would the same answer be if I asked you

6     whether USI was the cause of why the concourse modernization

7     project had not started?

8     A     Again, the threshold is first it receive a design

9     from an architect that meets the building code and the

10    building standards, and then at that point, there may

11    well -- you know, we could have gotten into other issues

12    from there, but we didn't get to that stage.

13    Q     Now, at the time you came on board in 2012 and

14    became aware of the subbasement project then, the concourse

15    renovation project, did all of those projects contemplate

16    the lease and governance structure that was in place since

17    the 1980s, as you said, changing or staying the same?

18    A     From all of my experience, every conversation I

19    had, conversations with my Board of Directors, it

20    anticipated the current lease structure.

21         MR. SCHARF:  Your Honor, we have no further

22    questions of the witness.  We tender her.

23         THE COURT:  Hang on.  Before cross-examination,

24    Mr. Ross, no questions?

25         MR. ROSS:  No.  No, Your Honor.

1          THE COURT:  All right.

2          MR. ROSS:  No.

3          THE COURT:  All right.  Thanks, Mr. Ross.

4          MS. HARRISON:  Lindsay Harrison representing

5     Amtrak.

6          THE COURT:  Hi, Ms. Harrison.  Go ahead.

7          MS. HARRISON:  Thank you, Your Honor.

8                        - - -

9                    CROSS-EXAMINATION

10    BY MS. HARRISON:

11         Q    Ms. Swaim-Staley, you've been retired from USRC

12    now for more than a year, correct?

13         A    About 13 months.

14         Q    And so you've not attended Board meetings since

15    you retired; is that correct?

16         A    I have not.

17         Q    And haven't participated in oversight of the

18    station at all?

19         A    I have not, other than as I said, I was asked just

20    to continue serving as treasurer, which I did through --

21    well, I was involved in the audit, so essentially

22    February 28th would have been my last involvement of any

23    kind with USRC.

24         Q    Okay.

25              Can you tell the Court, USRC is not part of the

1   Federal Government, correct?

2     A    That's correct.  We are a 501(c)(3) within the

3   District of Columbia.

4     Q    Okay.  Thank you.

5        You would agree that Union Station is an important

6   transportation hub for the District of Columbia, correct?

7     A    It's an extremely important intermodal

8   transportation facility for the region, I would say.

9     Q    And you're aware that Union Station is Amtrak's

10   second-busiest station, correct?

11     A    Yes.

12     Q    And would you agree that the station is at

13   capacity?

14     A    Again, I haven't been there in the last 13 months.

15   I mean, obviously during COVID, it was not.  Prior to COVID,

16   it was.  So I don't know the status today.

17     Q    Okay.

18        Would you agree, prior to COVID, with the

19   following statement:  Amtrak needs to grow if they're going

20   to continue to be successful in the northeast corridor?

21     A    Absolutely.

22     Q    You agree that Union Station competes with

23   three local airports for business?

24     A    I'm not sure, having run BWI Thurgood Marshall,

25   I'm not sure I would say it competes, but I mean, obviously

1    there's some, but I think they have two very different

2    markets.

3        Q    Fair enough.

4             Have you referred to the Union Station as the D.C.

5    area's fourth airport?

6        A    I have done that on many occasions.

7        Q    And you've also said in the past, am I right, that

8    75 percent of travelers between D.C. and New York travel by

9    train, not plane, correct?

10       A    Those were the stats again, several years ago

11   before the pandemic.  I have no idea what they are today.

12       Q    Okay.

13            Would you agree that pre-pandemic, the passenger

14   experience at Union Station was frustrating?

15       A    I would agree it could certainly be improved, yes.

16   Although I think Amtrak certainly did -- I don't want that

17   to reflect -- I mean, I think Amtrak does a very good job of

18   operating their service and did so at Union Station as well.

19       Q    But you would agree it was pretty obvious that the

20   passenger experience was frustrating at the concourse?

21       A    Obviously the concourse, after 30 years, needed a

22   refresh at a minimum.

23       Q    Okay.

24            So do you agree that it was pretty obvious that

25   the passenger experience was frustrating?

1          MR. SCARF:  Objection.

2          THE WITNESS:  I know that I agree --

3          THE COURT:  Hang on, hang on --

4          THE WITNESS:  I mean, I didn't see on there their

5    passengers.  I mean, I think many people have a very good

6    and wonderful experience on Amtrak, which is why they return

7    to use Amtrak.  So I wouldn't want to suggest that --

8    that -- yeah, that Amtrak doesn't have a good service out of

9    Union Station.

10   BY MS. HARRISON:

11        Q    Okay.  You gave many presentations when you were

12   CEO of USRC, correct?

13        A    I did what as US --

14        Q    You gave many presentations, speeches?

15        A    I gave many presentations, yes, I did.

16        Q    Including about the Second Century of Union

17   Station.

18        A    Many presentations about the Second Century.

19        Q    And when you spoke publicly as CEO of USRC, you

20   endeavored to be truthful, correct?

21        A    I certainly do, did, and do today.

22        Q    Okay.

23             Could I call up Clip 4, please.

24             (Audio played)

25

BY MS. HARRISON:

Q    That was you speaking, correct?

A    It is, of course.  I'm sure for many people, they
did.  But I don't want to begin to suggest that everyone who
uses Union Station is unhappy with the Amtrak service that's
provided there.

Q    Okay.

A    Because -- that's true.

Q    It's truthful that the passenger experience can be
pretty frustrating?

A    For many passengers, it can be.  And for others,
I'm sure it is not, depending on where they're going in the
station and where they're coming from.

Q    And you agree that the tracks and platforms do not
meet modern design standards, correct?

A    Well, I'm not an engineer, but from what I -- from
the little bit I know and have heard, they do not meet
modern design standards.

Q    And you agree that support facilities are obsolete
and inadequate for Amtrak?

A    Again, I think that upgrading, refresh, making
things look nice, at a minimum, is optimal.

Q    And function better as well, correct?

A    Well, again, I don't run the railroad, so I'm not
sure how it works within the Amtrak, between their

1    passengers.  I mean, I do know that they had a very nice

2    ticket office, and we have a beautiful historic building

3    with, again, before COVID, retail facilities.

4            The -- they had waiting areas and many food

5    amenities.

6            Again, it was a -- it's a 30-year-old structure,

7    and it doesn't look modern and fresh and -- so.

8            But I'm not going to suggest that people -- you

9    know, we certainly didn't -- I certainly didn't get

10   complaints from -- generally from people, you know, being

11   unhappy.

12           But that doesn't mean you can't always make the

13   experience better, particularly depending upon where they're

14   coming from and going to, as I said in my remarks many

15   times.

16      Q    And before you left as CEO of USRC, you agreed

17   that Amtrak needed new capacity at Union Station for

18   high-speed rail service, correct?

19      A    That was what the professionals had relayed to us

20   for many years, although I don't think that we were

21   referring to that now as high-speed rail in terms of what

22   most people in this country would refer to as high-speed

23   rail.

24           But definitely a service that was faster than the

25   existing service.  But I think there are particular

1  definitions for high-speed rail, such as in California and

2  Maglev and other types of rail.  So I don't want to confuse

3  the two.

4      Q    Okay.

5           But you agree that Amtrak would need new capacity

6  to provide higher speed rail service?

7      A    That is what all the consultants from Amtrak told

8  us, and I believe them.

9      Q    Okay.

10          And, in fact, you told that to audiences when you

11  were speaking?

12     A    Because -- yes, I was the spokesperson for the

13  project, and so I spoke based upon what the consultants that

14  were hired by the various entities, including Amtrak,

15  relayed to us, so I had no reason to believe that was not

16  the case.

17     Q    And, in fact, you agreed, when you were CEO of

18  USRC, that Union Station desperately needed to increase

19  Amtrak's capacity at Union Station, correct?

20     A    Again, based upon the studies that were done by

21  Amtrak that were put, I think the very part, out in the

22  public.  I think at one point in time in 2012, they were

23  projecting three times as many travelers.  I think later it

24  was twice as many travelers.

25          But clearly, as projects -- Moynihan is now online

1   in New York, so obviously when you have a rail yard that's

2   almost 100 years old, it would be nice to upgrade it to

3   modern -- a modern facility.

4        Q    And, in fact, it would be -- it was desperately

5   needed that Amtrak could increase its capacity at

6   Union Station as soon as possible, correct?

7        A    I think it was also in relationship to the

8   railcars, which were due, and I'm not sure if they've been

9   delivered yet or not.

10       Q    Can you call up Clip 5, please.

11            (Audio played)

12  BY MS. HARRISON:

13       Q    That was you speaking again, correct?

14       A    As I said, I was the spokesperson for the project,

15  and that was the information that the group -- we were

16  working -- we worked very much as a collective group on the

17  Second Century projects, and yes, I relayed the information

18  that we were using from Amtrak and others for the project.

19       Q    And you believed it to be truthful at the time you

20  said it, correct?

21       A    Well, I have no -- yeah, I believe -- yeah, I

22  believe, absolutely believe what Amtrak and the consultants

23  were telling us.

24       Q    And you agree that the concourse modernization

25  project is a big part of improving capacity at Union Station

1  for Amtrak, correct?

2      A    I'm not sure the concourse was so much part of the

3  capacity.  I think where we talked more about the capacity

4  long term with regard to the larger project that was really

5  going to, like, change the rail yard and changing how trains

6  came in and out.  So I just don't recall if that was a major

7  feature, it may have been, I just don't recollect if that

8  was one.

9          But certainly I think, again, as I said, it's an

10  old, 30-year-old concourse, it would be nice if it looked

11  more modern.

12     Q    And when you were CEO of USRC, you agreed that

13  modernization in the concourse projects are absolutely

14  necessary for Amtrak to really be able to continue serving

15  the northeast corridor, correct?

16     A    We were all very excited about the concourse

17  project, USRC, USI, WMATA.  There were other efforts that

18  were going to take place at the same time that the concourse

19  took place.

20          We were going to be rehabilitation --

21  rehabilitating some portions of the station that needed to

22  be rehabilitated.  USI had talked about doing some things.

23          So I think we all looked at it as a really great

24  opportunity, again, to sort of take a 1985 station and

25  upgrade the back, not the historic part, upgrade the back

1  portions so that it would be more modern and more amenable

2  and just make it easier for people to get through.

3          Remember again, the area wasn't going to be

4  significantly larger.  I don't believe that Amtrak was going

5  to lease -- take over some of the lease spaces that were

6  there, although they could have chosen to do that.

7          But yes, the configuration of waiting areas

8  certainly would have allowed more capacity.

9      Q    Yes or no, when you were CEO of USRC, you agreed

10  that modernization and concourse projects were absolutely

11  necessary for Amtrak to really be able to continue serving

12  the northeast corridor?

13     A    We absolutely did, which is why it was so

14  frustrating that we could not get a design so that we could

15  proceed.

16     Q    Okay.  Thank you.

17          When you were head of USRC in April of 2022, you

18  became aware that this condemnation action was filed,

19  correct?

20     A    I don't remember exactly what time, but that's

21  somewhere in the early 2022 time frame.

22     Q    And USRC did not intervene in this litigation,

23  correct?

24     A    I do not recall that we did.  Again, I wouldn't

25  have done so without my Board's approval, and I don't recall

1  that we did that.

2      Q    And your Board also didn't vote to file anything

3  opposing Amtrak's condemnation action, correct?

4      A    I don't believe that -- no, in the Board -- no,

5  no, they did not.  We --

6      Q    And you're aware that FRA approved preprogramming

7  authority for Amtrak to acquire the leasehold interest,

8  correct?

9      A    I'm not sure -- I don't recall.

10     Q    Okay.

11     A    We had some conversations with someone who's no

12 longer at FRA.  I don't know if I knew of any official

13 transactions that had taken place.

14     Q    And FRA has a seat on the USRC Board, correct?

15     A    Oh, they have a seat on the USRC Board, yes.

16     Q    Okay.

17     A    But in terms -- again, because of the, obviously

18 con- -- obvious conflict of interest, we didn't really

19 discuss these issues as part of the USRC Board to take -- in

20 a way to take action.

21          And we do have a member on the Board that is a

22 representative of Amtrak, and so, you know, they agreed.

23 I mean, we were all just very careful to make sure that we

24 did not step on conflict of interest, so...

25     Q    You testified about the lease structure and that,

1    I think, USRC has a lease with USI, and USI then has a

2    sublease with Amtrak and other tenants.

3           If Amtrak wanted approval to take a particular

4    action at the station, Amtrak first would need USI's

5    approval before USRC's approval or FRA's approval; isn't

6    that right?

7    A    Well, again, we try to work together, when I was

8    at the station.  So, you know -- and also that was part of,

9    I think, making sure that things didn't get hung up.

10           So it's -- at least on major projects that would

11   have required, we didn't -- you know, it wasn't always

12   linear.  I mean, again, you can save time often if you can

13   work together to get something done.

14   Q    But USI was the landlord to Amtrak, correct?

15   A    USI was the landlord, but USI also did not have

16   the authority to approve anything that they knew was not

17   going to meet the building codes.

18   Q    And if something met the building codes, then USI

19   did have the approval?

20   A    The first step would have been meeting building

21   codes, and then both USRC and USI would have had an

22   opportunity -- would have needed to approve the project

23   before it proceeded.

24   Q    So to move a sign around within Union Station, are

25   you testifying that USRC would need to approve USI's

1    decision to move a sign from one location to another?

2        A    Well, I would presume, depending where they're

3    moving it, it's not a building code issue.

4        Q    And so USI could do that without going to USRC --

5        A    As I said earlier, there are many --

6        Q    -- for approval?

7        A    -- yeah, many activities between the lessor and

8    lessee that they could do without any involvement --

9        Q    Okay.

10       A    -- so as long as it was not in opposition to the

11   lease and did not require a building permit of any sort.

12       Q    And so USRC wouldn't have been privy to all

13   conversations between USI and Amtrak about the station,

14   correct?

15       A    No, as I said before, there are many, many, on a

16   daily basis, as they work together in the operation of the

17   station, that we would not have been involved in.

18            Major capital projects, however, would not fall

19   into that category.

20       Q    Okay.

21            And the exhibit we looked at earlier, Exhibit 28,

22   that is only talking about major capital projects; is that

23   right?

24       A    Yes.  These were the major -- were part of the

25   Second Century plan, I believe, is how those ended up being

1    selected.

2        Q    And you testified that this was a weekly report,

3    correct?

4        A    I believe they were generally.  I mean, they were

5    fairly frequently.

6             Now, of course, vacations, different things, so

7    there many weeks that it didn't -- yeah, didn't take place

8    due to scheduling.  But it was very frequent.

9        Q    And there were some weeks where USI's approval

10   would have been outstanding on this report, and that would

11   have been reflected in the "Responsible Party" column,

12   correct?

13       A    Presumably.  I think that -- again, I believe this

14   report started in the 2020 time frame, and we all would have

15   had -- yeah, we all had deliverables.

16       Q    Okay.

17            And, in fact, if you turn to -- my version doesn't

18   have page numbers so I'm just going to put it up here.

19            If you turn to this page -- sorry, it doesn't have

20   page numbers -- of the document, and I guess for

21   identification, the first item is "No. 3, Inspection,

22   Inspections of topside through Track 22 projects."

23            Do you see that?

24       A    I see it on this one, yes.

25       Q    Okay.

1           And then if you go down, I think you identified as

2    outstanding from USI an item that over here it's listed,

3    I think, as No. 5?

4        A    It says USI is the responsibility party there.

5    Yes, back of house planning.

6        Q    I just want to point out, right beneath that,

7    do you see No. 6 establishing a baseline schedule and

8    budget, and it shows Amtrak as the responsible party?

9        A    It does.

10        Q    And then if you go to the right, the deliverable

11    appears to be that Amtrak needs design proposal and letter

12    agreement from USI.

13           Do you see that?

14        A    I do.  I remember those.

15        Q    Okay.

16           So even though Amtrak is listed as the responsible

17    party, the outstanding item, the deliverable that they were

18    waiting on, was from USI, correct?

19        A    Right.

20           And when I testified, I said I was not given time

21    to read the comments, so that there might be other things

22    there.

23           Those were submitted, yes.  They apparently had

24    not been as of this date, which is why I couched what I said

25    earlier in my testimony.

1      Q     Thank you so much.

2            And you agree that if Amtrak were to take over the

3      rights of USI under USI's lease agreement with USRC, Amtrak

4      would no longer need to go to USI for approval in addition

5      to going to USRC for approval, correct?

6      A     Well, presumably if they become the lessee, then

7      obviously they would -- that whole structure changes and it

8      becomes USDOT FRA USRC Amtrak.

9      Q     And Amtrak would then get USI's rights under the

10     USI lease, correct?

11     A     Again, I'm not an eminent dom- -- but presumably,

12     yes.

13     Q     And Amtrak could then control maintenance in USI's

14     space in accordance with the terms of the USI lease, right?

15     A     They could.

16     Q     And Amtrak could control security in the USI space

17     in accordance with the terms of the USI lease, correct?

18     A     Yes.  They would be responsible for all of that.

19     Q     And Amtrak could control signage within the USI

20     space in accordance with the terms of the USI lease,

21     correct?

22     A     That's correct.

23     Q     Okay.

24           And for things that require USRC permission,

25     instead of Amtrak going to USI and USI going to USRC, Amtrak

```
1   would go directly to USRC to get their approval, correct?

2        A    Presumably, yes.

3             MS. HARRISON:  No more questions.

4             THE COURT:  All right.  Thank you.

5             Any redirect?

6             MR. SCHARF:  Just a few, Your Honor.

7                              - - -

8                      REDIRECT EXAMINATION

9   BY MR. SCHARF:

10       Q    So when we were looking at Exhibit 28, those

11  particular items that were pointed out to you by

12  Ms. Harrison, I noticed that there was a green box next to

13  them that said "Closed."

14       A    Can you refer to which line that was again,

15  please.

16       Q    Sure.

17            The only one that had USI's --

18       A    Oh, that.  That was towards the back then, as

19  I recall.

20            Thank you.

21       Q    You see "Closed"?

22       A    Yes.  Can you move it to the -- so I can read the

23  comments for the closed item.

24       Q    Sure.

25       A    USI submitted revised program for Amtrak review.
```

1      Okay.

2      Yes.  Again, there was a series, so you have the

3  program, and I don't remember all the details, but, yes you

4  need the general program of what -- USI needed to move many

5  back-of-house items.  So they had told Amtrak what they

6  would be needing to move and where --

7      And, then, of course, I believe, and I'm not

8  certain of this recollection, I believe, though, Amtrak was

9  going to hire the designer to help, but I'm not sure of

10 that.  I just don't recall the details between who was going

11 to hire the designer to actually effect and put a design

12 together for the back-of-house space.

13     Q    Right.

14     A    But I believe in the filings that I read back and

15 forth to the Court, it appeared that these issues had been

16 resolved.

17     Q    Now, Ms. Harrison asked you a bunch of questions

18 about signage being placed, right?

19     Signage may impact historic preservation review as

20 well, correct?

21     A    It could.  That's why I said -- yes, depending

22 upon what the signage was.  But, yes, very clearly,

23 wayfinding can impact the historic levels.

24     Q    Can you expand on that for the Court, please?

25 What do you mean that wayfinding could impact historic

1  preservation issues?

2      A    Well, for example, we couldn't put -- you couldn't

3  put a large, you know, blue and white Amtrak sign in the

4  main hall, for example, which is why when you go into the

5  main hall, you see the signs are of a certain type, color,

6  size, and those are all approved by the SHPO.  So that sort

7  of thing.

8           So type, sign size, sign location.

9           Again, in the concourse, it's not historic, so

10  generally, you know, Amtrak would have great latitude to do

11  what they need to do with regard to wayfinding in the -- and

12  certainly in the areas that they lease.  But if they wanted

13  to put something in another part of the station, then that

14  might be subject to the SHPO review.

15     Q    And if Amtrak became a direct lessee with USRC,

16  they'd still have to comply with the same historic

17  preservation issues, correct?

18     A    Yes.

19     Q    Now, the -- you were asked some questions about a

20  high-speed rail service, and you said high-speed rail

21  service has particular definitions and things like that, but

22  I'm -- specifically just want to get you into that frame of

23  mind where Ms. Harrison was asking you about those

24  questions.

25           The provision of high-speed rail service as is

1   being described, those were not in the historic portions of

2   the station, right?  Those were out at the track areas,

3   correct?

4       A    That's correct.

5            The reason I made the distinction, I wasn't sure

6   the time frame of when my comments were replayed.  So, for

7   example, for a time period of 2012 into maybe 2014, 2015,

8   Amtrak plans did envision a separate set of tunnels for

9   high-speed rail, in addition to the normal Amtrak upgrades.

10           Those plans were dropped at some point in time.

11  So -- and I just don't recall, which is, like I said -- and

12  I'm not sure of the time period there, when we were

13  referring to.

14           But it's sort of a catch-all phrase.  Frequently

15  people talk about high-speed rail, but it can have a

16  different definition than the Amtrak corridor service in the

17  northeast corridor.

18      Q    And those clips that were being played where you

19  were advocating for rehabilitation and change, were you, at

20  the same time, advocating for change in the leasehold and

21  governance structure?

22      A    Oh, never, no.

23      Q    Okay.

24           Now, did USRC ever direct Amtrak to acquire the

25  USI leasehold?

1      A    No.

2      Q    Did USRC direct USI to give more space to Amtrak?

3      A    Again, Amtrak had the option in the lease --

4 I don't recall if it's every five years or there's a

5 particular time element, but there are opportunities for

6 Amtrak to actually lease areas other than what they're

7 currently leasing.  I don't believe they ever took up those

8 options during the ten years that I was there.

9           MR. SCHARF:  I have no further questions,

10 Your Honor.

11           THE COURT:  All right.  Thank you very much for

12 your time and your testimony.  Appreciate it.

13           THE WITNESS:  Thank you, sir.  Have a good day.

14 I'm just going to leave these.

15           THE COURT:  Yes, just leave all that there.

16           All right.  Mr. Scharf.

17           MR. SCHARF:  Your Honor, can the witness who just

18 testified be excused for the day?

19           THE COURT:  Oh, yeah, of course.

20           MR. SCHARF:  Thank you, Your Honor.

21           THE COURT:  Sure.

22           All right.  Another witness?

23           MR. SCHARF:  Yes, we do.  We have

24 Mr. Michael Rebibo.  Your Honor, I just wanted to note for

25 the Court that I didn't think the direct was going to get

1   done by 5:00.  I just wanted to note that for the Court.

2          THE COURT:  Mr. Rebibo's direct won't be done

3   until 5:00?

4          MR. SCHARF:  It won't be done by 5:00, correct,

5   but I would love to start.

6          THE COURT:  Okay.  Let's just get started.  We'll

7   see where we are.

8          COURTROOM DEPUTY:  Please raise your right hand.

9          (Witness is placed under oath.)

10         COURTROOM DEPUTY:  Thank you.

11         THE COURT:  All right.  Mr. Rebibo, welcome.

12         THE WITNESS:  Your Honor.

13                         - - -

14  MICHAEL REBIBO, WITNESS FOR THE DEFENDANT, SWORN

15                    DIRECT EXAMINATION

16                         - - -

17  BY MR. SCHARF:

18      Q    Mr. Rebibo, can you please tell the Court your

19  current profession?

20      A    I'm the managing principal of Rexmark.

21           M-i-c-h-a-e-l, R-e-b-i-b-o.

22      Q    And what is the business of Rexmark?

23      A    Rexmark is an investment firm based in New York

24  City that invests in all sectors of real estate throughout

25  the United States and Europe.

1          Q     And how long has Rexmark been in business?

2          A     About 12 years.

3          Q     In terms of asset value, what is the total value

4     invested by Rexmark?

5          A     We have about -- a little over $2 1/2 billion in

6     cash invested on roughly $7 billion of real estate globally.

7          Q     And where in the cap stack does Rexmark invest?

8          A     All throughout the capital stack.  We have

9     mortgages, mezzanine loans, preferred equity, common equity.

10    In some cases we lend, in some cases we lend.

11         Q     Can you please describe to the Court the location

12    that Rexmark is invested in?

13         A     All throughout gateway cities in the United States

14    and Europe.  New York, Boston, Washington, D.C.,

15    Los Angeles, San Francisco, Miami, Chicago, London.

16         Q     And what types of property or asset classes is

17    Rexmark invested in?

18         A     The majority of asset classes is office buildings,

19    apartment buildings, hotels, infrastructure in this case,

20    retail, industrial, mixed use, medical facilities, schools.

21         Q     Now, I notice you didn't mention railways.  How

22    would you define the asset class of Washington

23    Union Station?

24         A     Although the station is -- serves as a passenger

25    railway station, it's a mixed-use property with a variety of

1  different sectors and asset classes within the property.

2      Q    And what sectors would those be?

3      A    As you've heard today, there's office space,

4  there's retail space, there's event space, there is signage,

5  a variety of uses.

6      Q    And as the managing principal of Rexmark, what

7  role do you serve?

8      A    I oversee the asset management and operations of

9  the properties that we own and operate, as well as the

10  day-to-day oversight of all the investments, fundraising,

11  joint ventures, pretty much all sectors of the operation of

12  asset management.

13      Q    And when did Rexmark become involved with the

14  leasehold interest at Union Station?

15      A    In 2018.  May of 2018, I believe.

16      Q    And in what capacity?

17      A    We were originally the mezzanine lender for the

18  property.

19      Q    Could you describe to the Court what it means to

20  be a mezzanine lender and what loan you're referring to?

21      A    Essentially there were two loans on the property.

22  There was a senior mortgage loan, which is secured by the

23  leasehold interest, you know, the leasehold of the property.

24          And a secondary loan, which we refer to as the

25  mezzanine loan, which was in the amount of $100 million that

1    was secured by the borrower's interest in leasehold.

2        Q    Did there come a time when the mezzanine loan went

3    into default?

4        A    Yes.

5        Q    When was that?

6        A    May of 2020.

7        Q    And did there come a time when the lender

8    foreclosed the mezzanine interest and acquired the USI

9    equity?

10       A    Yes.

11       Q    When was that?

12       A    June of 2022.

13       Q    What is Rexmark's current relationship with

14   Kookmin Bank as it relates to Washington Union Station?

15       A    Rexmark, since the origination of the loan, which

16   we originated, is the agent in the United States and

17   basically manager on behalf of Kookmin Bank.

18            Kookmin Bank is the trustee in Asia, but, you

19   know, as far as the representative, the authority in the

20   U.S., we're the -- we're the authority in the U.S.

21       Q    And what is Rexmark's current relationship with

22   this entity called KTB CRE Debt Fund No. 8 as it relates to

23   Washington Union Station?

24       A    Similar relationship.  KTB CRE Debt Fund No. 8 is

25   the vehicle, the trust, which originated the loan and is the

1　possessor of the leasehold currently, and we're the manager

2　of that vehicle.

3　　　　　　THE COURT:  And just to be clear, Rexmark no

4　longer is -- holds a -- what's the word I'm looking for.

5　　　　　　The loan has already been paid off by Kookmin,

6　right?

7　　　　　　THE WITNESS:  It's been not paid off, it's been

8　extinguished.

9　　　　　　THE COURT:  Extinguished.  Okay.

10　　　　　　THE WITNESS:  Yes.

11　　　　　　THE COURT:  But the company stayed on as the

12　representative for the bank?

13　　　　　　THE WITNESS:  We invest the money so we stay on as

14　the -- it's not a -- the bank is a trustee.  They're not

15　actually -- what's it called.  It's not actually their

16　money, they're just a trustee that was designated when we

17　originated the loan.

18　　　　　　We are the day-to-day manager.  We originated the

19　loan directly to Ashkenazy in 2018.  We underwrite, we lend.

20　It's -- our role has been the same all the way through.

21　We're -- for all effective purposes, we're the person that

22　runs the investment.

23　　　　　　THE COURT:  Okay.

24　BY MR. SCHARF:

25　　　　Q　　Now, you mentioned the senior loan.  Does Rexmark

1   have any relationship to the senior loan currently?

2        A    We purchased the senior loan in January of 2022.

3        Q    Okay.

4             Now, what is Rexmark's current relationship with

5   the entity called USI as it relates to Washington

6   Union Station?

7        A    USI is a subsidiary of another entity which was

8   formed last year called Daol Rexmark Union Station, LLC, and

9   I'm one of the managing members of that entity so I

10  effectively manage that entity.

11       Q    Now, we've had lots of conversation already today

12  about the structure and ownership and operation of

13  Union Station.  The USI/USRC lease was referred to as an old

14  lease.  What's the term of that lease?

15       A    It was a 99-year lease, which was originated in

16  the 1980s.  It's got roughly 60 years left on it.

17       Q    And when I refer to the leasehold interest, will

18  you understand that I'm referring to the lease between USI

19  and USRC?

20       A    Yes.

21       Q    Is Amtrak a party to that leasehold interest?

22       A    No.

23       Q    What were Amtrak's rights with respect to

24  Union Station?

25       A    When the lease was set up in the 1980s,

1    concurrently with that lease, Amtrak had a -- effectively

2    coterminous lease, which was set up for a designated portion

3    of the station to run their operation.

4         Q    And when you say "coterminous," can you tell the

5    Court how many years that lease was for?

6         A    It was also for 99 years, and it also has roughly

7    60 years left on it.

8         Q    And if I refer to that lease as the Amtrak

9    sublease, will you understand that I'm referring to the

10   sublease between USI and Amtrak?

11        A    Yes.

12        Q    Now, does Amtrak sublease all or part of

13   Union Station?

14        A    A portion of Union Station, roughly 15 percent or

15   20 percent.

16        Q    Can you describe the businesses that lease --

17   other than Amtrak, that lease space at Union Station from

18   USI?

19        A    You have everything from retail tenants, food and

20   beverage, apparel, alternative uses of retail,

21   tourism-related tenants.  You have office users.  Digital

22   signage companies.

23             Event space, which is used for a variety of

24   functions, everything from public functions to Presidential

25   inauguration dinners to weddings to all kinds of things, so

1    pretty diverse.

2         Q    And do these users of the space that is not leased

3    to Amtrak have contractual arrangements for the use of the

4    space?

5         A    I'm sorry, I don't understand -- contractual

6    arrangements with who?

7         Q    With USI.

8         A    Yes, they do.

9         Q    Okay.  And what type of --

10        A    Leasing agreements, license agreements.

11             Leasing agreements, they have leases, commercial

12   leases, as well as license agreements.  Management

13   agreements in certain cases.

14        Q    And can you tell the Court, is the current

15   percentage of occupancy of the leasehold interest higher now

16   than it was in January of 2022?

17        A    Yes.

18        Q    Now, you saw Mr. Gardner talking about what's been

19   marked as Plaintiff's Exhibit 10, his idea or Amtrak's idea

20   for the future use of Washington Union Station.

21             Do you see that?

22        A    I saw it earlier.

23        Q    Okay.

24             And can you describe to the Court what effect, if

25   any, he is proposing that will have on the retail space on

1   the main level of the station?

2       A    From what I see, it looks like they want to --

3   Mr. Gardner would like to repurpose the majority of the

4   station to fit certain needs that Amtrak may have.

5            And essentially, the retail, some of the

6   alternative uses at the station.  The commercial space, the

7   event space would effectively be minimized significantly

8   and -- thank you.

9            Would be, you know, significantly reduced and

10  significantly altered in terms of the -- you know, the core

11  use of the property.

12           One of the core uses of the property.

13      Q    Sorry?

14      A    One of the core uses of the property.

15      Q    And does Amtrak's plan listed here in

16  Plaintiff's Exhibit 10 differ from the way USI is running

17  that part of the station?

18      A    Yes.

19      Q    How so?

20      A    Well, in the Claytor Concourse, as well as the

21  east hall and some other spaces that have been designated

22  here along the east portion of the property, they're

23  repurposing and redesignating existing space for waiting

24  areas or all types of other alternative uses, which would

25  significantly eliminate a significant portion of the

1    commercial space of the property.

2        Q    Who's using some of those commercial spaces that

3    Amtrak is proposing being eliminated?

4        A    Today, food and beverage tenants, some retail

5    operators, some amenity space for the building, some

6    tourism-related space, a variety of uses.

7        Q    I would like you to take a look at the lower level

8    that Amtrak is proposing.  Can you describe to the Court how

9    the -- what's being proposed will affect the current

10   operations and use of the space at Washington Union Station?

11       A    Again, the lower level is currently the food

12   court, which, if you've been to the station during the day,

13   is probably the busiest area.  The station serves as a main

14   hub for a lot of the neighboring buildings and not just as a

15   pass-through for commuters but especially the food court.

16            You know, it looks from here that the majority of

17   the food court would be repurposed and that there would be

18   some limited food options, but effectively, the food court

19   today serves as a -- an affordable option where you have,

20   you know, more fast food type of users in that space, and

21   seems like most of that has gone in exchange for a baggage

22   area, some train services, some other uses related to

23   Amtrak's needs.

24       Q    Now, if Amtrak took immediate possession and began

25   implementing this, can you describe to the Court what impact

1  it would have on the station as the station is currently

2  set up?

3      A    I think if Amtrak were to take possession of the

4  station today and implement the plan they have, it would

5  significantly, significantly not only devalue the property

6  but alter the use of it ever, you know, coming back to what

7  it was pre-COVID or, you know, meeting its full potential.

8      Q    Why is that?  What is it about their plan that you

9  believe will devalue it or will harm it in a way that would

10 not allow it to be brought back to its pre-COVID potential?

11         MS. HARRISON:  Objection, Your Honor.  This is

12 seeking expert opinion testimony without any foundation for

13 this witness having a basis to give it.

14         THE COURT:  I don't know if he can -- by

15 "devalue," he means an actual, you know, valuation of

16 project, I mean, does he have the ability to testify bout

17 that?

18         MR. SCHARF:  Well, I'd love him to describe what

19 he meant by that, Your Honor, because I think based upon his

20 experience --

21         THE COURT:  If he means devalue in a sort of

22 ordinary sense, he can testify about that.

23         Go ahead.

24         THE WITNESS:  I meant devalue in the sense that

25 they would effectively, you know, terminate the leases.

1          The uses that are currently, you know, being

2    performed in the station today would cease to exist.

3          The functions which take place in the station

4    today, because the use would be changed, would cease to

5    exist.

6          And if they were to take possession of the station

7    today, it's not like they're keeping the same use

8    essentially.  It would essentially, you know, alter what the

9    property is, and I'm not talking numbers, but it would --

10   it's changing the use.

11         It's changing the fundamental use of the property

12   if it's going from a commercial, whatever you want to call

13   it, a mixed-use commercial property to an area which serves

14   as a seating area, waiting room, baggage claim area.

15   I mean, one generates revenue the other one doesn't.

16   BY MR. SCHARF:

17     Q    What effect, if any, do you believe it would have

18   on the current leasing program that is currently in place

19   for the property?

20         THE COURT:  Mr. Scharf, what do you mean by that,

21   "the leasing program"?

22   BY MR. SCHARF:

23     Q    Can you describe, since Rexmark has taken over and

24   working with JLL, what work has been done as it relates to

25   releasing the premises to get it back to its pre-COVID

1    levels?

2        A    Obviously the station was significantly impacted

3    by COVID, as every major commercial property was throughout

4    the country.

5        Since taking over possession of the property,

6    we've worked to improve the condition of the property,

7    negotiate deals with existing tenants, as well as new

8    tenants, the leased space.

9        You know, re-open certain portions of the station

10   which have been closed for the past, you know, number of

11   months, or years in certain cases.

12       And I think those efforts would be completely

13   undone.  I think that if they were to take possession of the

14   station today and implement the plan they have, it would

15   basically undo all those efforts and make it impossible

16   to -- or significantly damage the ability to continue the

17   progress that's been made.

18       Q    We heard earlier today from Mr. Gardner about USI

19   cooperation, so I'd like to ask you about that for a moment.

20       Since Rexmark has foreclosed on the property and

21   taken control pursuant to the preliminary injunction you

22   were granted, has USI been cooperating with Amtrak in its

23   requests?

24       A    Yes.  I think we've been good collaborators with

25   all the stakeholders.  We communicate routinely with Amtrak.

1  Our operations people, along with JLL, communicate with

2  their -- everybody from security to operations.

3          With respect to USRC, we have, you know, weekly

4  calls.

5          In terms of communication on projects, we've

6  approved a number of projects with Amtrak, including, you

7  know, some basement-related projects to relocate some of the

8  security back-of-the house, you know, matters, as well as

9  fire-alarm-related matters that involve re-opening Track 22,

10 which I believe is slated to open up later this year.

11         So I think we've certainly -- I can't think of a

12 scenario where we haven't approved any requests.  I don't

13 think there is one.

14    Q    Are there any pending requests, as you sit here

15 today, from Amtrak seeking approval from -- anything from

16 USI relating to Washington Union Station?

17    A    Not to my knowledge.

18    Q    Now, there was some conversations about bathroom

19 projects earlier today.  Are you familiar with that project?

20    A    Yes.

21    Q    Can you describe to the Court what your

22 familiarity is with that project, where the bathroom is

23 located, what the size of the bathroom is, and who's been

24 responsible for what?

25    A    So currently, if you're familiar, the bathrooms

1   are adjacent to the Sbarro space.  It's currently part of

2   Amtrak's obligation.  There was an agreement signed in 2017

3   with the prior owner, Ashkenazy, to build new bathrooms

4   closer to where the McDonald's space is by Station Place and

5   to refurbish, in the meantime, the existing bathrooms.

6           That project to refurbish the existing bathrooms

7   was just completed, I believe, in Q1 of this year, took them

8   almost six years.

9           And you're talking about a 200-square-foot

10  bathroom with four stalls.  And the caliber of the refresh,

11  or whatever Mr. Gardner referred to it as, was, you know,

12  installing new sinks, some ceiling -- some of the wall

13  tiles.  You're not talking about a gut renovation.  You're

14  talking about like very cosmetic in nature.

15          And I don't think it was done to the satisfactory

16  of any party.  They used residential-grade materials.

17  There's all kinds of issues with it, which even they've

18  complained about it.

19          But it's ironic that the bathrooms came up today.

20      Q   Who was responsible for doing the work?

21      A   Amtrak.

22      Q   And whose space is it?

23      A   It's Amtrak's space.

24      Q   Okay.

25          Now, you mentioned that Amtrak -- I'm sorry, that

1   Rexmark or Rexmark as agent for the mez lender, as well as

2   ultimately the acquirer of the senior loan, it has the

3   positions that it does in the cap stack.

4           Did USRC consent to the loans that were made by

5   Rexmark over the lender's predecessor and then by the mez

6   lender as well?

7       A    Yes, USRC consented to the loans.

8       Q    And what is the collateral with respect to the mez

9   loan?

10      A    The collateral for the mez loan was the borrower's

11  interest in the leasehold.

12      Q    And let's talk for a moment about when the mez

13  lender purchased the senior loan interest.  When did that

14  happen?

15      A    In January of 2022, early January.

16      Q    And were you involved in the negotiation and

17  closing of the purchase of the mortgage loan in January of

18  2022?

19      A    Yes.

20      Q    And what was the purchase price of that?

21      A    $358 million.

22      Q    And was the mortgage loan in default at the

23  time --

24      A    Yes.

25      Q    -- the mez lender exercised its right to purchase

1    the senior loan?

2         A    Yes.  Both loans had been in default since May

3    of 2020.

4         Q    Can you describe to the Court, what was your

5    thought process by which you, as the mez lender, decided to

6    exercise your purchase agreement rights and pay $358 million

7    for the senior loan?

8              MS. HARRISON:  Objection; relevance.

9              MR. SCHARF:  It's something that was discussed,

10   Your Honor, in a meeting that Mr. Rebibo will testify about

11   that he had with people at Amtrak.

12             THE COURT:  Okay.  Go ahead, you can answer it.

13             THE WITNESS:  We had intricate familiarity with

14   the property.  We had originated the loan, we had

15   underwritten the loan in 2018.  We were very familiar with

16   the property.  We knew of the value that the property had.

17   The property had previously, at the time of origination,

18   been valued at over a billion dollars.

19             We had conducted -- as part of our internal

20   procedures and, you know, our fiduciary responsibilities, we

21   conducted a more recent appraisal in January of 2020, just

22   maybe a week or two before Amtrak's appraisal and had

23   received an appraisal for, I think 700- -- over $700

24   million, 720- or 730-.

25             MS. HARRISON:  Your Honor, I'm going to renew my

1    objection.  This is just valuation testimony.  We're going

2    to be here two weeks if we do the valuation part of the case

3    when we're supposed to be doing possession, Your Honor.

4          THE COURT:  All right.  Let's move forward.  I do

5    want to let counsel have --

6          MR. SCHARF:  Yes.

7    BY MR. SCHARF:

8          Q    Mr. Rebibo, did there come a time when you

9    communicated the appraisal that you had gotten in connection

10   with your purchase of the senior loan to people at Amtrak?

11         A    Yes.  I had a meeting with Amtrak.  They had

12   reached out after the foreclosure auction was canceled, and

13   I had a meeting with them, I believe it was January 20th,

14   about three weeks after I purchased -- the last two and a

15   half weeks after I purchased the mortgage.

16         THE COURT:  So this was January 2022?

17         THE WITNESS:  Yes, sir.  Yes, Your Honor.

18   BY MR. SCHARF:

19         Q    And how many meetings did you have, and who did

20   you have those meetings with?

21         A    We only had one meeting.  It was with

22   three representatives from Amtrak, including their General

23   Counsel, Deborah Rochkind and, I believe, Mr. MacIver.  You

24   don't forget a name like that.

25         Q    And what was the purpose of that meeting?

1      A      They had expressed interest in purchasing the

2  loans and had expressed interest, obviously, in -- in owning

3  the leasehold.

4      Q      And did -- at that meeting, did Amtrak say how

5  much they were interested in paying for the leasehold

6  interest or bidding at a foreclosure sale?

7      A      No, no, they did not express any numbers.

8          We had expressed what the value was of our

9  appraisal, that the property had previously been in contract

10 just months before with a -- with a -- in a hard contract

11 with a non-refundable deposit of $100 million, for a

12 significant value of about $700 million for a partial

13 interest.

14         But they did not -- they said they needed

15 additional information to formulate an opinion.

16         THE COURT:  I'm sorry, that meeting took place

17 after the auction was canceled, I thought you said.

18         THE WITNESS:  Yes, Your Honor.

19         THE COURT:  Okay.

20         THE WITNESS:  Two weeks.

21 BY MR. SCHARF:

22     Q      Who did you ask to perform -- or who performed

23 your appraisal that came in for the above $700 million

24 amount?

25         MS. HARRISON:  Again, objection, Your Honor.

1           THE WITNESS:  $700 million.

2           THE COURT:  Let's not -- we have talked about

3    this.  I know what the number is.  Let's move forward.

4           I haven't asked for the basis for their appraisal.

5    I'm not going to ask for the basis of this one.  I just know

6    what the numbers are, and let's go ahead.

7           MR. SCHARF:  Okay.

8    BY MR. SCHARF:

9        Q    Now, we saw an email that Richard Marchitelli sent

10   to you.  Do you remember seeing that when I was questioning

11   Mr. Gardner?

12       A    Yes.

13       Q    Can you describe to the Court what was significant

14   about what Mr. Marchitelli had described to you.

15       A    We had reached out to Cushman --

16           MS. HARRISON:  Objection.

17           THE COURT:  Hang on, I'm sorry.

18           THE WITNESS:  We had reached out to Cushman --

19           THE COURT:  There's an objection I just need to

20   deal with.

21           MS. HARRISON:  Objection, Your Honor.  I think you

22   heard earlier my cocounsel say that that person,

23   Mr. Marchitelli, was an expert who inadvertently copied

24   Mr. Rebibo on an email that he wasn't supposed to be copied

25   on, it's privileged.  And it's also relevant because again,

```
1    this is just valuation testimony.

2              MR. SCHARF:  Your Honor, that was not an

3    inadvertent disclosure.  It's never been clawed back.  And

4    we know it's not an inadvertent disclosure because it was

5    communicating to Mr. Rebibo that --

6              MS. HARRISON:  We didn't produce it.

7              MR. SCHARF:  -- that --

8              THE COURT:  Hang on.  Let's not talk over one

9    another.

10             MR. SCHARF:  -- that -- that Mr. Rebibo's attempt

11   to have Cushman perform an appraisal for the property could

12   not be done because they had been working on a major

13   litigation and had already done four valuations at that

14   point in time.

15             So it was actually -- it was an intended

16   communication to tell Mr. Rebibo that the appraisal firm

17   could not work for him.

18             THE COURT:  Okay.  Well, again, I think the issues

19   here are a little bit more limited than the number of

20   appraisals and what those valuations were and what each side

21   was able to obtain or not obtain.

22             So -- and it's also a quarter of 5 so let's try

23   and keep moving forward and get as much done as we can.

24             MR. SCHARF:  Yes, Your Honor.

25
```

1   BY MR. SCHARF:

2       Q    Mr. Rebibo, did you have further communications

3   with anyone at Amtrak after this meeting that happened in

4   January of 2022?

5       A    Well, we had a few communications by email where

6   we had tried to execute a confidentiality agreement, and

7   were unable to come to an agreement on the terms of the

8   confidentiality agreement.

9       Q    What were the hangups on the terms of the

10  confidentiality that didn't allow it to go forward?

11      A    There was some standard language within every

12  confidentiality agreement that, you know, the information

13  that's being exchanged is for a specific purpose and that it

14  can't be used adversely against the disclosing party, and

15  they were unwilling to sign that language.

16      Q    Did Amtrak ever make an offer to you, when you

17  were in the lender position, to purchase the leasehold

18  interest?

19      A    No.

20      Q    Did Amtrak ever make an offer to buy the leasehold

21  interest after you foreclosed?

22      A    Not in writing.  We've had a number of meetings,

23  obviously, as, you know, Mr. Newman said.  Probably met with

24  them ten times, maybe a little bit more.

25           We've talked about a variety of different

1    potential options, but they've never offered anything formal

2    in writing.

3         Q    Now, when you talk about potential other offers or

4    potential different structures, can you describe to the

5    Court, were all the conversations that you had or proposals

6    that you made all about only money?

7              THE COURT:  I'm sorry to interrupt.  Can you just

8    give me the timing of all this?  I mean, is this before the

9    condemnation or after?

10              THE WITNESS:  No, no, we never had a meeting with

11    Amtrak in person after that January 20th meeting --

12              THE COURT:  Right.

13              THE WITNESS:  -- until Q4 of 2022, and --

14              THE COURT:  Okay.  I just wanted to make sure I'm

15    understanding the time.

16              THE WITNESS:  Yeah.  That's when the -- the

17    discussion started -- like the negotiation for settlement or

18    whatever started in Q4 of 2020.

19              THE COURT:  Okay.

20    BY MR. SCHARF:

21         Q    And can you describe to the Court those meetings

22    that happened post Q4 2022 [sic], were those conversations

23    only about money?

24         A    No.

25         Q    Can you describe to the Court what else those

1    encompassed other than money?

2        A    We had proposed a variety of different solutions

3    to Amtrak as a compromise to the dispute.  We had talked

4    about restructuring the ground lease.  We had talked about

5    conduiting the space.

6             MS. HARRISON:  Your Honor, objection.

7             THE COURT:  One second.

8             MS. LAMBERT:  These discussions took place

9    pursuant to Rule 408, Your Honor.  So the substance of the

10   discussions are not admissible.

11            THE COURT:  I'm not sure that's accurate but...

12            Yeah, I mean, they're -- I don't think it's an

13   issue under 408.  I mean, 408 speaks in terms of not

14   admitting such statements to prove or disprove the validity

15   or amount of a disputed claim, and I don't think that's what

16   this is about.

17            And then to use -- statements can't be used to

18   impeach by a prior inconsistent statement or contradiction,

19   two different criteria here.  So I don't think it's

20   foreclosed, at least not what he's about to testify about.

21            Go ahead.

22            So the objection is overruled.

23            THE WITNESS:  We provided alternative solutions to

24   Amtrak based on some of the other properties, some of which

25   were mentioned earlier today -- you know, the structure in

1   New York, the structure in other cities where Amtrak has a

2   presence -- where we could restructure the ground lease to

3   give them more control, so to speak, or more flexibility if

4   there was issues.

5          We offered to condo a certain space similar to

6   what they described as their current status at Moynihan

7   Train Hall in New York.

8          We offered joint ventures.

9          We offered a variety of alternative options, not

10  just limited to saying, Here's a flat-out number we need.

11  Q    Now, putting aside these offers of alternative

12  structures, does Amtrak have the ability to do the concourse

13  renovation work that it wants to have within the existing

14  lease structure?

15  A    Yes.

16  Q    And --

17  A    I don't -- again, I wasn't privy to all the

18  discussions before, but there's been no discussion with

19  Rexmark and Amtrak where there's been an impediment to

20  getting any work done since I took over possession.

21  Q    And did anybody ask you, since you've taken over,

22  that Amtrak wanted to add more Amtrak police and have them

23  positioned in the historic area?

24  A    No.

25  Q    Did anybody ask you that you want -- that Amtrak

1  wanted to put in benches or waiting areas in the historic

2  building?

3      A    No.

4      Q    Did anybody ask you any of the things that

5  Mr. Gardner said he wanted to get done immediately?  Was

6  that -- has Amtrak ever asked you if they can do that since

7  you've taken over?

8      A    No.

9      Q    Now, who's the current property manager at

10 Union Station?

11     A    Jones Lang LaSalle.

12     Q    And who --

13     A    JLL, Jones Lang LaSalle.

14     Q    And who is and what is Jones Lang LaSalle, JLL?

15     A    JLL is a global real estate company which manages,

16 leases, provides a variety of all real-estate-related

17 services, brokerage, advisory on over pretty much every

18 asset class that exists throughout -- throughout the world.

19     Q    And what are their current responsibilities at

20 Washington Union Station?

21     A    Currently, they oversee the day-to-day -- they

22 provide the day-to-day management of the property, as well

23 as are responsible for a portion of the leasing that's done

24 at the property.

25          And they are in communication with Amtrak and all

1  the stakeholders, USRC, FRA, DOT, Rexmark, with respect to

2  anything at the station that takes place.

3      Q    Who oversees JLL's work at the station?

4      A    Rexmark does.

5      Q    And can you describe to the Court how the

6  responsibilities of JLL differ now that Rexmark has taken

7  over ownership from the responsibilities that JLL had under

8  Ashkenazy's control of USI?

9      A    JLL, under Ashkenazy, essentially acted in a very

10 limited role.  They provided billing and accounting

11 services.  Certain staff were on their payroll.

12      But since we've taken over, we've expanded their

13 responsibilities.  They now oversee construction, marketing,

14 leasing, there's more.

15      We've increased staff at the station within JLL,

16 as well as staff throughout the station for a variety of

17 services, so they oversee all the day-to-day operations.

18      Q    What staff have you increased at the station since

19 you've taken over ownership of USI?

20      A    We've increased security.  We've increased.  You

21 know, the security significantly.  We've added the concept

22 of ambassadors.  If you walk through the station today, you

23 see people in burgundy jackets that are -- you know, that

24 have "Ask me" tags on it that direct people, you know,

25 pretty much similar to the role that Mr. Gardner described

1    as a customer representative, the CSRs.  Those exist at the

2    station today.

3             We've increased the maintenance staff.

4             We've filled roles that didn't exist before for

5    marketing and PR with the NoMa bid districts and things like

6    that.

7             So from a staffing standpoint and from a

8    maintenance standpoint, the station is significantly,

9    significantly different now than it was when Ashkenazy

10   managed the property.

11       Q    Now, you mentioned security, but I thought Amtrak

12   has Amtrak police.  Can you describe to the Court what type

13   of security you're referring to?

14       A    Amtrak does have their own police force, but the

15   station also has a separate security company, which is

16   contracted through USI, which has the majority of the

17   security throughout the property in terms of personnel.

18       Q    Now, who at JLL is currently responsible for JLL's

19   responsibilities at union station?

20       A    Matt Barry.

21       Q    And who is he?  Does he have a title?

22       A    He's the general manager of the property.  He

23   oversees the property on a day-to-day basis.  He's based at

24   the property.

25       Q    How and long has he been in that role?

1      A      Since last year.

2      Q      And how did Mr. Barry come to be in that role?

3      A      He was originally a referral by the previous

4  general manager, Joan Malkowski, who had been the general

5  manager of Union Station for ten years, roughly ten years.

6          She had come on and been with us during the

7  beginning of our stewardship of the station and then

8  transferred to him as she was retiring.

9      Q      And what experience, if any, does Mr. Barry have

10  in connection with managing an asset like Washington

11  Union Station?

12          MS. HARRISON:  Objection; relevance.

13          THE COURT:  Let me see what he's getting at.

14          Could you just answer that last question, and then

15  let's figure out where we're going from here.

16          Go ahead, you can answer it.

17          THE WITNESS:  Mr. Barry was previously one of the

18  managers at one of the trophy assets in Washington, D.C., in

19  Tysons Corner, and he worked for several of the top

20  institutions throughout the United States, Macerich,

21  Westfield, you know.  He has extensive experience dealing

22  with trophy assets which have mixed-use purposes.

23          THE COURT:  All right.  Let's figure out where we

24  are here.  How much longer do you think your --

25          MR. SCHARF:  I'm more than halfway through my

1    direct examination of Mr. Rebibo, and then we have

2    Mr. Barry, who's probably a 20-minute witness.

3              THE COURT:  Oh, I thought you only had two.

4              MR. SCHARF:  Three.  I mentioned that first thing

5    this morning in an email --

6              THE COURT:  I'm sure you did.  It's been a long

7    day.

8              And Mr. Barry is the gentleman we just talked

9    about?

10             MR. SCHARF:  Yes, Your Honor.

11             THE COURT:  How long do you think your cross

12   will be?

13             MS. HARRISON:  15 minutes at most.  20 minutes,

14   probably with two.

15             THE COURT:  All right.

16             Let's take 15 minutes, and we'll keep going, and

17   we'll try and get done this evening.  All right.

18             MR. SCHARF:  Your Honor, if I may, before we do

19   that, I'm supposed to be in Miami for a mediation tomorrow

20   morning.  It starts at 9:00, and I've got a flight to catch

21   out tonight.

22             THE COURT:  That means you better ask your

23   questions quickly.

24             MR. SCHARF:  Okay, Your Honor.

25             COURTROOM DEPUTY:  All rise.

1          This Court stands in recess.

2          (Recess from 5:01 p.m. to 5:16 p.m.)

3          COURTROOM DEPUTY:  All rise.  The Honorable

4     Amit P. Mehta presiding.

5          THE COURT:  All right.  Mr. Scharf.

6          MR. SCHARF:  May I continue?

7          THE COURT:  You may.

8          MR. SCHARF:  Thank you.

9     BY MR. SCHARF:

10         Q    Now, Mr. Rebibo, you've spoken to DOT about your

11    interest in the leasehold, correct?

12         A    Yes.

13         Q    And FRA?

14         A    Yes.

15         Q    And Amtrak, right?

16         A    Yes.

17         Q    Prior to Mr. Gardner's testimony this morning and

18    him showing us Plaintiff's Exhibit 10, did anyone from any

19    of those entities ever tell you about these plans that so

20    drastically changed the nature of the use of the leasehold

21    interest?

22         A    No.  I learned about them right before the last

23    hearing in the discovery, or prior to the last scheduled

24    hearing.

25         Q    And did you have an understanding as to whether

1  JLL or Matt Barry would continue with the management of

2  Union Station if Amtrak put this plan in place?

3      A     I can't say whether they would or wouldn't.

4  I don't know.

5      Q     Okay.

6            Now, did you see the valuation that Amtrak

7  utilized to base its declaration of taking on?

8      A     Yes.

9      Q     And when was that?

10     A     When did I see it?  In late --

11     Q     Yes.

12     A     -- late 2022, December of 2022.

13     Q     And did it refer to the information that Amtrak

14  was looking for from you but did not get because you didn't

15  enter into an NDA with them?

16           MS. HARRISON:  Objection.

17           THE WITNESS:  Specifically --

18           MS. HARRISON:  The document speaks for itself.

19           THE COURT:  No, I'm sure it does, but go ahead,

20  you can answer the question.

21           THE WITNESS:  The appraisals that Amtrak obtained

22  specifically says it has no property-level information of

23  any kind, so there's no financial information used to

24  formulate the appraisal, and says that it can't be relied

25  upon, effectively.

1  BY MR. SCHARF:

2      Q    Without giving information as to numbers, have you

3  also given Amtrak a number that you would take for the

4  leasehold interest?

5      A    Yes.  We've proposed a variety of different

6  solutions, including numbers.

7      Q    Okay.

8           And in response to your latest proposal, what did

9  Mr. Gardner tell you?

10     A    When we had submitted the last proposal, which was

11  a week prior to or in the weeks leading up to the prior

12  hearing, his response was he wanted to see how the hearing

13  went before responding to me.  He did not provide a counter.

14          And we had previously provided offers in writing

15  to DOT and USRC and as far as back as March, so everyone was

16  aware.  And obviously I'd had a number of meetings with

17  Mr. Newman and his colleagues, so there's not a lack of

18  awareness as to what number we would resolve or how to

19  resolve it.  We've provided a number of different

20  opportunities to do that.

21     Q    Now, we've talked a lot about the concourse

22  modernization project.  You've heard about that, right?

23     A    Yes.

24     Q    Has the project, from your perspective as the

25  owner of USI and also as the lender, been completed yet?

1    A    No.

2    Q    Is it awaiting any approvals from USI?

3    A    No.

4    Q    Does USI have approval or rejection rights

5    regarding the concourse modernization project?

6    A    There are certain aspects of the various projects

7    that require collaboration with USI, but there is not --

8    there's not anything that they -- that they're unable to do

9    as a result of USI.

10        They have the ability to expand per their existing

11   lease, and if there's something outside of the lease, then

12   it would be an agreement similar to what's taken place on

13   other fronts.

14   Q    Can you describe to the Court what are some of

15   those other agreements that have taken place on other

16   fronts?

17   A    Currently as part of the Track 22 project, to

18   re-open that or get it going, or finalized, one example is

19   they had a problem with their fire alarm system.  They

20   required some assistance from USI in order to tie in to our

21   fire pump system, which was not part of their property.

22        And Mr. Newman called me up, I think it was no

23   more than a five-minute conversation, where we provided him

24   with approval to do that.  It was quickly -- quickly agreed

25   to in writing, and that's just one example.

1          There was a basement project that they're

2     referring to for security back of the house and some other

3     matters where we've also provided, you know, an approval to

4     do those projects as well.

5          So we've been working -- I would say we have a

6     very -- certainly Mr. Newman and I have a very good working

7     relationship.  We communicate whenever there's an issue.

8     Our people communicate with their people, and there hasn't

9     been -- and I've made it clear to everybody at the Amtrak,

10    DOT, FRA, and even FRA thanked me at the last meeting for

11    helping with Track 22 -- there hasn't been any instance

12    where we haven't been cooperative or worked together to find

13    a common solution.

14    Q    Since June of 2022, has USI objected to, delayed,

15    or otherwise impeded Amtrak's ability to proceed with the

16    concourse modernization project?

17    A    No.

18    Q    Does Amtrak need immediate possession of the

19    leasehold interest in order to perform the concourse

20    modernization project?

21    A    No.

22    Q    Why not?

23    A    There's nothing that they're trying to do that

24    we're stopping them from doing.

25    Q    And to your knowledge, is Amtrak proceeding with

1  the concourse modernization project?

2        A    To my knowledge, they're proceeding with it, yes.

3        Q    And how about the sub-basement project?

4        A    To my knowledge, they're proceeding with all of

5  it, yeah.

6        Q    And as it relates to Track 22, you talked a little

7  bit about that, what's the status of that?

8        A    My understanding is that's slated -- again,

9  timelines tend to move, but my understanding is that's

10  slated for opening later this year.

11        Q    And is there anything relating to the Track 22

12  project that USI is stopping, hindering, or delaying?

13        A    No.

14        Q    What's the status of the sub-basement project from

15  your perspective?

16        A    You're categorizing it as one project, but the

17  subbasement project has multiple layers to it, as they said,

18  shoring up the reinforcement of the foundation.

19              As far as I understand, they're still in the

20  design and predevelopment phase.

21        Q    And does USI have approval or rejection rights

22  relating to the subbasement project?

23        A    I wouldn't say we have approval or rejection

24  rights.  I would say it requires cooperation and

25  collaboration given the fact that the space is adjacent --

1    it's not -- not all of the space is in their lease premises.

2        Q    And have you cooperated with Amtrak with respect

3    to the subbasement project?

4        A    Absolutely.

5        Q    And does Amtrak require possession of the

6    leasehold interest in order to proceed with the subbasement

7    project?

8        A    No.

9        Q    Why not?

10       A    They have the ability, under their current lease,

11   to take additional space if they need to.

12            They can take all the available office space.

13   They could take all the available retail space.  They could

14   take whatever space they need to to complete their projects,

15   and they just have to pay whatever the fair market share is

16   for that.  And I can assure the taxpayer it's a lot less

17   than $250 millions to lease office space at Union Station.

18       Q    Just a couple of more questions, sir.  Since

19   foreclosing --

20            THE COURT:  I'm sorry to interrupt.

21            But do you mean to say that Amtrak can -- that

22   under the lease, the sublease with USI, it would have the

23   option to lease the entirety of the building?

24            THE WITNESS:  Not exactly, Your Honor.

25            I would say that they have the right to lease

1  adjacent space as they -- you know, as they worked out an

2  agreement with the bathrooms.

3         I would say that from a commercial market

4  standpoint, they had the ability to lease all the office

5  space, they just chose to go elsewhere.

6         THE COURT:  Okay.

7         THE WITNESS:  They have the ability, again,

8  whether it's under the lease or not like the fire sprinkler

9  and the fire pump issue, or the subbasement issue, where we

10  worked with them on the, you know, the security room and

11  that -- some of the storage space.

12         THE COURT:  But just say hypothetically, let's

13  take the great hall area.  Does the lease currently

14  contemplate that Amtrak could try and expand to its --

15         THE WITNESS:  No, not entirely like that, no.  No,

16  your Honor.

17  BY MR. SCHARF:

18     Q    But what about the ticketing area that's in the

19  grand concourse -- in the grand room?

20     A    If they wanted to take additional space adjacent

21  to the ticketing area, you know, they could do that.

22     Q    Okay.

23         Now, since foreclosing, has the lender taken

24  action to develop the commercial aspects of Union Station?

25     A    Yes.  I would say we've taken a number of them.

1     Q    Can you describe to the Court what you've done

2 over the last 15 months with respect to developing the

3 commercial aspects of the station?

4     A    As I said before, we've leased spaces.  We've done

5 a number of public events there.  We've increased security.

6 We've required a number of tenants that were closed to

7 re-open, and made settlements with tenants that were in

8 default of their leases.

9          We have expanded the operation of the station so

10 that it's not just a 9:00-to-5:00 operation.  We require

11 stores to be open on the weekends now.  We have musical

12 events there.  We have events for the BID, the business

13 improvement district locally.  We've invested in the station

14 on a variety of fronts to revitalize it.

15     Q    And since foreclosing, has the render taken action

16 to ensure that the commercial development of the station

17 financially supports the operation and maintenance of the

18 station?

19     A    Yes, I would say we've done that.  We have a

20 significant amount of capital invested in the station,

21 hundreds of millions of dollars, and it's our fiduciary

22 responsibility to make sure that the station is -- is

23 self-sustaining from a financial standpoint, and profitable,

24 hopefully.

25     Q    Now, in your testimony you're saying that Amtrak

```
1    can really accomplish all it needs under the current lease.

2    Has Amtrak asked to restructure the lease to accommodate any

3    additional needs that it has?

4         A     Not under my stewardship.

5         Q     Has USRC asked you to restructure the lease to

6    accommodate any additional needs?

7         A     Not under my stewardship.

8         Q     Has USRC ever defaulted USI under its lease

9    obligations to USRC?

10        A     Not under our -- not under our ownership of USI.

11        Q     And has Amtrak provided any notices of default

12   under its lease with USI with respect to USI's obligations

13   to Amtrak under the Amtrak sublease?

14        A     Not since we've been involved, no.

15             MR. SCHARF:  No further questions, Your Honor.

16             THE COURT:  Thank you, Mr. Scharf.

17   Cross-examination.

18             MS. HARRISON:  I don't know -- me first?  I don't

19   know if Mr. Ross --

20             THE COURT:  Oh, I -- maybe it was too

21   presumptuous.

22             MR. ROSS:  No, nothing for this witness,

23   Your Honor.

24             THE COURT:  All right.  Thank you, Counsel.

25             MS. HARRISON:  Thank you.
```

1                              - - -

2                      CROSS-EXAMINATION

3    BY MS. HARRISON:

4        Q    Mr. Rebibo, hello.  I'm Lindsay Harrison.

5        A    Hi, Ms. Harrison.

6        Q    Good to meet you.

7        A    Nice to meet you.

8        Q    You and Rexmark took control of the day-to-day at

9    the station in June of 2022; is that correct?

10       A    August of 2022, because the prior owner didn't

11   turn over possession until the Southern District of New York

12   intervened.

13       Q    Okay.

14            And you're not testifying about whether USI's

15   conduct impeded Amtrak's project at the station prior to

16   August of 2022, correct?

17       A    No, I'm not testifying that.

18       Q    You're familiar with the letter that Mr. Newman at

19   Amtrak sent to Mr. Press in April of 2022 with an offer to

20   purchase the leasehold interest for $250 million?

21       A    I saw it later on throughout the discovery, but

22   I -- I was not aware of it at the time.

23       Q    You would not have expected a 250 million offer in

24   April of 2022 for USI's leasehold interest on the lender's

25   behalf, correct?

1          MR. SCHARF:  Objection.

2          THE COURT:  Basis.

3          MR. SCHARF:  Hypothetical.

4          THE COURT:  I think there may be a lot of

5    hypotheticals here.  You can answer the question.

6          THE WITNESS:  No, the station had just been

7    purchased -- the senior mortgage had just been purchased for

8    $358 million, and it was worth significantly more.  I had a

9    fixed purchase option.  So even the purchase price that I

10   purchased it at was not market value.  The answer is no, I

11   would not have accepted a $250 million offer.

12   BY MS. HARRISON:

13        Q    And sitting here today, you're not willing to

14   accepted a $250 million offer in exchange for the sale of

15   the leasehold interest of USI in Union Station, correct?

16        A    I don't think anybody experienced would accept

17   $250 million for one of the premier trophy assets in the

18   United States and the second-busiest train station in the

19   United States.

20        Q    And you say that you provided a number to Amtrak

21   prior to the last scheduled hearing in this case.  Amtrak

22   did not accept that, correct?

23        A    Amtrak did not accept that, that's correct, yes.

24        Q    And you have not reached agreement with Amtrak on

25   a price, correct?

1      A    I have attempted numerous times but have sadly not

2  come to a resolution.  I wouldn't even say it's just about

3  price, we've not come to any resolution --

4      Q    Okay.

5      A    -- with respect.

6      Q    When Amtrak filed this condemnation action, USSM

7  and Kookmin disagreed about which entity had the right to

8  control USI, correct?

9      A    Not accurate, no.

10          When a loan is in default, effectively -- and

11  Amtrak knew this when we met in January, and they knew this

12  when they bid on the foreclosure auction, or attempted to

13  bid, when a loan is in default, the commercial lender is

14  effectively in control.

15      Q    I'm just asking, was there a dispute between the

16  parties over who was in control?

17      A    Prior to the condemnation being filed?

18      Q    Correct.

19      A    No.

20      Q    Okay.

21      A    The prior owner, when a loan is in default, is not

22  allowed to approve expenses, sign any lease agreements, do

23  anything effectively while a loan is in default, and that

24  had taken place for two years so --

25      Q    Let's -- let's move then to --

1      A      -- there's no dispute -- there was no dispute

2   about who makes the call.

3      Q      Okay.

4             Let's move to the period after condemnation was

5   filed, so let's say July of -- June/July period.

6             There was a dispute at that point about who had

7   control of USI, correct?

8      A      Yes.

9      Q      In fact, two different parties filed answers for

10  USI in this case?

11     A      That's correct.

12     Q      And there was a dispute about who could negotiate

13  a settlement in this case, correct?

14     A      There was a dispute about who could negotiate a

15  settlement in this case following the condemnation filing,

16  yes, but I think that was resolved in August of 20 --

17  I mean, that's in the documents that we have power of

18  attorney, but it was resolved by the Southern District of

19  New York.

20            I don't think there's any dispute, which is why

21  your client commenced discussions with us following August

22  of 2023 -- 2022.

23     Q      And after Amtrak filed its declaration of taking,

24  Kookmin noticed Amtrak and the Court that the lender had

25  exclusive authority to engage in settlement discussions,

1  correct?

2      A    That's correct, in May of 2022.

3      Q    And it was Kookmin's position that USSM ignored

4  that notice, correct?

5      A    That's accurate.

6      Q    And then Kookmin --

7      A    All following the condemnation filing.

8      Q    Right.

9           And on August 4th, 2022, Kookmin and Rexmark filed

10  the lawsuit against USSM in New York, correct?

11     A    Following this Court's direction, yes, that's

12  correct.

13     Q    And in the complaint, Kookmin asked the Court for

14  a declaration that it had the right to act as USSM's

15  attorney in fact, and that all of USSM's right, title, and

16  interest in and to USI have been extinguished and that

17  Kookmin is the sole owner of USI, correct?

18     A    That's correct.

19          MS. HARRISON:  Your Honor, Plaintiff's Exhibit 8

20  is the complaint in that case.  I'd ask that you take

21  judicial notice of the fact that the complaint was filed by

22  Kookmin and Rexmark against USSM in August of 2022 and

23  sought a declaration that Kookmin is the sole owner.

24          THE COURT:  I'm sorry, what was the exhibit

25  number?

1          MS. HARRISON:  It's Plaintiff's Exhibit's 8.

2          THE COURT:  All right.  Plaintiff's 8 will be

3     admitted.

4          MS. HARRISON:  Thank you.

5                              (Plaintiff's Exhibit 8
                              received into evidence.)
6

7     BY MS. HARRISON:

8          Q    You filed that complaint because the Ashkenazy

9     group was disputing that Kookmin had those rights, correct?

10         A    I filed the complaint because they didn't turn

11    over possession of the property following the foreclosure.

12    They were interfering with the station's operations.  There

13    were bills not being paid at the time.

14              There was a potential disruption at the station,

15    and I had to take action to do what was in the best interest

16    of all the stakeholders, including your client, and protect

17    the interests of all parties.

18         Q    And if Ashkenazy had accepted Amtrak's offer to

19    buy the leasehold interest in April of 2022, Kookmin would

20    have found that to be unacceptable and unlawful, correct?

21         A    Not unacceptable, unlawful because they don't have

22    the ability to accept an offer, which the client was aware

23    of in January and November and prior when they saw the loan

24    was on the market.

25              It was a public auction so...

1    Q    If Amtrak wanted to take additional space at

2  Union Station right now, they could negotiate with USI over

3  a sublease amendment, correct?  That's what you mean when

4  you say they could take more space if they wanted it?

5    A    They could do a sublease amendment.  They could

6  direct lease as they did with the office space.  They

7  could -- at one point they were negotiating to take the east

8  hall for an Amtrak lounge several years ago.

9         They could do a variety of different things that

10  don't involve spending, you know, time on a condemnation and

11  wasting 15 months.

12    Q    All of those things would require an agreement as

13  to price and terms, correct, for the additional space?

14    A    Yes, I would imagine so, or some sort of

15  arrangement.

16    Q    There's no automatic way that Amtrak could just

17  magically take more space?

18    A    Yes, there is.  That's not accurate.  Yes, there

19  is.  They have the right to take additional adjacent space

20  under their lease, they just have to pay fair market value

21  for it.  They can go lease the Sbarro space if they want --

22    Q    Right.

23    A    -- and expand the lounge that they have.  They can

24  go lease some of the neighboring adjacent spaces.

25    Q    Right.  They would have to --

1       A    They just have to pay what the market rent is

2  for it.

3       Q    They would have to negotiate over that and reach

4  agreement as to what --

5       A    The fair market value?

6       Q    Yes.

7       A    No different and a lot less tedious than this

8  process, for a fair market value, yes.

9            MS. HARRISON:  No more questions.

10           THE COURT:  All right.  Thank you.

11           Any redirect?

12           MR. SCHARF:  Nothing, Your Honor.

13           THE COURT:  All right.  Thank you very much.

14           THE WITNESS:  Thank you, Your Honor.

15           THE COURT:  Thank you.

16           All right.  Last witness.

17           MR. KIERNAN:  Your Honor, we call Matt Barry.

18  He's right in the hallway.

19           MR. SCHARF:  Your Honor, while Mr. Barry is coming

20  in, just one housekeeping issue that related to our answer

21  to a question Your Honor had whether or not we had raised

22  the issue.

23           I would draw the Court's attention -- sorry, I'm

24  getting a blast of emails coming in -- page 7 of our answer

25  and page 35 and 36 of our answer, there aren't numbered

1   paragraphs, but on those pages, we make reference to the

2   issue about Amtrak not being able to take this interest

3   because of the way the governance structure was set up.

4           THE COURT:  Okay.

5           MR. SCHARF:  Thank you.

6           THE COURT:  Yeah, I appreciate that.  Like I said,

7   I don't think it was in the argument, but you'll forgive me,

8   I don't flyspeck the answers typically, but in any event --

9           MR. SCHARF:  Thank you, Your Honor.

10          MS. LAMBERT:  And, your Honor, just for the

11  record, we disagree that that's what it says.

12          THE COURT:  Okay.

13          COURTROOM DEPUTY:  Please raise your right hand.

14          (Witness is placed under oath.)

15          COURTROOM DEPUTY:  Thank you.

16          THE COURT:  Hello, Mr. Barry.  Thank you for your

17  patience with us.  Hopefully you haven't been sitting here

18  all day.

19

20

21

22

23

24

25

1                          - - -

2    MATT BARRY, WITNESS FOR THE DEFENDANT, SWORN

3                     DIRECT EXAMINATION

4                          - - -

5    BY MR. KIERNAN:

6        Q     Good afternoon.

7              Would you please state your name for the record

8    and spell your name.

9        A     Sure.  Matthew Barry.  M-a-t-t-h-e-w, B-a-r-r-y.

10       Q     Mr. Barry, what's your current position?

11       A     General manager of Union Station.

12       Q     And how long have you had that position?

13       A     Nine months now.  Just over nine months, yeah.

14       Q     Broadly speaking, and we'll come back to some

15   details, what are your responsibilities as the general

16   manager of the station?

17       A     I'm responsible for all the contracts -- we have

18   over 100 of them -- to help take care of the common area.

19   I'm also in charge of all the leases that are underneath the

20   entity USI.

21             And, you know, I have a staff that deals with the

22   leasing and the marketing as well.

23             And in-house team that helps lease the place,

24   market the place, everything from on-site events to exterior

25   marketing including the website, and other duties as

1    assigned.

2         Q    Fair to say you're very familiar with what happens

3    at the station on a day-to-day basis?

4         A    Yes, I am.

5         Q    Are you very familiar with ongoing projects at

6    Amtrak or other tenants may be working on?

7         A    Yes, I am, intimately.

8         Q    Prior to taking the position at Union Station, can

9    you tell the judge just briefly what your experience has

10   been in property management?

11        A    Sure.

12             I have lengthy -- I guess 30 years of property

13   management experience, most recently at Tysons Corner

14   Center, where I had a hotel, of course, office buildings,

15   residential tower, and the largest shopping center in this

16   area, and top five in the U.S.

17             THE COURT:  I'm sorry, you're saying Syria?

18             I'm sorry, in the area?

19             THE WITNESS:  In the area, yeah, and number

20   five --

21             THE COURT:  It's getting late.  I thought you said

22   Syria.

23             THE WITNESS:  In this area.  Hopefully you've been

24   out there to Tysons Corner Center.

25             THE COURT:  No, I definitely have.  Not to Syria.

1          THE WITNESS:  And -- in this area and one of the

2   top five in the U.S. in terms of productivity.

3          And before that, locally also Westfield Montgomery

4   Mall, Westfield Annapolis Mall, Westfield Wheaton Plaza, and

5   the Kennedy Center.

6      Q    Just in terms of scale for a second, the square

7   footage involved, or the complexity involved, how does

8   Tysons Corner Center, where you were previously, compare to

9   Union Station?

10     A    It's massive compared to Union Station.  I mean

11  it's over a million -- almost 2 million square feet,

12  including all the properties put together.

13  BY MR. KIERNAN:

14     Q    In addition to work in connection with malls and

15  mixed-use projects, do you have a history of working on

16  other types of properties?

17     A    I do.  Yeah, residential and commercial, all

18  different types, condominiums, residential, numerous others.

19     Q    Do you have any degree, college degree, master's

20  degree?

21     A    I do, yes.

22          I have an economics degree undergrad, MBA, and I'm

23  a certified shopping center manager, designation from the

24  ICSC.

25     Q    Where's your MBA from?

1      A     University of Baltimore.

2      Q     Directing your attention to what is happening at

3  Union Station, and focusing particularly on the time where

4  you've been at Union Station, the last nine months you told

5  us, how are things going at Union Station?

6      A     I'm proud of what's going on.  I think things are

7  going really well.

8            So we have -- I have nine tenants under

9  construction right now, Halal Guys is due to open next week.

10            Soon thereafter, Cinnabon will be opening.

11            And then Raising Cane's should be up next.

12            And then right behind them six others that are

13  under construction.

14            So we have, I think, 12 letters and 10 signed,

15  which are LOIs about, you know, working on the go to lease.

16            So with leasing --

17      Q     That's just for -- I don't mean to cut you off,

18  but that's not public, so I don't want you to discuss things

19  that aren't signed up yet by --

20      A     Yeah, I would never --

21      Q     By name I mean.

22      A     -- discussing -- no names with LOIs.

23            But the -- you know, we're showing space every day

24  so the interest is strong.

25            And, you know, we hired Papadopoulos Properties to

1  represent us in the food and beverage not too long ago.

2          And, you know, so the food and beverage, as you

3  just heard some of those names that are about to open, is

4  strong and people want to be there.

5      Q    What about the station's relationship with both

6  its creditors and the people that owe it money, what's the

7  condition of that?

8      A    The condition?

9      Q    Yeah, your AR and so forth.

10     A    Oh, the AR.

11         Yeah, the AR has been whittled down, I think on

12 the AP side of things, zero balance in terms of bills owed,

13 paid all the bills.  So, yeah, financially, books are good.

14     Q    What about projects that are going on in the -- in

15 Union Station, how are those coming along?

16     A    Great, yeah.

17         So we have numerous projects.  One of them being

18 most recently was the new website, which you can look and

19 see has a whole new feel.

20         And on top of that, assign the marketing and

21 events manager.  So you're going to see a lot more rollout

22 towards the experiential side of things, on the floor, if

23 you will.  So you have new stores but then you also have

24 another reason to go there besides getting food and

25 shopping.

1          So -- and then other than that, on the capital

2     improvement side, we have the historic door project, which

3     you'll see all new doors.

4          Q     Historic what, I'm sorry?

5          A     Historic door project.

6          So all the doors that are at the front of the

7     station and around the side will be new.  They actually just

8     came on-site last week and they're in storage.  Looking

9     forward to installing them.

10         And then we have an exhaust fan project, so on top

11    of the roof, if you were there last week, you would see the

12    crane lifting up the exhaust fans for smoke and general

13    exhaust on top of the building, taking air out and in.

14         Q     Now, with all this activity at Union Station,

15    do you have a responsibility -- or do you engage in

16    communications with your landlord, USRC, about what is

17    happening in the station?

18         A     Yes.  Yeah, we have weekly meetings, and, of

19    course, we talk to each other all the time, you know.

20         Q     And are there periodic reports that are submitted

21    by you as the -- by USI as the tenant to its landlord, USRC,

22    about economic activity and projects and so forth?

23         A     Yes.  We have a monthly and quarterly report, as

24    well as an annual report.

25         Q     Okay.

1         Do you regularly meet with representatives of

2  Amtrak?

3     A    Yes, I do, yep.

4     Q    Approximately how often do you personally meet?

5     A    Well, a lot of times on the floor, almost every

6  day.  And then, you know, once a week.  And then we have a

7  standing monthly as well.  We'll get on a call with some of

8  the regionals of Amtrak.

9         But yeah, I mean, it's interactive every single

10  day.

11     Q    During your tenure at the station, to your

12  knowledge, has Amtrak sent to USI a default notice under its

13  lease saying that USI is not doing something it's required

14  to do under its lease with Amtrak?

15     A    No, not to my knowledge.

16     Q    To your knowledge, are there any requests pending

17  in front of USI from Amtrak about any project that Amtrak

18  wants to proceed with?

19     A    No.

20     Q    During the time you've been there, have there been

21  any material issues that, in your experience as a property

22  manager for many years, that USI has delayed responding to

23  or acted in an inappropriate way in responding to or turning

24  around?

25     A    No.

1        Q    Has your landlord, USRC, communicated to you

2   anything about its view about how things are going at the

3   station?

4        A    Yes.

5        Q    Like what?

6        A    The improvements in security are pretty obvious.

7             And some lighting improvement, housekeeping.  Just

8   a lot of the contractors that, you know, I've been whipping

9   into shape and -- from the bronze, you know, polishing to

10  leasing activity as well.

11       Q    Under the arrangements between USI and USRC, does

12  USI need to secure approvals from USRC regarding certain

13  expenditures related to the station for certain projects?

14       A    Yes.

15       Q    And in that connection, is information shared with

16  USRC about the status of projects and how things are going?

17       A    Yes.

18       Q    Who are you -- you're employed by Jones Lang

19  LaSalle; is that right?

20       A    Correct, yep.

21       Q    And does Jones Lang LaSalle have a certain

22  procedure or standard that it follows in how it manages

23  properties?

24       A    Yes, it does.

25       Q    How would you describe that?

1        A     Best in class.  Standard operating procedures by

2   JLL have been procured for, you know, 50 years plus and are

3   topnotch.  We're considered one of the best private

4   management companies in the world.

5        Q     And to your knowledge, does that same level of

6   best-in-class property management -- is JLL bringing that to

7   the table these days at Union Station, excuse me?

8        A     Yes, it does, yeah.  Strong regional support and

9   office here on K Street.

10       Q     And who is the law enforcement agency that has

11  jurisdiction at Union Station?

12       A     Amtrak police.

13       Q     And where are Amtrak police physically located at

14  the station?  Do they have a place?

15       A     Yes.  They have an office right in the Amtrak

16  leased area.

17       Q     And do you and your people interact with the

18  Amtrak police on a regular basis?

19       A     Yes.

20       Q     We've also heard, when you weren't in the room,

21  about a security operation or additional security people.

22  Can you just describe briefly what that is.

23       A     Sure.

24             We have a contract with professional security

25  consultants.  And, you know, as soon as I got there, we

1  increased the hours.

2       And they are in charge of the -- they're a private

3  security force, so they're on, like, the retail and common

4  areas.

5       If when something happens, they'll contact Amtrak

6  police for further backup, if you will.

7  Q    During your tenure over the last nine months or

8  so, have there been occasions where Amtrak has asked to be

9  allowed to have access or have additional space in order to

10 operate?

11 A    Not to my knowledge.

12 Q    During the time that you've been there, has there

13 come a time where Amtrak has asked you or has approached the

14 station and asked to be able to be allowed to put furniture

15 in the great hall or to establish a new waiting area?

16 A    No.  Not to my knowledge, no.

17 Q    Have they asked whether they could have space to

18 create a kid's play area in the station?

19 A    No, they have not.

20      MR. KIERNAN:  Just bear with me one second,

21 Your Honor.

22      (Pause)

23      MR. KIERNAN:  Thank you, Your Honor.  I have

24 nothing further.  Thank you.

25      THE COURT:  All right.  Thank you, Mr. Kiernan.

```
1              Any cross-examination, Ms. Harrison?

2              Oh.

3              MR. ROSS:  No, Your Honor.  Thank you.

4              MS. HARRISON:  Just trying to...

5              Very, very briefly, Your Honor.

6                          - - -

7                    CROSS-EXAMINATION

8    BY MS. HARRISON:

9        Q    Hi, Mr. Barry.  My name's Lindsay Harrison.  It's

10   good to meet you.  I represent Amtrak.

11       A    Nice to meet you.

12       Q    You started working at Union Station I think you

13   said in November of 2022; is that right?

14       A    Correct.  November 28th, correct, yes.

15       Q    So you played no part in managing Union Station at

16   the time Amtrak was negotiating to acquire Union Station

17   leasehold interest from USI in April of 2022, correct?

18       A    I did not, no.

19       Q    And you have no personal knowledge of Amtrak's

20   difficulties getting projects accomplished before November

21   of 2022, correct?

22       A    I do not.

23       Q    Okay.

24            Before the role you presently had, you had no

25   experience with railway facility, a railway station,
```

1  correct?

2       A     Well, Tysons had a Metro station attached to it

3  so --

4       Q     Right, but not --

5       A     -- we had the metro, you know, police and activity

6  coming over.

7       Q     You've never managed a multimodal transportation

8  station, correct?

9       A     I have not managed a train station, no.

10      Q     Okay.

11            You've managed malls and commercial real estate

12  spaces that are retail focused, for the most part, correct?

13      A     I managed numerous sites, properties, mixed use,

14  shopping centers, entertainment venues, you name it.

15      Q     Nothing primarily transportation focused, correct?

16      A     No.

17      Q     No airports?

18      A     Nope.

19      Q     Okay.

20      A     Westfield had an airport division.  I helped them

21  with some of their contracts at National and Dulles.

22      Q     Did you manage an airport?

23      A     No, I did not manage the airport, no.

24      Q     Okay.

25            You mentioned a number of leases with tenants that

1  you're negotiating.  For example, the Halal Brothers,

2  I think you said.  Is that one of them?

3      A    It's Halal Guys, yes.

4      Q    Halal Guys.  Okay.

5           And the opening day for that lease is September?

6  It's this month?

7      A    Yeah, they're actually just getting their finals

8  hopefully this week.  Maybe happened today, so I look

9  forward to -- they said September 15th was the approximate

10 opening date, yes.

11     Q    When was the lease signed?

12     A    I don't have that date in front of me.  I do not

13 remember.

14     Q    Sometime in the last six months?

15     A    I believe it was signed before that.

16     Q    Was it signed after November of 2022, when you

17 started at Union Station?

18     A    There was an amendment done after November 28th,

19 so I was involved in the amendment, but the lease was signed

20 prior to my start of November 28th, yes.

21     Q    Was the amendment to extend it, the lease, so that

22 it would continue further into the future, to extend the

23 term?

24     A    I have to remember all the details of that

25 amendment, but I believe so.  I believe we had an extended

1  term on it.

2      Q    And Amtrak was not involved in the lease

3  negotiations with Halal Guys, correct?

4      A    No, they were not.

5      Q    Amtrak wasn't consulted by you about the terms of

6  the lease with Halal Guys, correct?

7      A    No, they were not.

8      Q    What about with Cinnabon, was Amtrak consulted

9  about the lease terms with Cinnabon?

10      A    No.

11      Q    And was Amtrak allowed to participate in the lease

12  negotiations with Cinnabon?

13      A    No.

14      Q    Okay.

15          What about Raising Cane's, was Amtrak consulted

16  about the lease terms with Raising Cane's?

17      A    No.

18      Q    And Amtrak didn't participate in those lease

19  negotiations either, correct?

20      A    Not to my knowledge.

21      Q    And I think you mentioned 12 other leases that

22  you're -- either negotiated or attempting to negotiate.

23  Amtrak is not involved in any of those lease negotiations

24  either, correct?

25      A    No, they're not.

1      Q    If Amtrak takes possession of the leasehold

2  interest, Amtrak would have to re-negotiate those contracts

3  if Amtrak needed that space for transportation-related

4  projects at the station, correct?

5           MR. KIERNAN:  Objection.

6           THE COURT:  I don't know that he can -- well, if

7  he can answer the question, but it seems like a legal

8  question to me.

9           But in any event, do you have an answer to that?

10          THE WITNESS:  Can you restate the question?

11          MS. HARRISON:  Yeah, maybe I'll rephrase it.

12  BY MS. HARRISON:

13     Q    You're familiar with the terms of those leases,

14  correct?

15     A    Yes.

16     Q    Okay.

17          Do those leases permit Amtrak to use the space

18  being leased to those tenants for transportation-related

19  projects that Amtrak wants to pursue?

20     A    I mean, I don't quite understand the question, to

21  be honest.

22     Q    Does the lease with Cinnabon give Amtrak any

23  ability to use Cinnabon's space?

24     A    No, it does not.

25     Q    Does the lease with Halal Guys give Amtrak any

1  ability to use Halal Guys' space?

2      A    No, it does not.

3      Q    And that's true for all of the other tenants as

4  well, Amtrak won't have the right to use that space that USI

5  is leasing to those other tenants, correct?

6      A    Correct, it's a lease between USI and the tenant,

7  yeah.

8      Q    Okay.

9           And USI is also evicting certain tenants from

10 Union Station too, correct?

11     A    We have some pending suits going on, they may

12 result in eviction.

13     Q    You filed an eviction lawsuit against DDOT for

14 bike storage space, correct, bike shed?

15     A    That is correct, default, yep.

16     Q    And you did not consult Amtrak before filing that

17 eviction action, correct?

18     A    No, we did not.

19     Q    Okay.

20          And you said you've signed contracts to host

21 events at the station, correct?

22     A    That is correct.

23     Q    And that's in the east hall and the great hall?

24     A    Yes.

25     Q    And you didn't consult with Amtrak before signing

1    those agreements for events in those spaces, correct?

2        A    No, we did not.

3        Q    And those contracts for those events don't give

4    Amtrak the right to cancel or use the space if Amtrak needs

5    it, correct?

6        A    That's correct.

7        Q    And some of those events that you're signing

8    contracts for will take place as late as fall of 2024,

9    correct?

10       A    Yes.

11       Q    Anything beyond fall of 2024?

12       A    Not to my knowledge.  I think we booked out to the

13   fall of '24 at this moment.

14       Q    You take your direction from Rexmark, correct?

15       A    Yes.

16       Q    From Mr. Rebibo, yes?

17       A    Yes, I do.

18       Q    And you ultimately have to get approval from

19   Rexmark for leases and other management decisions that

20   affect the station, correct?

21       A    Yes.

22       Q    Are you aware that Amtrak has deposited

23   $250 million with the Court to commence this condemnation

24   action?

25       A    I was aware of that, yes.

1       Q    So did Mr. Rebibo make you aware that Amtrak is

2  actually the holder of the title of the leasehold interest

3  in Union Station?

4       A    I was not aware of that.

5       Q    He didn't direct you to involve or consult Amtrak

6  about any aspect of leases or events or other contracts that

7  affect the station, correct?

8       A    No.

9       Q    And neither did anybody else from Rexmark?

10      A    No.

11      Q    You testified that USI has, I think you said,

12  never delayed responding to an Amtrak request that you're

13  aware of; is that correct?

14      A    Could you repeat the question?

15      Q    Right.

16           You testified that USI has never delayed its

17  response to an Amtrak request.

18           MR. KIERNAN:  I'm going to object because I don't

19  think that's what his testimony was, but obviously he can --

20           MS. HARRISON:  I don't have realtime.

21           THE COURT:  No, I know.  I'm not sure that was his

22  precise testimony either but --

23           THE WITNESS:  Yeah, the -- yeah, there's no --

24  nothing currently open that -- I don't know about never, but

25  currently open, no.

```
1    BY MS. HARRISON:
2        Q    Okay.
3             And do you remember testifying about not having
4    observed USI delay its response to requests made by Amtrak?
5        A    That's correct.
6        Q    And I think you said you couldn't remember any
7    instance in which you observed USI not respond in a timely
8    manner -- I'm paraphrasing here -- to a request by Amtrak;
9    is that correct?
10       A    That's correct.
11       Q    Okay.
12            You know that Amtrak disagrees with that, correct?
13       A    I don't know that.
14       Q    Okay.
15            MS. HARRISON:  May I approach?
16            THE COURT:  Sure.
17   BY MS. HARRISON:
18       Q    I'm showing you a document that's not marked.
19   This is a March 3rd, 2023-dated document.
20            Do you recognize it?
21       A    Yes, I do.
22       Q    This is a letter from Amtrak to you from March of
23   2023, correct?
24       A    Correct.
25       Q    And in this letter, Amtrak informed you that it
```

1  had made requests of USI regarding the Track 22

2  reconstruction project related to fire suppression and fire

3  alarm systems, correct?

4     A    Correct.

5     Q    And it said that those requests were made in a

6  November 18th, 2022 letter, correct?

7     A    That's what the letter says.

8     Q    Okay.

9          And what Amtrak told you was that it had not

10 received any formal response despite follow-up emails and

11 calls.  That's what the letter says, correct?

12    A    That's what the letter says, yes.

13    Q    And so it's actually not true that you're

14 unfamiliar with Amtrak's belief that USI did postpone and

15 delay providing approvals and responses to Amtrak requests,

16 correct?

17    A    No, I mean, upon receiving this, reached out and

18 acted on it prior to me getting there.  I didn't know that

19 this was true or not.  I didn't have this letter so --

20    Q    Okay.

21         But you received this letter in March of 2023,

22 correct?

23    A    Yes.

24    Q    And so in March of 2023, you were aware that

25 Amtrak believed that USI had delayed many months responding

1    to a request about fire alarm and suppression systems for

2    Track 22, correct?

3        A    Well, I think we disagreed with that because we

4    had asked them for plans, and they had not delivered plans.

5        Q    Right, and my question is about what Amtrak was

6    telling you.

7            THE COURT:  The document speaks for itself.  Let's

8    move on.

9            MS. HARRISON:  That's the last question.

10           THE COURT:  Okay.  Great.  Thank you.

11           Redirect, Mr. Kiernan.

12           MR. KIERNAN:  Thank you, Your Honor.  Just

13   briefly.

14                         - - -

15                REDIRECT EXAMINATION

16   BY MR. KIERNAN:

17       Q    Mr. Barry, is it correct that the Halal Guys'

18   lease was signed back pre-COVID?

19       A    Yes.

20       Q    And what about the Cinnabon lease?

21       A    That was signed recently.

22       Q    There's a reference -- Ms. Harrison referenced

23   something involving the McDonald's and the bathroom issue.

24   Can you explain to the Court what you have done in

25   connection with the request from Amtrak regarding the new

1  bathroom where the McDonald's is?

2      MS. HARRISON:  Objection; outside the scope of the

3  cross.

4      THE COURT:  Yeah, I think Mr. Rebibo was

5  testifying on bathrooms, not Mr. Barry.

6      MR. KIERNAN:  There weren't any bathrooms.

7  All right.

8  BY MR. KIERNAN:

9      Q    Well, let me ask this then.

10          Is it correct that in connection with the

11  project -- this is different bathrooms, Your Honor -- the

12  other bathrooms down at the other end of the concourse, that

13  the -- that USI has worked out an arrangement with Amtrak

14  for that project?

15     A    Yes.

16     Q    And that involves moving a tenant, right, at

17  Amtrak's request, to free up space, another tenant?

18     A    That's correct.

19     Q    Ms. Harrison had also asked about the -- the

20  leasing and eviction activity.  Is it correct that all of

21  that activity is regularly reported to the landlord, USRC,

22  as part of your regular reporting to them?

23     A    Yes.

24     Q    And on the letter that was -- it's not marked --

25          MR. KIERNAN:  Will you move this in or no?

1          All right.  Well, never mind then.  Thank you.

2          THE COURT:  All right.  Thank you.

3          MR. KIERNAN:  No further questions.

4          THE COURT:  All right.  Mr. Barry, thank you very

5    much for your time and testimony.  You may step down, sir.

6          MR. SCHARF:  Your Honor, some quick housekeeping.

7          I have been reminded by my team that we didn't

8    move the Cushman appraisal, Exhibit 24, with Mr. Rebibo,

9    that was talked about with Mr. Gardner as well, as well as

10   the concourse agreement, which was Exhibit 22, which was

11   discussed with Mr. Rebibo, I'd move those in evidence.

12         MS. LAMBERT:  Your Honor, we had an objection to

13   28, and I believe you overruled my objection.  But if you

14   didn't, I renew my objection.

15         THE COURT:  Yeah, 28 was the -- you were going

16   to -- you were going to --

17         MR. SCHARF:  Your Honor, if I said 28, I was

18   trying to say 24 and 22.

19         MS. LAMBERT:  So -- but --

20         MR. SCHARF:  So let me start again.

21         Exhibit 22, which is the concourse agreement that

22   Mr. Rebibo referred to.

23         MS. LAMBERT:  We have no objection.

24         MR. SCHARF:  And Exhibit 24, which was the Cushman

25   appraisal that was referred to by Mr. Gardner and by

1  Mr. Rebibo.

2          MS. LAMBERT:  We do have an objection, but we

3  think that the Court has already ruled and denied that

4  objection.

5          MR. SCHARF:  Okay.

6          MS. LAMBERT:  But to the extent the Court hasn't,

7  I would object.

8                          (Defendant's Exhibits 22 and 24
                                received into evidence.)
9

10          THE COURT:  And then on 28, we were just going to

11  ask, you were just going to verify the source of the record.

12          MR. SCHARF:  Yes.

13          We were going to confer -- I think the best way to

14  do it is confer --

15          THE COURT:  Okay, that's fine.

16          MR. SCHARF:  -- where it came from.

17          Your Honor, we also had provided pretrial

18  deposition designations that were -- there were no

19  objections made to them.  I wanted to provide those to the

20  Court.

21          THE COURT:  Okay.

22          MS. LAMBERT:  On 28, we withdraw any objections to

23  that, Your Honor, just so there's housekeeping.

24          And so was there any -- I'm -- kind of missed that

25  last part.

1          MR. SCHARF:  Sure.  The deposition designations

2    that were not objected to that we provided pretrial, we

3    wanted to provide those to the Court.

4          MS. LAMBERT:  We didn't get any.

5          MR. SCHARF:  It was sent by email.

6          MS. LAMBERT:  Neither one of us have received it.

7          MR. SCHARF:  Why don't we try to work that out,

8    Your Honor, as well, and we'll meet and confer on that.  And

9    if it's to be provided, we will.

10          Your Honor, we had, pretrial, made a request to do

11    some post-trial briefing.  In lieu of the fact that some of

12    these issues are legal issues, we would request to submit

13    proposed findings of fact and conclusions of law no longer

14    than 25 pages.

15          THE COURT:  Okay.

16          MR. SCHARF:  If that would be helpful to the

17    Court.

18          MS. LAMBERT:  We'll do whatever you would like us

19    to do with -- recognizing that the hour's late.

20          THE COURT:  Well, I mean that's -- look,

21    I think -- yes, I think the short answer is it would be

22    helpful, and I do want to then have an argument based upon

23    that just to at least get everybody back in.

24          Now, the question is what the timing is.  How long

25    do you think?  And just -- I just need one submission, I'm

1  not going to ask for replies.  We can --

2          MR. SCHARF:  Yes, simultaneous submissions?

3          THE COURT:  Right.

4          MS. LAMBERT:  Your Honor, I think -- the parties

5  are going to, I think, order the transcripts, and I would

6  suggest one week after the parties receive the transcript.

7          MR. SCHARF:  We were going to suggest three weeks

8  after the parties receive the transcript.

9          THE COURT:  Okay.

10         So I think the question is, Bill, do you have a

11  sense of -- I mean, you've got -- you're going to be doing

12  dailies.

13         Well, I think the bottom line is, I'd just like to

14  get something on the calendar, and so if Bill -- let's say

15  hypothetically Bill says he can take about ten days, take

16  ten days or so to get that done.  That puts us at -- what's

17  today's date, the 11th.  That puts us around the 21st, give

18  or take, and if you all want three weeks, the 12th.

19         Why don't we do this.  Why don't we just say, if

20  everybody is comfortable with it, three weeks from when the

21  transcript is finalized.  And once that happens, I'll look

22  at the calendar and figure out when we can get everybody

23  back in.  It's just messy, but we'll figure it out.

24         MR. SCHARF:  Thank you, Your Honor.

25         THE COURT:  It will be 6:00 some other night.

1          All right.  Well, thanks, everybody.  I really

2     appreciate the presentations today.  It's very interesting

3     and, frankly, a very nice break from the usual diet of cases

4     that we've been having around here.

5          All right.  So we've got -- just confirm with

6     Mr. Douyon that the exhibit lists are correct in terms of

7     what we have and we've got all the exhibits here.

8          Is there anything else we need to discuss?

9          MR. SCHARF:  Nothing from us, Your Honor.

10          MS. LAMBERT:  I have one other request,

11     Your Honor.

12          There were leases that are being made of spaces

13     that Amtrak has taken, and remember, Amtrak has taken the --

14     those subject to the leases.  So it is confusing as to what

15     rights any new leases would have.

16          We would request that no new leases be entered

17     into during this time period.

18          THE COURT:  I think that's a more complicated

19     request than simply a thumbs up or thumbs down.

20          MR. SCHARF:  Yes, Your Honor.

21          THE COURT:  I think if you want that, then you're

22     going to have to put something in writing.

23          I mean, I understand what the leasehold's interest

24     is right now, and I'm not sure what that entitles you --

25     what that entitles you to legally in terms of the current

1   lease negotiations and other commercial arrangements that

2   are being made.

3            MS. LAMBERT:  May I request modifying my request

4   and say that at least they would let us know about it so

5   that if there's any -- before they actually sign a lease so

6   if there's any specific issues that are -- where if we do

7   have an issue in general, but because there might be

8   specific issues, that that would allow us to raise them?

9            MR. SCHARF:  My client has said thumbs up to that,

10  Your Honor.

11           THE COURT:  Okay.

12           MS. LAMBERT:  Thank you, Your Honor.

13           THE COURT:  Is this, what, a week's notice before

14  a lease is signed?  I don't know whether that's a realistic

15  way of framing things.  If you have a date certain in which

16  a lease is going to be signed, seven days prior to that,

17  Amtrak is consulted.  Does that work, Mr. Barry, Mr. Rebibo?

18           MR. REBIBO:  We'll give them proper notice,

19  Your Honor.  Two weeks, whatever.

20           THE COURT:  Great.  All right.  Terrific.  All

21  right.  Thank you, all, very much.  Safe travels.

22           And have a good night, everybody.

23           COURTROOM DEPUTY:  All rise.

24           THE COURT:  Please don't wait for me.

25           (Proceedings concluded at 6:08 p.m.)

# C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:__September 19, 2023____    

William P. Zaremba, RMR, CRR

**BY LEFT SPEAKER:**
**[1]** 179/18
**BY MR. KIERNAN:**
**[13]** 181/1 182/8 183/6
184/13 192/12 192/22
193/9 194/7 195/2
315/5 317/13 335/16
336/8
**BY MR. SCHARF: [57]**
96/3 97/14 101/15
102/1 104/16 110/2
113/8 113/12 114/8
114/20 115/17 116/15
117/15 118/3 122/19
123/9 124/11 124/21
128/5 128/18 132/5
135/17 144/20 145/11
146/25 148/12 149/25
150/17 151/9 152/7
156/15 164/2 213/5
217/1 218/10 219/4
226/23 230/14 233/5
235/2 236/7 238/4
243/3 261/9 266/17
270/24 277/16 277/22
283/7 283/18 284/21
285/8 286/25 288/20
296/9 298/1 303/17
**BY MS. HARRISON:**
**[11]** 245/10 248/10
248/25 252/12 306/3
307/12 311/7 325/8
329/12 333/1 333/17
**BY MS. LAMBERT:**
**[30]** 11/7 16/16 18/22
21/25 23/12 26/23
29/17 48/22 49/6 59/3
60/7 61/25 69/6 70/15
71/7 73/11 74/10 78/3
80/12 82/5 83/3 85/25
90/19 166/8 168/4
175/21 177/4 179/13
180/11 196/25
**COURTROOM
DEPUTY: [21]** 5/2 5/6
10/23 10/25 70/24 71/1
131/18 131/20 167/14
167/16 212/1 212/3
212/13 212/16 266/8
266/10 295/25 296/3
314/13 314/15 342/23
**MR. KIERNAN: [20]**
175/13 176/23 180/7
180/20 181/25 182/4
182/23 193/5 193/25
196/15 196/17 313/17
324/20 324/23 329/5
332/18 335/12 336/6
336/25 337/3
**MR. REBIBO: [1]**
342/18
**MR. ROSS: [7]** 131/8
165/25 196/20 244/25
245/2 305/22 325/3
**MR. SCHARF: [146]**
9/5 9/12 9/19 10/7
10/19 82/13 86/11

95/20 97/11 97/13
101/14 101/25 104/9
109/23 110/1 114/14
114/19 115/10 116/6
116/9 116/12 117/2
117/6 117/10 122/16
123/8 123/19 123/24
124/1 124/3 124/5
124/8 124/20 127/25
128/17 130/4 130/19
130/22 131/4 132/1
146/21 148/1 148/22
149/2 149/4 149/12
149/24 150/12 151/22
152/23 153/6 153/10
153/12 153/20 154/11
154/20 154/24 155/25
163/17 165/18 165/22
166/20 166/23 167/1
167/12 198/12 198/18
199/17 200/8 200/12
200/21 201/3 201/12
201/22 202/6 202/10
202/21 203/2 203/5
203/9 204/3 204/8
204/21 205/3 205/7
205/10 205/16 205/22
206/2 207/1 207/6
210/9 212/9 217/21
232/16 235/25 239/12
239/20 241/3 244/21
248/1 261/6 265/9
265/17 265/20 265/23
266/4 276/18 282/9
283/6 285/7 286/2
286/7 286/10 286/24
294/25 295/4 295/10
295/18 295/24 296/6
296/8 305/15 307/1
307/3 313/12 313/19
314/5 314/9 337/6
337/17 337/20 337/24
338/5 338/12 338/16
339/1 339/5 339/7
339/16 340/2 340/7
340/24 341/9 341/20
342/9
**MS. HARRISON: [35]**
217/18 217/23 239/14
240/14 240/17 240/21
241/1 241/6 245/4
245/7 261/3 276/11
282/8 282/25 284/25
285/16 285/21 286/6
289/6 294/12 295/13
297/16 297/18 305/18
305/25 310/19 311/1
311/4 313/9 325/4
329/11 332/20 333/15
335/9 336/2
**MS. LAMBERT: [121]**
6/3 6/5 6/15 6/19 6/23
7/5 7/9 7/15 7/20 8/3
8/6 8/9 8/14 8/16 8/20
8/25 9/8 9/11 9/18 9/21
9/25 10/12 10/15 21/17
21/20 21/24 23/10
29/13 29/15 71/4 71/6

73/6 74/2 74/6 82/3
82/11 85/24 90/15
90/17 95/16 101/6
104/2 113/2 113/11
114/2 114/16 115/4
130/13 144/13 145/5
147/24 148/16 149/17
149/20 150/5 151/8
151/12 151/25 152/20
154/25 155/3 156/5
163/22 166/4 166/19
167/7 167/20 167/24
175/10 175/12 175/19
176/25 179/17 180/2
180/18 183/1 184/5
192/11 193/3 193/23
194/4 194/13 194/17
196/19 197/5 197/10
197/21 197/24 198/1
198/3 198/9 207/14
207/23 208/9 208/14
208/21 209/13 210/3
210/5 210/7 210/10
210/17 210/20 210/25
211/3 211/14 289/8
314/10 337/12 337/19
337/23 338/2 338/6
338/22 339/4 339/6
339/18 340/4 341/10
342/3 342/12
**THE COURT: [331]**
5/4 5/17 6/4 6/13 6/16
6/22 7/1 7/8 7/13 7/17
7/22 8/5 8/8 8/11 8/15
8/17 8/23 9/3 9/6 9/10
9/15 9/20 9/22 10/4
10/8 10/14 10/17 11/1
16/12 18/5 18/21 21/16
21/18 21/22 22/17
22/24 23/3 23/9 26/16
27/13 29/11 29/14
29/16 48/20 58/13
59/23 60/2 60/5 61/3
67/23 68/7 68/19 69/4
70/19 71/2 71/5 73/23
74/4 74/8 77/21 78/1
80/4 80/10 82/14 82/20
85/21 86/12 90/13
90/16 90/18 95/17
95/21 97/12 101/11
101/23 104/5 109/25
113/6 114/4 114/15
114/17 115/9 115/14
116/4 116/8 116/11
116/14 117/4 117/8
117/23 122/9 123/6
123/15 123/23 123/25
124/2 124/4 124/7
124/18 127/23 128/2
128/14 128/16 129/25
130/6 130/15 130/21
130/23 131/11 131/22
135/2 144/15 145/8
146/23 148/8 148/20
148/25 149/3 149/10
149/19 149/21 150/6
150/15 152/2 152/6
152/21 153/4 153/7

153/11 153/14 153/23
154/18 154/21 155/2
155/19 156/9 163/14
163/21 163/23 165/21
165/23 166/2 166/5
166/21 166/25 167/2
167/9 167/13 167/17
167/23 175/14 175/17
176/24 179/11 179/15
180/8 180/19 180/22
181/22 182/2 182/5
182/25 183/2 184/6
192/14 193/6 194/2
194/16 194/18 196/22
197/6 197/17 197/23
197/25 198/2 198/8
198/10 198/15 199/16
200/6 200/9 200/19
201/1 201/5 201/19
202/1 202/9 202/17
202/22 203/3 203/7
203/21 204/6 204/16
204/22 205/6 205/9
205/13 205/20 205/25
206/23 207/2 207/7
207/20 208/4 208/12
208/9 209/11 210/1
210/4 210/15 210/18
210/21 211/1 211/11
211/23 212/5 212/11
212/17 212/19 216/21
218/21 219/3 226/3
226/5 230/10 232/14
234/19 234/23 235/19
235/23 236/24 237/12
237/24 238/3 240/2
240/8 240/16 241/2
241/8 243/2 244/23
245/1 245/3 245/6
248/3 261/4 265/11
265/15 265/19 265/21
266/2 266/6 266/11
270/3 270/9 270/11
270/23 276/14 276/17
277/20 282/12 283/4
283/16 284/16 284/19
285/2 285/17 285/19
286/8 286/18 288/7
288/12 288/14 288/19
289/7 289/11 294/13
294/23 295/3 295/6
295/11 295/15 295/22
296/5 296/7 297/19
302/20 303/6 303/12
305/16 305/20 305/24
307/2 307/4 310/24
311/2 313/10 313/13
313/15 314/4 314/6
314/12 314/16 316/17
316/21 316/25 324/25
329/6 332/21 333/16
335/7 335/10 336/4
337/2 337/4 337/15
338/10 338/15 338/21
339/15 339/20 340/3
340/9 340/25 341/18
341/21 342/11 342/13
342/20 342/24

**THE WITNESS: [91]**
11/2 16/14 18/12 22/21
22/25 23/4 26/18 27/15
48/21 58/15 59/24 60/4
60/6 61/8 68/4 68/8
68/21 77/23 78/2 80/8
80/11 82/18 82/21
86/15 117/14 118/2
128/15 135/5 144/14
144/17 152/5 167/18
175/11 182/6 184/10
192/15 194/5 197/9
212/18 216/24 217/24
218/24 226/4 226/9
230/12 232/20 232/23
233/3 234/21 234/25
235/21 236/1 237/2
237/13 238/1 240/6
240/11 240/20 240/25
241/18 248/2 248/4
265/13 266/12 270/7
270/10 270/13 276/24
282/13 283/17 284/18
284/20 285/1 285/18
288/10 288/13 288/16
289/23 294/17 297/17
297/21 302/24 303/7
303/15 307/6 313/14
316/19 316/23 317/1
329/10 332/23

**$**

**$100 [2]** 268/25 284/11
**$2 [1]** 267/5
**$250 [13]** 90/23 94/19
152/18 166/9 166/14
170/15 170/17 302/17
306/20 307/11 307/14
307/17 331/23
**$250 million [1]** 331/23
**$300 [2]** 183/8 183/23
**$358 [3]** 281/21 282/6
307/8
**$50 [1]** 184/16
**$550 [2]** 150/4 150/13
**$550 million [1]** 150/13
**$60 [2]** 13/12 46/2
**$60 billion [2]** 13/12
46/2
**$7 [1]** 267/6
**$700 [4]** 282/23 284/12
284/23 285/1
**$830 [2]** 147/23 148/15

**'**

**'10 [1]** 30/22
**'20 [1]** 124/9
**'21 [5]** 109/10 110/15
126/22 128/21 149/5
**'22 [13]** 101/1 101/16
103/3 103/6 103/15
103/24 104/17 111/13
124/6 124/13 171/6
229/10 234/17
**'23 [7]** 128/7 129/13
129/16 129/18 132/17
136/6 136/6
**'24 [4]** 135/20 135/24

**'**

**'24... [2]**  151/6 331/13
**'80s [2]**  217/10 225/4
**'81 [1]**  114/12

**0**

**01043 [1]**  1/4

**1**

**1/2 [1]**  267/5
**10 [18]**  31/8 47/4 47/5
158/6 158/7 162/3
162/25 163/2 163/19
163/23 163/25 165/8
165/12 165/15 273/19
274/16 296/18 318/14
**10/15 [1]**  128/21
**100 [2]**  252/2 315/18
**100 percent [2]**  227/17
242/16
**10019 [1]**  2/4
**10022 [1]**  2/13
**1043 [1]**  5/7
**109 [1]**  190/10
**10:00 [1]**  185/20
**10th [1]**  56/13
**11 [7]**  1/5 72/20 72/21
73/7 73/24 160/22
230/19
**1100 [1]**  2/17
**112 [3]**  116/7 116/12
117/20
**11:00 [3]**  70/20 70/22
70/25
**11:15 [1]**  70/23
**11:16 [1]**  70/25
**11th [2]**  83/8 340/17
**12 [8]**  72/20 73/3 73/8
73/10 221/22 267/2
318/14 328/21
**125 [3]**  115/24 116/7
116/16
**12:20 [1]**  172/25
**12:35 [2]**  130/6 131/19
**12th [1]**  340/18
**13 [6]**  21/11 21/17
21/18 78/12 245/13
246/14
**13 months [1]**  125/12
**13th [1]**  187/11
**14 [2]**  79/18 179/21
**14 million [1]**  16/22
**15 [15]**  11/25 29/20
30/11 31/8 119/22
128/21 130/19 134/13
135/13 211/24 272/14
295/13 295/16 304/2
312/11
**15 percent [1]**  134/12
**15460 [1]**  186/5
**15th [1]**  327/9
**16 [3]**  94/7 171/7 171/8
**16,000 [1]**  17/22 17/24
**1633 [1]**  2/3
**17 [4]**  194/8 209/16
210/9 210/15
**1700 [1]**  2/4
**17th [1]**  2/17

**18th [1]**  334/6
**19 [3]**  209/18 210/9
343/7
**197 [2]**  116/8 116/9
**1980s [5]**  217/13 221/1
244/17 271/16 271/25
**1981 [3]**  113/25 114/10
115/8
**1985 [2]**  204/10 253/24
**1988 [4]**  15/23 16/2
16/8 86/5
**1:15 [2]**  131/14 131/19
**1:35 [2]**  130/7 130/16
**1:42 [1]**  185/19

**2**

**2,000 [1]**  31/5
**20 [9]**  30/11 130/14
137/11 215/3 221/8
228/18 272/15 295/13
309/16
**20-minute [1]**  295/2
**20-year [1]**  222/8
**200 [1]**  66/14
**200-square-foot [1]**
280/9
**20001 [2]**  2/23 11/16
**20006 [1]**  2/18
**2000s [1]**  222/23
**2007 [1]**  5/10
**2010 [1]**  30/22
**2011 [4]**  29/20 30/22
32/10 224/4
**2012 [9]**  30/22 32/10
222/17 224/1 225/18
228/7 244/13 251/22
264/7
**2013 [1]**  224/10
**2014 [2]**  224/11 264/7
**2015 [5]**  134/14 227/13
237/16 241/20 264/7
**2016 [5]**  106/3 106/10
137/4 137/6 137/11
**2017 [5]**  140/13 241/22
242/5 242/6 280/2
**2018 [13]**  16/17 17/23
103/21 164/8 164/12
165/2 227/15 229/4
242/17 268/15 268/15
270/19 282/15
**2019 [4]**  143/23 228/18
229/4 242/25
**202 [2]**  2/18 2/23
**2020 [8]**  228/2 228/18
237/18 258/14 269/6
282/3 282/21 288/18
**2021 [14]**  56/13 75/20
77/19 107/1 107/7
109/2 109/8 126/1
137/11 150/18 150/21
151/6 183/11 235/10
**2022 [60]**  82/8 83/8
91/18 100/23 110/24
124/14 124/22 124/24
125/4 159/5 159/10
169/12 169/15 169/24
171/7 171/16 172/21
173/12 174/3 174/21

176/4 178/7 178/16
179/21 215/13 231/2
231/16 231/23 234/11
236/17 236/22 254/17
254/21 269/12 271/2
273/16 281/15 281/18
283/16 287/4 288/13
288/22 297/12 297/12
300/14 306/9 306/10
306/16 306/19 306/24
309/22 310/2 310/9
310/22 311/19 325/13
325/17 325/21 327/16
334/6
**2023 [8]**  1/5 94/4
127/11 309/22 333/23
334/21 334/24 343/7
**2023-dated [1]**  333/19
**2024 [2]**  331/8 331/11
**2025 [1]**  235/10
**2040 [5]**  13/15 17/10
17/13 30/11 102/19
**20th [2]**  283/13 288/11
**21 [6]**  7/19 7/22 8/1
77/12 78/12 194/12
**21,000-mile [1]**  12/5
**212 [2]**  2/4 2/14
**21202 [1]**  2/9
**21204 [1]**  1/14
**21st [2]**  222/20 340/17
**22 [26]**  7/19 7/20
104/21 105/6 105/10
105/10 105/11 112/4
112/18 113/4 134/3
140/5 219/13 235/5
258/22 279/9 299/17
300/11 301/6 301/11
334/1 335/2 337/10
337/18 337/21 338/8
**22-01043 [1]**  1/4
**22-1043 [1]**  5/7
**220 [1]**  17/12
**22nd [1]**  82/8
**23 [1]**  132/22
**24 [9]**  152/16 156/3
156/13 188/4 191/23
337/8 337/18 337/24
338/8
**24' [1]**  136/8
**24101 [1]**  73/8
**24305 [1]**  71/22
**24311 [2]**  199/6 201/10
**24th [1]**  151/6
**25 [3]**  130/14 151/4
339/14
**250 [9]**  17/6 112/19
148/3 153/10 153/11
153/12 170/24 171/1
306/23
**2500 [2]**  18/4 41/11
**25th [3]**  5/10 231/2
234/10
**27 [1]**  140/13
**27th [1]**  2/8
**28 [15]**  15/14 30/14
128/7 230/16 230/20
238/6 238/21 239/13
257/21 261/10 337/13

337/15 337/17 338/10
338/22
**28th [5]**  127/11 245/22
325/14 327/18 327/20
**2nd [1]**  125/14
**2nd Century [10]**
102/10 102/15 102/22
102/25 103/5 106/1
106/4 106/25 108/8
125/10

**3**

**30 [8]**  16/17 39/24
158/8 158/16 163/15
165/3 247/21 316/12
**30 million [1]**  16/21
**30,000 [1]**  17/21
**30-year-old [2]**  250/6
253/10
**300 [1]**  13/3
**30th [3]**  191/7 191/7
191/22
**31st [2]**  204/10 215/12
**32 [3]**  7/2 7/19 7/20
**32 million [1]**  12/7
**3249 [1]**  2/23
**332-8542 [1]**  2/9
**333 [1]**  2/22
**339-6759 [1]**  1/14
**35 [2]**  29/19 313/25
**35 minutes [1]**  163/15
**354-3249 [1]**  2/23
**36 [2]**  132/13 313/25
**3:00 [2]**  211/24 212/2
**3:15 [1]**  211/25
**3:16 [1]**  212/2
**3rd [1]**  333/19

**4**

**4/28 [1]**  128/7
**4/28/23 [1]**  132/22
**40 [7]**  24/9 55/4 115/22
116/13 121/23 122/8
137/22
**407 [1]**  155/4
**408 [3]**  289/9 289/13
289/13
**41 [1]**  122/8
**410 [2]**  1/14 2/9
**45 [2]**  20/25 130/4
**46 [1]**  12/6
**49 [2]**  73/7 199/6
**4:00 [1]**  186/8
**4th [1]**  310/9

**5**

**50 [1]**  323/2
**50,000 [1]**  17/23
**500 [4]**  1/13 17/13
54/24 66/14
**501 [1]**  246/2
**503 [1]**  155/4
**506-1700 [1]**  2/4
**51 [2]**  135/4 135/12
**515 [1]**  94/6
**52 [1]**  198/13
**53 [2]**  235/3 235/5
**55 [2]**  235/4 235/8

**550 [2]**  154/16 166/10
**5564 [1]**  2/18
**58 [4]**  97/18 98/13
235/4 235/8
**5:00 [4]**  266/1 266/3
266/4 304/10
**5:01 [1]**  296/2
**5:16 [1]**  296/2

**6**

**60 [7]**  55/4 66/1 158/8
158/16 198/13 271/16
272/7
**60 days [1]**  153/12
**60 Massachusetts [1]**
24/10
**60 plus [1]**  13/15
**60 seconds [1]**  198/14
**600 [1]**  41/19
**6759 [1]**  1/14
**6:00 [1]**  340/25
**6:08 [1]**  342/25
**6th [9]**  169/12 169/15
169/24 171/6 171/7
171/16 173/21 178/7
185/19

**7**

**7,000 [1]**  43/22
**7.1 [1]**  204/13
**700 [1]**  282/23
**71.1E3 [1]**  211/21
**72 [1]**  96/25
**720 [1]**  282/24
**730 [1]**  282/24
**735-8604 [1]**  2/14
**75 [1]**  247/8
**7th [4]**  172/5 172/15
172/17 186/7

**8**

**8/7 [1]**  135/24
**80 percent [1]**  15/16
**800 [1]**  2/17
**812 [3]**  115/22 116/13
117/22
**830 [1]**  154/17
**8542 [1]**  2/9
**8604 [1]**  2/14
**8th [2]**  172/15 172/17

**9**

**90 [3]**  153/17 158/8
158/17
**900 [1]**  30/21
**901 [1]**  1/13
**909 [1]**  2/13
**955-5564 [1]**  2/18
**97 [1]**  116/9
**97-125 [3]**  115/24
116/7 116/10
**98 [3]**  97/17 97/18
98/13
**99 [1]**  272/6
**99-year [1]**  271/15
**9:00 [2]**  5/22 295/20
**9:30 [1]**  1/6
**9th [4]**  172/21 172/23
173/12 173/19

## A

**a.m [4]** 1/6 70/25 70/25 172/25
**abandoned [2]** 48/18 125/18
**ability [18]** 32/5 53/22 65/11 87/9 92/15 94/15 199/2 276/16 278/16 290/12 299/10 300/15 302/10 303/4 303/7 311/22 329/23 330/1
**able [88]** 16/6 20/10 20/16 30/15 32/20 38/9 41/2 42/6 42/10 42/24 45/5 45/10 45/21 46/19 47/18 49/2 50/2 50/6 51/16 52/24 53/24 54/5 55/11 55/15 57/25 58/1 59/20 60/23 61/18 61/21 62/13 63/1 65/4 65/8 65/20 66/11 67/19 70/1 70/7 70/13 74/19 75/1 76/12 88/12 88/24 89/5 89/18 90/5 90/7 105/9 107/11 107/15 125/7 125/15 125/20 126/17 127/2 129/5 137/1 137/7 138/12 141/21 142/7 142/8 142/13 142/14 143/4 155/12 157/12 163/5 163/9 177/20 180/13 186/14 187/13 188/10 188/11 192/16 220/1 233/7 253/14 254/11 286/21 314/2 324/14
**about [237]** 11/25 12/6 12/16 12/23 13/3 13/11 13/14 13/21 15/15 16/9 16/11 16/22 17/6 17/12 17/21 17/21 17/23 18/4 19/5 21/19 25/3 25/5 29/18 29/19 29/20 30/21 35/11 37/7 40/18 40/19 41/10 41/19 43/22 44/23 45/15 46/25 47/9 47/11 47/16 49/25 51/2 53/7 54/23 56/6 57/20 58/3 66/14 75/3 75/24 76/22 78/21 85/19 88/17 88/18 89/23 96/15 96/16 96/25 99/13 99/13 99/17 99/18 101/7 102/13 103/20 104/11 106/4 106/9 109/16 109/21 111/3 111/13 112/15 113/18 113/19 115/11 115/16 115/20 120/18 121/5 121/19 130/4 132/6 132/7 133/15 134/7 135/1 136/12 136/17 139/2 140/17 140/25 141/4 141/24 142/11 142/23 143/3 143/8 143/9 146/6 146/20 147/9 147/10 147/25 148/2 148/4 148/5 149/8 150/7 151/16 151/19 153/9 153/21 154/13 154/14 155/15 155/21 159/7 159/19 162/4 163/14 164/24 165/12 169/6 177/19 179/23 180/16 181/7 185/15 186/2 186/17 187/14 187/15 187/17 190/9 200/7 200/22 201/2 201/2 201/5 202/23 204/4 207/8 207/9 209/2 209/18 211/17 225/23 228/15 235/14 236/20 240/2 241/10 245/13 248/16 248/18 253/3 253/16 253/22 255/25 257/13 257/22 262/18 263/19 263/23 264/15 267/2 267/5 271/12 273/18 276/8 276/22 278/18 278/19 279/18 280/9 280/13 280/14 280/18 281/12 282/10 283/14 284/12 285/2 285/14 287/25 288/3 288/6 288/23 289/4 289/4 289/16 289/20 289/20 295/9 296/10 296/19 296/22 298/21 298/22 301/3 301/7 303/18 306/14 308/2 308/7 309/2 309/6 309/12 309/14 314/2 318/15 319/3 319/5 319/14 320/16 320/22 321/17 322/2 322/2 322/16 323/21 328/5 328/8 328/9 328/15 328/16 332/6 332/24 333/3 335/1 335/5 335/20 336/19 337/9 340/15 342/4
**above [6]** 24/12 55/19 61/10 187/1 284/23 343/4
**above-titled [1]** 343/4
**absolutely [14]** 13/6 15/6 47/10 47/23 52/23 73/17 154/24 158/21 246/21 252/22 253/13 254/10 254/13 302/4
**absorb [1]** 20/4
**accept [13]** 6/11 65/16 65/16 123/1 123/11 171/8 183/25 184/3 184/11 307/16 307/22 307/23 311/22
**accepted [3]** 307/11 307/14 311/18
**access [6]** 34/5 34/12 35/18 71/20 225/13 324/9
**accommodate [5]** 42/25 43/12 138/21 305/2 305/6
**accommodated [1]** 45/8
**accompany [1]** 176/10
**accomplish [4]** 44/14 48/3 66/16 305/1
**accomplished [3]** 67/5 226/21 325/20
**accordance [5]** 201/16 220/6 260/14 260/17 260/20
**according [3]** 161/5 202/2 235/9
**account [5]** 115/21 118/9 119/7 140/16 140/20
**accounting [1]** 292/10
**accuracy [3]** 133/3 239/5 239/6
**accurate [10]** 21/13 25/15 132/17 136/4 238/21 239/23 289/11 308/9 310/5 312/18
**Acela [8]** 15/14 26/8 30/16 35/16 76/14 94/17 225/12 227/22
**Acelas [1]** 30/14
**achieve [5]** 40/23 57/3 84/11 125/16 126/17
**achieved [2]** 129/12 135/13
**achievement [1]** 129/15
**achieving [3]** 84/10 135/15 223/7
**acknowledge [1]** 138/15
**acknowledged [3]** 158/19 201/15 242/25
**acquire [34]** 45/17 72/9 72/15 73/15 73/18 73/20 74/11 75/13 76/19 80/6 80/8 80/14 92/15 94/20 110/12 122/20 154/1 166/18 169/21 170/10 170/13 171/3 177/20 177/23 181/10 181/12 181/14 181/16 182/13 183/8 192/16 255/7 264/24 325/16
**acquired [3]** 80/13 182/18 269/8
**acquirer [1]** 281/2
**acquiring [5]** 74/13 109/3 111/9 119/19 170/7
**acquiring it [1]** 74/13
**acquisition [25]** 15/19 41/18 60/20 62/19 66/2 72/1 77/16 78/8 78/10 78/18 82/19 82/22 83/15 84/16 85/7 85/10 112/19 120/12 123/22 173/25 180/1 191/6 191/21 191/22 203/17
**across [8]** 12/5 33/20 38/15 43/21 55/14 67/1 71/21 89/18
**act [9]** 113/24 114/10 115/6 203/6 209/20 209/24 209/24 218/1 310/14
**acted [4]** 201/15 292/9 321/23 334/18
**action [44]** 5/7 24/25 47/12 57/8 59/15 62/13 64/9 70/18 71/1 86/16 92/16 93/2 93/15 94/7 95/6 95/11 100/2 100/23 106/15 109/13 109/14 111/21 119/5 119/14 137/18 156/18 157/5 195/23 202/11 233/22 233/22 239/3 243/1 243/11 254/18 255/3 255/20 256/4 303/24 304/15 308/6 311/15 330/17 331/24
**actions [10]** 102/14 102/16 102/24 113/15 115/18 129/10 199/20 233/13 233/25 233/25
**active [3]** 116/18 118/24 163/5
**activities [5]** 14/19 61/21 71/18 121/2 257/7
**activity [12]** 74/24 84/6 160/14 161/19 162/18 200/17 320/14 320/22 322/10 326/5 336/20 336/21
**actor [1]** 108/16
**acts [1]** 218/3
**actual [13]** 18/10 22/14 61/23 108/19 112/23 138/25 150/8 162/25 171/4 176/1 234/8 234/9 276/15
**actually [31]** 14/14 23/18 47/8 47/11 54/12 55/4 67/23 68/7 70/13 106/2 128/22 160/17 164/21 186/9 194/24 195/16 200/15 201/1 208/21 238/19 241/25 262/11 265/6 270/15 270/15 286/15 320/7 327/7 332/2 334/13 342/5
**ADA [1]** 18/14
**adapt [3]** 67/21 75/1 142/15
**add [6]** 53/17 53/20 66/13 88/19 141/8 290/22
**added [5]** 64/4 97/18 224/13 225/19 292/21
**adding [1]** 42/8
**addition [15]** 18/14 27/21 52/25 75/13 76/6 89/4 95/3 98/15 121/24 148/17 149/18 218/8 260/4 264/9 317/14
**additional [27]** 40/9 41/16 46/4 46/14 88/19
137/25 138/8 138/8 138/13 142/11 150/25 173/24 174/2 174/4 174/6 174/9 226/15 284/15 302/11 303/20 305/3 305/6 312/1 312/13 312/19 323/21 324/9
**additionally [3]** 14/6 38/12 76/8
**address [5]** 11/9 11/13 168/6 168/10 242/11
**addressed [1]** 108/5
**addressing [1]** 211/10
**adds [1]** 38/14
**adequate [1]** 126/4
**adjacent [6]** 280/1 301/25 303/1 303/20 312/19 312/24
**adjourn [1]** 130/11
**administration [10]** 45/25 59/25 62/18 83/11 84/2 215/23 216/6 229/16 230/12 238/7
**Administrator [1]** 215/22
**admissibility [1]** 8/19
**admissible [1]** 289/10
**admission [4]** 175/10 176/21 182/23 198/2
**admit [4]** 6/16 7/23 156/9 241/9
**admitted [12]** 3/4 3/16 21/12 29/11 82/15 163/24 175/14 176/24 180/8 183/3 197/15 311/3
**admitting [1]** 289/14
**advance [26]** 58/1 61/17 63/2 84/9 87/25 89/25 90/5 90/7 93/12 102/25 105/2 105/10 106/18 107/14 107/25 108/18 120/24 125/15 125/25 125/23 127/3 134/17 136/10 137/7 160/12 163/9
**advancing [6]** 60/18 74/19 108/3 125/14 137/13 171/25
**adversely [1]** 287/14
**advise [8]** 174/5 174/7 174/8 174/10 174/12 174/14 175/3 175/22
**advised [4]** 84/15 151/20 176/2 177/5
**advising [2]** 175/7 176/14
**advisory [1]** 291/17
**advocating [2]** 264/19 264/20
**affairs [1]** 52/22
**affect [3]** 275/9 331/20 332/7
**affidavit [1]** 104/11
**affirmative [1]** 83/6
**affordable [1]** 275/19

**A**

**afraid [1]** 117/20
**after [44]** 81/16 94/6
95/11 96/18 105/25
109/24 111/8 122/21
124/8 131/17 136/5
136/8 153/15 156/16
158/8 158/17 161/1
161/17 172/3 178/24
178/25 184/15 185/10
185/20 224/3 229/23
231/9 238/21 238/24
247/21 283/12 283/14
283/15 284/17 287/3
287/21 288/9 288/11
309/4 309/23 327/16
327/18 340/6 340/8
**afternoon [16]** 29/10
29/18 29/19 29/23 30/2
30/3 30/5 96/5 167/19
167/20 181/2 181/4
212/18 212/19 213/6
315/6
**again [122]** 17/9 24/2
24/22 28/1 29/6 30/8
32/9 33/21 34/9 35/3
42/13 43/9 43/24 44/17
46/1 48/4 49/17 49/23
52/15 53/2 53/9 54/13
55/6 62/20 63/4 64/15
65/6 67/10 69/16 76/1
78/22 79/1 87/12 92/18
93/11 98/7 108/1
108/15 111/14 116/5
118/14 118/17 119/8
120/23 123/7 125/19
127/2 127/4 127/6
129/7 129/14 129/19
133/4 133/10 134/9
134/16 136/22 137/14
137/18 138/11 140/14
141/14 141/16 141/21
143/1 146/8 157/25
158/21 159/22 159/25
160/11 162/16 162/18
165/10 181/3 194/4
196/4 204/23 208/5
208/10 212/4 218/16
220/8 223/15 228/19
232/15 233/23 235/18
238/12 239/9 242/9
243/22 244/8 246/14
247/10 249/21 249/24
250/3 250/6 251/20
252/13 253/9 253/24
254/3 254/24 255/17
256/7 256/12 258/13
260/11 261/14 262/2
263/9 265/3 275/11
284/25 285/25 286/18
290/17 301/8 303/7
337/20
**against [4]** 287/14
310/10 310/22 330/13
**agency [4]** 60/1 144/24
239/22 323/10
**agent [2]** 269/16 281/1
**agents [1]** 33/20

**ago [6]** 14/16 31/8
222/8 247/10 312/8
319/1
**agree [35]** 78/17 86/25
92/8 98/11 99/12 101/7
102/9 103/5 120/20
129/6 129/24 143/7
145/3 148/1 154/1
155/10 155/11 155/25
162/8 189/10 203/14
246/5 246/12 246/18
246/22 247/13 247/15
247/19 247/24 248/2
249/14 249/19 251/5
252/24 260/2
**agreeable [1]** 69/14
**agreed [7]** 7/23 250/16
251/17 253/12 254/9
255/22 299/24
**agreement [43]** 55/12
83/23 84/1 93/22
105/20 128/9 128/19
128/25 129/3 136/9
138/13 138/17 139/25
140/12 140/15 141/7
154/7 155/13 179/25
180/13 180/14 180/15
180/17 205/14 205/18
211/1 228/10 231/18
259/12 260/3 280/2
282/6 287/6 287/7
287/8 287/12 299/12
303/2 307/24 312/12
313/4 337/10 337/21
**agreements [18]** 64/4
64/17 64/18 64/19
105/23 107/11 125/16
135/15 162/12 228/11
273/10 273/10 273/11
273/12 273/13 299/15
308/22 331/1
**ahead [25]** 7/23 70/20
90/14 109/25 114/7
144/15 145/10 149/22
155/21 156/12 177/16
184/9 186/25 193/8
194/3 194/23 198/17
211/23 245/6 276/23
282/12 285/6 289/21
294/16 297/19
**AHJ [6]** 218/9 220/8
227/4 227/17 238/12
242/15
**aided [1]** 2/25
**air [2]** 222/21 320/13
**airline [1]** 45/6
**airlines [1]** 34/16
**airport [10]** 20/13 21/3
32/7 34/17 35/4 214/20
247/5 326/20 326/22
326/23
**airports [3]** 44/18
246/23 326/17
**AL [1]** 1/6
**alarm [4]** 279/9 299/19
334/3 335/1
**alight [1]** 30/25
**alighting [2]** 32/17

43/11
**aligned [1]** 68/14
**alignment [4]** 63/3
63/4 63/12 68/13
**all [257]** 5/2 5/18 5/21
5/24 6/16 7/22 8/11
8/12 8/16 8/23 9/6 9/15
9/16 9/24 10/8 10/9
10/21 12/21 15/9 19/7
19/16 21/1 22/22 23/6
29/14 31/1 36/10 38/1
38/10 38/17 41/13 42/4
42/13 42/15 42/25 43/8
43/20 45/15 46/15
47/19 48/24 49/18 51/9
52/4 53/19 53/20 53/25
59/20 61/4 63/22 64/4
66/9 68/4 70/24 71/1
71/2 74/9 75/9 82/14
82/23 84/2 87/6 87/10
87/10 88/8 88/11 92/18
93/9 94/17 94/24 95/17
97/6 99/16 103/12
107/11 107/20 109/18
110/9 113/15 115/9
117/23 118/13 125/1
126/11 127/7 129/19
130/15 131/20 131/22
132/12 133/5 134/10
137/1 137/8 137/15
138/10 147/6 147/12
148/9 150/16 151/13
152/6 153/8 153/15
154/14 154/23 155/20
156/9 157/7 157/19
158/2 158/5 159/19
161/3 161/20 162/5
162/12 163/1 165/23
167/2 167/5 167/6
169/7 170/14 172/22
173/18 174/2 174/5
174/8 174/12 179/14
180/19 183/2 185/18
189/1 190/2 190/21
191/13 197/6 197/11
197/15 198/11 198/22
199/20 203/14 205/4
206/25 208/11 209/3
209/9 210/14 211/1
212/1 212/3 212/7
217/3 220/16 223/11
223/18 223/19 228/8
228/16 228/20 240/13
242/18 242/18 244/15
244/18 245/1 245/3
245/18 251/7 253/16
253/23 255/23 257/12
258/14 258/15 260/18
261/4 262/3 263/6
264/14 265/11 265/15
265/16 265/22 266/11
266/24 267/8 267/13
268/10 268/11 270/20
270/21 272/12 272/25
274/24 278/15 278/25
280/17 283/4 288/5
288/6 288/8 290/17
291/16 291/25 292/17

294/23 295/15 295/17
295/25 296/3 296/5
301/4 302/1 302/12
302/13 303/4 305/1
305/24 310/7 310/15
311/2 311/16 311/17
312/12 313/10 313/13
313/16 314/18 315/17
315/19 317/12 317/17
319/13 320/3 320/6
320/14 320/19 324/25
327/24 330/3 336/7
336/20 337/1 337/2
337/4 340/18 341/1
341/5 341/7 342/20
342/20 342/21 342/23
**all right [7]** 8/16 29/14
115/9 117/23 295/17
311/2 336/7 337/4
341/5
**allocated [3]** 162/9
162/10 206/13
**allow [9]** 20/11 40/14
149/22 188/13 193/6
194/2 276/10 287/10
342/8
**allowable [1]** 211/15
**allowed [6]** 237/20
254/8 308/22 324/9
324/14 328/11
**allows [6]** 34/9 66/24
141/8 141/10 204/1
220/23
**almost [9]** 96/4 96/5
223/7 225/8 232/23
252/2 280/8 317/11
321/5
**along [8]** 24/11 67/9
67/25 117/16 159/19
274/22 279/1 319/15
**already [25]** 13/7 13/16
21/12 24/19 30/20 45/3
75/14 76/6 77/10 78/25
81/10 83/8 90/9 91/15
95/5 137/22 150/19
150/22 178/20 190/4
194/19 270/5 271/11
286/13 338/3
**also [81]** 8/9 9/12
15/13 19/12 19/21
19/23 20/8 21/21 25/24
26/5 27/13 28/14 32/17
33/12 35/16 38/24 39/3
39/5 40/5 47/18 52/9
54/17 59/10 61/12
65/22 66/20 67/22
69/24 74/12 76/8 96/12
97/18 102/22 108/14
108/22 114/3 115/5
118/15 133/17 146/8
147/12 150/2 156/8
168/18 169/2 175/7
188/3 193/1 193/14
206/5 214/21 218/3
218/5 218/9 220/24
222/20 223/4 224/22
225/6 234/4 235/13
247/7 252/7 255/2

256/8 256/15 272/6
272/6 285/25 286/22
293/15 298/3 298/25
300/3 315/19 317/3
319/23 323/20 330/9
336/19 338/17
**alter [2]** 276/6 277/8
**alterations [1]** 240/22
**altered [1]** 274/10
**alternative [6]** 272/20
274/6 274/24 289/23
290/9 290/11
**although [4]** 247/16
250/20 254/6 267/24
**always [8]** 86/20
103/17 118/14 141/19
155/22 201/25 250/12
256/11
**am [19]** 11/12 77/8
106/1 112/13 118/2
143/18 148/15 156/16
163/17 164/3 169/10
179/3 193/11 209/17
229/9 243/6 247/7
316/4 316/7
**ambassador [1]** 40/6
**ambassadors [1]**
292/22
**Amber [2]** 2/12 5/14
**amenable [1]** 254/1
**amended [1]** 208/20
**amendment [10]** 139/6
139/8 139/18 208/22
312/3 312/5 327/18
327/19 327/21 327/25
**amendments [6]**
138/16 138/21 138/22
138/25 194/9 205/4
**amenities [6]** 34/5
34/12 36/10 54/15
225/11 250/5
**amenity [1]** 275/5
**America [3]** 204/10
205/23 206/12
**America's [1]** 12/13
**AMIT [4]** 1/9 5/3 131/21
296/4
**Amit P. Mehta [2]**
131/21 296/4
**among [2]** 206/14
211/9
**amongst [1]** 42/18
**amount [21]** 28/20
51/8 88/22 90/24 90/25
94/20 121/5 121/6
121/25 147/17 147/18
148/5 164/4 166/17
170/16 184/3 184/16
268/25 284/24 289/15
304/20
**amounts [1]** 171/2
**AMTRAK [505]**
**Amtrak has [1]** 18/3
**Amtrak's [16]** 11/20
13/7 13/17 14/25 16/19
16/20 17/24 20/1 25/13
32/12 32/16 33/15
33/16 39/11 39/19

**A**

**Amtrak's... [54]** 44/23
45/16 53/7 55/2 58/10
60/17 62/11 63/4 65/11
66/2 66/3 67/7 68/2
69/7 72/14 76/22 76/23
76/25 78/14 81/19
83/14 84/20 85/8 109/2
109/10 123/1 123/11
144/7 170/23 171/8
178/1 193/1 193/11
198/22 203/16 227/8
241/4 241/5 246/9
251/19 255/3 271/23
273/19 274/15 275/23
280/2 280/23 282/22
300/15 306/15 311/18
325/19 334/14 336/17
**Amtrak/USI [1]** 138/16
**analysis [4]** 31/9
121/25 122/5 236/14
**analyst [2]** 214/24
238/25
**analyze [1]** 31/23
**Angeles [1]** 267/15
**Annapolis [1]** 317/4
**announcer [1]** 33/13
**annual [1]** 320/24
**another [15]** 68/10
79/4 80/17 99/6 130/4
130/25 147/25 160/21
257/1 263/13 265/22
271/7 286/9 319/24
336/17
**answer [27]** 109/24
119/10 142/20 166/23
187/5 187/7 187/19
187/22 187/23 192/14
200/22 207/24 211/21
211/21 244/5 282/12
294/14 294/16 297/20
307/5 307/10 313/20
313/24 313/25 329/7
329/9 339/21
**answered [1]** 148/25
**answering [1]** 243/15
**answers [4]** 33/11
98/18 309/9 314/8
**anticipate [8]** 8/21
10/11 15/18 43/21
44/24 45/1 53/10
130/14
**anticipated [7]** 9/7
10/12 77/18 111/21
135/7 192/5 244/20
**anticipating [2]** 9/16
30/8
**anticipation [1]** 120/25
**anxious [5]** 65/4
187/12 187/25 188/15
190/5
**any [115]** 6/6 7/3 8/19
9/4 11/18 17/4 29/5
34/25 36/25 40/7 43/13
43/14 44/5 46/21 60/23
64/11 79/23 80/25
81/22 92/6 93/3 100/16
100/20 104/13 113/1

113/4 116/18 118/24
125/21 125/23 133/2
136/19 141/19 142/11
142/22 151/19 153/3
163/21 166/3 171/7
173/18 174/2 174/4
182/25 188/22 188/22
188/23 188/23 189/2
195/7 195/8 195/23
196/2 196/9 198/22
207/5 209/24 217/15
219/20 220/10 221/9
231/13 232/3 232/18
240/21 242/11 242/24
243/11 245/22 255/12
257/8 257/11 261/5
271/1 273/25 276/12
277/17 279/12 279/14
280/16 284/7 290/20
291/4 294/9 296/18
297/23 299/2 300/11
305/2 305/6 305/11
308/3 308/22 309/20
313/11 314/8 317/19
321/16 321/17 321/21
325/1 328/23 329/9
329/22 329/25 332/6
333/6 334/10 336/6
338/22 338/24 339/4
341/15 342/5 342/6
**anybody [10]** 142/5
142/16 142/17 142/23
142/24 290/21 290/25
291/4 307/16 332/9
**anymore [1]** 211/12
**anyone [7]** 93/25 130/9
174/16 174/18 193/21
287/3 296/18
**anything [27]** 10/18
25/6 25/7 90/10 101/9
104/11 146/24 151/15
151/16 159/13 160/7
202/23 218/7 227/9
228/5 232/8 255/2
256/16 279/15 288/1
292/2 299/8 301/11
308/23 322/2 331/11
341/8
**anytime [1]** 173/16
**anyway [2]** 179/16
207/11
**anywhere [4]** 66/7
192/20 204/17 220/10
**AP [1]** 319/12
**apartment [1]** 267/19
**APD [2]** 40/3 53/22
**apiece [1]** 10/5
**apparel [1]** 272/20
**apparently [1]** 259/23
**appear [1]** 233/3
**APPEARANCES [2]**
1/11 1/15
**appeared [2]** 232/25
262/15
**appears [4]** 133/12
236/19 241/11 259/11
**applies [1]** 198/16
**apply [1]** 201/4

**appointee [1]** 215/22
**appoints [1]** 215/21
**appraisal [37]** 147/15
147/22 148/11 149/4
150/23 151/2 151/2
152/16 152/19 152/21
154/17 170/18 170/19
175/4 175/4 175/9
177/7 177/17 178/22
184/20 184/22 184/24
185/1 185/7 188/22
282/21 282/22 282/23
283/9 284/9 284/23
285/4 286/11 286/16
297/24 337/8 337/25
**appraisals [2]** 286/20
297/21
**appraised [6]** 121/8
121/8 147/18 151/7
166/14 166/16
**appraiser [2]** 175/5
176/10
**appreciate [4]** 5/21
265/12 314/6 341/2
**approach [12]** 33/18
88/20 97/11 108/20
114/14 115/25 117/3
126/13 126/15 126/16
126/17 333/15
**approached [1]** 324/13
**appropriate [6]** 52/7
145/7 162/17 162/18
220/10 220/12
**appropriately [2]** 89/21
161/22
**approval [39]** 58/4
60/21 60/22 63/24 78/9
119/14 119/15 160/12
190/13 191/5 196/2
218/15 219/6 220/22
223/10 227/4 227/6
231/14 232/19 242/2
243/12 254/25 256/3
256/5 256/5 256/5
256/19 257/6 258/9
260/4 260/5 261/1
279/15 299/4 299/24
300/3 301/21 301/23
331/18
**approvals [20]** 55/25
59/16 59/18 59/20
60/24 62/14 62/16 63/6
63/8 64/12 106/20
106/22 127/6 129/6
145/23 219/18 232/3
299/2 322/12 334/15
**approve [5]** 219/23
256/16 256/22 256/25
308/22
**approved [9]** 127/8
191/5 219/9 219/10
219/21 255/6 263/6
279/6 279/12
**approves [1]** 85/10
**approximate [1]** 327/9
**approximately [2]**
147/23 321/4
**April [35]** 91/18 100/23

101/1 124/9 124/23
127/11 129/13 132/17
136/6 169/12 169/15
169/24 171/6 171/7
171/16 172/5 172/15
172/21 172/23 173/12
173/19 173/21 174/3
178/1 178/3 178/7
178/15 178/15 179/21
186/7 254/17 306/19
306/24 311/19 325/17
**April 9th [1]** 172/21
**apron [1]** 26/3
**AR [3]** 319/9 319/10
319/11
**architect [1]** 244/9
**are [228]** 6/9 6/10 7/6
7/12 7/22 8/21 9/6 9/16
10/6 12/9 12/18 15/15
17/16 17/22 18/9 18/20
19/14 19/22 21/7 21/9
23/14 24/7 24/9 24/14
25/20 26/25 27/1 27/2
27/9 27/18 28/16 28/19
29/22 30/18 31/4 32/4
32/6 33/5 33/6 33/7
36/7 36/11 37/15 38/2
38/12 39/2 39/5 39/6
39/7 41/24 42/4 43/16
43/16 44/11 46/21 47/5
47/6 47/8 47/23 53/2
53/9 54/3 55/17 58/23
58/24 59/6 59/6 61/10
61/19 61/19 63/23 65/4
65/17 66/25 66/25
68/14 71/3 72/20 77/1
77/6 82/7 86/22 86/22
87/7 87/10 88/4 89/12
91/15 91/16 93/12 94/6
94/9 94/10 94/12 94/15
94/21 94/22 94/24 95/2
95/15 97/23 98/1 98/7
98/9 100/5 100/24
103/12 104/3 118/13
125/11 125/22 127/21
129/21 130/11 130/23
133/5 134/4 134/22
138/20 139/24 140/11
141/3 141/9 142/22
145/13 147/9 147/10
150/6 150/7 152/21
153/4 153/18 155/14
156/7 156/21 157/17
162/10 163/8 163/9
164/23 169/3 169/8
179/2 180/3 190/18
190/19 194/17 197/12
197/12 198/24 209/11
209/13 209/13 210/15
211/7 211/22 212/7
213/17 213/21 215/25
217/15 217/17 218/1
224/22 226/10 226/11
233/16 233/25 234/2
234/3 234/4 246/2
247/11 249/19 250/25
253/13 256/24 257/5
257/15 263/5 263/6

265/5 266/7 270/18
277/1 279/14 279/19
280/1 285/6 286/19
289/10 291/19 291/23
291/25 292/23 294/24
299/6 299/14 315/15
315/19 316/5 318/5
318/6 318/12 318/15
319/3 319/13 319/14
319/15 320/6 320/20
320/20 321/16 322/2
322/6 322/16 322/18
323/2 323/13 324/2
326/12 331/22 339/12
340/5 341/6 341/12
342/22
**area [110]** 15/9 16/24
17/3 19/6 19/14 19/22
22/5 22/7 22/13 23/6
23/10 23/15 23/20 24/3
24/4 24/23 25/11 26/4
26/12 26/20 26/21
26/21 27/24 28/5 28/6
28/15 28/24 30/18
32/22 33/14 33/25 34/1
34/1 34/3 34/7 34/19
34/23 35/8 36/8 36/20
37/19 39/9 39/12 40/7
40/8 41/8 41/25 42/1
42/16 43/1 43/6 43/9
44/6 45/21 46/8 48/15
49/25 50/1 50/4 51/1
51/4 51/15 51/16 52/4
52/6 52/17 53/13 54/1
54/4 54/8 57/18 57/19
58/25 61/5 61/7 62/5
62/8 62/11 62/11 63/19
65/8 68/23 68/25 70/5
89/2 89/4 89/18 159/7
213/25 217/5 219/1
254/3 275/13 275/22
277/13 277/14 277/14
290/23 303/13 303/18
303/21 315/18 316/16
316/18 316/19 316/23
317/1 323/16 324/15
324/18
**area's [1]** 247/5
**areas [21]** 19/2 22/4
25/20 31/2 40/16 52/15
88/2 141/25 217/6
225/11 226/10 226/17
226/21 250/4 254/7
263/12 264/2 265/6
274/24 291/1 324/4
**aren't [5]** 8/18 61/6
160/15 313/25 318/19
**arguably [1]** 149/14
**argue [2]** 155/14
155/23
**arguing [3]** 154/9
201/5 203/11
**argument [16]** 149/18
154/3 154/18 155/6
156/4 203/22 206/25
207/3 207/5 207/9
207/24 208/7 208/13
209/10 314/7 339/22

**A**

**arguments [1]** 211/21
**arose [1]** 242/12
**around [19]** 20/19 21/2
24/13 30/4 39/20 54/3
55/22 66/10 88/8 95/9
106/2 106/10 222/17
228/18 256/24 320/7
321/24 340/17 341/4
**arrange [1]** 189/5
**arrangement [2]**
312/15 336/13
**arrangements [8]**
134/2 139/14 144/18
217/12 273/3 273/6
322/11 342/1
**arrived [1]** 225/17
**Article [3]** 194/12
204/12 204/13
**Article 21 [1]** 194/12
**Article 7 [1]** 204/12
**Article 7.1 [1]** 204/13
**as [381]**
**as-of [2]** 230/25 231/1
**Ashkenazy [12]** 67/9
93/7 110/21 122/25
123/10 172/13 270/19
280/3 292/9 293/9
311/8 311/18
**Ashkenazy's [1]** 292/8
**Asia [1]** 269/18
**aside [2]** 175/22
290/11
**ask [60]** 5/19 6/11
21/11 22/2 26/16 38/7
56/6 58/3 60/12 63/22
67/7 67/24 72/21 73/4
76/21 77/9 78/11 79/19
80/2 80/20 81/9 81/14
86/2 88/17 90/8 91/14
130/8 142/5 142/17
148/9 151/4 153/4
161/6 163/16 166/22
167/10 171/10 173/22
174/21 175/17 176/25
208/1 209/15 210/1
210/5 226/3 239/10
241/13 278/19 284/22
285/5 290/21 290/25
291/4 292/24 295/22
310/20 336/9 338/11
340/1
**asked [35]** 109/6
110/19 126/19 132/2
142/24 156/22 187/3
188/5 188/5 196/7
196/14 200/22 215/14
224/4 228/1 237/18
238/23 239/3 241/22
242/23 244/5 245/19
262/17 263/19 285/4
291/6 305/2 305/5
310/13 324/8 324/13
324/14 324/17 335/4
336/19
**asking [8]** 145/9
151/22 181/7 196/4
201/8 232/13 263/23

**A**

**aspect [1]** 332/6
**aspects [3]** 299/6
303/24 304/3
**Assembly [1]** 214/24
**assert [1]** 93/13
**assessment [1]** 133/11
**assessments [2]**
108/17 170/14
**asset [19]** 20/6 52/25
53/2 74/23 75/5 84/19
86/19 92/24 134/1
189/12 267/3 267/16
267/18 267/22 268/1
268/8 268/12 291/18
294/10
**assets [7]** 14/3 39/20
62/24 168/20 294/18
294/22 307/17
**assign [2]** 195/7
319/20
**assigned [2]** 229/16
316/1
**assignment [2]** 5/9
154/13
**assist [1]** 132/2
**assistance [5]** 33/10
33/21 88/5 89/20
299/20
**associated [6]** 14/7
37/21 66/17 90/2 94/16
157/21
**assume [8]** 9/6 87/4
113/7 146/19 154/4
216/24 217/24 243/21
**assuming [1]** 239/9
**Assumption [1]** 5/9
**assure [1]** 302/16
**assured [1]** 158/20
**Atlanta [1]** 12/21
**attached [5]** 172/1
190/12 190/17 204/15
326/2
**attachment [1]** 199/24
**attain [1]** 83/23
**attempt [4]** 80/6 93/17
127/3 286/10
**attempted [4]** 181/12
181/14 308/1 308/12
**attempting [3]** 107/13
131/9 328/22
**attend [1]** 78/4
**attendance [1]** 110/8
**attendants [2]** 39/6
39/7
**attended [1]** 245/14
**attention [10]** 82/2
98/12 114/21 128/6
169/18 185/16 186/3
192/23 313/23 318/2
**attorney [2]** 309/18
310/15
**attractive [1]** 225/11
**auction [20]** 77/22
77/25 78/9 78/22 79/15
80/1 80/11 85/12
111/22 120/25 122/23
123/18 124/2 124/4

308/15

**auctions [6]** 77/15
77/25 79/12 111/16
181/13 190/3
**audiences [1]** 251/10
**Audio [2]** 248/24
252/11
**audit [6]** 77/6 78/15
78/17 111/15 111/20
245/21
**August [16]** 94/3 94/4
124/14 124/24 125/4
126/1 126/22 135/19
136/8 242/16 306/10
306/16 309/16 309/21
310/9 310/22
**authentic [1]** 241/11
**authenticated [1]**
239/25
**authentication [1]**
239/18
**authenticity [1]** 239/15
**authority [34]** 26/12
83/14 83/16 83/20
83/24 84/10 84/11
150/2 150/4 159/1
159/4 159/6 159/18
160/5 160/6 160/11
166/11 199/13 200/5
201/16 201/17 201/23
210/24 218/3 218/16
219/19 220/9 223/16
243/15 255/7 256/16
269/19 269/20 309/25
**authorize [1]** 205/14
**authorized [3]** 150/13
152/17 206/12
**authorizes [2]** 85/10
154/16
**automatic [1]** 312/16
**availability [1]** 141/5
**available [7]** 17/4 28/4
40/12 88/16 172/7
302/12 302/13
**Avenue [5]** 2/13 2/22
11/13 24/10 168/10
**awaiting [3]** 231/14
232/19 299/2
**award [1]** 235/10
**awarded [2]** 156/19
203/18
**aware [37]** 75/16
100/13 106/12 111/1
138/20 139/8 139/9
141/15 142/20 142/22
145/13 147/21 148/13
148/13 156/24 157/19
178/21 193/19 193/22
194/14 195/16 195/22
195/23 243/4 244/14
246/9 254/18 255/6
298/16 306/22 311/22
331/22 331/25 332/1
332/4 332/13 334/24
**awareness [1]** 298/18
**away [9]** 38/13 53/24
55/15 63/17 69/13

166/12 183/17 283/12
284/17 308/12 311/25

69/13 87/14 89/11
105/9

**B**

**B-a-r-r-y [1]** 315/9
**B-e-v-e-r-l-y [1]** 213/9
**back [86]** 5/19 13/7
16/10 17/24 18/8 21/1
29/20 30/21 37/18 39/4
45/11 47/17 47/17
47/21 48/19 48/25 49/1
49/22 50/19 53/25 54/4
57/5 62/2 73/24 74/25
79/2 81/7 83/25 84/13
89/17 97/15 124/13
128/10 128/20 129/3
129/7 129/23 130/15
131/14 131/22 132/21
137/4 137/5 154/21
171/15 172/14 173/4
173/21 174/20 174/20
181/6 185/12 186/1
186/20 188/1 188/18
193/18 214/22 217/10
222/22 227/7 227/24
228/3 228/7 229/3
229/4 229/4 231/20
253/25 253/25 259/5
261/18 262/5 262/12
262/14 276/6 276/10
277/25 279/8 286/3
298/15 300/2 315/14
335/18 339/23 340/23
**backing [1]** 137/13
**backup [3]** 90/3 188/22
324/6
**backwards [1]** 15/21
**bad [4]** 31/19 70/13
139/23 154/4
**baggage [13]** 20/25
24/23 28/13 28/13
28/14 49/25 50/1 50/2
50/2 50/3 222/25
275/21 277/14
**bags [4]** 50/3 50/4 50/7
88/5
**balance [1]** 319/12
**Baltimore [2]** 2/9 318/1
**bank [12]** 2/11 69/10
123/18 170/3 170/4
211/11 212/8 269/14
269/17 269/18 270/12
270/14
**bankruptcy [3]** 75/8
92/13 92/21
**Barrett [1]** 2/22
**Barry [18]** 293/20
294/2 294/9 294/17
295/2 295/8 297/1
313/17 313/19 314/16
315/2 315/9 315/10
325/9 335/17 336/5
337/4 342/17
**base [18]** 38/20 38/23
39/9 40/18 41/23 42/10
49/16 54/23 223/6
297/7
**based [20]** 18/2 41/11

41/22 67/8 69/7 129/14
147/15 152/17 153/3
156/11 207/10 235/10
236/16 251/13 251/20
266/23 276/19 289/24
293/23 339/22
**baseline [1]** 259/7
**basement [5]** 60/11
279/7 300/1 301/3
301/14
**basement-related [1]**
279/7
**bases [1]** 41/24
**basic [2]** 37/22 99/16
**basically [12]** 24/10
25/13 25/22 31/2 32/1
35/20 36/7 153/1 192/9
209/5 269/17 278/15
**basis [11]** 206/22
240/5 240/7 257/16
276/13 285/4 285/5
293/23 307/2 316/3
323/18
**Bates [6]** 121/23 122/8
149/9 186/4 190/9
241/6
**bathroom [17]** 51/24
52/1 139/2 139/10
139/12 139/19 139/20
139/21 140/1 140/25
141/1 279/18 279/22
279/23 280/10 335/23
336/1
**bathrooms [21]** 51/25
139/23 140/17 140/23
141/2 141/3 141/5
141/5 141/8 225/12
225/13 279/25 280/3
280/5 280/6 280/19
303/2 336/5 336/6
336/11 336/12
**be [301]** 5/4 5/18 7/11
7/11 7/15 8/18 8/21
10/11 17/7 20/10 20/16
21/2 21/11 27/17 27/17
30/7 30/15 32/20 33/4
38/9 38/13 38/18 38/18
40/6 41/2 42/2 42/10
42/24 44/1 44/13 45/5
45/7 45/10 45/21 46/9
47/6 47/23 49/4 49/4
50/2 50/6 50/22 51/3
51/11 51/15 51/16
51/23 52/23 52/25 53/3
53/24 54/5 54/10 54/11
55/1 55/17 57/2 57/25
58/1 58/25 59/1 60/23
61/16 61/16 61/18
61/21 62/20 62/23 63/1
63/14 65/4 65/8 65/20
65/22 65/23 66/11
67/18 69/21 70/1 70/13
75/1 75/20 76/12 78/12
80/5 80/20 82/14 83/22
84/7 84/8 84/12 85/23
86/17 86/24 87/11
87/14 87/24 87/25
88/12 88/24 89/5 89/17

**B**

**be... [199]** 89/18 89/18 90/5 90/7 90/9 91/3 93/8 94/10 101/8 104/22 105/1 105/10 105/15 106/5 118/8 119/12 122/14 123/3 123/13 123/16 125/4 125/7 125/20 125/20 126/3 130/18 130/24 131/2 134/20 136/7 137/1 137/7 140/1 142/7 142/8 142/13 142/14 143/4 150/8 151/17 154/15 155/12 156/7 157/12 159/20 161/19 162/9 162/17 162/20 163/5 163/23 165/19 166/24 167/21 168/20 170/1 170/2 175/14 176/24 176/25 177/20 178/17 178/18 179/17 180/8 183/2 186/11 187/10 187/12 188/10 188/11 189/12 191/9 192/16 192/24 194/19 194/21 198/6 199/20 199/24 201/9 201/23 202/24 203/18 204/11 205/17 206/3 206/13 208/16 208/17 208/18 211/20 212/4 212/5 217/11 218/9 218/21 223/17 224/13 225/10 225/10 225/14 225/22 226/6 226/9 226/18 226/20 227/22 229/7 229/21 232/10 232/12 233/3 233/7 233/22 234/6 234/6 234/25 235/9 235/19 236/16 237/17 239/3 239/3 239/4 239/10 240/8 241/11 242/6 242/7 242/10 242/22 244/1 244/5 246/20 247/15 248/20 249/9 249/11 252/2 252/4 252/19 253/10 253/14 253/20 253/22 254/1 254/3 254/11 259/11 259/21 260/18 262/6 263/14 265/18 266/2 266/4 268/2 268/20 270/3 274/7 274/9 275/17 275/17 276/10 277/4 278/12 283/2 283/3 285/24 286/12 287/14 289/17 294/2 295/12 295/19 297/24 299/12 304/11 307/4 311/2 311/20 316/6 318/10 318/11 319/4 320/7 324/8 324/14 324/14 329/21 339/9 339/16 339/21 340/11 340/25 341/16 342/7 342/16

**bear [2]** 196/15 324/20
**bears [2]** 149/15 241/5
**beautiful [2]** 37/14 250/2
**became [7]** 15/25 74/23 129/15 224/12 244/14 254/18 263/15
**because [95]** 9/19 3/25 29/7 30/16 31/13 32/19 33/21 35/15 47/15 51/25 53/21 54/13 56/5 61/10 62/24 64/14 64/18 65/3 65/6 65/16 68/13 70/9 80/1 92/6 93/14 104/24 108/1 110/8 110/18 113/21 120/22 122/23 124/2 125/15 126/4 126/12 126/17 129/4 129/21 134/16 135/14 136/2 136/9 141/7 146/10 148/17 148/17 155/17 156/6 171/24 173/4 175/18 184/3 184/11 186/7 187/13 192/7 196/3 201/8 201/13 201/24 202/8 202/24 203/21 204/12 205/19 206/16 208/17 210/14 220/9 221/13 230/6 230/16 233/24 234/4 241/23 243/16 244/1 249/8 251/12 255/17 276/19 277/4 285/25 286/4 286/12 297/14 306/10 311/8 311/10 311/21 314/3 332/18 335/3 342/7
**become [6]** 161/2 196/8 204/25 205/1 260/6 268/13
**becomes [2]** 52/5 260/8
**becoming [1]** 106/12
**bed [4]** 224/9 224/19 224/20 235/8
**been [197]** 7/6 7/7 7/10 7/21 8/6 8/7 11/24 13/21 14/18 15/10 16/5 22/2 26/22 33/23 43/20 44/23 45/15 46/15 46/24 46/25 48/18 48/20 48/21 51/4 61/16 61/24 65/2 66/10 71/17 72/22 74/17 74/19 76/8 76/9 77/19 79/12 92/22 93/19 93/22 100/24 101/10 102/25 105/7 105/9 106/2 106/10 106/16 106/18 107/6 107/11 107/12 107/13 107/15 109/15 109/19 110/6 115/5 115/7 125/18 126/17 127/2 128/21 129/5 129/12 132/7 134/16 134/17 134/24 137/21 138/12 138/15 138/20 138/22

**begin [11]** 6/3 125/8 159/17 159/24 218/11 218/14 218/17 234/10 236/18 242/25 249/4
**beginning [3]** 130/25 173/5 294/7
**begins [1]** 112/6
**begun [1]** 136/24
**behalf [4]** 212/8 238/8 269/17 306/25
**behind [7]** 19/15 33/12 37/22 94/15 94/18 179/9 318/12
**being [38]** 20/7 42/6 47/18 49/2 58/24 64/20 67/19 70/7 86/4 94/25 105/18 137/16 140/1 144/11 149/6 152/2 177/5 190/2 201/6 229/14 238/25 243/20 250/10 257/25 262/18 264/1 264/18 275/3 275/9 277/1 287/13 308/17 311/13 314/2 319/17 329/18 341/12 342/2
**belief [1]** 334/14
**believe [56]** 7/5 25/8 25/16 77/20 82/3 86/5 86/17 97/5 99/5 99/21 115/19 126/2 129/22 141/7 158/2 160/22 160/25 166/16 197/15 198/4 205/3 205/6 209/16 217/10 227/12 228/8 229/5 231/17 239/20 239/25 241/20 251/8 251/15 252/21 252/22 252/22 254/4 255/4 257/25 258/4 258/13 262/7 262/8 262/14 265/7 268/15 276/9 277/17 279/10 280/7 283/13 283/23 327/15 327/25 327/25 337/13
**believed [4]** 123/3 123/13 252/19 334/25
**belongs [1]** 113/5
**below [5]** 32/24 58/16 60/9 116/17 122/6
**benches [2]** 142/1 291/1
**beneath [1]** 259/6
**benefit [3]** 67/21 70/3 160/3
**benefits [1]** 20/17
**BENSON [1]** 2/3
**besides [2]** 175/7 319/24
**best [7]** 67/18 85/9 311/15 323/1 323/3 323/6 338/13
**better [22]** 32/4 38/19 38/19 42/17 42/18 52/1 65/9 66/12 87/13 87/17 132/4 157/12 157/23 182/20 195/3 219/17

**begin [11]**

**bear**

**began [9]** 14/17 16/6 224/2 228/17 228/19 237/16 241/19 242/18 275/24

**beforehand [1]** 20/24

**befitting [3]** 45/13 66/21 66/22
**before [56]** 1/9 6/3 10/17 21/1 24/25 59/15 62/13 84/10 89/6 94/1 96/12 99/9 104/22 106/5 106/15 107/6 127/3 130/11 136/23 140/8 142/3 146/6 150/22 153/7 157/2 178/22 181/13 196/1 197/3 198/12 212/13 231/9 244/23 247/11 250/3 250/16 256/5 256/23 257/15 282/22 284/10 288/8 290/18 293/4 295/18 296/22 298/13 304/4 317/3 325/20 325/24 327/15 330/16 330/25 342/13

**139/9** 141/21 142/11 147/22 147/22 148/4 150/22 151/3 151/20 152/15 152/17 159/9 159/19 162/4 163/1 165/2 165/4 165/4 165/5 165/5 168/12 168/13 178/21 181/18 184/17 188/23 189/15 189/15 189/20 190/1 190/3 195/16 195/23 195/24 196/2 197/15 198/4 201/25 202/5 203/20 203/23 204/7 204/8 206/25 214/17 218/19 220/21 220/25 221/1 222/22 226/17 227/4 228/24 229/3 231/15 231/18 231/23 232/25 233/23 236/23 237/25 238/1 239/15 239/18 240/23 245/11 245/22 246/14 252/8 253/7 256/20 257/12 257/17 258/10 258/11 259/24 262/15 267/1 270/5 270/7 270/7 270/20 273/18 274/21 275/12 277/24 278/10 278/17 278/22 278/24 279/23 282/2 282/18 284/9 286/3 286/12 290/18 290/19 293/25 294/4 294/6 295/6 298/25 300/5 300/9 300/11 300/18 300/18 307/6 307/7 310/16 314/17 316/10 316/23 318/4 319/11 321/20 321/20 322/8 323/2 324/8 324/12 337/7 341/4

**223/8** 225/12 225/13 249/23 250/13 295/22
**betterments [1]** 87/10
**between [44]** 13/12 15/8 15/16 17/10 17/13 30/8 30/10 57/23 63/18 64/16 64/17 66/15 67/14 69/17 69/17 84/1 84/6 86/3 91/16 140/12 141/10 159/7 191/10 191/23 192/10 194/9 204/10 205/18 205/20 205/23 208/6 210/1 217/8 221/3 247/8 249/25 257/7 257/13 262/10 271/18 272/10 308/15 322/11 330/6
**beverage [4]** 272/20 275/4 319/1 319/2
**Beverly [4]** 64/10 212/9 213/2 213/8
**beyond [12]** 16/5 32/11 54/1 114/2 141/5 145/6 146/9 151/17 159/14 193/3 226/8 331/11
**bid [11]** 80/11 85/12 150/4 183/17 237/7 237/8 238/19 293/5 304/12 308/12 308/13
**bidding [2]** 166/13 284/6
**bids [1]** 136/3
**big [11]** 35/17 36/13 41/4 51/18 55/12 55/13 63/12 76/10 94/24 219/15 252/25
**bigger [3]** 13/22 45/24 69/3
**biggest [1]** 20/8
**bike [2]** 330/14 330/14
**bill [5]** 65/6 235/16 340/10 340/14 340/15
**billing [1]** 292/10
**billion [5]** 13/12 46/2 267/5 267/6 282/18
**bills [3]** 311/13 319/12 319/13
**binder [7]** 7/9 7/14 8/3 90/14 169/2 210/12 230/18
**binders [1]** 7/1
**binding [2]** 85/11 85/12
**bit [18]** 19/20 29/24 29/25 30/3 56/4 83/25 128/23 133/15 143/8 146/6 154/21 158/12 194/2 213/23 249/17 286/19 287/24 301/7
**blacks [1]** 55/15
**blaming [1]** 63/5
**blast [1]** 313/24
**block [7]** 25/20 26/3 26/25 35/8 41/25 54/1 62/12
**blow [2]** 175/17 194/24
**blown [1]** 175/25
**blue [1]** 263/3

**B**

**board [80]** 11/23 19/8 29/9 30/25 39/6 69/2 76/16 76/22 76/23 76/25 77/5 77/7 77/15 78/8 79/5 79/7 79/10 79/11 79/12 79/14 79/20 80/3 80/18 80/25 81/12 81/20 82/7 82/23 84/16 84/23 85/2 85/6 85/13 98/2 109/3 109/7 109/11 109/15 109/16 111/3 111/12 111/17 111/19 115/20 118/8 119/5 119/25 120/8 121/17 121/22 122/2 124/22 148/14 149/6 150/13 188/23 190/13 190/24 191/5 191/5 191/13 193/12 201/25 215/9 215/16 215/17 215/18 221/13 224/4 242/4 242/13 244/13 244/19 245/14 255/2 255/4 255/14 255/15 255/19 255/21
**Board's [1]** 254/25
**boarded [1]** 23/8
**boarding [8]** 24/22 28/3 28/22 31/2 32/17 43/11 52/6 62/12
**boards [1]** 28/11
**body [1]** 39/8
**book [3]** 6/9 6/19 190/8
**booked [1]** 331/12
**books [3]** 90/15 128/4 319/13
**bookshelves [1]** 180/21
**borne [1]** 94/10
**borrower's [2]** 269/1 281/10
**Boston [5]** 12/15 68/2 68/12 155/3 267/14
**both [26]** 12/17 12/24 13/23 26/21 30/25 32/25 41/3 41/22 54/13 60/17 72/6 77/24 86/20 88/24 102/15 105/22 118/14 146/11 163/11 190/2 192/25 207/17 220/16 256/21 282/2 319/5
**bottom [12]** 21/21 22/12 24/3 27/11 48/6 49/8 50/5 50/19 52/18 114/22 186/4 340/13
**bought [3]** 75/7 181/23 182/3
**bout [1]** 276/16
**box [1]** 261/12
**brand [4]** 40/6 45/7 66/20 70/11
**branding [2]** 36/25 37/1
**break [12]** 33/14 70/20 89/6 130/9 131/5 202/13 205/15 205/17

**breakdown [1]** 191/20
**bridge [3]** 58/9 61/24 223/2
**brief [2]** 122/9 172/11
**briefed [2]** 107/3 229/23
**briefing [1]** 339/11
**briefly [7]** 25/19 132/6 216/3 316/9 323/22 325/5 335/13
**bring [14]** 23/18 26/2 26/7 42/13 43/25 49/17 50/3 53/20 53/22 53/25 54/4 88/4 88/24 128/3
**bringing [4]** 47/21 54/24 222/19 323/6
**broader [1]** 62/21
**Broadly [1]** 315/14
**Broadway [1]** 2/3
**broken [1]** 153/8
**brokerage [1]** 291/17
**bronze [1]** 322/9
**Brothers [1]** 327/1
**brought [2]** 75/1 276/10
**budget [2]** 214/16 214/23 259/8
**build [7]** 54/3 71/21 228/2 237/8 237/17 237/21 280/3
**buildable [1]** 227/18
**building [90]** 19/4 19/11 19/15 21/2 23/2 24/13 24/17 25/24 27/11 27/23 36/10 36/15 36/19 37/1 37/2 37/6 37/11 40/25 41/6 41/20 41/23 45/10 46/25 47/17 47/22 49/20 51/12 51/20 52/20 53/4 55/5 55/7 55/16 57/11 57/11 57/12 58/17 59/10 59/11 59/14 61/14 62/23 63/20 65/8 67/12 68/21 74/22 75/2 75/11 75/15 76/5 89/16 89/18 118/16 143/3 145/22 145/25 146/1 164/11 164/17 164/18 164/19 164/21 164/24 216/4 218/18 219/2 219/10 219/22 220/11 220/12 220/19 221/11 221/14 223/11 224/5 228/24 244/3 244/9 244/10 250/2 256/17 256/18 256/20 257/3 257/11 275/5 291/2 302/23 320/13
**buildings [5]** 237/6 267/18 267/19 275/14 316/14
**built [3]** 140/2 191/9 225/4
**bulk [1]** 215/2

**bunch [3]** 141/24 190/4 262/17
**burden [1]** 198/19
**burgundy [1]** 292/23
**bus [1]** 20/8
**buses [1]** 220/24
**busiest [10]** 12/13 14/22 15/2 29/6 45/14 48/5 187/15 246/10 275/13 307/18
**business [23]** 5/8 11/8 11/12 11/22 29/4 40/1 45/4 45/22 46/23 54/21 57/2 72/5 76/11 84/20 87/15 93/14 103/17 168/6 168/10 246/23 266/22 267/1 304/12
**businesses [1]** 272/16
**busy [1]** 28/21
**busyness [1]** 30/13
**butting [1]** 142/1
**buy [5]** 33/9 119/5 183/15 287/20 311/19
**BWI [2]** 214/20 246/24

**C**

**cafe [1]** 39/6
**calendar [2]** 340/14 340/22
**caliber [1]** 280/10
**California [1]** 251/1
**call [22]** 10/16 19/2 70/2 70/5 70/6 82/1 167/7 172/7 172/8 172/10 172/11 172/12 173/8 173/9 212/7 212/9 248/23 252/10 277/12 309/2 313/17 321/7
**called [19]** 6/9 7/18 18/13 39/5 59/4 59/5 72/23 102/10 103/11 216/14 224/17 234/25 242/5 242/10 269/22 270/15 271/5 271/8 299/22
**calling [3]** 9/16 169/18 222/9
**calls [5]** 179/23 229/21 229/23 279/4 334/11
**calm [1]** 89/5
**came [19]** 56/25 71/19 103/25 104/15 150/23 153/18 222/15 239/16 239/16 241/4 242/3 242/13 242/14 244/13 253/6 280/19 284/23 320/8 338/16
**cameras [1]** 53/20 53/21 88/22
**can [189]** 5/18 8/23 21/20 21/23 23/25 25/10 26/16 28/14 30/24 31/5 31/5 31/17 34/13 38/18 41/19 42/15 43/12 43/24 44/12 45/7 45/11 46/18 47/3 47/3 49/9 53/10

63/19 65/13 66/16 73/24 74/3 74/7 83/16 85/23 86/12 86/13 87/5 87/24 88/16 89/7 101/13 101/24 104/23 105/2 105/3 105/6 111/24 117/8 117/8 117/10 117/11 117/16 122/9 122/11 125/20 125/23 125/24 128/6 128/14 129/9 131/3 131/4 131/15 131/24 132/3 135/3 135/12 140/6 142/9 143/1 143/5 148/20 152/4 153/4 153/21 154/15 155/22 156/3 158/23 161/7 161/20 161/25 162/2 163/10 167/21 168/5 173/9 175/17 179/8 181/20 183/21 184/8 186/2 186/11 186/25 192/14 194/11 194/18 194/19 194/21 194/21 194/24 194/25 198/12 199/6 201/9 203/10 203/13 206/20 208/17 209/5 210/1 212/13 213/6 216/3 218/11 221/3 222/11 225/1 226/3 230/20 230/24 232/1 234/8 234/18 234/19 236/9 240/3 241/3 241/9 241/13 245/25 249/9 249/11 252/10 256/12 256/12 261/14 261/22 261/22 262/23 262/24 264/15 265/17 266/18 267/11 272/4 272/16 273/14 273/24 275/8 275/25 276/14 276/22 277/23 279/21 282/4 282/12 285/13 286/23 288/4 288/7 288/21 288/25 291/6 292/5 293/12 294/16 297/20 299/14 302/12 302/16 302/21 304/1 305/1 307/5 312/21 312/23 316/8 319/18 323/22 329/6 329/7 329/10 332/19 335/24 340/1 340/15 340/22
**can't [27]** 38/10 66/6 66/7 93/12 125/16 142/20 145/3 154/3 154/5 154/7 154/15 175/25 175/25 200/10 207/21 208/16 209/25 218/14 218/17 220/9 225/22 250/12 279/11 287/14 289/17 297/3 297/24
**cancel [1]** 331/4
**cancelation [2]** 79/15 80/1
**canceled [9]** 79/13

94/2 111/5 111/9 111/16 112/21 204/11 283/12 284/17
**Cane's [3]** 318/11 328/15 328/16
**cannot [2]** 153/25 199/12
**cap [2]** 267/7 281/3
**capacity [23]** 15/16 42/10 51/19 51/24 52/13 66/19 67/3 72/6 87/9 95/2 109/18 112/15 228/9 246/13 250/17 251/5 251/19 252/5 252/25 253/3 253/3 254/8 268/16
**capital [14]** 14/7 61/13 98/8 144/7 218/11 219/5 219/8 219/21 220/5 257/18 257/22 267/8 304/20 320/1
**capitalize [1]** 98/8
**capitalized [1]** 98/2
**capitol [2]** 66/22 67/1
**car [1]** 39/7
**care [2]** 167/5 315/18
**career [2]** 14/15 215/1
**careful [2]** 98/5 255/23
**Carolina [1]** 12/20
**carousel [2]** 28/13 50/5
**carriageway [1]** 27/24
**case [27]** 68/12 93/16 100/17 101/4 135/14 141/15 145/6 147/24 148/2 155/18 168/24 190/1 195/6 197/16 206/19 215/21 218/4 227/21 242/24 251/16 267/19 283/2 307/21 309/10 309/13 309/15 310/20
**cases [9]** 137/13 155/14 219/25 230/7 267/10 267/10 273/13 278/11 341/3
**cash [2]** 121/24 267/6
**catch [2]** 264/14 295/20
**catch-all [1]** 264/14
**categorizing [1]** 301/16
**category [2]** 234/18 257/19
**cause [4]** 64/6 243/24 244/1 244/6
**caused [3]** 63/23 63/23 119/19
**cease [2]** 277/2 277/4
**ceasing [1]** 177/12
**ceiling [5]** 58/10 58/17 58/23 59/2 280/12
**center [6]** 316/14 316/15 316/24 317/5 317/8 317/23
**centers [1]** 326/14
**central [1]** 54/5
**centralize [1]** 53/19
**century [25]** 102/10

# C

century... [24] 102/15 102/22 102/25 103/5 106/1 106/4 106/25 108/8 125/10 125/14 136/18 137/2 143/8 222/6 222/10 222/13 222/14 222/20 223/24 225/15 248/16 248/18 252/17 257/25

CEO [16] 11/12 11/19 11/20 77/3 92/2 214/7 215/4 215/8 215/12 221/4 248/12 248/19 250/16 251/17 253/12 254/9

certain [29] 96/10 98/22 98/23 99/4 115/12 115/13 115/20 125/1 135/8 137/25 138/8 146/24 183/13 226/12 234/2 262/8 263/5 273/13 274/4 278/9 278/11 290/5 292/11 299/6 322/12 322/13 322/21 330/9 342/15

certainly [30] 64/2 87/5 109/15 115/25 121/15 121/20 125/19 136/4 138/23 140/18 141/18 144/9 150/24 162/1 178/13 190/2 207/24 209/22 215/2 241/10 247/15 247/16 248/21 250/9 250/9 253/9 254/8 263/12 279/11 300/6

certified [2] 2/21 317/23

certify [1] 343/2

cetera [10] 24/23 33/14 38/6 40/17 40/25 44/14 49/2 61/22 84/8 110/9

CH [1] 2/22

chain [2] 64/20 71/23

chair [3] 57/14 57/14 215/24

challenge [1] 51/25 63/9 69/23

challenges [9] 56/15 56/18 56/21 109/22 143/9 143/24 144/8 145/22 147/7

chance [3] 52/16 54/5 96/18

change [16] 46/21 62/19 75/25 93/9 110/3 110/7 110/7 121/1 122/23 126/25 127/9 129/2 243/12 253/5 264/19 264/20

changed [8] 125/20 139/21 204/20 239/4 239/4 239/10 277/4 296/20

changes [7] 97/6 98/12 142/8 143/5 239/7

changing [6] 75/25 109/11 244/17 253/5 277/10 277/11

charge [4] 70/10 91/2 315/19 324/2

charged [2] 45/23 239/22

charging [1] 34/6

chart [1] 125/2

chartered [2] 39/18 203/9

check [2] 20/25 238/24

checked [1] 50/3

Chicago [2] 12/25 267/15

chief [1] 214/21

children [12] 32/23 44/4 44/5 44/6 44/7 44/10 44/13 44/14 44/15 51/16 104/13 112/25

chose [2] 207/17 303/5

chosen [1] 254/6

Christmas [1] 142/3

chuckle [1] 139/2

chute [1] 50/5

Cinnabon [6] 318/10 328/8 328/9 328/12 329/22 335/20

Cinnabon's [1] 329/23

Circle [2] 22/14 24/3

circulating [1] 20/20

circulation [2] 26/1 68/24

cities [2] 267/13 290/1

city [15] 12/2 12/3 13/23 19/11 20/8 39/21 57/15 66/3 72/5 85/8 132/25 203/12 203/19 215/24 266/24

civil [3] 5/7 179/15 179/17

claim [3] 222/25 277/14 289/15

claims [1] 170/15

clarifying [1] 18/5

clarity [3] 178/11 178/14 187/17

class [15] 35/2 35/3 35/4 35/16 35/21 45/5 52/16 54/8 54/14 54/22 66/21 267/22 291/18 323/1 323/6

classes [4] 38/4 267/16 267/18 268/1

clause [1] 195/23

clawed [1] 286/3

Claytor [4] 18/13 18/19 23/1 274/20

clear [14] 13/21 47/23 51/23 55/17 80/5 92/25 93/10 134/20 162/11 170/14 177/22 218/21 270/3 300/9

clearing [1] 129/8

clearly [9] 45/25 46/1 74/23 75/5 92/17 133/13

clerk [1] 8/10

clerks [2] 33/14 33/19

client [4] 309/21 311/16 311/22 342/9

Clip [2] 248/23 252/10

clips [1] 264/18

clock [2] 70/22 174/20

close [2] 153/18 154/6

closed [5] 261/13 261/21 261/23 278/10 304/6

closer [3] 210/18 226/19 280/4

closing [1] 281/17

Club [1] 26/9

CMGC [1] 242/10

co [3] 38/16 41/1 210/5

co-counsel [1] 210/5

co-located [2] 38/16 41/1

coaching [2] 213/23 214/1

cocounsel [1] 285/22

code [7] 11/17 218/4 218/25 220/10 220/12 244/9 257/3

codes [3] 256/17 256/18 256/21

codified [1] 116/13

coding [1] 240/9

COHEN [1] 2/12

collaborate [1] 54/16

collaboration [4] 42/18 134/10 299/7 301/25

collaborative [1] 227/14

collaborators [1] 278/24

collateral [2] 281/8 281/10

colleagues [3] 86/18 96/12 298/17

collective [1] 252/16

college [1] 317/19

color [3] 48/10 240/9 263/5

COLUMBIA [5] 1/1 215/20 218/5 246/3 246/6

Columbus [4] 22/14 22/15 24/3 54/3

Columbus Circle [1] 24/3

column [4] 232/21 233/9 233/14 258/11

columns [2] 58/21 61/23

come [42] 10/22 23/5 27/22 28/14 31/1 37/12 37/13 38/17 40/15 41/4 55/12 56/23 65/18 65/18 71/25 74/25 80/8 110/14 127/7 141/18 142/12 148/19 153/19 164/9 164/13 180/14 180/15 180/17 180/20 199/16 212/4 212/11

comes [5] 8/24 15/9 31/1 61/9 199/17

comfortable [4] 34/10 34/18 51/17 340/20

coming [23] 11/25 15/15 17/8 20/5 20/25 27/19 31/2 71/10 74/11 76/10 77/18 94/16 108/19 149/14 213/15 225/6 249/13 250/14 276/6 313/19 313/24 319/15 326/6

commence [2] 107/15 331/23

commenced [1] 309/21

comment [2] 229/4 239/4

comments [6] 227/20 242/20 242/20 259/21 261/23 264/6

commercial [24] 14/20 47/20 63/10 67/11 67/15 69/20 114/23 118/11 162/18 273/11 274/6 275/1 275/2 277/12 277/13 278/3 303/3 303/24 304/3 304/16 308/13 317/17 326/11 342/1

commissary [1] 38/6

commitments [1] 228/23

committee [6] 71/24 77/7 78/15 78/17 111/20 163/3

common [4] 267/9 300/13 315/18 324/3

commune [1] 54/17

communicate [4] 278/25 279/1 300/7 300/8

communicated [2] 283/9 322/1

communicating [1] 286/5

communication [5] 143/2 147/8 279/5 286/16 291/25

communications [3] 287/2 287/5 320/16

community [7] 43/6 43/15 52/22 52/25 53/2 104/12 112/24

commuter [7] 17/14 17/16 20/7 26/22 29/23 30/9 220/25

commuters [3] 20/23 30/3 275/15

companies [2] 272/22 323/4

company [9] 11/21 12/4 44/3 66/25 92/23 119/22 270/11 291/15

293/15

compare [1] 317/8

compared [1] 317/10

comparison [1] 149/8

compete [2] 34/15 66/24

competes [3] 45/5 246/22 246/25

competing [1] 20/12

competitive [1] 166/13

competitor [1] 32/7

complained [1] 280/18

complaint [8] 51/20 207/16 207/17 310/13 310/20 310/21 311/8 311/10

complaints [3] 32/25 51/19 250/10

complete [19] 26/24 40/21 98/17 105/11 105/12 128/11 128/20 132/14 133/9 134/11 217/14 223/1 223/2 223/7 224/4 232/24 235/10 241/24 302/14

completed [12] 104/22 105/7 105/10 105/15 139/12 226/1 231/22 232/25 233/4 242/6 280/7 298/25

completely [1] 225/8 226/14 278/12

completing [1] 238/18

completion [2] 135/8 243/13

complex [13] 19/2 21/14 33/20 38/15 67/1 88/14 88/23 110/8 114/24 115/1 116/19 118/13 118/25

complexity [1] 317/7

compliance [1] 220/1

complicated [3] 131/1 241/14 341/18

comply [6] 113/21 114/9 217/16 221/15 221/19 263/16

complying [1] 213/15

components [2] 151/10 224/5

compounding [1] 75/14

comprehensive [1] 157/5

compromise [1] 289/3

compromised [1] 58/24

computer [2] 2/25 117/18

computer-aided [1] 2/25

con [1] 255/18

concede [1] 159/20

conceivably [1] 162/5

conceived [1] 225/14

concept [4] 30/15 118/17 118/18 292/21

concern [2] 44/8 108/2

# C

**concerned [9]** 75/12 76/1 76/6 78/21 92/12 92/12 103/17 187/13 187/16
**concerns [2]** 69/10 93/4
**conclude [1]** 85/13
**concluded [3]** 84/16 192/19 342/25
**conclusion [13]** 56/25 71/25 72/3 72/4 78/14 79/18 79/19 81/7 81/16 81/18 85/1 145/9 188/25
**conclusions [2]** 56/23 339/13
**concourse [99]** 16/6 18/13 18/19 18/19 22/25 23/1 23/1 23/7 24/4 26/20 28/2 28/3 28/8 28/10 28/23 31/5 31/15 31/20 32/12 32/16 36/18 43/9 43/10 46/13 49/24 53/16 56/9 57/19 60/25 62/2 62/4 62/5 62/11 99/19 102/23 103/2 106/9 106/16 107/7 108/22 125/25 126/20 127/8 127/13 139/25 140/2 140/15 143/23 143/24 145/22 217/5 219/16 221/7 223/1 224/22 225/4 225/6 225/9 225/15 225/20 226/5 226/7 226/11 226/16 226/18 226/25 227/11 228/13 228/25 235/14 236/9 236/18 236/22 241/15 243/13 243/24 244/6 244/14 247/20 247/21 252/24 253/2 253/10 253/13 253/16 253/18 254/10 263/9 274/20 290/12 298/21 299/5 300/16 300/19 301/1 303/19 336/12 337/10 337/21
**concurrently [2]** 105/2 272/1
**condemn [5]** 164/11 199/6 199/8 204/1 210/16
**condemnation [37]** 27/2 80/7 82/20 82/22 85/12 191/8 191/11 191/25 192/20 201/21 202/20 203/24 209/2 209/3 209/6 209/8 209/11 209/19 209/21 210/13 210/22 211/4 211/15 211/18 243/10 243/11 243/16 254/18 255/3 288/9 308/6 308/17 309/4 309/15 310/7 312/10 331/23
**condemned [4]** 164/16

**condemning [1]** 210/24
**condition [11]** 62/22 84/17 110/7 139/23 159/18 160/5 160/19 188/8 278/6 319/7 319/8
**conditions [7]** 32/4 112/8 143/3 154/13 158/25 159/3 183/13
**condo [3]** 68/22 69/2 290/5
**condominiums [1]** 317/18
**conduct [6]** 152/24 175/5 176/3 177/7 200/17 306/15
**conducted [2]** 282/19 282/21
**conducting [1]** 177/12
**conductors [1]** 39/2
**conduiting [1]** 289/5
**confer [3]** 338/13 338/14 339/8
**confidentiality [4]** 287/6 287/8 287/10 287/12
**configuration [1]** 254/7
**configured [1]** 33/17
**confined [3]** 17/1 18/6 226/7
**confines [1]** 25/13
**confirm [4]** 112/23 181/8 240/3 341/5
**confirmation [1]** 241/9
**confirmed [2]** 77/2 241/10
**conflict [4]** 62/10 67/14 255/18 255/24
**confuse [1]** 251/2
**confused [2]** 200/7 203/21
**confusing [1]** 341/14
**Congress [8]** 12/4 45/23 45/25 144/12 203/6 206/12 209/21 220/22
**congressional [5]** 200/2 202/7 202/9 202/11 209/23
**congressionally [1]** 203/9
**conjunction [1]** 222/21
**connect [2]** 36/12 73/18
**connected [8]** 28/24 38/18 43/17 46/24 60/8 60/12 60/14 60/16
**connecting [2]** 15/4 36/12
**connection [10]** 47/19 182/13 190/13 190/25 283/9 294/10 317/14 322/15 335/25 336/10
**consent [6]** 193/21 195/10 195/20 207/21

**consented [1]** 281/7
**consider [5]** 72/14 73/14 74/12 108/19 111/15
**consideration [1]** 229/11
**considered [11]** 74/15 75/24 82/23 109/3 109/11 156/10 190/24 190/24 202/24 242/22 323/3
**considering [3]** 48/12 50/16 53/7
**consisted [1]** 222/24
**consistent [5]** 116/21 119/2 197/18 205/11 241/11
**consolidate [2]** 42/15 55/6
**consolidated [1]** 49/4
**constant [2]** 51/20 51/24
**Constitution [1]** 2/22
**construct [1]** 206/6
**construction [37]** 41/5 105/8 108/20 133/24 134/4 135/21 135/23 135/24 146/3 146/12 164/22 198/25 218/11 218/14 218/18 218/22 225/23 228/15 234/9 234/18 235/1 235/9 236/5 236/18 237/5 237/9 238/19 241/17 241/22 241/25 242/2 242/3 242/7 243/1 292/13 318/9 318/13
**constructs [2]** 146/4 146/10
**consult [3]** 330/16 330/25 332/5
**consultant [2]** 151/16 151/21
**consultants [5]** 150/25 251/7 251/13 252/22 323/25
**consulted [5]** 97/19 328/5 328/8 328/15 342/17
**consulting [3]** 213/19 213/21 214/4
**consumed [2]** 43/10 135/11
**contact [3]** 37/12 92/9 324/5
**containing [1]** 7/2
**contemplate [3]** 137/16 244/15 303/14
**contemplated [4]** 206/7 206/9 211/16 228/7
**context [1]** 83/18
**contexts [1]** 83/17
**continue [17]** 14/3 15/12 56/21 122/16 152/23 161/17 161/20 164/7 228/4 245/20

**246/20 253/14 254/11 278/16 296/6 297/1 327/22
**continued [6]** 2/1 49/14 60/17 110/6 114/25 205/5
**continues [2]** 120/17 211/9
**continuing [3]** 53/12 136/22 234/1
**continuity [3]** 38/15 161/8 161/25
**contract [6]** 26/19 154/1 237/4 284/9 284/10 323/24
**contracted [1]** 293/16
**contractor [3]** 213/19 237/15 242/24
**contractors [3]** 88/25 158/1 322/8
**contracts [7]** 315/17 326/21 329/2 330/20 331/3 331/8 332/6
**contractual [2]** 139/13 140/22 215/14 273/3 273/5
**contradiction [1]** 289/18
**control [51]** 34/13 46/17 46/22 57/1 57/24 61/20 63/19 65/24 67/20 68/5 68/9 69/11 70/14 71/20 87/7 87/24 88/12 92/20 92/23 93/3 93/5 93/8 93/9 93/9 93/13 94/20 94/23 95/10 125/8 142/8 143/5 158/21 159/13 159/24 160/10 163/8 163/10 178/8 178/14 183/21 260/13 260/16 260/19 278/21 290/3 292/8 306/8 308/8 308/14 308/16 309/7
**controlled [3]** 25/14 65/25 142/14
**controlling [1]** 141/12
**conversation [6]** 121/3 140/25 142/11 244/18 271/11 299/23
**conversations [10]** 109/16 159/24 221/24 239/11 244/19 255/11 257/13 279/18 288/5 288/22
**convey [2]** 169/23 171/14
**cooperated [1]** 302/2
**cooperating [2]** 160/2 278/22
**cooperation [4]** 12/19 116/1 278/19 301/24
**cooperative [2]** 75/7 300/12
**cooperatively [1]** 63/2
**copied [2]** 285/23 285/24
**copies [1]** 229/18

**copy [4]** 8/10 114/18 194/8 230/18
**core [10]** 17/5 40/1 40/1 40/2 47/21 51/11 84/20 274/10 274/12 274/14
**Corner [4]** 294/19 316/13 316/24 317/8
**corners [1]** 24/11
**corollary [1]** 103/10
**Corp [1]** 209/24
**corporate [5]** 9/11 9/12 9/17 9/22 211/7
**Corporation [9]** 5/8 57/13 68/22 193/2 204/11 205/24 214/8 216/7 216/9
**correct [249]** 6/15 41/11 77/20 81/3 81/7 81/8 86/5 86/6 86/9 94/5 96/7 96/8 96/10 96/11 96/13 96/16 96/19 97/4 98/6 98/18 98/22 99/4 99/10 99/23 100/6 100/7 100/11 100/14 100/18 100/25 101/5 101/18 102/2 102/6 102/10 102/13 102/23 103/6 103/15 104/18 104/23 104/24 105/7 105/13 105/16 105/18 105/24 106/1 106/23 107/19 107/20 109/9 109/12 110/21 110/22 110/25 111/6 111/7 111/10 111/13 113/23 113/25 114/11 119/20 120/16 121/7 121/18 122/6 122/22 124/1 124/6 124/14 124/24 125/18 126/1 126/7 126/14 126/20 126/23 127/1 127/14 136/21 137/2 144/24 147/23 148/15 150/20 156/16 157/2 157/3 157/6 158/20 159/11 159/21 160/24 161/3 162/10 163/2 164/3 164/5 164/17 164/19 170/4 170/21 171/21 172/15 176/5 177/15 181/10 181/15 182/19 182/21 183/9 183/10 183/12 183/14 183/24 184/1 184/19 184/23 185/3 185/13 185/22 191/1 193/2 193/10 193/15 200/11 206/2 210/17 229/9 229/15 239/1 243/5 243/8 245/12 245/15 246/1 246/2 246/6 246/10 247/9 248/12 248/20 249/2 249/15 249/23 250/18 251/19 252/6 251/3 252/20 253/1 253/15 254/19 254/23

**C**

**correct... [93]** 255/3 255/8 255/14 256/14 257/14 258/3 258/12 259/18 260/5 260/10 260/17 260/21 260/22 261/1 262/20 263/17 264/3 264/4 266/4 296/11 306/9 306/16 306/25 307/15 307/22 307/23 307/25 308/8 308/18 309/7 309/11 309/13 310/1 310/2 310/4 310/10 310/12 310/17 310/18 311/9 311/20 312/3 312/13 322/20 325/14 325/14 325/17 325/21 326/1 326/8 326/12 326/15 328/3 328/6 328/19 328/24 329/4 329/14 330/5 330/6 330/10 330/14 330/15 330/17 330/21 330/22 331/1 331/5 331/6 331/9 331/14 331/20 332/7 332/13 333/5 333/9 333/10 333/12 333/23 333/24 334/3 334/4 334/6 334/11 334/16 334/22 335/2 335/17 336/10 336/18 336/20 341/6 343/3

**corrected [1]** 198/5

**corrections [4]** 96/23 97/3 97/17 98/2

**correctly [2]** 129/1 165/9

**corridor [10]** 12/12 15/5 15/8 68/1 222/19 246/20 253/15 254/12 264/16 264/17

**cosmetic [1]** 280/14

**cost [4]** 64/23 105/22 142/24 142/25

**costs [2]** 64/24 94/10

**coterminous [2]** 272/2 272/4

**couched [1]** 259/24

**could [147]** 11/8 12/8 14/24 18/1 18/23 21/21 22/5 23/10 23/20 23/21 24/6 24/20 25/19 27/5 39/15 41/16 41/17 41/25 46/7 47/6 48/3 48/8 48/10 48/12 48/19 49/7 49/16 50/10 50/14 50/15 50/25 52/21 53/6 62/3 69/23 70/5 70/6 71/12 73/3 73/23 73/24 74/4 74/15 75/6 75/6 75/8 75/9 75/13 76/1 76/7 76/23 77/12 79/1 79/2 79/18 82/6 84/12 85/1 85/4 85/5 87/17 87/19 87/21 88/18 89/1 89/3 89/9 89/14 89/23

91/14 92/14 92/19 92/19 93/9 94/21 95/4 124/25 127/7 127/23 129/25 156/24 158/20 159/9 159/18 162/5 167/10 169/2 170/9 171/11 171/25 172/10 176/7 179/25 181/6 188/18 189/3 189/12 189/14 191/6 202/4 202/5 222/9 226/9 235/23 237/2 237/7 238/17 242/11 244/11 247/15 248/23 252/5 254/6 254/14 254/14 257/4 257/8 260/13 260/15 260/16 260/19 262/21 262/25 268/19 286/11 286/17 290/2 294/14 302/13 302/13 303/14 303/21 309/12 309/14 312/2 312/4 312/5 312/5 312/7 312/9 312/16 324/17 332/14

**couldn't [12]** 64/18 65/15 67/8 164/13 178/23 201/3 239/9 242/25 244/1 263/2 263/2 333/6

**Council [2]** 57/15 215/24

**counsel [13]** 6/8 70/19 95/18 114/17 154/19 167/9 196/22 210/5 239/17 240/18 283/5 283/23 305/24

**counter [2]** 188/6 298/13

**countermand [2]** 199/12 199/13

**countermanding [1]** 200/1

**counteroffer [12]** 93/25 94/1 174/9 174/11 186/13 188/2 188/7 188/9 188/11 188/14 188/17 188/19

**counterparty [1]** 153/22

**counters [1]** 33/5

**counting [1]** 21/8

**country [2]** 250/22 278/4

**County [1]** 214/16

**couple [13]** 13/8 55/14 61/19 89/8 127/21 160/8 166/20 181/5 184/14 185/16 217/25 236/3 302/18

**course [26]** 19/18 20/12 20/22 28/19 36/13 47/19 49/12 49/14 51/10 54/7 59/11 69/2 71/18 74/21 103/10 105/11 118/20 161/22 215/9 238/6 249/3 258/6 262/7

265/19 316/14 320/19

**court [78]** 1/1 2/20 2/21 5/2 6/11 12/8 14/24 18/2 18/23 24/6 24/17 25/19 27/5 46/7 48/11 48/15 50/15 53/6 58/5 62/3 70/21 76/24 77/13 95/5 103/3 103/25 104/15 113/18 131/18 140/24 155/3 155/8 160/16 162/24 166/17 179/11 208/1 212/3 216/3 225/1 227/8 245/25 262/15 262/24 265/25 266/1 266/18 267/11 268/19 272/5 273/14 273/24 275/8 275/12 275/15 275/17 275/18 275/25 279/21 282/4 285/13 288/5 288/21 288/25 292/5 293/12 296/1 299/14 304/1 309/24 310/13 331/23 335/24 338/3 338/6 338/20 339/3 339/17

**couldn't [12]** ...

**Court's [4]** 10/15 124/16 310/11 313/23

**courtroom [1]** 9/7 9/23 100/8 131/4 167/22

**courtrooms [1]** 180/23

**cover [2]** 7/4 14/1

**covered [1]** 165/20

**covering [1]** 112/16

**COVID [9]** 246/15 246/15 246/18 250/3 276/7 276/10 277/25 278/3 335/18

**crafted [1]** 151/2

**craftspeople [2]** 38/4 42/14

**crammed [1]** 52/5

**crane [1]** 320/12

**CRE [2]** 269/22 269/24

**create [17]** 34/22 39/12 40/14 44/20 45/13 46/22 52/1 52/13 61/23 67/3 75/9 88/1 88/9 89/3 89/5 138/23 324/18

**created [6]** 12/4 120/23 121/2 145/1 199/9 240/23

**creates [3]** 38/14 45/6 88/12

**creator [1]** 240/23

**credible [1]** 94/19

**credit [1]** 183/17

**creditors [1]** 319/6

**crew [10]** 38/20 38/23 39/9 40/18 41/23 41/24 42/10 49/16 54/23 223/5

**crews [3]** 38/23 39/1

**criteria [1]** 289/19

**critical [8]** 90/1 93/12 108/4 118/19 133/21 187/16 224/12 237/22

**cross [19]** 4/4 4/11 10/13 95/19 96/2 130/3 130/22 131/9 156/25 180/25 193/7 244/23 245/9 295/11 305/17 306/2 325/1 325/7 336/3

**cross-examination [10]** 95/19 96/2 180/25 193/7 244/23 245/9 305/17 306/2 325/1 325/7

**cross-functional [1]** 156/25

**crowded [1]** 30/20

**CRR [2]** 343/2 343/8

**CSRs [3]** 89/12 89/15 293/1

**cull [1]** 74/2

**cumbersome [1]** 76/7

**cure [1]** 221/18

**curious [1]** 8/11

**current [32]** 42/4 42/11 44/24 66/16 87/6 87/11 112/6 127/12 127/12 129/12 134/2 136/14 141/2 144/6 155/5 162/12 233/13 244/20 266/19 269/13 269/21 271/4 273/14 275/9 277/18 290/6 291/9 291/19 302/10 305/1 315/10 341/25

**currently [23]** 22/18 36/16 93/13 160/23 161/6 162/10 213/17 213/21 265/7 270/1 271/1 275/11 276/1 277/1 277/18 279/25 280/1 291/21 293/18 299/17 303/13 332/24 332/25

**Cushman [7]** 170/19 184/22 285/15 285/18 286/11 337/8 337/24

**customer [5]** 33/10 33/20 52/2 88/7 89/13 142/18 293/1

**customers [5]** 35/5 35/5 39/19 40/5 42/19

**cut [1]** 318/17

**cutting [1]** 131/23

**CV [1]** 1/4

**D**

**D.C [15]** 1/5 2/18 2/23 11/14 12/9 12/23 14/10 15/20 16/3 168/11 214/9 247/4 247/8 267/14 294/18

**D.C. [2]** 18/2 41/11

**D.C.-based [2]** 18/2 41/11

**dailies [1]** 340/12

**daily [1]** 257/16

**damage [1]** 278/16

**Dan [1]** 174/24

**Dan Sporik [1]** 174/24

**Daniel [1]** 2/2

**Daol [1]** 271/8

**date [27]** 42/5 56/12 125/4 128/7 132/21 134/15 148/10 148/10 148/20 149/1 149/2 149/4 210/23 230/24 230/25 231/1 232/3 234/10 235/16 235/16 236/5 259/24 327/10 327/12 340/17 342/15 343/7

**dated [4]** 83/8 169/12 171/16 333/19

**dates [2]** 240/9 241/17

**David [5]** 2/2 2/11 5/14 5/15 101/17 177/6

**David Ross [2]** 5/14 177/6

**day [41]** 11/21 11/21 13/3 17/13 17/20 66/14 66/15 94/8 119/12 153/23 156/10 162/1 172/4 172/22 192/10 215/13 265/13 265/18 268/10 268/10 270/18 270/18 275/12 291/21 291/21 291/22 292/11 292/17 292/23 293/23 295/7 306/8 306/8 314/18 316/3 316/3 318/23 321/6 321/10 327/5

**days [11]** 94/6 153/17 153/17 158/17 175/6 191/24 191/24 323/7 340/15 340/16 342/16

**DDOT [1]** 330/13

**de [1]** 62/10

**de-conflict [1]** 62/10

**deal [6]** 85/11 91/12 107/17 166/11 197/3 285/20

**dealing [1]** 63/14 294/21

**deals [2]** 278/7 315/21

**dealt [1]** 155/5

**Deborah [1]** 283/23

**Deborah Rochkind [1]** 283/23

**debt [30]** 77/23 77/24 77/24 78/2 80/6 80/9 80/13 90/24 90/25 121/5 121/6 121/10 121/12 121/14 121/20 121/21 121/25 122/1 122/2 123/17 123/18 123/21 124/4 124/5 147/18 181/14 181/19 182/13 269/22 269/24

**decades [2]** 71/18 203/19

**December [11]** 77/19 81/16 107/1 109/2 109/8 109/10 150/18 150/21 151/23 183/11 297/12

**decide [1]** 76/15

**D**

decided [4] 121/6
223/15 228/3 282/5
decision [19] 45/16
70/16 71/9 71/10 72/11
72/13 72/15 73/15
73/18 73/20 74/11 92/2
92/5 99/25 100/3
199/14 237/22 237/24
257/1
decision-maker [1]
100/3
decision-making [3]
70/16 71/9 99/25
decisions [2] 236/20
331/19
declaration [9] 101/4
101/16 104/7 104/8
124/10 297/7 309/23
310/14 310/23
declarations [2]
100/16 100/20
declare [1] 119/6
decrease [1] 141/11
decrepit [1] 49/19
dedicated [2] 52/9
52/11
deemed [3] 227/17
227/22 242/21
deeply [1] 92/12
default [22] 75/5 77/24
110/4 119/18 119/21
120/21 189/16 189/18
189/20 190/3 221/18
269/3 281/22 282/2
304/8 305/11 308/10
308/13 308/21 308/23
321/12 330/15
defaulted [1] 305/8
defaults [3] 110/13
120/8 120/10
Defendant [4] 2/2 2/11
266/14 315/2
DEFENDANT'S [5]
3/16 4/12 8/1 156/13
338/8
defendants [3] 1/7
5/16 180/4
defense [5] 39/23 40/4
130/17 197/19 197/25
deficiencies [1] 106/13
deficient [1] 58/24
define [1] 267/22
definitely [4] 86/22
188/11 250/24 316/25
definitely have [1]
316/25
definition [1] 264/16
definitions [2] 251/1
263/21
degree [4] 317/19
317/19 317/20 317/22
delay [6] 20/15 105/21
105/25 136/14 333/4
334/15
delayed [7] 94/25
105/21 300/14 321/22
332/12 332/16 334/25

delaying [2] 94/12
301/12
delays [11] 30/19
30/21 31/4 63/22 63/25
64/6 64/25 75/14 89/7
110/6 241/16
deliver [7] 14/2 14/4
126/5 126/14 126/19
127/4 127/7
deliverable [2] 259/10
259/17
deliverables [3] 230/6
230/8 258/15
delivered [5] 237/23
239/17 242/16 252/9
335/4
delivering [3] 11/21
14/9 126/22
delivery [10] 66/3 87/8
126/6 127/5 144/7
229/7 236/20 236/25
237/11 242/10
demand [2] 30/17
54/12
demanded [1] 177/11
demands [2] 52/7
142/12
demonstrate [1]
198/22
demonstrative [9] 27/4
29/13 29/15 47/4 48/8
73/9 163/20 197/14
198/7
demonstratives [2]
47/5 72/19
denied [1] 338/3
Dennis [4] 91/6 167/7
168/1 168/8
depart [1] 30/4
Department [23] 15/25
40/3 57/10 59/25 77/4
83/4 83/12 83/20 84/1
84/3 107/3 116/2
119/13 119/15 196/8
199/18 207/16 214/11
214/18 216/5 216/16
216/22 217/9
Department's [1]
119/14
departments [1] 71/21
departure [2] 29/10
89/21
departures [3] 29/18
29/19 29/21
depending [5] 226/9
249/12 250/13 257/2
262/21
depicted [1] 28/23
depiction [2] 23/25
27/11
deploy [1] 89/16
deposed [1] 96/7
deposit [2] 166/17
284/11
deposited [2] 160/15
331/22
depositing [1] 191/25
deposition [10] 96/10

96/13 96/18 98/23
99/13 99/17 100/17
125/3 338/18 339/1
Deputy [3] 214/13
214/19 215/19
derivatively [1] 202/24
describe [42] 12/8 18/2
18/23 24/6 24/20 25/19
27/5 39/15 46/7 48/11
50/15 53/6 71/13 74/15
76/23 83/19 170/9
172/10 216/3 221/3
222/12 225/1 267/11
268/19 272/16 273/24
275/8 275/25 276/18
277/23 279/21 282/4
285/13 288/4 288/21
288/25 292/5 293/12
299/14 304/1 322/25
323/22
described [16] 5/11
22/8 24/18 42/13 43/9
47/15 125/1 162/2
206/21 220/16 220/18
223/10 264/1 285/14
290/6 292/25
description [3] 162/16
225/9 240/10
design [49] 90/6
104/19 104/25 105/10
108/19 133/14 133/24
134/18 135/16 136/11
146/9 220/12 225/22
225/24 226/10 227/4
227/13 227/14 227/16
227/21 227/25 228/2
228/10 229/3 237/3
237/14 237/17 237/21
238/10 238/16 238/18
238/18 241/17 241/19
241/21 241/24 242/6
242/15 242/21 242/22
243/1 244/1 244/8
249/15 249/18 254/14
259/11 262/11 301/20
designated [8] 99/22
99/24 99/25 218/19
236/6 270/16 272/2
274/21
designates [4] 199/19
200/3 200/13 200/16
designation [2] 241/5
317/23
designations [2]
338/18 339/1
designed [1] 53/3
designee [6] 9/11 9/12
9/22 176/10 215/23
215/24
designees [1] 9/17
designer [3] 237/14
262/9 262/11
designers [2] 40/25
227/15
designing [1] 237/8
designs [5] 89/24
146/4 229/10 237/16
242/11

desire [5] 31/6 40/13
44/12 122/2 141/1
desires [1] 167/13
desisting [1] 177/13
desperately [2] 251/18
252/4
despite [2] 160/4
334/10
destination [2] 20/12
20/21
detail [4] 138/10
138/18 139/13 231/24
details [5] 141/13
262/3 262/10 315/15
327/24
determination [3] 69/7
70/17 155/12
determine [2] 122/1
227/18
determined [2] 85/6
126/13
determining [1] 229/7
devalue [5] 276/5
276/9 276/15 276/21
276/24
develop [2] 178/5
303/24
developed [3] 66/10
108/8 136/18
developer [4] 69/18
216/20 221/2 222/22
developing [1] 304/2
development [8] 66/9
68/22 114/23 118/11
145/16 213/24 214/1
304/16
developments [1]
120/9
devoted [1] 44/5
diagram [1] 27/10
dial [1] 154/21
did [200] 23/7 25/1
31/9 31/22 31/23 37/19
41/21 45/16 46/8 55/23
56/1 56/21 56/23 57/21
59/16 62/16 64/14
71/25 72/2 72/11 72/12
72/13 72/16 72/16
73/14 73/18 74/12
74/14 75/19 76/15
76/17 78/4 78/5 78/17
83/4 83/17 84/11 85/13
91/4 92/2 92/4 92/5
96/21 97/5 98/19 98/23
103/7 103/22 108/16
111/4 111/11 118/9
119/7 119/10 121/12
121/19 122/23 123/11
136/19 137/6 138/12
140/20 142/5 142/16
142/16 150/25 150/25
153/11 164/6 164/14
164/21 165/9 169/14
169/19 169/25 171/8
171/22 172/2 172/8
172/8 172/9 172/24
173/9 173/14 173/16
173/17 174/2 174/4

174/5 174/7 174/8
174/10 174/12 174/14
174/16 175/22 176/15
176/16 177/13 177/16
177/16 177/18 177/19
183/25 187/4 187/6
187/8 187/22 187/24
188/21 189/1 189/11
196/9 197/2 214/4
214/6 215/11 219/14
219/22 220/15 221/22
223/9 223/17 224/6
224/17 228/12 229/18
229/25 230/2 233/12
235/16 238/5 238/14
238/15 238/20 242/24
243/1 243/9 243/11
244/15 245/20 247/16
247/18 248/13 248/15
248/21 249/4 254/13
254/22 254/24 255/1
255/5 255/24 256/15
256/19 257/11 264/8
264/24 265/2 268/13
269/2 269/7 281/4
281/13 283/8 283/19
283/19 284/4 284/4
284/7 284/14 284/22
287/2 287/16 287/20
290/21 290/25 291/4
294/2 295/6 296/18
296/25 297/6 297/10
297/13 297/14 298/8
298/13 307/22 307/23
312/6 325/18 326/22
326/23 330/16 330/18
331/2 332/1 332/9
334/14
did USI [1] 174/2
did you [23] 41/21
72/11 78/4 91/4 92/5
118/9 119/7 142/16
169/14 169/19 171/22
172/24 173/9 173/16
187/6 187/24 214/6
215/11 224/17 229/18
229/25 284/22 326/22
didn't [63] 17/4 55/8
75/12 92/8 92/8 99/13
113/11 116/5 123/7
133/2 137/16 140/16
149/13 153/19 153/19
164/11 170/5 184/2
184/11 187/23 189/2
190/6 197/21 201/22
202/16 202/17 204/4
207/5 207/10 211/20
220/2 221/21 227/23
238/16 239/4 239/6
244/4 244/12 248/4
250/9 250/9 255/2
255/18 256/9 256/11
258/7 258/7 265/25
267/21 286/6 287/10
293/4 297/14 306/10
311/10 328/18 330/25
332/5 334/18 334/19
337/7 337/14 339/4

**D**

**diet** [1] 341/3
**differ** [2] 274/16 292/6
**different** [42] 20/2 20/3
20/6 20/18 20/22 22/4
33/18 38/3 38/17 42/14
42/18 42/25 47/19
63/10 64/1 83/17 101/8
105/3 126/13 126/15
127/4 134/22 204/4
204/19 206/16 235/5
247/1 258/6 264/16
268/1 287/25 288/4
289/2 289/19 293/9
298/5 298/19 309/9
312/9 313/7 317/18
336/11
**differently** [4] 108/7
201/24 202/3 211/13
**difficult** [5] 37/2 64/17
92/15 142/12 226/19
**difficulties** [1] 55/9
64/14 325/20
**difficulty** [2] 63/7
135/15
**Digital** [1] 272/21
**dinners** [1] 272/25
**direct** [33] 4/4 4/11
11/5 36/9 57/25 61/1
62/20 62/21 62/23 63/1
64/13 87/12 115/11
117/25 122/11 122/13
168/2 185/16 186/3
187/20 213/3 234/19
263/15 264/24 265/2
265/25 266/2 266/15
292/24 295/1 312/6
315/3 332/5
**directed** [6] 115/15
115/16 145/14 156/17
203/18 206/22
**Directing** [1] 318/2
**direction** [3] 73/21
310/11 331/14
**directional** [1] 37/5
**directly** [7] 51/24 60/23
61/6 89/19 187/2 261/1
270/19
**director** [4] 82/7
214/15 214/19 215/22
**directors** [10] 11/23
76/23 78/8 109/3 118/9
149/6 191/5 215/9
215/17 244/19
**disagree** [1] 314/11
**disagreed** [2] 308/7
335/3
**disagrees** [1] 333/12
**disbursements** [1]
104/13
**disclosing** [1] 287/14
**disclosure** [2] 286/3
286/4
**discovered** [1] 224/7
**discovery** [7] 206/24
207/3 207/5 207/5
207/11 296/23 306/21
**discuss** [10] 10/18

15/20 72/20 78/7 91/24
130/8 180/5 255/19
318/18 341/8
**discussed** [9] 84/23
85/15 90/1 99/16 125/9
134/16 138/12 282/9
337/11
**discussing** [4] 18/1
46/15 124/22 318/22
**discussion** [4] 77/16
186/15 288/17 290/18
**discussions** [6] 145/7
289/8 289/10 290/18
309/21 309/25
**dispatchers** [1] 40/20
**disprove** [1] 289/14
**dispute** [8] 289/3
308/15 309/1 309/1
309/6 309/12 309/14
309/20
**disputed** [1] 289/15
**disputing** [1] 311/9
**disruption** [2] 108/2
311/14
**dissatisfaction** [1]
33/1
**disseminates** [1]
239/23
**disservice** [1] 55/15
**dissimilar** [1] 21/3
**distance** [4] 12/19
12/20 12/25 20/24
**distant** [1] 19/20
**distinction** [1] 264/5
**distraction** [2] 55/13
63/18
**distressed** [3] 74/23
75/5 189/12
**distribute** [1] 33/19
**district** [12] 1/1 1/1
1/10 57/15 145/2
215/20 218/5 246/3
246/6 304/13 306/11
309/18
**districts** [1] 293/5
**diverse** [1] 273/1
**divide** [1] 211/8
**division** [1] 326/20
**DKoevary** [1] 2/5
**do** [238] 10/11 10/17
13/16 15/13 18/7 19/22
22/10 22/11 26/17 33/2
35/12 37/7 40/11 41/13
42/6 43/3 45/9 45/23
46/19 47/24 52/23
54/20 59/17 59/21
61/23 61/24 63/12
65/15 66/11 66/16
67/20 74/2 75/22 77/21
84/5 87/17 87/19 87/21
87/25 88/18 89/1 89/14
89/23 91/22 93/12
94/20 97/8 97/8 97/20
98/14 100/20 101/13
102/11 103/1 109/20
112/1 112/2 112/10
112/11 113/15 115/2
116/24 117/10 117/11

117/12 118/4 120/13
120/14 121/16 128/12
129/21 130/2 131/12
131/16 132/10 133/3
133/22 133/23 135/21
135/21 135/23 135/25
136/1 136/1 137/1
137/5 139/14 141/24
142/5 142/23 142/24
143/25 144/1 145/24
146/5 155/21 155/24
156/19 156/22 157/14
157/15 158/10 161/6
161/24 162/21 178/2
178/23 186/6 188/16
190/21 190/22 191/15
192/2 192/8 192/15
197/3 201/19 202/2
204/16 206/16 208/1
209/11 209/21 209/25
210/21 211/8 213/18
213/18 213/19 214/4
217/19 218/8 218/22
219/20 221/17 221/22
222/11 224/4 228/1
228/11 228/11 228/21
229/17 231/6 231/9
233/18 233/19 233/22
236/25 237/2 237/3
237/4 237/7 237/13
237/16 237/16 237/18
237/19 240/18 240/20
240/21 240/25 242/9
242/11 247/24 248/21
248/21 249/14 249/17
250/1 254/6 254/24
255/21 257/4 257/8
258/23 259/7 259/13
259/14 262/25 263/10
263/11 265/23 268/7
273/2 273/8 273/21
277/17 277/20 283/2
283/4 285/10 290/12
291/6 294/24 295/11
295/18 298/20 299/8
299/24 300/4 300/23
302/21 303/21 308/22
311/15 312/5 312/9
317/15 317/17 317/19
317/21 320/15 320/15
321/1 321/3 321/4
321/14 323/14 323/17
325/22 327/12 329/9
329/17 331/17 333/3
333/20 333/21 338/2
338/14 339/10 339/18
339/19 339/22 339/25
340/10 340/19 342/6
**do you** [14] 10/11
100/20 211/8 219/20
221/17 231/6 237/13
237/16 247/24 268/7
320/15 321/1 321/4
323/17
**do you believe** [1]
277/17
**do you have** [6] 112/1
317/15 317/19 320/15

329/9 340/10
**do you know** [1] 103/1
**Do you recognize** [1]
333/20
**do you remember** [2]
285/10 333/3
**do you see** [24] 22/10
33/2 97/20 98/14
112/10 115/2 116/24
118/4 120/13 132/10
135/21 135/23 135/25
143/25 146/5 157/14
158/10 190/21 192/2
233/18 258/23 259/7
259/13 273/21
**do you understand** [1]
202/2
**docket** [1] 101/24
**document** [33] 77/12
82/6 112/15 112/22
113/2 120/2 129/20
133/5 140/8 152/5
152/12 154/16 157/4
161/5 171/12 171/13
175/2 182/15 190/15
194/14 194/15 194/20
194/24 195/17 233/24
234/24 236/2 239/21
258/20 297/18 333/18
333/19 335/7
**documentation** [1]
154/14
**documents** [10] 96/10
97/9 123/19 132/19
148/4 155/20 155/23
194/17 237/20 309/17
**does** [66] 13/2 13/4
13/17 17/7 22/17 22/21
25/17 30/6 40/9 40/19
41/16 42/20 43/5 44/24
65/10 66/2 86/25 94/23
130/17 137/25 152/8
162/23 162/23 168/15
185/9 192/4 199/16
199/20 211/3 216/14
216/15 219/12 221/9
226/13 233/20 234/3
247/17 259/9 267/7
270/25 272/12 274/15
276/16 281/3 290/12
292/4 293/14 293/21
294/9 297/19 299/4
300/18 301/21 302/5
303/13 317/7 322/11
322/21 322/24 323/5
323/8 329/22 329/24
329/25 330/2 342/17
**doesn't** [23] 32/16 61/5
69/13 101/24 104/8
104/11 152/3 152/4
157/21 159/22 159/22
199/7 199/13 200/4
202/23 208/22 211/12
248/8 250/7 250/12
258/17 258/19 277/15
**doing** [16] 5/8 151/15
155/22 159/19 163/9
213/22 228/6 228/22

329/9 340/10
**do you know** [1] 103/1
237/9 237/10 253/22
280/20 283/3 300/24
321/13 340/11
**dollar** [2] 98/3 155/21
**dollars** [14] 65/2 65/15
65/16 65/19 65/23
83/21 83/22 84/3 84/5
160/13 160/16 160/18
282/18 304/21
**dom** [1] 260/11
**domain** [19] 47/12 57/8
59/15 64/9 70/18 71/10
92/3 94/7 95/11 119/7
123/3 123/13 137/5
145/4 153/25 154/4
154/9 201/9 205/14
**dominated** [1] 67/11
**don't** [140] 6/1 7/3 7/13
8/13 10/21 25/8 32/20
34/25 36/1 36/1 37/5
70/4 87/4 87/5 90/10
94/22 97/1 97/8 97/8
99/24 101/19 101/20
103/4 104/7 107/9
112/23 113/1 113/4
113/7 114/4 114/5
116/25 117/4 117/6
117/20 117/24 125/15
130/6 130/10 141/6
141/7 141/18 141/18
142/21 143/2 146/23
148/9 148/9 152/11
152/22 153/16 154/14
157/7 158/1 158/2
158/4 159/12 162/11
162/13 163/8 166/21
186/21 186/23 189/18
194/23 198/4 200/6
201/6 206/20 207/23
208/4 208/9 208/12
211/13 212/11 214/22
221/21 221/25 226/14
226/14 226/16 226/22
227/12 228/8 229/5
231/8 231/15 231/22
246/16 247/16 249/4
249/24 250/20 251/2
253/6 253/7 254/4
254/20 254/25 255/4
255/9 255/12 262/3
262/10 264/11 265/4
265/7 273/5 276/14
279/12 280/15 283/24
289/12 289/15 289/19
290/17 297/4 305/18
305/18 307/16 309/20
311/21 312/10 314/7
314/8 318/17 318/18
327/12 329/6 329/20
331/3 332/18 332/20
332/24 333/13 339/7
340/19 340/19 342/14
342/24
**done** [60] 46/1 59/7
61/16 72/24 72/25 73/2
105/2 108/14 118/8
130/25 134/20 134/24
134/24 136/2 137/16

**D**

**done... [45]** 139/6
139/11 142/3 147/22
148/14 148/21 150/19
150/22 151/24 152/9
152/17 153/12 163/13
188/23 188/24 201/9
201/13 201/23 202/3
224/13 229/15 233/22
234/6 247/6 251/20
254/25 256/13 266/1
266/2 266/4 277/24
280/15 286/12 286/13
286/23 290/20 291/5
291/23 295/17 304/1
304/4 304/19 327/18
335/24 340/16
**door [10]** 5/19 19/10
19/10 29/1 43/25 45/7
69/25 148/2 320/2
320/5
**doors [3]** 70/1 320/3
320/6
**DOT [18]** 13/13 57/13
144/22 144/22 144/24
145/25 146/1 147/13
199/22 206/13 209/16
210/11 210/12 223/10
292/1 296/10 298/15
300/10
**double [5]** 13/14 17/9
30/16 55/11 238/24
**double-check [1]**
238/24
**doubling [2]** 30/9
30/10
**doubt [2]** 133/2 133/8
**Douyon [1]** 341/6
**down [32]** 22/9 23/18
26/2 26/15 48/24 50/4
61/9 65/17 70/6 73/24
114/22 116/16 117/12
117/13 128/9 130/10
134/13 136/3 145/21
152/22 164/22 170/12
184/17 191/3 194/15
197/2 197/8 259/1
319/11 336/12 337/5
341/19
**draft [4]** 156/18 190/16
191/16 191/22
**dramatic [1]** 106/14
**drastically [1]** 296/20
**draw [4]** 27/14 98/12
114/21 313/23
**drink [1]** 49/14
**drive [1]** 54/21
**driven [1]** 29/24
**drop [3]** 22/13 27/19
28/14
**drop-off [2]** 22/13
27/19
**dropped [1]** 264/10
**dross [1]** 2/5
**dscharf [1]** 2/15
**dual [1]** 193/13
**due [3]** 252/8 258/8
318/9

**Dulaney [1]** 1/13
**Dulles [1]** 326/21
**duration [1]** 190/18
**during [22]** 16/25
31/11 32/19 74/21
131/4 172/17 176/10
219/7 220/15 221/4
221/17 221/17 224/25
246/15 265/8 275/12
294/6 321/11 321/20
324/7 324/12 341/17
**duties [1]** 315/25

**E**

**each [14]** 10/5 24/10
135/6 209/1 209/6
210/13 211/9 211/14
211/16 229/20 229/23
238/24 286/20 320/19
**earlier [28]** 22/8 26/17
29/24 30/4 41/10 44/5
47/15 52/17 67/24
102/13 102/19 103/15
128/22 134/17 138/12
173/3 181/12 184/18
188/4 235/15 257/5
257/21 259/25 273/22
278/18 279/19 285/22
289/25
**early [11]** 30/5 30/22
78/21 94/3 133/14
178/15 191/6 222/23
228/18 254/21 281/15
**earth [1]** 66/15
**earthquake [1]** 224/3
**ease [1]** 230/15
**easier [4]** 128/2 190/11
226/20 254/2
**easily [5]** 30/24 31/5
65/13 65/15 122/11
**east [8]** 32/8 50/23
51/4 52/14 274/21
274/22 312/7 330/23
**eaten [1]** 135/11
**economic [1]** 74/24
320/22
**economics [3]** 75/4
76/3 317/22
**edits [2]** 98/3 240/21
**effect [3]** 262/11
273/24 277/17
**effective [1]** 270/21
**effectively [14]** 21/5
45/22 63/20 65/4 88/16
271/10 272/1 274/7
275/18 276/25 297/25
308/10 308/14 308/23
**effectuate [1]** 70/14
**efficiency [2]** 42/17
87/8
**efficient [5]** 32/14 41/1
49/5 67/4 86/19
**efficiently [7]** 21/4
36/15 42/6 45/22 63/20
65/20 131/3
**effort [5]** 207/4 222/16
225/8 225/24 227/14
**efforts [7]** 93/20

150/11 156/25 230/7
253/17 278/12 278/15
**either [18]** 9/16 27/12
27/19 27/23 33/9 85/11
100/10 103/1 152/4
173/8 183/17 187/24
202/11 208/9 328/19
328/22 328/24 332/22
**elapse [3]** 135/3 135/5
135/10
**elapsed [1]** 132/13
**elected [1]** 164/7
**electric [1]** 19/18
**electrical [1]** 42/21
**electronic [1]** 180/22
**element [2]** 64/5 265/5
**elements [19]** 14/20
42/25 47/20 49/4 53/2
58/22 61/19 118/20
126/8 126/10 134/22
138/11 146/11 157/8
157/17 157/19 186/17
237/10 240/13
**elevated [1]** 25/22
**elevators [1]** 26/2
**eligible [1]** 65/22
**eliminate [1]** 274/25
**eliminated [1]** 275/3
**eliminating [3]** 56/24
57/20 58/4
**ELMO [2]** 117/4 122/14
**elongated [1]** 136/7
**else [11]** 10/18 66/7
92/14 129/20 174/18
185/17 192/23 208/17
288/25 332/9 341/8
**elsewhere [3]** 53/17
67/20 303/5
**email [29]** 1/15 2/5 2/5
2/10 2/14 2/19 171/13
171/14 171/16 172/1
172/4 172/5 172/6
172/20 172/24 173/2
173/7 173/13 173/14
173/19 186/6 187/1
188/1 188/7 285/9
285/24 287/5 295/5
339/5
**emails [8]** 91/16 91/19
91/20 172/14 185/11
186/1 313/24 334/10
**emergency [1]** 129/9
**eminent [19]** 47/12
57/7 59/15 64/8 71/10
92/3 94/7 95/11 119/6
123/3 123/13 137/5
145/3 152/25 154/4
154/8 201/9 205/14
260/11
**emphasis [1]** 225/19
**Empire [1]** 68/22
**employed [5]** 168/12
168/13 213/17 214/5
322/18
**employees [9]** 18/2
38/12 41/11 41/13
41/25 42/18 43/20
43/25 88/4

**employer [1]** 213/20
**empty [1]** 88/15
**enabling [1]** 113/10
113/14 205/19
**encompassed [1]**
289/1
**encompasses [2]**
100/2 102/15
**encounter [1]** 53/23
**encountered [1]** 65/1
**encumbrances [1]**
170/15
**end [14]** 23/16 43/21
68/18 68/18 76/1 97/23
97/23 105/15 137/11
141/24 153/23 156/10
190/9 336/12
**endeavor [1]** 87/17
**endeavored [3]** 109/18
137/6 248/20
**endeavoring [2]** 74/17
137/19
**ended [8]** 64/20 71/8
151/1 153/1 153/5
153/6 153/7 257/25
**enforcement [1]**
323/10
**engage [5]** 43/14 44/1
92/13 309/25 320/15
**engaged [2]** 71/17
161/6
**engaging [2]** 238/11
238/11
**engine [2]** 39/1 49/18
**engineer [2]** 40/20
249/16
**engineering [1]** 238/12
**engineers [3]** 39/2
40/24 49/2
**enhance [2]** 57/1 87/24
**enough [5]** 32/20 43/5
62/9 113/6 247/3
**ensure [5]** 59/1 84/17
86/19 98/2 304/16
**ensuring [3]** 61/6
61/11 62/22
**enter [10]** 18/9 26/14
27/10 75/8 100/1
145/14 158/22 202/14
204/13 297/15
**entered [8]** 86/3
140/12 145/18 157/25
199/25 202/13 206/4
341/16
**entering [1]** 85/11
**entertain [1]** 44/14
**entertainment [1]**
326/14
**entire [5]** 13/5 67/7
88/20 88/23 222/19
**entirely [1]** 303/15
**entirety [1]** 302/23
**entities [4]** 63/8 220/22
251/14 296/19
**entitled [1]** 6/19
**entitles [2]** 341/24
341/25
**entity [19]** 65/25 68/11

75/7 147/9 163/7
202/25 203/7 203/8
216/11 218/19 218/20
221/14 269/22 271/5
271/7 271/9 271/10
308/7 315/20
**entrance [4]** 27/18
27/20 28/17 45/13
**entranceway [1]** 22/19
**entry [1]** 85/22
**entryway [1]** 28/25
**environmental [1]**
103/11
**envision [1]** 264/8
**equipment [4]** 14/7
15/14 19/23 42/20
**equity [3]** 267/9 267/9
269/9
**era [1]** 33/18
**errata [3]** 97/15 98/13
100/18
**erratas [1]** 97/23
**errors [2]** 97/4 239/2
**escalators [1]** 26/2
**especially [4]** 132/7
233/17 239/24 275/15
**essence [2]** 26/1 77/15
125/13 186/13 186/19
189/23 200/1
**essential [8]** 13/25
44/2 46/18 59/8 60/17
66/18 67/2 84/22
**essentially [22]** 17/2
26/3 30/9 45/10 51/5
53/14 55/10 55/20 58/9
59/12 61/23 62/4
105/11 105/12 137/9
183/20 245/21 268/21
274/5 277/8 277/8
292/9
**establish [1]** 116/2
198/20 324/15
**established [6]** 76/25
92/23 199/3 203/4
203/5 220/21
**establishes [1]** 152/25
**establishing [2]** 50/22
259/7
**estate [11]** 14/19
160/23 168/22 190/16
191/20 195/9 266/24
267/6 291/15 291/16
326/11
**estimate [2]** 41/17
41/22
**estimated [1]** 225/23
**estimation [1]** 204/7
**et [11]** 1/6 24/23 33/14
38/6 40/17 40/25 44/14
49/2 61/22 84/8 110/9
**et cetera [7]** 33/14 38/6
40/17 40/25 49/2 61/22
110/9
**Europe [2]** 266/25
267/14
**evaluate [1]** 163/11
**evaluated [1]** 149/6
**evaluation [7]** 48/1

**E**

**evaluation... [6]** 149/8 163/13 165/8 165/13 165/17 224/5

**even [29]** 17/6 30/20 31/8 32/3 36/25 62/24 75/7 87/21 91/24 111/8 125/11 136/7 136/7 147/17 159/10 159/17 161/17 178/23 188/8 198/21 200/17 211/16 239/17 244/2 259/16 280/17 300/10 307/9 308/2

**evening [2]** 30/5 295/17

**event [11]** 11/18 52/18 52/21 53/10 53/11 110/13 268/4 272/23 274/7 314/8 329/9

**events [15]** 22/20 43/6 43/14 52/19 112/24 304/5 304/12 304/12 315/24 319/21 330/21 331/1 331/3 331/7 332/6

**eventual [1]** 83/21

**eventually [2]** 46/11 178/6

**ever [22]** 31/20 40/19 42/20 46/4 55/23 64/6 65/6 152/1 162/20 184/24 197/2 208/8 221/17 221/25 264/24 265/7 276/6 287/16 287/20 291/6 296/19 305/8

**every [17]** 29/7 51/22 94/8 112/16 119/12 209/1 209/6 210/13 220/3 244/18 265/4 278/3 287/11 291/17 318/23 321/5 321/9

**everybody [11]** 70/23 131/22 212/6 239/9 279/2 300/9 339/23 340/20 340/22 341/1 342/22

**everyone [12]** 5/5 5/17 5/18 29/2 29/2 33/22 131/17 131/17 211/25 242/25 249/4 298/15

**everyone's [1]** 225/3

**everything [10]** 38/16 52/5 100/3 145/7 165/20 224/15 228/9 272/19 272/24 315/24

**evicting [1]** 330/9

**eviction [4]** 330/12 330/13 330/17 336/20

**evidence [34]** 6/17 8/1 24/19 77/10 78/25 81/10 82/12 83/1 83/9 84/14 90/9 91/15 95/5 148/18 156/3 156/13 163/18 163/25 170/20 171/11 175/15 177/2 180/9 183/4 194/17

194/19 194/20 198/22 209/12 239/13 239/21 311/5 337/11 338/8

**evidentiary [4]** 1/9 5/25 104/10 184/6

**evolve [1]** 136/23

**evolved [1]** 106/11

**evolves [1]** 46/20

**ex [2]** 11/22 77/3

**exact [3]** 150/24 162/13 216/18

**exactly [6]** 37/15 152/12 192/4 201/12 254/20 302/24

**examination [21]** 11/5 95/19 96/2 115/11 166/7 168/2 180/25 193/7 196/24 213/3 244/23 245/9 261/8 266/15 295/1 305/17 306/2 315/3 325/1 325/7 335/15

**examined [1]** 122/1

**example [12]** 43/19 48/2 216/12 226/10 227/22 237/7 263/2 263/4 264/7 299/18 299/25 327/1

**exceeded [1]** 13/9

**exceeding [1]** 31/6

**exception [3]** 197/12 239/24 240/1

**exchange [2]** 275/21 307/14

**exchanged [1]** 287/13

**excited [2]** 52/23 253/16

**exclusive [1]** 309/25

**exclusively [1]** 34/3

**excuse [4]** 22/17 24/22 184/16 323/7

**excused [2]** 167/21 265/18

**execute [1]** 287/6

**execution [1]** 207/10

**executive [7]** 71/24 72/7 91/6 163/3 168/8 168/14 214/19

**executives [2]** 102/3 156/23

**exercise [6]** 123/2 123/12 153/25 202/19 209/6 282/6

**exercised [1]** 281/25

**exhaust [3]** 320/10 320/12 320/13

**exhibit [109]** 6/6 6/20 8/1 21/10 21/12 21/17 24/18 25/9 27/5 47/4 47/5 56/3 56/12 56/12 56/12 72/21 77/10 78/11 78/11 78/25 80/2 80/7 81/9 82/4 82/11 83/1 83/7 83/9 84/13 90/8 90/17 91/14 95/4 111/24 120/5 121/18 121/23 125/3 127/23 128/1 140/5 143/13

143/14 148/23 149/7 150/3 151/4 151/19 152/1 152/16 154/12 156/1 156/3 156/13 157/1 162/3 162/25 163/2 163/19 163/25 165/8 165/12 165/15 169/1 169/8 171/10 174/22 175/15 176/17 176/17 176/21 176/22 177/2 180/9 181/6 181/20 182/6 182/9 183/4 184/14 184/15 184/15 185/8 185/12 186/4 186/22 190/7 194/8 197/12 197/14 204/15 208/23 209/16 230/20 239/13 257/21 257/21 261/10 273/19 274/16 296/18 310/19 310/24 311/5 337/8 337/10 337/21 337/24 341/6

**Exhibit 1 [1]** 78/25

**Exhibit 10 [1]** 165/8

**Exhibit 24 [1]** 337/24

**Exhibit 28 [1]** 239/13

**Exhibit 8 [2]** 169/8 186/22

**Exhibit A [1]** 230/20

**Exhibit J [1]** 204/15

**Exhibit's [1]** 311/1

**exhibits [22]** 3/2 3/14 6/10 6/10 6/17 7/2 7/2 7/10 7/18 7/19 8/4 8/17 8/21 127/19 131/6 132/3 167/10 197/11 197/15 211/17 338/8 341/7

**exist [7]** 69/23 70/12 75/22 277/2 277/5 293/1 293/4

**existed [7]** 103/6 103/8 103/15 103/18 109/22 127/6 137/20

**existing [13]** 35/11 62/10 121/25 225/3 225/9 226/7 250/25 274/23 278/7 280/5 280/6 290/13 299/10

**exists [5]** 87/14 120/21 141/7 158/4 291/18

**exorbitant [1]** 55/10

**expand [17]** 15/17 40/11 40/13 42/10 45/20 46/2 50/6 52/12 52/24 62/5 109/18 141/1 141/4 262/24 299/10 303/14 312/23

**expanded [4]** 54/18 226/9 292/12 304/9

**expanding [2]** 87/9 226/8

**expansion [5]** 46/13 51/18 102/17 102/19 103/12

**expect [13]** 6/2 13/4 15/11 17/7 17/10 17/12

30/7 32/6 35/15 94/14 94/14 121/15 130/17

**expectations [2]** 35/23 69/17

**expected [2]** 225/21 306/23

**expedite [1]** 242/12

**expend [1]** 83/21

**expenditures [1]** 322/13

**expense [2]** 116/21 119/1

**expenses [3]** 14/2 84/12 308/22

**experience [29]** 32/24 34/14 44/20 45/7 52/2 54/14 65/9 66/21 70/8 70/14 94/13 119/22 142/10 142/19 215/1 244/18 247/14 247/20 247/25 248/6 249/9 250/13 276/20 294/9 294/21 316/9 316/13 321/21 325/25

**experienced [1]** 307/16

**experiencing [1]** 143/10

**experiential [1]** 319/22

**expert [3]** 243/16 276/12 285/23

**expire [1]** 210/23

**expired [2]** 46/11 138/14

**explain [5]** 6/6 14/24 62/3 241/16 335/24

**explaining [1]** 140/24

**explains [1]** 129/21

**explicit [1]** 211/20

**explicitly [1]** 207/25

**express [2]** 17/18 284/7

**expressed [3]** 284/1 284/2 284/8

**expressly [2]** 199/10 199/22

**extend [3]** 226/19 327/21 327/22

**extended [4]** 153/14 170/6 194/1 327/25

**extends [2]** 25/24 29/25

**extensive [1]** 294/21

**extensively [1]** 224/25

**extent [4]** 86/12 114/1 114/24 338/6

**exterior [3]** 218/23 218/24 315/24

**extinguished [3]** 270/8 270/9 310/16

**extremely [1]** 246/7

**F**

**facade [1]** 24/11

**face [3]** 95/1 117/12 117/12

**faced [1]** 75/14

**faces [1]** 147/8

**facilitate [1]** 87/13

**facilities [18]** 17/15 19/21 26/20 35/24 38/25 40/14 41/7 42/4 44/17 47/20 49/19 66/10 67/20 141/1 222/18 249/19 250/3 267/20

**facility [26]** 40/15 45/5 53/1 58/1 61/7 61/11 63/11 66/13 67/14 67/20 69/3 74/18 76/12 94/9 120/18 125/23 142/9 157/13 157/24 160/10 162/1 217/6 217/11 246/8 252/3 325/25

**facing [1]** 110/7

**fact [35]** 13/8 36/25 64/12 67/8 79/12 87/23 96/21 109/17 121/17 128/21 136/17 148/5 156/10 160/4 161/13 163/18 164/16 188/7 189/6 201/19 204/16 207/21 210/21 226/17 239/1 251/10 251/17 252/4 258/17 301/25 309/9 310/15 310/21 339/11 339/13

**facts [1]** 196/13

**factual [1]** 155/11

**fail [1]** 158/20

**fails [1]** 198/22

**failure [2]** 92/24 221/19

**fair [15]** 21/13 25/15 91/1 113/6 157/20 195/18 214/25 223/20 236/16 247/3 302/15 312/20 313/5 313/8 316/2

**fairly [2]** 242/14 258/5

**fairs [5]** 43/6 43/19 52/22 104/12 112/25

**faith [4]** 150/9 154/5 155/1 155/7

**fall [4]** 257/18 331/8 331/11 331/13

**fallow [2]** 48/24 165/6

**familiar [37]** 44/22 77/6 91/18 115/25 124/15 138/2 138/7 138/10 138/17 138/24 139/17 139/24 139/24 140/11 140/22 141/9 141/13 143/11 143/17 169/3 169/8 179/2 194/5 195/14 195/15 215/25 222/2 222/4 224/22 225/3 279/19 279/25 282/15 306/18 316/2 316/5 329/13

**familiarity [2]** 279/22 282/13

**families [8]** 20/25 32/23 44/4 44/7 44/10 44/10 44/21 51/16

**family [1]** 44/13

**F**

**fan** [1] 320/10
**fans** [1] 320/12
**fantastic** [1] 67/13
**far** [10] 31/6 32/23
32/23 145/5 228/7
229/4 244/4 269/19
298/15 301/19
**farther** [2] 38/12 94/17
**fast** [1] 275/20
**faster** [1] 250/24
**favor** [1] 201/20
**feature** [3] 44/17 44/18
253/7
**features** [4] 34/4 45/12
77/2 164/23
**February** [4] 80/3 81/2
81/17 245/22
**February 28th** [1]
245/22
**federal** [39] 57/15
59/25 62/17 65/15
65/16 65/18 65/22
83/11 83/22 84/2 84/3
94/11 103/11 113/10
116/18 116/21 118/24
119/1 119/11 199/15
202/24 202/25 203/5
203/8 203/23 204/1
208/22 215/23 215/24
216/6 220/20 229/16
230/12 239/21 239/22
246/1
**federally** [2] 39/18
199/8
**fee** [1] 68/8
**feedback** [1] 91/25
**feel** [3] 27/14 99/16
319/19
**feet** [1] 317/11
**feigned** [1] 198/23
**Ferrell** [1] 176/3
**few** [7] 52/11 96/14
175/6 179/23 184/17
261/6 287/5
**fiduciary** [2] 282/20
304/21
**figure** [8] 29/8 131/6
135/4 150/9 294/15
294/23 340/22 340/23
**file** [7] 70/17 71/10
92/2 92/13 239/16
241/5 255/2
**filed** [24] 25/1 47/13
59/15 62/13 93/15
93/16 100/23 101/4
101/10 106/15 124/12
153/15 178/15 254/18
308/6 308/17 309/5
309/9 309/23 310/9
310/21 311/8 311/10
330/13
**files** [1] 191/8
**filing** [9] 94/6 124/9
181/9 191/10 191/25
207/17 309/15 310/7
330/16

**filings** [1] 262/14
**fill** [1] 31/5
**filled** [2] 32/19 293/4
**final** [2] 153/8 229/10
**finalized** [2] 299/18
340/21
**finally** [1] 211/19
**finals** [1] 327/7
**finance** [4] 76/3 77/6
111/15 111/20
**finances** [1] 157/18
**financial** [5] 142/12
214/21 214/23 297/23
304/23
**financially** [3] 114/25
304/17 319/13
**find** [14] 27/25 37/13
44/18 55/15 68/12
89/20 124/17 127/17
146/12 178/5 209/9
236/1 238/20 300/12
**finding** [3] 36/6 116/25
153/1
**findings** [1] 339/13
**fine** [7] 9/10 21/22
86/14 149/22 207/12
236/13 338/15
**finger** [1] 117/18
**finish** [2] 227/24 237/4
**finished** [6] 73/12 74/7
191/7 192/24 232/23
237/14
**finishing** [1] 190/19
**fire** [9] 42/21 279/9
299/19 299/21 303/8
303/9 334/2 334/2
335/1
**fire-alarm-related** [1]
279/9
**firm** [4] 241/20 242/3
266/23 286/16
**firms** [2] 237/21 238/13
**first** [67] 9/8 9/9 9/10
15/22 19/3 22/5 23/18
25/2 25/18 35/2 35/3
35/4 35/16 39/15 39/23
42/4 45/5 50/18 52/16
54/8 54/14 58/4 58/19
65/13 66/21 69/20
71/12 72/22 86/20
93/24 103/25 109/3
109/14 115/23 119/22
133/4 140/14 144/6
151/13 169/18 171/16
172/22 175/19 175/22
175/24 176/1 181/13
181/21 185/18 186/3
189/18 200/19 203/22
208/5 212/7 212/10
230/5 232/6 233/1
233/17 244/3 244/8
256/4 256/20 258/21
295/4 305/18
**first-class** [8] 35/2
35/3 35/4 35/16 45/5
52/16 54/14 66/21
**fit** [3] 44/12 162/23
274/4

**fits** [1] 14/25
**five** [10] 16/9 139/11
147/4 191/24 214/22
265/4 299/23 316/16
316/20 317/2
**five years** [1] 139/11
**five-minute** [1] 299/23
**fixed** [4] 70/2 70/6
168/20 307/9
**flat** [1] 290/10
**flat-out** [1] 290/10
**fleet** [1] 168/21
**flexibility** [1] 290/3
**flight** [1] 295/20
**flipping** [1] 122/12
**floor** [16] 2/8 25/1 25/2
25/17 25/18 50/9 50/10
50/16 50/17 54/10
58/18 58/23 68/24
108/3 319/22 321/5
**floors** [3] 21/7 24/14
24/15
**Florida** [1] 12/21
**flow** [7] 31/11 65/17
84/3 121/24 216/8
216/9 216/14
**flow-down** [1] 65/17
**flow-through** [2] 216/9
216/14
**flows** [2] 31/9 31/24
**flyspeck** [1] 314/8
**focal** [1] 14/23
**focus** [6] 75/1 127/21
154/22 215/4 219/5
235/13
**focused** [2] 21/4
103/24 118/23 326/12
326/15
**focusing** [1] 318/3
**folks** [21] 14/3 20/19
27/18 29/7 30/4 30/21
31/1 31/6 33/6 33/7
38/18 39/7 41/1 49/18
51/24 54/4 70/10 89/6
89/8 89/20 156/21
**follow** [5] 65/19 117/16
173/18 201/22 334/10
**follow-up** [2] 173/18
334/10
**followed** [1] 171/15
**following** [10] 153/4
173/6 177/6 241/13
246/19 309/15 309/21
310/7 310/11 311/11
**follows** [2] 109/24
322/22
**food** [17] 48/15 49/14
51/8 51/13 54/15 250/4
272/19 275/4 275/11
275/15 275/17 275/18
275/18 275/20 319/1
319/2 319/24
**foodservice** [1] 38/6
**foot** [1] 280/9
**footage** [1] 317/7
**Footnote** [2] 185/4
185/6
**footprint** [3] 66/16

226/7 226/8
**force** [7] 39/16 39/17
39/18 39/18 40/10
293/14 324/3
**forcing** [1] 33/22
**foreclose** [2] 183/15
183/16 183/17
**foreclosed** [4] 269/8
278/20 287/21 289/20
**foreclosing** [3] 302/19
303/23 304/15
**foreclosure** [16] 75/21
79/16 110/24 111/1
111/5 111/8 111/21
120/22 122/21 124/5
190/3 191/4 283/12
284/6 308/12 311/11
**foreclosures** [1] 120/9
**foregoing** [1] 343/3
**foremost** [1] 69/20
**forfeited** [1] 207/4
**forget** [1] 283/24
**forgive** [1] 314/7
**forgot** [2] 11/17 169/5
**form** [4] 69/1 119/13
204/15 206/3
**formal** [1] 109/13
109/14 222/1 288/1
334/10
**format** [1] 240/8
**formed** [1] 271/8
**former** [5] 24/22 24/23
48/17 65/11 110/4
**forms** [2] 36/12 103/18
**formulate** [2] 284/15
297/24
**forth** [13] 19/9 19/19
21/1 39/4 116/22 119/2
171/15 172/14 185/12
186/2 262/15 319/9
320/22
**forward** [33] 80/6 87/9
110/12 113/7 119/6
125/11 131/24 139/18
149/23 156/12 160/1
171/18 171/22 171/24
171/25 187/13 188/10
188/12 188/13 189/14
191/14 199/2 227/11
238/10 241/8 241/17
242/23 283/4 285/3
286/23 287/10 320/9
327/9
**found** [4] 63/14 149/8
239/2 311/20
**foundation** [7] 115/5
151/13 151/25 152/3
239/15 276/12 301/18
**four** [11] 146/11
146/12 150/19 150/22
151/10 151/24 152/9
214/18 233/25 280/10
286/13
**four separate** [1]
151/24
**fourth** [2] 81/18 247/5
**FRA** [55] 57/13 59/19
59/23 60/24 83/8 83/20

84/6 106/23 107/1
107/4 107/19 107/20
126/11 126/19 127/7
137/8 146/11 147/8
147/12 147/13 158/14
160/5 216/19 216/21
217/9 217/16 218/3
218/9 218/9 218/12
218/15 218/16 219/6
219/9 219/22 220/8
221/2 223/10 223/15
227/14 228/17 229/11
230/11 232/4 238/25
240/11 242/14 255/6
255/12 255/14 260/8
292/1 296/13 300/10
300/10
**FRA's** [2] 159/3 256/5
**frame** [6] 186/12
242/17 254/21 258/14
263/22 264/6
**framing** [1] 342/15
**Francisco** [1] 267/15
**frankly** [8] 31/6 55/13
89/4 108/18 200/4
202/6 209/3 341/3
**FRCB** [1] 198/13
**free** [3] 27/14 170/14
336/17
**freely** [1] 32/5
**frequencies** [1] 30/16
**frequent** [1] 258/8
**frequently** [2] 258/5
264/14
**fresh** [1] 250/7
**Friday** [1] 173/3
**front** [28] 6/7 8/9 19/10
19/10 22/16 22/22
24/11 27/6 27/10 29/1
37/11 43/24 45/6 45/13
54/3 55/22 56/11 69/25
88/6 120/5 122/15
148/23 151/4 190/10
194/11 320/6 321/17
327/12
**frontline** [1] 40/4
**fronts** [3] 299/13
299/16 304/14
**frustrating** [5] 247/14
247/20 247/25 249/10
254/14
**FTI** [1] 97/19
**fulfill** [4] 113/9 113/13
113/15 149/13
**fulfills** [2] 73/21 86/20
**full** [8] 6/9 98/17
120/17 125/16 133/10
158/2 242/22 276/7
**fully** [4] 125/15 125/23
157/19 157/21
**function** [5] 20/4 47/21
53/18 60/18 249/23
**functional** [1] 156/25
**functionally** [1] 159/13
**functions** [23] 17/5
18/16 18/20 19/12
19/12 26/10 28/12 38/1
38/17 43/12 43/16

**F**

**functions... [12]** 43/16 47/16 48/25 49/1 49/1 49/23 50/24 61/13 162/1 272/24 272/24 277/3

**Fund [2]** 269/22 269/24

**fundamental [7]** 15/3 29/3 29/4 45/19 68/13 108/2 277/11

**fundamentally [4]** 13/19 20/5 63/17 76/3

**funded [2]** 61/16 84/12

**funding [3]** 107/13 119/15 228/10

**fundraising [1]** 268/10

**funds [1]** 84/12

**furniture [2]** 89/4 324/14

**further [24]** 75/9 92/14 92/20 94/15 95/16 116/16 128/9 155/13 159/24 165/22 166/19 170/12 178/17 180/18 194/14 196/17 244/21 265/9 287/2 305/15 324/6 324/24 327/22 337/3

**futile [2]** 178/17 178/18

**future [13]** 13/5 13/24 30/7 44/3 44/25 45/9 47/7 66/4 67/3 67/4 72/5 273/20 327/22

**G**

**gain [10]** 56/25 71/19 78/8 125/20 138/13 141/17 158/21 160/10 161/20 163/10

**gaining [1]** 106/20

**gains [1]** 29/2

**garage [1]** 23/22

**Gardner [25]** 10/16 10/22 11/1 11/4 11/11 96/4 117/24 130/8 131/13 143/12 167/3 167/21 190/24 198/21 206/21 273/18 274/3 278/18 280/11 285/11 291/5 292/25 298/9 337/9 337/25

**Gardner's [1]** 296/17

**gate [2]** 31/1 36/10

**gates [9]** 18/10 21/5 28/16 31/8 31/12 31/25 32/8 52/12 89/21

**gateway [1]** 267/13

**gave [8]** 81/12 96/9 103/20 190/12 222/15 248/11 248/14 248/15

**general [19]** 11/18 34/4 76/18 115/25 140/2 143/3 187/23 214/24 237/15 242/24 262/4 283/22 293/22 294/4 294/4 315/11 315/15 320/12 342/7

**generally [10]** 68/5

106/6 118/17 118/19 127/10 138/20 142/10 250/10 258/4 263/10

**generated [2]** 232/4

**generates [1]** 277/15

**generation [1]** 44/21

**generator [2]** 90/4 129/9

**generators [2]** 42/21 61/22

**generous [1]** 54/14

**gentleman [1]** 295/8

**get [110]** 10/2 20/11 20/16 24/23 27/7 29/7 29/8 30/12 33/10 36/19 37/15 37/16 41/21 44/21 46/10 46/23 51/20 53/24 59/7 59/16 59/18 59/20 61/17 62/7 62/14 62/16 62/24 64/2 64/3 64/17 67/5 67/9 69/14 70/6 70/7 74/19 75/6 75/13 76/7 79/2 87/17 87/24 90/5 92/19 94/17 101/12 115/15 116/5 124/25 125/8 127/23 129/6 130/25 131/6 131/14 139/11 142/3 142/7 153/18 153/20 154/10 160/12 161/18 166/21 166/21 169/9 173/3 173/5 177/16 178/6 179/16 183/21 184/12 187/12 187/18 197/3 207/12 220/3 226/20 230/9 234/12 235/18 238/16 241/9 244/4 244/4 244/12 250/9 254/2 254/14 256/9 256/13 260/9 261/1 263/22 265/25 266/6 277/25 286/23 291/5 295/17 297/14 299/18 321/7 331/18 339/4 339/23 340/14 340/16 340/22

**gets [3]** 52/5 157/11 211/8

**getting [24]** 21/4 44/2 57/24 63/8 74/20 94/15 106/22 107/13 124/23 127/6 132/2 150/6 150/8 152/21 169/7 193/24 290/20 294/13 313/24 316/21 319/24 325/20 327/7 334/18

**GIBBER [1]** 2/7

**GIELEN [1]** 2/7

**give [23]** 21/21 28/17 30/3 49/17 52/15 53/18 54/5 54/15 70/21 87/8 87/9 94/13 196/2 230/17 265/2 276/13 288/8 290/3 329/22 329/25 331/3 340/17 342/18

**given [14]** 8/10 46/1 52/7 54/18 75/3 86/13

105/9 117/21 125/21 134/2 195/20 259/20 298/3 301/25

**gives [5]** 34/12 83/20 88/12 137/24 161/25

**giving [5]** 63/5 63/23 100/17 100/20 298/2

**glasses [1]** 169/5

**global [1]** 291/15

**globally [1]** 267/6

**go [90]** 7/23 12/9 14/2 15/21 16/17 19/4 23/17 24/11 25/23 27/6 39/4 48/8 49/11 50/4 50/9 61/22 62/23 66/6 66/7 66/14 69/13 69/13 70/20 77/11 79/1 79/2 83/21 85/19 90/14 105/1 109/25 114/7 122/18 128/9 139/18 144/15 145/10 145/21 149/22 153/19 155/21 156/12 171/16 173/21 173/22 174/20 175/19 176/7 177/16 184/9 186/1 188/1 192/19 192/20 193/8 194/3 194/23 195/1 197/3 198/17 204/4 204/8 211/23 223/13 226/11 227/24 230/9 234/18 237/4 237/13 237/15 242/23 245/6 259/1 259/10 260/4 261/1 263/4 276/23 282/12 285/6 287/10 289/21 294/16 297/19 303/5 312/21 312/24 318/15 319/8

**go ahead [22]** 7/23 70/20 109/25 114/7 144/15 145/10 149/22 155/21 156/12 177/16 184/9 193/8 194/3 198/17 211/23 245/6 276/23 282/12 285/6 289/21 294/16 297/19

**goal [11]** 13/14 63/17 68/16 83/21 87/23 88/19 142/7 142/13 143/4 162/17 163/5

**goals [6]** 13/24 73/19 73/21 116/22 119/2 136/13

**goes [5]** 149/12 154/12 193/5 193/7 210/11

**going [117]** 8/18 15/15 20/5 21/1 21/10 22/2 22/3 27/9 42/11 45/17 47/24 50/18 54/10 54/11 56/6 60/12 64/23 67/24 71/9 72/18 72/19 72/20 72/21 73/4 76/21 77/9 77/11 78/20 79/1 81/7 84/7 86/10 90/9 93/8 94/10 103/10 108/6 113/3 123/1 124/16 125/4 131/1

131/6 143/22 152/22 153/5 153/18 160/1 161/17 163/16 166/13 166/24 169/1 171/10 172/14 175/19 176/2 189/13 192/20 193/20 197/13 204/3 214/22 216/18 220/12 224/13 226/15 226/18 226/19 229/8 230/16 246/19 249/12 250/8 250/14 253/5 253/18 253/20 254/3 254/4 256/17 257/4 258/18 260/5 260/25 260/25 262/9 262/10 265/14 265/25 277/12 282/25 283/1 285/5 294/15 295/16 299/18 318/5 318/6 318/7 319/14 319/21 322/2 322/16 330/11 332/18 337/15 337/16 338/10 338/11 338/13 340/1 340/5 340/7 340/11 341/22 342/16

**gone [1]** 275/21

**good [46]** 5/4 5/6 5/17 11/1 13/15 14/8 36/24 43/19 46/23 48/2 48/10 51/8 55/16 63/3 63/4 68/12 70/13 70/14 86/21 96/4 96/5 98/9 118/20 133/21 150/9 155/1 155/7 155/16 167/19 167/20 181/2 181/4 212/18 212/19 213/6 247/17 248/5 248/8 265/13 278/24 300/6 306/6 315/6 319/13 325/10 342/22

**Good afternoon [1]** 167/19

**good morning [3]** 5/17 11/1 96/4

**got [31]** 7/18 8/12 14/2 14/4 14/8 21/18 28/12 28/13 37/3 39/25 49/3 51/11 51/15 95/10 98/5 122/8 159/4 160/4 160/6 188/17 190/17 190/18 194/14 197/2 197/24 271/16 295/20 323/25 340/11 341/5 341/7

**Gotcha [1]** 23/9

**gotten [3]** 189/4 244/11 283/9

**govern [1]** 210/2

**governance [14]** 55/23 56/15 56/24 57/7 57/21 65/1 109/11 112/7 216/1 221/10 221/13 244/16 264/21 314/3

**governing [1]** 221/14

**government [11]** 13/21 116/18 118/24 119/11 144/24 145/1 209/17 217/15 220/20 227/9

246/1

**Government's [1]** 208/22

**grab [1]** 167/9

**grabbed [1]** 210/12

**grade [2]** 31/21 280/16

**graded [1]** 31/20

**grammar [1]** 98/10

**grand [5]** 37/14 45/12 72/6 303/19 303/19

**grant [5]** 83/22 83/25 84/12 145/13 200/2

**granted [4]** 201/17 203/25 206/4 278/22

**grants [1]** 65/18

**great [20]** 22/23 23/5 24/4 24/13 24/21 44/20 50/12 50/19 52/18 53/13 70/7 160/3 253/23 263/10 303/13 319/16 324/15 330/23 335/10 342/20

**green [11]** 181/19 181/23 182/12 182/14 182/18 183/8 183/14 183/21 183/25 184/17 261/12

**greenlight [1]** 220/4

**greenlighted [2]** 107/6 107/9

**Gretchen [1]** 99/6

**grew [1]** 17/6

**grossly [1]** 35/13

**ground [2]** 289/4 290/2

**group [3]** 252/15 252/16 311/9

**groups [1]** 20/4

**grow [7]** 13/13 13/25 42/7 46/20 66/11 67/21 246/19

**growing [1]** 103/17

**grown [2]** 16/22 225/7

**growth [16]** 13/4 13/10 13/18 13/19 14/25 15/6 15/10 15/12 15/18 16/23 16/24 17/4 17/7 57/4 76/10 95/2

**guess [15]** 8/23 117/11 197/15 200/6 202/18 203/21 206/23 208/7 216/24 222/20 223/8 236/21 243/23 258/20 316/12

**guessing [1]** 233/24

**guide [1]** 88/9

**gut [1]** 280/13

**Guys [6]** 318/9 327/3 327/4 328/3 328/6 329/25

**Guys' [2]** 330/1 335/17

**H**

**H Street [1]** 223/2

**ha [2]** 154/6 154/6

**ha-ha [1]** 154/6

**had [255]** 5/22 10/1 14/12 14/14 16/4 16/22 16/25 29/20 32/1 37/7

**H**

**had... [245]** 48/18 55/9 55/12 55/14 63/7 63/14 64/11 64/19 71/16 74/22 75/4 75/5 75/14 75/16 77/25 79/12 91/23 92/6 92/22 93/4 96/18 103/8 103/16 106/16 106/18 107/6 107/11 107/12 107/13 107/13 107/14 107/15 107/17 109/6 109/15 110/13 110/14 111/12 119/23 125/9 126/3 126/11 126/17 127/2 128/21 129/12 135/12 135/14 137/21 139/2 141/19 143/2 146/12 147/21 147/22 148/3 150/18 150/19 150/22 150/25 151/6 151/23 151/23 152/8 152/9 152/16 152/25 152/25 155/6 155/6 156/7 162/4 164/3 165/2 165/4 165/4 168/23 170/17 170/18 174/16 178/20 178/20 178/21 178/22 178/24 178/25 179/20 179/23 181/11 181/12 181/18 182/1 182/14 182/18 183/14 184/4 184/11 184/17 184/20 185/11 187/8 187/8 187/10 188/5 188/5 188/23 188/24 189/4 189/4 189/7 189/11 189/15 189/15 189/20 189/25 190/1 190/4 195/14 195/20 195/23 202/3 208/5 211/2 214/17 214/25 219/9 219/18 220/21 220/25 221/23 221/23 222/6 222/22 223/6 227/4 228/8 228/9 228/10 228/15 228/24 229/3 229/10 229/20 230/6 231/15 231/17 231/23 234/15 234/16 236/22 237/19 237/24 238/1 238/11 242/9 243/25 244/7 244/19 250/1 250/4 250/19 251/15 253/22 255/11 255/13 256/21 258/15 258/15 259/23 261/17 262/5 262/15 265/3 271/11 272/1 282/2 282/11 282/13 282/14 282/14 282/16 282/17 282/19 282/22 283/9 283/11 283/11 283/13 283/21 284/1 284/2 284/8 284/9 285/14 285/15 285/18 286/12 286/13 287/5 287/6 287/22 288/5 288/10

289/2 289/3 289/4 292/7 294/4 294/6 295/3 298/10 298/14 298/16 299/19 303/4 307/6 307/7 307/8 308/7 308/24 309/6 309/24 310/14 311/9 311/15 311/18 313/21 313/21 315/12 316/14 325/24 325/24 326/2 326/5 326/20 327/25 334/1 334/9 334/25 335/4 335/4 336/19 337/12 338/17 339/10 **hadn't [2]** 195/24 195/25 **Halal [9]** 318/9 327/1 327/3 327/4 328/3 328/6 329/25 330/1 335/17 **half [4]** 10/12 16/9 230/19 283/15 **halfway [1]** 294/25 **hall [25]** 22/19 22/23 23/5 24/4 24/13 24/21 27/25 36/19 50/12 50/16 50/19 50/23 50/23 51/4 53/13 68/23 263/4 263/5 274/21 290/7 303/13 312/8 324/15 330/23 330/23 **hallway [1]** 313/18 **hallways [1]** 25/23 **hand [9]** 8/13 10/23 56/5 91/9 113/6 167/14 212/14 266/8 314/13 **handed [2]** 167/10 242/7 **Handera [3]** 101/17 102/2 103/1 **Handera's [1]** 104/11 **handle [8]** 15/17 35/21 40/15 50/3 50/7 66/12 66/17 89/10 **hang [8]** 7/1 149/19 149/19 244/23 248/3 248/3 285/17 286/8 **hangar [3]** 25/20 25/22 26/24 **hangups [1]** 287/9 **happen [23]** 31/5 75/3 75/6 92/14 92/19 94/21 94/22 105/3 105/6 136/4 189/23 189/25 192/5 202/16 202/17 204/4 204/5 204/24 208/6 234/15 234/16 281/14 **happened [16]** 15/23 16/2 119/23 120/22 123/25 124/6 124/9 128/22 128/24 172/3 202/16 205/8 243/7 287/3 288/22 327/8 **happening [9]** 76/11 103/12 176/9 229/24 229/24 233/9 238/7 318/2 320/17

**happens [6]** 19/16 30/18 86/25 316/2 324/5 340/21 **happy [3]** 97/10 120/4 153/20 **hard [3]** 191/21 240/11 284/10 **harm [1]** 276/9 **Harrison [11]** 245/4 245/6 261/12 262/17 263/23 306/4 306/5 325/1 325/9 335/22 336/19 **harsh [1]** 75/4 **has [124]** 6/10 7/10 15/13 18/3 18/8 26/22 30/6 31/15 31/20 33/23 39/19 43/5 46/4 51/4 57/17 61/12 62/21 84/15 84/16 85/6 86/16 93/16 93/22 100/13 101/10 102/9 103/18 105/7 106/2 106/11 114/9 114/17 115/5 115/5 115/7 120/22 139/9 142/10 142/11 144/21 146/10 147/4 149/9 152/1 156/1 157/25 159/14 159/25 160/23 161/14 165/25 171/7 177/6 195/12 196/6 199/3 199/24 201/15 201/24 202/14 203/22 210/13 216/10 216/16 216/19 216/20 217/15 220/4 221/1 225/7 239/25 241/6 255/14 256/1 256/1 263/21 267/1 270/5 270/20 272/6 275/21 277/23 277/24 278/20 278/22 281/2 290/1 291/6 292/6 293/12 293/15 293/16 293/25 294/21 297/22 298/24 300/14 301/17 303/23 304/15 305/2 305/3 305/5 305/8 305/11 316/9 319/11 319/19 321/12 321/22 322/1 323/10 324/8 324/12 324/13 324/13 331/22 332/11 332/16 336/13 338/3 341/13 341/13 342/9 **hasn't [9]** 160/19 194/19 194/20 194/22 194/22 198/19 300/8 300/11 338/6 **hat [5]** 193/17 193/19 195/19 195/19 196/5 **have [495]** **haven't [23]** 29/11 54/25 105/9 114/16 125/18 129/19 132/19 136/2 139/21 148/25 159/10 159/17 160/6 163/13 206/18 207/21

236/2 245/17 246/14 279/12 285/4 300/12 314/17 **having [30]** 9/20 20/19 20/21 41/4 43/19 43/24 53/25 65/10 99/3 116/25 127/7 137/15 137/16 175/5 175/18 177/23 188/8 188/10 188/13 190/3 218/3 218/17 219/19 220/9 221/25 223/16 246/24 276/13 333/3 341/4 **he [67]** 86/12 86/13 86/13 91/8 91/10 91/12 99/10 101/23 102/3 109/24 110/19 115/10 123/13 123/20 144/16 146/22 146/23 146/23 146/24 146/24 148/3 151/16 151/20 152/3 152/4 153/21 156/6 156/10 167/21 167/22 179/4 184/8 185/20 187/3 187/4 194/13 194/18 194/19 194/19 194/20 194/21 194/22 208/9 273/25 276/14 276/15 276/16 276/19 276/21 276/22 282/11 285/24 291/5 293/21 293/21 293/22 293/25 294/3 294/19 294/21 298/12 298/13 329/9 329/7 332/5 332/19 340/15 **he said [5]** 109/24 146/23 146/24 156/6 208/19 **he'll [2]** 122/14 128/3 **he's [15]** 9/9 72/20 102/5 109/25 117/25 167/23 179/9 194/14 207/20 209/5 289/20 293/22 293/23 294/13 313/18 **head [43]** 19/3 19/5 19/7 19/11 19/25 20/2 20/3 21/7 22/8 22/17 23/2 24/2 25/17 26/25 27/1 36/8 36/19 37/4 42/1 42/16 42/16 42/22 43/1 45/21 46/17 47/7 48/4 53/21 57/1 57/16 57/24 60/8 60/9 60/10 60/13 60/14 60/16 60/19 64/9 94/22 141/1 141/8 254/17 **heading [1]** 14/17 **headquarters [2]** 55/2 55/7 **hear [4]** 113/11 114/4 165/9 197/22 **hear you [1]** 197/22 **heard [19]** 36/3 38/20 60/25 92/11 101/8 146/22 146/23 187/15 206/15 206/19 222/6

223/21 249/17 268/3 278/18 285/22 298/22 319/3 323/20 **hearing [17]** 1/9 5/25 94/2 101/6 104/10 150/7 184/7 184/7 200/19 206/24 208/8 208/11 296/23 296/24 298/12 298/12 307/21 **hearings [3]** 10/1 156/17 200/23 **hearsay [5]** 146/21 148/17 184/8 239/25 240/2 **heart [1]** 154/12 **heavily [1]** 105/19 **heavy [1]** 19/22 **hedged [1]** 201/10 **held [1]** 155/8 **hello [3]** 96/6 306/4 314/16 **help [17]** 13/23 33/21 36/14 54/21 66/3 88/4 88/5 88/9 89/19 117/3 118/15 158/3 202/4 203/10 235/22 262/9 315/18 **helped [1]** 326/20 **helpful [4]** 201/7 235/20 339/16 339/22 **helping [3]** 40/5 89/20 300/11 **helps [3]** 34/14 34/15 315/23 **hemmed [1]** 66/8 **her [5]** 99/21 232/17 234/19 235/23 244/22 **here [127]** 5/24 7/4 8/12 9/11 17/10 17/15 20/13 22/12 26/20 27/12 27/20 27/21 27/24 29/6 31/9 31/12 32/7 41/5 42/9 48/1 48/10 49/12 49/16 49/22 51/1 51/7 51/13 51/15 51/18 51/18 52/4 52/17 53/9 53/12 53/14 53/14 53/17 54/20 55/16 57/18 63/17 67/19 72/23 73/22 84/18 97/21 104/14 108/2 108/16 112/14 117/13 119/9 119/14 120/3 120/24 122/10 131/5 132/15 133/11 134/13 134/15 135/12 136/12 137/10 142/7 142/13 143/4 144/11 144/17 145/13 145/21 153/18 157/8 159/23 160/9 161/21 161/24 162/17 169/20 180/20 185/19 186/7 186/9 187/2 190/10 190/10 191/3 194/12 197/18 202/16 203/11 203/16 204/5 206/11 206/24 208/16 208/18 213/12

**H**

**here...** [29] 214/8 231/21 231/24 232/6 233/4 234/8 234/22 235/17 236/2 236/12 236/17 258/18 259/22 274/15 274/22 275/16 279/14 283/2 286/19 289/19 294/15 294/24 307/5 307/13 314/17 323/9 333/8 341/4 341/7
**Here's** [1] 290/10
**hereto** [1] 204/15
**hereunder** [1] 195/9
**Hey** [1] 188/19
**Hi** [4] 212/17 245/6 306/5 325/9
**high** [12] 35/5 35/20 57/4 250/18 250/21 250/22 251/1 263/20 263/20 263/23 264/9 264/15
**high-quality** [1] 57/4
**high-speed** [9] 250/18 250/21 250/22 251/1 263/20 263/20 263/25 264/9 264/15
**higher** [2] 251/6 273/15
**highest** [2] 50/9 72/7
**highlighted** [4] 72/22 73/5 73/7 177/1
**highlighting** [1] 195/3
**Hill** [1] 242/3
**Hill Construction** [1] 242/3
**him** [24] 22/3 72/21 74/2 115/15 115/16 122/10 122/11 122/13 122/15 128/14 128/16 148/9 154/22 167/11 173/4 179/8 185/12 187/5 194/21 276/18 286/17 294/8 296/18 299/23
**himself** [1] 72/21
**hindering** [1] 301/12
**hindrance** [1] 199/2
**hire** [4] 237/13 241/22 262/9 262/11
**hired** [6] 43/22 228/15 242/1 242/2 251/14 318/25
**hiring** [2] 43/18 43/20
**his** [15] 101/12 103/3 109/24 152/3 152/4 156/2 166/23 171/24 184/8 273/19 276/19 298/12 298/17 332/19 332/21
**historic** [26] 17/3 22/7 22/22 23/1 24/17 53/16 217/6 218/1 218/13 218/15 218/22 221/11 221/14 250/2 253/25 262/19 262/23 262/25 263/9 263/16 264/1

**historical** [1] 15/21
**historically** [4] 18/15 23/4 23/8 159/11
**history** [2] 138/17 317/15
**hklaw.com** [1] 2/19
**hold** [10] 43/6 43/19 53/23 58/22 125/14 199/11 200/3 200/13 214/6 233/17
**holder** [2] 204/19 332/2
**holding** [1] 40/16
**holds** [3] 59/11 200/11 270/4
**holiday** [1] 87/25
**HOLLAND** [1] 2/16
**honest** [1] 329/21
**honestly** [1] 229/5
**Honor** [180] 5/6 6/3 6/15 6/25 7/5 8/20 8/25 9/5 9/14 10/7 10/19 24/19 27/16 29/15 48/21 58/16 59/24 61/8 71/6 72/19 73/6 74/7 90/17 91/15 95/16 95/20 97/11 101/6 104/2 104/9 109/23 113/2 114/2 114/14 114/16 115/4 117/3 117/7 122/17 123/19 130/5 130/13 130/20 131/7 131/8 132/1 144/13 145/5 146/22 147/24 148/1 148/16 148/22 149/5 149/17 150/5 150/12 151/12 152/20 152/23 153/13 153/21 154/11 154/24 154/25 155/25 156/5 163/17 163/22 165/19 165/22 165/25 166/4 166/19 167/7 167/18 167/20 167/24 169/5 176/23 180/2 180/7 180/18 182/23 184/5 192/11 193/3 193/23 193/25 194/13 196/20 197/9 197/10 197/21 198/9 198/12 198/19 200/22 201/13 202/21 203/10 203/11 205/3 205/8 206/2 207/6 207/14 208/10 208/24 209/9 210/9 210/11 210/20 210/25 212/9 212/10 230/17 239/12 239/14 239/20 241/3 241/7 244/21 244/25 245/7 261/6 265/10 265/17 265/20 265/24 266/12 276/11 276/19 282/10 282/25 283/3 283/17 284/18 284/25 285/21 286/2 286/24 289/6 289/9 295/10

**295/18 295/24 302/24 303/16 305/15 305/23 310/19 313/12 313/14 313/17 313/19 313/21 314/9 314/10 324/21 324/23 325/3 325/5 335/12 336/11 337/6 337/12 337/17 338/17 338/23 339/8 339/10 340/4 340/24 341/9 341/11 341/20 342/10 342/12 342/19**
**HONORABLE** [1] 1/9 5/3 131/20 212/3 296/3
**hope** [2] 125/21 158/22
**hoped** [2] 137/6 184/11
**hopeful** [1] 125/7
**hopefully** [7] 126/16 132/3 242/12 304/24 314/17 316/23 327/8
**hoping** [2] 192/8 192/15
**host** [2] 22/20 330/20
**hotel** [1] 316/14
**hotels** [1] 267/19
**hour's** [1] 339/19
**hours** [7] 10/13 89/8 130/19 131/23 188/4 191/23 324/1
**house** [58] 19/3 19/5 19/7 19/11 19/25 20/2 21/7 22/8 22/17 23/2 24/2 25/17 26/25 27/1 36/8 36/19 37/4 38/10 42/1 42/16 42/16 42/22 43/1 45/21 46/17 47/7 48/4 48/19 48/25 49/1 49/22 53/21 57/1 57/16 57/24 60/8 60/9 60/10 60/13 60/14 60/16 60/19 90/3 94/22 128/10 128/20 129/3 129/7 129/23 141/2 141/8 231/20 259/5 262/5 262/12 279/8 300/2 315/23
**house's** [1] 20/3
**housekeeping** [6] 197/10 197/16 313/20 322/7 337/6 338/23
**how** [105] 10/4 10/10 11/24 12/16 12/23 13/2 14/24 16/10 18/2 20/1 21/7 25/5 27/5 28/23 31/15 36/11 37/15 37/16 39/21 41/16 41/21 43/16 45/16 49/25 60/8 60/12 60/13 60/21 62/19 65/10 66/2 73/18 83/4 84/2 84/7 85/19 86/10 86/13 90/22 93/8 93/9 94/23 96/25 126/13 130/2 130/11 130/17 131/6 153/18 161/24 162/4 162/13 162/21 162/23 168/12 172/17 177/19 179/10 179/15 179/19**

**180/16 190/18 192/18 202/4 202/4 202/18 206/20 211/8 225/20 226/24 229/8 233/7 236/22 237/23 240/18 241/15 243/12 249/25 253/5 257/25 267/1 267/21 272/5 274/19 275/8 283/19 284/4 292/5 293/25 294/2 294/24 295/11 298/12 298/18 301/3 315/12 317/7 318/5 319/15 321/4 322/2 322/16 322/22 322/25 339/24**
**however** [2] 173/23 257/18
**hub** [4] 12/11 36/14 246/6 275/14
**huge** [6] 14/22 15/10 43/20 49/17 65/6 87/14
**huh** [3] 90/18 101/21 235/6
**hundred** [1] 242/20
**hundreds** [1] 304/21
**hung** [1] 256/9
**hurdle** [1] 244/3
**hyphen** [1] 213/10
**Hypothetical** [1] 307/3
**hypothetically** [2] 303/12 340/15
**hypotheticals** [1] 307/5

**I**

**I also** [1] 69/24
**I am** [6] 77/8 143/18 163/17 179/3 243/6 316/7
**I assume** [4] 9/6 113/7 146/19 216/24
**I believe** [34] 7/5 77/20 82/3 86/5 97/5 99/5 99/21 115/19 126/2 160/22 160/25 197/15 205/3 209/16 217/10 231/17 239/20 239/25 241/20 251/8 252/21 257/25 258/4 258/13 262/7 262/8 262/14 268/15 279/10 283/13 283/23 327/15 327/25 337/13
**I can** [8] 21/23 73/24 101/24 117/10 117/11 143/1 234/18 261/22
**I can't** [2] 142/20 175/25
**I did** [12] 72/12 72/16 78/5 98/19 140/20 172/2 173/14 173/17 187/22 245/20 248/13 325/18
**I didn't** [4] 113/11 116/5 123/7 197/21
**I didn't know** [1] 334/18
**I didn't see** [1] 248/4

**I don't** [43] 25/8 97/1 99/24 103/4 104/7 113/4 114/5 116/25 141/7 142/21 143/2 146/23 152/11 158/2 166/21 186/21 186/23 198/4 200/6 207/23 208/4 208/9 208/12 226/14 227/12 249/24 250/20 254/4 254/20 255/4 262/3 265/7 279/12 289/15 289/19 290/17 297/4 307/16 309/20 314/7 314/8 329/20 332/18
**I don't have** [4] 7/3 117/6 327/12 332/20
**I don't recall** [9] 201/6 221/25 226/14 226/16 231/8 231/15 254/25 255/9 265/4
**I guess** [12] 8/23 117/11 197/15 200/6 202/18 203/21 208/7 222/20 223/8 236/21 258/20 316/12
**I have** [29] 7/1 7/13 7/17 47/2 73/13 93/21 130/25 166/20 184/25 195/15 195/16 196/17 197/18 209/11 241/6 245/16 245/19 247/6 247/11 265/9 300/6 308/1 315/21 317/22 318/8 324/23 326/9 327/24 341/10
**I haven't** [5] 114/16 129/19 132/19 246/14 285/4
**I just** [16] 5/19 29/12 42/8 112/22 114/4 117/20 210/12 217/18 226/21 233/13 253/6 253/7 262/10 264/11 285/19 339/25
**I know** [18] 44/15 138/11 138/22 139/12 141/16 145/16 149/23 162/19 184/7 184/10 194/18 202/17 207/7 210/13 211/6 249/17 285/3 332/21
**I mean** [44] 8/18 28/25 50/18 51/20 59/10 60/10 64/25 94/24 103/16 109/13 125/13 134/9 136/2 136/3 137/13 149/11 153/23 184/7 197/17 204/18 207/2 207/9 207/20 214/2 227/20 232/8 237/10 237/22 246/15 250/1 255/23 256/12 258/4 277/15 289/12 289/13 309/17 317/10 321/9 329/20 334/17 336/20 340/11 341/18
**I misspoke** [1] 202/10

**I**

**I recall [2]** 219/24 261/19

**I should [3]** 37/14 228/9 232/12

**I think [127]** 6/23 13/19 24/15 36/23 41/4 45/13 52/19 63/7 63/9 66/5 69/16 69/17 71/8 86/18 92/10 92/22 98/7 99/15 99/24 100/15 104/2 104/5 106/11 106/12 109/13 110/16 112/14 112/19 115/23 118/11 120/2 125/6 126/8 128/25 129/2 129/5 129/10 129/14 129/16 131/13 134/9 134/19 135/14 136/17 143/13 144/17 154/3 157/17 157/25 158/19 159/6 159/22 159/25 166/20 175/24 179/22 184/11 187/7 190/7 196/12 197/17 197/19 201/10 202/6 202/25 203/11 203/13 203/22 207/6 208/15 211/10 211/14 211/19 217/19 219/13 222/14 223/5 223/20 224/10 225/3 225/4 225/23 228/8 228/18 235/14 236/13 238/15 240/2 242/16 247/1 247/16 247/17 248/5 249/21 250/25 251/21 251/22 251/23 253/3 253/9 256/1 258/13 259/1 259/3 276/3 276/19 278/12 278/13 278/24 285/21 286/18 299/22 307/4 309/16 318/6 318/14 319/11 327/2 328/21 332/11 333/6 335/3 336/4 338/13 339/21 340/5 340/13

**I thought [8]** 54/9 123/17 194/16 203/3 211/1 284/17 295/3 316/21

**I understand [10]** 152/2 165/9 166/25 192/25 202/25 231/22 243/18 243/19 301/19 341/23

**I want [6]** 15/20 15/21 52/9 70/16 70/21 174/20

**I wanted [2]** 6/6 173/3

**I was [22]** 71/8 90/16 92/12 99/25 141/4 171/24 194/5 195/14 195/22 195/23 214/23 215/14 217/21 222/3 222/7 229/6 231/5 238/2 245/21 265/8 327/19 332/4

**I went [2]** 99/15 229/22

**I will [4]** 115/7 155/14 156/9 190/11

**I wouldn't [5]** 104/24 248/7 254/24 301/23 308/2

**I'd [42]** 10/15 25/9 48/6 78/11 80/2 80/20 81/9 81/14 82/1 82/11 84/13 90/8 101/11 106/6 109/23 112/3 114/21 127/9 127/21 133/15 143/7 148/23 151/3 152/15 156/3 160/21 173/2 173/22 174/21 186/20 209/15 215/4 219/5 230/15 235/13 239/12 276/18 278/19 298/16 310/20 337/11 340/13

**I'll [29]** 7/17 72/23 74/4 101/11 101/22 104/10 114/5 121/24 122/16 122/16 122/17 127/17 130/8 131/16 145/8 149/22 186/6 190/10 192/24 193/6 193/7 194/2 207/15 210/18 234/17 235/18 241/8 329/11 340/21

**I'll just [1]** 7/17

**I'm [199]** 8/11 11/17 11/20 18/5 21/10 22/2 22/3 29/11 45/17 51/22 56/6 58/13 59/23 60/12 61/3 70/19 72/18 72/19 72/20 72/25 73/2 73/4 73/23 74/1 76/21 77/9 77/21 79/1 80/4 85/22 90/13 90/13 97/10 97/18 97/21 100/3 100/19 101/23 103/19 103/24 104/1 107/2 108/6 108/6 115/15 115/23 115/25 116/4 116/20 116/25 117/17 117/20 118/4 118/10 118/18 118/23 120/4 123/6 123/15 124/15 124/24 128/25 131/6 135/2 138/2 138/10 138/17 138/24 139/8 139/13 141/13 142/20 143/1 150/3 150/24 151/6 152/11 152/12 153/20 154/18 157/7 158/7 162/11 162/19 163/16 166/24 168/17 169/1 171/10 175/18 175/19 182/6 185/5 185/8 186/6 194/11 195/5 196/4 197/21 198/15 200/6 200/19 201/12 202/9 202/10 202/18 203/21 207/3 207/7 208/10 210/11 211/6 213/18 213/18 216/18 216/21 219/1

219/1 219/11 221/12 222/7 225/18 226/3 226/14 226/16 227/2 228/15 230/10 230/16 231/20 231/21 232/13 232/14 232/20 233/24 236/5 236/12 241/18 243/15 243/15 243/16 243/22 243/23 246/24 246/25 249/3 249/12 249/16 249/24 250/8 252/8 253/2 255/9 258/18 260/11 262/7 262/9 263/22 264/12 265/14 266/20 270/4 271/9 271/18 272/9 273/5 277/9 280/25 282/25 284/16 285/5 285/17 288/7 288/14 289/11 294/25 295/6 295/19 297/19 302/20 306/4 306/17 308/15 310/24 313/23 315/17 315/19 316/17 316/18 317/22 318/6 320/4 332/18 332/21 333/8 333/18 338/24 339/25 341/24

**I'm going [10]** 22/2 22/3 56/6 72/19 73/4 108/6 163/16 175/19 230/16 332/18

**I'm just [8]** 8/11 72/20 97/21 103/19 116/25 203/21 232/20 258/18

**I'm not [24]** 79/1 118/18 124/15 138/2 138/10 138/17 139/8 141/13 142/20 162/11 166/24 211/6 213/18 216/18 226/14 226/16 236/5 243/22 250/8 255/9 260/11 262/7 269/9 277/9

**I'm not sure [20]** 85/22 100/19 107/2 139/13 150/24 152/11 152/12 157/7 162/19 198/15 202/18 221/12 227/2 241/18 243/15 246/24 252/8 253/2 289/11 332/21

**I'm sorry [36]** 18/5 29/11 58/13 59/23 73/23 74/1 77/21 90/13 97/18 101/23 108/6 116/4 116/20 123/6 124/24 135/2 150/3 151/6 182/6 185/5 185/8 186/6 194/11 195/5 196/4 197/21 198/15 200/6 200/19 210/11 216/21 222/7 226/3 230/10 232/14 273/5 280/25 284/16 285/17 310/24 316/17 316/18

**I'm sure [4]** 249/3 249/12 295/6 297/19

**I've [25]** 7/18 8/12

14/14 43/9 109/19 118/12 118/18 119/8 125/1 132/2 133/4 140/14 149/23 152/5 162/2 165/19 168/13 179/23 197/24 198/4 208/5 208/5 295/20 300/9 322/8

**ICSC [1]** 317/24

**idea [7]** 34/2 54/11 119/11 242/6 247/11 273/19 273/19

**ideal [1]** 32/24

**ideally [1]** 161/20

**ideas [1]** 156/22

**identification [4]** 151/4 179/12 230/21 258/21

**identified [1]** 259/1

**identify [7]** 23/21 25/10 82/6 171/11 174/22 182/11 230/20

**ignored [1]** 310/3

**imagine [1]** 312/14

**immediacy [2]** 70/7 198/23

**immediate [13]** 5/25 88/13 100/14 103/25 156/17 161/8 161/18 161/19 161/25 198/20 198/24 275/24 300/18

**immediately [23]** 70/2 70/2 87/11 87/21 87/23 88/1 88/3 88/7 88/9 88/16 88/18 89/2 89/3 89/10 89/14 89/23 89/25 90/5 141/25 142/23 174/1 242/7 291/5

**imminent [3]** 70/17 95/3 196/3

**impact [10]** 45/16 65/11 66/3 94/23 128/20 177/19 262/19 262/23 262/25 275/25

**impacted [2]** 105/22 278/2

**impeach [1]** 289/18

**impeded [4]** 105/18 105/19 300/15 306/15

**impedes [1]** 112/7

**impediment [2]** 63/15 290/19

**impediments [2]** 75/10 109/21

**impetus [2]** 110/11 110/16

**implement [5]** 122/17 163/1 163/12 276/4 278/14

**implementation [2]** 144/3 147/3

**implementing [1]** 275/25

**implicates [1]** 217/16

**implicitly [1]** 211/19

**implied [1]** 149/14

**import [1]** 54/20

**important [18]** 20/14

37/24 38/7 38/15 42/2 44/16 50/21 51/10 52/2 59/7 59/12 66/5 93/14 118/14 118/19 220/19 246/5 246/7

**importantly [3]** 148/18 199/3 205/10

**impossible [1]** 278/15

**impressions [1]** 184/8

**improve [16]** 15/17 40/11 41/6 43/1 46/2 62/12 65/8 67/21 74/18 84/21 88/25 94/9 142/9 158/23 162/2 278/6

**improved [5]** 59/1 61/11 86/17 86/24 247/15

**improvement [13]** 41/4 62/8 87/15 102/17 118/16 125/24 144/8 218/12 219/8 219/21 304/13 320/2 322/7

**improvements [19]** 14/8 40/23 42/17 61/13 64/22 74/20 75/10 76/13 88/13 94/12 95/1 103/7 109/17 109/18 125/9 126/6 206/6 220/5 322/6

**improving [4]** 112/8 120/18 142/18 252/25

**inability [1]** 64/2

**inadequate [4]** 35/13 42/5 45/3 249/20

**inadvertent [2]** 286/3 286/4

**inadvertently [1]** 285/23

**inappropriate [1]** 321/23

**inauguration [1]** 272/25

**include [4]** 22/18 171/22 189/1 189/2

**included [1]** 191/18

**includes [8]** 102/12 102/22 133/24 145/6 146/1 146/8 168/21 223/2

**including [17]** 14/21 82/23 113/24 114/10 144/18 183/14 202/22 205/5 240/9 248/16 251/14 279/6 283/22 298/6 311/16 315/25 317/12

**inconsistent [2]** 209/22 289/18

**increase [8]** 15/13 15/15 37/9 88/25 94/16 141/10 251/18 252/5

**increased [9]** 15/18 29/21 292/15 292/18 292/20 292/20 293/3 304/5 324/1

**increasing [1]** 94/9

**incredible [1]** 43/18

**incurred [1]** 65/3

**I**

**independent [3]** 67/16 69/22 213/19

**INDEX [4]** 3/2 3/14 4/2 4/9

**indicate [1]** 180/5

**indicated [4]** 172/12 178/21 186/12 207/15

**indicates [1]** 232/17

**indication [1]** 177/22

**indirect [1]** 102/5

**indisputably [1]** 204/21

**individual [1]** 223/9

**individuals [1]** 238/12

**industrial [1]** 267/20

**information [22]** 28/4 29/8 37/4 37/5 37/10 91/21 153/3 161/21 173/24 173/25 174/3 174/4 174/6 252/15 252/17 284/15 287/12 297/13 297/22 297/23 298/2 322/15

**informed [4]** 110/23 120/7 238/2 333/25

**infrastructure [4]** 65/6 164/25 168/21 267/19

**inherit [1]** 86/16

**initial [4]** 79/3 124/12 150/9 156/16

**initiated [1]** 219/9

**injunction [1]** 278/21

**inquiry [1]** 203/16

**inspection [8]** 175/6 175/11 176/3 176/11 177/7 177/12 224/3 258/21

**Inspections [1]** 258/22

**installing [2]** 280/12 320/9

**instance [6]** 68/11 97/17 99/3 235/3 300/11 333/7

**instances [3]** 68/10 219/8 219/20

**instead [3]** 63/18 128/3 260/25

**institutions [1]** 294/20

**instructional [1]** 36/7

**instructions [1]** 14/4

**insufficient [6]** 35/21 50/1 227/17 227/23 242/22 244/2

**integrity [2]** 59/13 61/7

**intend [1]** 206/21

**intended [1]** 286/15

**intends [1]** 46/1

**intent [3]** 200/2 202/7 202/9

**intention [1]** 137/4

**inter [10]** 12/2 12/3 13/23 20/8 39/21 66/3 72/5 85/8 132/25 203/19

**inter-city [10]** 12/2 12/3 13/23 20/8 39/21 66/3 72/5 85/8 132/25

**inter-city [10]** 12/2 12/3 13/23 20/8 39/21 66/3 72/5 85/8 132/25

**interact [2]** 51/21 323/17

**interactive [1]** 321/9

**interest [113]** 5/9 5/10 5/11 5/12 41/18 45/18 60/20 61/11 61/15 63/11 65/10 65/11 65/23 66/2 67/11 67/15 72/1 72/9 72/15 73/16 73/20 76/19 78/18 83/15 93/5 109/4 110/13 111/10 119/6 119/18 119/19 121/19 122/21 123/2 123/12 123/22 136/19 136/20 144/21 145/4 145/15 150/20 154/1 154/2 157/11 157/22 160/1 164/12 168/24 169/22 169/25 170/10 170/14 171/4 182/16 183/8 192/16 193/20 195/8 195/24 199/7 199/8 199/9 199/11 199/19 200/3 200/4 200/10 200/11 200/12 200/14 200/16 201/4 203/25 204/22 210/4 216/15 243/5 255/7 255/18 255/24 268/14 268/23 269/1 269/8 271/17 271/21 273/15 281/11 281/13 284/1 284/2 284/6 284/13 287/18 287/21 296/11 296/21 298/4 300/19 302/6 306/20 306/24 307/15 310/16 311/15 311/19 314/2 318/24 325/17 329/2 332/2 341/23

**interested [11]** 68/15 76/4 87/3 92/7 92/10 92/25 111/9 154/18 173/4 177/23 284/5

**interesting [1]** 341/2

**interests [23]** 63/10 63/10 63/16 66/23 67/16 75/17 84/17 84/22 85/7 85/9 85/11 160/1 161/2 177/8 178/21 181/10 181/12 183/19 183/22 195/21 205/5 208/16 311/17

**interface [2]** 15/8 146/10

**interfacing [2]** 51/23 89/19

**interfered [1]** 64/21

**interference [1]** 63/18

**interfering [1]** 311/12

**interim [2]** 92/19 95/2

**interior [2]** 218/23 218/24

**interlude [1]** 57/23

**intermixed [1]** 19/21

**intermodal [1]** 246/7

**intern [1]** 14/15

**internal [2]** 71/13 282/19

**interrogatory [3]** 196/6 196/13 201/14

**interrupt [8]** 61/3 70/19 80/4 129/25 135/22 236/24 288/7 302/20

**interruption [1]** 69/5

**interstitiary [1]** 64/16

**intervene [3]** 106/13 207/18 254/22

**intervened [2]** 207/21 306/12

**interview [2]** 40/16 53/23

**intimately [3]** 124/15 138/2 316/7

**intricate [1]** 282/13

**introduce [2]** 50/19 197/13

**introduced [2]** 170/20 197/19

**introduction [1]** 156/1

**intuitive [2]** 20/16 37/17

**invest [4]** 65/5 65/8 65/12 65/14 65/14 65/23 267/7 270/13

**Investco [2]** 45/17 182/16

**invested [8]** 13/11 94/19 267/4 267/6 267/12 267/17 304/13 304/20

**investment [6]** 14/9 46/2 67/5 178/6 266/23 270/22

**investments [1]** 268/10

**investor [1]** 94/11

**Investors [1]** 216/10

**invests [1]** 266/24

**invite [1]** 196/9

**inviting [2]** 175/8 176/14

**invoke [2]** 9/1 199/6

**involve [4]** 226/8 279/9 312/10 332/5

**involved [23]** 14/18 72/8 93/19 119/11 119/12 119/16 146/19 157/13 211/4 220/3 220/17 223/17 223/19 245/21 257/17 268/13 281/16 305/14 317/7 317/7 327/19 328/2 328/23

**involvement [3]** 119/14 245/22 257/8

**involves [1]** 336/16

**involving [2]** 104/4 335/23

**ironic [2]** 208/15 280/19

**is [732]**

**is that correct [3]** 41/11 332/13 333/9

**is that right [1]** 154/10

**is there [11]** 8/18 39/9 39/11 40/7 41/8 44/5 127/15 163/21 230/24 234/19 301/11

**Island [1]** 69/1

**isn't [11]** 67/7 70/1 87/20 87/22 100/8 100/10 104/7 110/11 196/11 204/17 256/5

**isn't -- strike [1]** 87/20

**issue [22]** 71/14 104/4 104/5 108/17 147/12 148/19 151/18 151/20 155/1 206/18 208/24 237/13 257/3 289/13 300/7 303/9 303/9 313/20 313/22 314/2 335/23 342/7

**issued [2]** 219/22 228/25

**issues [28]** 6/6 40/15 64/5 64/11 94/22 126/9 126/10 127/5 127/9 127/10 147/12 218/25 221/23 224/8 242/11 244/11 255/19 262/15 263/1 263/17 280/17 286/18 290/4 321/21 339/12 339/12 342/12 342/6 342/8

**it [647]**

**it happened [1]** 128/24

**it would be [12]** 57/2 65/23 130/24 187/10 226/20 235/19 252/2 252/4 253/10 254/1 299/12 339/21

**it's [255]** 5/17 5/18 6/24 13/25 14/22 14/22 15/2 17/21 20/3 20/5 20/15 20/18 23/22 24/18 24/19 26/4 26/5 28/21 28/21 28/22 28/25 29/1 29/3 29/4 29/6 29/7 29/13 30/20 32/14 32/23 32/24 33/3 33/17 33/17 35/4 35/8 35/8 35/10 35/13 35/13 36/1 37/1 37/3 37/14 38/3 38/15 38/24 39/1 39/5 40/1 41/22 44/19 48/20 48/21 51/11 51/21 52/2 54/11 54/13 54/13 59/8 59/8 59/12 59/24 59/25 60/4 60/5 60/6 60/10 60/10 61/5 61/8 62/8 66/5 66/18 67/2 67/16 68/17 68/17 69/2 70/5 70/20 70/22 72/22 77/12 77/17 82/16 83/13 86/7 90/8 90/9 92/21 101/23 102/24 103/7 103/8 103/17 104/9 105/12 113/7 113/14 114/3 116/7 117/16 120/22 121/23 122/8 127/9 128/1 128/2 130/6

**italics [1]** 192/7

**item [6]** 114/22 239/3 258/21 259/2 259/17 261/23

**Item C [1]** 114/22

**items [7]** 38/25 142/22 163/1 233/16 234/2 261/1 262/5

**its [63]** 13/4 13/5 14/25 15/7 17/7 17/24 18/9 19/12 31/20 34/23 40/9 42/11 44/25 46/5 63/24 72/14 75/16 86/20 101/17 104/18 113/19 113/13 123/3 123/13 124/12 130/17 133/2 137/1 137/24 148/14 157/18 157/18 161/2 188/24 193/20 193/22 195/21 198/19 201/16

**132/21 133/8 133/13 134/7 143/14 144/6 145/2 145/8 148/17 148/17 148/22 149/7 149/8 149/22 152/2 153/3 154/23 155/9 155/9 155/16 156/6 156/10 156/10 157/20 158/20 160/22 161/5 164/24 165/5 172/4 174/22 175/25 176/12 182/9 182/15 184/2 184/6 184/7 184/7 186/3 186/7 186/22 190/9 190/17 190/18 191/7 191/21 192/7 192/7 192/14 193/6 194/8 194/18 195/18 198/2 200/10 201/8 203/9 203/13 204/3 208/4 208/15 208/23 209/22 210/9 210/10 211/24 216/4 216/5 216/8 216/18 216/18 218/24 219/24 220/19 221/25 222/3 223/20 230/16 230/18 230/18 230/19 233/23 233/24 236/3 237/22 237/23 239/24 240/2 241/14 246/7 249/9 250/6 253/9 256/10 257/3 259/2 263/9 264/14 265/4 267/25 270/7 270/7 270/14 270/15 270/20 271/16 277/7 277/10 277/11 277/12 280/1 280/19 280/23 282/9 285/25 285/25 286/3 286/4 286/22 289/12 289/19 295/6 302/1 302/16 303/8 304/10 304/21 308/2 311/1 316/21 317/10 317/11 321/9 321/13 325/9 327/3 327/6 330/6 334/13 336/24 339/9 340/23 341/2**

**I**

**its... [24]** 205/14 217/9 221/19 221/19 240/13 241/10 252/5 276/7 276/10 277/25 278/22 281/25 297/7 303/14 305/8 305/12 309/23 319/6 320/21 321/12 321/14 322/2 332/16 333/4

**itself [12]** 31/15 31/20 57/11 60/10 60/19 68/21 68/24 101/10 113/3 204/20 297/18 335/7

**J**

**jackets [1]** 292/23
**James [1]** 2/2
**January [22]** 5/10 78/2 78/21 79/8 81/17 110/24 111/2 111/13 174/21 208/6 271/2 273/16 281/15 281/15 281/17 282/21 283/13 283/16 287/4 288/11 308/11 311/23
**January31 [1]** 176/4
**Jay [1]** 2/6
**JC [1]** 131/16
**JLL [21]** 104/4 161/6 161/7 161/10 161/13 161/14 161/19 161/20 277/24 279/1 291/13 291/14 291/15 292/6 292/7 292/9 292/15 293/18 297/1 323/2 323/6
**JLL's [2]** 292/3 293/18
**Joan [1]** 294/4
**Joan Malkowski [1]** 294/4
**job [6]** 43/6 43/19 52/22 104/12 112/25 247/17
**Joe [6]** 67/9 91/17 169/17 169/19 174/16 174/18
**Joe Press [4]** 67/9 91/17 169/17 169/16 174/16
**John [1]** 176/3
**join [3]** 175/8 175/9 176/14
**joint [38]** 6/9 21/10 21/17 24/18 56/2 56/12 77/10 78/11 78/24 80/2 80/17 81/9 83/7 83/9 90/8 90/17 91/14 95/4 111/24 120/4 121/18 121/23 125/3 148/22 149/7 150/3 157/1 169/1 169/8 171/10 181/6 184/15 185/8 185/12 186/4 190/7 268/11 290/8
**joke [1]** 179/16
**Jones [5]** 291/11 291/13 291/14 322/18

322/21
**judge [2]** 1/10 316/9
**judged [1]** 244/2
**judicial [1]** 310/21
**July [5]** 215/12 229/10 236/22 309/5 309/5
**jump [1]** 186/25
**June [7]** 56/13 124/6 149/5 269/12 300/14 306/9 309/5
**June/July [1]** 309/5
**jurisdiction [6]** 218/4 218/17 219/19 220/9 223/16 323/11
**just [205]** 5/19 5/19 6/1 7/17 7/23 8/11 8/23 9/8 10/2 10/4 10/9 13/11 15/14 16/12 16/14 18/5 21/3 21/23 24/25 26/16 26/24 27/13 29/12 31/17 32/23 42/8 43/18 43/23 50/11 50/18 51/23 53/13 55/8 55/17 66/16 66/18 68/6 69/3 69/16 72/20 73/23 73/24 74/4 74/18 85/22 85/23 86/2 91/25 92/11 92/17 92/18 93/8 94/7 94/17 97/21 98/1 98/7 103/19 104/5 112/22 114/4 116/25 117/4 117/8 117/10 117/16 117/20 117/24 122/9 122/10 122/14 127/17 127/17 127/21 128/2 128/6 130/8 130/11 130/23 130/24 132/21 135/3 139/12 146/17 148/9 148/20 151/3 151/22 155/17 159/19 161/17 164/24 165/18 165/19 167/9 175/17 180/3 181/7 181/22 184/17 186/25 193/17 194/23 194/25 196/13 196/15 196/19 197/10 199/5 200/4 203/21 204/3 207/15 207/23 208/7 210/12 214/10 216/3 217/18 217/20 218/21 220/16 225/11 226/21 230/9 230/15 232/20 233/13 233/24 237/13 239/10 240/3 240/3 240/14 241/15 243/23 245/19 253/6 253/7 254/2 255/23 258/18 259/6 261/6 262/10 263/22 264/11 265/14 265/15 265/17 265/24 266/1 266/6 270/3 270/16 275/14 280/7 282/21 283/1 284/10 285/5 285/19 286/1 288/7 288/14 290/10 294/14 295/8 299/25 302/15 302/18 303/5 303/12 304/10

307/6 307/7 308/2 308/15 312/16 312/20 313/1 313/20 314/10 315/13 316/9 317/6 318/17 319/3 320/7 322/7 323/22 324/20 325/4 327/7 335/12 338/10 338/11 338/23 339/23 339/25 339/25 340/13 340/19 340/23 341/5
**justify [1]** 14/9
**justifying [2]** 112/18 112/22
**JX [1]** 21/16
**JX1 [3]** 6/13 6/17 113/14

**K**

**KASOWITZ [1]** 2/3
**kasowitz.com [1]** 2/5
**kasowtiz.com [1]** 2/5
**KATZ [1]** 1/12
**KAY [3]** 213/2 213/8 213/9
**keep [8]** 19/23 39/25 92/17 161/11 161/19 214/22 286/23 295/16
**keeping [1]** 277/7
**Kennedy [1]** 317/5
**kept [2]** 161/13 228/21
**key [7]** 15/4 30/17 38/1 44/19 84/19 118/12 237/24
**KGB [2]** 241/19 241/19
**kid's [1]** 324/18
**kids [1]** 51/15
**Kiernan [14]** 2/16 5/15 7/16 110/18 125/2 180/19 180/23 181/22 198/5 198/11 199/5 201/14 324/25 335/11
**kind [17]** 17/2 17/11 19/1 24/13 25/25 32/6 34/4 36/7 43/14 64/16 89/5 207/25 240/4 240/6 245/23 297/23 338/24
**kinds [3]** 243/17 272/25 280/17
**knew [13]** 92/10 93/7 121/10 121/13 147/17 148/5 195/20 229/6 255/12 256/16 282/16 308/11 308/11
**KNIGHT [1]** 2/16
**knob [1]** 194/25
**know [185]** 7/13 17/20 20/23 23/5 29/2 31/4 34/16 34/16 36/11 39/7 39/17 40/22 44/9 44/15 46/1 48/15 48/17 66/5 66/14 67/10 68/16 69/24 70/1 70/4 70/12 72/24 83/6 86/23 87/6 94/2 97/8 101/19 101/20 101/24 103/1 104/7 106/19 107/9

114/5 115/21 118/11 118/19 119/15 121/12 125/14 129/20 138/11 138/22 139/12 141/16 142/21 145/16 148/10 149/23 150/9 150/16 153/16 153/18 153/24 154/6 157/7 157/16 160/9 161/24 162/11 162/13 162/19 166/13 168/19 172/7 176/9 176/11 176/11 178/3 178/5 178/11 178/13 178/13 178/20 178/25 179/15 184/7 184/10 187/9 189/18 190/2 190/4 194/18 195/16 195/24 196/1 200/24 202/17 202/23 205/6 206/18 206/20 207/7 210/13 211/6 211/13 211/14 214/22 217/5 219/24 221/8 229/5 230/8 231/23 237/9 238/9 239/3 240/18 240/21 244/11 246/16 248/2 249/17 250/1 250/9 250/10 255/12 255/22 256/8 256/11 263/3 263/10 268/23 269/19 274/9 274/10 275/16 275/20 276/6 276/7 276/14 276/15 276/25 277/1 277/8 278/9 278/10 279/3 279/7 279/8 280/11 282/20 285/3 285/5 286/4 287/12 287/23 289/25 292/21 292/23 292/24 294/21 297/4 300/3 303/1 303/10 303/21 305/18 305/19 312/10 315/21 318/15 318/23 318/25 319/2 320/19 321/6 322/8 322/9 323/2 323/25 326/5 329/6 332/21 332/24 333/12 333/13 334/18 342/4 342/14
**knowing [1]** 189/12
**knowledge [20]** 75/22 99/4 219/11 226/6 227/3 229/12 238/1 279/17 300/25 301/2 301/4 321/12 321/15 321/16 323/5 324/11 324/16 325/19 328/20 331/12
**knowledgeable [1]** 146/19
**known [5]** 22/23 24/9 39/1 40/4 242/3
**knows [2]** 144/16 239/17
**Koevary [1]** 2/2
**Kookmin [29]** 2/11 69/10 170/3 170/4 170/5 174/17 174/19

178/2 178/4 178/8 179/6 179/7 180/4 181/23 182/3 269/14 269/17 269/18 270/5 308/7 309/24 310/6 310/9 310/13 310/17 310/22 310/23 311/9 311/19
**Kookmin's [1]** 310/3
**Kostura [5]** 99/6 99/18 100/6 156/17 156/22
**KTB [2]** 269/22 269/24

**L**

**label [2]** 33/4 34/25
**labeled [5]** 25/20 28/2 33/2 227/17 242/15
**lack [6]** 38/14 74/24 178/11 178/14 187/17 298/17
**lacked [1]** 126/4
**laid [2]** 151/13 164/22
**Lambert [19]** 1/12 5/13 71/2 111/25 113/18 120/5 121/4 123/4 123/20 141/23 155/25 158/13 158/19 162/3 165/7 181/7 182/25 185/15 207/13
**land [1]** 158/4
**landlord [8]** 55/10 193/14 256/14 256/15 320/16 320/21 322/1 336/21
**Lang [5]** 291/11 291/13 291/14 322/18 322/21
**language [8]** 72/22 73/5 73/7 85/5 171/23 175/23 181/24 182/3
**large [7]** 20/4 48/17 135/11 222/3 225/10 230/17 263/3
**largely [2]** 69/19 168/17
**larger [7]** 76/5 164/24 225/10 225/12 226/18 253/4 254/4
**largest [2]** 66/22 316/15
**LaSalle [5]** 291/11 291/13 291/14 322/19 322/21
**last [36]** 43/22 120/6 142/6 142/16 172/20 178/25 196/4 208/6 208/25 215/3 215/6 215/12 215/13 229/5 236/2 236/3 245/22 246/14 271/8 283/14 294/1 294/14 296/22 296/23 298/10 300/10 304/2 307/21 313/16 318/4 320/8 320/11 324/7 327/14 335/9 338/25
**lasting [1]** 191/23
**lasts [1]** 66/1
**late [13]** 30/5 75/20

**L**

**late... [11]** 173/3 221/1 228/18 242/4 242/5 242/6 297/10 297/12 316/21 331/8 339/19
**later [14]** 16/17 125/12 128/23 128/24 171/7 175/6 181/25 182/4 191/8 228/3 251/23 279/10 301/10 306/21
**latest [1]** 298/8
**latitude [1]** 263/10
**launch [2]** 76/13 94/17
**law [5]** 1/12 8/10 115/24 323/10 339/13
**laws [1]** 65/18
**lawsuit [4]** 92/3 181/9 310/10 330/13
**lawyer [3]** 177/6 211/7 243/23
**lay [1]** 158/3
**layer [3]** 57/20 57/23 64/16
**layers [8]** 46/21 56/24 57/6 58/4 60/21 65/2 76/7 301/17
**lead [4]** 25/23 26/1 31/25 58/19
**leadership [4]** 55/3 55/7 219/7 220/14
**leading [5]** 11/20 24/4 152/9 231/3 298/11
**leads [1]** 58/19
**learned [1]** 296/22
**lease [205]** 25/1 35/9 46/4 46/8 46/11 51/25 57/12 57/16 57/17 57/24 60/3 60/5 61/5 66/1 84/21 85/17 85/17 85/21 85/23 86/7 86/10 86/15 86/23 87/1 87/3 87/6 87/11 87/19 87/21 88/11 88/12 134/2 134/21 137/1 137/24 138/3 138/11 138/13 138/16 138/23 138/25 139/6 139/8 139/14 139/18 139/22 141/3 141/6 141/9 141/13 142/8 144/6 144/10 144/11 144/11 144/17 144/18 145/18 158/22 159/2 159/9 162/14 164/5 164/7 193/22 194/9 199/18 199/23 199/24 200/9 200/14 201/2 201/6 202/4 202/12 202/13 202/14 202/14 202/15 203/17 203/20 203/24 203/25 204/2 204/9 204/12 204/17 204/18 204/19 204/24 205/2 205/4 205/15 205/19 205/20 205/22 205/25 206/3 206/5 206/8 206/8 206/10 206/16 206/17 206/20 206/21 207/10

208/20 209/17 210/2 210/10 210/15 216/5 216/6 216/9 216/19 216/20 217/8 217/9 220/2 220/6 221/15 221/15 226/13 226/15 227/10 227/10 228/6 243/20 243/20 244/16 244/20 254/5 254/5 255/25 256/1 257/11 260/3 260/10 260/14 260/17 260/20 263/12 265/3 265/6 271/13 271/14 271/14 271/15 271/18 271/25 272/1 272/2 272/5 272/8 272/16 272/17 289/4 290/2 290/14 299/11 299/11 302/1 302/10 302/17 302/22 302/23 302/25 303/4 303/8 303/13 305/1 305/2 305/5 305/8 305/12 308/22 312/6 312/20 312/21 312/24 315/23 318/15 321/13 321/14 327/5 327/11 327/19 327/21 328/2 328/6 328/9 328/11 328/16 328/18 328/23 329/22 329/25 330/6 335/18 335/20 342/1 342/5 342/14 342/16
**leased [15]** 16/24 18/8 25/12 35/8 63/19 70/5 159/15 217/7 217/11 226/12 273/2 278/8 304/4 323/16 329/18
**leasehold [101]** 5/10 5/11 25/11 45/18 60/20 61/6 61/19 61/20 65/10 65/11 71/20 73/20 75/6 76/20 76/20 77/16 78/22 83/15 92/11 92/15 93/5 93/14 95/9 109/7 110/13 111/10 119/6 119/18 119/19 122/20 123/1 123/11 123/22 129/8 136/19 144/21 145/14 145/14 150/20 157/22 159/14 164/12 165/14 169/21 170/10 171/4 171/5 181/10 181/12 181/16 182/16 183/8 183/19 183/22 192/16 196/10 199/6 199/8 199/9 199/11 200/3 200/4 200/10 200/12 200/14 200/16 201/4 202/22 202/24 206/13 216/15 221/19 243/5 255/7 264/20 264/25 268/14 268/23 268/23 269/1 270/1 271/17 271/21 273/15 281/11 284/3 284/5 287/17 287/20 296/11 296/20 298/4

300/19 302/6 306/20 306/24 307/15 311/19 325/17 329/1 332/2
**leasehold's [1]** 341/23
**leaseholder [3]** 145/19 204/25 205/1
**leases [26]** 86/7 208/25 209/1 209/7 209/12 209/22 211/7 211/17 216/12 216/21 273/11 273/12 276/25 291/16 304/8 315/19 326/25 328/21 329/13 329/17 331/19 332/6 341/12 341/14 341/15 341/16
**leasing [21]** 25/5 25/7 46/10 46/14 57/6 112/6 141/11 160/23 215/25 265/7 273/10 273/11 277/18 277/21 291/23 292/14 315/22 318/16 322/10 330/5 336/20
**least [17]** 10/1 10/10 22/20 106/3 106/10 116/20 116/21 119/1 194/21 204/25 219/17 231/17 236/5 256/10 289/20 339/23 342/4
**leave [7]** 43/13 55/12 187/9 189/11 215/11 265/14 265/15
**leaving [1]** 26/13
**left [15]** 22/12 55/21 55/22 56/5 74/22 91/9 91/11 165/5 215/12 219/18 227/7 237/25 250/16 271/16 272/7
**left-hand [2]** 56/5 91/9
**legal [6]** 145/6 145/9 207/9 207/19 329/7 339/12
**legally [1]** 341/25
**leisurely [1]** 20/19
**lend [3]** 267/10 267/10 270/19
**lender [20]** 6/24 121/13 121/15 122/1 161/11 174/13 174/15 268/17 268/20 269/7 281/1 281/6 281/13 281/25 282/5 287/17 298/25 303/23 308/13 309/24
**lender's [22]** 6/20 7/2 7/10 7/18 7/19 121/19 128/1 140/5 143/14 150/3 151/4 152/16 194/8 209/16 210/9 230/16 230/20 238/6 238/21 239/12 281/5 306/24
**Lender's Exhibit 1 [1]** 143/14
**Lender's Exhibit 22 [1]** 140/5
**lenders [4]** 77/25 78/23 110/5 110/23
**length [1]** 64/3

**lengthy [2]** 77/11 316/12
**less [13]** 75/7 85/19 121/6 121/10 121/12 162/9 162/19 170/24 184/3 184/16 240/2 302/16 313/7
**lessee [10]** 68/14 195/6 195/7 195/9 202/5 205/15 219/25 257/8 260/6 263/15
**lesser [1]** 195/10
**lessor [3]** 219/25 220/7 257/7
**let [34]** 38/7 39/14 54/9 57/5 58/3 63/22 66/20 67/7 71/12 72/24 86/2 88/17 124/17 172/6 176/9 176/11 176/11 179/11 185/15 185/16 186/3 186/17 188/1 188/11 192/23 193/18 207/23 211/20 211/23 283/5 294/13 336/9 337/20 342/4
**let's [46]** 16/17 50/9 53/5 62/2 70/20 87/4 124/16 124/18 130/16 131/2 131/12 131/14 131/14 135/1 135/22 149/22 152/6 154/21 154/22 155/21 156/12 171/16 172/20 173/21 188/19 191/7 222/16 241/8 266/6 281/12 283/4 285/2 285/3 285/6 286/8 286/22 294/15 294/23 295/16 303/12 308/25 308/25 309/4 309/5 335/7 340/14
**let's see [2]** 130/16 135/22
**letter [49]** 83/7 83/8 83/10 83/11 90/11 90/20 91/4 99/9 169/19 169/15 169/20 169/24 170/5 170/13 171/6 172/1 173/11 173/21 174/24 176/13 176/15 176/19 177/5 181/7 182/11 183/7 185/2 185/6 185/10 185/19 186/19 186/20 188/3 188/6 188/21 189/1 189/16 222/1 259/11 306/18 333/22 333/25 334/6 334/7 334/11 334/12 334/19 334/21 336/24
**letters [1]** 311/14
**level [22]** 24/12 25/3 25/5 26/2 31/10 31/13 46/22 48/9 48/13 53/5 53/5 53/7 55/19 60/11 66/19 103/11 127/5 274/1 275/7 275/11 297/22 323/5

**levels [11]** 13/8 17/25 32/1 32/2 32/9 53/11 54/11 54/13 55/24 262/23 278/1
**license [2]** 273/10 273/12
**lien [1]** 171/2
**liens [7]** 75/16 75/19 75/22 170/15 170/22 170/23 170/25
**lieu [2]** 136/13 339/11
**lifting [1]** 320/12
**light [1]** 225/10
**lighting [1]** 322/7
**like [86]** 8/13 9/1 10/16 25/9 25/25 27/14 37/6 38/6 40/23 43/6 45/9 49/1 53/17 55/5 55/16 56/2 64/23 69/16 78/24 82/1 84/13 86/13 86/24 88/3 98/1 98/3 98/15 99/16 99/18 101/12 112/3 112/16 114/21 127/15 127/21 133/15 140/5 141/25 143/7 148/23 151/3 152/15 153/8 157/5 160/21 168/20 188/19 204/18 209/15 215/4 219/5 221/6 227/21 230/15 230/22 231/1 232/24 233/4 235/13 235/21 237/17 238/6 238/20 240/6 253/5 263/21 264/11 274/2 274/3 275/7 275/21 277/7 278/19 280/14 283/24 288/17 293/5 294/10 303/8 303/15 314/6 322/5 324/3 329/7 339/18 340/13
**limit [1]** 131/9
**limited [8]** 28/20 36/18 37/3 43/11 275/18 286/19 290/10 292/10
**limits [1]** 144/7
**Lindsay [3]** 245/4 306/4 325/9
**line [12]** 39/23 97/17 97/18 98/13 179/9 235/3 235/7 235/21 236/1 236/10 261/14 340/13
**linear [1]** 256/12
**lines [2]** 234/23 235/24
**list [3]** 136/3 145/21 225/17
**listed [4]** 234/3 259/2 259/16 274/15
**lists [2]** 143/23 341/6
**litigation [10]** 23/23 75/9 151/16 151/21 153/15 179/21 179/22 180/5 254/22 286/13
**litigators [1]** 179/15
**little [32]** 5/22 19/20 29/24 29/25 30/3 37/20 56/4 89/17 108/7

**L**

**little... [23]** 128/23 131/23 133/15 143/8 146/6 154/21 158/12 170/12 185/20 191/20 191/21 192/9 194/2 194/25 213/23 230/17 230/18 235/15 249/17 267/5 286/19 287/24 301/6

**live [1]** 119/12
**LLC [1]** 271/8
**LLP [3]** 2/3 2/12 2/16
**load [1]** 19/17
**loan [35]** 120/8 120/10 120/10 148/5 189/15 189/15 268/20 268/22 268/24 268/25 269/2 269/15 269/25 270/5 270/17 270/19 270/25 271/1 271/2 281/2 281/9 281/10 281/13 281/17 281/22 282/1 282/7 282/14 282/15 283/10 308/10 308/13 308/21 308/23 311/23
**loans [8]** 119/18 190/2 267/9 268/21 281/4 281/7 282/2 284/2
**local [2]** 222/22 246/23
**locally [2]** 304/13 317/3
**locate [3]** 40/24 41/5 97/21
**located [5]** 38/16 41/1 224/9 279/23 323/13
**location [9]** 16/5 32/18 36/1 42/11 49/5 227/22 257/1 263/8 267/11
**locations [2]** 12/22 37/4
**locomotive [1]** 39/2
**logistics [1]** 96/15
**LOIs [2]** 318/15 318/22
**London [1]** 267/15
**long [56]** 5/23 10/10 11/22 11/24 12/19 12/20 12/25 14/16 14/19 20/24 21/22 26/22 40/22 42/9 42/12 46/25 47/2 48/20 48/21 51/4 55/5 66/1 69/1 71/17 74/17 84/21 102/16 102/18 103/8 105/19 105/25 130/17 134/18 168/12 168/18 168/19 187/9 189/13 189/19 190/18 192/18 192/18 206/25 220/1 225/20 233/23 236/22 253/4 257/10 267/1 293/25 295/6 295/11 315/12 319/1 339/24
**long-distance [4]** 12/19 12/20 12/25 20/24
**long-range [2]** 168/18 168/19

**long-term [6]** 11/22 14/19 84/21 102/16 102/18 103/8
**longer [14]** 29/25 94/7 120/21 122/24 129/3 129/12 130/2 202/15 226/24 255/12 260/4 270/4 294/24 339/13
**longevity [1]** 84/18
**look [52]** 21/23 22/9 41/6 42/7 43/1 48/6 56/11 63/7 77/9 91/14 98/3 101/24 111/24 112/3 113/4 116/16 117/18 117/25 120/4 124/16 128/2 128/16 154/17 157/10 158/6 160/1 169/2 171/18 171/22 174/21 174/23 186/20 190/8 190/11 191/3 194/23 208/21 209/15 209/15 209/18 210/7 210/18 232/1 233/9 235/3 249/22 250/7 275/7 319/18 327/8 339/20 340/21
**looked [10]** 57/18 118/18 129/19 157/1 210/14 233/23 236/17 253/10 253/23 257/21
**looking [27]** 27/9 30/22 46/21 69/18 102/25 110/12 127/24 130/12 165/18 171/3 171/24 173/8 178/4 181/16 188/10 191/14 206/15 231/21 231/24 232/16 232/20 233/13 238/6 261/10 270/4 297/14 320/8
**looks [10]** 8/12 98/1 98/15 230/22 231/1 232/24 233/4 240/6 274/2 275/16
**loose [1]** 184/7
**Los [1]** 267/15
**Los Angeles [1]** 267/15
**lose [1]** 92/20
**lost [2]** 128/25 131/13
**lot [46]** 14/14 15/13 20/15 29/21 30/17 33/8 37/10 44/23 51/23 53/20 54/2 54/23 54/25 64/23 64/24 65/3 83/17 83/17 88/12 88/15 90/15 105/1 112/20 122/12 143/2 144/8 155/22 162/19 162/20 206/23 206/24 207/4 208/6 228/20 228/20 234/21 234/23 236/14 275/14 298/21 302/16 307/4 313/7 319/21 321/5 322/8
**lots [1]** 271/11
**loud [1]** 92/24
**lounge [18]** 26/8 35/1

35/1 35/1 35/2 35/2 35/11 35/12 35/25 52/15 52/16 54/7 54/18 68/25 225/12 227/22 312/8 312/23
**lounges [3]** 35/3 35/18 35/24
**love [4]** 48/25 52/1 266/5 276/18
**low [1]** 244/3
**lowball [1]** 154/5
**lower [6]** 25/5 31/25 48/9 48/12 275/7 275/11
**lowest [4]** 31/10 32/2 32/9 153/1
**loyalty [1]** 35/5 35/6 35/20 54/21
**lunch [4]** 130/6 131/5 131/17 131/23

**M**

**M-a-t-t-h-e-w [1]** 315/9
**M-i-c-h-a-e-l [1]** 266/21
**Macerich [1]** 294/20
**MacIver [5]** 83/13 99/9 99/10 100/10 283/23
**made [54]** 5/10 56/4 57/13 74/20 79/4 79/20 90/11 90/20 91/3 91/23 93/16 95/8 96/23 97/3 97/6 97/17 98/11 98/15 100/13 143/19 146/16 147/14 148/11 156/11 156/11 157/9 169/11 170/9 178/24 181/9 181/11 181/18 192/16 195/19 195/25 196/1 217/12 237/25 239/7 239/8 240/22 264/5 278/17 281/4 288/6 300/9 304/7 333/4 334/1 334/5 338/19 339/10 341/12 342/2
**magically [1]** 312/17
**Maglev [1]** 251/2
**magnitude [1]** 43/23
**Mahnoor [1]** 5/15
**Mahnoor Misbah [1]** 5/15
**main [22]** 19/1 19/3 20/4 24/16 27/25 31/12 31/25 32/15 36/19 47/17 50/9 50/16 50/16 50/17 54/10 63/9 67/25 68/24 263/4 263/5 274/1 275/13
**Maine [1]** 155/4
**maintain [6]** 19/22 19/23 38/5 38/5 51/13 202/15
**maintained [1]** 230/13
**maintaining [1]** 47/19
**maintains [2]** 19/17 243/19
**maintenance [6]** 114/25 118/16 260/13 293/3 293/8 304/17

**major [16]** 35/23 45/6 48/4 168/19 219/11 221/6 221/7 223/1 225/19 253/6 256/10 257/18 257/22 257/24 278/3 286/12
**majority [4]** 267/18 274/3 275/16 293/16
**make [60]** 14/3 14/8 27/23 29/12 31/17 45/12 48/12 65/9 66/12 76/15 86/18 88/13 92/2 92/5 92/15 98/5 104/10 108/4 109/18 114/17 112/9 125/8 131/1 137/19 142/8 142/14 143/5 152/12 156/3 156/24 163/10 165/19 169/9 169/22 174/9 174/11 190/5 197/16 198/13 198/16 201/19 202/5 204/16 210/21 217/18 224/14 228/20 230/5 238/24 240/12 250/2 254/2 255/23 278/15 287/16 287/20 288/14 304/22 314/1 332/1
**maker [1]** 100/3
**makes [2]** 65/13 309/2
**making [19]** 48/12 70/16 70/17 71/9 72/13 72/14 73/15 80/22 81/9 85/19 94/25 99/25 118/7 119/4 137/14 148/3 156/2 249/21 256/9
**Malkowski [1]** 294/4
**mall [5]** 20/1 20/18 22/18 317/4 317/4
**malls [2]** 317/14 326/11
**manage [6]** 161/22 200/14 241/25 271/10 326/22 326/23
**managed [6]** 237/21 293/10 326/7 326/9 326/11 326/13
**management [32]** 11/21 42/15 55/3 71/13 71/23 71/25 76/15 79/20 80/18 80/22 81/11 81/19 84/15 100/24 116/19 118/25 120/7 126/4 190/12 191/14 199/14 214/16 268/8 268/12 273/12 291/22 297/1 316/10 316/13 323/4 323/6 331/19
**manager [15]** 228/15 241/23 242/2 269/17 270/1 270/18 291/9 293/22 294/4 294/5 315/11 315/16 317/23 319/21 321/22
**managers [2]** 242/8 294/18

**manages [2]** 291/15 322/22
**managing [8]** 64/15 157/22 240/12 266/20 268/6 271/9 294/10 325/15
**mandate [1]** 13/13
**manner [2]** 195/7 201/13 333/8
**many [58]** 10/4 13/2 18/2 21/7 27/18 33/7 37/2 41/16 60/21 65/2 65/2 65/2 65/2 66/25 70/9 96/25 105/25 118/12 137/9 138/24 141/16 146/20 157/17 179/10 179/15 179/19 216/13 221/5 221/5 221/23 222/17 237/6 238/13 238/13 242/20 247/6 248/5 248/11 248/14 248/15 248/18 249/3 249/11 250/4 250/14 250/20 251/23 251/24 257/5 257/7 257/15 257/15 258/7 262/4 272/5 283/19 321/22 334/25
**MARC [6]** 17/17 26/16 52/10 52/11 66/15 220/24
**March [21]** 81/6 81/12 81/18 82/8 83/8 124/22 159/4 159/7 159/10 190/13 191/5 191/7 191/7 191/22 208/8 235/10 298/15 333/19 333/22 334/21 334/24
**Marchitelli [4]** 151/15 285/9 285/14 285/23
**marked [6]** 8/7 151/3 152/15 273/19 333/18 336/24
**market [10]** 91/1 302/15 303/3 307/10 311/24 312/20 313/1 313/5 313/8 315/24
**marketing [6]** 44/20 292/13 293/5 315/22 315/25 319/20
**markets [1]** 247/2
**Marshall [2]** 214/20 246/24
**Maryland [4]** 17/17 214/11 214/17 214/24
**Mass [1]** 55/4
**Massachusetts [3]** 11/13 24/10 168/10
**massive [1]** 317/10
**master [4]** 137/17 196/8 222/15 227/10
**master's [1]** 317/19
**material [3]** 77/14 190/23 321/21
**materials [4]** 26/7 149/5 190/12 280/16
**Matt [4]** 293/20 297/1 313/17 315/2

**M**

**Matt Barry [4]** 293/20 297/1 313/17 315/2
**matter [10]** 5/22 96/7 129/23 136/10 159/23 162/13 180/6 207/18 209/21 343/4
**matters [3]** 279/8 279/9 300/3
**Matthew [1]** 315/9
**maximize [1]** 69/18
**may [55]** 7/11 7/11 8/21 71/4 95/20 95/21 97/11 101/16 103/3 103/6 103/15 103/24 104/17 114/15 117/3 122/1 124/13 125/20 131/13 153/25 154/25 165/19 166/20 167/21 197/7 210/5 226/17 226/21 231/1 231/2 231/16 231/23 232/10 233/4 234/10 240/14 240/23 241/14 244/10 253/7 262/19 268/15 269/6 274/4 282/2 295/18 296/6 296/7 307/4 310/2 316/6 330/11 333/15 337/5 342/3
**May 2022 [1]** 231/16
**May 25th [1]** 231/2
**maybe [16]** 57/9 70/6 83/25 99/15 108/6 123/15 127/10 200/6 211/12 241/13 264/7 282/22 287/24 305/20 327/8 329/11
**Mayor [1]** 215/20
**MBA [2]** 317/22 317/25
**McDonald's [3]** 280/4 335/23 336/1
**MD [2]** 1/14 2/9
**me [83]** 6/1 22/3 22/17 24/23 29/18 38/7 39/14 54/9 57/5 58/3 63/22 66/20 67/7 71/12 71/23 72/24 86/2 88/17 92/22 92/25 95/8 98/4 98/11 99/12 102/4 102/9 103/5 117/21 120/20 124/17 124/17 127/15 132/2 135/3 143/7 145/3 150/10 151/16 151/21 153/5 157/9 162/8 165/10 169/4 172/7 181/22 184/16 185/15 185/16 186/3 186/17 188/1 188/18 192/23 193/18 196/15 200/22 202/4 204/6 207/23 211/20 211/23 214/22 229/23 234/12 235/22 236/9 288/8 292/24 294/13 298/13 299/22 300/10 305/18 314/7 323/7 324/20 327/12 329/8 334/18

336/9 337/20 342/24
**mean [89]** 8/18 18/7 28/25 49/1 50/18 51/20 57/21 59/10 60/10 64/25 66/9 77/21 83/16 83/18 85/22 91/22 94/24 103/16 107/2 107/9 109/13 119/12 120/23 123/17 123/17 125/13 134/9 135/21 136/2 136/3 136/22 137/13 140/18 149/11 153/23 168/15 184/7 187/7 189/25 192/4 196/12 197/17 204/18 204/23 207/2 207/7 207/9 207/20 214/2 217/19 218/23 219/12 221/12 227/20 232/8 233/20 234/3 237/1 237/10 237/22 246/15 246/25 247/17 248/4 248/5 250/1 250/12 255/23 256/12 258/4 262/25 276/16 277/15 277/20 288/8 289/12 289/13 302/21 309/17 312/3 317/10 318/17 318/21 321/9 329/20 334/17 339/20 340/11 341/23
**meaning [1]** 226/24
**meaningful [1]** 186/15
**means [10]** 68/18 106/8 135/4 135/10 155/11 168/17 268/19 276/15 276/21 295/22
**meant [3]** 233/21 276/19 276/24
**meantime [1]** 280/5
**measured [1]** 26/16
**mechanical [1]** 2/24
**mediation [1]** 295/19
**medical [1]** 267/20
**meet [27]** 13/23 15/7 33/23 45/21 46/18 54/22 58/2 89/21 92/8 94/15 150/11 186/2 187/25 188/20 188/20 220/12 241/24 249/15 249/17 256/17 306/6 306/7 321/1 321/4 325/10 325/11 339/8
**meeting [56]** 78/4 78/6 78/7 79/7 79/10 79/11 79/14 80/3 81/2 81/12 81/17 81/17 81/17 81/18 81/18 82/7 82/9 92/9 109/8 111/13 111/14 111/16 111/19 111/20 118/15 143/11 172/13 173/5 186/11 186/11 186/14 188/2 188/8 188/13 188/15 189/4 190/13 190/25 228/14 228/23 238/24 241/16 242/14 256/20 276/7 282/10 283/11

283/13 283/21 283/25 284/4 284/16 287/3 288/10 288/11 300/10
**meetings [15]** 43/7 84/24 109/15 179/10 179/19 179/24 180/12 238/22 245/14 283/19 283/20 287/22 288/21 298/16 320/18
**meets [2]** 163/6 244/9
**MEHTA [4]** 1/9 5/3 131/21 296/4
**member [5]** 11/23 77/5 131/8 229/20 255/21
**members [6]** 71/24 77/1 77/3 82/23 109/16 271/9
**memo [1]** 77/14
**memory [2]** 152/3 152/4
**men's [2]** 139/25 140/1
**mention [3]** 104/6 112/12 267/21
**mentioned [30]** 24/7 41/10 42/8 44/4 52/17 54/8 64/8 68/6 92/18 93/3 103/1 103/14 104/14 109/19 121/4 138/23 141/23 147/14 152/16 158/12 168/14 215/16 229/14 270/25 280/25 289/25 293/11 295/4 326/25 328/21
**mentioning [1]** 158/13
**mentoring [2]** 213/24 214/1
**Merit [1]** 2/20
**messy [1]** 340/23
**met [5]** 180/5 198/19 256/18 287/23 308/11
**method [4]** 229/7 236/20 236/25 242/10
**metro [9]** 20/8 25/20 26/11 26/12 26/25 49/13 52/15 326/2 326/5
**Metro Lounge [1]** 52/15
**Metro's [1]** 26/14
**metropolitan [8]** 26/9 26/12 35/1 35/2 35/18 35/24 54/7 68/25
**mez [7]** 281/1 281/5 281/8 281/10 281/12 281/25 282/5
**mezzanine [11]** 24/12 25/3 53/5 53/9 77/24 267/9 268/17 268/20 268/25 269/2 269/8
**Miami [2]** 267/15 295/19
**Michael [2]** 265/24 266/14
**mid [2]** 30/3 178/15
**mid-afternoon [1]** 30/3
**middle [3]** 48/16 51/7 53/17
**might [14]** 10/2 20/25

44/18 92/13 92/13 159/20 159/20 189/23 189/25 202/24 211/11 259/21 263/14 342/7
**mile [1]** 12/5
**milestone [1]** 136/13
**milestones [4]** 135/8 190/20 191/4 191/20
**million [43]** 12/7 13/15 16/9 16/11 16/21 16/22 39/24 90/23 94/19 112/19 147/23 148/15 150/4 150/13 152/18 154/16 166/9 166/10 166/14 170/15 170/17 170/24 171/1 183/8 183/23 184/16 268/25 281/21 282/6 282/24 284/1 284/12 284/23 285/1 306/20 306/23 307/8 307/11 307/14 307/17 317/11 317/11 331/23
**millions [3]** 65/2 302/17 304/21
**mind [2]** 263/23 337/1
**mindful [1]** 131/2
**mini [1]** 155/18
**minimized [1]** 274/7
**minimum [3]** 205/16 247/22 249/22
**minute [3]** 197/2 295/2 299/23
**minutes [14]** 20/24 20/25 82/7 85/4 130/4 130/14 130/19 163/15 163/15 188/23 211/24 295/13 295/13 295/16
**Misbah [1]** 5/15
**mischaracterization [1]** 104/4
**mismatch [1]** 69/16
**miss [1]** 36/2
**missed [1]** 338/24
**missing [1]** 236/12
**mission [10]** 12/5 13/13 13/20 15/7 40/2 72/14 113/9 113/13 113/16 120/18
**missions [1]** 68/13
**misspoke [2]** 202/10 217/22
**misunderstanding [1]** 123/15
**mixed [6]** 267/20 267/25 277/13 294/22 317/15 326/13
**mixed-use [4]** 267/25 277/13 294/22 317/15
**mobility [2]** 13/24 45/24
**modal [1]** 60/1
**model [1]** 146/3
**models [1]** 146/12
**modern [8]** 225/12 249/15 249/18 250/7 252/3 252/3 253/11 254/1

**modernization [35]** 60/25 62/2 62/4 99/19 102/23 103/2 106/9 106/16 107/7 108/22 125/25 126/20 127/13 224/23 225/16 225/20 226/6 226/25 227/11 228/13 228/25 235/14 236/18 236/23 243/13 243/25 244/6 252/24 253/13 254/10 298/22 299/5 300/16 300/20 301/1
**modernize [2]** 50/6 160/2
**modes [2]** 20/12 34/15
**modified [2]** 115/7 204/18
**modifying [1]** 342/3
**moment [11]** 24/25 76/21 120/24 131/9 219/6 222/8 234/12 235/13 278/19 281/12 331/13
**Monday [4]** 173/6 173/11 173/15 188/16
**money [15]** 64/23 64/24 65/20 84/8 94/20 112/20 147/17 166/17 192/1 270/13 270/16 288/6 288/23 289/1 319/6
**moneys [1]** 211/8
**monitor [1]** 228/12
**monitored [1]** 53/21
**monitoring [5]** 88/22 228/16 228/17 228/19 240/12
**Montgomery [2]** 214/16 317/3
**month [1]** 327/6
**monthly [2]** 320/23 321/7
**months [32]** 13/8 94/7 125/12 142/6 142/17 151/11 152/9 153/16 160/7 171/7 171/8 178/22 184/15 184/17 190/1 207/2 207/2 207/3 207/11 232/25 245/13 246/14 278/11 284/10 304/2 312/11 315/13 315/13 318/4 324/7 327/14 334/25
**more [72]** 14/9 16/20 24/14 30/10 31/13 31/18 37/7 39/24 42/8 45/1 45/20 49/4 49/22 52/13 53/5 53/20 58/13 63/20 65/5 66/12 66/12 66/13 69/14 85/20 85/23 86/19 92/15 126/16 141/17 147/18 155/11 162/20 170/23 170/25 174/7 174/10 184/12 190/5 191/10 191/20 225/10 225/11 225/12 225/25 229/5 230/4

**M**

**more... [27]** 226/21 241/14 245/12 253/3 253/11 254/1 254/1 254/8 261/3 265/2 275/20 282/21 286/19 287/24 290/3 290/3 290/22 292/14 294/25 299/23 302/18 307/8 312/4 312/17 313/9 319/21 341/18

**morning [16]** 5/4 5/6 5/17 5/22 5/24 11/1 29/22 30/1 96/4 104/14 106/10 113/19 185/20 295/5 295/20 296/17

**morphed [1]** 122/21

**MORRISON [1]** 2/12

**morrisoncohen.com [1]** 2/15

**mortgage [8]** 110/24 111/21 119/21 268/22 281/17 281/22 283/15 307/7

**mortgages [2]** 182/1 267/9

**most [20]** 14/1 27/22 31/12 33/7 41/1 98/1 98/7 100/24 140/11 148/18 214/25 215/6 217/6 220/14 250/22 275/21 295/13 316/13 319/18 326/12

**mostly [2]** 213/18 213/23

**motion [8]** 5/25 82/18 101/17 124/12 124/15 155/17 198/13 206/22

**motions [1]** 100/13

**motivated [1]** 76/2

**motivations [1]** 69/17

**move [62]** 10/9 16/6 32/5 37/10 41/17 41/19 42/20 50/7 53/5 55/6 55/14 68/16 74/5 80/6 82/1 82/11 87/9 88/3 88/5 109/23 110/11 113/7 122/16 125/17 129/9 131/2 131/24 146/21 149/22 152/6 153/11 156/3 156/12 163/10 163/18 171/25 175/10 176/21 180/2 182/23 187/13 188/10 188/11 188/13 189/14 199/2 239/12 241/8 256/24 257/1 261/22 262/4 262/6 283/4 285/3 301/9 308/25 309/4 335/8 336/25 337/8 337/11

**moved [2]** 16/4 55/14

**moves [1]** 6/24

**movie [1]** 48/17

**moving [1]** 21/4 122/17 125/11 163/16 187/18 227/10 238/10 241/17 257/3 286/23

336/16

**Moynihan [3]** 68/19 251/25 290/6

**Mr [7]** 117/24 180/23 181/22 277/20 292/25 314/16 325/9

**Mr. [133]** 7/16 9/14 10/22 11/1 91/16 96/4 99/3 99/9 99/10 100/5 100/10 101/17 102/2 102/1 104/11 110/18 124/19 125/2 129/25 130/8 131/13 131/25 135/2 151/15 153/21 163/14 165/23 165/24 166/2 167/3 167/10 167/17 168/5 169/17 171/12 171/14 171/20 172/6 172/12 172/13 172/18 173/3 174/25 175/7 175/8 176/13 178/25 179/2 179/5 179/20 180/19 181/2 183/7 185/10 185/18 186/10 187/1 187/20 188/18 190/24 197/6 198/5 198/11 198/11 198/21 198/21 199/5 200/23 201/14 206/21 234/20 235/19 244/24 245/3 265/16 265/24 266/2 266/11 266/18 273/18 274/3 278/18 280/11 282/10 283/8 283/23 285/11 285/14 285/23 285/24 286/5 286/10 286/16 287/2 287/23 291/5 294/2 294/9 294/17 295/1 295/2 295/8 296/5 296/10 296/17 298/9 298/17 299/22 300/6 305/16 305/19 306/4 306/18 306/19 313/19 315/10 324/25 331/16 332/1 335/11 335/17 336/4 336/5 337/4 337/8 337/9 337/11 337/22 337/25 338/1 341/6 342/17 342/17

**Mr. Ashkenazy [1]** 172/13

**Mr. Barry [11]** 294/2 294/9 294/17 295/2 295/8 313/19 315/10 335/17 336/5 337/4 342/17

**Mr. David [1]** 101/17

**Mr. Douyon [1]** 341/6

**Mr. Gardner [18]** 10/22 11/1 96/4 130/8 131/13 167/3 190/24 198/21 206/21 273/18 274/3 278/18 280/11 285/11 291/5 298/9 337/9 337/25

**Mr. Gardner's [1]** 296/17

**Mr. Handera [2]** 102/2 103/1

**Mr. Handera's [1]** 104/11

**Mr. Joe Press [1]** 169/17

**Mr. Kiernan [10]** 7/16 110/18 125/2 180/19 198/5 198/11 199/5 201/14 324/25 335/11

**Mr. MacIver [4]** 99/9 99/10 100/10 283/23

**Mr. Marchitelli [3]** 151/15 285/14 285/23

**Mr. Michael Rebibo [1]** 265/24

**Mr. Newman [15]** 91/16 99/3 100/5 167/17 168/5 171/12 181/2 183/7 197/6 198/21 287/23 298/17 299/22 300/6 306/18

**Mr. Press [16]** 171/14 171/20 172/6 172/12 172/18 173/3 174/25 175/7 175/8 178/25 185/10 185/18 186/10 187/1 188/18 306/19

**Mr. Press' [1]** 187/20

**Mr. Rebibo [24]** 9/14 153/21 179/2 179/5 179/20 266/11 266/18 282/10 283/8 285/24 286/5 286/16 287/2 295/1 296/10 306/4 331/16 332/1 336/4 337/8 337/11 337/22 338/1 342/17

**Mr. Rebibo's [2]** 266/2 286/10

**Mr. Ross [5]** 165/24 166/2 244/24 245/3 305/19

**Mr. Scharf [14]** 124/19 129/25 131/25 135/2 163/14 165/23 167/10 198/11 200/23 234/20 235/19 265/16 296/5 305/16

**Mr. Sporik [1]** 176/13

**Ms [2]** 182/25 306/5

**Ms. [32]** 64/10 71/2 99/6 99/18 100/6 111/25 113/18 120/5 121/4 123/4 123/20 132/2 141/23 155/25 156/17 156/22 158/13 158/19 162/3 165/7 187/1 185/15 207/13 212/11 245/6 245/11 261/12 262/17 263/23 325/1 335/22 336/19

**Ms. Beverly [1]** 64/10

**Ms. Gretchen Kostura [1]** 99/6

**Ms. Harrison [7]** 245/6 261/12 262/17 263/23 325/1 335/22 336/19

**Mr. Handera [2]** ... 

**Ms. Kostura [4]** 99/18 100/6 156/17 156/22

**Ms. Lambert [16]** 71/2 111/25 113/18 120/5 121/4 123/4 123/20 141/23 155/25 158/13 158/19 162/3 165/7 181/7 185/15 207/13

**Ms. Swaim-Staley [2]** 212/11 245/11

**Ms. Will [1]** 132/2

**MTA [1]** 17/17

**much [41]** 5/20 16/10 18/17 18/18 30/12 31/8 42/16 45/1 46/9 49/4 51/5 52/1 69/3 70/4 86/18 90/22 95/17 125/13 130/2 131/15 137/14 162/13 167/3 197/7 216/2 221/12 226/20 226/24 252/16 253/2 260/1 265/11 268/11 284/5 286/23 291/17 292/25 294/24 313/13 337/5 342/21

**multimodal [4]** 36/13 84/19 84/22 326/7

**multiple [3]** 138/16 138/21 301/17

**musical [1]** 304/11

**must [3]** 15/17 155/7 221/15

**my [79]** 11/12 14/14 22/2 48/3 70/22 72/18 91/11 91/25 98/23 100/2 108/6 115/4 115/10 115/18 117/18 118/4 118/7 119/4 119/22 131/6 140/18 140/20 140/25 141/20 148/16 148/25 165/18 168/8 168/8 168/10 169/5 171/14 174/25 178/18 178/25 187/19 193/25 195/3 208/19 210/5 215/13 219/11 224/25 227/3 229/12 236/19 238/1 243/23 244/18 244/19 245/22 250/14 254/25 258/17 259/25 264/6 279/17 282/25 285/22 294/25 301/2 301/4 301/8 301/9 305/4 305/7 321/15 324/11 324/16 325/9 327/20 328/20 331/12 335/5 337/7 337/13 337/14 342/3 342/9

**myself [2]** 44/15 156/23

**N**

**name [12]** 11/8 14/10 168/5 168/8 213/6 222/14 241/20 283/24 315/7 315/8 318/21 326/14

**name's [1]** 325/9

**named [1]** 204/17

**names [1]** 103/9 206/1 318/22 319/3

**narrow [3]** 6/6 17/1 18/6

**Nathan [1]** 83/13

**Nathan MacIver [1]** 83/13

**nation's [4]** 12/3 13/11 48/5 66/22

**National [4]** 5/7 20/13 22/16 326/21

**native [1]** 241/4

**nature [3]** 194/1 280/14 296/20

**navigate [2]** 36/15 37/2

**NDA [1]** 297/15

**near [10]** 42/9 62/9 66/4 102/14 102/16 102/24 103/8 105/14 105/14 164/19

**near-term [4]** 102/14 102/16 102/24 103/8

**nearby [1]** 164/16

**nearly [4]** 32/9 37/5 46/8 168/13

**necessarily [5]** 20/21 67/17 90/25 112/16 220/2

**necessary [23]** 38/2 39/21 41/6 57/2 72/1 72/4 75/11 76/13 82/22 84/17 85/7 94/13 107/12 108/1 134/24 143/5 143/6 198/21 203/12 203/15 203/18 253/14 254/11

**necessity [2]** 101/7 114/3

**need [84]** 10/18 13/17 13/22 19/13 20/10 21/6 28/1 31/16 33/18 33/21 34/5 36/14 37/16 38/13 40/9 40/11 40/19 40/24 41/3 42/5 42/20 42/24 45/20 45/20 46/9 46/22 49/4 53/23 53/23 58/25 60/21 61/18 61/20 62/6 66/11 66/21 67/3 67/8 69/7 69/13 71/19 88/5 89/8 89/22 90/10 95/1 103/14 103/20 104/11 104/12 106/13 108/4 112/13 112/15 112/24 112/25 114/12 125/16 141/1 141/4 152/3 160/14 160/17 186/13 188/2 188/9 223/10 223/11 224/13 243/12 251/5 256/4 256/25 260/4 262/4 263/11 285/19 290/10 300/18 302/11 302/14 322/12 339/25 341/8

**needed [37]** 56/25 57/22 59/18 59/20 62/14 75/1 92/23

**N**

needed... [30]  103/25 106/20 124/13 163/15 166/17 170/7 171/3 174/5 174/7 174/8 174/10 174/13 174/14 193/21 204/24 206/6 228/21 233/22 233/25 233/25 238/9 247/21 250/17 251/18 252/5 253/21 256/22 262/4 284/14 329/3

needing [3]  45/1 160/13 262/6

needs [48]  20/23 21/2 33/23 39/12 44/24 44/25 45/4 45/16 45/16 45/21 46/5 46/15 46/19 46/21 53/3 54/22 58/2 58/25 67/22 69/20 75/2 76/4 86/23 89/11 92/22 103/16 103/18 104/22 104/25 104/25 105/10 112/24 113/21 118/15 119/12 142/15 163/6 206/3 234/6 241/24 246/19 259/11 274/4 275/23 305/1 305/3 305/6 331/4

negotiate [18]  93/17 119/6 123/22 141/17 141/20 149/13 150/11 170/7 174/17 174/19 192/17 278/7 309/12 309/14 312/2 313/3 328/22 329/2

negotiated [4]  85/11 153/16 202/5 328/22

negotiating [10]  91/5 91/12 92/7 92/17 92/25 154/4 192/17 312/7 325/16 327/1

negotiation [6]  82/21 148/7 153/7 155/13 281/16 288/17

negotiations [17] 142/12 155/7 158/20 159/9 168/24 168/25 171/25 177/21 178/17 189/14 191/23 192/18 328/3 328/12 328/19 328/23 342/1

neighborhood [1] 66/9

neighboring [2] 275/14 312/24

neither [4] 174/18 207/17 332/9 339/6

network [10] 12/6 12/11 14/21 15/3 29/5 39/20 39/24 43/21 168/20 187/16

NEUBERGER [1] 2/7

neutral [2] 137/10 137/12

never [21] 32/3 32/6 92/11 108/18 123/16 123/25 150/14 152/5 187/5 187/19 204/20

264/22 286/3 288/1 288/10 318/20 326/7 332/12 332/16 332/24 337/1

new [53] 2/4 2/13 12/15 12/21 14/7 15/14 15/16 18/18 30/14 37/2 44/21 54/18 54/19 61/24 68/2 68/19 68/20 75/10 76/10 76/13 94/16 95/3 105/24 136/13 206/6 222/25 224/14 225/6 225/11 226/15 247/8 250/17 251/5 252/1 266/23 267/14 278/7 280/3 280/12 290/1 290/7 306/11 309/19 310/10 319/18 319/19 319/23 320/3 320/7 324/15 335/25 341/15 341/16

New Orleans [1] 12/21

New York [13] 12/15 15/16 68/2 68/20 247/8 252/1 266/23 267/14 290/1 290/7 306/11 309/19 310/10

Newman [19] 91/6 91/16 99/3 100/5 167/8 167/17 168/1 168/5 168/8 171/12 181/2 183/7 197/6 198/21 287/23 298/17 299/22 300/6 306/18

next [19] 23/10 23/20 23/25 24/4 30/11 50/9 130/13 145/10 167/6 172/4 185/20 187/1 221/8 233/9 233/22 234/6 261/12 318/9 318/11

nice [10] 5/18 5/18 181/2 249/22 250/1 252/2 253/10 306/7 325/11 341/3

night [2] 340/25 342/22

nine [6] 179/23 315/13 315/13 318/4 318/8 324/7

no [254] 1/4 6/10 6/20 7/7 9/5 9/6 9/20 9/21 17/1 25/4 27/3 28/21 32/14 32/18 32/22 32/22 34/24 35/13 36/22 36/25 39/10 39/13 40/8 41/9 41/15 43/4 43/8 43/13 44/7 44/7 46/16 47/25 52/10 59/22 62/15 63/7 63/25 66/15 67/10 67/10 69/9 69/15 79/24 81/4 82/3 82/11 82/13 85/18 85/18 89/9 91/13 91/25 92/9 93/23 95/16 100/21 100/21 102/3 103/19 104/24 105/19 108/10 111/24 115/5 115/14 115/14 119/7

119/10 120/21 120/23 122/23 125/3 125/13 128/24 129/3 129/12 133/4 133/8 137/3 137/6 137/18 138/10 140/3 140/9 140/14 140/20 140/25 142/7 142/25 144/4 144/14 145/22 146/3 148/23 150/3 151/13 151/18 151/25 152/11 153/12 153/14 153/14 153/14 155/19 157/1 157/4 157/23 157/23 160/23 162/25 162/25 163/22 165/25 166/19 166/21 166/22 166/25 171/9 173/17 174/22 175/13 176/23 177/6 178/25 180/7 180/18 183/1 186/7 189/3 191/10 196/20 197/4 201/1 201/8 202/1 202/1 202/15 207/20 211/16 217/4 219/12 226/2 227/3 229/1 233/3 233/12 236/11 236/19 239/15 239/18 241/6 241/6 244/21 244/24 244/25 244/25 245/2 247/11 251/15 252/21 254/9 255/4 255/4 255/5 255/11 257/15 258/21 259/3 260/4 261/3 264/22 265/1 265/9 269/22 269/24 270/3 271/22 284/7 284/7 287/19 288/10 288/10 288/24 290/18 290/24 291/3 291/8 296/22 297/19 297/22 297/23 299/1 299/3 299/22 300/17 300/21 301/13 302/8 303/15 303/15 303/15 305/14 305/15 305/22 306/17 307/6 307/10 308/9 308/19 309/1 309/1 312/16 313/7 313/9 316/25 318/22 321/15 321/19 321/25 324/16 324/16 324/19 324/23 325/15 325/18 325/19 325/24 326/9 326/16 326/17 326/23 326/23 328/4 328/7 328/10 328/13 328/17 328/25 329/24 330/2 330/18 331/2 332/8 332/10 332/21 332/23 332/25 334/17 336/25 337/3 337/23 338/18 339/13 341/16

No. [3]  165/12 196/7 259/7

No. 1 [1]  196/7

No. 10 [1]  165/12

No. 6 [1]  259/7

nobody [2]  203/11 209/5

NOLA [1]  66/9

NoMa [1]  293/5

nominated [2]  77/1 77/3

non [1]  284/11

non-refundable [1] 284/11

none [3]  34/21 37/23 198/24

nonprofit [2]  57/13 145/2

nope [2]  63/25 326/18

normal [2]  227/20 264/9

north [11]  12/9 12/12 12/13 12/14 12/20 19/20 25/20 25/22 25/25 26/24 41/24

North Carolina [1] 12/20

northeast [2]  12/12 15/4 15/8 68/1 246/20 253/15 254/12 264/17

northwest [3]  11/13 12/25 168/11

not [425]

not-so-near [1]  66/4

notably [1]  20/13

note [6]  178/25 179/1 181/24 188/18 265/24 266/1

noted [2]  169/20 173/4

notes [1]  165/18

nothing [13]  10/19 131/10 155/11 165/22 196/17 209/23 300/23 305/22 313/12 324/24 326/15 332/24 341/9

notice [13]  110/14 169/21 191/21 221/18 221/18 233/16 234/2 267/21 310/4 310/21 321/12 342/13 342/18

noticeable [1]  37/1

noticed [3]  110/23 261/12 309/24

notices [1]  305/11

notified [2]  191/4 207/17

November [13]  110/14 151/5 151/6 152/10 191/4 311/23 325/13 325/14 325/20 327/16 327/18 327/20 334/6

now [141]  5/2 5/3 13/11 14/10 16/17 17/10 24/16 27/4 29/20 30/10 32/10 40/18 41/10 43/5 52/10 55/17 59/15 62/13 63/5 64/6 65/4 65/24 72/13 80/16 80/25 83/7 83/14 84/14 85/17 88/22 90/10 94/6 99/12 100/13 102/9 103/1 103/5 103/24 107/22 109/6 110/3

112/12 113/9 114/6 118/23 122/20 124/12 129/24 130/7 133/15 135/1 136/17 137/24 143/6 143/7 144/21 147/14 147/21 150/7 150/18 154/3 155/22 157/16 162/3 163/5 164/3 165/7 168/14 170/22 172/14 173/21 175/25 179/10 180/23 183/13 185/10 189/22 194/14 197/20 197/23 198/25 199/12 200/25 201/5 201/7 202/22 206/13 209/12 211/24 216/14 217/2 217/14 219/5 219/20 221/17 223/21 228/5 228/12 229/14 233/16 234/8 237/7 244/13 245/12 250/21 251/25 258/6 262/17 263/19 264/24 267/21 270/25 271/4 271/11 272/12 273/15 273/18 275/24 279/18 280/25 285/9 288/3 290/11 291/9 292/6 292/13 293/9 293/11 293/18 296/10 297/6 298/21 303/23 304/11 304/25 312/2 315/13 318/9 320/14 339/24 341/24

nowadays [1]  33/19

nowhere [3]  62/9 112/12 154/6

nqgrg.com [1]  2/10

NRPC [1]  51/19

number [47]  14/6 21/21 26/9 28/20 30/6 31/25 35/15 35/19 41/21 43/20 44/11 49/3 51/19 52/8 63/12 77/2 86/17 121/23 122/8 127/23 141/4 149/9 150/24 153/8 180/4 186/5 186/18 225/21 233/16 241/6 278/10 279/6 285/3 286/19 287/22 290/10 298/3 298/16 298/18 298/19 303/25 304/5 304/6 307/20 310/25 316/19 326/25

number-one [1]  51/19

numbered [1]  313/25

numbers [10]  18/1 21/20 73/25 258/18 258/20 277/9 284/7 285/6 298/2 298/6

numerous [4]  308/1 317/18 319/17 326/13

nutshell [1]  94/25

NW [2]  2/17 2/22

NY [2]  2/4 2/13

**O**

**object [6]** 6/25 151/19 156/5 239/18 332/18 338/7

**objected [5]** 6/25 156/1 209/14 300/14 339/2

**objection [64]** 6/21 7/7 7/11 7/11 8/19 8/22 9/4 9/20 82/3 82/13 86/11 101/6 101/11 104/2 113/2 114/2 115/4 144/13 145/5 145/8 147/24 148/16 149/17 150/5 151/8 151/12 151/25 152/20 163/21 163/22 175/13 176/23 180/7 182/25 183/1 184/5 192/11 193/3 193/23 194/4 194/13 217/18 239/14 248/1 276/11 282/8 283/1 284/25 285/16 285/19 285/21 289/6 289/22 294/12 297/16 307/1 329/5 336/2 337/12 337/13 337/14 337/23 338/2 338/4

**objections [4]** 6/11 7/3 338/19 338/22

**objectives [1]** 44/20

**obligation [5]** 149/14 152/24 166/15 184/4 280/2

**obligations [10]** 14/7 86/21 114/13 149/13 202/14 211/9 221/16 221/20 305/9 305/12

**observed [2]** 333/4 333/7

**obsolete [1]** 249/19

**obtain [6]** 87/7 183/18 183/19 243/12 286/21 286/21

**obtained [5]** 5/9 170/18 170/18 184/20 297/21

**obtaining [4]** 121/20 175/3 177/13 178/22

**obvious [5]** 165/19 247/19 247/24 255/18 322/6

**obviously [43]** 18/17 38/2 38/10 40/1 68/1 74/22 75/4 103/17 124/8 163/8 178/20 187/25 192/7 195/25 216/11 217/25 218/17 220/6 220/8 220/9 223/6 225/5 225/7 229/22 230/7 233/12 238/9 241/24 243/16 246/15 246/25 247/21 252/1 255/17 260/7 278/2 284/2 287/23 298/16 332/19

**occasions [2]** 247/6 324/8

**occupancy [1]** 273/15

**occupied [2]** 18/15 162/14

**occupy [2]** 55/4 89/10

**occur [4]** 155/7 172/8 173/10 186/12

**occurred [2]** 79/7 160/19

**October [2]** 143/23 204/10

**off [13]** 22/13 27/19 28/14 32/3 41/22 77/25 129/14 153/8 233/17 242/7 270/5 270/7 318/17

**offer [78]** 34/13 90/11 90/20 90/23 91/3 91/23 91/24 91/25 92/6 92/8 98/23 121/6 123/1 123/11 147/14 148/3 148/10 148/11 149/15 152/17 152/18 154/6 156/2 156/11 156/11 166/9 166/14 166/16 169/11 169/23 169/23 170/9 170/12 170/13 171/2 171/6 171/8 171/14 172/17 173/24 178/24 181/7 181/9 181/11 181/18 182/13 182/15 183/13 183/20 183/25 184/3 184/11 185/10 186/12 186/19 186/20 187/8 187/9 187/10 188/21 189/1 189/11 191/6 191/10 191/22 192/17 194/1 195/19 195/25 196/1 287/16 287/20 306/19 306/23 307/11 307/14 311/18 311/22

**offered [10]** 91/2 121/8 150/14 152/3 171/4 183/7 288/1 290/5 290/8 290/9

**offering [1]** 123/16

**offers [3]** 288/3 290/11 298/14

**office [45]** 21/8 24/6 24/7 37/18 37/24 38/7 39/9 39/14 40/7 40/8 40/9 40/19 41/13 55/2 55/17 103/14 103/16 103/18 103/20 103/20 104/6 112/24 131/16 164/4 164/5 164/17 164/17 164/18 164/19 164/23 165/1 206/9 206/17 214/15 250/2 267/18 268/3 272/21 302/12 302/17 303/4 312/6 316/14 323/9 323/15

**officer [2]** 140/11 214/21

**officers [3]** 40/19 88/19 88/25

**offices [12]** 33/13

39/12 49/2 54/23 54/23 54/24 54/25 55/1 66/25 104/13 112/13 206/9

**official [2]** 2/21 255/12

**Officially [1]** 215/18

**officio [2]** 11/23 77/3

**often [7]** 33/21 63/14 64/17 64/21 76/9 256/12 321/4

**oh [22]** 21/18 27/15 31/21 37/20 49/10 59/24 90/13 114/17 117/8 117/10 175/24 189/25 194/18 236/2 255/15 261/18 264/22 265/19 295/3 305/20 319/10 325/2

**okay [182]** 5/17 6/4 6/13 6/22 7/8 8/8 8/15 8/23 9/3 10/8 10/14 18/21 21/18 21/24 23/3 27/15 29/14 29/16 48/7 50/8 50/13 72/17 74/8 78/1 80/10 97/2 97/25 98/20 100/22 101/25 102/8 103/23 104/20 106/7 107/21 108/12 109/1 109/24 111/23 116/11 116/14 120/15 123/15 123/23 124/7 124/20 130/17 130/23 131/11 132/16 133/7 133/16 136/16 138/19 139/1 139/15 140/4 140/10 143/15 143/16 145/21 146/2 147/2 148/8 148/8 149/21 149/24 150/15 152/6 152/14 158/7 163/21 163/23 164/15 165/21 166/5 167/1 176/6 182/5 182/22 185/25 189/21 191/2 191/17 192/6 193/16 197/17 198/8 200/19 200/20 203/3 205/9 207/12 211/23 213/14 214/3 215/10 219/3 219/6 222/5 224/21 229/13 231/11 232/10 233/11 233/15 235/12 235/19 236/3 236/8 237/12 238/3 241/1 241/2 243/2 245/24 246/4 246/17 247/12 247/23 248/11 248/22 249/7 251/4 251/9 254/16 255/10 255/16 257/9 257/20 258/16 258/25 259/15 260/23 262/1 264/23 266/6 270/9 270/23 271/3 273/9 273/23 280/24 282/12 284/19 285/7 286/18 288/14 288/19 295/24 297/5 298/7 303/6 303/22 306/13 308/4 308/20 309/3 314/4

314/12 320/25 325/23 326/10 326/19 326/24 327/4 328/14 329/16 330/8 330/19 333/2 333/11 333/14 334/8 334/20 335/10 338/5 338/15 338/21 339/15 340/9 342/11

**old [12]** 50/2 50/5 85/17 85/19 85/21 86/7 86/16 250/6 252/2 253/10 253/10 271/13

**older [1]** 169/7

**once [8]** 31/18 105/6 157/10 166/17 182/18 183/15 321/6 340/21

**one [100]** 2/8 6/10 7/15 12/25 20/14 20/17 22/20 26/19 26/19 44/19 45/5 51/19 51/19 53/5 54/14 58/13 66/6 69/25 72/23 74/6 77/12 79/2 83/25 90/16 94/2 102/14 102/24 123/18 123/21 123/21 126/3 126/19 148/6 153/12 153/12 156/16 158/25 159/3 160/9 162/1 166/4 172/20 177/9 182/7 182/9 186/18 193/13 196/4 196/15 196/19 199/20 200/23 207/19 209/1 209/7 210/12 210/13 214/19 232/6 233/1 233/3 233/9 237/17 238/23 240/14 240/22 242/25 243/1 251/22 253/8 257/1 258/24 261/17 271/9 274/12 274/14 277/15 277/15 279/13 283/21 285/5 286/8 289/7 294/17 294/18 299/18 299/25 301/16 307/17 312/7 313/20 317/1 319/17 323/3 324/20 327/2 339/6 339/25 340/6 341/10

**one-week [1]** 148/6

**ones [5]** 7/6 7/20 8/21 68/6 209/13

**ongoing [3]** 14/6 159/10 316/5

**online [2]** 33/8 251/25

**only [34]** 29/13 29/20 64/5 66/6 89/5 96/15 100/5 101/7 105/6 105/20 107/23 108/9 130/14 134/11 135/13 143/1 151/19 153/24 153/25 154/15 163/19 181/8 181/11 197/14 198/7 201/9 233/3 257/22 261/17 276/5 283/21 288/6 288/23 295/3

**open [16]** 26/4 49/14 62/5 62/10 89/10 153/2

190/8 278/9 279/10 299/18 304/7 304/11 318/9 319/3 332/24 332/25

**opened [1]** 148/2

**opening [5]** 279/9 301/10 318/10 327/5 327/10

**operate [10]** 12/5 38/10 38/23 45/5 45/22 68/17 87/5 200/13 268/9 324/10

**operates [2]** 52/11 216/11

**operating [8]** 14/1 31/10 38/1 112/8 157/22 221/1 247/18 323/1

**operation [20]** 29/4 41/19 46/19 59/1 59/8 60/18 67/4 112/8 114/25 116/19 118/25 203/19 257/16 268/11 271/12 272/3 304/9 304/10 304/17 323/21

**operations [18]** 14/20 15/17 16/6 18/9 19/16 32/13 33/16 34/8 37/19 37/23 37/24 41/16 268/8 275/10 279/1 279/2 292/17 311/12

**operators [1]** 275/5

**opinion [2]** 276/12 284/15

**opportunities [5]** 43/14 44/14 71/22 265/5 298/20

**opportunity [18]** 13/11 49/17 53/19 54/19 84/20 86/13 92/20 94/9 110/12 119/17 120/1 120/11 120/21 121/2 155/24 176/10 253/24 256/22

**opposed [4]** 53/25 65/24 231/8 240/22

**opposing [3]** 6/8 114/17 255/3

**opposition [1]** 257/10

**optimal [2]** 130/24 249/22

**option [6]** 226/13 237/17 265/3 275/19 302/23 307/9

**options [8]** 32/21 34/17 85/15 123/20 265/8 275/18 288/1 290/9

**order [10]** 204/24 212/4 233/7 233/22 234/6 299/20 300/19 302/6 324/9 340/5

**ordinary [1]** 276/22

**organizations [1]** 14/18

**orient [1]** 24/17

**orientation [1]** 50/11

**oriented [3]** 19/12

**O**

**oriented... [2]** 20/19 21/2
**original [9]** 85/22 115/24 137/4 194/9 200/22 204/24 210/10 237/16 240/23
**originally [7]** 23/5 86/3 166/12 205/23 223/24 268/17 294/3
**originated [6]** 269/16 269/25 270/17 270/18 271/15 282/14
**origination [2]** 269/15 282/17
**Orleans [1]** 12/21
**other [100]** 9/10 13/1 14/7 20/12 26/6 26/9 32/8 33/8 34/6 34/15 35/23 37/23 43/13 43/14 44/17 49/3 51/9 51/13 52/19 54/15 54/24 58/21 59/6 61/5 65/15 66/8 67/22 67/25 71/24 73/9 75/8 92/13 98/25 99/1 99/7 99/10 100/17 102/3 108/17 109/16 113/6 120/9 123/21 126/10 149/18 154/5 155/6 155/14 157/19 161/22 161/23 161/23 187/25 203/24 209/24 219/14 221/7 224/18 232/10 232/12 233/21 234/1 235/7 237/20 243/21 244/11 245/19 251/2 253/17 256/2 259/21 265/6 272/17 274/21 274/24 275/22 277/15 288/3 289/1 289/24 290/1 299/13 299/15 299/15 300/2 315/25 316/6 317/16 320/1 320/19 328/21 330/3 330/5 331/19 332/6 336/12 336/12 340/25 341/10 342/1
**other's [1]** 211/10
**others [11]** 95/8 106/20 106/22 137/14 146/22 216/13 230/8 249/11 252/18 317/18 318/12
**otherwise [9]** 26/14 78/9 85/9 141/8 155/17 177/8 197/14 208/17 300/15
**our [209]** 9/8 9/9 9/11 9/12 10/19 11/21 12/19 13/9 13/14 13/14 13/20 14/1 14/22 15/3 15/7 15/16 15/17 17/5 17/14 17/15 18/20 19/11 19/17 19/18 19/21 19/23 20/7 20/17 20/17 26/8 26/19 28/25 29/3 29/5 29/6 29/25 30/4

**O**

32/7 32/24 33/13 33/19 33/23 34/9 35/4 35/5 35/5 35/16 35/17 35/18 35/23 37/11 38/4 38/16 38/23 38/24 39/1 39/2 39/5 39/5 39/6 39/19 39/20 39/20 39/24 40/1 40/2 40/5 40/12 41/2 41/7 41/22 41/23 41/23 42/14 42/14 42/18 42/19 44/9 44/19 44/22 45/4 45/7 45/12 49/18 53/22 53/22 54/14 54/18 54/18 55/3 55/6 55/9 57/1 58/1 61/15 62/9 62/12 63/11 63/17 63/19 65/14 65/23 66/7 66/22 66/23 66/25 68/16 68/24 69/24 70/3 70/8 70/11 70/21 72/4 72/4 72/6 74/18 76/11 83/12 83/22 84/2 86/18 86/18 87/15 87/15 87/23 88/3 88/7 88/19 88/21 88/24 90/6 91/2 91/6 92/7 92/8 92/15 92/22 93/13 93/14 94/11 94/13 94/14 94/14 94/16 105/22 107/4 108/17 113/15 113/15 116/1 118/15 119/14 120/18 121/8 125/6 130/13 131/9 135/11 135/12 139/16 141/5 142/7 142/10 142/13 142/15 143/4 156/23 156/25 158/22 160/20 161/7 162/17 166/15 168/18 168/19 168/20 168/20 168/21 168/21 170/25 171/15 178/3 178/10 178/11 178/21 184/20 186/12 187/15 187/16 200/21 200/21 206/22 212/10 228/23 270/20 279/1 282/19 282/20 284/8 294/7 299/20 300/8 304/21 305/10 305/10 313/20 313/24 313/25
**ours [2]** 68/25 70/11
**ourselves [1]** 68/12
**out [56]** 14/2 16/12 16/14 20/11 21/4 24/5 25/23 26/5 29/8 32/6 42/5 49/18 49/19 52/9 52/11 54/1 56/4 56/5 72/23 74/2 129/8 131/6 163/10 179/8 182/3 187/8 187/9 187/10 189/11 199/17 237/4 237/15 238/18 241/4 248/8 251/21 253/6 259/6 261/11 264/2 283/12 285/15 285/18 290/10 294/15 294/23 295/21 303/1 316/24 320/13 331/12 334/17

336/13 339/7 340/22 340/23
**outcome [4]** 67/19 91/20 91/22 118/21
**outcomes [5]** 46/23 57/3 63/15 84/8 87/13
**outdated [1]** 86/22
**outgrowth [1]** 111/19
**outline [1]** 159/17
**outside [5]** 17/3 37/1 150/6 299/11 336/2
**outstanding [5]** 184/4 232/3 258/10 259/2 259/17
**over [61]** 14/12 14/13 15/10 17/13 27/20 42/9 42/11 42/24 43/20 46/20 49/22 50/23 52/14 66/14 67/5 69/11 75/2 77/11 93/14 95/9 95/12 95/14 106/12 113/4 126/22 130/9 138/16 146/20 151/11 151/23 165/2 196/10 229/22 254/5 259/2 260/2 267/5 277/23 278/5 281/5 282/18 282/23 286/8 290/20 290/21 291/7 291/17 292/7 292/12 292/19 304/2 306/11 308/16 311/11 312/2 313/3 315/13 315/18 317/11 324/7 326/6
**overall [1]** 150/10
**overhaul [1]** 19/23
**overrule [2]** 101/11 114/5
**overruled [4]** 144/15 192/14 289/22 337/13
**oversaw [1]** 168/25
**oversee [4]** 268/8 291/21 292/13 292/17
**overseeing [1]** 14/18
**oversees [2]** 292/3 293/23
**oversight [2]** 245/17 268/10
**owe [1]** 319/6
**owed [5]** 121/14 121/21 121/25 122/2 319/12
**own [11]** 57/11 68/5 68/7 68/8 68/8 68/22 70/10 88/24 228/4 268/9 293/14
**owned [6]** 13/20 68/20 68/21 199/8 216/4 220/19
**owner [17]** 16/1 66/25 68/13 93/7 122/25 123/10 144/22 154/2 169/25 170/6 178/12 280/3 298/25 306/10 308/21 310/17 310/23
**owners [4]** 13/20 94/14 110/4 110/21
**ownership [15]** 15/23

57/6 75/25 105/24 121/1 129/2 134/1 145/23 145/25 146/1 220/17 271/12 292/7 292/19 305/10
**owning [1]** 284/2
**owns [1]** 57/11

**P**

**P. [2]** 131/21 296/4
**P.A [2]** 1/12 2/7
**P.L [4]** 116/7 116/8 116/9 116/10
**p.m [8]** 131/19 131/19 186/8 212/2 212/2 296/2 296/2 342/25
**pace [3]** 63/15 109/17 132/4
**page [41]** 21/11 21/17 21/18 56/11 72/22 73/1 74/6 78/12 78/12 79/1 79/3 79/18 80/20 81/14 84/14 85/4 97/18 97/22 98/13 112/3 114/22 117/14 117/16 120/6 121/23 122/7 127/22 133/6 149/9 160/21 173/22 181/21 186/4 186/9 190/8 233/17 258/18 258/19 258/20 313/24 313/25
**page 1 [1]** 120/6
**page 3 [1]** 81/14
**page 5 [1]** 85/4
**page 7 [1]** 313/24
**pages [10]** 77/12 112/18 113/4 122/12 190/9 232/13 236/2 236/3 314/1 339/14
**paid [4]** 270/5 270/7 311/13 319/13
**pandemic [9]** 12/7 13/8 13/9 17/23 17/25 74/21 110/9 247/11 247/13
**Papadopoulos [1]** 318/25
**paper [1]** 234/21
**paragraph [8]** 112/4 120/6 175/20 175/23 175/24 176/1 176/7 176/25
**paragraphs [1]** 314/1
**paralegal [1]** 22/2
**paraphrasing [1]** 333/8
**Pardon [1]** 169/4
**parent [1]** 44/15
**parenthetical [1]** 146/9
**Park [2]** 22/15 22/16
**parking [1]** 23/22
**part [76]** 6/12 15/19 18/8 18/14 19/2 21/6 23/23 24/18 26/25 27/1 27/2 27/22 30/15 35/8 44/16 50/21 51/10 51/11 52/2 60/2 60/5 60/10 64/14 80/17 83/7 83/9 99/21 99/22 102/25 106/22 115/10

118/12 118/19 124/3 125/3 145/16 148/22 156/7 163/4 175/4 187/16 191/22 217/12 222/10 222/18 223/7 223/24 224/1 224/3 224/7 224/13 225/14 226/18 230/6 230/9 239/11 245/25 251/21 252/25 253/2 253/25 255/19 256/8 257/24 263/13 272/12 274/17 280/1 282/19 283/2 299/17 299/21 325/15 326/12 336/22 338/25
**partial [1]** 284/12
**participate [1]** 78/9 328/11 328/18
**participated [1]** 245/17
**particular [24]** 44/10 89/7 112/1 112/3 114/21 122/5 122/13 156/6 190/15 199/5 201/4 204/12 221/10 224/16 230/24 231/8 231/13 239/16 240/18 250/25 256/3 261/11 263/21 265/5
**particularly [8]** 34/16 42/7 43/12 44/9 98/12 168/19 250/13 318/3
**particulars [1]** 231/19
**parties [17]** 6/5 8/21 107/20 137/8 146/12 155/12 161/24 206/14 209/6 231/18 232/21 308/16 309/9 311/17 340/4 340/6 340/8
**partner [3]** 86/21 90/6 90/6
**partnering [1]** 108/4
**partners [3]** 41/3 108/17 178/5
**parts [13]** 18/23 59/6 65/15
**party [14]** 65/25 76/2 147/22 148/14 199/23 233/10 233/14 258/11 259/4 259/8 259/17 271/21 280/16 287/14
**pass [2]** 53/14 275/15
**pass-through [2]** 53/14 275/15
**passage [1]** 29/2
**passenger [52]** 5/7 12/2 12/3 12/13 13/4 13/12 13/22 13/23 16/7 19/11 20/23 26/20 28/2 28/2 28/8 28/10 28/23 28/24 31/11 31/11 32/15 34/8 35/22 36/18 38/8 39/22 42/2 43/10 43/17 46/3 47/16 50/3 52/6 57/3 57/18 58/2 65/7 67/15 72/5 74/24 75/2 85/8 89/11 203/12 203/15 206/7 206/17 247/13 247/20 247/25

**P**

passenger... [2] 249/9 267/24
passengers [62] 12/7 15/10 15/18 17/5 19/8 19/13 23/7 26/5 26/13 27/9 27/22 28/4 28/12 28/17 32/24 32/25 33/24 34/2 34/3 34/5 34/9 34/12 34/14 34/18 35/16 35/17 36/9 37/3 37/12 38/19 39/25 44/9 44/12 45/12 45/21 46/19 46/23 47/18 50/21 51/9 51/21 52/8 54/14 62/6 62/8 63/21 66/23 70/3 70/8 87/10 87/16 88/2 88/4 88/10 89/19 94/13 94/14 94/16 142/15 248/5 249/11 250/1
passengers' [3] 46/20 54/22 118/15
passes [1] 29/2
past [8] 13/8 33/18 142/10 151/11 214/7 221/22 247/7 278/10
path [1] 146/3
patience [2] 5/21 314/17
patient [1] 22/3
Patricia [2] 1/12 5/13
Paul [2] 2/16 5/15
paul.kiernan [1] 2/19
Pause [5] 196/16 210/6 232/22 233/2 324/22
pay [7] 183/8 183/22 211/12 282/6 302/15 312/20 313/1
paying [1] 284/5
payroll [1] 292/11
peaceful [1] 89/5
peak [17] 29/10 29/18 29/19 29/21 29/23 29/23 29/23 29/25 30/3 30/12 30/16 30/20 31/12 32/2 32/3 32/19 56/9
peaks [1] 29/22
pedestrian [3] 31/9 31/24 31/24
pending [3] 279/14 321/16 330/11
people [46] 18/9 19/4 20/4 20/11 20/11 21/4 28/22 30/24 31/2 31/13 33/8 33/21 36/14 38/10 39/19 40/20 43/22 54/15 54/24 66/12 66/17 67/9 67/16 68/16 88/5 89/9 142/1 226/20 248/5 249/3 250/8 250/10 250/22 254/2 264/15 279/1 282/11 283/10 292/23 292/24 300/8 300/8 319/4 319/6 323/17 323/21
per [4] 17/19 68/17

83/22 299/10
percent [17] 15/16 17/6 132/13 132/14 133/8 133/11 133/12 134/12 134/13 135/4 135/12 135/13 227/17 242/16 247/8 272/14 272/15
percentage [1] 273/15
perfect [2] 85/17 85/20
perform [3] 284/22 286/11 300/19
performance [4] 31/13 32/10 38/19 72/6
performed [2] 277/2 284/22
perhaps [1] 219/13
period [33] 15/11 16/25 17/13 29/21 30/12 30/23 31/12 32/19 39/4 56/10 87/25 94/21 95/1 105/25 106/6 106/12 106/20 107/4 136/23 148/6 153/15 153/17 161/8 165/4 189/13 222/17 224/11 228/19 264/7 264/12 309/4 309/5 341/17
periodic [1] 320/20
periods [1] 226/12
permissible [1] 88/11
permission [11] 10/15 61/17 61/20 64/3 84/9 114/14 142/5 142/24 197/3 230/17 260/24
permit [9] 32/17 218/18 219/10 219/22 220/11 223/12 244/3 257/11 329/17
permits [3] 202/19 203/23 228/24
permitted [1] 139/18
permitting [1] 218/12
person [13] 27/6 86/4 91/8 99/6 100/24 179/19 215/6 215/8 220/14 229/17 270/21 285/22 288/11
personal [2] 32/5 325/19
personally [11] 72/8 72/11 72/14 73/14 93/19 115/19 115/20 178/16 179/22 229/18 321/4
personnel [2] 39/6 293/17
perspective [15] 13/17 15/22 20/1 32/16 38/16 39/11 48/3 62/9 69/25 91/25 160/20 239/7 243/10 298/24 301/15
Pertaining [1] 5/11
PESSIN [1] 1/12
phase [8] 133/13 133/14 147/25 160/13 160/15 165/17 236/21

301/20
phases [1] 135/8
Philadelphia [2] 12/14 68/1
phone [3] 179/23 229/21 229/23
phrase [2] 186/19 264/14
physical [1] 105/5
physically [2] 60/13 323/13
pick [3] 22/13 33/9 66/7
pick-up [1] 22/13
picture [5] 24/8 24/18 56/5 56/8 63/12
pictures [1] 48/23
piece [1] 135/11
pklaw.com [1] 1/15
place [42] 26/5 34/10 51/17 54/5 54/16 66/8 89/6 89/9 110/14 127/18 137/21 144/12 161/11 161/13 161/14 163/1 205/4 223/6 228/9 228/11 234/19 238/19 243/22 244/16 253/18 253/19 255/13 258/7 277/3 277/18 280/4 284/16 289/8 292/2 297/2 299/12 299/15 308/24 315/23 315/24 323/14 331/8
placed [6] 10/24 167/15 212/15 262/18 266/9 314/14
places [3] 19/22 34/18 114/13
plaintiff [6] 1/4 1/12 5/13 11/4 168/1 213/2
plaintiff's [50] 3/4 4/5 6/17 8/4 8/17 8/20 25/9 27/5 47/4 72/21 73/3 73/7 73/10 82/1 82/2 82/11 82/14 83/1 84/13 162/25 163/2 163/19 163/23 163/25 174/21 175/12 175/14 175/15 176/17 176/22 176/24 177/2 180/3 180/9 181/20 182/9 182/24 183/2 183/4 184/15 197/11 197/20 197/23 273/19 274/16 296/18 310/19 311/1 311/2 311/5
Plaintiff's 11 [1] 73/7
Plaintiff's 12 [2] 73/3 73/10
Plaintiff's 2 [2] 182/24 183/2
Plaintiff's 6 [1] 180/3
Plaintiff's Exhibit [2] 25/9 84/13
Plaintiff's Exhibit 10 [5] 47/4 163/2 163/19 274/16 296/18
Plaintiff's Exhibit 11 [1] 72/21

Plaintiff's Exhibit 2 [3] 181/20 182/9 184/15
Plaintiff's Exhibit 4 [2] 176/17 176/22
Plaintiff's Exhibit 8 [1] 310/19
Plaintiff's Exhibit 9 [1] 27/5
Plaintiff's Exhibit No [2] 82/11 162/25
plaintiffs [1] 10/10
plambert [1] 1/15
plan [49] 63/2 95/6 102/10 102/22 102/25 103/6 103/12 106/1 106/4 106/25 108/8 108/13 108/15 108/19 125/6 125/14 127/11 134/20 135/16 136/18 143/24 145/18 156/18 156/23 157/5 161/5 161/7 162/3 162/8 162/25 163/4 163/9 163/11 217/10 222/13 222/16 223/25 224/1 225/14 225/15 227/24 237/16 241/23 257/25 274/15 276/4 276/8 278/14 297/2
plane [1] 247/9
planned [6] 108/22 135/12 137/5 158/16 189/7 221/8
planners [1] 40/25
planning [27] 14/18 14/19 17/9 48/1 71/18 91/7 104/18 104/19 106/16 106/18 107/22 108/16 127/13 133/13 163/5 165/8 165/13 165/17 168/9 168/15 168/16 168/18 168/19 222/16 222/21 237/9 259/5
Planning/design [1] 104/19
plans [15] 11/22 14/25 40/22 107/4 125/10 125/18 125/19 125/20 227/6 229/3 264/8 264/10 296/19 335/4 335/4
platform [1] 29/3
platforms [20] 19/15 19/18 19/24 19/25 20/16 23/14 23/16 24/5 25/23 26/4 26/5 28/18 38/5 38/14 43/2 59/9 59/13 61/10 108/1 249/14
play [2] 221/9 324/18
played [4] 248/24 252/11 264/18 325/15
Plaza [2] 54/4 317/4
pleading [1] 101/9
pleadings [1] 104/3
please [36] 5/4 5/20 10/23 10/25 23/11

23/20 23/25 50/10 50/14 56/17 74/4 79/3 111/24 130/1 131/13 167/14 173/25 176/7 181/20 212/5 212/14 213/6 222/12 230/21 232/1 234/21 248/23 252/10 261/15 262/24 266/8 266/18 267/11 314/13 315/7 342/24
plenary [4] 111/12 111/12 111/14 111/19
plenty [1] 106/5
plop [1] 122/10
plus [5] 13/15 101/9 110/6 179/23 323/2
point [46] 14/23 15/4 22/20 27/18 37/12 52/9 67/12 67/23 78/20 80/5 80/22 80/25 81/22 93/1 93/4 93/8 98/16 105/12 126/18 126/19 128/14 144/6 147/9 158/12 171/7 179/8 197/13 198/5 208/19 208/25 211/15 227/24 228/17 231/13 234/13 235/23 238/10 238/17 240/12 244/10 251/22 259/6 264/10 286/14 309/6 312/7
pointed [2] 209/24 261/11
pointing [4] 118/4 118/10 186/6 195/5
points [2] 15/8 238/16
police [21] 39/14 39/15 39/17 39/18 39/18 40/3 40/7 40/8 40/10 40/12 40/19 53/18 223/5 290/22 293/12 293/14 323/12 323/13 323/18 324/6 326/5
policing [1] 40/14
policy [1] 14/17
polishing [1] 322/9
popped [1] 56/5
population [1] 35/17
portion [15] 17/2 18/7 22/18 22/23 24/16 58/17 77/9 78/12 78/24 109/24 122/14 217/4 217/11 228/2 272/2 272/14 274/22 274/25 291/23
portions [5] 106/19 253/21 254/1 264/1 278/9
posing [1] 126/5
position [27] 67/19 87/12 92/19 109/7 135/16 137/1 137/17 162/21 181/14 182/13 183/21 186/15 192/25 196/10 196/11 196/12 199/11 200/24 200/24 201/9 203/17 206/13 287/17 310/3 315/10

**P**

**position... [2]** 315/12 316/8
**positioned [1]** 290/23
**positions [2]** 214/5 281/3
**possession [37]** 5/25 95/12 95/14 100/14 101/17 104/1 124/13 124/13 124/23 124/23 124/25 125/16 125/20 125/22 155/18 156/17 156/19 157/11 158/9 158/17 159/12 161/1 161/18 198/20 198/25 275/24 276/3 277/6 278/5 278/13 283/3 290/20 300/18 302/5 306/11 311/11 329/1
**possessor [1]** 270/1
**possibility [3]** 67/5 166/12 192/21
**possible [14]** 31/10 75/25 87/11 112/17 114/24 116/20 116/21 119/1 153/1 192/5 192/8 219/24 221/25 252/6
**possible use [1]** 112/17
**post [3]** 180/5 288/22 339/11
**post-litigation [1]** 180/5
**post-trial [1]** 339/11
**posted [1]** 132/3
**postpone [1]** 334/14
**postponed [1]** 94/2
**postponing [1]** 94/8
**posture [1]** 198/16
**potential [12]** 43/25 82/22 83/15 110/3 191/12 192/3 276/7 276/10 288/1 288/3 288/4 311/14
**potentially [3]** 42/24 136/5 178/4
**power [7]** 145/14 153/25 154/4 154/8 199/7 220/4 309/17
**PowerPoint [1]** 143/8
**powers [2]** 123/3 123/13
**PR [1]** 293/5
**practical [2]** 116/20 119/1
**practice [1]** 98/9
**pre [11]** 12/7 13/8 13/9 17/23 17/25 137/18 247/13 276/7 276/10 277/25 335/18
**pre-action [1]** 137/18
**pre-COVID [4]** 276/7 276/10 277/25 335/18
**pre-pandemic [6]** 12/7 13/8 13/9 17/23 17/25 247/13
**precedent [1]** 134/4

**precedes [1]** 26/3
**precipitated [1]** 110/3
**precise [1]** 332/22
**precursor [1]** 234/5
**predecessor [10]** 145/15 155/4 194/10 199/11 199/19 203/18 204/14 206/1 206/4 281/5
**predesign [2]** 236/14 236/21
**predevelopment [2]** 236/23 301/20
**predicate [5]** 59/6 72/18 90/2 148/3 156/2
**predicates [1]** 102/16
**preempts [1]** 208/25
**prefer [2]** 174/23 186/10
**preference [1]** 10/3
**preferred [1]** 267/9
**prefiling [2]** 149/13 199/3
**preliminarily [1]** 10/18
**preliminary [1]** 278/21
**premier [1]** 307/17
**premised [1]** 203/20
**premises [2]** 277/25 302/1
**premium [1]** 35/5
**prenegotiate [1]** 152/25
**preparation [4]** 77/15 77/17 95/12 208/11
**preparatory [1]** 129/10
**prepare [1]** 95/9
**prepared [6]** 96/9 123/2 123/12 230/10 230/13 239/21
**preprogramming [9]** 83/14 83/16 159/1 159/4 159/6 159/18 160/4 160/11 255/6
**presence [3]** 40/14 88/22 290/2
**present [2]** 9/13 120/11
**presentation [6]** 10/11 95/8 119/25 143/9 143/19 157/9
**presentations [5]** 248/11 248/14 248/15 248/18 341/2
**presented [3]** 121/17 121/22 148/13
**presently [1]** 325/24
**preservation [4]** 218/1 262/19 263/1 263/17
**preserving [1]** 60/17
**president [14]** 77/1 83/13 91/6 98/8 98/8 168/9 168/15 193/11 214/8 215/5 215/8 215/12 215/21 221/4
**president/treasurer [1]** 83/13
**Presidential [1]** 272/24
**presiding [3]** 5/3

131/21 296/4
**Press [21]** 67/9 91/17 169/17 169/19 171/14 171/20 172/6 172/12 172/18 173/3 174/16 174/25 175/7 175/8 178/25 185/10 185/18 186/10 187/1 188/18 306/19
**Press' [1]** 187/20
**presumably [4]** 258/13 260/6 260/11 261/2
**presume [1]** 257/2
**presumptuous [1]** 305/21
**pretrial [3]** 338/17 339/2 339/10
**pretty [11]** 112/18 134/20 177/22 247/19 247/24 249/10 268/11 273/1 291/17 292/25 322/6
**Prettyman [1]** 2/22
**prevented [1]** 228/6
**prevents [1]** 227/10
**preview [1]** 6/1
**previous [3]** 146/3 173/2 294/3
**previously [9]** 120/7 156/8 214/15 238/11 282/17 284/9 294/17 298/14 317/8
**price [10]** 154/2 154/7 154/8 180/16 180/17 281/20 307/9 307/25 308/3 312/13
**primarily [11]** 12/15 12/24 18/16 18/20 20/19 28/21 28/22 36/17 63/11 217/4 326/15
**primary [7]** 27/18 27/20 28/3 37/12 47/21 61/15 110/16
**principal [3]** 179/5 266/20 268/6
**printed [1]** 230/22
**prior [43]** 24/25 57/7 64/8 79/15 94/1 109/7 110/21 129/15 157/4 181/9 186/14 188/2 193/21 195/9 195/20 214/4 214/10 214/10 214/13 214/17 214/23 232/25 233/4 234/1 234/16 246/15 246/18 280/3 289/18 296/17 296/23 298/11 298/11 306/10 306/15 307/21 308/17 308/21 311/23 316/8 327/20 334/18 342/16
**priorities [1]** 65/21
**private [4]** 69/18 220/17 323/3 324/2
**privileged [1]** 285/25
**privy [2]** 257/12 290/17
**probably [13]** 128/2

130/4 136/4 163/14 203/14 219/13 223/4 234/4 234/12 275/13 287/23 295/2 295/14
**problem [3]** 32/15 69/25 299/19
**problems [3]** 54/2 70/8 70/12
**procedure [1]** 322/22
**procedures [2]** 282/20 323/1
**proceed [17]** 9/25 26/5 26/14 29/9 33/8 60/23 71/4 95/20 104/23 104/25 125/7 229/8 238/17 254/15 300/15 302/6 321/18
**proceeded [2]** 237/18 256/23
**proceeding [6]** 101/8 211/5 241/21 300/25 301/2 301/4
**proceedings [4]** 1/9 2/24 342/25 343/4
**proceeds [4]** 12/14 23/17 24/3 58/19
**procured [1]** 323/2
**procurement [1]** 105/1
**produce [2]** 211/17 286/6
**produced [1]** 2/25
**product [3]** 8/13 67/2 147/13
**production [1]** 241/4
**productivity [1]** 317/2
**profession [1]** 266/19
**professional [4]** 40/24 41/5 215/1 323/24
**professionally [1]** 214/5
**professionals [1]** 250/19
**proffer [1]** 193/25
**proffered [4]** 98/25 99/3 99/7 99/10
**profit [3]** 12/4 65/25 203/10
**profitable [1]** 304/23
**profiter [1]** 98/21
**program [24]** 35/6 35/20 65/20 102/15 103/7 106/11 107/8 107/14 136/22 136/24 137/2 160/13 160/18 222/6 222/8 222/13 232/6 232/24 237/19 261/25 262/3 262/4 277/18 277/21
**programmed [1]** 83/22
**programming [6]** 52/24 83/24 84/6 84/10

84/11 160/12
**programs [1]** 137/2
**progress [7]** 64/21 76/12 112/8 137/8 137/14 228/12 278/17
**progressed [1]** 71/22
**project [172]** 41/2 46/12 46/13 58/5 58/8 58/8 59/4 59/5 59/21 60/12 60/16 61/1 61/4 62/3 62/4 62/4 84/7 87/8 90/2 90/7 94/10 102/12 102/19 102/23 103/2 103/3 103/6 104/17 104/21 104/23 104/25 105/6 106/8 106/9 106/17 107/6 107/12 107/22 108/14 108/23 125/25 126/4 126/5 126/9 126/12 126/14 126/20 126/23 126/24 127/1 127/3 127/4 127/5 127/11 127/13 132/6 132/9 132/24 133/12 133/16 133/21 134/8 134/11 134/17 135/3 135/5 135/6 135/10 135/19 136/13 144/3 144/5 147/3 190/17 190/19 191/3 191/19 218/18 219/8 219/17 219/21 219/23 220/3 220/10 222/7 222/10 223/3 223/22 224/12 224/17 224/19 224/23 224/24 224/24 225/2 225/16 225/21 225/25 226/5 226/6 226/25 227/2 227/7 227/11 228/2 228/3 228/13 228/18 228/19 228/25 229/7 229/8 229/15 232/6 234/5 234/9 235/5 235/14 235/18 236/18 236/20 236/23 237/10 237/22 240/13 241/15 241/19 241/20 242/12 242/15 243/1 243/14 243/25 244/7 244/14 244/15 251/13 252/14 252/18 252/25 253/4 253/17 256/22 276/16 279/19 279/22 280/6 298/22 298/24 299/5 299/17 300/1 300/16 300/20 301/1 301/3 301/12 301/14 301/16 301/17 301/22 302/3 302/7 306/15 320/2 320/5 320/10 321/17 334/2 336/11 336/14
**project's [1]** 240/10
**projected [1]** 130/20
**projecting [1]** 251/23
**projects [76]** 40/21 46/10 55/25 58/1 58/4

**P**

**projects... [71]** 59/6 59/17 63/2 63/19 63/23 64/22 74/19 89/24 90/1 90/2 93/11 99/19 105/3 106/19 125/17 134/4 137/7 198/24 199/2 218/12 218/15 219/5 219/11 219/13 219/14 219/15 219/15 221/5 221/6 221/7 222/15 222/24 222/25 223/5 223/9 223/14 225/17 230/9 231/13 232/10 232/12 232/18 234/15 238/13 238/14 244/15 251/25 252/17 253/13 254/10 256/10 257/18 257/22 258/22 279/5 279/6 279/7 279/19 299/6 300/4 302/14 316/5 317/15 319/14 319/17 320/22 322/13 322/16 325/20 329/4 329/19

**promise [1]** 40/1
**Prompt [1]** 185/23
**proper [2]** 207/10 342/18
**properly [1]** 163/11
**properties [8]** 161/23 268/9 289/24 317/12 317/16 318/25 322/23 326/13
**property [77]** 5/11 41/18 65/24 65/24 66/2 68/7 72/9 72/15 73/15 74/12 78/18 80/14 87/24 91/1 147/23 154/1 168/24 169/22 169/25 170/8 170/13 170/22 171/4 177/8 177/20 177/23 178/2 178/5 178/6 178/9 180/1 199/8 199/15 202/20 203/14 204/19 267/16 267/25 268/1 268/18 268/21 268/23 274/11 274/12 274/14 274/22 275/1 276/5 277/9 277/11 277/13 277/19 278/3 278/5 278/6 278/20 282/14 282/16 282/16 282/17 284/9 286/11 291/9 291/22 291/24 293/10 293/17 293/22 293/23 293/24 297/22 299/21 311/11 316/10 316/12 321/21 323/6
**property-level [1]** 297/22
**proposal [3]** 259/11 298/8 298/10
**proposals [1]** 288/5
**proposed [6]** 51/15 220/5 275/9 289/2 298/5 339/13

**proposing [3]** 273/25 275/3 275/8
**prospective [1]** 165/14
**protect [2]** 39/19 311/16
**protected [1]** 88/21
**proud [2]** 43/25 318/6
**prove [1]** 289/14
**provide [23]** 6/1 19/7 34/2 38/6 42/17 54/15 98/17 118/15 169/20 173/23 174/2 174/6 176/9 184/8 187/22 187/23 204/9 213/11 251/6 291/22 298/13 338/19 339/3
**provided [22]** 77/14 77/15 107/1 107/3 148/6 206/8 216/16 227/20 229/10 240/1 249/6 289/23 292/10 298/14 298/19 299/23 300/3 305/11 307/20 338/17 339/2 339/9
**provider [2]** 12/2 12/3
**providers [2]** 20/7 68/15
**provides [8]** 65/7 84/20 138/7 139/25 199/1 206/5 218/20 291/16
**providing [3]** 89/19 89/20 334/15
**provinces [1]** 12/6
**provision [4]** 116/5 194/6 209/1 263/25
**provisionally [1]** 241/9
**provisions [5]** 73/15 73/25 115/12 209/4 211/7
**prudent [1]** 159/23
**public [19]** 12/5 14/9 34/4 40/2 43/14 52/19 65/9 67/22 68/15 87/13 115/24 140/2 215/2 220/17 251/22 272/24 304/5 311/25 318/18
**publicly [1]** 248/19
**pull [4]** 85/5 132/21 156/22 181/6
**pulled [1]** 56/4
**pump [2]** 299/21 303/9
**pumps [1]** 42/21
**purchase [19]** 109/6 123/1 123/11 123/17 123/21 142/13 154/2 154/7 154/8 182/16 281/17 281/20 281/25 282/6 283/10 287/17 306/20 307/9 307/9
**purchased [11]** 15/14 30/14 86/16 94/23 271/2 281/13 283/14 283/15 307/7 307/7 307/10
**purchasing [3]** 33/6 33/7 284/1
**purpose [14]** 67/12

78/6 78/7 79/10 79/11 80/14 156/6 175/1 175/2 179/24 206/25 230/3 283/25 287/13
**purposes [9]** 29/15 47/12 50/11 130/24 164/22 197/11 198/7 270/21 294/22
**pursuant [6]** 5/9 84/6 164/4 198/13 278/21 289/9
**pursue [6]** 46/9 78/9 82/18 119/19 120/12 329/19
**pursuing [1]** 63/16
**pushed [1]** 18/18
**put [53]** 8/9 21/11 22/3 22/5 43/23 45/10 50/14 56/3 72/23 73/1 73/3 73/24 74/7 78/12 81/14 88/7 89/9 90/9 117/4 117/9 117/12 120/5 122/14 123/18 140/6 140/7 143/22 144/12 148/4 148/23 151/3 155/20 157/8 169/1 176/17 181/21 182/20 183/19 187/8 190/10 191/14 230/16 251/21 258/18 262/11 263/2 263/3 263/13 291/1 297/2 317/12 324/14 341/22
**puts [2]** 340/16 340/17
**putting [5]** 47/16 67/19 141/25 194/11 290/11

**Q**

**Q1 [1]** 280/7
**Q4 [3]** 288/13 288/18 288/22
**quality [4]** 31/24 35/25 57/4 86/19
**quarter [1]** 286/22
**quarterly [1]** 320/23
**question [57]** 18/5 31/18 31/19 71/12 72/18 108/6 108/7 110/19 114/4 114/5 115/9 115/10 115/14 115/16 115/18 118/2 118/4 118/7 119/4 121/5 123/7 133/10 142/20 145/10 149/1 150/10 153/24 162/21 166/4 187/3 187/5 187/7 187/19 187/20 196/4 196/19 200/22 202/18 226/3 232/14 232/16 241/13 241/14 243/16 294/14 297/20 307/5 313/21 329/7 329/8 329/10 329/20 332/14 335/5 335/9 339/24 340/10
**questioning [1]** 285/10
**questions [25]** 56/6 58/3 76/21 95/16

141/23 151/19 165/25 166/19 166/22 180/18 181/5 196/20 240/14 244/22 244/24 261/3 262/17 263/19 263/24 265/9 295/23 302/18 305/15 313/9 337/3
**queue [2]** 28/17 33/22
**queues [1]** 28/11
**queuing [3]** 28/22 52/6 62/12
**quick [3]** 130/11 226/3 337/6
**quicker [1]** 132/4
**quickly [9]** 20/11 74/5 125/8 172/17 172/19 173/4 295/23 299/24 299/24
**QUINN [1]** 2/7
**quite [4]** 20/3 116/5 200/6 329/20
**quo [2]** 109/12 110/4

**R**

**R-e-b-i-b-o [1]** 266/21
**rail [37]** 12/2 12/3 13/12 13/22 16/7 28/24 34/7 37/25 38/8 39/21 42/2 43/17 44/21 58/2 65/7 66/3 72/5 85/8 203/12 203/15 203/19 220/25 222/19 224/14 250/18 250/21 250/23 251/1 251/2 251/6 252/1 253/5 263/20 263/20 263/25 264/9 264/15
**railcars [1]** 252/8
**railroad [18]** 5/7 12/13 14/15 17/14 19/16 29/1 38/2 39/17 40/5 59/25 62/17 69/2 164/25 215/23 216/6 229/16 230/12 249/24
**railroads [1]** 30/9
**rails [1]** 18/10
**railway [5]** 17/18 203/6 267/25 325/25 325/25
**railways [2]** 26/22 267/21
**raise [7]** 10/23 167/14 211/20 212/14 266/8 314/13 342/8
**raised [7]** 7/11 201/6 201/7 203/23 207/24 211/21 313/21
**Raising [3]** 318/11 328/15 328/16
**ran [1]** 5/22
**range [2]** 168/18 168/19
**ranked [1]** 31/10
**rate [1]** 86/20
**rated [1]** 311/9
**rather [1]** 218/5
**rationales [1]** 100/1
**re [17]** 50/22 125/25 126/3 126/9 126/11

126/12 126/24 127/1 129/4 202/5 238/11 238/11 278/9 279/9 299/18 304/7 329/2
**re-engaging [2]** 238/11 238/11
**re-establishing [1]** 50/22
**re-negotiate [1]** 329/2
**re-negotiated [1]** 202/5
**re-open [2]** 278/9 299/18 304/7
**re-opening [1]** 279/9
**re-start [1]** 126/9 126/11 127/1
**re-started [4]** 125/25 126/3 126/12 126/24
**re-worked [1]** 129/4
**reach [10]** 64/18 64/19 107/11 136/9 138/12 154/7 155/12 179/25 180/13 313/3
**reached [10]** 85/2 93/22 105/20 105/23 105/24 283/12 285/15 285/18 307/24 334/17
**read [18]** 57/18 72/21 73/4 116/17 119/8 121/24 149/23 155/9 184/24 191/21 199/5 201/14 211/11 211/12 233/12 259/21 261/22 262/14
**reading [4]** 73/12 169/5 175/18 208/10
**ready [2]** 9/25 71/2 95/14 136/8 188/16 188/19 188/20 192/17 212/7 230/9 234/6 236/18
**real [16]** 14/19 36/25 55/9 74/19 74/24 130/11 160/23 168/21 186/7 190/16 191/20 266/24 267/6 291/15 291/16 326/11
**real-estate-related [1]** 291/16
**realistic [1]** 342/14
**reality [1]** 149/16
**realization [1]** 126/6
**realize [1]** 66/5
**really [90]** 12/3 12/11 15/3 15/6 17/1 19/1 19/9 20/3 20/14 21/3 23/15 28/21 29/22 32/3 32/4 32/18 32/23 33/17 33/23 34/9 37/23 38/15 40/5 42/5 43/10 43/13 44/2 44/12 44/19 44/21 45/13 46/17 47/15 47/21 52/6 52/10 52/24 53/13 54/19 54/21 57/2 57/22 62/7 63/4 64/20 66/10 67/18 68/4 70/4 74/22 74/25 76/3 76/9 77/17 88/20 88/21 89/4 91/24 92/20 92/21

# R

really... [30] 93/10 94/13 98/1 102/15 103/7 108/18 146/11 150/6 150/7 155/9 162/11 164/24 178/14 193/24 198/15 222/14 223/8 224/14 225/18 225/22 228/16 242/22 253/4 253/14 253/23 254/11 255/18 305/1 318/7 341/1

realtime [2] 2/21 332/20

rear [5] 17/2 18/7 18/18 28/1 54/1

reason [6] 133/2 133/8 206/14 251/15 264/5 319/24

reasonable [2] 55/15 149/15

reasons [6] 45/20 100/1 125/1 126/3 156/8 209/9

Rebibo [26] 9/14 153/21 179/2 179/5 179/20 265/24 266/11 266/14 266/18 282/10 283/8 285/24 286/5 286/16 287/2 295/1 296/10 306/4 331/16 332/1 336/4 337/8 337/11 337/22 338/1 342/17

Rebibo's [2] 266/2 286/10

rebuild [1] 223/3

rebuilding [1] 223/8

recall [24] 100/20 201/6 219/20 219/24 221/18 221/21 221/22 221/25 222/9 222/11 226/14 226/16 231/6 231/8 231/9 231/15 253/6 254/24 254/25 255/9 261/19 262/10 264/11 265/4

receive [12] 173/14 173/16 173/17 174/4 176/15 176/16 219/14 229/18 241/12 244/8 340/6 340/8

received [36] 6/17 8/1 83/1 91/24 92/6 93/24 94/1 128/15 150/2 150/4 156/13 163/25 166/11 172/4 172/6 173/2 175/15 177/2 178/25 180/9 183/4 219/10 219/18 231/12 237/19 238/21 240/4 240/7 240/18 244/22 282/23 311/5 334/10 334/21 338/8 339/6

receiving [2] 231/6 334/17

recent [3] 46/2 120/9 282/21

recently [6] 105/20 139/12 164/16 316/13 319/18 335/21

recess [6] 70/25 131/18 131/19 212/2 296/1 296/2

recognition [1] 84/11

recognize [1] 333/20

recognizing [1] 339/19

recollect [1] 253/7

recollection [6] 96/16 151/5 151/23 152/8 232/2 232/17 236/19 262/8

recommendation [13] 76/16 76/18 78/15 79/4 79/14 79/20 80/5 80/18 80/21 80/22 81/11 81/19 111/15

recommendations [2] 118/8 119/5

recommended [1] 115/19

reconfigure [1] 61/21

reconstruction [4] 134/3 223/22 224/17 334/2

record [14] 6/12 11/9 73/6 101/23 155/21 155/23 171/12 179/11 198/17 213/7 314/11 315/7 338/11 343/3

recorded [2] 2/24 238/25

recordkeeping [1] 239/23

recoup [2] 121/13 122/2

Recoupment [1] 121/21

recovering [1] 76/11

RECROSS [2] 4/4 4/11

red [17] 28/5 28/24 30/18 32/12 33/15 34/22 34/25 37/18 39/9 39/12 40/7 40/8 41/8 43/3 43/6 44/6 233/25

redcap [1] 88/3

redesign [3] 229/3 236/4 236/4

redesignating [1] 274/23

redeveloped [2] 15/11 16/4

redeveloping [2] 67/12 139/10

redevelopment [19] 18/14 18/17 57/12 113/24 114/10 116/1 116/3 145/17 145/17 193/2 204/11 205/24 209/23 214/8 216/7 216/9 217/12 221/7 222/21

redirect [10] 4/4 4/11 166/3 166/7 196/24 261/5 261/8 313/11 335/11 335/15

redlight [1] 220/4

reduced [1] 274/9

reducing [1] 95/2

reduction [1] 110/8

refer [9] 45/18 224/18 236/9 250/22 261/14 268/24 271/17 272/8 297/13

reference [8] 112/14 147/6 147/7 158/8 230/15 230/25 314/1 335/22

referenced [2] 185/1 335/22

references [1] 185/6

referral [1] 294/3

referred [9] 23/15 99/9 144/11 224/19 247/4 271/13 280/11 337/22 337/25

referring [13] 120/2 138/4 217/24 219/1 219/2 222/8 250/21 264/13 268/20 271/18 272/9 293/13 300/2

referring to [1] 138/4

refers [3] 152/13 157/25 190/16

reflect [9] 98/9 98/16 98/16 179/11 180/4 235/16 239/4 239/6 247/17

reflected [3] 129/18 136/12 258/11

reflecting [1] 98/3

reflects [3] 66/23 66/24 160/11

refrain [1] 177/12

refresh [6] 96/16 152/3 152/8 247/22 249/21 280/10

refreshes [5] 151/5 151/22 152/4 232/2 232/17

refundable [1] 284/11

refurbish [2] 280/5 280/6

refused [1] 92/1

regard [7] 35/12 213/23 229/23 231/19 232/5 253/4 263/11

regarding [9] 64/12 111/20 111/22 132/8 199/14 299/5 322/12 334/1 335/25

region [2] 45/25 246/8

regional [1] 323/8

regionals [1] 321/8

Registered [1] 2/20

regular [4] 35/19 201/16 323/18 336/22

regularly [4] 32/8 242/14 321/1 336/21

regulations [3] 217/19 217/21 218/2

rehab [1] 105/6

rehabilitated [1] 253/22

rehabilitating [1] 253/21

rehabilitation [4] 104/21 223/7 253/20 264/19

reinforcement [1] 301/18

rejected [1] 227/19

rejection [3] 299/4 301/21 301/23

relate [1] 147/11

related [23] 29/7 49/13 55/24 61/12 101/9 114/3 141/6 159/13 166/23 173/24 218/24 243/13 272/21 275/6 275/22 279/7 279/9 291/16 313/20 322/13 329/3 329/18 334/2

relates [15] 105/5 129/7 135/7 140/23 141/2 144/18 157/17 159/6 199/21 200/18 269/14 269/22 271/5 277/24 301/6

relating [5] 104/13 120/21 279/16 301/11 301/22

relations [2] 217/15 217/19

relationship [18] 57/25 63/1 68/2 139/14 141/9 157/18 160/3 215/15 218/6 221/3 252/7 269/13 269/21 269/24 271/1 271/4 300/7 319/5

relationships [3] 64/21 140/23 218/2

relative [4] 38/13 129/6 133/11 148/11

relatively [2] 33/22 172/11

relayed [3] 250/19 251/15 252/17

released [1] 222/16

releasing [1] 277/25

relevance [2] 282/8 294/12

relevancy [3] 149/10 149/11 149/12

relevant [4] 148/6 151/18 154/23 285/25

relied [3] 150/23 154/15 297/24

relocate [2] 41/25 279/7

relocation [9] 90/3 132/8 134/4 134/7 136/10 136/14 139/19 223/5 223/6

rely [4] 14/1 154/16 238/5 239/24

remain [1] 9/22

remained [1] 111/9 136/25 161/14

remains [3] 48/16 119/16 125/14

remarks [1] 250/14

remember [22] 96/25 97/1 124/18 124/19 200/10 201/1 201/8 208/4 208/7 208/9 208/12 226/22 254/3 254/20 259/14 262/3 285/10 327/13 327/24 333/3 333/6 341/13

remembering [1] 129/1

remind [2] 58/5 181/22

reminded [1] 337/7

remove [2] 46/21 75/9

render [1] 304/15

renegotiation [2] 158/13 159/1

renegotiations [1] 158/23

renew [4] 115/4 148/16 282/25 337/14

renovate [1] 225/8

renovation [6] 219/16 223/1 223/1 244/15 280/13 290/13

rent [5] 55/10 55/15 160/13 211/12 313/1

repair [4] 58/9 60/18 61/13 133/21

repeat [2] 123/6 332/14

rephrase [1] 329/11

replace [2] 42/6 243/21

replaced [1] 58/25

replacement [6] 133/16 133/21 134/23 135/19 224/20 232/6

replayed [1] 264/6

replies [1] 340/1

reply [3] 171/19 171/23 171/24

report [36] 38/24 79/19 102/3 102/5 112/12 127/12 128/7 129/18 129/19 132/7 132/20 132/22 132/24 133/17 146/16 146/19 148/17 148/21 231/4 231/7 231/8 231/10 231/12 231/24 232/4 234/10 240/4 240/7 240/19 240/22 240/24 258/2 258/10 258/14 320/23 320/24

reported [3] 122/3 144/2 336/21

reporter [5] 2/20 2/20 2/21 2/21 70/21

reporting [3] 215/9 215/16 336/22

reports [1] 102/2 102/3 151/10 180/3 229/19 229/25 230/4 230/11 238/5 238/20 320/20

reposition [1] 163/6

represent [4] 190/11 241/3 319/1 325/10

representation [4] 21/13 25/15 88/8

**R**

**representation... [1]** 104/10

**representative [11]** 82/24 83/4 175/8 182/12 185/11 193/1 193/11 255/22 269/19 270/12 293/1

**representatives [4]** 88/8 89/13 283/22 321/1

**represented [2]** 215/19 215/20

**representing [3]** 179/7 183/22 245/4

**repurpose [1]** 274/3

**repurposed [1]** 275/17

**repurposing [1]** 274/23

**request [15]** 83/14 239/7 332/12 332/17 333/8 335/1 335/25 336/17 339/10 339/12 341/10 341/16 341/19 342/3 342/3

**requested [2]** 157/9 197/25

**requesting [1]** 173/7

**requests [9]** 138/21 278/23 279/12 279/14 321/16 333/4 334/1 334/5 334/15

**require [12]** 193/24 198/25 207/5 207/11 223/17 238/11 257/11 260/24 299/7 302/5 304/10 312/12

**required [14]** 15/6 126/8 126/25 200/3 201/23 202/7 202/11 204/8 205/17 219/6 256/11 299/20 304/6 321/13

**requirement [2]** 150/11 155/10

**requirements [6]** 65/17 65/17 199/4 220/11 220/13 237/19

**requires [5]** 45/4 200/15 204/3 205/25 301/24

**resemblance [1]** 149/15

**reservation [1]** 33/10

**reserve [1]** 107/14

**residential [4]** 280/16 316/15 317/17 317/18

**residential-grade [1]** 280/16

**resolution [5]** 128/10 128/19 129/22 308/2 308/3

**resolve [3]** 85/5 298/18 298/19

**resolved [5]** 159/23 231/15 262/16 309/16 309/18

**resources [3]** 65/5

65/7 126/5

**respect [16]** 16/2 56/24 80/16 139/7 165/7 168/23 201/17 218/22 271/23 279/3 281/8 292/1 302/2 304/2 305/12 308/5

**respond [5]** 86/12 92/1 92/8 92/24 333/7

**responded [3]** 185/18 185/20 187/20

**responding [8]** 93/1 109/25 172/18 298/13 321/22 321/23 332/12 334/25

**response [18]** 83/13 121/5 173/12 173/14 173/16 173/17 176/15 176/16 176/19 179/1 185/23 196/6 201/15 298/8 298/12 332/17 333/4 334/10

**responses [1]** 334/15

**responsibilities [17]** 14/12 61/9 61/12 62/22 157/12 157/21 157/24 160/24 168/23 199/21 282/20 291/19 292/6 292/7 292/13 293/19 315/15

**responsibility [8]** 11/19 88/23 206/14 233/10 239/22 259/4 304/22 320/15

**responsible [19]** 11/20 61/4 61/6 139/9 161/3 168/18 200/17 227/5 232/20 233/14 258/11 259/8 259/16 260/18 279/24 280/20 291/23 293/18 315/17

**rest [7]** 38/25 39/3 39/4 49/20 58/11 59/2 70/21

**restate [2]** 73/23 329/10

**restroom [2]** 51/19 139/25

**restrooms [2]** 28/19 51/18

**restructure [3]** 290/2 305/2 305/5

**restructuring [1]** 289/4

**result [7]** 17/11 65/1 105/21 139/17 180/12 299/9 330/12

**resulted [1]** 64/12

**resume [2]** 70/23 130/7

**retail [23]** 20/1 22/19 51/8 51/13 53/12 69/18 162/9 162/14 162/17 162/19 162/23 217/6 250/3 267/20 268/4 272/19 272/20 273/25 274/5 275/4 302/13 324/3 326/12

**retain [2]** 52/17 161/7

**retired [9]** 213/18 225/25 227/1 227/3

228/24 229/2 229/9 245/11 245/15

**retiring [1]** 294/8

**return [4]** 55/16 178/6 211/25 248/6

**reuse [1]** 55/5

**revenue [1]** 69/19 118/16 277/15

**revenues [1]** 14/1

**review [11]** 71/14 96/19 96/21 97/9 127/15 156/24 227/16 229/25 261/25 262/19 263/14

**reviewers [1]** 218/4

**reviewing [5]** 96/10 115/24 227/21 230/3 242/19

**revised [1]** 261/25

**revitalize [1]** 304/14

**Rexmark [31]** 161/10 179/5 266/20 266/22 266/23 267/1 267/4 267/7 267/12 267/17 268/6 268/13 269/15 270/3 270/25 271/8 277/23 278/20 281/1 281/5 290/19 292/1 292/4 292/6 306/8 310/9 310/22 331/14 331/19 332/9

**Rexmark's [3]** 269/13 269/21 271/4

**Richard [1]** 285/9

**ride [1]** 35/17

**riders [10]** 13/15 16/9 16/11 16/21 17/21 17/23 17/24 35/19 39/25 66/24

**ridership [17]** 13/5 13/9 13/14 15/20 16/7 16/19 16/20 16/22 16/23 17/6 17/8 17/10 17/19 54/21 74/22 110/9 225/7

**rifling [1]** 128/3

**right [332]** 5/21 5/24 6/16 7/22 8/12 8/16 8/23 9/6 9/15 9/24 10/8 10/9 10/21 10/23 22/24 23/24 26/18 29/9 29/14 40/15 41/12 42/7 44/2 48/4 49/8 49/10 53/24 55/21 55/22 67/1 69/4 71/2 74/9 77/20 82/14 86/15 87/14 89/11 90/10 91/11 95/13 95/17 96/21 96/23 96/25 97/7 98/6 98/24 99/1 99/2 99/5 99/7 99/14 99/19 99/20 99/22 100/12 100/15 102/5 102/7 102/19 102/20 103/21 106/3 106/4 106/10 106/17 106/21 107/1 107/7 107/16 107/17 107/24 108/10 108/14 108/24

109/4 109/5 109/8 110/5 110/17 110/19 111/3 111/3 111/18 111/21 112/13 112/20 113/1 113/10 113/17 113/19 113/22 115/9 116/17 117/13 117/19 117/23 119/24 120/1 120/16 120/19 120/21 120/22 121/9 121/11 121/14 121/21 121/22 122/3 123/3 123/4 124/7 125/5 125/12 126/2 126/15 127/17 128/22 129/1 129/4 129/13 130/15 131/22 132/12 132/14 132/18 132/22 132/25 133/9 133/17 133/18 134/5 134/8 134/12 134/14 134/19 134/21 135/20 136/8 136/9 136/14 136/20 137/12 137/17 137/21 137/22 137/23 138/9 139/3 139/5 139/7 141/15 141/19 141/25 142/1 142/1 142/3 143/12 143/17 143/20 144/3 144/10 144/12 144/22 144/23 145/4 145/20 145/23 145/25 146/6 146/17 147/4 147/6 147/8 147/15 147/19 148/9 150/16 152/6 154/10 154/12 154/23 155/20 155/22 156/9 157/22 158/14 158/17 159/5 159/7 159/12 159/16 160/25 161/6 161/10 161/11 161/12 161/16 161/18 162/6 163/5 164/8 164/10 164/12 165/3 165/9 165/13 165/23 167/2 167/5 167/6 167/14 172/16 177/6 179/14 180/19 182/2 183/2 183/15 183/16 183/25 184/18 185/2 185/4 185/7 185/14 185/21 186/9 186/16 186/19 186/24 187/2 187/21 188/4 188/8 188/25 189/7 189/17 189/19 190/14 190/18 190/19 190/25 191/11 191/13 191/14 193/22 194/11 195/21 197/6 198/11 201/5 202/23 203/7 207/7 207/8 207/20 210/18 212/7 212/14 219/3 232/11 233/6 237/24 245/1 245/3 247/7 256/6 257/23 259/6 259/10 259/19 260/14 261/4 262/13 262/18 264/2 265/11 265/16

265/22 266/8 266/11 270/6 281/25 283/4 288/12 294/23 295/15 295/17 296/5 296/15 296/22 298/22 302/25 305/24 308/7 310/8 310/14 310/15 311/2 312/2 312/19 312/22 312/25 313/10 313/13 313/16 313/18 314/13 318/9 318/12 322/19 323/15 324/25 325/13 326/4 330/4 331/4 332/15 335/5 336/7 336/16 337/1 337/2 337/4 340/3 341/1 341/5 341/24 342/20 342/21

**rights [13]** 137/25 138/8 209/6 222/22 260/3 260/9 271/23 282/6 299/4 301/21 301/24 311/9 341/15

**ring [1]** 24/13

**ripe [1]** 160/20

**rise [5]** 5/2 70/24 71/1 131/20 212/1 212/3 295/25 296/3 342/23

**risen [1]** 30/6

**risk [2]** 74/12 126/5

**risks [5]** 74/15 75/24 94/24 95/1 157/12

**RMR [2]** 343/2 343/8

**road [3]** 1/13 152/22 194/15

**roadblock [2]** 144/3 147/3

**roadblocks [1]** 144/5

**roadway [2]** 22/9 22/14

**Rochkind [1]** 283/23

**role [14]** 13/22 45/24 116/18 118/24 126/25 193/13 221/9 268/7 270/20 292/10 292/25 293/25 294/2 325/24

**roles [1]** 293/4

**rollout [1]** 319/21

**roof [2]** 227/23 320/11

**room [8]** 28/21 32/20 141/25 226/15 277/14 303/10 303/19 323/20

**rooms [2]** 40/16

**Ross [8]** 2/2 5/14 165/24 166/2 177/6 244/24 245/3 305/19

**roughly [7]** 30/11 39/24 267/6 271/16 272/6 272/14 294/5

**route [1]** 12/13

**routes [2]** 12/8 12/9

**routinely [1]** 278/25

**RUBIN [1]** 2/7

**rule [4]** 9/2 211/21 239/25 289/9

**ruled [1]** 338/3

**Rules [1]** 239/21

**run [7]** 12/18 13/2 38/2 59/12 246/24 249/24

**R**

**run... [1]** 272/3
**running [2]** 235/15
274/16
**runs [2]** 69/8 270/22

**S**

**S-t-a-l-e-y [1]** 213/10
**S-w-a-i-m [1]** 213/9
**sadly [1]** 308/1
**safe [5]** 39/25 44/13
51/17 60/18 342/21
**safety [2]** 59/1 59/8
**said [83]** 5/11 15/2
30/6 30/14 31/23 37/21
51/6 54/9 59/23 67/10
90/13 103/25 109/24
112/19 115/19 118/12
123/13 124/13 143/4
144/22 146/23 146/24
152/11 153/3 155/6
156/6 156/7 163/15
174/16 176/8 177/11
178/14 187/10 188/1
191/14 195/22 196/6
200/23 201/3 203/22
208/19 208/25 210/11
211/19 217/19 222/8
223/15 242/9 242/18
242/21 243/19 244/17
245/19 247/7 250/14
252/14 252/20 253/9
257/5 257/15 259/20
259/24 261/13 262/21
263/20 264/11 284/14
284/17 287/23 291/5
301/17 304/4 314/6
316/21 325/13 327/2
327/9 330/20 332/11
333/6 334/5 337/17
342/9
**sale [7]** 110/24 111/1
122/21 124/6 196/3
284/6 307/14
**sales [2]** 111/5 111/8
**same [23]** 30/25 31/1
31/2 32/18 69/10 78/11
105/4 127/5 127/10
139/21 161/10 185/6
190/8 206/3 216/15
244/5 244/17 253/18
263/16 264/20 270/20
277/7 323/5
**San [1]** 267/15
**San Francisco [1]**
267/15
**satisfaction [1]** 52/3
**satisfactory [1]** 280/15
**satisfied [1]** 160/14
**satisfy [1]** 152/24
**Saturday [1]** 172/23
**save [2]** 122/12 256/12
**saw [7]** 123/4 162/16
273/18 273/22 285/9
306/21 311/23
**say [86]** 8/12 8/18 18/6
18/7 31/17 32/7 32/15
37/14 58/13 64/25

69/24 82/16 84/7 85/21
86/13 88/14 94/3 98/9
99/25 104/8 104/11
104/24 106/6 115/7
127/9 143/1 146/8
147/11 152/4 152/23
154/6 157/20 157/23
165/10 177/16 186/10
186/18 191/7 195/18
197/2 202/13 202/23
206/15 207/23 211/8
211/11 211/15 214/25
216/18 217/21 218/21
221/21 222/16 223/20
225/24 228/10 232/8
232/12 233/17 236/16
236/25 242/4 246/8
246/25 272/4 284/4
285/22 297/3 300/5
301/23 301/24 302/21
302/25 303/3 303/12
303/25 304/19 307/20
308/2 309/5 312/4
316/2 337/18 340/14
340/19 342/4
**saying [15]** 71/8
129/17 133/5 148/3
172/6 188/18 201/13
207/3 208/16 209/5
209/20 290/10 304/25
316/17 321/13
**says [45]** 84/15 84/18
85/6 104/8 114/23
116/17 120/7 124/18
124/19 128/7 132/15
132/23 133/20 134/1
149/23 153/24 157/10
168/17 170/12 171/18
173/23 175/2 182/15
185/19 187/1 188/7
188/9 194/13 199/24
204/13 205/11 206/2
209/24 210/22 220/11
235/8 235/10 259/4
297/22 297/24 314/11
334/7 334/11 334/12
340/15
**Sbarro [2]** 280/1
312/21
**scale [1]** 317/6
**scenario [1]** 279/12
**Scharf [17]** 2/11 5/15
124/19 129/25 131/25
135/2 163/14 165/23
167/10 198/11 200/23
234/20 235/19 265/16
277/20 296/5 305/16
**schedule [22]** 29/25
91/24 92/9 99/20
105/22 135/7 135/7
135/11 135/13 136/3
136/7 149/7 190/17
191/9 191/12 191/13
192/3 192/5 230/6
235/15 242/5 259/7
**scheduled [11]** 77/25
105/15 120/8 122/24
136/7 181/13 190/3

226/24 234/10 296/23
307/21
**scheduling [3]** 130/24
131/1 258/8
**schematic [4]** 27/11
47/6 50/14 50/23
**schematics [2]** 54/25
55/18
**schools [1]** 267/20
**scope [13]** 114/3
132/14 133/10 133/24
134/11 135/9 135/13
136/14 145/6 150/7
151/17 193/4 336/2
**screen [19]** 21/11
21/23 22/10 50/10 56/3
56/7 78/13 80/17 80/20
81/15 117/18 117/25
122/11 122/15 128/3
169/1 174/23 175/23
194/24
**se [1]** 68/17
**seat [4]** 10/25 212/13
255/14 255/15
**seated [4]** 5/4 68/25
212/4 212/5
**seating [11]** 28/20
32/21 34/17 43/11
49/15 50/19 51/7 52/13
52/13 88/1 277/14
**second [43]** 14/22 15/2
29/6 45/14 48/5 66/22
72/23 73/1 74/6 91/8
112/4 114/22 117/16
136/18 137/2 143/8
151/15 158/12 171/18
173/22 173/22 176/7
176/25 187/1 187/15
193/17 196/15 208/15
222/6 222/10 222/13
222/14 223/24 225/15
246/10 248/16 248/18
252/17 257/25 289/7
307/18 317/6 324/20
**second-busiest [6]**
29/6 45/14 48/5 187/15
246/10 307/18
**second-largest [1]**
66/22
**secondary [1]** 268/24
**Secondly [1]** 208/3
**seconds [2]** 198/13
198/14
**Secretary [14]** 77/4
77/4 201/20 201/24
202/7 202/8 202/12
204/9 205/16 214/11
214/13 214/19 215/18
215/19
**Secretary's [1]** 82/24
**section [14]** 53/17
73/10 116/7 116/12
116/17 116/23 117/20
119/3 119/7 119/8
195/5 205/10 205/11
209/18
**Section 112 [3]** 116/7
116/12 117/20

**Section 19 [1]** 209/18
**sections [1]** 115/20
**sectors [4]** 266/24
268/1 268/2 268/11
**secure [2]** 34/10
322/12
**secured [3]** 120/10
268/22 269/1
**securing [1]** 40/4
**security [27]** 39/23
53/19 53/20 53/20 54/2
88/17 88/18 88/20
88/24 88/25 260/16
279/2 279/8 292/20
292/21 293/11 293/13
293/15 293/17 300/2
303/10 304/5 322/6
323/21 323/21 323/24
324/3
**see [101]** 5/18 17/11
18/21 21/20 22/10 23/3
33/2 34/25 35/3 38/19
49/8 53/10 54/19 63/15
69/25 70/12 70/23 78/1
86/13 86/24 97/20
98/14 112/10 112/23
113/1 114/12 114/23
115/2 116/24 118/4
118/6 120/7 120/13
122/14 128/9 128/12
130/16 130/23 131/17
132/10 132/11 133/5
133/18 133/20 133/22
134/13 135/12 135/21
135/22 135/23 135/25
136/15 141/6 143/25
145/22 146/5 148/4
149/11 153/2 157/14
158/6 158/10 158/23
161/7 161/21 175/25
179/25 181/2 190/21
192/2 192/3 193/7
194/11 208/2 208/23
231/21 232/1 233/1
233/8 233/18 233/24
236/14 248/4 258/23
258/24 259/7 259/13
261/21 263/5 266/7
273/21 274/2 292/23
294/13 297/6 297/10
298/12 319/19 319/21
320/3 320/11
**seeing [5]** 15/10 75/10
231/10 236/5 285/10
**seek [4]** 60/22 76/19
113/15 121/13
**seeking [7]** 75/11
106/18 124/25 190/13
210/16 276/12 279/15
**seem [3]** 159/22
159/23 241/14
**seems [4]** 106/5
204/18 275/21 329/7
**seen [13]** 54/25 114/16
115/6 133/4 140/7
140/14 152/1 152/5
194/19 194/20 194/22
194/22 236/2

**select [1]** 34/1
**selected [3]** 199/10
242/4 258/1
**self [1]** 304/23
**self-sustaining [1]**
304/23
**sell [4]** 19/9 193/20
195/7 195/24
**selling [2]** 195/20
196/2
**Senate [1]** 77/2
**send [7]** 169/14 169/16
169/19 170/5 172/24
173/25 188/22
**sending [3]** 91/4 173/1
221/18
**senior [20]** 77/23
100/24 122/1 140/11
181/19 181/24 182/1
215/6 215/8 220/14
268/22 270/25 271/1
271/2 281/2 281/13
282/1 282/7 283/10
307/7
**senior-most [1]** 220/14
**sense [5]** 87/2 189/22
276/22 276/24 340/11
**sent [20]** 169/15
169/17 169/20 169/24
171/6 172/25 182/12
184/14 185/10 185/19
187/5 188/18 188/21
189/16 221/25 229/3
285/9 306/19 321/12
339/5
**sentence [4]** 120/17
169/18 171/18 173/22
**separate [4]** 151/10
151/24 264/8 293/15
**separately [1]** 8/7
**September [7]** 1/5
136/6 140/13 242/17
327/5 327/9 343/7
**sequence [1]** 225/18
**sequestered [1]** 89/17
**sequestration [1]** 9/1
**series [9]** 12/17 25/22
33/12 38/3 76/10 93/11
129/10 222/15 262/2
**serious [1]** 224/8
**serve [10]** 40/5 42/19
45/12 47/18 49/23 62/5
69/19 84/21 223/15
268/7
**served [1]** 57/14
**server [1]** 181/19
**serves [10]** 15/4 58/9
58/18 77/3 218/16
220/24 267/24 275/13
275/19 277/13
**service [42]** 12/21 13/7
14/3 14/9 15/3 19/17
20/17 22/16 26/6 28/24
33/10 33/20 35/16 38/8
38/11 38/19 40/11 42/3
42/8 43/17 51/9 52/7
57/3 57/4 58/2 75/2
84/4 88/7 89/13 215/2

**S**

**service... [12]** 222/19 247/18 248/8 249/5 250/18 250/24 250/25 251/6 263/20 263/21 263/25 264/16
**services [17]** 12/24 12/25 17/17 19/8 19/11 21/5 28/12 37/16 39/6 41/6 44/1 85/8 94/12 275/22 291/17 292/11 292/17
**serving [10]** 11/22 12/6 20/6 47/22 50/21 214/18 215/15 245/20 253/14 254/11
**session [2]** 5/3 212/4
**set [23]** 40/22 63/10 71/20 79/15 102/15 111/14 116/22 117/6 119/2 132/25 172/12 173/5 173/8 205/22 216/24 217/8 221/1 228/21 264/8 271/25 272/2 276/2 314/3
**set up [1]** 276/2
**settlement [4]** 288/17 309/13 309/15 309/25
**settlements [1]** 304/7
**seven [1]** 342/16
**several [13]** 20/6 122/5 153/16 178/22 190/1 219/16 222/24 234/15 234/16 242/20 247/10 294/19 312/8
**shall [6]** 195/7 199/20 204/13 205/12 206/5 210/22
**shape [1]** 322/9
**share [2]** 97/10 302/15
**shared [2]** 102/18 322/15
**she [10]** 99/18 99/22 99/24 100/8 100/9 215/21 241/10 241/11 294/6 294/8
**she's [1]** 100/8
**shed [1]** 330/14
**shopping [5]** 20/20 316/15 317/23 319/25 326/14
**shored [1]** 58/24
**shoring [1]** 301/18
**short [4]** 62/7 131/24 188/14 339/21
**short-term [1]** 62/7
**shortly [1]** 70/23
**shovel [1]** 136/8
**show [25]** 20/23 21/10 23/10 23/20 23/25 24/17 25/9 25/17 47/3

49/7 50/10 70/9 72/19 77/9 80/2 101/22 122/10 140/5 149/12 152/15 154/22 156/18 160/21 194/21 210/12
**showed [5]** 123/20 125/2 125/3 162/3 162/4
**showing [4]** 34/25 296/18 318/23 333/18
**shown [11]** 55/18 80/20 111/25 115/12 122/6 134/15 162/24 163/2 163/19 177/1 194/19
**shows [2]** 132/13 259/8
**SHPO [2]** 263/6 263/14
**shut [1]** 5/19
**sic [6]** 64/16 66/9 98/21 186/14 204/17 288/22
**side [15]** 10/5 10/19 30/2 51/14 52/12 53/12 56/5 66/20 91/9 155/6 286/20 319/12 319/22 320/2 320/7
**sign [8]** 256/24 257/1 263/3 263/8 263/8 287/15 308/22 342/5
**signage [17]** 36/3 36/6 36/16 36/17 36/18 36/21 37/8 37/9 37/10 88/9 221/6 260/19 262/18 262/19 262/22 268/4 272/22
**signals [1]** 19/19
**signed [14]** 100/16 101/5 280/2 318/14 318/19 327/11 327/15 327/16 327/19 330/20 335/18 335/21 342/14 342/16
**significant [6]** 110/7 112/19 274/25 284/12 285/13 304/20
**significantly [14]** 40/13 254/4 274/7 274/9 274/10 274/25 276/5 276/5 278/2 278/16 292/21 293/8 293/9 307/8
**signing [2]** 330/25 331/7
**signs [3]** 36/6 36/7 263/5
**silence [1]** 207/22
**Silent [1]** 48/23
**similar [9]** 35/3 35/25 54/20 216/18 216/19 269/24 290/5 292/25 299/12
**similar-quality [1]** 35/25
**simple [1]** 66/18 83/19
**simply [8]** 104/5 139/20 139/22 146/9 152/2 220/25 240/3

341/19
**simultaneous [1]** 340/2
**since [39]** 10/1 15/11 88/14 93/16 100/23 101/1 104/9 106/2 106/10 136/6 153/21 159/10 165/5 165/5 179/20 179/22 211/20 220/23 221/1 224/19 233/23 244/16 245/14 269/15 277/23 278/5 278/20 282/2 290/20 290/21 291/6 292/12 292/18 294/1 300/14 302/18 303/23 304/15 305/14
**single [3]** 49/5 220/3 321/9
**sinks [1]** 280/12
**sir [14]** 61/2 75/16 103/19 110/11 113/9 130/10 181/3 184/9 196/18 197/8 265/13 283/17 302/18 337/5
**sit [4]** 28/22 69/2 160/16 279/14
**site [6]** 160/24 175/5 176/3 177/7 315/24 320/8
**sites [1]** 326/13
**sits [1]** 60/11
**sitting [4]** 9/14 208/10 307/13 314/17
**situation [5]** 70/13 74/23 75/8 76/2 76/9
**situations [2]** 32/6 211/9
**six [9]** 106/15 142/6 142/17 160/7 168/13 191/24 280/8 318/12 327/14
**six months [1]** 142/17
**sizable [1]** 44/11
**size [4]** 42/7 263/6 263/8 279/23
**sized [1]** 52/6
**sizes [1]** 41/23
**sjw [1]** 2/10
**skinnier [1]** 182/10
**SL [11]** 181/19 181/23 182/12 182/12 182/14 182/18 183/8 183/14 183/21 183/25 184/17
**SL Green [10]** 181/19 181/23 182/12 182/14 182/18 183/8 183/14 183/21 183/25 184/17
**slated [5]** 135/19 198/24 279/10 301/8 301/10
**sleeper [1]** 35/17
**sleeping [1]** 39/7
**slide [9]** 24/19 56/2 56/17 143/22 157/10 158/6 160/21 160/22 161/21
**sliding [1]** 207/25

**slipping [1]** 207/25
**slow [3]** 70/22 109/16 197/2
**small [9]** 26/8 33/12 33/22 35/7 35/10 46/8 51/25 222/25 225/9
**smaller [4]** 8/3 18/18 223/4 230/18
**smoke [1]** 320/12
**snapshot [1]** 129/11
**so [482]**
**so I think [8]** 61/8 67/14 69/22 197/19 208/10 253/23 279/11 340/10
**so it's [11]** 14/22 39/1 59/12 60/10 67/2 70/22 157/20 182/9 230/19 256/10 334/13
**so this is [8]** 19/15 22/7 24/2 29/1 95/11 115/8 200/1 210/2
**So this relates [1]** 141/2
**so this schedule [1]** 136/3
**so this will [1]** 158/3
**social [1]** 22/20
**sold [1]** 222/22
**sole [3]** 131/8 310/17 310/23
**solicit [2]** 237/20 242/23
**solution [1]** 300/13
**solutions [3]** 289/2 289/23 298/6
**solve [1]** 70/8
**some [111]** 14/16 23/16 23/17 36/18 37/4 37/21 37/22 44/17 46/7 47/11 47/16 50/23 51/6 52/18 53/15 54/16 56/6 56/18 58/3 59/6 61/21 62/8 62/10 66/1 66/7 67/25 68/10 70/12 73/21 75/8 76/21 88/1 89/10 89/25 92/13 96/17 98/11 105/9 129/8 134/23 134/24 134/25 137/13 138/13 138/22 142/17 147/9 147/9 153/17 164/23 178/11 185/11 186/1 190/23 204/19 213/18 219/14 219/25 223/4 223/10 224/18 228/17 230/7 231/19 233/21 235/17 241/9 247/1 253/21 253/22 254/5 255/11 258/9 263/19 264/10 267/10 267/10 274/5 274/21 275/2 275/4 275/5 275/5 275/18 275/22 275/22 279/7 279/7 279/18 280/12 280/12 287/11 289/24 289/24 299/14 299/20 300/2 303/11

312/14 312/24 315/14 319/3 321/7 322/7 326/21 330/11 331/7 337/6 339/11 339/11 340/25
**somebody [4]** 5/19 69/14 208/17 209/21
**somebody's [1]** 8/13
**somehow [2]** 203/24 203/25
**someone [5]** 53/23 53/24 70/2 215/21 255/11
**something [42]** 7/18 8/12 36/2 54/20 92/14 97/18 102/10 104/22 118/13 122/10 127/15 129/11 150/13 156/10 157/16 158/16 185/17 188/3 189/6 189/23 189/25 192/23 201/23 203/4 204/24 224/16 234/5 234/5 234/25 237/8 239/10 242/10 256/13 256/18 263/13 282/9 299/11 321/13 324/5 335/23 340/14 341/22
**sometime [2]** 30/4 327/14
**sometimes [4]** 31/4 141/21 211/6 239/2
**somewhere [5]** 115/15 129/20 191/23 192/9 254/21
**soon [7]** 15/15 116/20 119/1 124/25 252/6 318/10 323/25
**sooner [1]** 131/15
**sorely [2]** 36/2 36/2
**sorry [65]** 8/14 11/17 16/12 18/5 21/16 21/18 29/11 31/21 58/13 59/23 59/24 60/15 61/3 69/4 70/19 73/23 74/1 77/21 80/4 90/13 97/18 101/23 108/6 116/4 116/8 116/20 123/6 124/24 127/17 128/23 133/19 135/2 141/22 150/3 151/6 169/5 175/11 182/6 185/5 185/8 193/5 197/21 202/9 202/10 210/11 216/21 222/7 226/3 230/10 232/14 232/23 236/24 258/19 273/5 274/13 280/25 284/16 285/17 288/7 302/20 310/24 313/23 316/17 316/18 320/4
**sort [40]** 14/2 18/8 18/18 20/4 22/18 27/23 33/17 37/11 38/14 49/18 52/5 53/13 53/25 57/9 57/23 62/9 62/20 67/11 75/4 87/12 89/17 100/3 101/12 129/21

**S**

sort... [16] 135/15
137/9 141/19 154/3
154/5 164/24 201/10
235/17 237/2 244/3
253/24 257/11 263/6
264/14 276/21 312/14
sorts [1] 42/25
sought [3] 113/9
113/13 310/23
sound [2] 96/25 227/23
sounds [2] 64/23 159/7
source [3] 32/25
241/10 338/11
sources [1] 64/1
south [9] 2/8 12/16
12/17 15/5 15/9 23/19
25/24 58/20 68/11
Southern [2] 306/11
309/18
southwest [1] 13/1
space [192] 17/4 25/1
25/14 26/11 26/13
28/20 31/11 31/14
31/15 31/24 32/5 32/12
32/18 32/23 33/15
34/22 34/25 35/4 35/7
35/8 35/10 35/10 35/21
36/9 36/21 37/7 37/14
37/14 37/18 37/18
37/21 37/24 38/7 38/9
39/9 39/12 39/14 40/7
40/8 40/9 40/19 40/24
41/4 41/8 41/13 41/23
43/3 43/5 43/13 43/24
44/5 44/7 44/12 44/24
44/25 45/3 45/8 45/15
45/16 45/20 46/4 46/5
46/10 46/14 46/15
46/18 48/24 49/22 52/1
52/10 52/11 52/16
52/18 52/21 53/10
53/11 53/15 53/24
54/13 55/2 55/6 61/21
62/10 66/17 74/18
88/15 89/10 90/3
103/14 103/20 103/21
104/6 104/12 104/12
104/12 112/13 112/24
112/25 112/25 129/8
136/10 137/25 138/8
138/9 138/13 139/2
139/7 139/10 139/16
139/19 139/20 139/21
139/22 141/3 141/6
141/11 141/17 142/11
142/13 159/14 162/5
162/9 162/21 162/22
163/6 163/11 164/4
164/17 164/19 165/1
206/17 217/2 217/3
217/4 232/24 260/14
260/16 260/20 262/12
265/2 268/3 268/4
268/4 272/17 272/23
273/2 273/4 273/25
274/6 274/7 274/23
275/1 275/5 275/6

275/10 275/20 278/8
280/1 280/4 280/22
280/23 289/5 290/5
301/25 302/1 302/11
302/12 302/13 302/14
302/17 303/1 303/5
303/11 303/20 312/1
312/4 312/6 312/13
312/17 312/19 312/21
318/23 324/9 324/17
329/3 329/17 329/23
330/1 330/4 330/14
331/4 336/17
spaces [10] 142/18
164/23 254/5 274/21
275/2 304/4 312/24
326/12 331/1 341/12
speak [6] 104/3 154/25
174/13 174/14 228/16
290/3
speaking [4] 249/2
251/11 252/13 315/14
speaks [5] 101/10
113/3 289/13 297/18
335/7
special [4] 111/12
154/13 181/19 201/16
specific [10] 58/3
85/23 118/20 120/2
187/22 199/21 199/23
287/13 342/6 342/8
specifically [18] 80/3
84/14 87/19 88/17
149/8 155/5 156/5
186/25 188/5 199/19
200/13 200/16 209/7
209/18 225/15 263/22
297/17 297/22
specificity [1] 99/15
speeches [1] 248/14
speed [11] 20/17
250/18 250/21 250/22
251/1 251/6 263/20
263/20 263/25 264/9
264/15
spell [1] 315/8
spend [2] 51/23 84/5
spending [3] 20/20
20/20 312/10
spent [7] 84/8 137/9
195/16 206/23 207/2
207/4 215/7
spoke [3] 96/15 248/19
251/13
spoken [1] 296/10
spokesperson [2]
251/12 252/14
Sporik [2] 174/24
176/13
spot [1] 33/22
spring [2] 159/8
242/24
sprinkler [1] 303/8
square [3] 280/9 317/6
317/11
squares [1] 202/19
squeeze [5] 131/15
189/7 189/9 189/10

192/9
squeezed [1] 189/6
stack [3] 267/7 267/8
281/3
staff [17] 41/16 41/19
55/3 89/21 157/8
213/24 214/1 229/16
229/20 229/22 230/1
292/11 292/15 292/16
292/18 293/3 315/21
staffing [1] 293/7
stage [1] 244/12
stages [1] 104/18
stairs [1] 26/1
stakeholders [6]
220/16 220/23 228/20
278/25 292/1 311/16
Staley [6] 64/10 212/10
212/11 213/2 213/8
245/11
stalls [1] 280/10
stamped [2] 190/9
190/15
stand [5] 10/16 90/9
90/10 167/8 176/18
standard [4] 61/13
287/11 322/22 323/1
standards [4] 72/6
244/10 249/15 249/18
standing [1] 321/7
standpoint [4] 293/7
293/8 303/4 304/23
stands [2] 131/18
296/1
start [29] 5/22 7/24
39/3 57/9 71/12 88/1
112/4 120/6 126/9
126/11 127/1 131/14
131/14 134/15 135/19
135/23 135/24 163/10
163/16 179/20 179/22
198/12 207/15 220/10
234/6 234/17 266/5
327/20 337/20
started [25] 14/14
50/20 125/25 126/3
126/12 126/24 134/14
134/19 135/24 159/10
191/6 224/1 227/13
234/3 235/11 242/13
243/11 243/25 244/7
258/14 266/6 288/17
288/18 325/12 327/17
starting [3] 78/25
189/13 190/19
starts [4] 30/2 171/13
186/7 295/20
state [9] 11/8 12/18
60/18 68/22 133/21
168/5 213/6 218/1
315/7
state-supported [1]
12/18
stated [3] 113/10
113/13 156/8
statement [3] 120/16
246/19 289/18
statements [3] 100/17

289/14 289/17
states [26] 1/1 1/10
12/6 12/19 77/1 173/11
196/7 199/9 199/10
199/14 199/23 200/2
200/14 203/17 204/10
205/18 205/21 205/23
206/12 209/17 266/25
267/13 269/16 294/20
307/18 307/19
stating [1] 196/13
station [311] 5/12
14/10 14/11 14/13
14/15 14/21 14/22
14/24 15/2 15/11 15/17
15/21 15/24 16/3 16/4
16/5 16/13 16/14 16/21
17/2 17/3 17/5 17/8
17/19 18/7 18/8 18/15
18/16 18/24 19/4 19/5
20/9 20/15 21/8 21/14
22/7 23/17 23/18 23/22
24/24 25/14 26/12
26/13 26/14 26/14 27/6
29/5 29/6 30/13 34/20
36/11 36/23 37/13
37/25 40/16 40/20 41/3
41/14 41/18 41/24
45/11 45/11 45/14
45/17 46/24 47/7 47/17
48/5 50/20 51/22 55/24
57/7 57/12 58/10 62/8
65/5 65/12 65/14 66/6
66/13 66/23 67/13 68/5
67/5 68/8 68/11 68/17
68/17 68/19 68/23
68/23 69/3 70/9 70/10
70/11 71/17 84/18
84/22 88/6 88/8 89/8
95/6 102/17 103/12
106/2 107/5 107/23
108/9 108/10 108/23
109/4 109/7 112/7
112/9 113/24 114/10
114/24 116/1 116/19
118/12 118/20 118/25
120/10 125/11 125/24
134/3 139/5 143/10
145/17 145/17 150/19
151/7 151/24 156/18
156/20 160/3 162/6
164/4 164/12 164/20
165/2 169/22 182/16
182/17 187/14 187/15
190/16 193/2 194/10
196/9 200/15 200/17
201/18 203/12 203/14
204/11 205/24 206/7
206/7 206/8 206/17
209/23 214/8 216/1
216/6 216/9 216/10
217/25 218/7 218/13
218/15 218/22 219/8
219/21 220/5 220/24
221/10 222/18 224/10
224/14 238/7 245/18
246/5 246/9 246/10

246/12 246/22 247/4
247/14 247/18 248/9
248/17 249/5 249/13
250/17 251/18 251/19
252/6 252/25 253/21
253/24 256/4 256/8
256/24 257/13 257/17
263/13 264/2 267/23
267/24 267/25 268/14
269/14 269/23 271/6
271/8 271/13 271/24
272/3 272/13 272/14
272/17 273/20 274/1
274/4 274/6 274/17
275/10 275/12 275/13
276/1 276/1 276/4
277/2 277/3 277/6
278/2 278/9 278/14
279/16 280/4 291/10
291/20 292/2 292/3
292/15 292/16 292/18
292/22 293/2 293/8
293/15 293/19 294/5
294/7 294/11 297/2
302/17 303/24 304/3
304/9 304/13 304/16
304/18 304/20 304/22
306/9 306/15 307/6
307/15 307/18 311/14
312/2 315/11 315/16
316/3 316/8 317/9
317/10 318/3 318/4
318/5 319/15 320/7
320/14 320/17 321/11
322/3 322/13 323/7
323/11 323/14 324/14
324/18 325/12 325/15
325/16 325/25 326/2
326/8 326/9 327/17
329/4 330/10 330/21
331/20 332/3 332/7
station's [3] 203/19
311/12 319/5
stations [7] 20/10
49/21 67/25 68/3 68/4
118/13 161/23
stats [1] 247/10
status [32] 35/20 75/19
109/12 110/4 127/12
127/12 128/20 129/13
132/7 132/24 156/24
162/11 162/14 180/3
187/14 187/17 229/2
229/15 229/19 229/25
230/10 234/2 238/5
238/20 240/4 240/6
240/10 246/16 290/6
301/7 301/14 322/16
statute [21] 14/5 26/19
45/23 73/22 73/25
113/10 113/14 114/9
114/12 118/18 119/8
153/24 155/4 155/5
199/4 201/2 201/3
202/19 203/23 204/1
208/25
statutes [3] 113/22
115/12 115/13

**S**

**statutorily [2]** 39/18 76/25

**statutory [7]** 72/14 116/4 120/18 150/11 152/24 199/7 201/23

**stay [7]** 55/8 89/8 167/21 167/23 215/14 243/22 270/13

**stayed [1]** 270/11

**staying [1]** 244/17

**steads [1]** 68/3

**stenography [1]** 2/24

**step [7]** 83/25 130/10 197/8 234/7 255/24 256/20 337/5

**steps [1]** 163/12

**Steven [7]** 2/6 5/14 10/16 11/4 11/11 143/12 167/21

**Steven Gardner [4]** 10/16 11/11 143/12 167/21

**stewardship [3]** 294/7 305/4 305/7

**still [18]** 10/6 17/24 51/8 52/17 75/22 125/11 127/13 137/1 139/21 160/6 160/9 227/3 229/6 231/3 236/19 243/7 263/16 301/19

**stipulated [6]** 6/20 7/4 7/6 7/12 8/6 8/18

**stop [1]** 54/9

**stopping [2]** 300/24 301/12

**storage [8]** 128/10 128/19 129/3 129/7 129/22 303/11 320/8 330/14

**store [2]** 38/24 50/7

**stores [2]** 304/11 319/23

**story [1]** 100/3

**straight [3]** 179/9 199/17 207/9

**strategic [1]** 168/18

**strategy [6]** 78/8 91/7 122/20 168/9 168/15 168/16

**street [6]** 2/8 2/17 23/18 67/1 223/2 323/9

**strictly [1]** 243/18

**strike [3]** 87/20 109/23 146/21

**string [3]** 171/13 171/17 172/5

**strong [6]** 13/13 87/2 218/6 318/24 319/4 323/8

**structural [10]** 58/21 58/22 59/13 61/7 133/16 133/20 134/23 135/18 224/5 232/5

**structurally [2]** 227/23 228/5

**structure [33]** 42/15

55/23 65/1 84/21 109/11 127/5 134/21 137/19 137/21 139/22 144/7 144/10 144/11 144/12 144/17 147/10 203/20 215/25 216/1 220/18 220/21 220/25 244/16 244/20 250/6 255/25 260/7 264/21 271/12 289/25 290/1 290/14 314/3

**structures [5]** 112/7 224/8 243/22 288/4 290/12

**stuck [3]** 135/16 137/9 137/12

**studies [2]** 188/23 251/20

**study [2]** 55/23 56/21

**studying [4]** 56/14 56/19 72/8 195/17

**stymied [1]** 76/9

**sub [3]** 116/12 301/3 301/14

**sub-basement [2]** 301/3 301/14

**subbasement [47]** 58/5 58/8 58/10 58/16 58/17 58/22 59/2 59/4 59/5 59/11 60/2 60/9 60/13 90/1 90/7 99/18 102/12 102/14 103/2 104/17 104/22 104/25 105/6 105/8 106/8 106/11 106/16 107/7 107/22 108/13 132/8 133/16 133/20 134/23 135/18 219/17 223/21 224/9 224/17 232/5 234/9 244/14 301/17 301/22 302/3 302/6 303/9

**subject [6]** 6/7 10/2 170/13 217/25 263/14 341/14

**subjecting [1]** 200/7

**sublease [32]** 1/6 5/8 26/17 45/8 57/17 67/8 84/17 85/7 85/10 138/3 138/5 157/11 158/4 158/13 161/2 195/8 199/1 200/15 204/14 205/18 210/1 210/22 222/2 222/3 256/2 272/9 272/10 272/12 302/22 305/13 312/3 312/5

**subleased [3]** 86/4 109/3 217/2

**subleases [1]** 217/3

**sublessee [1]** 206/1

**submission [3]** 103/3 227/5 339/25

**submissions [1]** 340/2

**submit [1]** 339/12

**submitted [9]** 101/16 106/25 107/2 227/4 227/15 259/23 261/25

298/10 320/20

**submitting [1]** 85/12

**subpar [1]** 16/5

**subpoena [1]** 213/16

**subpoenaed [1]** 213/11

**subpoints [1]** 147/4

**subsection [6]** 115/21 116/16 118/9 118/22 118/23 205/11

**Subsections [2]** 116/22 119/2

**subsequent [3]** 120/11 205/3 232/13

**subsequently [3]** 184/21 195/15 228/1

**subsidiary [4]** 203/24 216/23 216/25 271/7

**substance [3]** 96/16 101/12 289/9

**substandard [1]** 32/4

**substantial [3]** 16/23 16/24 164/3

**substantially [2]** 204/15 206/3

**substantive [2]** 97/6 98/12

**substation [1]** 49/12

**substations [1]** 42/21

**substitute [2]** 140/1 205/15

**substituted [2]** 205/2 205/4

**subtenant [7]** 64/13 64/15 107/23 108/9 108/14 108/23 134/21

**subtenants [1]** 62/25

**success [1]** 54/18

**successful [10]** 33/23 91/12 126/6 126/16 126/16 159/1 160/17 161/8 178/17 246/20

**successfully [2]** 127/2 183/14

**successor [2]** 204/22 210/4

**such [11]** 28/23 42/20 115/1 173/9 173/25 221/7 222/25 223/5 238/5 251/1 289/14

**suddenly [1]** 161/2

**sufficient [12]** 32/12 32/20 33/15 34/22 35/11 36/21 38/9 39/11 42/10 43/3 54/12 238/17

**suggest [6]** 173/9 248/7 249/4 250/8 340/6 340/7

**suggesting [1]** 204/23

**suggestion [1]** 122/9

**suit [1]** 178/15

**Suite [2]** 1/13 2/17

**suits [1]** 330/11

**summer [1]** 236/17

**supervision [1]** 42/17

**supplementation [1]** 6/7

**supplemented [1]** 198/21

**support [12]** 19/13 38/1 47/16 49/1 49/23 72/11 76/13 101/17 114/25 188/24 249/19 323/8

**supported [2]** 12/18 73/21

**supporting [6]** 19/12 26/9 67/22 76/4 164/25 224/8

**supportive [1]** 69/21

**supports [2]** 58/21 304/17

**suppose [1]** 154/9

**supposed [4]** 33/4 283/3 285/24 295/19

**suppression [2]** 334/2 335/1

**Supreme [2]** 155/3 155/8

**Supreme Court [2]** 155/3 155/8

**sure [92]** 12/10 18/25 25/21 27/15 29/12 31/17 48/14 58/7 71/5 71/15 85/22 97/10 97/12 98/5 100/19 101/14 107/2 108/4 110/1 114/17 116/6 117/2 120/4 123/8 128/17 139/13 145/12 150/24 152/11 152/12 155/2 156/24 157/7 162/19 165/11 165/19 167/23 169/9 186/22 190/5 197/16 198/15 198/15 198/17 200/8 202/18 207/4 217/19 221/12 225/18 225/22 226/4 227/2 228/15 228/20 230/5 231/25 232/7 234/14 238/24 240/12 240/16 241/18 243/15 246/24 246/25 249/3 249/12 249/25 252/8 253/2 255/9 255/23 256/9 261/16 261/24 262/9 264/5 264/12 265/21 288/14 289/11 295/6 297/19 304/22 315/9 316/11 323/23 332/21 333/16 339/1 341/24

**surrendered [1]** 140/1

**sustain [1]** 145/8

**sustainability [1]** 13/24

**sustaining [1]** 304/23

**Swaim [7]** 64/10 212/10 212/11 213/2 213/8 213/9 245/11

**Swaim-Staley [4]** 64/10 212/10 213/2 213/8

**sworn [7]** 11/4 100/16 100/20 168/1 213/2

266/14 315/2

**sympathetic [3]** 51/11 53/3 69/21

**Syria [3]** 316/17 316/22 316/25

**system [7]** 13/5 14/25 44/22 50/2 50/7 299/19 299/21

**systems [3]** 19/12 334/3 335/1

**T**

**table [3]** 91/8 122/6 323/7

**tactic [1]** 127/10

**tag [1]** 146/10

**tags [1]** 292/24

**take [79]** 8/24 13/22 45/24 52/4 57/23 63/17 64/3 70/20 95/9 95/14 104/7 117/24 118/9 119/5 119/7 120/4 124/16 126/13 130/6 137/25 138/8 140/16 140/20 163/12 164/21 167/5 190/18 194/23 196/10 199/12 200/5 202/12 208/1 209/20 210/18 211/23 211/24 223/6 225/21 226/24 228/3 232/1 234/12 238/19 253/18 253/24 254/5 255/19 255/20 256/3 258/7 260/2 275/7 276/3 277/3 277/6 278/13 295/16 298/3 302/11 302/12 302/13 302/14 303/13 303/20 310/20 311/15 312/1 312/4 312/7 312/17 312/19 314/2 315/18 331/8 331/14 340/15 340/15 340/18

**taken [22]** 79/23 80/25 81/5 81/22 110/13 115/18 255/13 277/23 278/21 290/21 291/7 292/6 292/12 292/19 299/12 299/15 303/23 303/25 304/15 308/24 341/13 341/13

**takes [2]** 292/2 329/1

**taking [11]** 95/12 101/5 130/14 190/14 238/18 241/15 278/5 297/7 309/23 316/8 320/13

**talent [1]** 44/2

**talk [19]** 51/2 99/13 120/17 121/19 132/6 133/15 135/1 143/7 148/4 159/19 186/2 186/17 187/15 211/17 264/15 281/12 286/8 288/3 320/19

**talked [26]** 40/18 40/18 54/23 96/12 99/17 99/18 102/13 106/9 109/21 115/11 136/17

## T

**talked... [15]** 142/22 143/9 146/6 185/15 235/14 253/3 253/22 285/2 287/25 289/3 289/4 295/8 298/21 301/6 337/9
**talking [16]** 19/5 35/11 44/23 45/15 57/20 120/24 132/7 140/17 141/4 153/9 257/22 273/18 277/9 280/9 280/13 280/14
**talks [6]** 134/7 136/12 149/7 154/13 154/14 209/18
**target [1]** 128/21
**targeted [1]** 241/16
**task [2]** 91/4 236/6
**taxes [1]** 170/14
**taxi [1]** 27/19
**taxiway [1]** 22/13
**taxpayer [2]** 94/11 302/16
**team [13]** 11/21 49/21 71/16 71/20 107/14 133/12 136/13 144/2 146/10 156/25 174/25 315/23 337/7
**Teams [2]** 173/8 186/11
**technical [3]** 42/25 98/3 242/11
**technically [1]** 6/24
**tedious [1]** 313/7
**tell [18]** 7/17 29/18 77/12 95/5 135/3 153/5 177/13 178/23 204/6 234/8 245/25 266/18 272/4 273/14 286/16 296/19 298/9 316/9
**telling [2]** 252/23 335/6
**temporarily [1]** 58/24
**temporary [3]** 88/1 88/9 89/3
**ten [9]** 88/19 214/7 214/23 265/8 287/24 294/5 294/5 340/15 340/16
**tenancy [1]** 162/15
**tenant [12]** 64/13 68/10 69/1 136/25 137/17 177/8 193/14 196/9 320/21 330/6 336/16 336/17
**tenants [26]** 17/14 17/14 17/16 20/7 26/18 55/4 157/18 158/1 162/9 162/12 162/14 256/2 272/19 272/21 275/4 278/7 278/8 304/6 304/7 316/6 318/8 326/25 329/18 330/3 330/5 330/9
**tend [2]** 30/4 301/9
**tended [1]** 229/21
**tender [1]** 244/22
**tenure [5]** 220/15 221/17 224/25 321/11 324/7
**term [25]** 11/22 14/19 36/3 36/6 38/20 42/9 42/9 42/12 62/7 84/21 102/14 102/16 102/16 102/18 102/24 103/8 103/8 105/14 107/10 201/6 223/8 253/4 271/14 327/23 328/1
**termed [1]** 216/8
**terminal [8]** 15/9 19/2 19/14 19/21 23/15 32/19 33/20 36/8
**terminals [1]** 45/6
**terminate [2]** 210/23 276/25
**terms [46]** 10/4 15/23 30/13 32/5 32/9 40/16 44/24 50/16 56/24 87/7 88/21 88/23 89/1 89/15 130/12 141/18 164/9 164/13 180/14 180/15 189/9 210/2 233/8 237/23 250/21 255/17 260/14 260/17 260/20 267/3 274/10 279/5 287/7 287/9 289/13 293/17 312/13 317/2 317/6 319/12 328/5 328/9 328/16 329/13 341/6 341/25
**terrific [2]** 241/10 342/20
**testified [9]** 99/12 146/17 156/2 255/25 258/2 259/20 265/18 332/11 332/16
**testify [5]** 153/21 276/16 276/22 282/10 289/20
**testifying [7]** 100/5 100/10 256/25 306/14 306/17 333/3 336/5
**testimony [21]** 96/9 98/18 99/21 101/12 130/9 140/17 140/18 140/21 167/4 197/7 213/11 259/25 265/12 276/12 283/1 286/1 296/17 304/25 332/19 332/22 337/5
**text [2]** 186/7 186/9
**than [51]** 9/10 16/20 20/18 24/14 30/10 31/13 32/4 37/23 39/24 45/1 65/5 66/13 69/3 75/7 100/17 121/6 121/10 121/12 125/12 147/18 155/11 162/9 162/19 162/20 164/24 170/24 171/1 184/3 184/17 187/25 191/10 218/5 240/2 241/14 245/12 245/19 250/24 264/16 265/6 272/17 273/16 286/19 289/1 293/9 294/25 299/23 302/17 313/7 320/1 339/14 341/19
**thank [80]** 5/20 8/25 10/20 10/25 11/2 18/21 49/10 69/4 71/6 74/9 95/17 97/13 97/16 131/23 132/1 165/23 166/2 167/3 167/12 167/13 167/16 167/18 167/24 196/18 196/21 196/22 197/5 197/7 197/9 198/9 198/10 198/18 207/14 211/25 212/5 212/16 213/15 217/22 217/23 236/13 236/15 240/17 241/1 243/2 245/7 246/4 254/16 260/1 261/4 261/20 265/11 265/13 265/20 266/10 274/8 296/8 305/16 305/24 305/25 311/4 313/10 313/13 313/14 313/15 314/5 314/9 314/15 314/16 324/23 324/24 324/25 325/3 335/10 335/12 337/1 337/2 337/4 340/24 342/12 342/21
**thank you [59]** 8/25 10/20 10/25 11/2 18/21 69/4 71/6 74/9 95/17 97/13 97/16 165/23 166/2 167/3 167/12 167/13 167/16 167/18 167/24 196/18 196/21 197/5 198/9 198/10 198/18 207/14 212/5 213/15 217/22 217/23 236/13 236/15 241/1 243/2 245/7 246/4 254/16 260/1 261/4 261/20 265/20 266/10 274/8 305/16 311/4 313/10 313/13 314/5 314/9 314/15 324/24 324/25 325/3 335/10 335/12 337/1 337/2 337/4 342/12
**thank you very much [3]** 5/20 197/7 265/11
**thanked [1]** 300/10
**thanks [5]** 27/15 131/17 175/18 245/3 341/1
**that [1540]**
**that'll [1]** 83/22
**that's [244]** 6/13 6/15 6/19 7/2 8/15 9/10 10/2 14/4 15/15 18/13 18/19 18/19 19/3 19/9 19/16 20/14 21/22 22/13 22/14 22/15 22/15 22/22 23/6 23/14 23/23 26/11 26/12 26/13 26/18 26/21 28/11 30/6 33/5 33/6 37/11 37/22 39/3 41/12 42/11 44/16 45/13 48/18 49/8 49/10 49/12 52/7 53/14 55/3 56/9 65/24 66/21 66/22 68/25 69/14 74/25 77/20 77/20 81/3 84/2 86/7 86/14 88/11 88/15 91/2 95/13 96/11 98/24 99/2 99/5 99/21 100/7 100/12 100/15 102/7 103/8 104/24 105/15 106/4 109/5 109/9 110/18 111/7 115/14 117/23 117/24 117/25 118/22 120/16 121/15 121/17 124/1 124/6 125/1 126/2 126/15 129/8 129/11 132/15 132/17 132/17 132/20 132/23 133/11 133/17 134/14 134/15 135/14 136/2 136/12 136/21 137/23 141/15 141/20 144/10 144/11 144/15 144/23 145/5 145/7 146/18 147/25 148/4 148/18 153/13 154/9 154/15 154/17 158/16 158/16 159/12 160/14 160/25 161/12 162/1 162/22 162/25 163/4 165/17 170/4 170/6 170/19 172/5 172/16 175/24 177/24 179/6 180/22 182/19 182/21 183/11 184/19 184/23 185/1 185/12 186/19 188/3 189/23 190/9 191/1 191/12 191/19 192/18 193/15 195/3 196/11 197/16 197/17 200/19 201/7 201/10 202/16 203/10 203/13 205/25 206/2 206/18 206/22 206/25 207/7 207/11 207/12 208/7 210/7 210/17 211/10 217/2 218/19 218/19 221/21 232/8 232/13 233/1 234/4 235/5 236/13 237/8 237/10 237/22 246/2 249/5 249/8 252/1 254/20 260/22 262/21 264/4 278/17 287/13 288/16 289/11 289/15 291/23 299/25 301/8 301/9 303/18 307/23 309/11 309/17 310/2 310/5 310/11 310/18 312/3 312/18 314/11 318/17 318/18 330/3 330/23 331/6 332/19 333/5 333/10 333/18 334/7 334/11 334/12 335/9 336/18 338/15 339/20 341/18 342/14
**theater [1]** 48/18
**their [56]** 8/19 20/11 20/25 21/5 21/6 26/15 27/23 27/25 29/8 33/9 34/3 34/10 38/25 44/13 44/13 50/3 63/16 89/20 92/24 110/5 149/13 178/6 207/24 211/20 221/15 228/4 229/7 238/12 241/24 242/1 247/18 248/4 249/25 261/1 270/15 272/3 276/8 279/2 283/22 285/4 290/6 291/19 292/11 292/12 293/14 299/10 299/19 299/21 300/8 302/1 302/10 302/14 304/8 312/20 326/21 327/7
**them [55]** 6/7 6/11 6/24 6/25 6/25 8/9 21/5 42/6 52/13 53/24 53/25 70/6 72/20 88/5 89/16 92/11 96/15 107/3 123/21 139/10 159/19 176/14 182/3 183/15 183/19 185/16 196/9 206/15 208/8 210/14 226/13 238/21 251/8 261/13 280/7 283/13 287/24 290/3 290/22 296/22 297/15 300/24 303/10 303/25 315/18 318/12 319/17 320/9 326/20 327/2 335/4 336/22 338/19 342/8 342/18
**them out [1]** 182/3
**themselves [3]** 37/13 67/17 104/3
**then [145]** 6/19 7/9 7/22 8/3 9/1 9/25 10/21 11/22 12/20 14/19 16/10 18/10 18/18 19/14 19/20 22/25 23/1 24/4 26/11 27/23 27/25 28/16 29/8 29/25 30/2 41/23 46/9 49/3 50/4 50/22 51/6 52/4 52/14 53/16 54/7 57/11 57/16 57/17 60/21 60/22 61/22 71/22 72/23 74/21 82/22 84/5 93/1 102/16 105/1 116/2 116/13 117/5 123/10 123/24 125/8 127/12 128/25 129/2 129/9 129/15 137/5 138/14 142/14 145/19 146/10 158/22 160/14 161/21 162/2 162/22 163/11 171/15 173/1 178/24 182/3 183/15 185/11 186/1 188/1 191/19 191/25 192/19 192/20 192/24 205/2 205/13 210/22 211/24 216/8 216/11 216/12 216/16 216/20 219/17 220/7 220/7 221/2 223/4 224/12 228/1 228/3

**T**

**then... [44]** 229/22
230/7 237/3 237/4
237/14 237/15 238/18
241/25 242/13 242/15
243/20 244/10 244/14
256/1 256/18 256/21
259/1 259/10 260/6
260/9 260/13 261/18
262/7 263/13 281/5
289/17 294/7 294/14
295/1 299/11 308/25
310/6 318/11 318/12
319/23 320/1 320/10
321/6 321/6 336/9
337/1 338/10 339/22
341/21

**then-current [1]**
127/12

**then-leaseholder [1]**
145/19

**there [270]** 5/19 6/9
6/19 7/6 7/9 7/10 8/3
8/18 8/21 9/6 10/17
15/6 16/6 16/23 16/24
19/18 20/9 21/7 21/9
22/15 25/7 26/8 27/10
28/19 28/19 29/22
30/15 30/18 30/24 31/4
31/14 32/18 33/9 33/12
39/9 39/11 40/4 40/7
40/15 41/8 41/10 41/25
44/5 44/11 46/22 47/18
48/18 48/24 49/8 49/10
50/2 50/20 53/11 53/15
54/9 55/8 57/15 59/5
61/9 61/19 61/22 63/25
64/11 67/1 69/1 69/22
70/5 71/18 74/24 77/23
86/22 90/2 90/6 90/15
92/9 93/3 94/21 94/21
97/21 98/25 104/7
106/13 111/1 112/12
112/14 113/7 115/5
117/19 119/18 122/11
123/20 124/5 125/4
126/8 126/9 126/10
126/10 127/15 134/22
136/23 138/15 138/20
138/22 139/6 139/23
141/19 143/23 144/5
145/18 147/21 148/14
153/14 155/14 156/21
157/4 157/17 158/12
160/16 162/2 162/9
162/19 162/20 162/25
163/21 164/23 164/23
172/14 173/18 173/20
178/10 178/13 182/10
183/13 186/23 189/22
190/4 191/9 191/19
194/24 195/1 195/23
195/24 196/1 196/2
196/3 199/22 200/9
200/9 208/2 208/5
208/10 209/7 211/7
215/6 215/7 217/15

217/17 218/1 218/6
219/7 219/12 219/13
219/20 220/15 223/4
224/7 224/16 225/10
225/10 226/10 226/11
226/17 227/3 227/9
228/5 229/14 230/24
231/13 231/17 231/17
231/18 231/19 232/2
232/10 232/12 232/18
233/3 233/16 234/2
234/15 234/19 234/25
242/20 244/10 244/12
246/14 248/4 249/6
250/25 253/17 254/6
257/5 257/15 258/7
258/9 259/4 259/21
259/22 261/12 262/2
264/12 265/5 265/8
265/15 268/4 268/21
268/22 269/2 269/7
275/17 279/13 279/14
279/18 280/2 283/8
287/11 290/4 290/6
299/7 300/1 300/8
300/11 301/11 304/5
304/12 307/4 308/15
309/1 309/6 309/12
309/14 311/12 311/14
312/18 312/18 313/25
316/24 319/4 319/24
320/11 320/20 321/16
321/20 321/20 323/25
324/8 324/12 324/12
327/18 334/18 336/6
338/18 338/24 341/8
341/12 342/7

**there would be [1]**
225/10

**there's [93]** 6/20 9/20
19/1 20/8 20/15 22/25
23/1 28/13 28/21 29/22
31/13 32/22 32/22
33/12 35/11 36/24
36/25 37/21 38/25 40/8
44/7 48/15 48/17 49/12
52/9 52/10 57/9 58/16
66/6 66/15 67/14 69/16
69/24 74/6 82/3 83/7
83/25 88/15 88/20
103/10 104/6 105/1
106/5 129/10 129/20
144/8 146/11 151/13
151/18 151/25 158/8
162/19 162/20 163/3
170/22 186/1 186/4
186/7 191/20 209/22
210/3 211/6 211/16
218/5 234/5 234/21
234/23 239/15 239/18
247/1 265/4 268/3
268/4 268/4 280/17
285/19 290/18 290/19
292/14 297/23 298/17
299/8 299/11 300/7
300/23 309/1 309/20
312/16 332/23 335/22
338/23 342/5 342/6

**thereafter [1]** 318/10
**therefore [3]** 100/2
108/13 154/8
**therein [1]** 195/8
**these [61]** 8/6 12/18
19/22 32/4 32/6 35/24
36/7 38/17 45/15 45/19
47/5 47/6 47/8 47/11
47/23 54/25 55/18
56/14 56/18 56/21 63/2
63/23 65/17 73/14
73/19 73/21 75/9 82/7
84/12 84/23 88/4 88/13
91/16 94/17 98/1 98/7
103/12 110/9 126/11
132/19 134/10 147/9
209/1 220/16 220/22
223/9 238/5 238/12
238/13 238/14 238/20
255/19 257/24 262/15
265/14 273/2 289/8
290/11 296/19 323/7
339/12

**they [254]** 8/18 13/21
19/8 19/8 21/6 24/7
24/11 24/12 24/14
26/17 26/25 27/1 27/2
28/1 32/1 32/3 34/10
35/18 35/23 37/13
37/13 37/16 38/13
38/24 39/3 39/4 44/12
45/19 53/22 53/23
55/10 57/11 57/11
57/16 58/23 58/25 61/6
63/10 64/5 70/9 70/11
70/12 72/19 75/10
75/21 87/4 87/5 89/17
92/7 92/8 92/10 92/12
92/13 92/25 98/3 98/9
105/3 105/25 147/7
147/11 148/5 148/6
149/7 149/13 149/20
151/20 151/23 152/25
152/25 154/14 154/16
154/17 154/17 155/6
156/11 156/11 159/20
160/16 161/13 174/7
174/10 177/9 177/11
177/11 177/13 177/16
178/18 180/5 182/1
183/16 184/2 184/4
184/10 184/10 184/11
192/19 192/19 202/1
202/2 202/3 205/20
206/15 206/16 206/20
206/21 207/21 207/21
208/17 209/3 209/13
211/12 211/15 211/17
211/20 216/5 216/12
218/9 219/18 223/11
223/13 224/6 225/6
226/15 228/19 228/21
229/8 229/21 229/21
229/22 231/22 231/23
238/14 238/15 240/12
242/3 242/4 242/9
242/9 242/10 242/13
247/1 247/11 248/6

249/3 249/17 250/1
250/3 251/22 254/6
255/5 255/15 255/22
256/16 257/8 257/16
258/4 258/14 259/17
259/23 260/6 260/7
260/15 260/18 262/5
262/5 263/11 263/12
263/12 265/7 273/8
273/11 274/2 276/4
276/25 277/6 278/13
278/14 280/16 283/11
284/1 284/5 284/7
284/14 284/14 284/14
286/12 287/15 290/6
291/6 291/21 291/21
291/25 292/10 292/13
292/17 297/3 299/8
299/10 299/19 299/19
301/17 302/10 302/11
302/12 302/13 302/13
302/14 302/15 302/25
303/1 303/1 303/4
303/5 303/7 303/20
303/23 308/11 308/12
311/10 311/12 311/21
311/23 312/2 312/4
312/4 312/5 312/5
312/6 312/6 312/7
312/9 312/19 312/20
312/21 312/21 312/23
312/23 312/25 313/1
313/3 320/7 323/14
323/15 324/2 324/17
324/17 324/19 327/9
328/4 328/7 330/11
335/4 342/4 342/5

**they'd [2]** 89/18 263/16
**they'll [1]** 324/5
**they're [49]** 19/5 19/21
24/10 24/12 24/15
25/25 25/25 26/18
31/10 36/11 39/1 39/3
39/23 49/19 55/19
55/19 63/16 105/3
147/11 166/23 206/14
206/19 207/25 209/20
210/13 218/4 218/13
246/19 249/12 249/13
250/3 257/2 265/6
270/14 270/16 274/22
277/7 289/12 299/8
300/1 300/23 301/2
301/4 301/19 320/8
324/2 324/3 327/7
328/25

**they've [6]** 8/7 125/19
209/24 252/8 280/17
288/1
**thick [1]** 7/15
**thing [7]** 48/2 79/2
143/1 151/17 208/15
263/7 295/4
**things [68]** 20/14 23/7
26/6 33/8 34/6 38/6
43/13 47/8 51/13 53/6
63/13 64/4 67/5 75/9
75/13 83/17 86/17

86/22 87/7 88/3 92/18
93/9 94/17 94/21 94/24
103/12 104/14 105/2
109/19 110/9 125/21
127/21 129/21 133/5
141/24 146/24 160/8
177/9 188/10 189/3
206/16 217/25 225/18
228/21 234/16 238/24
239/3 243/17 249/22
253/22 256/9 258/6
259/21 260/24 263/21
272/25 291/4 293/5
312/9 312/12 318/5
318/6 318/18 319/12
319/22 322/2 322/16
342/15

**think [179]** 6/23 13/19
24/15 36/23 37/3 41/4
45/13 46/17 52/19 61/8
63/3 63/7 63/9 66/5
67/10 67/14 67/18
69/16 69/17 69/22
69/23 70/10 70/10
70/11 71/8 83/19 86/18
92/10 92/22 98/7 99/15
99/24 100/15 104/2
104/5 106/11 106/12
109/13 110/16 112/14
112/19 113/4 115/23
118/11 120/2 125/6
126/8 128/25 129/2
129/5 129/10 129/14
129/16 130/2 131/13
134/9 134/19 135/14
136/17 141/19 143/2
143/13 144/17 146/23
154/3 157/17 157/25
158/19 159/6 159/22
159/25 166/20 166/21
175/24 179/22 184/11
186/23 187/7 190/7
196/12 197/17 197/19
197/19 201/10 202/6
202/25 203/11 203/13
203/22 207/6 207/24
208/10 208/15 211/10
211/14 211/19 217/19
219/13 222/14 223/5
223/20 224/10 225/3
225/4 225/23 226/15
228/8 228/18 235/14
236/13 238/15 240/2
242/16 247/1 247/16
247/17 248/5 249/21
250/20 250/25 251/21
251/22 251/23 252/7
253/3 253/9 253/23
256/1 256/9 258/13
259/1 259/3 265/25
276/3 276/19 278/12
278/13 278/24 279/11
279/11 279/13 280/15
282/23 285/21 286/18
289/12 289/15 289/19
294/24 295/11 299/22
307/4 307/16 309/16
309/20 314/7 318/6

**T**

**think... [22]** 318/14 319/11 325/12 327/2 328/21 331/12 332/11 332/19 333/6 335/3 336/4 338/3 338/13 339/21 339/21 339/25 340/4 340/5 340/10 340/13 341/18 341/21

**thinking [6]** 46/25 47/8 47/11 162/4 177/19 219/12

**third [7]** 2/13 7/9 65/25 147/22 148/14 161/23 208/24

**third-party [2]** 65/25 147/22

**this [468]**

**This is Civil [1]** 5/7

**those [142]** 6/10 6/16 6/23 7/3 7/5 7/12 7/23 14/8 17/16 19/14 23/7 23/14 23/16 24/9 30/17 38/10 38/12 39/2 39/6 39/7 39/25 41/13 41/25 43/12 43/16 43/16 45/16 46/7 46/11 48/25 49/2 49/23 50/4 56/9 59/17 64/4 66/13 67/5 68/3 75/19 75/22 84/5 85/15 87/10 87/10 89/9 91/18 92/18 93/9 93/19 94/24 99/20 104/3 105/2 105/23 106/18 106/22 111/5 111/8 121/22 147/6 155/15 156/23 158/20 159/9 163/1 166/22 171/8 179/24 180/12 186/17 209/7 209/9 209/11 209/12 211/8 215/6 217/12 218/1 219/14 220/12 227/6 229/18 229/22 229/23 229/25 230/3 230/6 230/13 233/25 234/4 239/7 239/24 243/17 244/15 247/10 257/25 259/14 259/23 261/10 263/6 263/23 264/1 264/2 264/10 264/18 265/7 268/2 275/2 278/12 278/15 283/20 286/20 288/21 288/22 288/25 293/1 296/19 299/15 300/4 311/9 312/12 314/1 319/3 319/15 328/18 328/23 329/2 329/13 329/17 329/18 330/5 331/1 331/1 331/3 331/3 331/7 334/5 337/11 338/19 339/3 341/14

**though [9]** 17/6 98/7 100/8 108/15 125/11 146/8 147/17 259/16 262/8

**thought [15]** 26/24

**thousand [1]** 30/24

**three [24]** 10/1 10/7 12/6 19/1 21/9 24/14 24/15 51/22 107/20 123/20 151/11 152/9 190/9 214/11 225/24 232/25 246/23 251/23 283/14 283/22 295/4 340/7 340/18 340/20

**three local [1]** 246/23

**three representatives [1]** 283/22

**three years [2]** 214/11 225/24

**threshold [1]** 244/8

**through [70]** 6/13 6/17 7/2 7/19 7/19 7/20 7/22 8/1 10/10 12/14 12/20 13/1 15/9 18/10 22/4 22/4 23/17 27/12 27/24 27/24 27/25 31/1 31/11 32/1 36/9 36/15 53/14 59/12 62/24 65/18 71/23 74/5 78/12 82/20 82/21 82/21 102/19 104/25 105/1 106/19 106/19 107/4 116/22 119/3 122/18 128/4 131/2 138/13 146/13 147/8 155/13 165/18 170/18 181/18 191/22 216/9 216/14 220/8 223/14 231/24 233/13 244/4 245/20 254/2 258/22 270/20 275/15 292/22 293/16 294/25

**throughout [12]** 89/16 112/14 266/24 267/8 267/13 278/3 291/18 291/18 292/16 293/17 294/20 306/21

**throw [1]** 154/5

**thumbs [3]** 341/19 341/19 342/9

**Thurgood [2]** 214/20 246/24

**Thursday [1]** 173/15

**ticket [4]** 14/1 33/5 33/14 250/2

**ticketed [11]** 32/22 33/25 34/1 34/7 34/19 34/23 51/1 51/3 52/16 89/2 89/3

**ticketing [14]** 23/6 28/1 28/12 28/14 33/2 33/15 33/19 37/22 43/13 50/4 50/24 51/3 303/18 303/21

**tickets [7]** 19/9 29/7 33/6 33/8 33/9 34/2 104/13

**tie [1]** 299/20

**tiles [1]** 280/13

**till [1]** 94/3

**time [160]** 14/16 16/25 20/19 20/20 20/20 22/20 26/22 29/9 30/25 31/3 33/18 38/14 42/24 46/20 46/25 47/2 47/10 48/20 48/21 51/23 55/5 56/14 58/14 64/4 66/1 67/6 71/17 74/17 75/2 79/21 79/23 80/23 81/1 81/22 91/24 93/4 93/24 105/4 105/12 105/19 106/6 106/12 108/14 119/17 119/22 122/12 127/4 129/16 131/15 133/4 134/18 134/19 135/3 135/5 135/10 136/18 137/18 140/14 146/18 148/6 153/15 153/17 155/22 165/5 167/3 169/24 172/24 174/6 174/7 174/9 174/10 181/25 186/12 186/12 186/18 187/9 189/7 189/13 189/16 189/19 189/22 190/4 190/5 195/15 195/16 195/25 197/7 197/13 198/6 198/6 203/22 206/23 207/4 208/1 208/5 215/4 215/15 219/18 221/4 222/17 222/24 224/11 225/23 225/25 226/12 226/25 227/2 227/7 228/2 228/19 228/23 229/9 231/3 231/12 231/13 231/23 233/12 233/23 237/25 241/23 242/5 242/17 243/10 244/13 251/22 252/19 253/18 254/20 254/21 256/12 258/14 259/20 264/6 264/7 264/10 264/12 264/20 265/5 265/12 269/2 269/7 281/23 282/17 283/8 286/14 288/15 306/22 311/13 312/10 318/3 320/19 321/20 324/12 324/13 325/16 337/5 341/17

**timelines [1]** 301/9

**timely [1]** 333/7

**times [12]** 30/17 51/22 67/16 118/12 141/16 180/4 237/6 250/15 251/23 287/24 308/1 321/5

**timing [7]** 130/12 187/2 187/21 189/6 189/8 288/8 339/24

**title [8]** 11/8 168/5 168/8 210/23 211/2 293/21 310/15 332/2

**titled [1]** 343/4

**today [61]** 6/2 17/12 17/21 18/20 33/7 45/2

**45/3** 50/2 51/4 52/4 52/10 52/18 53/21 54/2 62/23 65/14 66/8 70/4 88/15 90/1 94/3 94/19 99/12 99/16 100/5 100/10 102/20 103/15 109/19 130/25 136/4 140/18 140/21 157/20 158/4 160/9 208/6 213/12 226/11 246/16 247/11 248/21 268/3 271/11 275/4 275/19 276/4 277/2 277/4 277/7 278/14 278/18 279/15 279/19 280/19 289/25 292/22 293/2 307/13 327/8 341/2

**today's [2]** 45/8 340/17

**together [33]** 6/5 38/18 38/18 44/11 44/13 49/20 54/16 61/15 63/2 103/13 105/3 110/10 127/7 134/10 156/23 157/8 158/24 160/2 187/12 220/1 220/23 221/5 223/20 228/16 238/13 238/14 238/15 256/7 256/13 257/16 262/12 300/12 317/12

**told [12]** 103/19 110/18 111/3 113/18 165/7 174/18 177/9 251/7 251/10 262/5 318/4 334/9

**tomorrow [2]** 131/1 295/19

**tonight [1]** 295/21

**too [7]** 188/14 194/25 195/18 225/9 305/20 319/1 330/10

**took [16]** 69/11 92/16 93/1 115/21 126/22 139/10 192/18 207/11 253/19 265/7 275/24 280/7 284/16 289/8 290/20 306/8

**top [9]** 57/10 128/6 133/18 294/19 316/16 317/2 319/20 320/10 320/13

**topic [2]** 101/8 109/15

**topics [8]** 98/22 98/24 99/1 99/4 99/7 99/10 99/13 99/16

**topnotch [1]** 323/3

**topside [1]** 258/22

**TORRES [1]** 2/3

**total [6]** 16/7 16/20 17/19 130/21 130/22 267/3

**totally [1]** 43/10

**touch [2]** 49/9 50/25

**touched [1]** 67/23

**touchscreen [1]** 27/14

**tourism [1]** 272/21 275/6

**tourism-related [2]** 272/21 275/6

**towards [5]** 24/5 41/24 226/19 261/18 319/22

**tower [1]** 316/15

**towers [5]** 21/8 24/7 24/7 24/9 55/17

**Towson [1]** 1/14

**track [27]** 13/15 26/2 104/21 105/6 105/10 105/11 108/3 134/3 219/1 219/13 219/17 223/2 224/9 224/19 224/20 225/13 235/5 235/8 258/22 264/2 279/9 299/17 300/11 301/6 301/11 334/1 335/2

**tracker [3]** 232/9 232/17 233/8

**tracking [4]** 228/22 229/14 230/22 230/23

**tracks [29]** 19/15 19/18 19/23 19/25 20/16 23/14 23/16 24/5 25/23 26/4 28/17 29/3 32/1 38/5 43/1 58/11 58/18 58/18 58/23 59/2 59/9 59/12 59/13 61/10 61/24 66/7 108/1 226/19 249/14

**traction [1]** 74/19

**traditional [1]** 237/3

**train [47]** 12/9 14/10 14/13 15/21 17/3 17/12 18/10 18/15 18/16 18/24 20/10 20/14 24/24 26/7 27/7 29/8 29/10 29/18 30/9 30/10 30/19 36/11 36/23 37/4 39/1 39/8 45/11 45/11 47/17 48/5 49/18 66/6 68/16 68/23 69/3 94/17 118/20 132/25 206/7 206/8 206/17 226/21 247/9 275/22 290/7 307/18 326/9

**trains [36]** 12/18 12/18 12/19 13/2 15/14 17/12 17/13 18/11 19/17 19/17 19/22 23/8 23/18 28/25 29/5 29/24 30/25 34/11 35/17 37/15 37/16 38/2 38/4 38/11 38/13 38/24 42/14 58/20 66/12 66/14 66/14 76/10 76/14 95/3 225/6 253/5

**trajectory [1]** 13/10

**transaction [2]** 92/14 190/17

**transactions [2]** 120/11 255/13

**transcript [8]** 1/9 2/24 96/19 97/24 340/6 340/8 340/21 343/3

**transcription [2]** 2/25 97/3

**transcripts [2]** 208/11 340/5

**T**

**transfer [7]** 158/8
158/17 161/1 195/8
198/20 198/25 211/3
**transferred [3]** 208/16
211/2 294/8
**transit [1]** 20/5
**transition [3]** 161/9
161/22 163/4
**transpire [1]** 190/6
**transpired [1]** 190/5
**transportation [64]**
13/23 15/25 20/6 20/13
34/15 36/9 36/12 36/14
39/22 47/20 47/22
51/12 53/1 53/3 57/10
60/1 63/11 66/4 67/13
67/15 68/11 68/14
68/18 69/20 77/4 77/5
83/5 83/12 83/20 84/1
84/4 84/19 85/8 116/2
163/7 196/8 199/18
201/20 201/24 202/8
202/12 203/13 204/9
205/17 207/16 214/2
214/2 214/12 214/14
214/18 215/1 215/3
215/19 216/5 216/16
216/22 217/9 237/7
246/6 246/8 326/7
326/15 329/3 329/18
**Transportation's [1]**
119/13
**transportation-related
[2]** 329/3 329/18
**travel [3]** 30/17 74/25
247/8
**travelers [5]** 20/24
44/22 247/8 251/23
251/24
**traveling [7]** 44/4
44/11 44/16 65/9 67/22
68/15 89/6
**travels [1]** 342/21
**treasurer [3]** 83/13
215/15 245/20
**tremendous [1]** 13/10
**tremendously [1]**
225/7
**trend [1]** 30/7
**trial [3]** 130/25 156/7
339/11
**tried [5]** 46/4 141/17
178/22 239/2 287/6
**trip [1]** 21/6
**trips [1]** 39/3
**trophy [3]** 294/18
294/22 307/17
**trouble [2]** 116/25
175/18
**true [8]** 110/11 144/6
192/13 192/13 249/8
330/3 334/13 334/19
**trumps [1]** 204/1
**trust [1]** 21/6
**trustee [3]** 269/18
270/14 270/16
**truthful [3]** 248/20

**try [13]** 38/16 61/17
108/7 121/16 122/17
131/15 131/24 172/12
256/7 286/22 295/17
303/14 339/7
**trying [25]** 43/19 62/5
62/7 69/19 87/7 93/12
97/21 103/19 107/14
107/25 115/15 117/25
126/15 134/17 154/9
160/2 160/10 173/5
189/5 217/21 230/9
240/11 300/23 325/4
337/18
**tuckets [1]** 33/9
**Tuesday [4]** 173/6
173/11 173/15 188/16
58/19
**tunnel [3]** 23/17 26/15
58/19
**tunnels [1]** 264/8
**turn [29]** 24/16 39/14
56/2 56/17 62/2 66/20
70/16 71/9 78/24 79/18
81/9 81/14 84/13 85/4
90/8 95/4 117/8 128/6
155/17 171/10 172/20
174/20 181/20 192/23
194/25 258/17 258/19
306/11 311/10
**turned [1]** 184/17
**turning [2]** 37/18
321/23
**twice [1]** 251/24
**two [42]** 7/1 10/5 10/12
12/24 17/14 17/14
17/16 20/24 26/22
29/22 43/22 51/22
53/11 54/11 58/3 72/19
90/2 100/13 130/19
160/11 169/22 186/17
189/16 197/12 214/13
219/15 219/15 225/24
240/14 247/1 251/3
268/21 282/22 283/2
283/14 284/20 289/19
295/3 295/14 308/24
309/9 342/19
**two commuter [1]**
26/22
**two levels [1]** 53/11
**type [10]** 48/2 48/4
213/21 223/10 237/21
263/5 263/8 273/9
275/20 293/12
**types [8]** 42/14 54/24
211/8 251/2 267/16
274/24 317/16 317/18
**typically [6]** 27/9 27/18
50/4 135/6 233/21
314/8
**Tysons [5]** 294/19
316/13 316/24 317/8
326/2
**Tysons Corner [2]**
316/13 317/8

**U**

**U.S [11]** 15/25 57/10
57/13 131/8 155/4
209/2 216/4 269/20
269/20 316/16 317/2
227/9
**U.S. [3]** 13/21 77/2
227/9
**U.S. Government [1]**
13/21
**U.S.
Government/USRC [1]**
227/9
**U.S. Senate [1]** 77/2
**U.S.A [1]** 186/14
**U.S.C [4]** 73/7 115/22
116/13 199/6
**UCI [3]** 204/16 204/25
205/1
**Uh [3]** 90/18 101/21
235/6
**Uh-huh [3]** 90/18
101/21 235/6
**ultimate [7]** 80/13
105/8 150/10 160/12
221/13 223/3 226/10
**ultimately [13]** 14/20
56/23 59/10 71/23
94/10 100/4 151/1
183/22 220/8 223/11
242/21 281/2 331/18
**unable [15]** 46/9 61/24
91/23 101/7 109/19
137/8 141/18 155/9
155/10 155/10 155/11
164/9 166/18 287/7
299/8
**unacceptable [2]**
311/20 311/21
**unanimous [5]** 81/25
82/10 82/16 82/16
82/18
**unaware [1]** 143/1
**unclear [2]** 92/22 134/1
**under [48]** 10/24 23/17
53/21 58/19 87/6 87/11
88/11 88/21 121/25
123/3 134/20 137/2
146/3 147/4 162/8
167/15 193/21 199/4
201/9 203/4 203/5
211/21 212/15 239/20
260/3 260/9 266/9
289/13 292/7 292/9
302/10 302/22 303/8
305/1 305/4 305/7
305/8 305/10 305/10
305/12 305/13 312/20
314/14 318/8 318/13
321/12 321/14 322/11
**under-monitored [1]**
53/21
**under-protected [1]**
88/21
**underdeveloped [1]**
86/23
**undergrad [1]** 317/22
**underground [1]** 26/15
**underleased [1]** 88/15

**undermines [1]** 44/19
**underneath [4]** 25/24
60/11 191/19 315/19
**undersigned [1]** 36/23
**undersized [1]** 35/14
**understand [36]** 36/10
44/1 71/19 75/19
103/19 108/20 148/20
152/2 152/22 154/20
155/19 155/19 157/12
157/21 157/24 158/3
161/14 165/9 166/25
169/25 186/15 192/25
202/2 202/4 202/25
230/25 231/22 233/7
243/18 243/19 271/18
272/9 273/5 301/19
329/20 341/23
**understanding [17]**
71/22 141/20 170/23
170/25 178/1 178/4
178/8 178/10 178/11
184/2 220/15 222/11
222/12 288/15 296/25
301/8 301/9
**understood [10]** 10/5
91/3 118/14 123/16
146/18 146/24 150/12
167/1 170/2 209/7
**undertake [4]** 40/23
61/18 63/19 107/12
**undertaken [1]** 160/6
**undertaking [1]** 108/20
**undertook [1]** 108/16
**underutilized [1]** 52/19
**underwrite [1]** 270/19
**underwritten [1]**
282/15
**undo [1]** 278/15
**undone [4]** 129/15
129/16 129/17 278/13
**unfamiliar [1]** 334/14
**Unfortunately [1]**
238/16
**unhappy [2]** 249/5
250/11
**uniformed [1]** 88/24
**unilateral [2]** 141/19
199/13
**unilaterally [2]** 200/5
239/10
**unimproved [1]** 139/22
**union [132]** 2/2 5/12
14/11 14/15 14/21
16/13 16/14 16/21 19/5
21/8 21/14 23/16 23/18
23/22 27/6 34/20 41/14
41/18 45/17 46/24
55/24 57/7 57/12 67/13
70/9 71/17 84/18 95/6
106/2 107/23 108/9
108/23 109/4 109/7
112/7 112/9 113/24
114/10 114/24 116/19
118/25 120/10 125/11
134/3 139/5 143/10
150/19 151/24 156/18
156/20 162/6 164/4

164/12 164/20 165/2
169/22 182/16 182/17
187/14 190/16 193/2
194/10 196/9 201/18
203/12 204/11 205/23
209/23 214/8 216/1
216/6 216/9 216/10
220/5 221/10 224/10
246/5 246/9 246/22
247/4 247/14 247/18
248/9 248/16 249/5
250/17 251/18 251/19
252/6 252/25 256/24
267/23 268/14 269/14
269/23 271/6 271/8
271/13 271/24 272/13
272/14 272/17 273/20
275/10 279/16 291/10
291/20 293/19 294/5
294/11 297/2 302/17
303/24 307/15 312/2
315/11 316/8 317/9
317/10 318/3 318/4
318/5 319/15 320/14
323/7 323/11 325/12
325/15 325/16 327/17
330/10 332/3
**Union Station [117]**
5/12 14/11 14/15 14/21
16/13 16/14 16/21 19/5
21/8 23/18 23/22 27/6
34/20 41/14 41/18
45/17 55/24 57/7 57/12
67/13 70/9 71/17 84/18
95/6 108/9 109/4 109/7
112/7 113/24 114/24
116/19 118/25 120/10
125/11 134/3 139/5
143/10 150/19 151/24
156/18 156/20 162/6
164/4 164/12 164/20
165/2 169/22 182/16
182/17 187/14 190/16
193/2 194/10 196/9
201/18 203/12 204/11
209/23 214/8 216/1
216/6 216/9 216/10
220/5 221/10 224/10
246/5 246/9 246/22
247/4 247/14 247/18
248/9 249/5 250/17
251/18 251/19 252/6
252/25 267/23 269/14
269/23 271/6 271/8
271/13 271/24 272/13
272/14 272/17 273/20
275/10 279/16 291/10
291/20 294/5 294/11
297/2 302/17 303/24
312/2 315/11 316/8
317/9 317/10 318/3
318/4 318/5 319/15
320/14 323/7 323/11
325/12 325/15 325/16
327/17 330/10 332/3
**unique [4]** 119/17
120/1 120/11 120/20
**unitary [1]** 108/16

**U**

**UNITED [23]** 1/1 1/10 77/1 196/7 199/9 199/10 199/14 199/23 200/2 200/14 203/17 204/10 205/18 205/21 205/23 206/12 209/17 266/25 267/13 269/16 294/20 307/18 307/19

**United States [16]** 196/7 199/9 199/10 199/14 199/23 200/2 204/10 205/18 205/21 209/17 266/25 267/13 269/16 294/20 307/18 307/19

**United States of [1]** 206/12

**University [1]** 318/1

**unlawful [2]** 311/20 311/21

**unleased [2]** 142/17 165/6

**unless [3]** 113/3 218/18 236/9

**unnecessary [1]** 46/22

**unsuccessful [1]** 123/24

**until [12]** 109/2 109/10 135/19 136/6 136/8 159/23 160/16 187/11 225/22 266/3 288/13 306/11

**unused [2]** 51/5 89/10

**unwilling [1]** 287/15

**up [116]** 8/13 8/24 10/22 11/25 12/15 20/23 22/3 22/5 22/13 28/14 31/5 33/9 40/15 41/24 48/6 49/16 50/19 53/5 53/9 56/3 57/5 57/13 58/22 58/24 59/11 62/5 62/10 64/20 66/7 70/9 71/20 73/1 73/3 73/24 74/7 76/2 80/16 85/5 89/21 90/15 102/19 103/20 108/19 111/14 117/6 117/12 117/12 123/18 124/2 124/4 125/21 128/3 132/3 136/12 137/13 140/6 140/7 143/22 149/14 151/1 152/9 153/1 153/2 153/5 153/6 153/7 153/19 153/19 163/17 165/2 166/22 169/1 172/12 173/5 173/8 173/18 174/22 175/17 175/25 181/6 181/21 190/10 193/18 194/11 194/25 205/22 211/8 212/12 216/24 217/8 221/1 223/1 230/16 233/8 248/23 252/10 256/9 257/25 258/18 265/7 271/25 272/2 276/2 279/10 280/19 298/11

299/22 301/18 314/3 318/11 318/19 320/12 334/10 336/17 341/19 342/9

**upcoming [1]** 175/6

**update [5]** 79/12 86/10 86/25 111/16 225/5

**updated [4]** 86/14 87/22 115/7 239/3

**updating [1]** 87/3

**upgrade [11]** 34/14 53/19 58/9 88/20 139/13 222/17 224/14 225/5 252/2 253/25 253/25

**upgraded [1]** 139/20

**upgrades [1]** 264/9

**upgrading [2]** 222/19 249/21

**upon [24]** 7/23 95/3 140/1 147/15 153/3 154/15 154/16 156/11 207/10 210/22 210/23 211/3 226/9 236/16 236/20 239/24 250/13 251/13 251/20 262/22 276/19 297/25 334/17 339/22

**urgency [3]** 187/2 187/21 189/22

**us [87]** 9/14 13/12 13/23 13/25 17/13 26/21 30/8 34/15 40/14 43/13 44/2 45/14 46/1 49/17 52/15 53/18 54/5 55/13 57/2 63/18 64/16 64/17 64/18 66/10 66/15 66/18 66/24 67/2 68/14 75/1 75/11 75/13 76/4 83/20 84/6 84/9 87/8 87/9 87/13 88/12 92/9 93/10 94/14 94/24 103/20 122/12 126/9 126/11 141/8 151/1 158/3 161/25 174/7 174/10 174/14 174/18 175/9 176/14 178/23 181/8 182/11 187/15 188/8 188/11 210/8 228/20 237/20 240/3 242/18 248/13 250/19 251/8 251/15 252/23 294/6 296/18 309/21 314/17 318/5 319/1 339/6 339/18 340/16 340/17 341/9 342/4 342/8

**USDOT [5]** 216/25 218/19 220/22 221/2 260/8

**use [54]** 14/3 14/8 17/15 34/3 43/18 45/12 46/18 47/6 48/4 48/19 48/25 49/2 52/21 54/13 61/20 63/20 66/12 88/16 112/17 112/23 131/4 138/8 140/2 142/14 142/17 142/18

162/5 164/19 165/14 216/13 230/25 248/7 267/20 267/25 273/3 273/20 274/11 275/10 276/6 277/4 277/7 277/10 277/11 277/13 289/17 294/22 296/20 317/15 326/13 329/17 329/23 330/1 330/4 331/4

**used [23]** 22/19 26/19 36/6 50/22 55/3 70/17 71/10 71/13 76/22 100/1 111/16 162/20 162/22 162/22 165/2 165/4 194/21 241/12 272/23 280/16 287/14 289/17 297/23

**useful [1]** 34/7

**users [3]** 272/21 273/2 275/20

**uses [13]** 48/11 50/15 52/20 249/5 268/5 272/20 274/6 274/12 274/14 274/24 275/6 275/22 277/1

**usher [1]** 33/13

**USI [253]** 25/1 25/6 25/7 25/12 45/18 46/14 57/16 57/17 59/18 60/23 61/20 62/17 62/24 63/5 63/9 63/14 63/23 64/2 64/3 64/4 64/13 64/15 64/18 64/19 65/10 65/11 65/16 69/8 69/11 75/4 75/16 76/20 90/11 90/20 91/5 91/12 91/25 92/6 93/7 93/13 105/18 105/20 105/24 106/20 107/18 109/6 110/4 111/9 120/8 122/25 123/10 126/9 127/6 128/9 128/19 129/6 129/8 129/15 129/22 134/24 136/10 136/19 137/1 137/7 137/24 138/3 138/5 138/16 138/24 139/18 140/1 140/12 141/10 141/17 142/5 142/10 142/17 142/24 143/2 144/19 146/11 157/11 157/18 157/25 161/1 162/14 166/9 169/12 170/2 170/10 171/8 171/14 173/18 173/23 174/2 174/10 174/12 174/14 174/16 174/18 175/3 176/2 176/14 177/8 177/22 178/8 178/10 178/12 178/17 178/21 178/22 180/5 181/11 184/14 185/11 187/10 188/21 188/22 191/6 191/10 191/23 193/20 194/10 195/6 195/20

197/2 199/20 200/3 200/13 200/16 202/15 203/25 204/14 204/21 204/25 205/4 206/1 206/16 208/16 210/2 210/10 216/10 216/15 217/2 217/3 218/8 219/22 219/25 220/7 221/9 221/15 221/19 222/2 227/14 228/6 228/14 231/14 231/20 232/19 232/24 233/1 238/11 242/14 243/4 243/21 244/6 253/17 253/22 256/1 256/1 256/14 256/15 256/15 256/18 256/21 257/4 257/13 259/2 259/4 259/12 259/18 260/3 260/4 260/10 260/14 260/16 260/17 260/19 260/20 260/25 260/25 261/25 262/4 264/25 265/2 269/8 271/5 271/7 271/13 271/18 272/10 272/18 273/7 274/16 278/18 278/22 279/16 292/8 292/19 293/16 298/25 299/2 299/4 299/7 299/9 299/20 300/14 301/12 301/21 302/22 305/8 305/10 305/12 307/15 308/8 309/7 309/10 310/16 310/17 312/2 315/20 320/21 321/12 321/13 321/17 321/22 322/11 322/12 325/17 330/4 330/6 330/9 332/11 332/16 333/4 333/7 334/1 334/14 334/25 336/13

**USI was [1]** 256/15

**USI's [25]** 61/5 120/10 145/15 169/21 177/5 186/15 189/15 193/14 193/14 199/10 203/18 205/19 206/1 206/4 220/2 256/4 256/25 258/9 260/3 260/9 260/13 261/17 305/12 306/14 306/24

**USI/USRC [1]** 271/13

**using [8]** 27/4 83/21 89/15 141/11 142/11 165/1 252/18 275/2

**USR [1]** 136/19

**USRC [192]** 52/24 57/23 57/25 59/18 60/24 61/9 61/12 62/17 62/21 62/24 63/3 63/4 64/8 64/9 64/11 64/13 64/15 64/19 70/6 86/3 86/18 86/21 86/25 87/2 87/12 90/6 107/17 108/4 119/13 126/4 126/10 126/13 126/19 126/7 134/3 134/7

134/10 134/25 136/14 137/8 144/2 144/5 144/5 144/6 144/9 144/21 145/1 145/14 145/16 145/18 146/4 146/9 147/3 147/6 147/7 147/8 147/9 147/11 147/12 147/12 158/14 158/23 159/2 159/17 159/24 159/25 193/12 193/14 193/17 193/19 193/21 193/24 194/9 195/10 195/18 195/20 196/2 196/5 196/8 199/18 199/21 199/23 200/11 200/15 202/4 202/13 202/14 202/25 204/13 205/2 205/11 205/13 205/17 205/18 205/21 206/5 206/19 207/16 209/2 209/2 209/17 215/5 215/11 215/17 215/18 216/17 216/19 216/20 217/3 217/9 217/16 218/8 219/7 219/10 220/2 220/7 220/14 221/2 221/4 221/4 221/14 221/18 221/20 222/2 223/17 224/4 224/16 227/9 228/1 228/6 228/12 229/20 230/5 231/3 237/18 238/8 239/9 241/22 241/25 242/14 242/23 243/4 243/8 243/12 243/19 243/24 245/11 245/23 245/25 248/12 248/19 250/16 251/18 253/12 253/17 254/9 254/17 254/22 255/14 255/15 255/19 256/1 256/21 256/25 257/4 257/12 260/3 260/5 260/8 260/24 260/25 261/1 263/15 264/24 265/2 271/13 271/19 279/3 281/4 281/7 292/1 298/15 305/5 305/8 305/9 320/16 320/21 322/1 322/11 322/12 322/16 336/21

**USRC's [8]** 126/25 145/4 196/11 197/3 206/18 216/21 239/6 256/5

**USRC/USI [3]** 222/2 228/6 243/4

**USSM [5]** 165/25 308/6 310/3 310/10 310/22

**USSM's [2]** 310/14 310/15

**usual [1]** 341/3

**usually [4]** 19/5 215/19 233/21 238/23

**usurp [2]** 206/20 206/21

**usurpation [1]** 206/11

**U**

**USV [7]** 86/4 204/13 204/14 204/14 205/4 209/2 209/3
**USV's [1]** 208/16
**utilities [4]** 49/3 61/22 90/3 129/9
**utility [4]** 132/8 134/4 134/7 136/14
**utilize [4]** 45/10 58/1 125/23 233/8
**utilized [2]** 125/5 297/7

**V**

**vacancy [2]** 162/13 162/20
**vacant [1]** 48/18
**vacations [1]** 258/6
**valid [2]** 187/11 202/15
**validity [1]** 289/14
**Valley [1]** 1/13
**valuable [1]** 55/11
**valuation [23]** 147/25 148/2 148/14 148/18 148/21 150/8 151/17 151/18 153/2 153/2 155/15 155/18 170/17 175/4 177/7 177/13 184/20 188/24 276/15 283/1 283/2 286/1 297/6
**valuations [11]** 150/19 150/22 150/25 151/1 151/24 152/9 153/1 155/16 156/7 286/13 286/20
**value [21]** 14/4 54/20 91/1 91/1 91/3 98/3 121/8 122/1 166/15 166/15 166/16 171/5 267/3 267/3 282/16 284/8 284/12 307/10 312/20 313/5 313/8
**valued [2]** 147/22 282/18
**values [2]** 122/5 155/21
**variety [22]** 20/22 26/6 34/17 63/25 134/22 144/18 156/21 164/22 166/12 220/23 267/25 268/5 272/23 275/6 287/25 289/2 290/9 291/16 292/16 298/5 304/14 312/9
**various [21]** 21/5 38/23 41/5 48/11 49/23 52/19 63/8 64/20 71/21 84/23 103/9 103/18 107/4 109/21 126/8 135/15 151/10 157/8 240/9 251/14 299/6
**vehicle [2]** 269/25 270/2
**vehicles [1]** 26/6
**vendors [2]** 158/1 216/13
**Venture [1]** 194/10

**ventures [2]** 268/11 290/8
**venues [1]** 326/14
**veracity [1]** 133/2
**verdict [1]** 206/22
**verified [1]** 132/19
**verify [2]** 241/7 338/11
**version [5]** 115/8 189/24 225/11 230/22 258/17
**versus [1]** 5/8
**vertical [2]** 26/1 68/24
**very [77]** 5/20 13/21 16/5 17/1 20/18 22/22 30/20 33/18 35/13 35/13 35/21 36/23 37/20 43/11 46/8 48/10 51/5 51/25 52/23 55/16 57/10 63/3 63/4 66/8 66/18 74/5 75/12 87/2 88/14 95/17 97/23 97/23 139/23 146/19 146/19 167/3 172/19 187/12 187/13 187/15 187/16 188/15 197/7 208/15 216/2 216/19 218/6 220/19 222/3 225/5 240/11 242/3 247/1 247/17 248/5 250/1 251/21 252/16 253/16 255/23 258/8 262/22 265/11 280/14 282/15 292/9 300/6 300/6 313/13 316/2 316/5 325/5 325/5 337/4 341/2 341/3 342/21
**vests [1]** 210/23
**vice [6]** 57/14 57/14 83/12 91/6 168/9 168/14
**video [1]** 88/22
**view [16]** 15/7 33/16 34/23 45/4 53/22 56/9 70/11 86/8 88/21 92/7 100/2 158/2 178/16 178/18 205/13 322/2
**views [1]** 47/6
**Virginia [2]** 12/20 17/18
**virtual [1]** 179/19
**visibility [1]** 158/5
**vision [3]** 57/3 102/17 102/18
**visitors [1]** 51/9
**voice [1]** 70/5
**volume [3]** 30/10 30/10 54/12
**volumes [2]** 17/12 182/10
**voluntarily [1]** 193/20
**vote [8]** 79/23 80/25 81/5 81/22 81/24 82/9 83/5 255/2
**voted [1]** 201/20
**VRE [5]** 17/17 26/17 52/10 52/11 66/15
**vs [1]** 1/5

**W**

**wait [11]** 19/8 34/10 51/16 89/6 94/7 94/8 95/3 142/1 197/2 237/14 342/24
**waited [1]** 23/7
**waiting [33]** 23/6 24/23 32/17 32/18 32/22 33/25 34/1 34/1 34/7 34/19 34/23 51/1 51/4 52/15 52/17 62/12 68/25 88/2 89/2 89/4 125/22 141/25 225/11 226/20 230/8 236/20 250/4 254/7 259/18 274/23 277/14 291/1 324/15
**waived [1]** 211/22
**Wakefield [1]** 184/22
**walk [3]** 18/10 22/3 292/22
**walkways [2]** 25/25 53/14
**wall [1]** 280/12
**want [57]** 15/20 15/21 20/23 24/16 24/17 29/12 33/19 42/9 47/3 52/9 67/3 70/1 70/7 70/13 70/16 70/21 74/2 112/22 115/21 122/10 122/13 124/17 125/22 128/16 132/6 142/3 142/8 154/22 155/20 157/23 159/20 174/20 187/8 189/11 191/15 197/16 198/16 206/15 206/16 214/22 217/18 247/16 248/7 249/4 251/2 259/6 263/22 274/2 277/12 283/5 290/25 312/21 318/18 319/4 339/22 340/18 341/21
**wanted [30]** 6/6 55/10 57/22 63/15 93/13 98/5 98/17 124/23 125/7 141/24 161/10 173/3 176/8 178/2 187/18 225/5 256/3 263/12 265/24 266/1 288/14 290/22 291/1 291/5 298/12 303/20 312/1 312/4 338/19 339/3
**wanting [1]** 142/23
**wants [7]** 35/12 142/18 199/12 217/14 290/13 321/18 329/19
**was [659]**
**Washington [69]** 1/5 2/18 2/23 5/12 11/13 12/11 12/14 14/11 14/15 14/21 15/16 16/21 17/10 19/1 19/4 35/25 41/14 41/17 46/24 55/24 57/7 66/6 71/16 84/18 95/6 106/2 107/23 108/9 108/23

109/4 109/17 112/7 112/9 120/9 125/10 134/2 143/10 151/24 156/18 162/5 164/4 164/12 164/20 165/2 168/11 182/17 187/14 190/16 201/17 214/9 216/1 220/5 221/10 224/10 267/14 267/22 269/14 269/23 271/5 273/20 275/10 279/16 291/20 294/10 294/18
**Washington's [1]** 36/13
**wasn't [17]** 109/2 122/25 158/25 166/10 196/3 196/3 201/2 201/13 205/1 211/16 241/7 254/3 256/11 264/5 285/24 290/17 328/5
**waste [1]** 155/22
**wasting [1]** 312/11
**watch [1]** 70/22
**way [45]** 12/21 19/10 21/3 27/13 27/23 27/25 29/1 29/7 36/6 41/1 53/25 62/9 66/15 67/11 83/19 89/20 106/14 117/6 125/24 136/3 146/12 155/9 182/20 195/4 196/2 204/4 204/6 204/19 211/16 220/21 224/18 237/3 241/7 243/11 243/18 243/19 255/20 270/20 274/16 276/9 312/16 314/3 321/23 338/13 342/15
**way-finding [1]** 36/6
**wayfinding [5]** 36/24 221/6 262/23 262/25 263/11
**ways [5]** 64/20 105/9
**we [754]**
**we believe [2]** 86/17 166/16
**We can [1]** 140/6
**we will [3]** 87/17 186/13 188/2
**we would [1]** 76/12
**we'd [9]** 9/1 51/6 52/1 63/1 63/1 86/24 90/5 137/7 228/10
**we'll [24]** 6/16 7/23 10/9 10/9 43/22 70/23 87/6 130/7 130/23 131/14 158/22 183/22 188/9 211/24 211/25 266/6 295/16 295/17 315/14 321/7 339/8 339/18 340/23 342/18
**we're [76]** 5/24 9/25 12/3 12/4 13/7 13/15 13/20 17/9 18/1 20/12 30/8 32/10 42/8 43/18 43/19 43/25 45/22 46/21 48/1 52/23 62/24

64/15 66/8 66/13 68/10 68/12 68/14 68/15 70/10 77/11 93/12 94/8 94/25 105/21 108/15 112/16 120/24 125/11 127/24 130/15 131/8 134/19 135/15 135/18 136/3 139/21 141/17 143/22 152/22 156/24 157/19 159/13 160/1 160/9 160/16 163/14 169/7 171/7 173/4 186/14 188/19 194/15 198/15 222/20 238/6 269/20 269/20 270/1 270/21 270/21 283/1 283/3 294/15 300/24 318/23 323/3
**we've [82]** 8/9 10/1 13/9 14/2 14/4 14/8 15/10 15/14 18/18 24/7 28/12 28/13 29/20 30/14 31/17 37/3 39/25 40/18 40/18 43/20 49/3 51/15 57/18 61/24 64/25 71/17 74/17 76/8 94/19 102/24 103/16 107/3 109/19 132/7 134/16 134/17 135/11 135/12 137/9 138/11 138/23 140/7 141/19 143/2 160/15 165/5 194/14 207/2 207/4 271/11 278/6 278/24 279/5 279/11 287/22 287/25 292/12 292/12 292/15 292/20 292/20 292/21 293/3 293/4 298/5 298/19 298/21 300/3 300/5 303/25 304/4 304/4 304/5 304/6 304/13 304/19 305/14 308/3 323/20 341/4 341/5 341/7
**wearing [4]** 193/17 193/19 195/18 195/19
**weather [1]** 49/19
**website [2]** 315/25 319/18
**weddings [1]** 272/25
**Wednesday [1]** 173/15
**week [20]** 51/23 94/1 148/6 153/12 172/22 173/6 191/8 191/10 192/10 229/20 231/9 231/9 282/22 298/11 318/9 320/8 320/11 321/6 327/8 340/6
**week's [1]** 342/13
**weekends [1]** 304/11
**weekly [8]** 228/14 228/21 239/11 240/4 240/7 258/2 279/3 320/18
**weeks [11]** 258/7 258/9 283/2 283/14 283/15 284/20 298/11 340/7 340/18 340/20

**W**

**weeks... [1]** 342/19
**welcome [7]** 11/1 45/6
131/22 167/17 167/23
212/17 266/11
**welfare [1]** 38/25
**well [193]** 9/8 9/14
10/2 10/17 10/21 13/19
13/25 14/14 15/20 17/9
20/3 22/19 25/11 25/25
28/25 30/8 30/20 31/17
32/10 33/5 34/9 38/1
38/9 41/22 42/4 43/18
44/9 45/1 45/19 46/8
47/3 52/6 55/9 57/9
57/22 60/9 60/22 63/22
65/13 66/5 66/24 69/13
76/1 77/14 79/11 87/2
87/23 89/25 91/23
92/10 92/18 92/23 93/3
98/15 99/7 99/15 99/24
102/24 103/16 104/9
105/19 106/11 107/2
107/25 112/14 115/23
118/11 119/21 120/23
122/23 123/19 124/16
125/6 125/19 127/2
127/19 129/14 129/19
132/19 133/10 134/22
136/5 137/18 138/2
139/7 139/20 140/18
141/16 142/7 146/18
147/7 148/25 149/4
150/15 151/2 153/20
155/14 156/21 157/7
159/22 160/8 163/3
166/21 168/17 173/2
176/12 177/22 178/3
178/10 178/20 181/16
182/15 189/15 189/25
191/13 196/11 197/13
201/1 202/21 205/22
206/18 206/23 207/1
207/6 207/23 208/19
215/8 218/16 220/6
220/19 221/12 222/14
222/20 223/11 228/14
230/5 230/7 235/3
235/5 237/6 237/6
238/14 238/15 240/1
241/8 242/3 242/4
243/24 244/1 244/11
245/21 247/18 249/16
249/23 249/24 252/21
256/7 257/2 260/6
262/20 263/2 268/9
273/12 274/20 274/20
276/18 278/7 279/8
287/5 291/22 292/16
300/4 315/22 318/7
320/24 321/5 321/7
322/10 326/2 329/6
330/4 335/3 336/9
337/1 337/9 337/9
339/8 339/20 340/13
341/1
**well-established [1]**

92/23
**well-known [1]** 242/3
**well-sized [1]** 52/6
**went [9]** 99/15 124/2
124/4 153/19 166/9
189/18 229/22 269/2
298/13
**were [261]** 16/5 17/3
23/8 25/7 30/21 31/9
31/12 32/3 32/8 41/10
45/19 45/19 46/9 46/10
47/11 55/4 55/11 55/11
55/15 56/18 57/6 57/20
63/22 63/25 64/5 64/11
65/14 71/8 72/7 74/15
75/3 75/5 75/10 75/12
75/21 75/24 76/1 76/6
76/8 76/11 77/18 77/23
77/24 77/25 85/15
91/18 91/23 92/10
92/25 93/9 96/7 97/3
98/5 98/21 98/25 98/25
99/17 104/14 105/23
105/23 105/25 106/12
107/14 107/25 108/3
108/18 110/21 110/23
111/1 111/5 111/8
111/16 111/25 118/7
119/4 121/22 122/5
122/21 123/5 123/20
124/25 125/7 126/8
126/9 126/10 126/10
126/15 137/8 137/11
137/15 137/19 139/14
139/23 143/23 144/5
147/21 147/21 153/9
164/9 166/18 170/23
170/25 171/3 173/1
173/7 175/5 176/2
176/14 178/13 180/13
181/13 181/16 183/13
187/12 187/13 187/16
187/25 188/9 188/15
188/15 188/20 189/3
189/4 189/13 190/5
192/17 193/19 193/22
207/16 211/1 213/11
214/5 215/4 217/12
219/7 219/12 219/13
219/25 220/17 222/2
222/9 223/4 223/14
223/19 224/8 224/9
225/19 226/15 226/17
227/20 228/14 228/16
228/22 229/8 229/21
230/7 231/3 231/13
231/13 231/19 231/20
231/22 232/2 232/3
232/18 232/18 234/15
238/16 238/17 238/21
238/23 239/7 239/7
240/12 240/22 242/4
242/20 243/7 247/10
248/11 250/20 251/11
251/14 251/17 251/20
251/21 251/22 252/8
252/15 252/18 252/23
253/12 253/16 253/17

253/18 253/20 254/5
254/9 254/10 254/17
255/23 257/24 257/24
258/4 258/4 258/9
259/17 259/23 260/2
261/10 261/11 263/19
264/1 264/2 264/6
264/10 264/12 264/18
264/19 264/19 268/17
268/21 271/23 276/3
277/6 278/13 278/22
281/4 281/16 282/15
284/5 286/20 287/7
287/9 287/15 287/17
288/5 288/22 289/25
292/11 304/6 304/7
311/12 311/13 312/7
317/8 320/11 328/4
328/7 334/5 334/24
337/15 337/16 338/10
338/11 338/13 338/18
338/18 339/2 340/7
341/12
**weren't [4]** 192/20
193/19 323/20 336/6
**west [7]** 12/23 12/24
15/5 50/23 51/14 52/12
53/12
**Westfield [5]** 294/21
317/3 317/4 317/4
326/20
**what [360]**
**what's [40]** 6/9 11/18
14/10 17/19 22/9 23/13
28/2 29/10 31/7 35/1
46/18 47/4 49/25 68/2
80/16 115/9 115/14
115/16 116/4 132/20
149/1 149/2 149/10
149/11 150/7 151/3
152/15 216/8 270/4
270/15 271/14 273/18
275/9 299/12 301/7
301/14 315/10 318/6
319/6 340/16
**whatever [10]** 150/9
157/25 167/10 277/12
280/11 288/18 302/14
302/15 339/18 342/19
**Wheaton [1]** 317/4
**when [141]** 8/11 8/17
18/6 19/4 28/21 30/18
30/21 31/4 31/9 32/18
38/12 38/18 39/3 44/16
50/20 53/22 57/20
59/16 67/11 69/25 70/9
70/12 71/2 72/24 74/7
81/5 82/16 84/5 85/21
89/7 93/24 95/9 101/4
103/24 104/14 107/23
108/9 108/23 110/18
118/7 119/4 119/17
120/24 124/12 124/22
135/10 148/21 153/2
154/16 154/17 155/23
160/12 160/14 163/10
164/13 169/14 172/7
173/9 174/2 174/5

174/8 174/12 174/16
178/15 178/24 184/14
186/2 188/21 189/18
190/18 190/19 193/18
195/19 198/21 210/23
215/11 218/21 222/8
224/2 225/14 225/17
225/18 227/21 228/24
229/2 231/6 234/9
236/25 237/14 237/16
238/21 239/23 248/11
248/19 251/10 251/17
252/1 253/12 254/9
254/17 256/7 259/20
261/10 263/4 264/6
264/12 268/13 269/2
269/5 269/7 269/11
270/16 271/17 271/25
272/4 281/12 281/13
283/3 283/8 285/10
287/16 288/3 288/16
293/9 297/9 297/10
298/10 308/6 308/10
308/11 308/12 308/13
308/21 311/23 312/3
323/20 324/5 327/11
327/16 340/20 340/22
**whenever [1]** 300/7
**where [123]** 10/6 18/9
18/9 18/19 19/7 19/8
19/8 19/9 19/16 19/16
19/17 23/6 23/8 24/7
26/4 26/6 26/13 28/3
28/11 28/16 29/7 29/8
33/2 33/5 33/6 33/13
33/19 35/11 36/10
36/16 37/11 37/15
38/13 38/23 38/24 39/1
39/3 39/5 43/24 45/11
49/7 49/16 54/25 74/23
76/9 84/7 92/20 112/6
114/23 116/25 117/17
120/7 128/7 128/14
129/21 130/23 134/21
135/21 136/12 149/11
153/5 153/6 153/15
154/13 155/6 158/4
162/23 176/8 176/12
176/12 176/13 186/1
188/1 193/7 198/16
199/9 199/16 214/5
219/8 219/20 219/22
221/1 227/2 229/6
235/8 237/8 238/10
238/17 239/15 249/12
249/13 250/13 253/3
257/2 258/9 262/6
263/23 264/18 266/7
267/7 275/19 279/12
279/22 280/4 287/5
290/1 290/2 290/19
294/15 294/23 299/23
300/3 300/12 303/9
316/14 317/8 318/3
323/13 324/8 324/13
336/1 338/16 342/6
**Where's [2]** 34/19
317/25

**Whereas [1]** 84/15
**whether [34]** 51/21
72/1 72/8 104/6 115/12
115/18 150/10 153/16
153/19 155/16 170/23
177/19 178/8 178/16
179/19 200/10 201/8
203/16 211/9 227/18
228/22 232/2 232/16
232/18 239/16 240/21
244/6 296/25 297/3
303/8 306/14 313/21
324/17 342/14
**which [142]** 6/10 6/20
7/10 7/10 12/12 17/17
17/21 20/18 21/3 25/11
25/17 27/11 27/24 28/3
28/16 31/4 33/13 34/16
44/11 44/20 45/25
50/20 51/4 51/9 51/12
51/15 52/18 53/16
54/15 55/12 57/13
58/10 58/23 62/11
62/21 63/3 64/21 66/20
68/23 77/10 78/25 80/2
80/17 81/9 84/14 86/4
87/8 94/10 94/11 95/4
105/9 108/19 117/14
122/7 124/3 124/9
127/6 129/15 136/23
150/25 153/4 156/1
159/18 160/19 163/19
165/19 171/11 180/3
182/6 190/7 193/13
193/14 194/10 195/10
197/12 199/18 200/3
200/4 201/18 203/17
203/23 204/4 206/12
206/13 209/16 209/24
220/8 220/23 223/3
224/6 225/4 227/16
227/20 233/9 236/1
237/15 237/17 242/24
245/20 248/6 252/8
254/13 259/24 261/14
263/4 264/11 268/22
268/24 268/25 269/15
269/25 271/7 271/15
272/2 272/23 274/24
275/12 277/3 277/13
278/10 279/10 280/17
282/5 289/24 291/15
293/15 293/16 294/22
298/10 299/21 308/7
309/20 311/22 318/15
319/18 320/2 333/7
337/10 337/10 337/21
337/24 342/15
**while [12]** 18/1 34/10
47/1 47/18 57/15 67/22
74/25 94/22 189/20
243/7 308/23 313/19
**whipping [1]** 322/8
**white [1]** 263/3
**whittled [1]** 319/11
**who [78]** 17/15 17/16
20/23 27/18 31/1 33/6
35/17 35/19 38/4 38/4

**W**

**who... [68]** 38/5 38/6
38/23 39/7 40/25 42/14
42/14 44/12 57/10
59/16 62/16 64/9 69/7
69/19 69/22 70/6 76/2
86/4 88/4 88/5 89/8
91/4 93/4 93/8 98/25
102/3 123/10 169/25
170/6 178/14 179/4
181/19 185/11 200/16
211/8 215/6 215/17
216/13 220/4 223/13
227/5 228/22 230/10
233/8 239/17 239/24
249/4 262/10 265/17
273/6 280/20 283/19
284/22 284/22 285/23
291/12 291/14 292/3
293/18 293/21 294/4
308/16 309/2 309/6
309/12 309/14 322/18
323/10

**Who'd [1]** 169/16

**who's [10]** 22/2 59/23
69/18 161/6 174/24
255/11 275/2 279/23
291/9 295/2

**whole [30]** 12/11 14/21
15/3 15/5 21/2 23/2
30/15 35/21 38/3 39/24
45/10 58/25 59/14 65/8
67/12 76/10 79/2 93/11
100/3 110/8 121/1
129/10 144/8 146/20
163/4 164/22 189/7
224/14 260/7 319/19

**whom [4]** 66/25 68/20
181/17 181/23

**whose [1]** 280/22

**why [61]** 6/1 8/13
10/21 13/17 34/7 37/24
38/7 42/2 43/16 44/8
55/8 59/7 61/4 61/6
79/25 90/24 92/5 92/17
94/7 113/7 114/4 117/4
117/24 126/3 130/6
130/10 148/9 152/21
152/22 154/15 154/22
166/10 169/19 170/5
170/16 171/2 171/22
173/1 178/19 180/22
194/23 201/14 205/1
206/15 212/11 218/14
220/15 243/24 244/6
248/6 254/13 259/24
262/21 263/4 276/8
300/22 302/9 309/20
339/7 340/19 340/19

**will [57]** 2/12 5/14 6/25
10/5 10/11 17/11 30/12
42/13 42/17 82/14 84/8
86/18 87/8 87/8 87/11
87/12 87/14 87/17
114/19 114/24 115/7
130/18 132/2 136/4
155/12 155/14 156/9
157/11 158/3 158/21

161/2 161/19 163/23
175/14 176/24 180/8
183/2 186/13 188/2
190/11 271/17 272/9
273/25 275/9 276/9
276/9 282/10 295/12
311/2 318/10 319/23
320/7 324/6 331/8
336/25 339/9 340/25

**will be [1]** 295/12

**William [3]** 2/20 343/2
343/8

**willing [2]** 159/20
307/13

**Willner [2]** 2/6 5/14

**Wilmington [1]** 68/1

**winter [1]** 159/7

**wisely [2]** 224/4 225/5

**wish [1]** 169/21

**wishes [1]** 173/23

**withdraw [1]** 338/22

**withdrawal [2]** 116/17
118/23

**withdrawn [1]** 143/6

**within [21]** 17/5 35/7
52/20 61/19 74/18
92/23 137/19 139/22
186/12 221/16 222/18
224/9 237/10 246/2
249/25 256/24 260/19
268/1 287/11 290/13
292/15

**without [17]** 10/13
30/21 38/9 130/22
130/22 195/9 199/2
218/12 218/15 220/10
220/11 231/24 254/25
257/4 257/8 276/12
298/2

**witness [44]** 4/2 4/9
9/8 9/9 10/24 11/4
98/21 113/4 115/5
115/11 117/3 130/13
131/10 148/2 148/24
151/14 152/1 156/2
166/1 167/6 167/15
168/1 196/21 198/11
212/8 212/10 212/15
213/2 230/17 239/16
239/17 239/25 240/15
244/22 265/17 265/22
266/9 266/14 276/13
295/2 305/22 313/16
314/14 315/2

**witness's [1]** 151/23

**witnesses [10]** 4/4
4/11 8/7 8/10 9/7 9/7
10/1 10/4 98/25 130/18

**WMATA [5]** 20/9 27/20
49/12 220/24 253/17

**woefully [2]** 42/5 45/3

**won't [4]** 160/17 266/2
266/4 330/4

**wonderful [1]** 248/6

**word [2]** 7/3 270/4

**words [7]** 61/5 112/23
121/22 154/5 195/13
203/25 241/16

**work [74]** 8/13 19/23
30/22 31/23 33/9 38/4
38/4 38/5 38/24 39/8
40/25 41/2 41/2 42/11
42/14 42/19 48/6 52/24
54/16 54/16 61/15
61/16 61/17 61/18
61/23 62/21 71/21
83/23 84/10 86/18 90/7
95/9 105/1 105/5 106/5
107/15 107/15 107/25
108/3 108/21 131/5
134/25 135/9 137/15
137/16 137/19 139/14
161/6 162/23 163/9
164/25 213/19 213/21
214/4 217/14 220/1
224/13 228/6 228/11
238/13 238/14 238/15
256/7 256/13 257/16
277/24 280/20 286/17
290/13 290/20 292/3
317/14 339/7 342/17

**workable [1]** 31/7

**workday [1]** 29/24

**worked [13]** 6/5 129/4
138/24 219/16 221/5
224/24 252/16 278/6
294/19 300/12 303/1
303/10 336/13

**working [27]** 61/17
70/1 71/16 76/4 125/6
134/9 136/13 137/7
146/15 156/21 156/25
163/4 218/8 218/9
220/22 223/14 231/20
243/7 252/16 277/24
286/12 300/5 300/6
316/6 317/15 318/15
325/12

**works [1]** 249/25

**workup [1]** 188/24

**world [2]** 291/18 323/4

**worried [3]** 75/3 75/6
76/11

**worse [4]** 30/12 75/13
76/2 76/7

**worst [1]** 31/13

**worth [1]** 307/8

**would [262]** 6/11 27/6
27/17 27/17 32/15
35/25 37/6 37/7 37/9
37/10 40/23 41/4 42/2
44/1 45/9 46/9 46/14
48/25 49/4 49/17 50/6
51/3 51/6 51/15 52/12
52/15 53/17 53/18 54/5
55/1 55/5 55/16 56/2
57/1 57/2 57/25 60/21
60/22 60/23 62/19
62/20 62/23 64/3 64/25
65/16 65/20 65/22
65/22 65/23 67/18
69/10 69/24 73/1 75/3
76/12 77/19 78/24
85/19 86/13 87/23
87/25 88/1 88/3 88/14
88/23 89/1 89/14 89/16

89/21 89/23 89/25
92/14 92/21 98/9 98/11
99/25 108/2 114/12
121/13 121/15 123/6
125/7 129/24 130/24
134/23 136/25 140/5
146/8 147/11 148/1
151/17 151/19 156/19
157/23 162/9 162/17
163/18 167/9 168/20
176/21 177/20 178/17
178/18 179/16 180/2
181/18 181/22 182/11
183/15 186/10 187/10
188/11 188/13 189/9
189/9 190/8 191/9
192/5 192/18 192/19
193/24 198/6 202/1
202/3 202/6 202/11
204/8 205/1 205/14
205/17 208/1 209/20
217/5 217/11 217/24
218/7 218/8 218/9
223/11 223/13 223/15
225/10 225/10 226/8
226/20 229/7 232/8
233/9 234/12 235/19
235/21 236/16 237/17
237/18 237/20 237/21
238/10 239/18 240/8
241/5 241/25 242/7
242/9 242/10 243/12
243/21 243/22 244/5
245/22 246/5 246/8
246/12 246/18 246/25
247/13 247/15 247/19
250/22 251/5 252/2
252/4 253/10 254/1
254/8 256/4 256/10
256/20 256/21 256/22
256/25 257/2 257/17
257/18 258/10 258/10
258/14 260/4 260/7
260/9 260/18 261/1
262/6 263/10 266/5
267/22 268/2 274/3
274/7 274/9 274/24
275/7 275/17 275/17
276/1 276/4 276/9
276/25 277/2 277/4
277/4 277/8 277/9
277/17 278/12 278/14
297/1 297/3 298/3
298/18 299/12 300/5
301/24 302/22 302/25
303/3 303/25 304/19
306/23 307/11 307/16
311/19 312/12 312/14
312/25 313/3 313/23
315/7 318/20 320/11
322/25 327/22 329/2
338/7 339/12 339/16
339/18 339/21 340/5
341/15 341/16 342/4
342/8

**would you [1]** 123/6

**wouldn't [11]** 89/17
104/24 188/14 196/1

208/18 248/7 254/24
257/12 297/3 301/23
308/2

**wow [1]** 27/17

**wrapping [1]** 163/17

**write [1]** 73/24

**writing [6]** 171/20
287/22 288/2 298/14
299/25 341/22

**written [5]** 133/12
157/4 193/21 195/9
195/20

**wrong [2]** 90/14 90/16

**WS9595 [1]** 241/5

**WUS [3]** 84/19 84/21
85/9

**Y**

**yard [3]** 225/13 252/1
253/5

**yards [1]** 19/25

**yeah [49]** 7/5 16/18
18/12 22/21 23/24 24/9
24/21 28/7 29/19 49/10
50/1 74/4 98/15 98/19
106/4 137/13 167/9
197/19 214/2 236/14
248/8 252/21 252/21
257/7 258/7 258/15
265/19 288/16 289/12
301/5 314/6 315/13
316/19 317/17 318/20
319/9 319/11 319/13
319/16 320/18 321/9
323/8 327/7 329/11
330/7 332/23 332/23
336/4 337/15

**year [20]** 12/7 16/19
17/8 39/25 43/21
105/16 121/2 160/7
208/6 214/19 222/8
245/12 250/6 253/10
271/8 271/15 279/10
280/7 294/1 301/10

**years [53]** 11/25 14/12
16/17 30/11 31/8 43/22
66/1 106/15 119/22
137/9 137/22 138/16
138/24 139/11 146/20
165/3 168/13 189/16
214/7 214/11 214/13
214/18 214/22 214/23
215/3 215/7 219/16
221/8 221/22 225/21
225/24 225/24 238/13
247/10 247/21 250/20
252/2 265/4 265/8
267/2 271/16 272/5
272/6 272/7 278/11
280/8 294/5 294/5
308/24 312/8 316/12
321/22 323/2

**yellow [1]** 22/10

**yep [18]** 8/5 11/10
16/15 25/16 28/10 34/6
80/11 123/5 132/23
134/13 158/18 159/3
161/15 165/17 182/4

**Y**

**yep... [3]** 321/3 322/20 330/15

**yes [284]** 8/20 9/18 9/9 15/1 18/12 21/15 22/11 27/8 28/9 31/19 31/21 33/3 36/4 38/21 40/22 42/23 47/14 53/8 56/16 56/20 56/22 58/15 61/2 64/7 64/14 68/8 69/12 72/10 73/17 74/14 74/16 75/18 75/23 78/16 78/19 79/6 79/9 79/17 79/22 80/15 80/19 80/24 81/13 81/21 81/23 84/25 85/3 85/14 85/16 85/24 90/12 90/21 91/20 92/4 93/6 96/14 96/17 96/20 96/22 96/24 98/1 98/7 99/8 99/11 100/15 101/2 101/3 102/11 102/21 105/8 105/17 106/24 108/10 108/11 108/15 108/25 109/24 110/20 111/14 111/22 112/5 112/21 113/20 114/19 115/3 117/11 118/6 118/17 119/7 120/17 122/4 122/6 122/16 123/14 126/2 126/21 126/24 127/16 127/17 127/20 127/25 128/8 132/11 132/15 133/1 133/19 133/25 134/6 134/9 134/16 135/5 136/15 138/6 139/4 140/19 142/2 142/4 143/13 143/21 144/25 146/1 146/7 147/5 147/16 147/20 149/3 150/22 154/20 154/24 158/11 158/15 158/21 160/25 161/4 162/7 165/16 165/17 167/7 168/7 169/10 169/13 170/11 171/13 174/24 176/1 176/20 177/10 177/18 177/25 179/9 185/24 190/22 198/3 200/12 201/12 208/14 212/9 213/13 215/3 216/2 216/4 216/25 221/5 222/3 222/3 222/7 222/9 223/19 223/23 224/24 229/17 229/20 230/2 230/13 231/9 233/19 234/21 235/9 235/25 238/9 238/23 239/9 239/11 240/11 246/11 247/15 248/15 251/12 252/17 254/7 254/9 255/15 257/24 258/24 259/5 259/23 260/12 260/18 261/2 261/22 262/2 262/3 262/21 262/22 263/18 265/15

265/23 269/4 269/10 270/10 271/20 272/11 273/8 273/17 274/18 278/24 279/20 281/7 281/19 281/24 282/2 283/6 283/11 283/17 283/17 284/18 285/12 286/24 290/15 295/10 296/12 296/14 296/16 297/8 297/11 298/5 298/23 301/2 303/25 304/19 307/23 309/8 309/16 310/11 312/14 312/18 312/18 313/6 313/8 316/4 316/7 317/21 320/18 320/23 321/3 322/4 322/14 322/17 322/24 323/8 323/15 323/19 325/14 327/3 327/10 327/20 329/15 330/24 331/10 331/15 331/16 331/17 331/21 331/25 333/21 334/12 334/23 335/19 336/15 336/23 338/12 339/21 340/2 341/20

**yet [17]** 35/25 37/15 83/23 129/5 129/6 135/24 136/9 150/14 154/15 159/10 159/12 160/15 160/19 239/19 252/9 298/25 318/19

**York [16]** 2/4 2/13 12/15 15/16 54/19 68/2 68/20 247/8 252/1 266/23 267/14 290/1 290/7 306/11 309/19 310/10

**you [1033]**

**you go [1]** 49/11

**you know [2]** 118/11 276/15

**you'd [6]** 27/14 34/5 35/3 35/15 52/4 127/15

**you'll [13]** 99/12 102/9 103/5 120/20 138/15 143/7 145/3 153/2 162/8 181/8 191/21 314/7 320/3

**you're [64]** 35/10 44/16 47/8 72/7 72/24 74/7 75/16 86/15 100/13 113/3 120/2 129/17 133/5 136/7 138/3 138/7 139/9 139/17 139/24 140/22 140/24 141/15 143/11 143/17 148/13 154/9 161/17 168/14 171/20 172/7 193/1 200/7 201/5 202/23 204/23 217/24 227/21 237/8 243/4 246/9 255/6 268/20 279/25 280/9 280/13 280/13 293/13 301/16 304/25 306/14 306/18 307/13 316/2 316/17 319/21 322/18 327/1

328/22 329/13 331/7 332/12 334/13 340/11 341/21

**you've [32]** 44/23 45/15 46/15 46/24 68/6 115/15 117/21 162/24 187/14 201/6 214/25 223/9 236/16 245/11 245/14 247/7 268/3 275/12 290/21 291/7 292/19 296/10 298/22 304/1 316/23 318/4 321/20 324/12 326/7 326/11 330/20 340/11

**young [2]** 44/10 44/15

**your [316]** 5/6 6/3 6/15 6/25 7/5 8/10 8/20 8/25 9/5 9/10 9/14 10/3 10/7 10/11 10/19 10/23 11/8 11/18 24/19 27/16 29/15 48/21 58/16 59/24 61/8 71/6 72/19 73/6 73/12 74/7 75/22 82/1 86/8 90/17 91/11 91/15 95/16 95/20 96/12 96/12 96/16 96/18 96/19 97/11 97/15 97/23 98/12 98/18 99/13 100/17 101/6 104/2 104/9 109/23 113/2 114/2 114/14 114/16 114/21 115/4 117/3 117/7 117/25 121/22 122/3 122/17 123/19 128/6 130/2 130/5 130/8 130/13 130/20 131/7 131/8 131/23 132/1 140/16 144/2 144/13 145/5 146/22 147/24 148/1 148/16 148/22 149/5 149/17 150/5 150/12 150/23 151/5 151/12 152/8 152/20 152/23 153/13 153/21 154/3 154/11 154/24 154/25 155/25 156/5 161/5 163/17 163/22 164/4 166/19 167/3 167/7 167/14 167/18 167/20 167/24 168/5 169/5 169/18 171/19 171/22 173/12 173/18 176/9 176/23 177/19 178/16 180/2 180/7 180/18 182/23 184/2 184/5 185/1 185/6 186/19 188/1 188/3 188/7 189/16 189/23 192/11 192/23 193/3 193/17 193/19 193/23 193/25 194/13 195/18 195/19 196/5 196/20 197/7 197/9 197/10 197/21 198/9 198/12 198/19 200/22 200/24

200/24 201/8 201/13 202/21 203/10 203/11 204/7 205/3 205/8 205/13 206/2 206/25 207/6 207/14 208/10 208/24 209/9 210/9 210/11 210/20 210/25 212/7 212/9 212/10 212/14 213/6 214/25 219/7 220/11 220/15 221/4 221/17 222/11 222/12 226/6 229/25 230/3 230/17 230/18 232/2 238/7 239/12 239/14 239/20 241/3 241/7 241/16 243/10 244/21 244/25 245/7 255/2 261/6 265/10 265/12 265/12 265/17 265/20 265/24 266/8 266/12 266/18 276/11 276/19 279/21 282/4 282/6 282/10 282/25 283/3 283/10 283/17 284/18 284/23 284/25 285/21 286/2 286/24 289/6 289/9 294/24 295/10 295/11 295/18 295/22 295/24 296/10 298/8 298/24 300/25 301/15 302/24 303/16 304/25 305/15 305/23 309/21 310/19 311/16 313/12 313/14 313/17 313/19 313/21 314/9 314/10 314/14 314/13 314/16 315/7 315/8 315/10 315/15 316/9 317/25 318/2 319/9 320/16 321/11 321/11 321/16 321/21 322/1 323/5 323/17 324/7 324/21 324/23 325/3 325/5 331/14 335/12 336/11 336/22 337/5 337/6 337/12 337/17 338/17 338/23 339/8 339/10 340/4 340/24 341/9 341/11 341/20 342/10 342/12 342/19

**your Honor [166]** 5/6 6/3 6/15 6/25 7/5 8/20 8/25 9/5 9/14 10/7 10/19 24/19 27/16 29/15 48/21 58/16 59/24 61/8 71/6 72/19 73/6 74/7 90/17 91/15 95/16 95/20 97/11 101/6 104/2 104/9 109/23 113/2 114/2 114/14 114/16 115/4 117/7 122/17 123/19 130/5 130/13 130/20 131/7 144/13 145/5 146/22 147/24 148/1 148/16 148/22 149/5 149/17 150/5 150/12 151/12 152/20 152/23

153/21 154/11 154/24 154/25 155/25 156/5 163/17 163/22 165/19 165/22 165/24 166/4 166/19 167/7 167/18 167/20 167/24 169/5 176/23 180/2 180/7 180/18 184/5 192/11 193/3 193/23 194/13 196/20 197/9 197/10 197/21 198/9 199/1 200/22 201/13 203/10 203/11 205/3 205/8 206/2 207/6 207/14 208/10 208/24 209/9 210/9 210/11 210/20 210/25 212/9 212/10 230/17 239/12 239/14 239/20 241/3 241/7 244/21 244/25 245/7 261/6 265/10 265/17 265/24 266/12 276/11 276/19 282/10 283/17 284/18 284/25 285/21 286/2 286/24 289/9 295/10 295/18 295/24 302/24 303/16 305/15 305/23 310/19 313/12 313/14 313/17 313/19 313/21 314/9 314/10 324/21 324/23 325/3 335/12 336/11 337/6 337/12 337/17 338/17 338/23 339/8 339/10 340/4 340/24 341/9 341/11 341/20 342/10 342/12 342/19

**yourself [1]** 73/4

**Z**

**Zaremba [3]** 2/20 343/2 343/8

**zero [1]** 319/12

**ZIP [1]** 11/17

**zone [1]** 23/15

**Zoom [3]** 131/16 173/8 186/11

# EXHIBIT 9

```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA


NRPC (AMTRAK),                      )
                                    )
          Plaintiff,                )
                                    )    CV No. 22-01043
      vs.                           )    Washington, D.C.
                                    )    November 28, 2023
SUBLEASE, ET AL.,                   )    2:00 p.m.
                                    )
          Defendants.               )
_____)



          TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
          BEFORE THE HONORABLE AMIT P. MEHTA
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Patricia M. Lambert
                            PESSIN KATZ LAW, P.A.
                            901 Dulaney Valley Road
                            Suite 500
                            Towson, MD 21204
                            (410) 339-6759
                            Email: plambert@pklaw.com
```

APPEARANCES CONTINUED:

For Defendant Union:          David Ross
                              KASOWITZ BENSON TORRES LLP
                              1633 Broadway
                              New York, NY 10019
                              (212) 506-1700
                              Email: dross@kasowtiz.com


For Defendant
Kookmin Bank:                 Y. David Scharf
                              MORRISON COHEN, LLP
                              909 Third Avenue
                              New York, NY 10022
                              (212) 735-8604
                              Email:
                              dscharf@morrisoncohen.com


Court Reporter:               William P. Zaremba
                              Registered Merit Reporter
                              Certified Realtime Reporter
                              Official Court Reporter
                              E. Barrett Prettyman CH
                              333 Constitution Avenue, NW
                              Washington, D.C. 20001
                              (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

60

1           And, in fact, when requests have been made prior
2      to this occasion --
3           THE COURT:  Can I ask you a question?
4           MR. SCHARF:  Yes.
5           THE COURT:  Where in the statute do you find this
6      temporal component of necessity; in other words, that the
7      need must be immediate?
8           I understand there was evidence presented about
9      what they would do, but it's not clear to me why the need
10     needs to be immediate in the sense that you are suggesting.
11          Maybe it does.  But I'm not sure I see where that
12     is in the statute or know of a case that suggests that
13     that's so.
14          MR. SCHARF:  Well, I think it's more the way
15     Amtrak framed its motion.  Amtrak framed its motion that it
16     had a need for immediate possession.
17          Your Honor may remember Ms. Lambert alluded to it
18     when they first came to this Court in the early days after
19     the filing, they claimed that there was chaos because of the
20     ownership interest.
21          THE COURT:  Look, I mean, Amtrak's need clearly
22     wasn't immediate when they filed it because it's been
23     19 months since then.  I know you pressed to some degree,
24     but it hasn't exactly been immediate pressure, so I take
25     that with a grain of salt.

# EXHIBIT 10

# Congress of the United States

## Washington, DC 20515

March 6, 2024

The Honorable Peter Buttigieg
Secretary
United States Department of Transportation
1200 New Jersey Ave SE
Washington, D.C. 20590

Dear Secretary Buttigieg,

We write regarding Amtrak's potential proposal to repurpose the footprint and business plan for Union Station. Specifically, we are concerned about recent comments from Mr. Gardner, Amtrak's Chief Executive Officer (CEO), related to transforming the station from a mixed-use retail, restaurant and transportation services building to solely a passenger rail hub facility.[1] After Union Station experienced a state of severe decline, Congress passed the *Union Station Redevelopment Act of 1981* (P.L. 97-125) to preserve the historic integrity of the station while advancing its useful purpose to the region.[2] The stated purpose the Act was to "achieve the goals of historic preservation and improved rail use of Union Station with maximum reliance on the private sector and minimum requirement for Federal assistance."[3]

The *Union Station Redevelopment Act of 1981* explicitly designates the Secretary of Transportation as the ultimate arbiter, decision-maker, and fiduciary regarding the management, administration, and vision for Union Station.[4]  Accordingly, neither Mr. Gardner nor anyone else at Amtrak, can unilaterally make decisions about Amtrak's footprint in Union Station or the presence and role of the private sector. Given this fact, we have significant concerns Amtrak's takeover plan may be contrary to law.

In light of these serious issues, and your role in Union Station's future, we request an in-person briefing for staff on the Department of Transportation's plan to maintain the existing public-private partnership for Union Station, as required by law. Please provide this briefing as soon as possible, but no later than March 20, 2024.

---

[1] The Editorial Board, *Amtrak Tries to Take Union Station*, WALL ST. J., (Nov. 26, 2023), *available at* https://www.wsj.com/articles/amtrak-tries-to-take-union-station-washington-eminent-domain-9b8b73d7?st=gvx028dpvos40cz&reflink=article_imessage_share.
[2] Pub. L. No. 97-125, 95 Stat. 1667.
[3] *Id*.
[4] *Id*.

Secretary Buttigieg
March 6, 2024
Page 2 of 2

  If you have any questions about this request, please contact Drew Feeley, Staff Director, Subcommittee on Railroads, Pipelines, and Hazardous Materials at Drew.Feeley@mail.house.gov. Thank you for your prompt attention to this matter.

        Sincerely,


Sam Graves
Chairman
Committee on Transportation and
Infrastructure

Tom Cole
Chairman
Subcommittee on Transportation, Housing
and Urban Development, and Related
Agencies
Committee on Appropriations

# EXHIBIT 11

[FULL COMMITTEE PRINT]

118TH CONGRESS    }                                              REPORT
  2d Session      }   HOUSE OF REPRESENTATIVES   {               118–XXX

## DEPARTMENTS OF TRANSPORTATION, AND HOUSING AND URBAN DEVELOPMENT, AND RELATED AGENCIES APPROPRIATIONS BILL, 2025

_____, 2024.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. WOMACK, from the Committee on Appropriations,
submitted the following

# R E P O R T

[To accompany _____]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for the Departments of Transportation, and Housing and Urban Development, and related agencies for the fiscal year ending September 30, 2025.

### INDEX TO BILL AND REPORT

|                                                              | Page number | |
| --- | --- | --- |
|                                                              | Bill | Report |
| Title I—Department of Transportation                         | 2    | 4      |
| Title II—Department of Housing and Urban Development          | 89   | 70     |
| Title III—Related Agencies                                    | 185  | 102    |
| Title IV—General Provisions                                   | 190  | 107    |

### PROGRAM, PROJECT, AND ACTIVITY

During fiscal year 2025, the terms "program, project, and activity" (PPA) shall mean any item for which a dollar amount is contained in appropriations acts (including joint resolutions providing continuing appropriations), accompanying reports of the House and Senate Committees on Appropriations, or accompanying conference reports and joint explanatory statements of the committee of conference. This definition shall apply to all programs for which new budget (obligational) authority is provided, as well as to discretionary grants and discretionary grant allocations made through either bill or report language.

54–843

8

*Infrastructure project standards.*—The Committee recognizes the role standards play in the planning, design, construction, and maintenance of safe, sustainable, and resilient infrastructure. The Committee encourages the Department to consider the adoption of frameworks, guidelines, and standards for sustainable infrastructure projects.

*Integrated project delivery.*—The Committee is aware that integrated project delivery is a construction delivery method that integrates project teams, including agencies, engineers, builders, and owners, which can lead to significant project delivery efficiencies. The Committee urges DOT to consider integrated project delivery under the "innovation" merit criteria within NOFOs issued by the Secretary.

*Major sporting events.*—The Committee directs DOT to provide a report to the House and Senate Committees on Appropriations within 90 days of enactment of this Act outlining prospective transportation challenges and needs as they relate to North America's hosting of the FIFA World Cup 2026 and the 2028 Olympics. The Committee expects this report to provide detail on the Federal role for supporting these events and how U.S. host cities can best be supported with recommendations, including through support to State and local transportation authorities.

*Multi-use fiber optic cable.*—The Committee directs the Secretary, in consultation with the Secretary of Energy and Secretary of Commerce, to develop and publish guidelines on best practices for States, Tribes, and units of local government regarding the deployment of "multi-use" fiber optic cable within Federally-funded infrastructure projects.

*Oversight of union station.*—The Committee notes that P.L. 95–125 requires the Secretary to provide for the rehabilitation and redevelopment of Washington Union Station and established the need for the private sector to play a significant role in the redevelopment of the station. In 1983, DOT established the Union Station Redevelopment Corporation to fulfill this need, bringing together the Federal and local governments, private sector, and Amtrak. The Secretary of Transportation, not Amtrak, is the legal arbiter and fiduciary regarding management of Union Station. The Committee expects the Secretary to continue fulfilling this obligation. Further, the Committee directs DOT to provide a report to the House and Senate Committees on Appropriations within 60 days of enactment of this Act on its plans to maintain the existing public-private partnership for Union Station, as established by the Union Station Redevelopment Act of 1981.

*Pending applications for antitrust immunity.*—The Committee is concerned that the Department's suspension in review of antitrust immunity for pending air carrier alliances is causing unjust harm to American carriers and consumers, and furthermore lacks effectiveness for imposing desired pressures on intended international parties. The Committee directs DOT within 60 days of enactment of this Act to provide a briefing on the cause of the delays in pending antitrust immunity review as well as an updated timeline for which pending applications can expect the required review under DOT authority.

*Statement of International Air Transportation Policy.*—The Committee notes that the Department's Statement of International Air